```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    CARRIE M. WARREN,                 )   Docket No. 15 C 496
                                        )
 4                    Plaintiff,        )   Chicago, Illinois
                                        )   July 18, 2018
 5            v.                        )   9:23 a.m.
                                        )
 6    KENDALL COUNTY SHERIFF DWIGHT     )
      BAIRD, in his official capacity   )
 7    and as successor in office to     )
      Richard Randall, KENDALL COUNTY,  )
 8    ILLINOIS, RICHARD RANDALL, SCOTT  )
      KOSTER and SABRINA JENNINGS,      )
 9                                      )
                      Defendants.       )
10                          VOLUME 1-A
11              TRANSCRIPT OF PROCEEDINGS - Trial
          BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
12
      APPEARANCES:
13
      For the Plaintiff:    MS. COLLEEN M. McLAUGHLIN
14                          Law Offices of Colleen M. McLaughlin
                            1751 S. Naperville Road, Suite 209
15                          Wheaton, IL 60189

16                          MS. KAREN J. DORAN
                            Karen J. Doran Attorney at Law LLC
17                          2100 Manchester Road, Suite 942
                            Wheaton, IL 60187
18
      For the Defendants:   MS. JULIE A. BRUCH
19                          MS. KARIN ANDERSON
                            O'Halloran Kosoff Geitner & Cook LLC
20                          650 Dundee Road, Suite 475
                            Northbrook, IL 60062
21
      Court Reporter:       LAURA R. RENKE, CSR, RDR, CRR
22                          Official Court Reporter
                            219 S. Dearborn Street, Room 1432
23                          Chicago, IL 60604
                            312.435.6053
24                          laura_renke@ilnd.uscourts.gov

25
```

1                          I N D E X

2                                              PAGE

3    Preliminary Jury Instructions ................... 8

4

5    OPENING STATEMENTS

6          On Behalf of the Plaintiff ................. 24

7          On Behalf of the Defense ................... 44

8

9    WITNESS

10   SCOTT KOSTER

11         Direct by Ms. McLaughlin ................... 84

12         Direct (Resumed) by Ms. McLaughlin ........ 124

13

14

15                        E X H I B I T S

16   NUMBER                                    ADMITTED

17   Plaintiff's Exhibit

18       No. 1   ................................... 123
         No. 2   ................................... 123
19       No. 3   ................................... 123
         No. 4   ................................... 123
20
         No. 5   ................................... 123
21       No. 6   ................................... 123
         No. 7   ................................... 123
22       No. 8   ...................................  89

23       No. 9   ................................... 123
         No. 11  ................................... 123
24       No. 13  ................................... 123
         No. 14  ................................... 123

25

E X H I B I T S   (C O N T' D.)

NUMBER                                          ADMITTED

Plaintiff's Exhibit

    No. 16    ..................................    123
    No. 18    ..................................    123
    No. 19    ..................................    123
    No. 23    ..................................    123

    No. 24    ..................................    123
    No. 29    ..................................    123
    No. 38    ..................................    123


Defense Exhibit

    No. 24    ..................................    124


Joint Exhibit

    No. 1     ..................................     89
    No. 3     ..................................    124
    No. 16    ..................................    124

1    (In open court outside the presence of the jury.)

2    THE CLERK:  15 C 496, Warren v. Kendall County.

3    THE COURT:  All right.  My law clerk should have given

4    you a redline version of the instructions which had some

5    modifications based on comments we received from counsel.

6    Unless there is an objection to those modifications

7    and to the instructions as modified based on our discussion

8    last night, those are the instructions that are going to be

9    copied and given to the jury.

10    Your objections made at the last trial and objections

11    made yesterday are preserved.  And these are preliminary

12    instructions that will -- I'm going to tell the jury they may

13    be modified by the time of closing argument -- and there will

14    be additional ones they get anyway -- and if there's any

15    changes, what will control their deliberations are the

16    instructions, of course, they get before they deliberate.

17    But the point of preliminary instructions, as I've

18    told you last time -- at the last trial -- and you're aware is

19    to give the jury some idea of what the issues are.

20    You're free to use these instructions in your opening

21    statements, keeping in mind that if they change, they change.

22    So are there any comments on the instructions as

23    revised?

24    MS. McLAUGHLIN:  We will have some at the final

25    instruction session, but they're fine for right now.

1          THE COURT:  Okay.  How about defense?

2          MS. BRUCH:  Certainly I think there was an objection

3     that we made to No. 24 regarding the discrimination under

4     Section 1983 against the Sheriff's Office.

5          THE COURT:  Yeah.

6          MS. BRUCH:  And we can address that again at the final

7     conference.

8          THE COURT:  Yeah, I think it's correct.  I'll address

9     it again.  You can argue it later.  But I think it's correct.

10    I think if -- the evidence as I recall from the first trial is

11    any conduct by defendants Koster or Jennings, their conduct is

12    attributable to Kendall County.  They were -- they're

13    supervisors.  They're acting within the scope of their

14    authority.  No one's arguing that they went off the reservation

15    if they imposed discipline that wasn't something that Kendall

16    County was aware of.  But if you have objections you want to

17    make later to final jury instructions to modify them, that's

18    fine.

19          I don't think I'm going to show a verdict form to the

20    jury.  I think there's enough ambiguity -- there's enough

21    confusion as to the best way to phrase it.  I think we all know

22    what we're trying to accomplish and what the law is.  But I

23    don't want to confuse the issues further by showing them a

24    verdict form that may be obsolete and not the one they end up

25    seeing.

1       So I'll simply tell them they're going to get a

2  verdict form at the end of the case and they'll have to answer

3  a series of questions about what they find as to the conduct of

4  the plaintiff and anything the defense puts forth relating to

5  it and whether -- not conduct of the plaintiff, rather, but

6  conduct of the defendants as it relates to the plaintiff.

7       Okay.  Anything else we need to discuss before we

8  bring in the jury?

9       MS. DORAN:  Judge, I think last evening I told you

10 that we were going to be using our computer from --

11      THE COURT:  Yeah, let's --

12      MS. DORAN:  -- the desk over here.  We are at times,

13 but not this time.  So I'm planning on using my computer during

14 the opening.  That's why I'm standing up.  And so just wanted

15 to let you know that I'm going to be plugging this in, and I

16 will want to have access to the overhead or the ELMO --

17      THE COURT:  All right.  So you --

18      MS. DORAN:  -- from here.

19      Let's go off the record.  We're off the record now.

20   (Off-the-record discussion.)

21   (Pause in proceedings.)

22      THE CLERK:  All rise.

23   (Jury in at 9:45 a.m.)

24      THE COURT:  All right.  Please be seated, ladies and

25 gentlemen.

1          Good morning.  You should have on your seats a

2     notepad.  You should all have something to write with.  If you

3     don't, raise your hand.  We'll give you something.

4          And then, finally, you should have a set of what are

5     called preliminary jury instructions, which we're going to read

6     in a moment.

7          Couple preliminary comments.  You may notice there's

8     11 of you instead of 12.  Although 12 jurors were selected, one

9     of the jurors, right after being sworn in, there was a

10    family -- serious family issue that prevents her from being a

11    juror.  You are still a legally constituted jury, and we can

12    proceed with 11.  So that doesn't affect the ability to -- of

13    you to hear the case and to reach a verdict on the case.

14         Secondly, I would remind you to use the elevators on

15    the south end of the building, this end of the building, and

16    I'll have the parties and the witnesses all use the ones on the

17    other end of the building.  That way we avoid any unintentional

18    contact between jurors and witnesses and lawyers.

19         And if there's any issues that come up relating to

20    scheduling or things that you need to accomplish for your own

21    schedules, make sure you talk to Ms. Newland about it, and

22    she'll bring it to my attention.

23         All right.  So with that, we're going to begin.  I am

24    required -- I'm -- you're going to -- you have a set of

25    preliminary jury instructions.  These will be also given to

1    you -- a set of final jury instructions will be given to you

2    before closing arguments later in the case.

3         This is -- these are being read to you to give you

4    some idea of the issues in the case and the things you're going

5    to have to decide and how to consider certain evidence.  In the

6    end, though, the final jury instructions will control your

7    deliberations.  I don't expect the final instructions to be

8    that much different than these, but if they are significantly

9    different, I'll point that out when I read the final

10   instructions to you.

11        But I'm going to allow you to keep these during the

12   trial.  I'll take them away from you before I give you another

13   set of instructions.  But you're free to write on these, if

14   you'd like.  Just make sure if you write on them that you

15   transfer whatever you write to your notepads because I'm not

16   taking your notepads back before you deliberate, but I am going

17   to take this copy back so we don't have separate sets of

18   instructions running around.  But you'll each get a set of

19   final instructions before you deliberate that you'll take back

20   to the jury room for deliberations.

21        So with that, I'm going to begin.

22        Members of the jury, you will see and hear all the

23   evidence and arguments of the attorneys.  I will instruct you

24   on the law.

25        You have two duties as a jury.  Your first duty is to

decide the facts from the evidence in the case.  This is job and yours alone.

Your second duty is to apply the law that I give you to the facts.  You must follow these instructions, even if you disagree with them.  Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially.

Nothing I say now, and nothing I will do during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and stipulations.

A stipulation is an agreement between both sides that certain facts are true or that a person would have given certain testimony.

Certain things are not to be considered as evidence.  And I'll list them for you:

First, if I tell you to disregard any testimony or exhibits or strike any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything you may see or hear outside the courtroom is not evidence and must be entirely disregarded.

Third, questions and objections or comments by the lawyers are not evidence.  Lawyers have a duty to object when

Preliminary Jury Instructions

1  they believe a question is improper.  You should not be

2  influenced by any objection, and you should not infer from my

3  rulings that I have any view as to what you should decide -- as

4  to how you should decide the case.

5          Fourth, the lawyers' opening statements and closing

6  arguments to you are not evidence.  Their purpose is to discuss

7  the issues and the evidence.  If the evidence as you remember

8  it differs from what the lawyers said, your memory is what

9  counts.

10          Certain demonstrative exhibits will be shown to you.

11  Those are used for convenience and to help explain the facts of

12  the case.  They are not themselves evidence or proof of any

13  facts.  They will not be given to you to take back -- take back

14  to the jury room when you deliberate.

15          During this trial, I may ask a witness a question

16  myself.  Do not assume that because I ask questions I hold any

17  opinion on the matters I ask about, or on what the outcome of

18  the case should be.

19          During trial, certain testimony may be presented to

20  you by the reading of a deposition.  A deposition is the sworn

21  testimony of a witness taken before trial.  The witness is

22  placed under oath to tell the truth, and lawyers for each party

23  may ask questions.  The questions and answers are recorded.

24          Deposition testimony is entitled to the same

25  consideration as -- and is to be judged, insofar as possible,

Preliminary Jury Instructions

1    in the same way as if the witness had been present to testify.

2          You've heard evidence about whether -- or you will

3    hear evidence about whether defendants' conduct complied with

4    or violated certain rules and regulations.  You may consider

5    this evidence in your deliberations.  But remember that the

6    issue is whether defendants discriminated against Carrie

7    Warren, not whether a rule or regulation may have been complied

8    with or violated.

9          It is proper for a lawyer to meet with any witness in

10   preparation for trial.

11         Any notes you take during this trial are only aids to

12   your memory.  The notes are not evidence.  If you do not take

13   notes, you should rely on your independent recollection of the

14   evidence and not be unduly influenced by the notes of other

15   jurors.  Notes are not entitled to any greater weight than the

16   recollections or impressions of each juror about the testimony.

17   You will not have the opportunity to review any portions of the

18   transcript during your deliberations.

19         And another word about notes.  Some people are good

20   note-takers.  Some people find taking notes distracting, and it

21   prevents you from hearing and concentrating on what a witness

22   says.  It's entirely up to you what you do with notes.  And

23   I've found -- and I've told jurors this -- sometimes if there

24   are exhibits that are identified by number that you want to

25   take a closer look at during deliberations, it's sometimes

Preliminary Jury Instructions

1    helpful to write down an exhibit number in your notes so that

2    when you go back to the jury room and you get dozens and dozens

3    of exhibits, you can refer to your notes and say, "I wanted to

4    see Plaintiff's Exhibit 25," or "Defendants' Exhibit 15" or

5    "Joint Exhibit 10."

6           So sometimes even writing down an exhibit number is

7    a -- is certainly a proper way and sometimes a helpful way of

8    allowing you to go back later to concentrate on an exhibit that

9    you wanted to spend more time looking at when you're

10   deliberating.

11          I do not expect you to have any questions of a witness

12   after the attorneys have finished questioning that witness.

13   However, if you still have questions after the attorneys are

14   finished with their questioning, I will allow you to propose

15   additional questions for the witness currently on the stand.

16   No witness will be recalled for questions you may want to ask

17   after the witness has been excused.

18          When the attorneys have finished questioning a

19   witness, I'll ask you to write down any questions you may have.

20          And I'll modify that.  If you have questions, you

21   don't have to write them down after the witness has finished

22   testifying.  You can start writing them down while the witness

23   is testifying, and if it's been covered, you can cross it out

24   and not submit it.  But there's no requirement -- you can write

25   it down anytime you want.

Preliminary Jury Instructions

1    I'll collect your questions and review them at a

2    sidebar conference with the attorneys to determine whether the

3    questions can be properly asked under the rules of evidence.

4    If I rule the question is proper, one of the attorneys will ask

5    it of the witness.

6        Sometimes a proposed question will not be asked

7    because it concerns an issue I've ruled is not relevant.  Some

8    questions may be better answered by a future witness.  If your

9    question is not asked, do not concern yourself with the reason

10   or take any offense.  You must not draw any conclusions from

11   the fact that your question is not asked.  Do not share your

12   question with other jurors if it is not asked.

13       You must not use the opportunity to ask questions to

14   advocate for either side.  You must keep an open mind

15   throughout the trial and not compromise your obligation to act

16   as a neutral fact-finder, which is an obligation you swore to

17   maintain.  This opportunity to ask questions must not cause you

18   to prematurely deliberate or adopt a position prior to the

19   close of evidence.  Answers to juror questions are not entitled

20   to any greater or lesser weight than answers to attorney

21   questions.

22       You should use common sense in weighing the evidence

23   and consider the evidence in light of your own observations in

24   life.  In our lives, we often look at one fact and conclude

25   from it that another fact exists.  In law we call this an

1  inference.  A jury is allowed to make reasonable inferences.

2  Any inference you make must be reasonable and must be based on

3  on the evidence in the case.

4      You may have heard the phrases "direct evidence" and

5  "circumstantial evidence."  Direct evidence is proof that does

6  not require an inference, such as the testimony of someone who

7  claims to have personal knowledge of a fact.  Circumstantial

8  evidence is proof of a fact, or a series of facts, that tends

9  to show that some other fact is true.

10      As an example, direct evidence that it's raining is

11  testimony from a witness who says, "I was outside a minute ago,

12  and I saw it raining."  Circumstantial evidence that it's

13  raining is the observation of someone entering a room carrying

14  a wet umbrella.

15      The law makes no distinction between the weight to be

16  given to either direct or circumstantial evidence.  You should

17  decide how much weight to give to any evidence.  In reaching

18  your verdict, you should consider all the evidence in the case,

19  including the circumstantial evidence.

20      In determining whether any fact has been proved, you

21  should consider all the evidence here bearing on the question

22  regardless of who introduced it.

23      The law does not require any party to call as a

24  witness every person who might have knowledge of the facts

25  related to this trial.  Similarly, the law does not require any

Preliminary Jury Instructions

1  party to present as exhibits all papers and things mentioned

2  during this trial.

3         You must decide whether the testimony of each of the

4  witnesses is truthful and accurate in part, in whole, or not at

5  all.  You also must decide what weight, if any, you give to the

6  testimony of each witness.

7         In evaluating the testimony of any witness, you may

8  consider, among other things:

9         The ability and opportunity the witness had to see,

10 hear, or know the things that the witness testified about;

11        The witness's memory;

12        Any interest, bias, or prejudice the witness may have;

13        The witness's intelligence;

14        The manner of the witness while testifying;

15        The witness's age; and

16        The reasonableness of the witness's testimony in light

17 of all the evidence in the case.

18        You may find the testimony of one witness or a few

19 witnesses more persuasive than the testimony of a larger

20 number.  You need not accept the testimony of the larger number

21 of witnesses.

22        In this case one of the defendants is a governmental

23 entity.  All parties are equal before the law.  And a

24 governmental entity is entitled to the same fair consideration

25 you would give any individual person.

Preliminary Jury Instructions

1    When I say a particular party must prove something by
2    "a preponderance of the evidence," or when I use the expression
3    "if you find" or "if you decide," this is what I mean:  When
4    you've considered all the evidence in the case, you must be
5    persuaded that it is more probably true than not true.

6    In deciding Carrie Warren's claims of discrimination,
7    you should not concern yourselves with whether defendants
8    Kendall County Sheriff's Office's, Richard Randall's, Scott
9    Koster's, or Sabrina Jennings' actions in terminating Carrie
10   Warren were wise, reasonable, or fair.  Rather, your concern is
11   only whether Carrie Warren has proven that defendants
12   terminated her in part because she is a woman.

13   You must give separate consideration to each claim and
14   each party in this case.  Although there are six defendants --
15   namely, the Kendall County -- well, actually, four defendants.
16   Arithmetic was not my strong point.

17   Although there are four defendants -- namely, the
18   Kendall County Sheriff's Office, Richard Randall, Scott Koster,
19   and Sabrina Jennings -- it does not necessarily follow that if
20   one is liable, any of the other defendants is also viable.

21   Carrie Warren claims that she was fired because she is
22   a woman and that her termination violated federal civil rights
23   law.  She claims that the Kendall County Sheriff's Office,
24   Richard Randall, Scott Koster, and/or Sabrina Jennings are
25   liable for her termination.  You should individually consider

Preliminary Jury Instructions

1   and determine whether any of these four individuals terminated

2   Carrie Warren in violation of federal civil rights law.

3          Carrie Warren has made discrimination claims under two

4   different federal statues:  Title VII of the Civil Rights Act

5   of 1964 against the Kendall County Sheriff's Office and

6   Section 1983, enacted as part of the Civil Rights Act of 1871,

7   against the Kendall County Sheriff's Office, Richard Randall,

8   Scott Koster, and Sabrina Jennings.

9          Carrie Warren claims she was fired by the Kendall

10  County Sheriff's Office because she's a woman.  To succeed on

11  this claim under Title VII, Carrie Warren must prove by a

12  preponderance of the evidence that her gender was a motivating

13  factor in the Kendall County Sheriff's Office's decision to

14  fire her.  A motivating factor is something that contributed to

15  the Kendall County Sheriff's Office's decision.

16         If Carrie Warren proves that her gender contributed to

17  the Kendall County Sheriff's Office's decision to fire her,

18  then the Kendall County Sheriff's Office must prove by a

19  preponderance of the evidence that it would have fired Carrie

20  Warren even if she was a man.

21         If the Kendall County Sheriff's Office satisfies this

22  burden, you must enter a verdict for Carrie Warren, but not

23  award her damages on this claim.  If the Kendall County

24  Sheriff's fails to satisfy this burden, you may also award

25  damages to Carrie Warren.

Preliminary Jury Instructions

1   If Carrie Warren does not prove that her gender
2   contributed to the Kendall County Sheriff's Office's decision
3   to fire her, then the Court will enter judgment for the Kendall
4   County Sheriff's Office, and you may not award her damages on
5   this claim.

6   Now, I realize some of this is confusing -- it may be
7   to you -- and the lawyers are going to explain it in further
8   detail in their opening statements and in closing arguments.

9   And there will be a verdict form you get -- you're not
10  going to get it now, but you'll get it at the end -- which goes
11  through each of the steps you have to follow to decide whether
12  or not the plaintiff has proven her case by a preponderance of
13  the evidence.

14  So although a bit confusing now, I think it will be
15  clear as the trial goes on and even clearer still with the
16  final instructions and with the verdict form you're going to
17  get.

18  Now, discrimination under 1983, Carrie Warren claims
19  that she was fired by Richard Randall, Scott Koster, and
20  Sabrina Jennings because she's a woman.  To succeed on this
21  claim under Section 1983, Carrie Warren must prove by a
22  preponderance of the evidence that her gender was a motivating
23  factor in the decisions of Richard Randall, Scott Koster,
24  and/or Sabrina Jennings to fire her.  A motivating factor is
25  something that contributed to the decisions of Richard Randall,

1   Scott Koster, and/or Sabrina Jennings.

2       If you find that Carrie Warren proves this by a

3   preponderance of the evidence, then you must decide whether

4   Richard Randall, Scott Koster, and/or Sabrina Jennings has

5   proved by a preponderance of the evidence that they would have

6   fired Carrie Warren even if she was a man.

7       If Richard Randall, Scott Koster, and/or Sabrina

8   Jennings satisfy this burden, you must enter a verdict for

9   Richard Randall, Scott Koster, and/or Sabrina Jennings.  If

10  Richard Randall, Scott Koster, or Sabrina Jennings failed to

11  satisfy this burden, you must enter a verdict for Carrie

12  Warren, and you may award her damages.

13      You must separately consider whether the parties have

14  met their respective burdens with respect to each of Richard

15  Randall, Scott Koster, and Sabrina Jennings individually.

16      Carrie Warren claims that she was fired by the Kendall

17  County Sheriff's Office because she's a woman.  To succeed on

18  her Section 1983 discrimination claim against the Kendall

19  County Sheriff's Office, Carrie Warren must prove by a

20  preponderance of the evidence that her gender was a motivating

21  factor in the decision of an employee of the Kendall County

22  Sheriff's Office to fire and Richard Randall approved of that

23  decision.  A motivating factor is something that contributed to

24  the Kendall County Sheriff's Office's decision.

25      If you find that Carrie Warren has proved this by a

1  preponderance of the evidence, then you must decide whether the

2  Kendall County Sheriff's Office has proved by a preponderance

3  of the evidence that it would have fired Carrie Warren even if

4  she was a man.

5        If the Kendall County Sheriff's Office satisfies this

6  burden, you must enter a verdict for the Kendall County

7  Sheriff's Office.  If the Kendall County Sheriff's Office fails

8  to satisfy this burden, you must enter a verdict for Carrie

9  Warren, and you may award her damages.

10        Carrie Warren must prove by a preponderance of the

11  evidence that Richard Randall, Scott Koster, and/or Sabrina

12  Jennings were personally involved in the conduct that Carrie

13  Warren complains about.  You may not hold them liable for what

14  other employees did or did not do.

15        And I will -- as an aside, I will tell you when I

16  began trying cases about 35, 40 years ago, there were no

17  written instructions.  A judge just read them, and the jury

18  didn't get a copy of them until -- and it was a single copy --

19  until they went back to deliberate.  So there's been

20  improvements.

21        All right.  So if you find that Carrie Warren has not

22  met her burden of proof against any of the defendants and that

23  same -- and that the same defendant or defendants failed to

24  meet their burden of proof, then you must determine what amount

25  of damages, if any, Carrie Warren is entitled to recover.

Preliminary Jury Instructions

Carrie Warren must prove her damages by a preponderance of the evidence.

If you find that Carrie Warren fails to meet her burden of proof against any of the defendants, then you will not consider the question of damages.

You may award compensatory damages only for injuries Carrie Warren proves by a preponderance of the evidence were caused by defendants' wrongful conduct.

Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they include both the physical and mental aspects of injury, even if they are not easy to measure.

In calculating damages, you should not consider the issue of lost wages and benefits. The Court will calculate and determine any damages for past or future lost wages and benefits.

You should consider the mental and emotional pain and suffering that Carrie Warren has experienced and is reasonably certain to experience in the future in calculating compensatory damages.

No evidence of the dollar value of mental and emotional pain and suffering needs to be introduced. There is no exact standard for setting the damages to be awarded on account of pain and suffering. You are to determine an amount

Preliminary Jury Instructions

1   that will fairly compensate Carrie Warren for the injury she

2   has sustained.

3           Carrie Warren is not entitled to recover damages for

4   stress or emotional problems caused by or related to the filing

5   or -- of -- filing or her involvement in this lawsuit.

6           You may, but are not required to, assess punitive

7   damages against Richard Randall, Scott Koster, and/or Sabrina

8   Jennings.  The purposes of punitive damages are to punish one

9   or more of these defendants for their conduct and serve as an

10  example or warning to these defendants and others not to engage

11  in similar conduct in the future.

12          Carrie Warren must prove by a preponderance of the

13  evidence that punitive damages should be assessed against any

14  of these particular defendants.  You may assess punitive

15  damages only if you find that the conduct of one or more of

16  these defendants was malicious or in reckless disregard of

17  Carrie Warren's rights.  Conduct is malicious if it is

18  accompanied by ill will or spite, or is done for the purpose of

19  causing injury.  An action is in reckless disregard of Carrie

20  Warren's rights if taken with knowledge that it may violate the

21  law.

22          If you find that punitive damages are appropriate,

23  then you must use sound reason in setting the amount of those

24  damages.  Punitive damages, if any, should be in an amount

25  sufficient to fulfill the purposes that I have described to

Preliminary Jury Instructions

you, but should not reflect bias, prejudice, or sympathy toward either or any party.

In determining the amount of any punitive damages, you should consider the following factors:

The reprehensibility of any of the particular defendant's conduct;

The impact of the particular defendant's conduct on Carrie Warren;

The relationship between Carrie Warren and the particular defendant;

The likelihood that the particular defendant would repeat the conduct if an award of punitive damages is not made; and

The relationship of any award of punitive damages to the amount of actual harm that Carrie Warren suffered.

Those, ladies and gentlemen, are the preliminary jury instructions to give you some idea of what the issues are you're going to have to decide, and I'll give you final instructions later in the case before closing arguments, and those will control your deliberations.

With that, is the plaintiff ready to proceed with opening statement?

MS. DORAN:  We are, your Honor.

THE COURT:  All right.  You may proceed.

MS. DORAN:  Thank you.

Opening Statement - Plaintiff

1      THE COURT:  All right.  You are hooked up.

2      MS. DORAN:  All right.

3      THE COURT:  Thank you.

4      MS. DORAN:  I'm going to turn this on because I might

5   move away from this microphone here, and I want to make sure

6   that everybody can hear me.

7           OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

8      MS. DORAN:  Good morning, ladies and gentlemen.

9      If you remember, my name is Karen Doran.  I'm an

10  attorney.  And I represent the plaintiff in this case, sitting

11  over there, Carrie Warren, along with my partner, Colleen

12  McLaughlin.

13     Fairness.  That's what this case is about, fairness.

14  It's about how wrong it is to treat people differently because

15  of their gender:  One standard for them, one standard for you.

16     They're going to say that they treated Carrie the same

17  way that they treated the guys.  But, oh, boy.  You guys are

18  going to find out different.

19     This case is about fairness, treating people equally.

20  Did they treat Carrie equally to the men?  That's your job.

21  You have to decide.  You have to judge the defendants.

22     Your role at this trial is to decide whether Koster,

23  Jennings, Randall, and the Kendall County Sheriff's Office took

24  Carrie's gender into account when they fired her.

25     The key question, the ultimate question, is whether

1    gender played any part whatsoever in the decision-making

2    process.  The law says it doesn't need to be the only reason;

3    it only needs to be a motivating reason.

4            Let me go grab some water real quick.  Thanks.

5            We invite you to ask yourselves after you've heard all

6    of the evidence do you believe defendants treated Carrie like

7    they did the guys.

8            The plaintiff, now, you have to know something about

9    Carrie.  She actually has a few names.  Her legal name is

10   Carrie Melissa Warren.  Her close friends call her Melissa.

11   She's formally known as Carrie.  And at the Kendall County

12   Sheriff's Office, they just refer to her as Warren.  I'm

13   telling you this because you're going to hear all these names

14   throughout the trial, and you just have to bear in mind that

15   they're all the plaintiff.

16           You've probably figured out by now that Carrie Warren

17   used to work for the Kendall County Sheriff's Office, or the

18   KCSO for short.  And let me tell you about that.

19           Back in 2008, she was selling granite, you know, the

20   kind that you use in your kitchen.

21           And then her husband -- he is an Oswego firefighter,

22   and you'll get to meet him in a few days.  He encouraged her to

23   apply to become a deputy sheriff with the Kendall County

24   Sheriff's Office.

25           She got the job.  She'll tell you she was elated.  She

Opening Statement - Plaintiff

1   was thrilled.  She was so proud to wear that uniform.  And you

2   know what?  She loved her job.

3          Now, okay.  Maybe it wasn't the most glamorous job in

4   the world.  She was working for the Kendall County jailhouse.

5   But it meant something to be a deputy sheriff, and she liked

6   being part of that something.  This was her career, her life's

7   calling, not just a job.  Not many of us get that.  She got to

8   have it for five years.

9          All right.  The KCSO is a paramilitary organization.

10  That means it's highly hierarchal.  Deputies report to --

11  sorry.  Deputies report to sergeants, who report to deputy

12  commanders, who report to commanders, who report to the chief

13  deputy, who reports to the Sheriff.  And that's where the buck

14  stops.

15         The KCSO is also divided up.  There's patrol,

16  investigations, the courthouse, the jail.  And that's what you

17  need to know.

18         All right.  There's a fact in this case that we think

19  you guys are all going to find particularly interesting.  This

20  case actually begins with jury duty.  Back in January of 2012,

21  Carrie had jury duty.

22         MS. McLAUGHLIN:  '14.

23         MS. DORAN:  Sorry.  2014.

24         Back in 2014, Carrie had jury duty.  She got her

25  summons sometime in December, and she told the KCSO.

Opening Statement - Plaintiff

1    The Friday before she was scheduled to go for jury

2    duty, she called the courthouse to confirm, and she found out,

3    yep, you have to report on Monday.  She sends an e-mail to her

4    boss, letting him know that she does, in fact, have to appear

5    for jury duty.

6    But here's the thing.  KCSO kept her on the work

7    schedule.  Carrie worked second shift.  That's 2:30 in the

8    afternoon till 11:00 at night.  She was actually scheduled to

9    work that Monday.

10   So the weekend.  That weekend was a doozy.  It was

11   cold.  It was snowy.  It was the pits.  And to top it all off,

12   Carrie's nine-year-old daughter got sick.  I mean really sick,

13   like the bad kind of sick.

14   And her husband, he was scheduled to work a 24-hour

15   shift starting bright and early Monday morning.  Really early,

16   like 6:45 in the morning early.

17   So Sunday comes along, and Carrie realizes that

18   Megan -- that's her daughter -- well, she can't go to school

19   the next day.  So Grandma comes to the rescue.  Carrie calls

20   Jeff's mom, Louise May -- you'll meet her too -- who agrees to

21   watch Megan so that Carrie can go to jury duty on Monday

22   morning.

23   And then she also calls her boss's boss, Commander

24   Sabrina Jennings, and she tells her about her scheduling

25   dilemma.  And Jennings tells her, "I'll get back to you."

Opening Statement - Plaintiff

1          Okay.  Fine.  Good enough.  She's got a plan.

2          Monday, January 6, 2014.  Now, I'm thinking that by

3     the end of this trial, you all are going to be really sick of

4     this date, Monday, January 6, 2014.  But it's important.

5          Let me tell you about that day.  First of all, the

6     weather didn't get any better.  It was snowing that morning,

7     and it was cold.  It was so miserable, in fact, that there were

8     lots of school closings that day, and Megan's school actually

9     was closed.  So Carrie calls the county thinking, hey, maybe

10    the courthouse is closed too.  No such luck.

11         So she's getting ready.  Jeff is already up and out.

12    She calls Louise, the mother-in-law, and confirms that it's

13    still a go.  And, in fact, Louise is in the car on the way

14    there.

15         Carrie also tries to call Commander Jennings twice,

16    but she doesn't get her.  Well, as it turns out, Commander

17    Jennings also tried to call her that morning too, but they

18    didn't connect.

19         So she drives to the courthouse, and she arrives

20    through security at 8:37 in the morning.  And there she is.

21         Now, remember when told you that the Sheriff's Office

22    is divided into all these different divisions.  Well, the

23    courthouse is one of these divisions.  So there are deputies

24    that work there too.  There's one, and there's another.

25         So she talks to them.  And she's told, "Hey, Deputy

Opening Statement - Plaintiff

1    Commander Leinen wants to see you.  He's in the court library."

2    So she goes there, and he tells her that Jennings wants her to

3    call her when she's done.

4          Okay.  So she reports to jury duty.  And, actually,

5    Leinen kindly walks her over to the sign-in.  And he introduces

6    her to his girlfriend, a woman named Nicki Swiss.  She's

7    another courthouse employee.

8          So Swiss says, "Hey, let me check to see if you even

9    need to be here because it's a criminal trial and you work at

10   the jailhouse," which is where, as I'm sure all of you know,

11   many criminal defendants are held pending their criminal trial.

12         So she comes back and she says, "No, you have to

13   stay."

14         So Carrie goes into the jury assembly room to wait --

15   and wait -- for about 50 minutes.  So to pass the time, she

16   texts with a couple of friends, she plays Angry Birds -- it was

17   2014 -- and she goes on to Facebook.

18         So here she is.  There's an arrow there.  I don't

19   know.  She's probably on her phone at that time.

20         So then she goes into the courtroom for prospective

21   jury questioning, Judge Robert Pilmer's courtroom.  She answers

22   some questions.  Carrie's going to testify that -- well,

23   actually, you're going to be able to read the court reporter's

24   transcript from those questions.  She's going to testify that

25   she said, "I'm a Kendall County deputy.  I have to work in the

Opening Statement - Plaintiff

1     afternoon.  I think I recognize the defendant, by the way.

2     And, sure, I can be fair."

3           So they go back to the assembly room where she waits

4     for another half an hour.  More texting.  She actually texts

5     with a deputy friend of hers who is actually working at the

6     jailhouse that day at the time who tells her that her schedule

7     had been changed.

8           So they break for lunch, she gets released for lunch,

9     and she's out the courthouse door by 11:10.  And there she

10    goes.

11          So what happens next?  Carrie will testify that the

12    first thing she did was call Jennings, but, again, she didn't

13    get through.  She talked instead to a guy named Deputy Cantwell

14    who told her, verified what the last deputy told her in the

15    text, that Jennings had changed her schedule.

16          So now Carrie wasn't supposed to report for her second

17    shift.  Instead, she was on the first shift, the shift that had

18    already started.

19          That was 11:14 when she talked to Cantwell.

20          Next thing she does, she calls Jeff, who was at work.

21    That's 11:16.  And then she calls her mother-in-law to find out

22    how Megan had been that morning.

23          Then she tries Jennings again.  Ta-da.  She got

24    through.  That happened at 11:20.

25          She'll tell you that Commander Jennings explained that

1  she had switched Carrie to the first shift, and so when she was

2  done with jury duty, she was to report to the jail for work.

3  Carrie tells her commander, "Okay.  I'm on lunch.  But

4  I have to go back to the courthouse to continue with jury duty.

5  I can't imagine that they're going to call me for this, so I'll

6  probably get cut."  And she mentions, "I'm going to go home.

7  I'm going to check on Megan.  I'm going to let out the dog."

8  And you're going to hear from Louise that at this

9  point Louise has probably already left for her shift at the

10  Jewel.

11  She calls Jeff again.  That's 11:32.  You're going to

12  see the phone records in this case, and you're going to see she

13  calls Jeff a lot.

14  So here's an important point.  While Carrie is going

15  through the McDonald's drive-through, she gets a phone call.

16  She'll testify that she remembers the caller said something

17  like, "You're all set.  Nothing else is needed."

18  She took that to mean jury duty.  She thought the

19  court was calling, letting her know that she didn't have to

20  return for jury duty.

21  So she goes home.  She feeds Megan, she lets the dog

22  out, and she changes into her uniform and she heads off to work

23  where she arrives at 12:27 in the afternoon.

24  From the courthouse door to the jailhouse door, it's

25  about an hour and 17 minutes.

Opening Statement - Plaintiff

1      You'll see the evidence, and you can basically trace

2   Carrie's movements at this point.  You know, she works at a

3   jail, so we're talking security all over the place, secured

4   doors.

5      So we know she's in the locker room at 12:32; she's

6   out by 12:33.  She goes through operations, up the stairs to

7   the break room to grab a soda.

8      And there she sees Deputy Chief Scott Koster, who is

9   there with two other employees.  They're having lunch.  So they

10   chitchat.  And Carrie tells them, "Hey, I had jury duty."  And

11   Carrie will tell you that Koster responds with something like,

12   "Yeah, everyone has to serve now."

13      Then she heads over to Commander Jennings' office to

14   let her know that she's reporting for duty.

15      And then by 12:42 that afternoon, she's at her

16   assignment.  From jailhouse door to the west pod where she

17   worked that day, nine minutes.  And she worked till 3:00, and

18   then she went home.  And that's it.

19      But it's not it.  Later that afternoon, Swiss e-mails

20   the Chief Judge McCann, alleging that Carrie tried to get out

21   of jury duty.

22      Then Leinen e-mails Koster and Jennings with three

23   complaints about Carrie:  Carrie disrespected everyone she had

24   contact with in the courthouse that day; she snuck in a

25   smartphone to update Facebook about how annoyed she was with

Opening Statement - Plaintiff

1    jury duty; she embarrassed the KCSO in front of other jurors

2    and Judge Pilmer.  You'll see the e-mail.  There's nothing

3    about lying.

4         The next morning, there's a number of e-mails to

5    Koster and Jennings about Carrie's behavior the day before.

6    Her Facebook post.  Judge Pilmer says that she said something

7    like she always sides with law enforcement.

8         So Koster goes over to the courthouse.  But you'll

9    find out he doesn't order the court reporter's transcript from

10   the jury questions that day.

11        Leinen also e-mails Jennings a report saying that he

12   told Carrie to call Jennings and to go to work when she was

13   through with jury duty.  So throughout the day, he sends her

14   reports from others on Carrie's conduct on the 6th.

15        The day after that, Jennings wants to know what time

16   Carrie returned to the courthouse after lunch.  Well, Carrie

17   will tell you that she never returned to the courthouse after

18   lunch.  She didn't return to the courthouse because she got

19   that call at the McDonald's saying she was done, so she went to

20   work instead.  She'll tell you she never told anyone that she

21   went back to the courthouse.

22        We ask you to keep this in mind.  Why would she lie

23   and say she returned to the courthouse?  Why?

24        So over the next week, Leinen gets the video

25   recordings of the courthouse when Carrie was there that Monday,

Opening Statement - Plaintiff

1    and he sends them to Jennings.

2          January 14th.  On this day, a week after jury duty,

3    Carrie's supervisor, Jennings, tells her that she's facing

4    three charges, three:  Causing a disturbance at the entry

5    point, having an electronic device when not allowed, attempting

6    to purposely get out of serving on the jury.

7          Carrie will tell you that she was just floored.  She

8    was taken aback.  She'll tell you that they briefly talked

9    about these charges and that Jennings asked Carrie what time

10   she returned to the courthouse after lunch.  She told her, "I

11   didn't return to the courthouse after lunch because I got a

12   phone call from them saying that I was all done.  So I went to

13   work instead."

14         Jennings asks her for her phone records to prove that

15   she got the call.  So Carrie then does two things.  She asked

16   Jeff to give her a copy of the phone bill, and she writes a

17   response to the charge.

18         Here's the thing.  It's a really big thing.  Jeff

19   won't do it.  He won't.  He told Carrie, "No.  I'm not giving

20   our personal phone bill over to the Kendall County Sheriff's

21   Office."  Remember, he's a fireman.  He's actually a battalion

22   chief for the City of Oswego.  He's got privacy concerns.  He

23   flatout refuses.

24         So two days later, Carrie submits her response to the

25   three allegations of misconduct:  "No, I didn't cause a

Opening Statement - Plaintiff

1  disturbance.  Yes, I did bring my phone.  No, I didn't shirk my
2  duty."
3        That same day, Jennings sees the courthouse videos and
4  notices that, well, other jurors had phones too.
5        On January 14th, Jennings also reaches out to Tracy
6  Page.  Now, she is one of the other two people that were in the
7  break room with Koster that day that Carrie goes and gets the
8  soda after jury duty.  And Jennings then gets a memo from Page
9  saying that Koster's -- that -- she says that Carrie said in
10  the break room that she said that she had to return to the
11  courthouse after lunch, and then she got dismissed, and then
12  she came to work.
13        So you're going to find out from the defendants that
14  that meant Carrie was lying.
15        Again, we ask you to consider this.  Why?  Why would
16  she lie about returning to the courthouse after lunch?
17        So later that week, Swiss -- she's the jury
18  commissioner -- she tells Jennings that, no, they never called
19  Carrie on the 6th.
20        You'll find out, ladies and gentlemen, that Carrie had
21  actually been dismissed from jury duty at around 11:10 that
22  day.  It wasn't just for lunch.  She'll explain to you that she
23  wasn't really paying attention.  You'll see that there are a
24  number of texts at around that time.
25        And she'll tell you, though, that she did get a phone

Opening Statement - Plaintiff

1    call.  The caller said something like, "You're all set."  And

2    she mistakenly believed that it was a coworker from the

3    courthouse letting her know that she had been released from

4    jury duty.

5           So Jennings finds out that the court didn't call

6    Carrie, but she doesn't tell Carrie.  You'll learn that she

7    keeps it a secret.  You'll see from the investigation that this

8    is the reason they fire her.  They say she lied about getting

9    the phone call.

10          You'll see video.  You'll hear audio.  You'll see

11   reports, and you'll also see phone bills.  Carrie's AT&T cell

12   phone bill.  The fact is, you won't see that call.  It's not

13   there.  It's not there.

14          But neither are the calls that Carrie makes to

15   mother-in-law Louise, and neither are the calls that Jennings

16   made to Carrie that morning on Monday, January 6th.  You'll see

17   that too.

18          Carrie's not going to be able to tell you why.

19   Jennings isn't going to be able to tell you why.  Louise isn't

20   going to be able to tell you why.

21          So within a week from this point, Jennings has

22   finished her report on Carrie's misconduct, and she has come to

23   the conclusion fire Carrie.  Carrie should be fired.  And she

24   gives her recommendation to her boss, Koster.

25          Now, it's exactly three weeks since jury duty.  Koster

Opening Statement - Plaintiff

1    has Jennings' recommendations to terminate Carrie.  And he asks

2    Leinen.  Remember him?  He's the courthouse employee with all

3    the memos.

4           Koster asks Leinen for more specificity about what he

5    said to Carrie on the 6th.  Leinen changes the memo he wrote on

6    January 7th to add the word "immediately."  That is now he

7    claims that he told Carrie to report to work immediately after

8    jury duty.

9           And the evidence will show that Carrie was an hour and

10    17 minutes door to door from the end of her jury duty to the

11    start of her shift, not immediately.

12           Koster tells Carrie she's facing serious discipline,

13    and he schedules an interrogation of her.  He provides Jennings

14    with the questions -- and you'll get to see those questions he

15    gave her -- and she interrogates Carrie on February 5th.

16           You'll actually get to hear that interrogation.  Well,

17    part of it.

18           We ask that you remember a very few important facts.

19    The charge against Carrie has those three allegations that I've

20    mentioned before.  Courthouse conduct, cell phone.

21           And Jennings hasn't told Carrie that the courthouse

22    staff says they never called her on the 6th.

23           So the very next day after this interrogation by

24    Jennings, Jennings again advises fire Carrie, this time for

25    untruthfulness.  She's a liar.

Opening Statement - Plaintiff

1    Koster informs Carrie that she's facing a

2 pretermination hearing.

3    Now, she then works with Jeff, her husband, and her

4 union rep to prepare.  The KCSO, as you can well imagine, has

5 policies.  And one of those policies is that if you're facing

6 serious discipline, you get to see the investigative report.

7    And you will learn that the investigation report that

8 Koster gives Carrie to prepare is missing something.  It's

9 missing Jennings' most recent report about firing Carrie for

10 lying.

11    But at this point Carrie and their union rep, well,

12 they don't know about the report, that it's been held back.

13 Instead, you see a long e-mail exchange between Carrie's union

14 rep and Koster where the union rep asks for the transcript from

15 Judge Pilmer's jury questioning.

16    And we would like you to remember what the written

17 charge says that Carrie is facing: courthouse conduct, cell

18 phone.

19    You'll find out that the KCSO has not ordered the

20 transcript.  So they postponed the hearing.

21    You'll see that the court reporter's transcript --

22 you'll get to see it -- that it corroborates with what Carrie

23 said, not with what Judge Pilmer said she said or anybody else

24 said she said.

25    Valentine's Day.  Carrie will tell you what she did

1  that day and who she talked to.  Jeff still will not hand over

2  the family phone records.  He's not going to give him his bill.

3          So Carrie will explain that she started scrolling

4  through her phone, looking for that mystery caller.  And she'll

5  tell you that she came across Chris Fidler.  Chris Fidler.

6  She's a travel agent.  And you'll learn that around the time of

7  Carrie's jury duty, she was booking a trip for Jeff and Carrie

8  to Cancun.  So Carrie asks Chris if she called her on

9  January 6th.  And Chris answers, "Probably, Carrie."

10         Carrie will tell you how relieved she felt.  See, she

11  had made her final payment for her Cancun trip that Friday

12  before jury duty.  And Chris remembers calling Carrie, telling

13  her something like, "You're all set."  Chris agrees to send

14  Carrie an e-mail to that effect, and you'll get to see that

15  too.

16         The day of the disciplinary hearing, Carrie gets a

17  phone bill -- Carrie -- sorry.  The day of the disciplinary

18  hearing, Carrie finally gets the phone bill from her husband.

19  And she'll tell you it weren't easy.  In fact, it was

20  excruciating.  Jeff planned on redacting the whole thing, and

21  he'll tell you that.  He had privacy concerns.  He didn't want

22  the defendants, the Kendall County Sheriff's Office, with his

23  personal phone bill.  He just didn't trust them.

24         But Carrie snatches it out of his hand before it's all

25  blacked out and takes it with her to the meeting.  But the

Opening Statement - Plaintiff

1   meeting didn't go.  It was cut short.  Koster had scheduling
2   issues.
3           But before it ended, Koster brushed aside any
4   discussion of those written charges.  You remember the ones:
5   entryway disturbance, brought in her cell phone, bad statements
6   made in Judge Pilmer's courtroom.  And instead he says, "We're
7   focusing on truthfulness."
8           Carrie gives him her phone bill, such as it was, black
9   marks and all, and she also shares Ms. Fidler's e-mail.
10          Then Detective Ratkovich interrogates Chris Fidler.
11  You're probably going to hear from Chris Fidler.  The
12  defendants are calling her as a witness.  Ms. Fidler was
13  interrogated twice by a Kendall County Sheriff's Office
14  detective.  He went to her travel agency, and while he was
15  questioning her, he looked at her phone bill.  And he didn't
16  find a record of the call.
17          When you hear the interrogation -- and you will -- we
18  ask that you put yourselves in her shoes.  Listen to her tone
19  of voice.  Consider the questions that Ratkovich is asking her.
20  We think that you're going to conclude that Ms. Fidler, like
21  Carrie, believed she had called her on the 6th.  She can't tell
22  you why the phone call doesn't show up on her bill, and neither
23  does Carrie -- neither can Carrie.  Maybe it wasn't her who
24  called her when Carrie was going through the McDonald's
25  drive-through.

1        March 11th.  That's the rescheduled hearing date with

2   Koster.  Koster says Carrie's lying.  Later that same day, that

3   same day, he recommends to Sheriff Randall that he fire Carrie

4   for being a liar.  The very next day, Sheriff Randall, Chief

5   Deputy Scott Koster, and Deputy Sheriff Carrie Warren meet, and

6   she's fired.  Why?  For untruthfulness, for lying.

7        She lied about not knowing about cell phone

8   prohibition at the courthouse.  She lied about not leaving the

9   courthouse for lunch.  She lied about receiving a phone call.

10       Now, we ask that you think about this and consider the

11  facts.  Carrie's got jury duty.  Jennings changes her shift.

12  Carrie gets lunch, goes home, lets out the dog, checks on

13  Megan.  All of these things she told Jennings she was going to

14  do.

15       She also changes into her work uniform because it's

16  her belief that she was released from jury duty from that phone

17  call that she got, and she knows that she's been scheduled to

18  work.  She goes to work an hour and 17 minutes after leaving

19  jury duty.  She does not stay home to care for Megan, who is

20  sick.  She doesn't do anything else.

21       And, in fact, the defendants are not even going to try

22  to convince you that she was doing anything else.  So why would

23  she lie?  Why would she lie about getting a phone call?  Why

24  would she lie about returning to the courthouse after lunch?

25  These are the questions we would like you to ask yourselves.

Opening Statement - Plaintiff

1    The defendants are not -- we don't think -- going to

2  say that she stole time, that she owes them an hour and

3  17 minutes.  They didn't fire her for that.  There aren't even

4  any allegations of time theft.

5    So why would she lie?  Think about that over the

6  course of the trial, please.

7    Fairness.  This case isn't about Carrie's conduct.  It

8  really and truly isn't.  It's about the defendants' conduct.

9  It's about whether they treated her more harshly than they did

10  male deputies.  We think you'll find out that they most

11  certainly did.

12    Now, I'm not going to go into now all of what the

13  defendants did or did not do when it came to male deputies

14  accused of misconduct.  I only went through Carrie's timeline

15  because it's so dense, and we want you to be able to identify

16  the facts and the evidence to support those facts as the trial

17  unfolds.  Cases with a lot of people, lot of documents, a lot

18  of things tend to get really convoluted pretty easily, and it's

19  important that you understand the timeline.

20    Suffice it to say you will be presented with evidence

21  about these guys, evidence you can use to compare.  You'll find

22  out that male deputies lied about sexual misconduct with female

23  inmates.  They lied about gifts to and from inmates.  They lied

24  about time records.  They lied about direct orders from Koster

25  himself.  You will hear about a lot of lies.  You will not hear

Opening Statement - Plaintiff

1      about a lot of guys getting fired.

2              Finally, we ask you to keep an open mind.  Note what

3      the defendants ignore.  Compare what they do with their male

4      deputies' misbehavior versus what they did to Carrie.  Ask

5      yourselves, did they consider all the evidence?  Did they focus

6      on things that you would expect them to review?

7              Did they delve into issues that they should have?  Did

8      they ask the right questions?  Did they monitor in a way that

9      you would expect?  Did they subject the men to the same

10     scrutiny that they subjected her?

11             In the end, do you think Carrie's gender was a

12     consideration in the decision to fire her?  We think you'll

13     find yes.

14             Thank you so very much for your time.

15             THE COURT:  All right.  Thank you.

16             Is defense ready to give their opening statement?

17             MS. BRUCH:  Yes, your Honor.

18             THE COURT:  All right.

19             Ladies and gentlemen, if you want to stand up and

20     stretch for a minute, I think each side has to move their

21     things from the podium.  So feel free to stretch.

22             And by the way, you can -- at any point if you believe

23     that you need a break, raise your hand.  We'll take a break.

24     And especially if you're in the back row, if you want to stand

25     up and stretch while witness testimony is going on or during

1    breaks, you're free to do that.  And certainly at sidebars, you

2    can do the same thing.  And you can even talk, as long as it's

3    not about the case.

4            Ms. Bruch, are you using the --

5            MS. BRUCH:  I'm using the ELMO.

6            THE COURT:  The ELMO?  All right.

7            All right.  Are you ready to proceed?

8            MS. BRUCH:  I am.

9            THE COURT:  All right.  Everyone should have a seat,

10   please.

11           You may begin.

12           MS. BRUCH:  Okay.  Thank you, your Honor.

13            OPENING STATEMENT ON BEHALF OF THE DEFENSE

14           MS. BRUCH:  May it please the Court, ladies and

15   gentlemen of the jury, Counsel.

16           My name is Julie Bruch, again, and with my co-counsel,

17   Karin Anderson, I'd like to just introduce my clients again so

18   that you have a frame of reference on who everyone is now that

19   you're hearing these names.  And I'm going to use their titles

20   throughout the course of the trial so that you can keep it

21   straight.

22           But we have right here Richard Randall.  Sheriff

23   Randall was the Sheriff of Kendall County at the time of the

24   incidents that we're going to be talking about.

25           Then we have Commander Sabrina Jennings.  Commander

Opening Statement - Defense

1   Jennings is the person who is in charge of the corrections

2   division in the Sheriff's Office.

3          Next we have Chief Deputy Scott Koster.  He was second

4   in command in the Sheriff's Office at the time of this lawsuit.

5   He has since retired but is now working in a part-time capacity

6   in the Sheriff's Office.

7          You may also see during the trial the current Chief

8   Deputy, Mike Peters.  He is now the second in command.  He's

9   not a defendant in the case, but he may be sitting at counsel

10  table.

11         And the individual who is sitting next to Karin is

12  Sheriff Dwight Baird.  He is the current Sheriff of Kendall

13  County.

14         So where is Kendall County?  Kendall County is in

15  Yorkville, Illinois.  So if you're driving on I-88 and you're

16  heading out to DeKalb and you get to the exit right before

17  DeKalb, that's the way to get to Kendall County.  You get off

18  and you drive south for, like, another half hour, and that's

19  where Yorkville is.

20         When Sheriff Randall became Sheriff, that was in 1986.

21  So it was quite some time ago.  When he first became Sheriff,

22  Yorkville was a tiny little community that barely had any

23  residents.  They had a -- only 26 full-time employees.

24         In the 28 years that Sheriff Randall was the Sheriff

25  in Kendall County, they went from that 26 full-time employees

1   to at the time of his retirement in 2014, they had

2   approximately 120 employees.  So it grew a lot during that

3   time.

4           And one of the ways that the Sheriff's Office grew is

5   that they built a new Public Safety Center.  And when they

6   built the new Public Safety Center, at that time they needed

7   more employees.

8           And one of the first female employees that Sheriff

9   Randall hired was Commander Jennings.  And she started out as a

10  deputy in the corrections division.  So within the Sheriff's

11  Office, there are a number of divisions.  They're all equal.

12  There's not one is better than the other, but there's the

13  patrol division, like when you're on the road and there's

14  somebody patrolling the streets.  Then there's also the

15  courthouse security individuals, and then there also is the

16  people who work in corrections.

17          So in a Sheriff -- just to kind of give you a little

18  bit of background, when someone is arrested and charged with a

19  crime but they haven't been convicted yet, they can and they

20  haven't -- they're not able to post bond or they're not allowed

21  to have bond, they are held in a county jail before their trial

22  is -- takes place.

23          They also -- if you're convicted -- and you're

24  convicted and I think your sentence is for less than a year,

25  you can be housed in the county jail.  Otherwise, if your

Opening Statement - Defense

1   conviction is longer, that's when you go to the state prison.

2          Also, they have inmates who -- you may hear the term

3   "a weekend person," who some people have sentences where after

4   they come out -- it's called work release, where after they

5   finish their job during the day, they then report to the jail

6   and they're there for the night, and then they go back to work

7   in the morning.  So those are the different prisoners.  And all

8   of those individuals are looked at by the deputies who are in

9   the corrections division.

10         So when Sabrina Jennings first was hired, she was one

11  of the first females.  And Sheriff Randall will tell you how he

12  promoted her from deputy to sergeant.  And ultimately she was

13  promoted by Sheriff Randall to replace a man and be the head of

14  the entire corrections division.

15         When Scott Koster began working in the Sheriff's

16  Office, he was working on the patrol side.  And he eventually

17  became the commander of the -- this public safety, a different

18  division than the corrections.  So he was essentially even with

19  Commander Jennings.  And at some point he was promoted to

20  become the chief deputy.

21         And at that time, Sheriff Randall will tell you and

22  Chief Deputy Koster will tell you, Sheriff Randall had other

23  obligations going on within the county, so he really was not

24  necessarily at the Sheriff's Office on a day-to-day basis.  So

25  those day-to-day operations would have been handled by Chief

Opening Statement - Defense

1    Deputy Koster.

2              Now, one of the things that is important to know is

3    that the jury duty process in Kendall County is done by the

4    judges.  Even though the Sheriff's Office is in charge of

5    security at the courthouse, it's really the judges' decisions

6    on how jury duty is going to be run.

7              And one of the rules that the judges have set out,

8    which is unlike the rules here -- and I think you're all

9    probably grateful for that -- is that jurors are not permitted

10   to bring cell phones into the courthouse when they're on jury

11   duty.  And that's something that was decided by the judges, not

12   by the Sheriff's Office.

13             So with that background in mind, we're going to talk

14   about why are we here today.  And the reason why we're here

15   today is that there's a saying that the coverup is always worse

16   than the lie.  And there's a proverb that states he who

17   conceals his transgressions will not prosper, but he who

18   confesses and forsakes them will find compassion.

19             The evidence will show in this case that not only was

20   Ms. Warren untruthful regarding the circumstances surrounding

21   her jury duty on January 6, 2014, but when her supervisors

22   asked for records to support those statements, she doubled and

23   tripled down on her lies rather than admit the untruthful

24   statements.  She recruited her husband and her travel agent to

25   lie and try to show the Sheriff's Office that something that

Opening Statement - Defense

1    she knew was not true happened.

2         So somebody tells you, well, I was fired for bringing

3    a cell phone into the courthouse for jury duty or taking too

4    long a lunch.  You'd think, well, that's really harsh.  Why

5    would you fire somebody for that?

6         But that's not what happened here.  It -- you know,

7    throughout this case, there are some important things to keep

8    in mind.  And you'll hear how in the Sheriff's Office, deputies

9    have a unique responsibility that most members of the public

10   don't have and you wouldn't have in your regular job, and that

11   is that they have the ability to prepare reports and provide

12   evidence that could end up taking someone's freedom away.  They

13   have the ability to create reports on people who have been

14   arrested for DUI.  They can write reports about behavior of

15   inmates who are in the jail.  And if those reports are not

16   truthful, then individuals can have their liberty taken away

17   from them.

18        And you will hear evidence that during her employment

19   as a Sheriff's Deputy that Ms. Warren served as a Breathalyzer

20   operator.  So that meant that when the patrol deputies arrested

21   somebody for a DUI and brought them into the Public Safety

22   Center that it was Ms. Warren's responsibility to monitor those

23   individuals and observe them while they took the breath test.

24        And as part of her duties, she would write reports --

25   and you'll see some of those reports -- where she would recount

Opening Statement - Defense

1   some admissions that arrestees may have made about how much

2   alcohol they had to drink and what they were doing that night,

3   and that information then could be used by the State's

4   Attorney's Office to call Ms. Warren as a witness in that trial

5   and potentially have somebody be convicted and sentenced to

6   prison.  So it would be very important to the Sheriff's Office

7   to ensure that deputies who work for them are truthful and

8   honest in their conduct as deputies.

9        You'll also hear evidence that as part of her job,

10  Ms. Warren would also have to prepare reports if an inmate in

11  the jail did some rule violation.  And if the inmate violated

12  some rules, maybe the inmate would have to be put into

13  segregation.  They could have additional charges.  So, again,

14  it would be very important to the Sheriff's Office to ensure

15  that individuals who work for them, who prepare these reports,

16  are truthful and honest in what they do.

17       So now let's talk about the jury duty.  So the events

18  in question began on January 6.  So, you know, like everyone

19  here, Ms. Warren received a jury summons telling her that she

20  needed to report to the courthouse for jury duty.  And in the

21  summons, there were some rules and expectations that were

22  developed by the Chief Judge.  And I'm going to show you what

23  the summons says.

24       This is in Joint Exhibit 3.  And it's the page that's

25  Bates-stamped 511.

Opening Statement - Defense

1          THE COURT:  Why don't you explain what a Bates stamp

2     is if you're going to refer to Bates stamps.  Show it.

3          MS. BRUCH:  I'm going to show you here.  Let me back

4     this up.

5          So at the bottom of the documents, there's numbers

6     here that you'll see throughout the case.  And that's the way

7     that we refer to the document, by the number, so that way we

8     can easily find it.

9          So this was the summons.  And she initially gets this

10    in the mail.  On the bottom of the summons, there's some

11    language.  And I'm going to show you this.  And it mentions to

12    jurors that "No cell phones, pagers, electronic devices, food

13    or drink will be allowed to be brought into the courthouse."

14         So that's what an individual who in Kendall County is

15    getting a summons for jury duty, they are instructed ahead of

16    time that they're not allowed to bring their cell phone into

17    the courthouse.

18         So you'll hear evidence in this case that Ms. Warren

19    told Commander Jennings that she read the summons, but she then

20    later claims that she didn't see that warning, that even though

21    it's on there, she didn't read it.

22         On the summons, the jurors were supposed to call a

23    recording at 3:30 the Friday before.  So her jury duty was on a

24    Monday.  She was supposed to call at 3:30 to find out if she

25    was selected or not.  And Ms. Warren will testify that on that

Opening Statement - Defense

1  Friday before her jury duty, she made not one, but two calls to

2  the number on the summons, and then when she called the number,

3  she would have heard a recorded message.

4          And this is Joint Exhibit 3 at Bates stamp 188.

5          So on the recording, individuals were told, you know,

6  "You've reached the Kendall County jury commission.  You need

7  to know your panel number," and it goes through and gives

8  instructions about who would need to appear for court the next

9  Monday.

10          What's important is that, again, in this audio

11  recording, the jurors are told that "Please note that no food,

12  beverages, cell phones, or other electronic devices are allowed

13  in the courthouse when you report for jury duty."

14          So she would have not only been instructed in the

15  summons, but she also would have been told that when she called

16  the recording on Friday that she called twice.

17          So now we have the morning of jury duty when

18  Ms. Warren comes to the courthouse.  So Joint Exhibit 3, which

19  is Bates-stamped 182.  When Ms. Warren entered the courthouse,

20  there is a sign that is posted on the front door as you're

21  walking into the courthouse.  And this is a picture of the

22  sign.  And it says, "Jurors:  Please return cell phones and/or

23  electronic devices to your car.  Thank you."

24          Ms. Warren will tell you that when she came into the

25  courthouse, she didn't see that sign, didn't notice it.

53

Opening Statement - Defense

1          After she went through security, she would need to go

2     into a room similar to probably what you had to go into

3     yesterday.  There's a room where you check in with your summons

4     and say, "I'm here for jury duty."

5          And the evidence will show that on the table when you

6     check in that there is this same exact sign that's on the

7     table.  And Ms. Warren will tell you that she didn't notice it

8     and she didn't read the sign.

9          So the night before Ms. Warren reported for jury duty,

10     she calls Commander Jennings at home to find out what shift

11     she's supposed to work.  Normally she's supposed to work in the

12     afternoon, and that starts at 2:00.

13          Commander Jennings tells her, "Well, plan on working

14     your normal second shift, but bring your uniform and call me in

15     the morning, and I'll check the schedule and I'll see if I can

16     switch you to a different shift."

17          So Ms. Warren will tell you that she doesn't recall

18     being told to bring her uniform that day.  But what she will

19     tell you is that there was this snowstorm and it was really

20     cold and that, you know, she left her uniform at home.

21          But what is important in this case is that the Public

22     Safety Center where she works is literally on the other side of

23     the parking lot from the courthouse.  So she could have brought

24     her uniform to jury duty that day and just went over to the

25     Public Safety Center, stored it in her locker, and come over to

1   the courthouse.  She didn't.  She left it at home.

2          Ms. Warren will tell you that while she was serving

3   jury duty, she was texting.  And the evidence will show that

4   when she first got to the courthouse, she was told and she knew

5   before she went into the courtroom with Judge Pilmer that she

6   was moved on to first shift, meaning that she was going to be

7   serving her jury duty and only needed to return to the

8   courthouse to finish off that rest of that shift if she was

9   released.  If she got put on a jury, she wasn't going to have

10  to work that day.  But if she did not get put on a jury, she

11  just had to finish out her eight and a half hours.

12         So that morning, Ms. Warren's called into the

13  courtroom of Judge Robert Pilmer, and he questions her just

14  like you were yesterday.  And Ms. Warren raised her hand a

15  number of times, and she answered the questions.

16         Judge Pilmer dismissed the jurors who were not

17  selected and sent them back to the jury room.  Judge Pilmer

18  told the jurors who were not selected that they would likely be

19  released, that they were going to be done for the day.

20         When Ms. Warren got back to the jury assembly room,

21  she waited for a short time, and a little after 11:00, one of

22  the jury commissioners said to the group, "You may go."  And

23  Ms. Warren will tell you that that's all the person said is

24  "You may go."  She didn't -- the person didn't say when you

25  may -- must return.  The individual didn't say, "You're on

Opening Statement - Defense

1    lunch, and you've got an hour, and you have to come back."

2    There was no mention of that whatsoever, just "You can go."

3         Ms. Warren will tell you she didn't ask for

4    clarification from this individual.  She simply left the

5    courthouse.

6         When Ms. Warren left the courthouse, she called

7    Commander Jennings from her car.  And Ms. Warren will tell you

8    that certainly at that point Commander Jennings told her,

9    "You're moved to first shift, so when you're done, come over

10   and report to work."  And she will say that "We were only

11   released for lunch," which was not true.  She was released for

12   the day, and she was done.

13        During the trial, you will not hear a single witness

14   testify that Ms. Warren was still on jury duty when she walked

15   outside of that courthouse that morning a little after 11:00.

16        You will see on that jury summons that I just showed

17   you, if you pore through it, one thing that you will notice is

18   that nowhere in the jury summons does it ask jurors for their

19   cell phone numbers.  You will not hear any testimony from

20   anyone that the jury commissioners ask jurors for their cell

21   phone numbers.  So you will hear testimony from Ms. Warren that

22   no one asked her for her cell phone number when she appeared

23   for jury duty.

24        So at the time that she's going to this -- when she

25   says she's going to this drive-through, there will be no

1    evidence to show that anyone from the courthouse could have

2    called her because they didn't know her cell phone number.

3             So after she gets lunch, she reports back to the

4    Public Safety Center to finish out her shift.  You will hear

5    testimony from two witnesses, Tracy Page and Lisa Bowen.  And

6    Tracy Page will testify that Ms. Warren told them -- and I'll

7    actually show you this.  This is evidence that -- memos that

8    Tracy Page and Lisa Bowen had given to the Sheriff's Office as

9    part of the investigation.  This is Exhibit 3, and it's

10   Bates-stamped 179.

11            So Tracy Page will tell you that when she was in the

12   break room that morning that Ms. Warren stated to her that she

13   had jury duty today, and the courts released the jurors for

14   lunch, and then they had to go back, and once she got back,

15   they released her.  And Tracy Page, it stuck in her mind

16   because she'll tell you that she said, like, "That stinks.  You

17   know, why would they do that?  Why wouldn't they release you

18   before lunch so you didn't have to waste your time going back?"

19            You will also hear testimony from Lisa Bowen.  Lisa

20   Bowen is another employee in the Sheriff's Office.  And Lisa

21   Bowen will tell you -- let me see if I can make this smaller.

22            Well, Lisa Bowen will tell you that Ms. Warren

23   complained to her that they kept the potential jurors all

24   morning, had them go to lunch, and made them come back after

25   lunch, only to dismiss them at that time.  And she will tell

1   you that she recalls the conversation because she remembers

2   thinking that it was kind of pointless to have them come back

3   after lunch only to let them go.

4           So later that afternoon, Commander Jennings was in

5   Tracy Page's office, and Tracy Page tells her about this

6   conversation.

7           So then what happens next is later on Monday

8   afternoon, Deputy Commander Leinen e-mails Commander Jennings

9   and Chief Deputy Koster to let them know that he passed on the

10  message.  And I will show you Joint Exhibit 16.

11          THE COURT:  Let's go off the record for a minute.

12      (Off-the-record discussion.)

13          THE COURT:  All right.  Back on the record.

14          MS. BRUCH:  I apologize.

15          All right.  So we are now at Joint Trial Exhibit 16

16  where Deputy Commander Leinen e-mails Commander Jennings and

17  Chief Deputy Scott Koster and tells you -- tells them how at

18  the time that Ms. Warren appears for jury duty that she managed

19  to disrespect everyone she had contact with while at the

20  courthouse and she embarrassed the office in front of other

21  jurors and Judge Pilmer.  And Judge Pilmer told Judge McCann,

22  who was the Chief Judge at the courthouse, that there will be a

23  complaint being made in the morning.

24          So that's information that Chief Deputy -- that Deputy

25  Commander Leinen provides to Commander Jennings and to Chief

Opening Statement - Defense

1   Deputy Koster.

2          Now I want to show you Joint Exhibit 6.  That same

3   day, one of the jury commissioners, Nicki Swiss, who is not an

4   employee in the Sheriff's Office, sent a memo to the Chief

5   Judge, Judge McCann, who, again, that's her boss.  He doesn't

6   work for the Sheriff's Office.

7          And essentially what Nicki Swiss states in the memo is

8   that when Ms. Warren appeared for jury duty, she made a comment

9   about how she was extremely salty about being there, wanted to

10  know why she had to do this, and they informed her that there

11  have been other deputies in the past who have served and it's

12  everyone's responsibility to serve when summoned.

13         And according to Ms. Swiss, when she was in the jury

14  room, she was texting, she was updating Facebook and making

15  some statements in there.  And attached to the memo, Nicki

16  Swiss included the Facebook post from Ms. Warren.  And I will

17  show you.  This is part of Joint Exhibit 6.

18         So in Ms. Warren's Facebook post, Ms. Swiss had

19  reported that Ms. Warren stated on her Facebook page that "It

20  looks like an all-day gig for me here at the courthouse.  I was

21  required to show up for jury duty, and they aren't being very

22  quick about the selections.  All the cases are criminal, which

23  I'll get excused when they get to me.  They are going in number

24  order, and I'm way down on the number, 80.  Yes, I'm a tad bit

25  irritated, but, hey, I'm doing my civic duty."

1      And then later on, there was a post that she had here:

2   "Oh, I forgot to mention that on top of the 10 inches of snow,

3   now we will have another 5 inches.  And I can't believe, being

4   in law enforcement, that I'm having to show up at the

5   courthouse Monday morning for jury duty.  Why they would want

6   me on a jury is beyond me.  If it's a civil case, I do believe

7   that people should pay their bills.  If it's criminal, I side

8   with the police.  Yep, I'm a bit salty about that one."

9      So on January 7th, the next morning, the Sheriff's

10  Office receives an e-mail from Judge Pilmer, who was the judge

11  that presided over the questioning of jurors when Ms. Warren

12  was at the courthouse the day before.  And I'm going to show

13  you in Joint Exhibit 3.  This is Bates-stamped 165-66.

14      Judge Pilmer will be a witness in this case, and he

15  will tell you that this is the first time that he made a

16  complaint to the chief judge about a juror since he became a

17  judge.  And in the e-mail that -- Judge Pilmer, who, again, is

18  not an employee of the Sheriff's Office -- Judge Pilmer had

19  complained to Judge McCann about Ms. Warren.

20      And in his memo -- or his e-mail to Judge McCann,

21  essentially what he states is that he had a concern about the

22  sincerity of her responses, and he believed that she was giving

23  answers designed to avoid jury duty.  And he said that, you

24  know, his inclination at the time was -- whoops.  Excuse me --

25  that she was seeking to avoid jury duty.

Opening Statement - Defense

1      And he mentioned that she was not called into one of

2  the panels.  She was released with the remainder of the venire

3  and sent back to the jury assembly room before release.

4      And he also reported to Judge McCann -- which, again,

5  was forwarded to the Sheriff's Office, so they saw this

6  e-mail -- that at the conclusion of the trial, Judge Pilmer was

7  informed that Ms. Warren was rude to the courthouse staff.  She

8  was posting to Facebook while in the jury assembly room,

9  contrary to posted policies.

10      And he mentioned that, you know, due to the weather

11  yesterday, there were probably a number of people who wanted to

12  be elsewhere but did report for jury duty and were ready and

13  willing to serve as jurors if selected.  And, you know, he

14  certainly had some challenges at his home, but he came to the

15  courthouse.  And he mentioned that none of the other members of

16  the venire expressed any concerns about those types of issues,

17  and none appeared to be answering questions in an effort to

18  avoid jury duty.

19      So after the Sheriff's Office receives this

20  complaint -- which Chief Deputy Koster will tell you this is

21  the first time that he's ever received a complaint from the

22  courthouse about one of the deputies.  This was something that

23  was -- that rose to a higher level.  Normally discipline is

24  done by a sergeant at the sergeant level and might work its way

25  up.  This one started all the way at the top because of the

1   fact that it was the Chief Judge who was bringing the complaint

2   and another judge in the courthouse.

3          So Chief Deputy Koster will tell you that that

4   morning, on the 7th, he went over to the courthouse to have a

5   meeting with Judges McCann and Pilmer.  And he will tell you

6   that when he met with them, he wasn't -- certainly wasn't happy

7   about receiving a complaint about a member of his office, but

8   he did tell them after listening to their concerns that the

9   Sheriff's Office would conduct an investigation, but even if

10  Ms. Warren engaged in that behavior, she probably would only

11  get a slap on the wrist, and it's not something that she would

12  be fired for.

13         So when he comes back to the Sheriff's Office, he

14  assigned the investigation to Commander Jennings to handle.

15  And Commander Jennings will testify that as part of her

16  investigation, she obtained memos and information from

17  individuals at the courthouse.  She got videos.  She did a lot

18  of background work.

19         So as a deputy, Ms. Warren is a member of the union.

20  And as a union member, she's entitled to rights under her

21  contract.

22         So on January 14th, Commander Jennings called her into

23  her office to discuss the issues relating to her jury duty.

24  And at the start of the meeting, Commander Jennings notified

25  Ms. Warren that she was investigating three issues.  And the

1    three issues were whether she caused a disturbance at the entry

2    checkpoint, whether she had an electronic device when not

3    allowed, and whether she attempted to purposely get out of jury

4    duty.

5         And Commander Jennings will testify that during that

6    meeting, Ms. Warren could say whatever she wanted to say.  She

7    wasn't limited in any way on how to answer the questions.  She

8    could tell her side of the story.

9         And as part of that conversation, Ms. Warren told

10   Commander Jennings that she didn't know that she couldn't have

11   a cell phone in the courthouse.  And she also stated during the

12   meeting that she was released to go to lunch somewhere around

13   11:30, and she called Commander Jennings to let her know what

14   was going on.

15        And you will hear that later on during that meeting,

16   Ms. Warren volunteered -- this was not based on a question from

17   Commander Jennings, but Ms. Warren volunteered that as she was

18   going through the McDonald's drive-through, as she's driving,

19   she gets this call from the courthouse telling her that nothing

20   more was needed; she didn't have to report to the courthouse

21   and she was done.

22        So Commander Jennings says, "Okay.  Can you just show

23   me, you know, a screenshot on your phone of the call, or, you

24   know, can you just show me the phone records that you got this

25   call."

Opening Statement - Defense

1    And Ms. Warren says, you know, "Okay. I'm going to

2  check."

3    So the evidence will show, you know, again, that the

4  jury commission doesn't ask her for her cell phone. So

5  Ms. Warren tells Commander Jennings that her husband Jeff makes

6  her delete numbers when her phone starts to run slow.

7    So Commander Jennings asked for a memo or the

8  screenshot.

9    So now she's getting -- as part of Commander Jennings'

10  investigation, she gets the memos that I just saw you -- showed

11  to you from Tracy Page, from Lisa Bowen. She gets information

12  from the individuals at the jury commission.

13    So let me show you Joint Exhibit 3. And this is

14  Bates-stamped 175-78.

15    THE COURT: Ms. Bruch, how much more do you have?

16  Because I -- we're about an hour and a half in, and I'm going

17  to give the jury a break if you're -- unless you're near

18  finished.

19    MS. BRUCH: I would --

20    THE COURT: I hate to interrupt your opening, but I'd

21  rather let the jury take their morning break at this time if

22  it's a convenient time to break.

23    MS. BRUCH: This is a convenient time to break for me.

24    THE COURT: All right. Ladies and gentlemen, we're

25  going to take our morning break right now. We'll continue with

1    the opening statements after that.  But we're going about an
2    hour and a half, which is about the right time to break.
3             Please don't discuss the case among yourselves or with
4    anyone else.  Keep an open mind.  There's evidence to hear in
5    the case.  See you in about 15 minutes.
6             THE CLERK:  All rise.
7             THE COURT:  You can leave all the materials you have
8    out there on your seats if you'd like.  There's no need to take
9    it back.
10    (Jury out at 11:14 a.m.)
11             THE COURT:  All right.  Anything we need to put on the
12    record?
13             MS. BRUCH:  No.
14             THE COURT:  Okay.  We'll break for 15 minutes.
15             Sorry to interrupt you, but if you were going to go
16    another 15 or 20 minutes, we'd be getting closer to lunch.
17             MS. BRUCH:  No problem.
18             THE COURT:  They needed a break, I'm told.  So okay.
19             Again, off the record now.
20    (Off-the-record discussion.)
21    (Recess at 11:15 a.m., until 11:30 a.m.)
22             THE CLERK:  All rise.
23    (Jury in at 11:34 a.m.)
24             THE COURT:  All right.  Please be seated, ladies and
25    gentlemen.

Opening Statement - Defense

1    I understand -- I've sat in those chairs before.

2  Never as a juror, but just to test them out.  They're not that

3  comfortable.  And if at any point you feel uncomfortable and

4  you need to stand up and stretch, and if you think that's going

5  to be something you're going to do, just sit in the back row so

6  you don't block the vision of another juror.

7    But you're free to stand up and stretch while

8  testimony is going on.  The lawyers and the witnesses

9  understand it's not meant as any disrespect, and there's no

10  need to take a break for something like that.  But the most

11  important thing, as I said yesterday, is that you're

12  comfortable so that nothing interferes with your ability to

13  hear the lawyers and hear the witnesses and think about the

14  case.

15    So with that, you may continue.

16    MS. BRUCH:  Okay.  Thank you, your Honor.

17    And, first, let me apologize.  You know, I don't mean

18  to drag this on forever.  But I think it's useful for you to

19  see the documents so you can kind of follow along because it is

20  a little bit of a complicated story.

21    So when we left off, we were talking about Commander

22  Jennings' investigation into the complaints that were brought

23  to the Sheriff's Office's attention by individuals at the

24  courthouse.

25    And as part of Commander Jennings' investigation, what

1    she did was she followed up with the jury commissioners and

2    asked them if, in fact, Ms. Warren would have been released for

3    lunch that day.  And what the jury commissioners told her was

4    that on the date of Ms. Warren's jury service that all jurors

5    were excused by 12:00 p.m. and at no point were any jurors

6    informed that they could leave for lunch but needed to return

7    for further selection after lunch.  And both juries were

8    selected, and all jurors were released, and there was no need

9    for their return.

10         There were some -- after Commander Jennings met with

11   Ms. Warren on January 14th and she had that initial discussion

12   with her where Ms. Warren claimed that she got this mysterious

13   phone call when she left the courthouse, saying that nothing

14   more was needed, as part of her investigation, Commander

15   Jennings received this report from the jury commission.  And

16   this is Bates-stamped 176 in Exhibit 3, Joint Exhibit 3.

17         And what the jury commission told Commander Jennings

18   was that during that jury week, there were no jurors called

19   after their release and told to come back after lunch or any

20   break on either January 6th or the 7th.

21         And there was a further follow-up, and this is Joint

22   Exhibit 3, Bates-stamped 177.  And, again, the jury commission

23   told Commander Jennings that when they release jurors, they

24   tell them that they're done, their service is complete, and

25   they do not need to come back until they get another summons in

67

Opening Statement - Defense

1    the mail from them.  And that's standard.  They're not released

2    until their service is totally, totally finished.

3         And the jury commission reported to Commander Jennings

4    that they've never called any juror after they were released

5    and told them that they had to come back for another day or

6    later that day.

7         So after assembling evidence as part of her

8    investigation, Commander Jennings' next step was to consider

9    what type of discipline would she give to -- recommend to give

10   to Ms. Warren.  And what Ms. -- what Commander Jennings sent

11   her is Joint Exhibit 12.

12        On January 24, 2014, Commander Jennings notified

13   Ms. Warren that she was contemplating a recommendation of

14   discipline greater than an unpaid suspension of more than three

15   days.

16        Commander Jennings will testify, and Chief Deputy

17   Koster will tell you, that Commander Jennings does not have the

18   authority to terminate people.  She can only make

19   recommendations.  She can't actually fire somebody.  So when

20   she is contemplating discipline greater than three days, then

21   according to the union contract, she's going to give notice to

22   the individual and allow them to have their union

23   representative present for a formal interrogation.

24        So the formal interview that Commander Jennings did of

25   Ms. Warren took place on February 4, 2014.  And at that time,

1    she was represented by her union individuals.  And what

2    Commander Jennings will tell you is that during that interview,

3    the questions that she asked, it was not meant to be a "tell me

4    your side of the story" type of situation.  Instead, there were

5    specific questions that Commander Jennings had of Ms. Warren

6    that were to verify the answers that she gave on January 14th

7    when they had that initial meeting in her office.  And she was

8    trying to get yes-or-no answers to those questions.

9         Commander Jennings will tell you that during that

10   formal interrogation, the answers that Ms. Warren gave her

11   changed from what she initially told her, so it was Commander

12   Jennings' belief that Ms. Warren was being untruthful.  And

13   Commander Jennings will tell you that this was the first time,

14   in her mind, that she felt that Ms. Warren was being

15   untruthful.

16        Chief Deputy Koster will tell you that he had

17   suspicions of her untruthfulness earlier than that, so he was

18   suggesting to Commander Jennings some questions that she should

19   ask Ms. Warren to determine whether or not she was being

20   untruthful.

21        And Commander Jennings will tell you that at the end

22   of that formal interrogation, she completed her investigation,

23   and she prepared recommendations to Chief Deputy Koster.  And

24   you will hear evidence that Commander Jennings believed that

25   Ms. Warren had a total disregard for the appearance of the

Opening Statement - Defense

1   Sheriff's Office and the Kendall County judiciary and

2   diminished the integrity of the Sheriff's Office by showing a

3   biased opinion of individuals involved in criminal issues.  So

4   ultimately Commander Jennings recommended Ms. Warren's

5   termination for the untruthfulness.

6          At that point Commander Jennings steps out of the

7   case.  She's not involved in the investigation.  She doesn't

8   have anything more to do with it.

9          Now we move on to Chief Deputy Koster.  So Chief

10  Deputy Koster will tell you that he reviewed Commander

11  Jennings' report, all of the documents, all of the information

12  that I was showing you now and that at that point he provides

13  Ms. Warren with Joint Exhibit 10.

14         Joint Exhibit 10 is a memo that Chief Deputy Koster

15  sends to Ms. Warren on February 13, 2014.  And it's notifying

16  her that she must appear for a pre-disciplinary hearing on

17  Thursday, February 20th.  And at that -- along with the notice,

18  she was provided with copies of all the pertinent documents

19  that made up the foundation for which disciplinary action was

20  being contemplated.

21         Ms. Warren was also notified that she had the right to

22  bring her union representative with her and that she would also

23  have the opportunity during that pre-disciplinary meeting to

24  bring in whatever evidence she wanted, testify to whatever she

25  thought was pertinent related to the case.

Opening Statement - Defense

1          The evidence in the case will show, and Ms. Warren

2     will tell you, that when she received this notice, she knew

3     this was a big deal, that she -- that the Sheriff's Office was

4     contemplating more than a slap on the wrist for her conduct.

5          So what was that?

6          You recall that initially when Commander Jennings met

7     with Ms. Warren on January 14th, she asked her for that

8     screenshot from her cell phone or the copy of the cell phone

9     bill.  And Commander Jennings and Ms. Warren will both tell you

10    that that was never provided to Commander Jennings as part of

11    her investigation.

12         And instead, what happened was after Ms. Warren

13    received this notice of pre-disciplinary hearing from Chief

14    Deputy Koster, her union representative on February 18th sends

15    an e-mail to Chief Deputy Koster asking for a lot of

16    information, like videos, and she wants a transcript of Judge

17    Pilmer's questioning of the jurors.

18         And what Chief Deputy Koster responds back to the

19    union representative, he says that they can get whatever

20    evidence they want.  He's not going to stand in their way.  But

21    he wants to let them know that the Sheriff's Office did not

22    review, examine, or rely on any audio recordings or written

23    transcript of the jury questioning and did not rely on that as

24    part of the investigation or the findings.

25         And why is that?  Because Chief Deputy Koster will

Opening Statement - Defense

1    tell you that when he met with Ms. Warren and the union

2    representative, Richard Stomper -- this is on February 28th --

3    it was supposed to be the pre-disciplinary hearing.  It

4    actually never took place that day.

5         But if you see in the letter, in the original letter,

6    it says -- I took it off, but it says February 20th.  It got

7    pushed to February 28th.  On February 28th they show up, and

8    they wanted to review video.  They wanted to review additional

9    evidence.  So that's why the hearing didn't take place that

10   day.

11        But there were two pieces of information that the

12   union and Ms. Warren provided to Chief Deputy Koster.  And we

13   would suggest that that information shows that they knew that

14   truthfulness was the focus of the investigation, and, in fact,

15   Chief Deputy Koster will tell you that he specifically told

16   them that the entire focus of the investigation at that point

17   was related to truthfulness concerning her release from jury

18   duty.

19        So the first document that Ms. Warren and her union

20   representative provided to Chief Deputy Koster on February 28th

21   before the pre-disciplinary hearing is Joint Exhibit 9.  Joint

22   Exhibit 9 is Ms. Warren's cell phone bills.  And the cell phone

23   records, if you can see, the date in question is January 6th.

24   That's the date of jury duty.

25        The phone records show that on Monday, January 6th,

1    when Ms. Warren had jury duty, she made two calls at 8:06 a.m.

2    and one call at 11:14 a.m. to the number of (630) 553-7500.

3    That's the number for the Sheriff's Office.  So that's when

4    she's calling Commander Jennings to talk about when she has to

5    work that day.

6          And the call at 11:15 was the one where she was

7    specifically told, "You're going to have to finish out your

8    shift.  Come back," and she -- and Ms. Warren claims that --

9    she said she was just released for lunch.

10         At 11:14 a.m. she made a phone call to the number of

11   (630) 730-2196.  The evidence will show that that is her

12   husband Jeff's cell phone number.

13         The next phone call that she makes is at 11:20 a.m. to

14   (630) 224-8328 [*sic*].  That was Commander Jennings' cell phone.

15         So the next call after that, as you can see, that call

16   is redacted.  It's blacked out so you can't see who made that

17   call or whether that was a call that she received.

18         And then the next call after that would have been made

19   by Ms. Warren at 3:28 p.m. to the number of (630) 730-2196,

20   which again is her husband Jeff's cell phone.

21         So this document is handed to Chief Deputy Koster by

22   Ms. Warren on February 28th with no explanation whatsoever.

23         And recall that Ms. Warren is telling us that the call

24   that she received as she was going through the McDonald's would

25   have been the call after the one made at 11:20 to Commander

Opening Statement - Defense

1    Jennings' cell phone.  So if you take a look at it, the one

2    that she would have allegedly received telling her nothing more

3    was needed was redacted with no explanation.

4            The second piece of information that Ms. Warren

5    provided to Chief Deputy Koster on February 28th is Joint

6    Exhibit 13.  Joint Exhibit 13 is -- let me just clear this

7    out -- an e-mail that was sent by the travel agent, Christine

8    Fidler, to Ms. Warren on February 28, 2014.

9            And in the e-mail, Christine Fidler writes, "To whom

10   it may concern:  After reviewing my phone records, I am the one

11   who called Carrie Warren on January 6, 2014, at noon.  I had

12   stated to her that everything was done and nothing else was

13   needed from her, told her to have a good day and not to work

14   too hard."

15           Again, this was given to Chief Deputy Koster with no

16   explanation whatsoever.  And the pre-disciplinary hearing

17   didn't take place that day.  So Chief Deputy Koster will tell

18   you -- and Chris Fidler is going to come in and tell you that

19   she never made a phone call on that day.

20           But in any event, Chief Deputy Koster will tell you

21   that he -- after receiving these records with no explanation

22   and not knowing what it was, he first then calls over to the

23   jury commission and thinking that, well, maybe Christine Fidler

24   was a juror and that's where this all came up.

25           So he finds out from the jury commission that she was

1    not listed as a juror.  She doesn't work in the courthouse.

2    She's not in the jury database.  So then he asked a detective

3    in the Sheriff's Office to go out and interview Ms. Fidler to

4    find out what she has to say about this.

5              And, again, you will see Ms. Fidler.  She is going to

6    come into court, and she will tell you that on February 14th,

7    she received a phone call from Ms. Warren.  And Ms. Warren told

8    her that she was having a political issue at work and would

9    she -- she checked her own phone records and saw that

10   Ms. Fidler had called her, and she wanted Ms. Fidler to prepare

11   an e-mail saying so.

12             According to Ms. Fidler, she will tell you that

13   Ms. Warren told her what to write in the e-mail, that she never

14   actually checked her phone records.  She simply relied on what

15   Ms. Warren was telling her, believing that it was accurate.

16             During the interview, Ms. Fidler, the travel agent,

17   gave the detective a copy of her cell phone records from her

18   business.  And she told him that "I only use my business number

19   when I call my clients.  I don't use my personal cell phone

20   number.  So if there's a call, it's going to be here."  And, in

21   fact, there were calls on the travel agent records showing that

22   on January 2nd and January 10th that Ms. Fidler had called

23   Ms. Warren.  There were no calls whatsoever made on

24   January 6th, the date of jury service.

25             Ms. Fidler, when she comes in to testify, you can ask

1    her if she felt like she was coerced.  She will tell you she

2    was not coerced in answering the questions.  She answered the

3    questions truthfully and honestly, and she will tell you that

4    she was told by Ms. Warren what to say.

5         The next step in this investigation after Chief Deputy

6    Koster gets the information back regarding Chris Fidler, they

7    have the pre-disciplinary meeting.  That takes place on

8    March 11th, 2014.  So Chief Deputy Koster will testify that

9    this March 11 meeting is Ms. Warren's opportunity to tell her

10   side of the story, provide whatever evidence that she wants to

11   explain what had happened.

12        And the evidence will show that during that meeting,

13   Ms. Warren stood by her statement that she was released for

14   lunch, but when she -- she thought she had to come back.  As

15   she's driving, she gets this phone call, and she was told

16   nothing more was needed.

17        So at that point Chief Deputy Koster will say he shows

18   them these redacted phone records and the e-mails and he asks,

19   "Well, what does this mean?"

20        And according to the union rep, he tells him that's

21   where the comedy of errors began, and the comedy of errors is

22   due to the nonspecific nature of the phone call, that

23   Ms. Warren thought it was the jury commission, but really it

24   was her travel agent, Ms. Fidler, that was calling her.

25        Chief Deputy Koster got extremely upset with that

1    answer, and he showed Ms. Warren and her union representative

2    the transcript from the call, from the interview that the

3    detective had done with Fidler, along with the audio.  And he

4    said, basically, "You're a liar, that we talked to Fidler.  She

5    never called you on that day.  That's not true."

6         So what will happen -- what Chief Deputy Koster will

7    say is that he asked Ms. Warren:  "Can you provide me those

8    cell phone records unredacted so I can see.  You can prove that

9    you got this call."  And Ms. Warren responded that her husband

10   would not allow it.

11        So at that point Chief Deputy Koster will say he

12   determined from his own independent investigation that

13   Ms. Warren was being untruthful.

14        So at that point, after the meeting was over, Chief

15   Deputy Koster prepared a lengthy memo to Sheriff Randall that I

16   will show you when Chief Deputy Koster is on the stand.  We

17   don't need to go through it now.

18        But essentially he recommends Ms. Warren's termination

19   for two things.  He recommends her termination for her being

20   untruthful about her repeated statements, about being unaware

21   of the prohibition of jurors bringing cell phones into the

22   courthouse, and the statement to Commander Jennings that she

23   was released from -- for lunch and had to go back and -- but

24   then had to -- got this phone call saying that nothing more was

25   needed, that those statements were untruthful and they were

Opening Statement - Defense

1   made during a formal interrogation.

2          Chief Deputy Koster will tell you that Ms. Warren was

3   never actually disciplined or terminated for her behavior with

4   Judge Pilmer; she was never disciplined or terminated for her

5   creating a disturbance in the -- in the entryway as she's going

6   through with the courtroom security officers.  That's what

7   precipitated the investigation.  That's why they started

8   investigating her.

9          But that's not what she was actually disciplined for.

10  She was not -- he will tell her she wasn't actually terminated

11  for taking too long at lunch; it was for being untruthful

12  during a formal interrogation about this incident.

13         So it was Chief Deputy Koster's finding that

14  Ms. Warren had lied during all stages of the investigation

15  regarding the circumstances surrounding her release from jury

16  duty.  So, again, Chief Deputy Koster does not have the

17  authority, though, to terminate.  Instead, he makes the

18  recommendation to Sheriff Randall.

19         Sheriff Randall will tell you, though, because he

20  entrusts the day-to-day operations of the Sheriff's Office to

21  his Chief Deputy that essentially he reviewed everything but

22  agreed with Chief Deputy Koster and ultimately terminated

23  Ms. Warren's employment.

24         Chief Deputy Koster in his report -- and he will tell

25  you on the stand -- that he found it especially significant

Opening Statement - Defense

1    that not only did Ms. Warren persist in this falsehood during

2    the entire investigative process, but she even went so far as

3    to fabricating evidence to support this story that she made up.

4         So because Ms. Warren is a union employee, she had a

5    right to file a grievance following her termination, which she

6    did.  And she filed a grievance asking to reverse her

7    termination.  So now as part of this entire process, Ms. Warren

8    is entitled to yet another hearing with the Sheriff's Office to

9    determine whether or not that termination was justified or not.

10   And the person who is basically in charge of this process is,

11   again, Chief Deputy Koster, along with Sheriff Randall.

12        And the evidence is going to show that as part of this

13   grievance process, before the next hearing, Ms. Warren and her

14   union representative provided additional documentation to the

15   Sheriff's Office that they believed warranted the reversal of

16   her termination.

17        So now I want to show you Defendants' Exhibit 9.  You

18   may recall that prior to Ms. Warren's termination that she

19   submitted records of her -- from her cell phone that were

20   redacted.  And there was one call in particular that was

21   redacted at the time of -- after -- let me just -- so the calls

22   that were shown on the redacted records were up through 11:20,

23   and then the 11:32 was redacted and the one at 3:28 was

24   visible.

25        So following her termination, she submitted additional

1    evidence that would -- she believed would show that she was not

2    being untruthful.  And what those records show is that she did

3    not receive a phone call as she's going through the McDonald's

4    drive-through as she claims.  According to these records that

5    she provided to Chief Deputy Koster, at 11:32 a.m., she made a

6    phone call to her husband Jeff, (630) 730-2196.  The one at

7    11:32 a.m., that is to her husband.

8         She -- you will not see any records in this case that

9    she ever provided to the Sheriff's Office substantiating her

10   statement during the formal interrogation that she received a

11   phone call after she left the courthouse, telling her that

12   nothing more was needed.  You will not see that.

13        So following review of that document, Chief Deputy

14   Koster prepared a denial of a grievance that was signed by the

15   Sheriff and the county board member.  Ms. Warren's gender

16   played no role -- no role -- in any of defendants' decisions to

17   recommend or terminate her employment.

18        One of her claims in this case is that the deputy --

19   that the Sheriff's Office had terminated her because she's a

20   woman and that male deputies committed worse rule violations

21   than she did.  And one of the things that I want to point out

22   to you is in the jury instructions that you were just handed by

23   Judge Durkin.

24        And one of those jury instructions, which we contend

25   is very important, is that in deciding her claims of

1    discrimination, you should not concern yourselves whether or

2    not the defendants' actions in terminating her were wise,

3    reasonable, or fair.  Rather, your only concern is whether

4    Ms. Warren has proved that the defendants terminated her in

5    part because she's a woman.

6              So it may be that you think that this was overly

7    harsh.  But ultimately, as you look through the evidence and

8    you follow the instructions that you're given by the Court, the

9    issue is not whether or not that's a valid reason to fire

10   somebody; it's that did her gender play any role in that.  And

11   the defendants' position in this case will be that at the end

12   of -- at the end of the trial, you will determine that it did

13   not.

14             And you will hear evidence from Chief Deputy Koster

15   and Commander Jennings that because it's a paramilitary

16   organization that people are disciplined all the time.

17   Commander Jennings will tell you that essentially she probably

18   has disciplined everybody who works underneath her.  And Chief

19   Deputy Koster will tell you that he sees probably about

20   20 recommendations a week of discipline of employees in the

21   Sheriff's Office that he has to review.

22             And when he's considering discipline of employees,

23   it's similar to how -- there's two things that he will tell you

24   that he keeps in mind.  First, when somebody does lie -- which

25   it does happen, certainly -- if they later admit their lie and

Opening Statement - Defense

1   they tell you that they misspoke, that they -- that what they

2   said initially wasn't true, they're still going to be

3   disciplined.  They're not going to let it slide.  But they're

4   not going to be fired.

5          But when somebody lies during a formal investigation,

6   which is more serious, that's the time when the Sheriff's

7   Office is going to recommend termination.  And they will tell

8   you that in a jail setting, it's difficult to hire female

9   corrections deputies.  You need to have female officers there

10  for the strip searches of female inmates.  So in that

11  situation, they wouldn't recommend Ms. Warren's termination

12  unless they felt that it was justified.

13         You will also hear testimony from Chief Deputy Koster

14  and Commander Jennings that they have recommended the

15  termination for male deputies for untruthfulness.  And they

16  make, again, a distinction between deputies who lie initially

17  in their job and those who persist in their lies as the

18  investigation progresses.

19         As the trial proceeds, Ms. Warren and her attorneys

20  are going to put on their case first.  We will have an

21  opportunity afterwards to put on our evidence.  And, again, we

22  ask you to keep an open mind and wait until you hear all of the

23  evidence before you make up your mind.

24         And at the close of evidence, we ask that you find in

25  favor of the Sheriff's Office and determine that Ms. Warren's

Opening Statement - Defense

1  gender did not motivate in any way, shape, or form the decision

2  of the Sheriff's Office to terminate her employment.

3          Thank you very much.

4          THE COURT:  All right.  Thank you.

5          Plaintiff may call her first witness.

6          MS. McLAUGHLIN:  Our first witness will be Scott

7  Koster.

8          THE COURT:  All right.

9          Sir, please raise your right hand.

10     (Witness duly sworn and takes the stand.)

11          THE WITNESS:  Yes, I do.

12          THE COURT:  And, Ms. McLaughlin, what are you going to

13  use, the ELMO or the computer?

14          MS. McLAUGHLIN:  The ELMO.

15          THE COURT:  The ELMO.  All right.  Then it's already

16  set.

17          MS. McLAUGHLIN:  Yes.

18          And prior to -- oh, wait a minute.  I forgot my --

19  sorry.

20     (Counsel conferring.)

21          THE COURT:  Ladies and gentlemen -- and,

22  Ms. McLaughlin, I will tell the jury.

23          Plaintiffs are entitled, and it's perfectly proper for

24  them, to in effect call a defense witness in their case.  And

25  it will begin, because he's an adverse witness to the

1   plaintiff, with Ms. McLaughlin cross-examining him.

2           The plaintiff -- the defense then has the choice of

3   either letting this witness go back to the table and come back

4   and testify in the defense case or having his direct testimony

5   take place right after it.  I think the defense has chosen to

6   do his direct testimony right after it so you can get it all at

7   once, and I think in the end it saves time.

8           But it's a perfectly proper practice of the plaintiff

9   to call in effect what would normally be a defense witness or a

10  defendant in their case.  And that's what's going to happen

11  here.  So it'll begin with cross-examination rather than with

12  the direct examination.

13          You may proceed.

14          MS. McLAUGHLIN:  Okay.  Before we start, your Honor, I

15  have a stipulation to read to the jury.

16          THE COURT:  All right.  You may.

17          MS. McLAUGHLIN:  This is agreements between the

18  parties.

19          The first stipulation is that Ms. Warren's job

20  performance prior to January of 2014 played no role in her

21  termination.

22          The second stipulation is that the time clock on the

23  courthouse videos for January 6, 2014, are approximately

24  20 minutes off.  For example, 10:50 a.m. is actually

25  approximately 11:10 a.m.

Koster - Direct by McLaughlin

1    SCOTT KOSTER, DEFENDANT HEREIN, PLAINTIFF'S ADVERSE WITNESS,

2                                    SWORN

3                            DIRECT EXAMINATION

4    BY MS. McLAUGHLIN:

5    Q.  Mr. Koster, would you please state your full name.

6    A.  Yes.  My name is Scott Koster, spelled K-O-S-T-E-R.

7    Q.  Okay.  So I understand that you are currently retired from

8    the KCSO but also a part-time employee.  Explain that.

9    A.  I'm retired from my full-time position, and I collect my

10   law enforcement pension.  Under pension rules, I'm allowed to

11   work a number of hours per year, up to 600, and I still do

12   part-time work with the Sheriff's Office under that cap.

13   Q.  And what is your title then for this part-time work that

14   you are doing?

15   A.  Just deputy.

16   Q.  Just deputy.  Okay.

17        Can you give me a brief history of your employment at

18   the KCSO.

19   A.  Certainly.  I was hired in January of 1990 as a patrol

20   deputy.  I worked as a patrol deputy I believe until about 1996

21   and was assigned as a community policing officer and D.A.R.E.

22   officer.  I served in those duties for several years, until I

23   was promoted to a patrol sergeant.

24        I served as a patrol sergeant until approximately

25   2004, when I was promoted to detective sergeant in charge of

Koster - Direct by McLaughlin

1   the investigations section.  I served in that position, and in

2   about -- towards the end of 2005, I was given an acting

3   commander appointment to be commander of the criminal division.

4           And in 2007, the Sheriff's Office reorganized its

5   division structure, and I was made a full commander -- or

6   commander of the support services division and maintained that

7   position until being appointed by the Sheriff, by Sheriff

8   Randall, as his Chief Deputy in 2010.

9   Q.  And in 2010, you are the number two position within the

10  office, correct?

11  A.  Yes.

12  Q.  And you basically ran the day-to-day operations of the

13  Sheriff's Office, correct?

14  A.  That is correct.

15  Q.  So could you outline the chain of command in early 2014

16  just briefly, going down to the commander level.

17  A.  It would be the Sheriff at the top of the chain of command;

18  the Chief Deputy, which is the position I held at the time; and

19  then the division commanders, of which I believe at that time

20  there were three; and then deputy commanders for each division.

21  Q.  Okay.  And so --

22  A.  I'm sorry.  I went a little further than --

23  Q.  Okay.

24  A.  -- you asked.

25  Q.  And so who were the commanders for each division?

Koster - Direct by McLaughlin

1   A.   Commander Jennings was the commander of the corrections

2   division, Commander Wollwert was the commander of the support

3   services division, and Commander Smith was the commander of the

4   criminal division.

5   Q.   Okay.  And the Deputy Commander at the jail and the

6   courthouse.

7   A.   Deputy Commander at the courthouse was Deputy Commander Rob

8   Leinen.  And at the courthouse, it was Deputy Commander Joe

9   Gillespie.

10  Q.   Okay.  So Rob Leinen was subsequently demoted to sergeant,

11  correct?

12  A.   He was reassigned to the position of sergeant.

13  Q.   That's a demotion, isn't it?

14  A.   I would have to let the -- the Sheriff, who then made that

15  decision, as to whether it was a demotion or whether they

16  eliminated that position.

17  Q.   Okay.  So all these individuals report up to you, right?

18  A.   That's correct.

19  Q.   And the executive staff for Richard Randall, the Sheriff,

20  that's you and all the division commanders, correct?

21  A.   And deputy commanders --

22  Q.   And deputy --

23  A.   -- at the time, yes.

24  Q.   Okay.  And the Sheriff is an elected position.

25  A.   Yes, that's correct.

Koster - Direct by McLaughlin

1  Q.  And so he's a politician, right?

2  A.  Yes, he is.

3  Q.  Okay.  And he's out of the office a lot during that

4  2013-'14 time frame, right?

5  A.  Yes, I'd say that he was out of the office frequently.

6  Q.  Okay.  But it was your practice to communicate with him at

7  least on a daily basis by phone or e-mail, right?

8  A.  I would say that with the exception of when one of us were

9  actually on an out-of-state or out-of-town vacation, yes, that

10  we communicated on a daily basis and, even under those

11  circumstances, you know, several times a week.

12  Q.  Okay.  And it would be your practice to make sure that

13  Mr. -- Sheriff Randall was aware of anything of note, correct?

14  A.  Yes.

15  Q.  So if you were contemplating significant disciplinary

16  action against an employee, termination or a suspension of more

17  than three days, if that -- if it was clear that there was

18  an -- that's where an incident was heading, you'd make sure to

19  keep him in the loop, wouldn't you?

20  A.  Yes, I would say that in general, if -- if I was -- if --

21  there could be circumstances where the contemplation that

22  discipline could exceed three days might not necessarily

23  trigger me having a specific conversation with the Sheriff

24  about it until after the formal interrogation.  So I can't say

25  that never -- that didn't ever happen, but I would say that

Koster - Direct by McLaughlin

1    in -- for general -- generally, yes, that would be accurate.

2    Q.  So with respect to your direct reports -- command staff?

3    Is that the proper term?

4    A.  Sure, yes.

5    Q.  Okay.  They would keep you apprised of any personnel issues

6    resulting in disciplinary actions, correct?

7    A.  Yes.

8    Q.  Okay.  In fact, you signed off on all disciplinary action,

9    right?

10   A.  I usually concurred on suspensions.  I often -- whenever

11   written warnings or verbal warnings that were documented in a

12   written form came across my desk, sometimes I would just make a

13   notation that I'd seen it and send it to the file.  But I don't

14   know that I did that in every case for a verbal warning that

15   was in writing or a written reprimand.

16   Q.  Okay.

17            MS. McLAUGHLIN:  Your Honor, I would be showing Joint

18   Exhibit No. 1, which is the code of conduct, and Plaintiff's

19   Exhibit 8, which is the complaint and investigation process.

20            THE COURT:  All right.

21            MS. McLAUGHLIN:  And I would move for admission so

22   that we can just shortcut this.

23            THE COURT:  Any objection?

24            MS. BRUCH:  No objection.

25            THE COURT:  They're both admitted without objection.

1        (Joint Exhibit 1 admitted in evidence.)

2        (Plaintiff's Exhibit 8 admitted in evidence.)

3    BY MS. McLAUGHLIN:

4    Q.   You're familiar with the code of conduct, correct?

5    A.   Yes.

6    Q.   And I'm putting up Joint Exhibit No. 1.  And you recognize

7    that document as the code of conduct, right?

8    A.   I do.

9    Q.   Okay.  And that came into effect in March of 2013 and

10   replaced an older set of rules and regulations, right?

11   A.   Yes.

12   Q.   You and Commander Jennings and Wollwert and Phil Smith, you

13   were all part of taking the old rules, updating them, and

14   putting them into this code of conduct, correct?

15   A.   Yes.

16   Q.   So this is the bible of the KCSO.  This is what you can and

17   cannot do, right?

18   A.   It -- I wouldn't say that it is the ultimate -- every

19   document such as this may not cover every circumstance or

20   situation.  So I wouldn't say just because it's not

21   specifically enumerated in the code of conduct or -- that it

22   would necessarily be something that would be approved by the

23   Sheriff.

24        And I think it's important to understand that in

25   addition to the code of conduct, the Sheriff's Office has

Koster - Direct by McLaughlin

1    hundreds of policies that the employees, all employees, are

2    required to follow.  Policies are often more guidelines and

3    have wider latitude for decision-making, but there are often

4    bright lines or prohibitions or requirements within policies

5    also.

6           And the code of conduct is more of a -- it's the

7    closest thing that you could say to a concise guideline of

8    conduct, which it was the code of conduct, what the

9    expectations for conduct are and what are prohibited.

10          But, again, I don't think that I can say that there is

11   no -- no -- nothing -- there -- that everything an employee

12   could do that they would be disciplined for is in the code of

13   conduct because we also have hundreds of policies and

14   procedures that they're -- that they're also required to

15   follow.

16   Q.  Okay.  Well, we're going to look at a few of the pertinent

17   provisions.

18          So on Kendall 13, Bates stamp Kendall 13, the letter R

19   is called Truthfulness.

20          And that says that an employee -- whoops.  Sorry.

21   Whoops.  An employee -- whoops -- shall not knowingly -- ah, I

22   hit the wrong one.  Sorry about that.  I haven't done this in a

23   little while, but I'll get the hang of it.  Just hang in there.

24          All right.  I'm still doing it wrong.

25          Okay.  An employee shall not knowingly depart from the

1    truth in any investigation, testimony, or conversation with a

2    supervisor.  Correct?

3    A.  Yes, it does.

4    Q.  So there's a little bit of leeway there, isn't there?  It

5    takes into account that an employee may be mistaken or forget

6    something, or maybe something slips their memory.  And you

7    don't punish employees for that, right?

8    A.  I think in addition to that, there's -- throughout the

9    entire code of conduct, there are no provisions or penalties

10   for infractions.  And that's because we understand that in any

11   type of conduct, there's going to be varying degrees and

12   varying levels.

13   Q.  Okay.

14   A.  So in addition to misremembering something or forgetting

15   something, there may be episodes or instances of truthfulness

16   that are on a lower end of a conduct scale, and then there may

17   be episodes of untruthfulness or deceptiveness that goes to a

18   higher level of a conduct scale, for instance, fabricating

19   evidence against an offender or making a false statement in an

20   affidavit or providing a false statement in a formal

21   interrogation.

22   Q.  Okay.  The bottom line is that you expect the truth at all

23   times in all day-to-day interactions, not just during formal

24   interrogations.  Isn't that correct?

25   A.  Yes, that is our expectation.

Koster - Direct by McLaughlin

1  Q.  Okay.  So this code, it doesn't distinguish between an

2  employee lying in the course of performing their regular job

3  duties and lying in response to a direct question, say in a

4  formal interrogation.  Isn't that correct?

5  A.  And I think I --

6  Q.  There's no distinction.

7  A.  I think I explained that, that there is no distinction,

8  specifically --

9  Q.  Okay.

10  A.  -- because there can be varying levels of --

11  Q.  Just answer my question, sir.

12  A.  -- determination.

13  Q.  Let's take a look now at the gift ban.  It's on page

14  Kendall 9.  And this is Roman numeral II, letter E.

15          And that says an employee shall not use their status

16  to solicit a gratuity, doesn't it?

17          And then, 2, gratuities not authorized under the

18  state -- Illinois State Gift Ban Act shall not be accepted and

19  returned to the donor with an explanation of the gratuity

20  policy.

21          That's your policy regarding receiving -- officers

22  receiving gifts from anyone who's associated with -- from the

23  public.

24  A.  Yes, as enumerated there in the code of conduct.

25  Q.  Okay.  And then let's look at Roman numeral III.C, which is

Koster - Direct by McLaughlin

1    on -- III.C.2, which is on Kendall 9.  And that is -- III.C.

2           I think I've written that down wrong.  Sorry.

3           All right.  Well, let's take a look at Roman numeral

4    III.M.6, which is on Kendall 19.

5           THE COURT:  And, ladies and gentlemen, these numbers

6    may get a little confusing.  When -- what the Bates number on

7    the bottom -- it's called Bates because there's some guy in

8    1900 who developed a self-stamping -- a device that could stamp

9    and then advance the number for the next page when it stamped

10   again.

11          And that's a way the parties when they exchange

12   documents in the pretrial proceeding -- what's called

13   discovery -- keep track of the records they've given each other

14   so there's no disputes about did you give me this document or

15   not.

16          The document number that is the important one -- the

17   Bates number will give you individual pages, but the document

18   number that is one you should focus on, unless the parties

19   direct you to a Bates number, is the exhibit number itself

20   because the exhibit numbers don't have identifiers like

21   "Kendall" or different numbers in front of it because the

22   numbers often -- the Bates numbers often identify where a

23   document came from.

24          But the exhibit numbers themselves are the -- probably

25   the easiest way to follow along, unless the attorneys, which

Koster - Direct by McLaughlin

1   they're allowed to do, direct you to a particular page.

2   Sometimes they use a Bates number to do that.

3           You may proceed.

4   BY MS. McLAUGHLIN:

5   Q.   Okay.  So this is Kendall 19.  And we're talking about

6   Relationships and Control of Inmates or Arrestees.

7           And on -- let's see.  That's M.6.  Let's take a look

8   at that.  Employees shall not borrow money or any type of

9   property; lend money or any property; accept any gifts or give

10  gifts; or show any favor to any inmate, arrestee, or detainee

11  while that person is in the custody of the Kendall County

12  Sheriff's Office.

13          That's one of your code of conducts, right?

14  A.   Yes.

15  Q.   Okay.

16          And now I found the one that I was looking for before,

17  the Illness and Injury Reports, which is C.2, which is actually

18  found on Kendall 16.

19          And that says -- oops.  C.2 is right up here at the

20  top.  Employees shall not feign illness or injury, or falsely

21  report themselves ill or injured, or otherwise deceive or

22  attempt to deceive any employee of the Sheriff's Office as to

23  the condition of their health.

24          That's one of your code of conducts, correct?

25  A.   Yes.

Koster - Direct by McLaughlin

1  Q.  So in addition to flatout lies, meaning a false statement

2  made with the deliberate intent to deceive, the code also

3  prohibits lies of omission, right?

4  A.  I believe that the -- in several areas, the expectation

5  that the full truth or that the full information be provided,

6  yes.

7  Q.  Okay.  A lie of omission is -- that refers to deliberately

8  withholding pertinent details or material details about

9  something in order to skew someone's -- someone else's idea of

10  what the truth -- or what is the truth or engender some kind of

11  misconception, right?

12  A.  Yes, I understand.

13  Q.  Okay.  So let's look at III -- Roman numeral III.N.1, which

14  is found on Kendall 13.

15           And III.N.1.  Whoops.  Well, I did a lousy job of

16  writing down my numbers, didn't I.

17           Okay.  It's on Kendall 19, the Bates stamp number.

18           And that says that employees shall submit all

19  necessary reports by the end of their tour of duty and by the

20  deadline authorized, and reports submitted by an employee shall

21  be truthful, accurate, and complete.  Right?

22  A.  Yes.

23  Q.  So completeness, omitting something that's important is a

24  problem, right?

25  A.  It is a requirement that we expect, yes.

Koster - Direct by McLaughlin

1    Q.   And if they leave out a material fact, that can be
2    construed as a lie of omission, right?
3    A.   Not without fully investigating the circumstances.  I can't
4    say that in every instance it would.
5    Q.   So the code isn't just concerned with honesty; it also
6    prohibits things like abuse of power.
7              Let's take a look at letter V.  Or that's, I guess,
8    Roman numeral V.F, which is found on Kendall 23.
9              That says an employee will not make false complaints
10   or accusations against coworkers or other members of the
11   Sheriff's Office.  Correct?
12   A.   Yes.
13   Q.   So by its very definition, abuse of power is also --
14   concerns -- is also a concern about honesty and integrity
15   within the office, correct?
16   A.   I'm sorry.  I didn't -- wasn't able to see the entirety --
17   Q.   Well, this is under Abuse of Power.
18   A.   Okay.  I wasn't able to see that on the exhibit, so I can't
19   confirm that that number falls under that chapter.
20   Q.   Okay.
21   A.   I mean, obviously, it speaks for itself as to what it says.
22   But without being able to see the entire exhibit --
23   Q.   Okay.  Well, happy to show you.
24   A.   Thank you.
25   Q.   So we're talking about Roman numeral V.

Koster - Direct by McLaughlin

1  A.  Yes.

2  Q.  Abuse of Law Enforcement Powers.  And that's on Kendall 22.

3         We move on to Kendall 23.  And under Roman numeral F,

4  it says an employee will not make false or capricious

5  complaints or accusations against coworkers or other members of

6  the Sheriff's Office.

7         So my question to you is, isn't abuse of power by

8  definition also concerned with honesty?

9  A.  If -- it could be under a certain circumstance.  In another

10  circumstance, it could have nothing to do with honesty.  It all

11  depends on the circumstances that we're talking about.  There

12  again, that's why there's no specific penalties associated with

13  any of these things, because there's wide ranges of conduct or

14  multiple issues of misconduct within --

15  Q.  Right.

16  A.  -- one circumstance.

17  Q.  Okay.  And you're --

18  A.  So you can't say that they're -- just because somebody did

19  this that it also becomes untruthfulness.  In some cases it

20  may, but not -- it's not a -- it's not a black-and-white issue.

21  Q.  The code defines, at least in part, that the abuse of power

22  can take the form of an employee making false complaints.

23  Right?

24  A.  Certainly.

25  Q.  Okay.  And that is to say lying.  You make a false

1    complaint, in other words, it's a kind of lie, isn't it?

2    A.  Again, without explaining -- if you give me a specific

3    question or a specific circumstance, I can say if it is an

4    untruthful act or not.  Making a --

5    Q.  Is a false complaint a lie?

6              THE COURT:  You need to let him finish his answer.

7              THE WITNESS:  It depends on the circumstances.  If the

8    false complaint was based on a misrepresentation or a

9    misunderstanding, it may not be a lie.  It certainly could be

10   an intentional lie.  But that's why we have investigations, and

11   that's why we make determinations on these things.  I can't

12   make a blanket statement that -- that an accusation that is

13   false is a lie.

14   BY MS. McLAUGHLIN:

15   Q.  Okay.  Well, you just used the word "intentional lie."

16   Isn't a lie by definition intentional?

17   A.  Well --

18   Q.  You're making a false statement intentionally versus --

19   A.  -- if you --

20   Q.  -- a misunderstanding or a mis -- misremembering something?

21   A.  But you asked me the question about the rule violation.

22   And I'm simply trying to give you the most full answer that I

23   can and the most accurate answer that I can.

24   Q.  Okay.  All right.

25              So let's take a look at Plaintiff's Exhibit No. 8.

1    And this is the complaint and acceptance and investigation

2    policy.  I'll show you a picture of the first page of that

3    exhibit.  I think I need to make this smaller so I can get in

4    more of the complaint or the document.

5              Okay.  So do you recognize that policy?

6    A.  Yes, I do.

7    Q.  This is the policy that was in effect during Melissa

8    Warren's employment, correct?

9    A.  It was yes.

10   Q.  Okay.  It makes reference to the issue date was 2004, but

11   it hadn't been rescinded.  This is the policy that was in

12   effect, correct?

13   A.  That's correct.

14   Q.  Okay.  So on page I, Roman numeral I, there is a reference

15   that this policy -- I'm sorry.  It is the policy of the office

16   to receive, document, and investigate all instances of alleged

17   misconduct.

18             So anytime something comes to your attention that may

19   involve potential misconduct, it is your obligation to

20   investigate, correct?

21   A.  I believe actually even further in the policy, it talks

22   about informally handling, you know, day-to-day infractions,

23   such as tardiness and things like that, without reviewing the

24   entire policy.

25             So you're -- you're making the statement again, the

Koster - Direct by McLaughlin

1    broad statement, that every infraction or every type of conduct

2    that would come to someone's attention has to be part of an

3    investigation.  I can't -- I can't say that.

4            And I think that the policy itself further on kind of

5    delineates some of those differences.

6    Q.  Well, let's look at Roman numeral III.E, which is found on

7    page 2 of this document.

8            And that references that an employee shall cooperate

9    in a Sheriff's Office internal investigation of an allegation

10   of misconduct when so directed by the office, and shall

11   truthfully answer questions and render complete, material, and

12   relevant statements, including all facts and circumstances

13   surrounding the subject matter of the investigation which may

14   be known by the employee.  Omissions of material fact shall be

15   classified as failure to cooperate in an internal

16   investigation.

17           Is that one of your policies then?

18   A.  Yes.

19   Q.  Okay.  So purposely omitting a material fact, that would be

20   a lie of omission, correct?

21   A.  As outlined in this particular policy, it would be as

22   pursuant to an internal investigation.

23   Q.  So this complaint process is also concerned with fairness,

24   wouldn't you say?  There's a provision that there must be a

25   neutral fact-finder, right?

Koster - Direct by McLaughlin

1   A.  Yes.

2   Q.  And you go into issues like -- well, I think this pertains

3   to what you were talking about earlier.  There's complaint

4   classification under Roman numeral VI, page 4 of the document.

5   And it talks about the type and nature of the complaint will

6   determine whether it's handled and resolved at the first-line

7   supervisory level or referred to the appropriate division

8   commander for more serious action.  Correct?

9   A.  Yes, I think that in that respect, it's much like what I've

10  responded to you before with the code of conduct and other

11  policies, that it's not a one-size-fits-all.  Classifications

12  and determinations have to be made based on the level of

13  conduct and the severity.

14  Q.  Okay.  And not all complaints, under B, can be

15  automatically categorized.  Supervisors are required to

16  exercise good judgment and common sense when they are made

17  aware of a complaint, right?

18  A.  Yes.

19  Q.  And we look at C.  And we've got in cases where there's an

20  allegation concerning violations of the Illinois Compiled

21  Statutes -- that's the laws, the statutes of Illinois, correct?

22         Those have to be referred to the appropriate division

23  commander and -- well, I'm sorry.  The division commander will

24  immediately contact the deputy chief, and then this matter will

25  then be reviewed with the Kendall County State's Attorney to

1   determine whether a separate criminal investigation should be
2   initiated.
3           So when there is a violation or a suspected violation
4   of Illinois law, that has to come automatically to you,
5   correct?
6   A.  It should come to me, yes.
7   Q.  And it's a requirement under this procedure that you bring
8   that to the attention of the state's attorney so they can
9   decide whether or not this is really an employment matter or it
10  should be investigated criminally, right?
11  A.  I have to clarify that because that is not an accurate
12  representation of what the intent of that is.  The intent of
13  that is to coordinate with the state's attorney, not for them
14  to make a determination whether a criminal investigation should
15  be started because the State's Attorney's Office doesn't make a
16  determination on the investigation, but rather prosecution.
17          That point is to make sure that when the -- if a
18  criminal investigation occurs that there is not -- a process
19  doesn't engage with the administrative investigation that might
20  taint the criminal investigation based on *Miranda* or other
21  constitutional issues that might arise in an administrative
22  investigation of something that may also be criminal or
23  ultimately be charged criminally.
24  Q.  So if you know that there's a criminal investigation
25  ongoing, you're going to coordinate with the State's Attorney's

1    Office so that your administrative investigation may not

2    conflict with the criminal investigation --

3    A.  Yes.

4    Q.  -- right?

5         Okay.  So let's look at VII -- VII.E.  That would be

6    on page 5 of this document.

7         And that references that the appropriate division

8    commander will notify the Chief Deputy immediately of

9    complaints under Section C above.  And that refers to formal

10   complaints and that the Sheriff will also be advised of any of

11   these formal complaints.  Right?

12   A.  It does.  But to fully understand and explain this, I have

13   to give again the background and the philosophy of the

14   Sheriff's Office.  Again, policies are guidelines.  They're not

15   like the code of conduct or rules and regulations, which are

16   usually strict prohibitions or requirements.

17        And in the case of this, the philosophy of the

18   organization is generally formal public complaints, so it

19   wouldn't necessarily be every type of conduct that an employee

20   engages in that might meet the level of a formal interrogation

21   or investigation.  But particularly if it comes through from

22   the public and is an issue with the public, particularly given

23   the Sheriff's position as an elected official and his

24   relationship with the public, he needs to know about those

25   things right away.

Koster - Direct by McLaughlin

1    So sometimes what's, you know, on the page has to also

2    be represented in the context of the -- of what the expectation

3    of the Sheriff is or what the philosophy of the organization

4    is.

5    Q.  Okay.  VII.E reference -- I mean -- sorry -- VIII.E

6    references that all interviews deemed -- this is the

7    investigation process -- deemed necessary to accumulate the

8    evidence and facts in the matter under investigation will be

9    conducted.  Prior to scheduling an interrogation, the accused

10   employee will be served with Notification of Charges/

11   Allegations completed by the investigator.

12       So we have heard reference to a formal interview, and

13   we have heard reference to a formal interrogation.  Those are

14   the same thing, right?

15   A.  If they're being used to mean the same thing by the person

16   who is saying it.  If you're asking me when I have used it, I

17   can clarify whether I meant that or not.  But I don't know

18   about anybody else that's used those things interchangeably.

19       What I can say is that there are -- I usually call it

20   a formal interrogation if it meets the criteria of the -- of a

21   formal investigation, expecting three days or more of

22   suspension -- or anticipating, not expecting, but the

23   potential.

24   Q.  That's --

25   A.  There are all -- there are lots of lower levels of

Koster - Direct by McLaughlin

1   interviews.  There can be informal conversations with

2   supervisors that could be considered an interview.  There can

3   be a -- an actual, you know, fact-finding interview with the

4   supervisor that may not have reached to that level of a formal

5   interrogation.

6           So there are -- again, there are always varying levels

7   depending on the conduct and depending on the circumstances.

8   Q.  So when an investigation -- so an investigator interviews a

9   deputy and conducts other interviews and -- during the

10  investigation and something comes up, proper procedure is to

11  amend the charge or notice or provide notice of the new charge,

12  isn't it?

13  A.  No.

14  Q.  Well, isn't this section that we just referred to

15  referencing that the accused has a right to Notice of Charges?

16  Right?

17  A.  It actually makes the requirement on the employer that they

18  provide the Notice of Charges.  What the -- the circumstance

19  and what -- this is based on Illinois law that requires that an

20  individual reasonably understand the conduct that they're being

21  investigated for.  It doesn't require an absolute definition of

22  every bit of the conduct or everything under investigation.

23          Furthermore, further in the policy, I believe while

24  you're indicating that there's a requirement for Notification

25  of Charges, further in the policy, it points out that if there

Koster - Direct by McLaughlin

1    is misconduct or ongoing misconduct during the investigation or

2    as part of the investigation, the investigator can make a

3    determination whether or not to open up a new investigation and

4    start a new case.

5    Q.   Okay.  Well, let's look at that.  Roman numeral IX,

6    letter B, which is on page 6 of this document.

7              And that says if the investigation reveals previously

8    uncited allegations of misconduct, the investigations

9    supervisor may decide whether to include the additional

10   information in the original case file or activate a new

11   investigation and case file.  He or she shall ensure that the

12   new allegation is then thoroughly investigated by the

13   investigator.

14             Doesn't that provision, in fact, give -- well, let me

15   rephrase that.

16             Previously uncited allegation of misconduct.  That

17   refers to a violation of a rule or a policy that was not

18   included in the original Notice of Charges, correct?

19   A.   Yes, it could.

20   Q.   Okay.  So let's take a scenario.  If the employee is

21   accused of A -- and she gets to know that she's accused of A

22   before she has to be -- submit to a formal interrogation,

23   right?  She gets to know she's accused of A, whatever A is?

24   A.   There's an allegation of that, yes.  Yes.

25   Q.   But if she's accused of A and has been told she's been

Koster - Direct by McLaughlin

1    accused of A and then KCSO later thinks, hey, I think she's

2    also done B, she gets to know that she's now also being accused

3    of B before the KCSO gets to formally interrogate her, right?

4    A.   I don't agree with that assessment at all, no.

5    Q.   Okay.  So if you find during the course of an investigation

6    a previously uncited allegation of misconduct, it's perfectly

7    acceptable not to provide the accused notice of that new

8    charge?  That's your position?

9    A.   I said I don't believe it's required, particularly if an

10   individual --

11   Q.   And I'm asking you whether or not --

12            THE COURT:  You both --

13   BY MS. McLAUGHLIN:

14   Q.   -- it's acceptable.

15            THE COURT:  -- need to slow down a little bit.  Let

16   him complete his answer, and you need to wait till she

17   completes her question before you begin to answer.

18            THE WITNESS:  Yes, sir.

19            THE COURT:  Ask it again.

20   BY MS. McLAUGHLIN:

21   Q.   Is it your position that it is perfectly acceptable for --

22   if you find during the course of an investigation that a

23   previously uncited allegation of misconduct is found that it's

24   perfectly acceptable not to provide the accused notice of that

25   new charge?  Is that your position?  Yes or no.

Koster - Direct by McLaughlin

1   A.  I can't answer that question yes or no.  I need to be able

2   to more fully explain.  Again, these things are not black and

3   white, and they're not --

4   Q.  That's fine.

5   A.  -- they're not all yes or no.

6   Q.  That's fine.  Your counsel will ask you for the

7   explanation.

8           Moving on, let's look at VII.G.

9           THE COURT:  Ms. McLaughlin, we're going to break for

10  lunch in a little while.  But how much longer do you have on

11  this document?

12          MS. McLAUGHLIN:  I am almost done with these

13  documents --

14          THE COURT:  All right.

15          MS. McLAUGHLIN:  -- and then we'll --

16          THE COURT:  Why don't you --

17          MS. McLAUGHLIN:  -- move on to some new topic.

18          THE COURT:  -- finish off the documents.  Then we'll

19  take our break.

20          MS. McLAUGHLIN:  Okay.  Well, I can't find VII.G at

21  the moment.  Let me -- or VII.G is not what I thought it was.

22  BY MS. McLAUGHLIN:

23  Q.  So let's look at -- oh, here it is.  It's VIII.G.  Excuse

24  me.  It's on page 5.

25          A member under investigation shall not be required or

Koster - Direct by McLaughlin

1   requested to disclose any item of his personal -- or any item

2   of his property, income, assets, sources of income, debts,

3   personal or domestic expenditures, unless such information is

4   necessary to investigating a possible conflict of interest with

5   respect to the performance of his official duties, or unless

6   such disclosure is required by law.

7           A personal family phone bill is a private -- is

8   private property, isn't it?

9   A.  I guess the individual's copy would be private property.

10  Q.  Now let's look at letter H.

11          A member under investigation shall not be required --

12  I'm sorry -- not be compelled to submit to a polygraph, but an

13  employee may volunteer -- voluntarily submit to such

14  examination and would be advised of the results of the

15  examination, blah, blah, blah.

16          That's an option, providing a polygraph to a -- to a

17  deputy, right, if they want to submit to one?

18  A.  Yes, but they cannot be required to.

19  Q.  Okay.  And the Sheriff's Office has the equipment to

20  conduct that polygraph, correct?

21  A.  No.

22  Q.  They have access to that equipment?

23  A.  We have access to polygraphers.

24  Q.  Okay.  But you never offered Carrie Warren the choice of

25  taking a polygraph, did you?

1   A.  Not that I'm aware of, no, not any part of the

2   investigation.

3   Q.  You've offered that to male deputies, haven't you, in the

4   past?

5   A.  Not as part of an internal investigation.

6   Q.  Didn't Sergeant Hawkins have a polygraph examination at

7   some point?

8   A.  I believe that was pursuant to a criminal investigation.

9           I'm not aware of ever offering a polygraph as part of

10  an administrative investigation.  I can't, you know, throughout

11  my career, attest that it never happened.  But I believe every

12  one that I'm aware of was -- it was that was part of a criminal

13  investigation where these rules and the -- and other things

14  regarding employment law didn't -- don't apply.

15          MS. McLAUGHLIN:  Move to strike.  That was not

16  responsive to the question.

17          THE COURT:  Overruled.  In response to the question

18  you asked, overruled.

19  BY MS. McLAUGHLIN:

20  Q.  All right.  Finally, just the last question with respect to

21  this complaint procedure is Roman numeral IX.C.

22          And that's said each complaint investigation, whether

23  investigated within the division or by investigations, shall

24  result in a clear "conclusion of fact" as to the disposition.

25          And your choices of disposition are unfounded, not

Koster - Direct by McLaughlin

 1   involved, exonerated, not sustained, sustained, and a policy

 2   failure.  Those are your choices, right?

 3   A.  Yes.

 4          MS. McLAUGHLIN:  Okay.  Nothing further in this

 5   particular area.

 6          THE COURT:  All right.  Ladies and gentlemen, the --

 7   we'll take our lunch break now.  It's about a quarter to 1:00.

 8   We'll reconvene at 2:00.  It's a little longer -- it's about an

 9   hour and 15 minutes.  See if that's enough time.  Gives you a

10   little time to acquaint yourself with the Loop and places to

11   eat.  But see if that's enough time.

12          We're going to have a longer lunch break than normal

13   tomorrow.  There's a matter I can't reschedule.  I do other

14   matters over lunch hour and before you come in.  But I'll keep

15   you apprised on a daily basis what the schedule is.

16          Secondly, we'll break today anywhere between 4:30 and

17   5:00.  You should collectively decide what is a good break time

18   for you, if there's a last express train or there's some

19   commitment you have that needs -- where you need to get out of

20   here at 4:30 and you agree that's appropriate, that's fine.

21   The later we go, the fewer days the case will take.

22          So we're not going to go past 5:00 on any day, but I'm

23   going to leave it up to you.  And that close time may change

24   based on your own commitments, and just let Ms. Newland know

25   when you want to break every day.

1    I'm going to read you an instruction now that we're

2    having our first lengthy break.  I'm not going to read it at

3    every time, but I'm going to read it now so you keep this in

4    mind at all breaks.

5         We're about to take our first lengthy break during the

6    trial, and I want to remind you of the instruction I gave you

7    earlier.  Until the trial is over, you're not to discuss this

8    case with anyone, including your fellow jurors, members of your

9    family, people involved in the trial, or anyone else.

10        If anyone approaches you and tries to talk to you

11   about the case, do not tell your fellow jurors, but advise me

12   about it immediately.

13        Do not read or listen to any news reports of the

14   trial, although I don't expect there will be any, but in the

15   unlikely event there is, don't read about it or listen to it.

16        Finally, remember to keep an open mind until all the

17   evidence has been received and you've heard the views of your

18   fellow jurors.

19        So with that, we'll break till 2:00.  Have a good

20   lunch.

21        THE CLERK:  All rise.

22        THE COURT:  And you can leave your materials here

23   during any break except the end of the day where I'll ask you

24   to take them back to the jury room and we'll lock them up.

25        Thank you.

1      (Jury out at 12:45 p.m.)

2            THE COURT:  All right.  Please shut the back door.

3            All right.  Sir, you're excused till 2:00.  You're on

4      cross-examination, so don't discuss your testimony with anyone.

5            THE WITNESS:  Yes, sir.

6            THE COURT:  All right.  Thank you.

7            As to the parties then, I have a set of defense

8      exhibits.  Is there a set of joint and plaintiff exhibits

9      that --

10            MS. McLAUGHLIN:  Oh.

11            THE COURT:  -- I'm due?

12            MS. McLAUGHLIN:  Yes.

13            THE COURT:  Okay.  All right.

14            MS. McLAUGHLIN:  I apologize for that.

15            THE COURT:  When -- at -- during the lunch hour, just

16      put them up on the side of the bench.  I don't need them at

17      this moment.

18            MS. McLAUGHLIN:  Okay.

19            THE COURT:  And is there an exhibit list that is --

20      there was --

21            MS. McLAUGHLIN:  Yes.

22            THE COURT:  There were exhibit lists as part of the

23      final pretrial order, but is there something that can be put

24      together where I have a plaintiff's exhibit, defense exhibit,

25      and joint exhibit and just use the stapler here and put them

1     all together?  If you can do that -- if you can do that over

2     lunch too, I'd appreciate it.  I don't need it right now, but

3     just get the three --

4              MS. McLAUGHLIN:  The full -- yeah.  The full exhibit

5     lists are -- I think they are in the pocket or in front of all

6     of our exhibits in the binder.

7              THE COURT:  Okay.  Well, that may very well be.  And

8     then --

9              MS. McLAUGHLIN:  But we can get you a --

10             THE COURT:  You're right.  I've got it for the defense

11    exhibits.  It's the beginning of their binder.  I don't need

12    another one.  But I just need something for joint and plaintiff

13    exhibits so I can staple them all together and keep track of

14    the exhibits as they're admitted.

15             Okay.  Anything -- oh, and, Ms. McLaughlin, the reason

16    I did not strike the testimony of Mr. Koster, or Deputy Koster,

17    was because of the broader question don't you give polygraphs

18    to male deputies.

19             MS. McLAUGHLIN:  Okay.

20             THE COURT:  Because of that broad question, I think

21    that opened up his broad answer.

22             MS. McLAUGHLIN:  Okay.

23             THE COURT:  But that was the reason for my -- I didn't

24    want to say that in front of the jury, but that was the reason

25    I didn't strike the testimony.

1          Anything else we need to put on the record?  First

2    from plaintiff.

3          MS. McLAUGHLIN:  Not at the moment.

4          THE COURT:  Defense.

5          MS. BRUCH:  Yes, your Honor, there is one thing.

6    First, when Chief Deputy Koster was questioned about Sergeant

7    Hawkins, I mean, is this -- are we adding additional

8    comparators now?  He was never part of the case.  Now it brings

9    up a criminal investigation, which prejudices the Sheriff's

10   Office.

11         THE COURT:  Well, if there's a curative instruction

12   you think is necessary, I -- I'm not sure why anyone would

13   think that it's unusual or -- occasionally people in a

14   sheriff's office when they're dealing with inmates may have

15   a -- there may be a criminal investigation relating to them.

16         And I think it's going to come out that a couple of

17   these guys were -- couple of these deputies were criminally

18   prosecuted, the one with the sexual abuse of an inmate.

19         So I don't know why -- I don't view that as

20   overwhelmingly prejudicial.  But if you're concerned, propose a

21   curative instruction or a cautionary instruction to plaintiffs,

22   and if it's agreed to, I'll give it.  If it's disagreed, give

23   it to me and I'll decide whether to give it or not.

24         MS. BRUCH:  I think the broader point, though, is that

25   my understanding is that we had agreed who the comparators were

1    before the trial began, and now we have new individuals being

2    brought up.

3              THE COURT:  All right.  Well, keep it within the

4    parameters of what we talked about.  I think this was fairly

5    harmless, and I think the witness distinguished it in a way

6    that he chose to distinguish it.

7              But --

8              MS. McLAUGHLIN:  I --

9              THE COURT:  -- if you're going to raise new names,

10   Ms. McLaughlin, that are not part of the comparators, run it by

11   defense counsel and see if there's something you need to bring

12   to my attention before we hear it.

13             MS. McLAUGHLIN:  Well, and for the record, I don't

14   think I was offering it as a comparator of sorts; I was

15   offering it as a -- that's an option; you've given it to men

16   before.  So not in terms -- I didn't go into any of the details

17   with respect to --

18             THE COURT:  Well --

19             MS. McLAUGHLIN:  -- the misconduct.

20             THE COURT:  -- if you're going to start with

21   comparisons -- well, we're opening up the whole issue of the

22   fairness of the proceedings that the plaintiff was afforded.

23   And that opens its own issues.  So --

24             MS. McLAUGHLIN:  Okay.  Well --

25             THE COURT:  -- so be it.

1     If you're going to raise names, though, particular

2  names of instances that are not part of the comparator set, run

3  them by defense so that if there's a basis for objection, we

4  can deal with it outside the presence of the jury, that's all.

5     MS. McLAUGHLIN:  Okay.

6     THE COURT:  Okay.  Anything else?

7     MS. BRUCH:  No, your Honor.

8     THE COURT:  Anything else from plaintiff?

9     MS. McLAUGHLIN:  One thing that maybe we can deal with

10  right now is we had provided -- I'm sorry.  I'm walking away.

11  I don't have my thing on.

12     We had provided defense counsel with a list of the

13  exhibits that we planned to use with Mr. Koster today.

14     THE COURT:  Okay.

15     MS. McLAUGHLIN:  This is a partial list because I

16  greatly doubt that we will finish his testimony completely.

17     But at this point, it would -- it would facilitate

18  moving things along if we just agreed to their admission, if

19  that's acceptable to you.

20     MS. BRUCH:  There's -- well, there's one --

21     THE COURT:  Well, here's what I'll do.  At 2:00 or a

22  few minutes before 2:00, come on back.  Read off all those

23  exhibits that you both agreed are -- that there's no objection

24  to its admissibility.  And if there's a disputed one, we'll

25  either talk about it there, or we may have to get a proffer

 1    from the witness as to its admissibility.  But why don't we do

 2    that at 2:00 when you've both had a chance to look it over.

 3              MS. BRUCH:  Okay.  Thank you.

 4              MS. McLAUGHLIN:  Thank you.

 5              THE COURT:  Okay.  Thank you.  See you at 2:00.

 6              THE CLERK:  All rise.

 7              THE COURT:  All right.  Off the record.

 8         (Off-the-record discussion.)

 9         (Recess at 12:51 p.m.)

```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    CARRIE M. WARREN,              )   Docket No. 15 C 496
                                     )
 4                 Plaintiff,        )   Chicago, Illinois
                                     )   July 18, 2018
 5           v.                      )   2:00 p.m.
                                     )
 6    KENDALL COUNTY SHERIFF DWIGHT  )
      BAIRD, in his official capacity)
 7    and as successor in office to  )
      Richard Randall, KENDALL COUNTY,)
 8    ILLINOIS, RICHARD RANDALL, SCOTT)
      KOSTER and SABRINA JENNINGS,   )
 9                                   )
                   Defendants.       )
10
                             VOLUME 1-B
11            TRANSCRIPT OF PROCEEDINGS - Trial
         BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
12
      APPEARANCES:
13
      For the Plaintiff:    MS. COLLEEN M. McLAUGHLIN
14                          Law Offices of Colleen M. McLaughlin
                            1751 S. Naperville Road, Suite 209
15                          Wheaton, IL 60189

16                          MS. KAREN J. DORAN
                            Karen J. Doran Attorney at Law LLC
17                          2100 Manchester Road, Suite 942
                            Wheaton, IL 60187
18
      For the Defendants:   MS. JULIE A. BRUCH
19                          MS. KARIN ANDERSON
                            O'Halloran Kosoff Geitner & Cook LLC
20                          650 Dundee Road, Suite 475
                            Northbrook, IL 60062
21
      Court Reporters:      KELLY M. FITZGERALD, CSR, RMR, CRR
22                          JUDITH A. WALSH, CSR, RDR, F/CRR
                            Official Court Reporters
23                          219 S. Dearborn Street, Room 1432
                            Chicago, IL 60604
24                          312.435.6053
                            laura_renke@ilnd.uscourts.gov
25
```

1      (In open court outside the presence of the jury:)

2           THE COURT:  Are there exhibits you have reached

3      agreement on the admissibility of?

4           MS. BRUCH:  So, Your Honor, just so you know, for

5      this trial, we are going to be objecting for the record to a

6      lot of the comparator ones, just to make a record of it.

7           THE COURT:  All right.  Why don't you then simply say

8      "objection for the record," and we can argue it later.

9           MS. BRUCH:  Well, I think what we were contemplating

10     is maybe --

11          THE COURT:  Yeah.

12          MS. BRUCH:  Counsel had given me a list.  And maybe

13     if we could just read through it and go one by one, and you

14     could admit it.  We don't even have to do it in front of the

15     jury.

16          THE COURT:  Okay.  Should we do it right now or at a

17     break?

18          MS. BRUCH:  Yeah, we could do it right now one by

19     one.

20          THE COURT:  All right.  Let's do it right now.

21          Plaintiff's 8 is already in evidence.

22          MS. McLAUGHLIN:  And Joint 1.

23          THE COURT:  Okay.  Joint 1 is in, and Plaintiff's 8

24     is in.

25          Okay.

1          MS. McLAUGHLIN:  Plaintiff 2.

2          THE COURT:  Any objection?

3          MS. BRUCH:  Yes.  We're objecting.

4          THE COURT:  And that is?

5          MS. BRUCH:  Not proper comparator.

6          THE COURT:  All right.  Overruled.

7          MS. McLAUGHLIN:  Plaintiff 23.

8          MS. BRUCH:  Objecting; not proper comparator.

9          THE COURT:  Overruled.

10          And these are comparators I've already ruled are in,

11    correct?

12          MS. BRUCH:  Yes.

13          THE COURT:  Okay.  Fine.

14          MS. McLAUGHLIN:  Plaintiff 14.

15          MS. BRUCH:  No objection to that one.

16          THE COURT:  Okay.  14 is admitted.

17          MS. McLAUGHLIN:  Plaintiff 9.

18          MS. BRUCH:  Objection.  Not proper comparator.

19          THE COURT:  Okay.  It's admitted.

20          MS. McLAUGHLIN:  Plaintiff 20.

21          MS. BRUCH:  Objection.  Not proper comparator.

22          THE COURT:  It's admitted.

23          MS. McLAUGHLIN:  Plaintiff 11.

24          MS. BRUCH:  Objection.  Not proper comparator.

25          THE COURT:  It's admitted.

1          MS. McLAUGHLIN:  Plaintiff 16.

2          MS. BRUCH:  Objection.  Not proper comparator.

3          THE COURT:  Admitted.

4          MS. McLAUGHLIN:  Plaintiff 18.

5          MS. BRUCH:  Objection.  Not proper comparator.

6          THE COURT:  Admitted.

7          MS. McLAUGHLIN:  Plaintiff 13.

8          MS. BRUCH:  Objection.  Not proper comparator.

9          THE COURT:  Admitted.

10         MS. McLAUGHLIN:  Plaintiff 19.

11         MS. BRUCH:  Objection.  Not proper comparator.

12         THE COURT:  Admitted.

13         MS. McLAUGHLIN:  Plaintiff 24.

14         MS. BRUCH:  Objection.  Not proper comparator.

15         THE COURT:  It's admitted.

16         MS. McLAUGHLIN:  Defendant 24.

17         MS. BRUCH:  No objection.

18         THE COURT:  Hang on.  Let me get there.

19         All right.  That's admitted.

20         MS. McLAUGHLIN:  Defendant -- sorry -- Plaintiff 29.

21         MS. BRUCH:  No objection.

22         MS. McLAUGHLIN:  Joint 16.

23         MS. ANDERSON:  Hold on a minute.  Plaintiff 29 is no

24   objection?

25         MS. BRUCH:  No objection.

```
1              THE COURT:  And Joint, what number?

2              MS. McLAUGHLIN:  16.

3              THE COURT:  Okay.

4              MS. BRUCH:  No objection.

5              MS. McLAUGHLIN:  Joint 3.

6              MS. BRUCH:  No objection.

7              MS. McLAUGHLIN:  Plaintiff 38.

8              MS. BRUCH:  No objection.

9              MS. McLAUGHLIN:  Plaintiff 7.

10             THE COURT:  Let me get the 38.  Hang on one second.

11             MS. McLAUGHLIN:  Okay.

12             THE COURT:  Okay.  What's the next one, 7?

13             MS. McLAUGHLIN:  Yes, actually Plaintiff 1 through 7

14   are the videos.

15             THE COURT:  All right.

16             Any objection?

17             MS. BRUCH:  Objection.  Relevance.

18             THE COURT:  Overruled.  These are all videos played

19   last time?

20             MS. McLAUGHLIN:  Yes.

21             MS. BRUCH:  Correct.

22             THE COURT:  The last one I think is 38,

23   Plaintiff's 38.

24       (Plaintiff's Exhibits 1-7, 9, 11, 13, 14, 16, 18, 19, 23,

25          24, 29, 38 received in evidence.)
```

1    (Defense Exhibit 24 received in evidence.)

2    (Joint Exhibits 3 and 16 received in evidence.)

3        MS. BRUCH:  Thank you, Your Honor.  That will make it

4  go faster.

5        THE COURT:  Okay.  Very good.  Let's bring in the

6  jury.  Oh, go ahead.

7        Hang on.

8        MS. McLAUGHLIN:  I have that issue.  I need two

9  minutes.

10       THE COURT:  Two minutes.  We'll wait until you're

11  back.  We won't bring the jury in until you're back.  Let's

12  shut the right door.  If one of the externs could shut the

13  right-side door, please.

14    (Brief recess.)

15    (Jury enters.)

16       THE COURT:  All right.  Please be seated, ladies and

17  gentlemen.

18       Sorry we're late.  We're trying to get a few things

19  done outside your presence to speed up the process in court.

20  So I appreciate your patience.

21       And, Ms. McLaughlin, you may continue your

22  examination.

23  SCOTT KOSTER, DEFENDANT HEREIN, PLAINTIFF'S ADVERSE WITNESS,

24                PREVIOUSLY SWORN

25           DIRECT EXAMINATION (Resumed)

1    BY MS. McLAUGHLIN:

2    Q.   So the primary function of a corrections deputy is to keep

3    everyone safe within the jail, correct?

4    A.   Certainly is one of the primary functions of a corrections

5    deputy.

6    Q.   And that includes staff and inmates, correct?

7    A.   Yes.

8    Q.   And as we've already established, your employees are

9    required to be truthful at all times with respect to both

10   their written and verbal communications, correct?

11   A.   Yes.

12   Q.   Okay.  So it's your position, or it's the KCSO's

13   position that you and the KCSO, in general, treat all

14   employees the same regardless of whether they are a male or a

15   female, correct?

16   A.   Yes.

17   Q.   Okay.  So we're going to take a look now at how some of

18   the men were treated when allegations of misconduct arose.

19        The jail began to accommodate females in early 1990s,

20   right?

21   A.   I'm not -- I don't understand the question.

22   Q.   Female inmates.  The jail was open to female inmates in

23   the early 1990s, correct?  That's when they first started to

24   house female inmates?

25   A.   I believe female inmates were always  -- there was a

1  potential for housing them even before that.

2  Q.  Okay.

3  A.  I'm not trying to be -- not answer your question, but I

4  don't know if that's a correct statement is my point.

5  Q.  Okay.  So most of the jails -- most of the deputies who

6  work for you at the jail are men, correct?

7  A.  Yes.

8  Q.  Okay.  And these men are responsible for guarding the

9  safety of both male and female inmates, correct?

10  A.  Yes.

11  Q.  And these inmates are under the constant supervision of

12  the deputies in the jail, correct?

13  A.  Again, that's a difficult question to answer yes or no.

14  Q.  Okay.

15  A.  I mean, there is supervision in the jail at all times.

16  Whether any individual inmate is constantly under the direct

17  supervision of a correctional officer, I mean, that's -- I

18  can't say that that is, in fact, the case.

19  Q.  Well, my point is that the deputies who are in charge of

20  the jail facility have a lot of authority over these inmates,

21  correct?

22  A.  Yes.

23  Q.  I mean, they can dole out privileges, or they can pull a

24  privilege away from an inmate, right?

25  A.  That is not actually accurate.  There are procedures for

1  privileges and for discipline and administrative procedures.

2  Q.  Well, inmate movements within the jail are monitored,

3  correct?

4  A.  To the extent that there are video cameras or monitoring

5  devices in the areas that the inmates are moved.

6  Q.  And the deputies, well, they can even read an inmate's

7  mail, right?

8  A.  Is the question for incoming mail --

9  Q.  Let me rephrase that.

10  A.  -- or outgoing mail?

11  Q.  There's not a whole lot of privacy for inmates at the

12  jail, is there?

13  A.  I would agree there's very little privacy for an inmate.

14  Q.  Yes.  And their mail is scrutinized, correct?

15  A.  Ingoing or outgoing mail?  There's different distinctions

16  between privileged mail with attorneys.

17  Q.  Okay.

18  A.  So there's --

19  Q.  On occasion, a deputy can read an inmate's mail; isn't

20  that correct?

21  A.  I think that would be a very unusual circumstance for a

22  deputy to just read an inmate's mail.  It would either have to

23  be -- there would have to be an exigent circumstance.  I think

24  most of the mail assessment is done by a supervisor or higher.

25  Now, I could be incorrect about that statement, but that's my

1    recollection.

2    Q.   Okay.  In 2011, you had not one but two male deputies,

3    Deputies Rick Levy and Tim Brennan, who were accused by female

4    inmates of sexual misconduct; isn't that correct?

5    A.   Yes.

6    Q.   And one of the female prisoners said that Rick Levy was

7    sexually harassing her and threatened her, correct?

8    A.   Yes.

9    Q.   Okay.  And Commander Jennings conducted the investigation

10   into those inmates' complaints, did she not?

11   A.   I believe with the assistance of Deputy Commander

12   Gillespie.  And there may have been some other individuals

13   that were involved in interviews and investigative aspects of

14   that incident.

15   Q.   Okay.  And she provided you with a report of her

16   investigation, correct?

17   A.   She did.

18   Q.   And that is Plaintiff's Exhibit No. 22 which has already

19   been admitted into evidence, but I'm going to show you a copy,

20   or a top copy of the Plaintiff's Exhibit No. 22.  And that's

21   addressed to you, correct?

22   A.   It is.

23   Q.   And that's your handwriting and initials in the upper

24   right corner of the page of this document saying received and

25   concurred and a date, correct?

1    A.  Yes, they are.

2    Q.  Okay.  So this investigation and report started because of

3    allegations of sexual misconduct by both Levy and Brennan who

4    were both on the third shift during this time frame, correct?

5    A.  My recollection is that they were on the third shift.  I

6    don't have independent knowledge without reviewing the

7    entirety, but I believe that they were.

8    Q.  And the third shift is the overnight shift, right?

9    A.  Correct.

10   Q.  It starts at 10:30 in the evening and goes until, what,

11   7:00 in the morning?

12   A.  Or 6:00 in the morning, I think.

13   Q.  Okay.

14        THE COURT:  And, ladies and gentlemen, we're going to

15   go into a series of these, and I do want to inform you the

16   inmates aren't being brought in as witnesses in this case.

17   The allegations inmates made and responses aren't being

18   brought in for the truth of what their allegations were but

19   really to show what the response of the defendants was to such

20   allegations.  This is a gender discrimination case, not a case

21   about misconduct by particular deputies relating to inmates.

22   But the response of the defendants to that is something that's

23   allowed -- I'm allowing in for you to evaluate the

24   reasonableness of the response as comparing it to how they

25   dealt with the plaintiff.  But the truth of the allegations,

1   that there was a sexual harassment situation or there was

2   other situations I think Ms. McLaughlin is going to properly

3   bring out, is not -- not -- it's not being brought in for the

4   truth of those allegations but to show the response of the

5   defendants to those allegations.

6           You may proceed.

7           MS. McLAUGHLIN:  Okay.

8   BY MS. McLAUGHLIN:

9   Q.  All right.  So this female inmate came forward and

10  complained to Deputy Mike Moore that she was being bullied by

11  other inmates.  Let's see.  That's right here on this.  Deputy

12  Moore observed an inmate as being upset and asked her what the

13  problem was.  Inmate made the statement that inmates were

14  bullying her and another inmate.  They were the pod bosses,

15  and they were -- they made -- because they were not allowed to

16  go to the laundry room, so they were going to make up stories

17  about her and get her in trouble, and she didn't want any

18  trouble.

19          So she felt that she was being bullied, right?

20  A.  Yes.

21  Q.  So then Deputy Moore, Gerena, and Cantwell, they began an

22  investigation into this matter, correct?

23  A.  Into the man or the matter?

24  Q.  That's what the report indicates, correct?

25  A.  Into the matter?  Into the allegation, or did you say they

1   made an investigation into a man or matter?  I didn't hear the

2   question.

3   Q.  The matter.

4   A.  The matter, yes.

5   Q.  Okay.  Now, in the course of the investigation, another

6   inmate told Gerena, Deputy Gerena, that Deputy Tim Brennan was

7   having sex with her in the medical room as well as the

8   employee bathroom, right?  You recall that allegation?

9   A.  Yes, but I don't --

10  Q.  Deputy Brennan in the medical and employee bathroom, that

11  she was having sex?

12  A.  To clarify, if I could ask for clarification on the

13  question, are you asking if the inmate that reported it was

14  the same inmate that was having sex with Deputy Brennan, or

15  she was reporting that another inmate was having sex with

16  Deputy Brennan?

17  Q.  Well, I believe it says that the inmate told Gerena that

18  inmate whoever, X, was talking and bragging that she was

19  having sexual relations.  So that was what was reported,

20  correct?

21  A.  Yes.

22  Q.  And this is a very, very serious allegation against

23  Deputy Brennan; wouldn't you say?

24  A.  It is a serious allegation.

25  Q.  Okay.  So the investigation document notes that at least

1    two other inmates reported hearing about Deputy Brennan having

2    sex with an inmate in a third area, the laundry room, while

3    another inmate was acting as a lookout.  Do you recall that

4    allegation?

5    A.   Yes.

6    Q.   Okay.  And that's, again, a very highly problematic

7    situation if true, correct?

8    A.   Yes.

9    Q.   Okay.  So I want to just clarify this.  So the inmate also

10   stated that the -- made statements that she was having a

11   sexual relation with Deputy Levy in the TB room.

12            You don't have a TB room, right?  Is that referring

13   to the TV room?

14   A.   No, it's the tuberculosis.

15   Q.   So it's a medical?

16   A.   Yes.

17   Q.   Okay.  All right.  So your jail, it has cameras throughout

18   various areas of the jail, correct?

19   A.   Yes.

20   Q.   And how many cameras did you actually have back in 2011?

21   A.   I could not tell you that.

22   Q.   Could you ballpark it?

23   A.   Hundreds.

24   Q.   Okay.  And you've added -- since 2011 -- between 2011 and

25   2014 when Carrie Warren was terminated, you've added quite a

1  few cameras as well, haven't you?

2  A.  There have been cameras added, yes.

3  Q.  Okay.  So you had a lot of cameras to capture the

4  goings-on of the jail in 2011, but you didn't have cameras

5  covering every single inch of the facility, did you?

6  A.  That's correct.

7  Q.  And there are a number of hallways, corners behind doors,

8  storage areas that were not covered by the camera, correct?

9  A.  Yes.

10  Q.  And did you have cameras to show what was happening in all

11  areas of the laundry room?

12  A.  I can't make a definitive determination that we did or

13  that we didn't.  It's my recollection that there could have

14  been blind spots in that area, but I don't have an independent

15  recollection from that time.

16  Q.  And how about cameras covering every area of the medical

17  room?

18  A.  Again, same answer.

19  Q.  Okay.

20  A.  I believe that there were blind spots, but from that time,

21  I can't -- I don't have an independent recollection of the

22  complete layout.

23  Q.  So when you got these allegations against Deputy Levy and

24  Deputy Brennan, did you direct anyone to pull the video from

25  any of these areas that the inmates allege Deputy Brennan was

1  having sex with them in to substantiate or otherwise prove

2  those charges were false?

3  A.  I don't recall that I provided direction to do that, but

4  as was part of the investigation, it's my recollection that

5  video from those areas during those times were examined.

6  Q.  Okay.  But you don't have any independent recollection of

7  that?

8  A.  That I told anyone to do it, but my independent

9  recollection is I do believe that there was an examination of

10  videos from those areas made, a video from those areas made.

11  Q.  Okay.  You testified earlier that the Sheriff's Office has

12  a number of divisions.  The jail is one of them.  And then you

13  have an investigations unit, right?

14  A.  Yes.

15  Q.  Okay.  And the investigation unit employs professional --

16  these are detectives in that investigation unit, correct?

17  A.  Correct.

18  Q.  Okay.  And these detectives are, and I quote, "selected

19  through a formal process, and they receive comprehensive and

20  extensive investigative training on issues like sex crimes,

21  for example."  That's a quote from your website.  Do you

22  recall that?

23  A.  I would not disagree with it.

24  Q.  Okay.  So did you direct a detective from your

25  investigations unit to interrogate Brennan on the potential of

Koster - Direct by McLaughlin

135

 1  a -- of his having sex with an inmate in these areas of the

 2  jail?

 3  A.  No.

 4  Q.  How about the witnesses, did you ask a detective from the

 5  investigations unit to go out and interview those witnesses to

 6  determine whether or not there was some merit to these

 7  allegations?

 8  A.  No, I did not.

 9  Q.  If true, weren't these allegations a criminal offense?

10  A.  Some of the allegations could have been a criminal offense

11  if true.

12  Q.  Okay.  So you handled this as a --

13          THE COURT:  Again --

14          MS. McLAUGHLIN:  I'm sorry.

15          THE COURT:  -- I'm not sure he was done.

16          If you're done, that's fine, but I think you both

17  have to take a breath and make sure -- don't answer a question

18  until it's done, and --

19          MS. McLAUGHLIN:  Okay.

20          THE COURT:  -- don't interrupt an answer until the

21  answer is done.

22          So were you done with your answer?

23          THE WITNESS:  I will be, sir.  That's fine.

24          THE COURT:  Go ahead.  You may proceed.

25  BY MS. McLAUGHLIN:

1  Q.  So you handled this as an employee conduct matter,

2  in-house, so to speak, as opposed to referring it out to the

3  criminal investigation unit, correct?

4  A.  I would articulate it as that we handled it as an inmate

5  complaint which is something that generally always starts with

6  an investigation in the jail.

7  Q.  Okay.  But it was an inmate complaint concerning a

8  potential criminal act, correct?

9  A.  It was an inmate complaint.

10  Q.  Okay.  Concerning a potential criminal act, correct?

11  A.  Some of the allegations could be potential criminal acts.

12  Q.  Okay.  So then let's look at the next page of this report,

13  Bates stamp 956.

14         Paragraph 2, and it says -- whoops.  I'm sorry.  I

15  didn't do this.  It says, after speaking with the inmates --

16  whoops.  Do this.  Deputies Moore and Cantwell went to speak

17  to the inmate in regards to the allegations made.  The inmate

18  became upset and said Levy had made her uncomfortable, made

19  sexual comments towards her and that she was scared of him.

20         So Deputy Moore asked her to write up a statement,

21  correct?

22  A.  Yes.

23  Q.  And here at Bates stamp 982, we have the actual statement

24  that the inmate provided, correct?

25  A.  Yes.

Koster - Direct by McLaughlin

137

1   Q.  So I want to go back to the code of conduct.  Remember we

2   looked at Rule, I believe it was, 9 on page 4, VI.C, and it

3   says that a potential criminal offense must be brought to your

4   attention, deputy chief's attention.  And who brought that to

5   your attention?

6   A.  I believe Commander Jennings informed me once it -- once

7   she was aware of the investigation.

8   Q.  So she informed you of it immediately before she even

9   commenced an investigation, right?

10  A.  I can't recall the exact sequence of events whether -- it

11  appears from the report -- or from the summary of the report

12  that there was an investigation that had actually been started

13  by the deputies when they received the information that they

14  had actually began based on what we just went over.  I can't

15  recall when that information got to deputy -- or

16  Commander Jennings and when she reported it to me specifically

17  on a date.  I just don't have that recollection.  I'm sorry.

18  Q.  Okay.  I'm sorry.  You're saying there's a potential that

19  the deputies or Commander Jennings did not report it to you

20  immediately.  Is that your testimony?

21  A.  I don't recall the date that I was informed, so I can't

22  compare it.  So I would have to accept that as a possibility.

23  Q.  Okay.  So after you found out about these really egregious

24  allegations against two of your deputies, did you immediately

25  report it to Sheriff Randall?

1   A.  I don't recall the exact sequence of events.  I would have

2   reported it to him in a timely manner.  I don't know if

3   immediately, like I picked up the phone right then.  I just

4   can't remember from the date and time in question.

5   Q.  Did you direct Commander Jennings to make sure that you

6   pull the videos to see whether or not there is some truth to

7   these allegations with these inmates?

8   A.  I don't believe that I -- I don't have a recollection of

9   doing that.  But as part of the investigation, I know that was

10  done.  I don't recollect that I instructed it.  I may have.  I

11  don't recall from the date and time, or from that time.

12  Q.  Did you have anyone from medical examine these women to

13  see whether or not they had some recent activity, sexual

14  activity?

15  A.  No.

16  Q.  Okay.  And you didn't interrogate Officer Brennan, did

17  you?

18  A.  You mean a formal interrogation?  Did I conduct a formal

19  interrogation?

20  Q.  Yes.

21  A.  No, I did not.

22  Q.  Did you interview him?

23  A.  I did not interview him.

24  Q.  Did you have any contact with the state's attorney

25  concerning these potential charges?

Koster - Direct by McLaughlin

1  A.  There were no potential charges.

2  Q.  Well, these potential allegations.  You didn't refer it to

3  the state's attorney when you first learned of it --

4  A.  I did not.

5  Q.  -- and let them make an independent assessment as to

6  whether or not they want to investigate this on a criminal

7  basis?

8  A.  As I discussed before, that's not part of the process, nor

9  is it a requirement for their making a decision or

10  determination.  The difference between the administrative

11  investigation and the criminal investigation and the

12  coordination with the State's Attorney's Office is intended to

13  make sure that there is no conflict between the two

14  investigations.

15  Q.  But in your view, sir, the allegations, if true, against

16  Levy and Brennan actually constituted predatory sexual

17  misconduct; isn't that correct?

18  A.  I don't know that that would be the exact criminal

19  statute.  However, I believe that there would have been -- had

20  there been sexual conduct between a guard or a corrections

21  officer and an inmate, it could be custodial -- or custodial

22  sexual misconduct.  There's different aspects of it.  However,

23  going down that road, there was no credibility to any of these

24  allegations from these individuals.

25  Q.  Didn't you previously testify in -- under oath in this

1  matter that you thought that this conduct by Levy was --

2  constituted predatory sexual misconduct?

3  A.  Again, I just said I'm not sure if that's the same.  I'm

4  not arguing with the fact that there was a criminal statute

5  involved.  I don't recall if that's the exact name of the

6  statute that would cover it.

7  Q.  Do you recall using that term when you testified

8  previously under oath?

9  A.  I don't recall if I used "predatory sexual misconduct," or

10  if I used "custodial sexual misconduct."  I'm sorry.  I don't

11  remember.

12  Q.  Okay.  We'll look at that.

13       So in this serious complaint, the inmate explains

14  that she had a written letter that was -- excuse me.  Let me

15  make sure I get to the right page.

16       Okay.  That one night, I sent out several letters,

17  and one of them was a sexual nature for a close friend.  And

18  the next morning, Officer Levy pulled me out in order to talk

19  myself -- take myself to -- and some other person to the

20  laundry.  And he stopped in the library, and he told me that

21  the letter "made his dick hard" and also said that if he were

22  my man, he'd never leave because of my ability to write

23  letters like that.

24       That was the allegation that the inmate made about

25  Deputy Levy, right?

Koster - Direct by McLaughlin

1  A.  Yes.

2  Q.  So the inmate goes on further and says -- let's see.  We

3  were in the laundry.  And he came to the door, and he asked me

4  if he were on the streets if I'd have sex with him.  And he

5  also made comments about my letter.

6         That's what she reported, right?

7  A.  Yes.

8  Q.  Okay.  You mentioned previously that it might not be

9  appropriate in all circumstances for a deputy to read an

10  inmate's mail, but obviously officer -- or Deputy Levy had

11  read this woman's letter, correct?

12  A.  That is her allegation.

13  Q.  Well, he admitted it too, didn't he?

14  A.  I don't recall.

15  Q.  Well, we'll get to that.

16         Okay.  So he -- she further claims that there was an

17  incident where Levy told her to -- oh, let's see -- get a rag

18  and wipe some spilled hallway -- coffee in the hallway because

19  he wanted to see her bend over and told me after that he had

20  been watching me the whole time.

21         That's pretty detailed allegations against this

22  particular officer, correct?

23  A.  It is an allegation.

24  Q.  Okay.  Well, let's take a look at how you investigated

25  this.

1      So deputies are required to track all movements of

2  the inmates, right?  Like if they escort a female inmate over

3  to the laundry, that's documented somewhere, right?

4  A.  There's to be a record of it.

5  Q.  And in the course of investigating these very serious

6  allegations of sexual misconduct, you uncovered that Levy

7  hadn't been complying with that order with regards to this

8  inmate.  He did not document when he was escorting her to the

9  laundry area or other places, right?

10 A.  My recollection from the outcome of the investigation is

11 that there was some finding that he did not properly document

12 inmate movement.

13 Q.  And that's pretty suspicious behavior.  Wouldn't you

14 agree?

15 A.  It's inappropriate.

16 Q.  Okay.  So let's take a look at Bates 983, the next page.

17      So the inmate -- whoops.  I should clear that out.

18      Okay.  He also told me that he wanted a letter the

19 next time he worked.  And I put it in a request with a -- for

20 a razor the last time he worked, and he told me to put it in

21 the request form.

22      So inmates, when they want to communicate with the

23 deputies, they have these request forms, right?

24 A.  That's correct, yes.

25 Q.  And anything they want or need or want to discuss that

Koster - Direct by McLaughlin

1    they want an investigation of something, that goes into the

2    request form, right?

3    A.   It does.

4    Q.   All right.  And it all gets documented somewhere, right?

5    A.   In the inmate's file.

6    Q.   Okay.  Now, there's a curious term or phrase that I want

7    to draw your attention to, and that is the report states that

8    Levy told the inmate to "pretend this is Vegas," I guess

9    meaning that what was being said was not to be repeated.

10          This is the sort of specificity that law enforcement

11   looks to when they are investigating a criminal matter, right,

12   that, you know, a complainant could give those kind of details

13   to substantiate their complaint?  Isn't that something that

14   you look for?

15   A.   I would say corroborating details are important.

16   Q.   And that helps you determine if the inmate is credible or

17   not, right?

18   A.   If they could be corroborated, not just because the

19   information or statement is explicit or is complicated or

20   complex.

21   Q.   So I'm going to digress just for a moment.  The inmates,

22   they don't do their laundry individually, right, generally

23   speaking?

24   A.   I would have to defer that question to another member of

25   the office.

Koster - Direct by McLaughlin

1    Q.   Okay.  That's fine.

2    A.   Particularly as to what the circumstance was then.

3    Q.   Okay.  So this inmate then -- oh, I'm sorry.  I keep doing

4    that, don't I?

5         So this inmate then basically admits that the next

6    time Levy worked that she put a letter in the request form

7    like he asked, and he slipped it under the door.  And then he

8    walked up to the door and made an obscene gesture with his

9    tongue, grabbed the request, walked away and then came back

10   and looked in my door again.

11        So she's, again, being very specific about what

12   happened, correct?

13   A.   Yes.

14   Q.   Back to the -- okay.  So this letter, it was pretty

15   pornographic in nature, wasn't it?

16   A.   I don't believe I ever saw -- the re- -- not reproduction

17   but the statements as to what it contained I believe were

18   graphic, yes.

19   Q.   Well, Levy claims that he received the letter, but he tore

20   it up, right?  He threw it away?

21   A.   That's correct.

22   Q.   Okay.  And but he remembered what it said, right?

23   A.   He recounted it, yes.

24   Q.   Right.

25   A.   And that's the version or the version of the letter that I

1    believe that I read as part of the investigation was what he

2    recounted was in the letter.

3    Q.   And then the inmate goes on and says, the next morning

4    Levy pulled me out at breakfast and told me that, quote, he

5    was "hard all night" from the letter and that the next time he

6    worked to watch and if he winked at me to be naked when he did

7    his count.

8            Now, a count is when the deputies go around and

9    periodically check that everybody is where they're supposed to

10   be, right?

11   A.   That's correct.

12   Q.   And so Levy is on the third shift.  When would he do his

13   counts?

14   A.   I can't give you -- I don't know what the time frame

15   between counts are.  Usually it's at the beginning of the

16   shift.  My understanding, there might be -- for reasons there

17   would be an additional count done, probably not on the third

18   shift because everyone would be locked down.  That would be a

19   question that would be better answered by probably another

20   member of the Sheriff's Office.

21   Q.   So then this woman reports that I've been hiding under the

22   covers every night since afraid of him.  I didn't want to --

23   let's see.  I didn't want to do this.  I didn't know what to

24   do.  He had already threatened that nobody would believe me

25   and that my laundry privileges would be taken away.

1    That's what she reported, correct?

2    A.  Yes.

3    Q.  And would you agree that the conduct described there is

4    pretty darn egregious?

5    A.  Yes.

6    Q.  But you believed her, didn't you?

7    A.  I believe that she asked or that Levy may have asked for a

8    letter from her.

9    Q.  The standard procedure is to have the officer -- the

10   accused officer write a report of the incident, right?

11   A.  I'm sorry.  The standard procedure for what?

12   Q.  When an officer is accused of something they're supposed

13   to write -- they're usually asked to write a report, their

14   version of the events, right?

15   A.  Oh, they may be asked to provide a memorandum or a

16   statement, yes.

17   Q.  Okay.  So that's found at 985 Bates stamp number.

18       THE COURT:  What exhibit is this again?  What is the

19   exhibit number?

20       MS. McLAUGHLIN:  Oh, I'm sorry.  We're still on the

21   same exhibit, P-22.

22       THE COURT:  Okay.  Thank you.

23   BY MS. McLAUGHLIN:

24   Q.  And in this report, Levy admits that he read the inmate's

25   sexual letter to her friend, and he admits that he spoke to

1    the inmate about the letter.  He even admits that he told the

2    inmate that he thought it was, quote, "very hot."

3            Okay.  That's what he admitted to, right?

4    A.  Yes.

5    Q.  Okay.  Now, in the next paragraph, he admits the inmate

6    wrote him a pornographic -- pornographic letter, but he

7    doesn't admit -- let's see:  It was noticed that the request

8    was blank, but there was a letter inside.  This letter was

9    similar to the previous, very provocative with very explicit

10   language.  I won't go into the language, but it's pretty

11   explicit, as you said, correct?

12   A.  Yes.

13   Q.  And he infers, or certainly infers that it wasn't his

14   idea.  He didn't tell the inmate to write the letter.  He

15   infers that she did this of her own accord, right?

16   A.  Without reviewing the rest of the statement, I don't

17   recall his state of mind, whether he was inferring or implying

18   something that wasn't written in the statement.

19   Q.  Okay.

20   A.  To the question --

21   Q.  Okay.  But he didn't admit that he asked --

22            THE COURT:  Were you going to say more?

23            MS. McLAUGHLIN:  I'm sorry.

24            THE WITNESS:  If I could.

25            THE COURT:  Finish the answer.

1   BY THE WITNESS:

2   A.  My understanding from my recollection is that he claimed

3   that she wrote him the letter of her own volition.  And my

4   answer was only strictly that I'm not sure about an inferral

5   or an implication based on what was going on in his mind, but

6   that's my recollection of the investigation.

7   BY MS. McLAUGHLIN:

8   Q.  Okay.  And not for a New York minute did you swallow that

9   cock-and-bull story, did you?  You didn't believe him?

10  A.  I suspected that he had actually asked her or said

11  something like that after the initial -- seeing the initial

12  letter.

13  Q.  Do you recall testifying in this matter on August 26th of

14  2016?  You remember testifying in August of 2016?

15       MS. McLAUGHLIN:  Deposition testimony, page 449,

16  line 13.

17  BY MS. McLAUGHLIN:

18  Q.  And did you not state at that time, I always believed that

19  he was not being truthful in 2011?  You made that statement,

20  correct?

21  A.  Exactly.

22  Q.  Okay.

23  A.  Specifically to the fact that he -- I thought that he did

24  ask her to write the letter.

25  Q.  Well, specifically you didn't believe that -- Levy's

1  report when he stated that he only just told the inmate that

2  she was a good writer, you didn't believe that, did you?

3  A.  I don't recall.  Are you saying that I didn't -- I did

4  believe that she -- or he asked for the letter, or are you

5  just asking -- I don't understand the question.

6  Q.  You didn't --

7  A.  Could you repeat it?

8  Q.  I'm sorry.

9       You didn't -- specifically you didn't believe Levy's

10  report when he stated that he only just told the inmate that

11  she was a good writer?

12  A.  Okay.  I understand now.

13       To my -- yeah.  I think that that's part of my

14  statement from before.  I think that he said more and asked

15  her to write a letter to him.

16  Q.  Okay.  And you also did not believe Levy's report when he

17  suggested that he didn't ask the inmate to write the letter

18  and that she basically did it on her own, right?

19  A.  Yes, as I think I testified to three times, three times

20  here.

21  Q.  Okay.  So you didn't interrogate or interview Levy

22  regarding these charges, right?

23  A.  I did not, no.

24  Q.  But you did have a meeting with him, didn't you?

25  A.  I did.

Koster - Direct by McLaughlin

1    Q.  And at that meeting, you basically advised him -- or maybe

2    "warn" is a better word -- that you didn't believe him, right?

3    You told him that?  You told Levy, "I don't believe you"?

4    A.  Consistent, yes, with exactly what I've been testifying

5    over and over about, is that I didn't believe --

6    Q.  Okay.

7    A.  -- that he didn't ask her for that letter.

8    Q.  Okay.  And my question is you told Levy, "I don't believe

9    you"?

10   A.  I did.

11   Q.  And you told him that you would fire him if you learned

12   that he ever did anything like this again, right?

13   A.  Yes.

14   Q.  Did you ever question the thoroughness of -- let me

15   rephrase that.

16        You didn't question the thoroughness of

17   Sabrina Jennings' report of investigation, did you?

18   A.  No, I found the investigation to actually be quite

19   thorough.  There was a lot more to it than what we went over

20   here at this time.

21   Q.  Okay.

22   A.  And probably the biggest issue, that created the inability

23   in my mind to be able to enforce or to --

24        MS. McLAUGHLIN:  Your Honor, excuse me.  I would ask

25   that the answer beyond -- he did not answer my question and

1    that it be stricken.

2              THE COURT:  Well, the question was --

3              MS. McLAUGHLIN:  You didn't ask --

4              THE COURT:  -- you didn't question the thoroughness

5    of Sabrina Jennings' report, did you?

6              You said you found it very thorough, and then you

7    continued the answer.  I think you answered the question you

8    didn't question the thoroughness of the investigation.  Your

9    attorney will have an opportunity when she comes up and

10   questions you to ask you -- more about this if there's more

11   you want to say.

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  All right.  So the last part of the

14   answer will be stricken.

15             The part that remains is the part where he said he

16   did not question the thoroughness of Ms. Jennings'

17   investigation where he said "that's correct."

18             Go ahead.

19   BY MS. McLAUGHLIN:

20   Q.  In Jennings' opinion, there was nothing more that she

21   could do about the situation because it was basically a

22   "he said" situation; isn't that correct?

23   A.  If that's something that's contained in the investigative

24   report, I don't recall.  Could you direct that to my

25   attention?  Other than that, I would be speculating, you know,

Koster - Direct by McLaughlin

152

1    as to what was in her mind when she ended the report.  But I

2    could answer for myself based on what I read and what I

3    reviewed from the investigation.

4    Q.  I'm asking you if you understood that that was part of the

5    recommendation with -- from Commander Jennings, that she

6    thought it was a "he said/she said" situation?

7    A.  I don't recall that that language is in the report.

8    Q.  Okay.

9    A.  But if you could show it to me for the record, I would be

10   happy to refresh my memory.

11   Q.  And you agreed with her that this was a "he said/she said"

12   situation, didn't you?

13   A.  Again, I don't accept that characterization.  I don't

14   think that language was used, if you could show it to me in

15   the investigative report.  If I could fully answer to my

16   opinion of what the investigation showed, I could probably get

17   my mindset a lot better.

18   Q.  Well, you didn't call Levy in for a formal interrogation,

19   right?

20           MS. BRUCH:  Objection.  Asked and answered.

21           THE COURT:  Sustained.

22   BY MS. McLAUGHLIN:

23   Q.  You didn't otherwise investigate any further after you

24   received Jennings' report, did you?

25   A.  No, I think it was a concluded matter at that point.

1  Q.  So despite the fact that you did not believe Levy, neither

2  you nor Jennings recommended a formal interrogation on these

3  charges, correct?

4        MS. BRUCH:  Objection.  Asked and answered.

5        THE COURT:  Overruled, but this opens up the area

6  that he was not -- that I struck.

7        So go ahead and answer.

8        THE WITNESS:  I'm sorry.  Could I have the question

9  again?

10        THE COURT:  You can ask it again, or --

11  BY MS. McLAUGHLIN:

12  Q.  Despite --

13        THE COURT:  -- withdraw that question and ask another

14  one.

15  BY MS. McLAUGHLIN:

16  Q.  Despite the fact that you did not believe Levy, neither

17  you nor Jennings recommended convening a formal interrogation?

18  A.  That's correct.  I did not recommend convening a formal

19  interrogation based on the totality of the investigation.  The

20  witnesses that were presented by the complainant gave --

21  Q.  Okay.

22  A.  -- different statements.  They contradicted her statement.

23        MS. McLAUGHLIN:  Your Honor --

24        THE COURT:  No, let him finish.

25        Go ahead.

1  BY THE WITNESS:

2  A.   And there was -- in my opinion, there was a formal

3  interrogation.  The only evidence that would be available in

4  it would be the testimonial evidence, and to use your

5  statement, "he said/she said," which is not my phraseology or

6  my words that I would use, but there would be -- there would

7  be no way to overcome based on the different witnesses giving

8  vastly different statements and even in their way impeaching

9  the complainant or arguing or stating what the complainant

10  said, she didn't say it, there was nothing more, in my

11  opinion, to be done at that point.

12          MS. McLAUGHLIN:  Move to strike everything past the

13  first sentence of his response.

14          THE COURT:  Overruled.

15          Proceed.

16  BY MS. McLAUGHLIN:

17  Q.   With respect to that comment regarding the predatory

18  sexual misconduct, again, referring to your testimony in

19  August 2016, page 448, lines 23 to 449, line 5.

20          Were you not asked this question -- and you were

21  under oath at that time, correct?

22  A.   Yes.

23  Q.   Okay.  Were you not asked this question and give this

24  conduct -- give this following answer:

25          "Q.  Would you agree that the conduct described by

1    the inmate in her written statement suggests predatory

2    sexual misconduct on the part of Levy?

3         "A.  I would agree that the -- the statements that

4    she makes, were they true, could lead to that criminal

5    assumption or assumption for criminal liability."

6         Correct?

7    A.  I'm sorry.  Yes, I did say that, and I could not remember

8    from 2016 if the question was criminal predatory sexual

9    misconduct, or if I used custodial or if you used custodial

10   sexual misconduct.

11   Q.  Okay.  You didn't consider transferring him off the night

12   shift, did you?

13   A.  I don't believe so.

14   Q.  Given that you didn't believe Levy and that the female

15   inmate described, you know, sexual misconduct, did you direct

16   Sabrina Jennings to be on the lookout for such behavior by

17   Levy or Brennan in the future?

18   A.  Well, as a result of that, I made an overall statement to

19   supervisors and command staff that, you know, I expected them

20   to be on the -- continue to be diligent in monitoring their

21   employees.  However, I want to say that the entirety of Levy's

22   statement isn't what I believed.  I just didn't believe that

23   he didn't ask her for that letter.

24   Q.  You didn't document that directive anywhere, did you?

25   A.  I don't believe so.

1        Excuse me, if I may.  I don't have -- I can't say

2   definitively, but I think that I may have after that or about

3   that time, or it may have been another incident that I gave

4   some documentation or some written directive for that, but I

5   don't think it was for the 2011, no.  I stand by my original

6   answer.  I don't think so.

7   Q.   Okay.  So going back to Brennan, that wasn't the only time

8   that he was investigated for sexual misconduct with a female

9   inmate, was it?

10  A.   No.  He was actually investigated again later.

11  Q.   Okay.

12  A.   In a future event, incident.

13  Q.   The very next year, in fact, in 2012 he was again facing a

14  complaint of sexual misconduct; isn't that right?

15  A.   I don't recall if it was end of 2012 or beginning of 2013,

16  if you could refresh my memory with the document, with the

17  investigative documents.

18  Q.   With respect to both of the investigations, the 2011 and

19  then the 2012 investigation, did you -- Brennan denied having

20  sex with any of the -- the inmate, correct, with any inmate?

21  A.   My understanding is that as part of -- well, definitely in

22  the 2011 investigation.  The subsequent investigation, which

23  was partially -- or which was the -- or did have a criminal

24  investigation conducted by the Illinois State Police,

25  ultimately he may have made a confession to having sex with

1  the inmate.  Again, I'm not sure exactly what your question

2  is, or, again, if you could provide me with something to help

3  me refresh my recollection --

4  Q.  Okay.

5  A.  -- on the investigation that you're talking about, I could

6  answer more fully.

7  Q.  Well, let me ask you this:  Isn't it a fact that in 2012

8  it was again brought to the Kendall County Sheriff's Office

9  attention that there was an allegation of sexual misconduct by

10  Brennan?  That, again, was not -- no action was taken.  But in

11  2000- -- late 2013, that investigation of the 2012 incident

12  was reopened by the ISP, the Illinois State Police?

13  A.  Again --

14  Q.  Does that refresh your recollection?

15  A.  No, I would need to see something from the original

16  allegation in 2012.  I'm sorry.  I don't have an independent

17  recollection of that.

18  Q.  Okay.  So did you believe Brennan's denials of "I didn't

19  have sex with anybody"?

20  A.  At what time?

21  Q.  In either -- in either case.

22  A.  Again, I don't have an independent recollection of the

23  2012 case.  If you could provide me with something to help

24  refresh my memory on the investigation, it might --

25  Q.  Well, you recall -- I'm sorry.  You recall that there were

1    two instances.  He was accused of sex with an inmate in 2011,

2    and he was accused of sex with an inmate in 2012.  Whether you

3    learned about it in 2013 or in 2012, I guess it really doesn't

4    matter.  The issue is when you learned of these allegations

5    and his denials, you knew of his denials, right?

6    A.  Again, I can't answer to the 2012 incident.  I don't

7    recall what you're specifically talking about.

8    Q.  You're saying that you did not know in 2011 and even in

9    2013 that Brennan was outright denying he ever had sex with

10   these inmates?

11   A.  I'm sorry.  I already answered in 2011, and I had no

12   reason not to believe him in 2011.  But you keep asking about

13   2012, and I'm -- if you could show me specifically what you're

14   asking about --

15   Q.  Okay.

16   A.  -- particularly information that came to me about his

17   denial and when, I could appropriately answer your question.

18   Q.  As you sit here today, you now know that Brennan had, in

19   fact, lied about whether or not he was having sex with female

20   inmates, correct?

21   A.  Again, I have to draw a distinction between 2011 and

22   between the future event and the future case that you're

23   talking about.  I don't have evidence or knowledge that he

24   lied in 2011.  And I also don't know what statements he made

25   to the Illinois State Police when he was under investigation,

Koster - Direct by McLaughlin

1   if he denied it or not.  But it is my understanding that as a

2   result of that investigation, he ultimately did admit it, did

3   admit to it.

4   Q.  You were cooperating with the Illinois State Police in

5   2000- -- late 2013, early 2014, when they were investigating

6   the charges against Brennan, were you not?

7   A.  That's correct.

8   Q.  Okay.  And Brennan was charged with -- by that State's

9   Attorney's Office with a felony sexual misconduct against an

10  incarcerated individual, correct?

11  A.  Yes, I believe he was.

12  Q.  And he pled guilty to that charge eventually, didn't he?

13  A.  To my understanding, he did, yes.

14  Q.  Okay.  And that's when he was finally terminated, right?

15  A.  He actually resigned immediately I think upon either

16  confessing or being charged with the -- with the offense.

17  Q.  So Brennan wasn't your only deputy to be investigated by

18  the Illinois State Police.  Levy was also investigated by them

19  in late 2013, early 2014, correct?

20  A.  Yes, that was part of the same investigation.

21  Q.  Okay.  And in a criminal case -- and I think that was

22  discussed sometime earlier today -- the burden of proof is

23  beyond a reasonable doubt, correct?

24  A.  Yes, it is.

25  Q.  And that's a very tough standard to meet.  You have to --

1    have to eliminate all doubt that there -- that the individual

2    engaged in the conduct of criminal activity, correct?

3    A.  Yes, it could be a high bar.

4    Q.  But that's not the standard that you used -- okay.  Let me

5    rephrase that.

6           So to your knowledge, the ISP -- that's the Illinois

7    State Police -- dropped this investigation into Levy but the

8    KCSO picked it up, didn't it?

9    A.  Yes, we did.

10   Q.  Okay.  And this was -- they originally were looking at it

11   from a criminal standpoint, right?  You used detectives to

12   conduct an investigation?

13   A.  I'm sorry.  The Illinois State Police or our

14   investigation?

15   Q.  The KCSO.

16   A.  Yes, it was a criminal investigation.  We asked the

17   Illinois State Police to continue their investigation after

18   they got the charge against Brennan, and they ultimately

19   declined to continue the investigation.  They didn't feel they

20   would be able to gather enough evidence.  My review and my

21   understanding of what had been done, I believe that there was

22   an opportunity still to make a criminal charge on this.  So we

23   did -- yes, we opened a criminal investigation.

24   Q.  But Kendall County did not ultimately pursue him

25   criminally, did they?

Koster - Direct by McLaughlin

1  A.  No.  We were not able --

2  Q.  Okay.

3  A.  We were also unable to meet that bar.

4  Q.  But eventually you decided you didn't have enough for

5  beyond a reasonable doubt, but that's not your burden in an

6  administrative matter, and you terminated him, or you

7  conducted an investigation regarding his charge from the --

8  from the employment standpoint, correct?

9  A.  Yes, we did.

10  Q.  Okay.  So that was one of the findings that led to his

11  termination in October of 2014, correct?

12  A.  I'm sure -- I'm sorry.  Did you specify a finding or what

13  the finding was?

14  Q.  I'm sorry.  That he -- that he -- well, actually, one of

15  his findings was that he lied with respect to that

16  investigation that you conducted, correct?

17  A.  Yes, that's correct.

18  Q.  Okay.  But that is not the only charge on truthfulness

19  that he was found guilty of when he was terminated, correct?

20  A.  Without reviewing the case record or my summary of the

21  case record and findings, I don't recall exactly which

22  allegations were sustained and which were not.

23  Q.  Didn't Sabrina Jennings make a finding with which you

24  concurred that he had engaged in a pattern of sexually

25  harassing female inmates over a period of years?

A.  I believe that that is correct, but, again, I don't

independently recall the language from that report.  If you...

Q.  There were other complaints about -- from inmates about

Levy.  There were complaints from male inmates as well,

correct?

A.  I'm sure most every deputy has received complaints.  I

know that there's at least one or two that we'll probably be

going over here.

Q.  Well, there was a complaint that he retaliated against

inmates for -- an inmate for -- the inmate made a report

against him, and then he report -- he retaliated against that

inmate.  Do you recall that incident?

A.  Yes, I do recall there was such a complaint.

Q.  Okay.  And with respect to that incident that you recall,

that's Plaintiff's Exhibit No. 23.  And that was an incident

where -- let's see.  Okay.  Whoops.  All right.  Plaintiff's

Exhibit 23, and this was an incident where --

          MS. McLAUGHLIN:  Here I am again.  Thank you.

BY MS. McLAUGHLIN:

Q.  The inmate is complaining that Levy was banging on his

door and his glass -- or the glass, causing irritation to the

inmates.  And let's see.  And Sergeant Flowers -- I'll correct

that.  The inmate complained that Levy came into the north

dorm.  He was vulgar and disrespectful towards him because the

complaint -- because of the complaint the inmate had filed the

1   day before.  So after reading the reports, Jennings says, I

2   don't concur with the recommendation of just an oral

3   reprimand.  So she actually gave him a written reprimand for

4   that behavior, correct?

5   A.  Yes, that's correct.

6   Q.  And in that instance, Levy was reported to have acted in a

7   very aggressive manner towards the inmate.  Do you recall

8   that?

9   A.  My recollection is that the report is that he entered and

10  he was yelling at them and may have used foul language towards

11  them.

12  Q.  Okay.  So it -- Jeanne Russo conducted an investigation of

13  this, didn't she?

14  A.  I do believe that Sergeant Jeanne Russo was the supervisor

15  that investigated this complaint.

16  Q.  All right.  And she says, I spoke with the inmate to get

17  more information, and the inmate said that he entered the

18  dorm, started yelling at him, calling him a "bitch ass punk,"

19  telling him that putting in a request form was some "pussy ass

20  shit."  And then he stated that he told Deputy Levy he was not

21  going to argue with him.  He laid back down on his bunk.  He

22  stated that Levy continued to yell at him and -- let's see.

23         So at that point, Jeanne Russo reviews the DVR from

24  the day, and it shows him standing in the doorway in this

25  excited conversation with the inmate.  And the inmate is in

1    his bunk.  He goes up to the railing and just stands there and

2    appears to be listening.  He then returns to his bunk, and

3    Levy continues for a few seconds more, then places a piece of

4    paper on the table and exits the dorm.  And then he returns,

5    and Levy is in the doorway.  His arms are flinging around, and

6    it appears that he is speaking in a very animated manner.

7            That's what Jeanne Russo reports that she saw on the

8    DVR tape, right?

9    A.  Yes, she does.

10   Q.  All right.  And Levy in his -- in his report that he filed

11   regarding this incident, he basically says, all right, I --

12   let's see.  He says -- let's take a look at that a little

13   closer.

14           He goes into north -- he's down in south pod, and

15   this inmate had complained about him shaking doors and making

16   a racket earlier.  I'm down in south pod, but I just wanted to

17   go down into north pod and address this.  And he goes into

18   north pod, and he says, I made a general statement as to did

19   my shaking the door intimidate or provoke anyone?  No one said

20   anything.  I went on to say that if anything I do ever offends

21   someone that they should just come up to me and tell me.  And

22   then finally the inmate said he put in a request because he

23   did not want this from me, and reporting officer Levy asked,

24   what am I -- what I am -- what, I am just asking a question.

25   An inmate then stated, you always give me shit about what I

1    ask.  And the inmate stated I was always giving him slack

2    about his uniform.  And reporting officer says very

3    reasonably, you know, yes, I do, but that's every inmate that

4    wears an extra large when he should be asking for a 3X.  And

5    once you explain that if you need it for your height, I give

6    it to you.  The inmate proceeded to raise his voice, get out

7    of his bunk, stand by the rail and yell.

8            So inmate standing by the rail and yelling, that's

9    not what Jeanne Russo observed, is it?

10   A.  Could you go back to the previous exhibit?  I don't recall

11   if she indicated that he wasn't yelling or that -- I know she

12   indicated he was standing by the railing, but I'm not sure how

13   she articulated that she could tell he wasn't yelling --

14   Q.  Sure.

15   A.  -- or wasn't using a loud voice.

16           And I apologize.

17   Q.  That's okay.

18   A.  I understand that my memory on all this isn't that great,

19   but, I mean, the numbers from the Bates stamp, we're at, like,

20   page 3600, and we've turned over almost 4,000 pages of these

21   documents.  So my memory on all of them is not 100 percent.

22   Q.  Okay.  So she says he gets up, he goes to the railing and

23   just stands there and appears to be listening.

24   A.  Okay.  Thank you very much.

25   Q.  Okay.  So that doesn't jive with what Levy is reporting,

Koster - Direct by McLaughlin

1    does it?

2    A.  I would say that it -- if there's no indication that he

3    was yelling, it would be -- it would not be consistent.

4    Q.  So basically Levy was lying about what happened, right?

5    A.  I can't make that determination based on the fact that

6    there was no audio.  It could be that he was, but there's

7    no -- I don't see where there's any evidence that I could use

8    to concur or confirm that he -- that he wasn't.

9    Q.  Videotape isn't sufficient for your -- in your estimation?

10   A.  Not without audio.  I mean, some people speak in a very

11   animated manner and could have a fairly low-level voice.

12   Someone else could yell while standing up by the railing.  I'm

13   not saying that's what happened.  I'm just saying I don't

14   think that there's sufficient evidence one way or the other.

15        And I think that the real thing that I kind of

16   focused on remembering now seeing that so fully was that

17   basically, whether it's relevant or not, Deputy Levy and the

18   inmate both basically have the same version of what

19   Deputy Levy said, which was he said "punk ass shit" or "punk

20   ass bitch," or I think Deputy Levy referred to it as "punk ass

21   move."

22        So the conversation, the words that were used seemed

23   to be in line with both their stories.  It was really just the

24   fact that one appeared animated and the inmate said he was and

25   he said he wasn't screaming and yelling, and Levy said that

Koster - Direct by McLaughlin

1    the inmate did yell from the top of the bunk -- or from the

2    top of the dormitory.

3    Q.   Right.  So Levy said, this guy was yelling, right?

4    A.   I understand, and I think I've clearly articulated that I

5    don't think I could really draw a distinction as to who lied

6    and who didn't lie based on --

7    Q.   He was -- oh, I'm sorry.

8    A.   Based on that.

9    Q.   So you think it's perfectly consistent that he was yelling

10   while he appeared to be listening, right?  You got Levy saying

11   he was yelling.  You got Jeanne Russo saying he appeared to be

12   listening.  So you think that that's consistent, so he was

13   yelling while he appeared to be listening?

14   A.   I didn't make the determination.  I didn't make a

15   determination on it.

16   Q.   And there were other inmates who testified -- other

17   inmates who were interviewed, and their statements

18   corroborated that the inmate wasn't yelling back at Levy;

19   isn't that correct?

20   A.   Again, I don't recall what all the statements were.  I

21   think there were three or four, and I think they were pretty

22   concise at the end.  If you could put that up so I could

23   review it, I would appreciate it.  And, again, I'm not trying

24   to -- I just can't recall with all the literally thousands

25   of -- there are thousands of documents that we provided for

1    disciplinary issues, and trying to remember everything is

2    difficult.

3    Q.   On Bates stamp 3252 -- I'm sorry.  I shouldn't be using

4    this exhibit here.  All right.  3252, I pulled each inmate --

5    this is Jeanne Russo's report -- one at a time and spoke to

6    them individually.  I was told, stated in summary, he did hear

7    Levy calling this inmate a "bitch ass punk" and other

8    derogatory terms, names in regards to having turned in a

9    special request slip complaining about him.

10           Then another inmate stated in summary Levy entered

11   the pod and started swearing at the inmate about a request

12   that he had turned in.  One inmate said I was in the washroom.

13   I did not speak to him.  Another inmate said -- stated in

14   summary that he heard Deputy Levy calling someone names and

15   telling them that there was a -- they were a pussy for filing

16   the request slip and then stated in summary that he heard

17   stuff but he didn't want to say anything because it was a

18   pretty -- petty request slip.

19           Okay.  So all inmates refused to put their statements

20   in writing, citing the reaction of Deputy Levy over the last

21   written statement about him.  They were in fear of

22   retaliation.

23           So would you agree then that there were -- well,

24   first of all, you would expect that Deputy Russo -- I'm sorry

25   Sergeant Russo at the time -- when she's making this

Koster - Direct by McLaughlin

1    investigation, she's asking those inmates, well, was the

2    inmate yelling back?  I mean, she's asking not only did Levy

3    talk smack to this guy, but was the inmate reacting as well,

4    right?  You would expect that?

5    A.   I don't know what she asked him, but based on -- and thank

6    you for bringing that back up for me because my recollection

7    was that no inmate indicated that he was yelling but that he

8    had used foul language, and that's my -- so that --

9    Q.   Okay.

10   A.   -- that refreshes my recollection.

11        And I think the language is consistent between what

12   the inmate said and what Deputy Levy said.  And, again, I

13   don't have -- I have not made a definitive conclusion on

14   whether he did yell or didn't yell.  But I think that my

15   recollection was that the other inmates didn't indicate that

16   there was yelling, just foul language.

17   Q.   Right.  And you would expect that if there had been

18   yelling by the inmate, it would have been in Jeanne Russo's

19   report back, right?  It would have been reported here in this

20   document?

21   A.   Oh, I was talking about Levy.  They don't indicate that

22   Levy was yelling.

23   Q.   Right.  And with respect to the way the -- the manner that

24   Jeanne Russo conducted her investigation and spoke to all

25   these inmates, you would have expected that had these inmates

1   said, oh, the inmate in question was yelling back at Levy and

2   provoking Levy that that would have been included in this

3   report by Jeanne Russo, correct?

4   A.  Yes.

5           MS. BRUCH:  Objection.  Calls for speculation.

6           THE COURT:  Well, it's an extremely long question, so

7   rephrase it.

8   BY MS. McLAUGHLIN:

9   Q.  Wouldn't you expect that Jeanne Russo, in providing a

10  truthful, complete report as she is required to do, would have

11  put any comments about the inmate yelling back at Levy into

12  her report?

13  A.  I would think that that would be -- if indeed she asked

14  those questions of the other inmates that that should be

15  included in the report.  I don't know that that question was

16  asked.  So the only thing I have to go by is what she did

17  report that the other inmates said.

18  Q.  Okay.  So in 2011 you had no problem concluding that Levy

19  was lying about mistreating an inmate, but here in 2013, where

20  the inmate's complaints are corroborated by multiple sources,

21  the video and these other inmates, you do not believe or you

22  just can't draw a conclusion as to whether Levy is lying about

23  his version of the events, correct?

24          MS. BRUCH:  Objection to the form.  It's

25  argumentative.

 1          THE COURT:  Sustained.

 2    BY MS. McLAUGHLIN:

 3    Q.  Well, let's move on to Deputy Michael Dean.

 4          Now, let -- you recall an incident that happened on

 5    February 14, 2014 when Deputy Dean lied about giving a female

 6    inmate a pat-down?  Do you recall that incident?

 7    A.  Yes, I do.

 8    Q.  Okay.  And this is the report, Plaintiff's Exhibit No. 14.

 9    That's the report that was prepared by Sabrina Jennings and

10    provided to you, correct?

11    A.  That is actually the cover letter regarding his

12    suspension -- oh, I'm sorry.  There's additional documents

13    behind that.

14    Q.  Yeah.

15    A.  I just wanted to refer directly to what was on the screen.

16    Q.  I believe this is the whole packet here.

17    A.  Thank you.

18    Q.  Okay.  And you concurred with her recommendation that Dean

19    would get a one-day suspension, correct?

20    A.  I did.

21    Q.  Well, let's look at what Dean did to warrant that one-day

22    suspension.  We'll look at page 3 of the exhibit.  This is --

23    this is Jennings' actual report to you.  And if you look

24    there -- well, this is Jennings' report to you, but do you

25    recall that it was Sergeant Russo again who conducted the

Koster - Direct by McLaughlin

1   investigation?

2   A.  My recollection is that it was Sergeant Jeanne Russo that

3   conducted this investigation, yes.

4   Q.  Okay.  So let's look at what Russo actually said about

5   this investigation, and that's on page 2116.  Whoops.  I did

6   it again.  I gave the wrong document.

7            THE COURT:  And, Ms. McLaughlin, we're going to take

8   an afternoon break shortly.  If you want to do it now or get

9   another question or two in because the jury has said they want

10  to leave at 4:30.

11           It's 3:20.  We'll do a ten-minute break.  Is this an

12  okay time for a break?

13           MS. McLAUGHLIN:  That's fine.

14           THE COURT:  All right.  We'll break for ten minutes,

15  a little shorter than normal because we have a shorter

16  afternoon.

17           Please don't discuss the case amongst yourselves or

18  with anyone else.  Keep an open mind.  And I think you know

19  your way to the jury room.  So find your way back, and we'll

20  have you back out at 3:30 to finish up at 4:30 today.

21           Thank you.

22     (Jury exits.)

23           THE COURT:  All right.  Sir, you can leave the stand.

24  Don't discuss your testimony with anyone.  You're on

25  cross-examination.

Koster - Direct by McLaughlin

1          Anything we need to put on the record?

2              MS. BRUCH:  No, Your Honor.

3              MS. McLAUGHLIN:  I don't think so.

4              THE COURT:  Okay.  See you in ten minutes.

5      (Recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            (Proceedings heard in open court.  Jury out.)

 2            THE COURT:  Go ahead.

 3            MS. McLAUGHLIN:  Okay.  I'm going to ask for an

 4    admitting instruction and -- an admonition, an admonishment of

 5    the witness.  Here's my situation.  I'm trying to ask very

 6    concise -- and particularly in this section, I'm asking very

 7    concise leading questions that require yes or no answers.  I'm

 8    purposely doing that because of the time constraints that we

 9    are under, and I think it would be appropriate -- I mean, I

10    think the jury might be getting aggravated and you are, too,

11    with my interrupting.

12            THE COURT:  No, I'm not aggravated.

13            MS. McLAUGHLIN:  And so if the jury were advised that

14    there are time constraints, that that's why there's some rush

15    to get the information out but, quite frankly, these

16    explanations that Mr. Koster is giving should be on their

17    time, you know.  It's their case in chief.

18            THE COURT:  Well, you're asking repetitive --

19            MS. McLAUGHLIN:  I'm asking very precise leading

20    questions.

21            THE COURT:  But you're asking repeatedly.  There

22    could have been half a dozen more objections "asked and

23    answered" other than the one or two that were sustained.  I'll

24    tell you, frankly, I've heard the same question asked

25    repeatedly, and on each one of these incidents -- and the jury
```

1    gets it after one or two or three or four.  And last time I

2    struck his answer, you decided to ask another question going

3    to the well one more time, and I warned you if you asked it,

4    I'm not going to stop the witness and I'm going to allow him

5    to answer fully.

6            You have to -- try the case as you wish, but you --

7    there's never been a jury yet that I have talked to after they

8    deliberated where they haven't said, "What do you think we

9    are, stupid?  We got it the first time."  Every time juries,

10   they always get irritated with repetitive questioning.

11           These are -- these are relevant issues, have been

12   ruled relevant.  You're entitled to get into them, but if you

13   keep asking the same questions over and over, you're going to

14   eat into your time.

15           I will ask the witness, restrict your answers to the

16   question that's asked.  There's a frustration sometimes where

17   you can't get out the full answer, and if it's not responsive

18   to the question, you're not entitled to get a full answer out.

19   Your lawyer will have an opportunity to clear those things up

20   if you think there's more that you need to say.  So I give you

21   that admonition.

22           I'm not going to tell the jury there are time

23   constraints.  If I think there's abuse going on later on in

24   the case, I may reconsider.  At this point, there's no need to

25   tell them that.  Okay.  Anything else we need to discuss?

1          MS. McLAUGHLIN:  No.  I'm ready to proceed.

2          THE COURT:  Okay.

3      (Proceedings heard in open court.  Jury in.)

4          THE COURT:  All right.  Please be seated, ladies and

5   gentlemen.  I understand, for planning purposes, you want to

6   know how long lunch is going to be.  I told you it's going to

7   be an extended lunch period.  We're going to break about 12:15

8   and reconvene about 2:15.

9          This is not an episode of "Mad Men."  Believe me, I

10  don't usually take two hours' break at lunch, and I certainly

11  don't drink during lunch, but this is an unusual situation I

12  can't avoid, but it will be from about 12:15 to about 2:15.

13  So, hopefully it's a good day out and you can get out in the

14  Loop and make some plans during that period of time to get out

15  and see some of downtown if you'd like.

16         And then Friday, I have no other court cases in the

17  morning other than this, so we can start at 9:00 o'clock or

18  even, if you decide collectively you'd like for me to start a

19  little earlier, I'll let you decide, but there's nothing that

20  can restrict us from starting at 8:30 or 8:45 if you choose.

21  If you all can get in and start a little bit early, we'll get

22  a longer day in, but that's going to be up to you.  Otherwise,

23  we'll start at 9:00 o'clock sharp on Friday.  Today, we'll

24  break at 4:30, so I'll stop talking, and I'll let

25  Ms. McLaughlin continue her questions.

1        You may proceed.

2   BY MS. McLAUGHLIN:

3   Q.   Okay.  So we were talking about Deputy Jeanne and the

4   incident that occurred in February of 2014 regarding an inmate

5   pat-down.  And Sergeant Russo -- and you said you recalled

6   that incident, correct?

7   A.   Yes.  It was investigated by Sergeant Jeanne Russo.

8   Q.   And she noted that Dean brought a female inmate into a --

9   the booking to be processed, and Sergeant Russo noted that he

10  said he patted her down.  That's your recollection, right?

11  A.   Correct.

12  Q.   Okay.  And then Sergeant Russo basically says, "Hey, wait

13  a minute.  Why is a male deputy patting down the female inmate

14  when there are female deputies on shift?"

15       So she questions Deputy Dean about this, correct?

16  A.   Yes.

17  Q.   And Dean tells her that he did pat down that inmate but he

18  was not aware of the policy that said, oh, you've got to get a

19  female inmate -- or female deputy to do the female inmate

20  pat-downs.  Do you recall that --

21  A.   Yes.

22  Q.   -- being an incident?  Okay.

23       And she counsels him on this policy, and Jeanne Russo

24  wrote up an oral reprimand for him.  Do you recall that?

25  A.   Yes.

Koster - direct by McLaughlin

1   Q.  Okay.  So then Jeanne Russo says -- I'm sorry.  That was

2   on Page 2123 where she writes him up and gives him an oral

3   reprimand.  He wasn't aware of the policy, and she explains

4   that there.  Okay.

5           So Dean -- but then Sergeant Russo was burning a DVD,

6   and she notices, hey, Jeanne -- Dean didn't perform a pat-down

7   on that particular female inmate.  He had lied.  Isn't that

8   correct?

9   A.  Yes.

10  Q.  And that inmate could have had a weapon on her, had been a

11  danger to herself or other deputies or other inmates, right?

12  A.  Yes.

13  Q.  That's why you have a pat-down policy when you're booking

14  an inmate, right?

15  A.  Yes.

16  Q.  Okay.  So Sergeant Russo, she finds that Dean flat-out

17  lied.  That's on Page 2114.  And let's see.  I'm sorry.  Well,

18  she found that he had flat-out lied.  She charged him with

19  untruthfulness, correct?

20  A.  I don't recall if she did or if Commander Jennings

21  determined that it was untruthfulness, but one of the two

22  definitely made a finding that they had been untruthful, yes.

23  Q.  All right.  So if we look at the notice of charge here and

24  it says, "being untruthful about pat search" --

25  A.  Yes.

1  Q.   -- correct?

2  A.   Yes.

3  Q.   And it was -- you didn't terminate him at that time,

4  correct?

5  A.   No.

6  Q.   You concurred with this decision to give him a -- I

7  believe he got a suspension, right, a day's suspension?

8  A.   I believe that's correct, yes, one-day suspension.

9  Q.   Right.  So even though he -- the video showed he flat-out

10 lied about it, you did not terminate him, did you?

11 A.   No, I did not.

12 Q.   Okay.  You later terminated Deputy Dean in, like, December

13 of 2014, correct?

14 A.   I believe it was December or late November of 2014.

15 Q.   Okay.  And with respect to that termination, he had again

16 lied about one of his official duties, correct?

17 A.   Yes, he did.

18 Q.   And at that point in time, you said, that's strike three.

19 He had lied in 2005.  There was a charge of untruthfulness,

20 and you didn't terminate him then.  There was this charge in

21 earlier 2014 where he was found guilty of untruthfulness.  And

22 then you terminated him at the end of 2014 because he had that

23 third strike, right?

24 A.   Yes, because he lied.

25 Q.   Okay.  Now, let's look at -- what are we going to look at

Koster - direct by McLaughlin

1    next?  We are going to look at Jeremy Crumly, Deputy Crumly.

2    There were several incidents in 2012 involving Deputy Crumly

3    for which he received, at your authorization, a seven-day

4    suspension, correct?

5    A.  I believe that's correct.  Five to seven days is my

6    recollection.

7    Q.  Okay.  And this is going to be Plaintiff's Exhibit No. 9.

8    And in this report -- let's see.  Sabrina Jennings conducted a

9    formal interrogation of Deputy Crumly in this matter, right?

10   A.  I believe she did, yes.

11   Q.  Okay.  Because anything that's over a three-day

12   suspension, you're going to get a formal interrogation, right?

13   A.  Yes.

14   Q.  Okay.  So this Page 1, 2, 3, 4, whatever, is Sabrina

15   Jennings' report of what occurred during the formal

16   interrogation.  Is that your recollection?

17   A.  And I think the entirety of the investigation --

18   Q.  Okay.

19   A.  -- including the formal interrogation.

20   Q.  All right.  And so the first issue in this matter is that

21   Deputy Crumly had received a gift from one of the inmates, the

22   work release inmates, correct?

23   A.  I believe that's correct.

24   Q.  And he had received a jar of pickles, right?  Right?

25   A.  I believe that is one, and I think he also may have

Koster - direct by McLaughlin

1   admitted to receiving or had received a bar, bars of soap.

2   Q.   Right.  Some Dial soap because one of the inmates worked

3   at Dial Company, correct?

4   A.   Yes.  I think it was the same inmate, but I'm not sure.

5   Q.   And that's a pretty serious situation when they are --

6   when inmates give gifts to a deputy, that's a violation of the

7   code of conduct.  We discussed that earlier, correct?

8   A.   It is.

9   Q.   So when Crumly -- what Crumly did with those pickles is he

10  brought them into master control.  He took a bite.  He tasted

11  it.  He passed -- tried to pass it around.  Nobody else took

12  him up on the offer.  And then he admitted that he didn't

13  report this infraction of the rules, right, that he had taken

14  this -- taken these pickles?

15  A.   At the time, at the time of the incident, yes.  I'm sorry.

16  Q.   And while you're investigating that pickle or -- while

17  Jennings is investigating that pickle situation, she also

18  knows that he got the Dial soap from an inmate that worked at

19  Dial, correct?

20  A.   Yes.  I believe it's the same -- part of the same

21  investigation.

22  Q.   Now, Sergeant Hawkins, that's Michael Hawkins, he was

23  aware of the soap and told him to get rid of it and tell

24  him -- tell the inmate to stop, but nothing regarding Sergeant

25  Hawkins' knowledge of this inmate -- this infraction was ever

Koster - direct by McLaughlin

1    written up, was it?

2    A.  I don't recall.  I can't say that it was or wasn't.  I

3    don't recall.

4    Q.  Well, take a look.  It was on question No. 5.  "Did you

5    report or did anyone else become aware that you had received

6    these items?"

7            And she's got, paren, Hawkins.  "And Deputy Crumly

8    stated that Sergeant Hawkins knew him about getting the bag of

9    soap the second time.  Deputy Crumly stated that Sergeant

10   Hawkins saw the soap.  He told Sergeant what it was.  Deputy

11   Crumly stated that Sergeant Hawkins told him to get rid of it

12   and tell the inmate to stop.  Nothing was documented."

13           Correct?

14   A.  I'm sorry.  I misunderstood the original question.  I

15   thought it was asking if we did not document that interaction

16   or that statement from the interview, not that Deputy Crumly

17   indicated that it wasn't documented at the time.

18   Q.  Sergeant Hawkins wasn't ever disciplined for not

19   documenting that incident, was he?

20   A.  I don't know.

21   Q.  Okay.  So let's move to the second issue, and this is

22   about Crumly giving gifts or gratuities to inmates, and that

23   is, I believe, No. 6.  "Have you ever provided inmates with

24   gifts, gratuities, or other items?"

25           "And Crumly seemed confused at first by the question,

1   so I asked him again.  And he at first stated no, he had not,

2   but then he remembered there was an incident that he talked to

3   deputy," whomever, "about that happened a few years back.

4   Deputy Crumly stated that he had taken a crock pot down to

5   west pod, and he cooked up some venison stew or roast.  And he

6   stated that nobody on shift wanted it, and so he let an

7   inmate," an inmate, "taste it since the inmate stated he had

8   never had anything like that.  I asked him who the inmate was,

9   and he thought it was one of the Chicago cops.  I asked him if

10  he fed more than one inmate, and he said no, it was only the

11  one, and he only let him have a taste."

12          That wasn't a true statement, was it?

13  A.  I don't know if it was or wasn't a true statement.  I

14  didn't make a determination on whether that was a true

15  statement.

16  Q.  So you signed off on this report, right?

17  A.  I -- yes, I did.

18  Q.  Okay.  So you saw everything that's in this report, and

19  you didn't make a determination that Crumly was lying about

20  the fact that he only gave one inmate a taste of the venison?

21  A.  No, I did not.

22  Q.  Okay.  So there were four Chicago cops, police officers,

23  that were under indictment, and for safety reasons, they were

24  housed at Kendall County Sheriff's Office, correct?

25  A.  Yes.

Koster - direct by McLaughlin

184

1   Q.   Okay.   And let's take a look at Plaintiff's Exhibit

2   No. 20.   This is the report -- excuse me.   This is the report

3   of what the -- all the other deputies said about what they

4   knew about these incidents.   And let's take a look.

5        So we have statements about the venison stew.   And

6   during this process, Deputy -- is it Lenard?   So Deputy Lenard

7   claims that Crumly gave four inmates -- excuse me.   I need to

8   find the right page.   Oh, 1652.

9        So during the questioning -- okay.   There it is.

10  "Deputy Lenard stated that a few years back, he had seen

11  Deputy Crumly give four inmates in west pod -- that he had

12  brought in a stew that he had brought in.   Deputy Lenard

13  states that he was there when this happened, and there were

14  four inmates from Chicago who used to be cops.   I asked Deputy

15  Lenard if he had reported this to the -- to the sergeant, and

16  Deputy Lenard said that he had not.   However, he thought that

17  Deputy Cantwell had reported it.   And I asked Deputy Lenard if

18  he was sure about this, and he stated, oh, yes, Sergeant

19  Gillespie had been informed of this and did nothing about it.

20  I asked Deputy Lenard if anyone else was there, and he stated

21  that Deputies Cantwell, Belmonte, and Storey were there as

22  well as a few others."

23       So Deputy Lenard says it wasn't one inmate, it was

24  four inmates, right?

25  A.   He did say that.

Koster - direct by McLaughlin

1  Q.  Okay.  And then we go on.  So then there is Sergeant

2  Belmonte.  And Sergeant Belmonte, he says -- oops.  Sergeant

3  Belmonte, he gives a statement, and he's -- actually, he was

4  Deputy Belmonte at the time.  He's since been promoted and is

5  now a sergeant, correct?

6  A.  Yes, because this incident occurred three years before the

7  2012 date, in 2009.

8  Q.  Okay.  And he says that he was watching on master control

9  cameras, and he saw this happen on the camera and that he

10  couldn't believe this happened.  And the inmates brought their

11  trays out for lunch.  Crumly gave them the stew, and then they

12  returned for seconds.

13      That's not a taste.  They returned for seconds, right?

14  A.  That's what Belmonte stated.

15  Q.  So Deputy Belmonte's statement directly contradicts Deputy

16  Crumly's, right?

17  A.  It does.

18  Q.  Okay.  And then we have Cantwell.  And Cantwell, when

19  questioned, he says, "Yes, it's four cops."  Let's see.  He's

20  over here.  He says, "Yes, it's four cops.  And I heard about

21  this, and I got mad, and I confronted Crumly.  Storey also

22  corroborates seeing Crumly violating the rule about giving

23  gifts to an inmate."

24      So I want to go back just a minute.  Cantwell says he

25  never did report to Gillespie, but Gillespie did know about

1    this incident at the time, didn't he?

2    A.  I don't believe that he did, no.

3    Q.  Well, let's take a look at that.  Crumly, in Plaintiff's

4    Exhibit 9, which is his -- his investigative report, Crumly

5    says on -- I believe it's 1636.  Crumly says -- where did that

6    go?

7          Crumly says, it's on Page -- okay.  It's in answer to

8    letter G.  He says that, "Deputy Crumly also stated that his

9    sergeant at the time also told him never to do this again.

10   And when asked who his sergeant was, he looked over at Deputy

11   Commander Gillespie and said 'Sergeant Gillespie.'"  Gillespie

12   was a sergeant at the time.

13          "I asked if this had been documented, and he stated,

14   no, it had not.  When asked how the sergeant was informed, he

15   stated that he didn't know because he didn't tell him and

16   maybe he smelled it or something."

17          So Deputy Crumly says Gillespie knew, right?  He

18   later reneged on that statement, didn't he?

19   A.  I don't know if he reneged or not, but Deputy -- or

20   Deputy -- Commander Gillespie denied having knowledge of it,

21   so if we're relying on Deputy Crumly's veracity here, I think

22   that would support potentially his veracity on the -- or any

23   other aspect of his statement, also.

24   Q.  Okay.  Let's move on to the third issue with Crumly.

25   Crumly was placed on administrative leave because of the

Koster - direct by McLaughlin

1    gratuity issue, right, the taking of the pickles and the

2    Dial soap, etcetera.  Do you recall that?

3    A.   Yes, pursuant to the ongoing investigation.

4    Q.   So when someone is put on administrative leave, they are

5    stripped of their badge and their gun and they have to -- they

6    don't have access to that, right?  They have to turn it in?

7    A.   Correct.

8    Q.   And there was an issue with respect to when he turned in

9    his weapon, correct?

10   A.   I believe that it was not in a fully-loaded condition, my

11   recollection is.

12   Q.   But Deputy Crumly actually stated in his report that it

13   was fully loaded and that there was one round in the chamber,

14   correct?

15   A.   Yes.  He stated that he believed that it was, yes.

16   Q.   But it was Sergeant Hawkins and Sergeant Gillespie at the

17   time who found the weapon -- or who escorted him to his car

18   and got the weapon from him when they put him on

19   administrative leave, right?

20   A.   That's correct.

21   Q.   And they said, uh-uh, there was not a fully loaded --

22   there was, half the magazine was gone and there was -- and he

23   didn't have another fully loaded magazine readily available.

24   And that's a requirement that they're supposed to have,

25   correct?

Case: 1:15-cv-00496 Document #: 235 Filed: 07/30/18 Page 188 of 213 PageID #:13912
Koster - direct by McLaughlin
188

1   A.   That the weapon should be fully loaded and functional, yes.

2   Q.   So Sergeant Hawkins, he was appalled at the condition of

3   Crumly's weapon, wasn't he?

4   A.   I believe his statement -- I don't recall what his exact

5   statement was, but I know he made a statement that it was not

6   an appropriately ready weapon.  I don't know if he used the

7   word "appalled," but I wouldn't dispute that.

8   Q.   Well -- okay.  Well, that's in Plaintiff's Exhibit 20.

9   And I believe he stated it was inexcusable, literally

10  unprepared, not to mention virtually unarmed.  Do you recall

11  him making those statements?

12  A.   With the refreshment, yeah.  I just didn't remember the

13  word "appalled."

14  Q.   Okay.  So after this, Sabrina Jennings finds him guilty of

15  extreme lack of judgment and in violation of a whole host of

16  rules, correct?

17  A.   Yes.

18  Q.   But he wasn't charged with untruthfulness, was he?

19  A.   No, never made a determination of untruthfulness.

20  Q.   So when Crumly -- now, you said that Gillespie was not

21  disciplined, and one of the reasons why was because Crumly was

22  re-interviewed during that -- during the investigation of

23  Gillespie, and Crumly took back his prior statement that

24  Gillespie knew, right?

25  A.   My understanding is just that he said that he may not have

1   known.

2   Q.  So would you agree with me that the evidence is pretty

3   darn overwhelming that Crumly lied about giving only a taste,

4   and he lied about how many inmates he gave the food to?

5   A.  Based on the length of time from when the incident

6   occurred to when this investigation or information came to

7   light, I can't say that I found the evidence compelling with

8   the three-year period and given that no one had reported it at

9   the time and the change in memory and the time that occurred.

10   And I didn't make a finding on truthfulness.

11         I mean, there were a lot of extenuating circumstances

12   as it pertains to, again, the timeframe involved.  People had

13   different memories, people stating different things.  And

14   furthermore, when it comes to the issue of the weapon, I think

15   that generally that Commander -- and I don't know if it's

16   reflected in her report, but our conversation is that she

17   believed that Deputy Crumly was surprised and shocked that his

18   weapon was not in the appropriate condition, that he was not

19   lying to the supervisor about it, that he may have forgotten

20   or, you know, left it in an unprepared condition and forgot

21   about -- forgot that he had done that, and he thought that it

22   was loaded when he reported it to her.

23   Q.  And you believe that?

24   A.  I didn't make a determination.  I don't think there was

25   sufficient evidence to determine that he was being untruthful,

1   so I didn't make a determination.  I don't think that there

2   was perhaps not enough evidence for me to say that he

3   absolutely was telling 100 percent the truth, but I don't

4   believe that based on the circumstances I described that there

5   was by anywhere near enough information for me to make a

6   determination that he was not being untruthful or that he was

7   being intentionally deceptive.

8   Q.  He just forgot about the condition of his gun?

9   A.  That's my --

10          MS. BRUCH:  Objection, argumentative.

11          MS. McLAUGHLIN:  So let's move on to --

12          THE COURT:  Well --

13          MS. McLAUGHLIN:  Oh, I'm sorry.

14          THE COURT:  I get to rule.  Since he answered,

15  overruled.

16  BY MS. McLAUGHLIN:

17  Q.  Okay.  Let's move on to Deputy Graham.  In 2013, there was

18  an incident where Deputy Graham, regarding the use of force

19  against an inmate that he did not report.  Do you recall that

20  incident?

21  A.  Yes, I do.

22  Q.  And Graham drew his taser and held it against an inmate's

23  chest, correct?

24  A.  Yes, that's correct.

25  Q.  And that was confirmed by video of the incident, correct?

Koster - direct by McLaughlin

191

A.   It was.

Q.   And any time a deputy pulls a weapon out, that has to be documented, right?

A.   A weapon, a taser -- the action that he took, yes, was -- met the requirements for reporting.  I don't want to make -- because there are different levels of weapons.  And if someone were to just pull out an OC spray, that might not necessarily require reporting documents, but the level -- but what he did with the taser would meet that requirement, yes.

Q.   So and there's very clear rules about having complete, accurate, thorough reports, right?

A.   Yes.

Q.   Okay.  And he did not include that in his original report, did he?

A.   I don't believe he did, no.

Q.   Okay.  Let's look at the original report just very quickly.  That is Plaintiff's Exhibit 11.  And we're looking at KC FOIA 3066.  And down at the bottom, he says:

          "On 6/26/13 at approximately 8:10, I, Deputy Graham was escorting inmates to the sally port.  I heard Inmate so-and-so threaten Deputy Swisher.  Inmate told Swisher, 'I'm going to get you, bitch.'  I then took control of the inmate to focus him on getting in the transport van.  Inmate was placed on the side of the van other -- until other inmates could be secured.  Inmate so-and-so was then escorted into the

1    van.  During my transport to the courthouse, I radioed for

2    assistance in case Inmate so-and-so's acts had become

3    escalated."

4              Okay.  Nowhere in there does he mention that when he

5    puts him up to the side of the van, he pulled his taser out

6    and put it to his chest?

7    A.  He does not.

8    Q.  And you would agree, wouldn't you, that Deputy Graham's

9    report was actually a lie of omission, wasn't it?

10   A.  I didn't make a finding of truthfulness.  I don't believe

11   a finding of truthfulness was made.  I think it was a neglect

12   of duty.  He certainly neglected his duty in his failure to

13   provide all the information in the report or the required

14   information in the report.  I didn't make a determination on

15   whether he intentionally lied or intentionally omitted that

16   fact.

17   Q.  Okay.  Let's move on to Deputy Buis, Eric Buis.  And I'll

18   show you Exhibit No. 16.  This is a written report concerning

19   Deputy Buis, and this is dated, what is it, 8/14/12.  And it

20   says that Buis was 45 minutes late to his shift and that he

21   was written up for the same issue a month earlier, on 7/6/12,

22   correct?

23   A.  Yes.

24   Q.  And you -- it's written to you, so you got this, right?

25   A.  Yes.

Case: 1:15-cv-00496 Document #: 235 Filed: 07/30/18 Page 193 of 213 PageID #:13917
Koster - direct by McLaughlin
193

1   Q.   Okay.  Oh, and in this report, Commander Gillespie clearly

2   indicates that she does not believe Deputy Buis.  She says

3   that, "Buis was in my office and advised me of the passing of

4   his grandfather.  During our conversation, I asked him about

5   his days, and he told me that he was on a two-day rotation and

6   worked the following morning.  On his way out of the office,

7   he also said good-bye to Debbie and said, 'I would see you

8   tomorrow.'

9        And his excuse for being late was that he, you know,

10  forgot that he had to work, right?

11       MS. BRUCH:  Objection to the form of the question

12  because it mischaracterizes the document in terms of Commander

13  Jennings' beliefs.

14       THE COURT:  Well, the witness can correct the

15  question if he believes it contains an improper predicate.

16  Overruled.

17  BY THE WITNESS:

18  A.   From my reviewing the document, I don't see that Commander

19  Jennings made any determination about his truthfulness based

20  on the comments that he made coming out on his days off.

21  BY MS. McLAUGHLIN:

22  Q.   He says he was confused about his days off and he mixed

23  them up --

24  A.   Yes.

25  Q.   -- correct?

Case: 1:15-cv-00496 Document #: 235 Filed: 07/30/18 Page 194 of 213 PageID #:13918
Koster - direct by McLaughlin
194

1        And then Commander Jennings suggests that he was in

2    his office -- he was in her office.  He said, "I'm on a

3    two-day rotation.  I'll be working tomorrow."  He says

4    good-bye to Debbie.  He says, "I'll see you tomorrow."

5        That doesn't suggest to you that she didn't believe

6    him?

7    A.  You asked me if that was what she said.  I'm answering

8    what's in that document.  If you have that question for her,

9    what her belief was, I think that would be more helpful.

10   Q.  Okay.  So in July of 2014, there are other issues that are

11   raised about Buis's attention.  Do you recall that

12   disciplinary incident?

13   A.  I'm sorry.  His attention or his attendance?

14   Q.  His attendance.  I'm sorry.

15   A.  Yes, ma'am.

16   Q.  And Sergeant Russo investigated his timesheets for a

17   two-month period and determined that he was late 33 times

18   within -- between May 1st and July 4th of 2014, correct?

19   A.  It's my understanding that Sergeant Jeanne Russo did that

20   research or auditor investigation, and that was her finding,

21   her conclusion.

22   Q.  And that is Plaintiff's Exhibit 5.  And somehow, I'm

23   missing that in my pile, so we'll have to come back to that.

24   Okay.  But do you recall that she also stated that Buis had

25   worked 44 days and he had -- not once did he swipe in on

1   time --

2   A.  Yes, I --

3   Q.  -- in that time period?

4   A.  I don't know the exact number of days, but I'm certain

5   that it was over 30 days.

6   Q.  In fact, it came down to a situation where Jeanne Russo

7   did kind of an audit of Buis's time, and she found that he was

8   late 256 minutes.  And that didn't include the hour and a half

9   that he was late on June 18th of 2014.  So there was a total

10  of basically 346 minutes that he was late in this about

11  two-month time period, which is five and three-quarters hours.

12  A.  I'm relying on your -- without seeing the document, that

13  does sound correct.

14  Q.  And Jeanne recommended a suspension because of his

15  habitually falsifying his timesheets.  Do you recall that?

16  A.  And tardiness, I believe.  I think there were more than

17  one, but I could be wrong.  It might just have been one

18  finding, but I thought she had several findings.

19  Q.  Okay.  But that was -- one of her findings was that he

20  should be suspended because of his habitually falsifying his

21  timesheets.  That was one of the findings she made, correct?

22  A.  I believe so.  I'm sorry.  I thought you characterized it,

23  that was her only finding.  My apologies.

24  Q.  And in that same report, she reports that when

25  interviewing Buis, he had said to her that he had no idea he

1    was late that many times, correct?

2    A.   To my recollection, yes.

3    Q.   And she didn't believe that excuse, did she?

4    A.   I don't know.   I don't -- without seeing the

5    characterization or the complete file, again, not to make an

6    excuse but with over 3,600 documented infractions, I can't

7    remember all those things.

8    Q.   You didn't charge him -- he was not charged with

9    untruthfulness, was he?

10   A.   No.  We don't --

11   Q.   Okay.

12   A.   -- handle timesheet situations as untruthfulness issues.

13   Q.   Let's -- I'm sorry.  Let's talk about Brennan, Deputy

14   Brennan.  He's the same person that we talked about earlier

15   that was subsequently terminated in 2014 -- I'm sorry,

16   subsequently resigned in 2014 because of the criminal

17   allegations against him, correct?

18   A.   Yes.

19   Q.   And he also had a real issue with sick leave abuse and

20   tardiness, didn't he?

21   A.   He was disciplined on several occasions for tardiness and

22   sick leave.

23   Q.   In 2008 -- I'm sorry, 2011, there -- Plaintiff's 18 and

24   Plaintiff's 13, exhibits, he was -- let's see.  Plaintiff's

25   Exhibit 18, he was disciplined between January and October of

1   2011.  He had been warned three times about being late and

2   calling off sick, and then he called off sick nine times in

3   conjunction with vacation or comp time.  So he was kind of

4   padding his time off, correct?

5   A.  Without making a determination into the validity of each

6   and every sick call, I can't say that he was padding time, but

7   the pattern of the amount of time he took off suggested abuse

8   of sick leave, which is I believe what the -- why the

9   investigation, why Commander Jennings conducted the

10   investigation and then came to the conclusion that she did.

11   Q.  And that was, I believe, a report that was written by

12   Koster on October 11th of '11.  And on that same day, she

13   provides another report to you that -- let's see.  That was

14   Plaintiff's 13.  And that report indicates that -- there we

15   go.

16         Over the past 11 months, he had had an issue with

17   being late.  And he was spoken to on several occasions.  And

18   he was advised that if he was late again, he would be

19   disciplined.  And then again, he was late again, right?

20   A.  Yes.

21   Q.  And then we have Plaintiff's 17.  In 2013, in September of

22   2013, you were again notified that Brennan was abusing sick

23   time and was chronically tardy, and he was getting a written

24   reprimand for that.

25         MS. BRUCH:  Your Honor, this exhibit has not been

Case: 1:15-cv-00496 Document #: 235 Filed: 07/30/18 Page 198 of 213 PageID #:13922
Koster - direct by McLaughlin
198

1    admitted.

2              THE COURT:  All right.

3              MS. McLAUGHLIN:  Oh, I'm sorry.

4              MS. BRUCH:  Plaintiff's 17.

5              THE COURT:  Are you moving for its admission?

6              MS. McLAUGHLIN:  Actually, I don't have it right

7    here, so I will have to go back.

8              THE COURT:  All right.

9              MS. McLAUGHLIN:  We'll skip that.

10   BY MS. McLAUGHLIN:

11   Q.  Do you recall in 2013 that you again notified Brennan --

12   or you were again notified by Sabrina Jennings that Brennan

13   was abusing sick time and was chronically tardy?

14   A.  I do recall that there was an additional incident of -- or

15   incidents of him with sick time.  I don't recall the exact

16   date.

17   Q.  And a few months after that, in January of 2014, Jennings

18   informed you that Brennan called in sick for duty late and

19   that he had been advised previously that if he had called off

20   sick again, he was taking a suspension, and he had to have a

21   doctor's note if he called off around that suspension date.

22              Let's see.  Okay.  So this was an incident that

23   occurred on -- on January 5th -- oops, I'm sorry.  I'm looking

24   at the wrong document.

25              THE COURT:  Make sure when you put something on the

Koster - direct by McLaughlin

1   screen, you note the exhibit number so that there's a record.

2           MS. McLAUGHLIN:  Yes.  Okay.  I'll cover that later.

3   BY MS. McLAUGHLIN:

4   Q.  All right.  Moving on beyond Mr. -- Mr. Brennan then, Joe

5   Jasnosz, now, I'm going to ask you some questions about

6   another individual, Joe Jasnosz.  And before being promoted to

7   deputy chief in 2010, you were the commander of the patrol

8   division, right, or the -- you were his boss, Joe Jasnosz's

9   boss.  What division was that?

10  A.  I was, as commander of the support services division.

11  Q.  Okay.  And he was in investigations, correct?

12  A.  Yes.  I believe he was the detective sergeant.

13  Q.  Okay.  And in March and April of -- in March, April of

14  2009, you found out that Jasnosz, who was married, was having

15  an affair with the wife of a guy named Jeff Burgner, correct?

16  A.  I don't know that I had independent or confirmation, but I

17  know that I was told that by -- I was -- that was reported to

18  me.  I don't know that I was ever able -- or ever conducted a

19  specific investigation to confirm that that happened.

20  Q.  And Burgner was the deputy chief of police for the Oswego

21  Police Department, correct?

22  A.  I don't believe he was when that was -- the original

23  report, when that report was made.

24  Q.  He worked for the Oswego Police Department, right?

25  A.  He did.

Koster - direct by McLaughlin

1   Q.   Okay.  So the Oswego Police Department and the KCSO, they

2   worked closely together and encountered one another all the

3   time, right?

4   A.   That's correct.

5   Q.   And both men were actually detective sergeants and,

6   therefore, they worked collaboratively together on a very

7   regular basis, didn't they?

8   A.   Yes.

9   Q.   And, in fact, Jasnosz and Burgner were both serving on the

10  Kendall County major crime task force together, correct?

11  A.   Yes.

12  Q.   Jasnosz was the commander of that task force, and Burgner

13  was the deputy commander of that task force, correct?

14  A.   Yes.

15  Q.   And at that time in 2009, Jeff Burgner didn't want to --

16  he wanted to keep the matter private and try to reconcile with

17  his wife, so he didn't file a complaint, did he?

18  A.   That's my recollection, which is -- makes me believe I

19  never drew a definitive conclusion that that actually

20  occurred, but the report was -- I knew the report of the

21  rumor.

22  Q.   Okay.  But you know that Jasnosz did resign from the

23  Kendall County major task -- crime task force, correct?

24  A.   I believe he did at that time.  I'm not sure exactly what

25  the timeframe, and I don't remember if it was -- I'm sure that

Koster - direct by McLaughlin

1    it was at that same timeframe, but without the dates in front

2    of me from eight years ago, it's very hard for me to testify

3    clearly here.

4    Q.  And your understanding of why Burgner resigned is that

5    Burgner was --

6    A.  Oh, I'm sorry.  You said Jasnosz before.  That's what

7    confused me.

8    Q.  That Burgner resigned from the task force.

9    A.  Then I misunderstood the question.

10   Q.  Okay.

11   A.  That's why I was confused.  I do believe that -- I recall

12   that Jeff Burgner resigned from the task force because he

13   didn't want to be working with Jasnosz.

14   Q.  Okay.

15   A.  I'm sorry if I misheard.  I thought you said Jasnosz

16   resigned, which caused confusion.

17   Q.  So that was your understanding, that Burgner was resigning

18   because he didn't want to continue working with Jasnosz in

19   such a -- on that major task force, but he did pledge that he

20   would maintain professionalism with Jasnosz at that time,

21   correct?

22   A.  That is correct.

23   Q.  Okay.  And there was no discipline of Jasnosz in 2009,

24   right?

25   A.  No, no complaint had been brought forward, and I don't

Koster - direct by McLaughlin

1   know, without a complaint and an investigation that there was

2   any discipline that I could have issued.

3   Q.  But you did meet with Jasnosz at that time, right?

4   A.  I believe I did, yes.

5   Q.  Okay.  And you told him in no uncertain terms that you

6   knew what was going on, his actions had severely damaged the

7   working relationship with the Oswego Police Department and the

8   KCSO, and he damaged the operational ability of the major

9   crimes task force, didn't you?

10  A.  I did.

11  Q.  And you told him that his conduct lessened his credibility

12  and his trustworthiness within the KCSO and with all the other

13  local law enforcement agencies, didn't you?

14  A.  I did.

15  Q.  And that's because while this is -- this is the type of

16  thing that tends to get around.  It's a small town.  The legal

17  community, the legal law enforcement community talks, don't

18  they?

19  A.  Yes.

20  Q.  Okay.  And the tensions between these sergeants was -- you

21  thought would become noticeable, right?

22  A.  I don't know that I drew the distinction.  I believe that

23  both of those individuals could continue to act

24  professionally, but I was, as my statements made, very

25  disappointed with Detective Sergeant Jasnosz's conduct.

Koster - direct by McLaughlin

1  Q.  But most importantly, you clearly warned him that

2  continuing or future conduct of this nature would result in

3  his removal from duty as a detective sergeant and could result

4  in his termination.  Didn't you warn him of that?

5  A.  I did.

6  Q.  And you directed him to cease all such conduct

7  immediately, didn't you?

8  A.  I did.

9  Q.  And there was no doubt in your mind that this was a

10  directive from you to stop this affair immediately, correct?

11  A.  I believe that it was clear that that was what I was

12  directing.  I'm not sure that I had the legal authority to

13  direct him to not do that, but it was certainly a directive

14  that I gave him expecting him to comply.

15  Q.  Okay.  Well, you didn't talk to him explicitly about the

16  affair and confirm that?  You didn't interrogate him or

17  interview him in that sense, right?

18  A.  No, but I think that the understanding was when we were

19  talking, I think he knew that that's what we were talking

20  about.

21  Q.  Well, of course, he did.  And the -- and the having an

22  affair between married people, that's actually an illegal act

23  in Illinois, isn't it?

24  A.  It was at the time.  I'm not sure if that is still on the

25  books or not.

Case: 1:15-cv-00496 Document #: 235 Filed: 07/30/18 Page 204 of 213 PageID #:13928
Koster - direct by McLaughlin
204

1   Q.  So you probably did have the authority to tell him, "Stop

2   that right now.  You cannot be committing an illegal act,"

3   right?  Would you agree with that?

4   A.  Again, I'm not sure that I did have -- if we were in this

5   courtroom litigating and me firing him for having an affair, I

6   don't know that I would win that case.  I didn't like it.  So

7   if that's good enough for you --

8   Q.  All right.  And you told him to stop --

9   A.  Yes.

10  Q.  -- and you considered that an order, right?

11  A.  I did.

12  Q.  Okay.  So then in July 2010, you got a complaint, the KCSO

13  got a complaint from the Oswego chief of police, a man named

14  Dwight Baird, who is now the sheriff -- and he's sitting right

15  over there at the table there -- of the -- of the Kendall

16  County Sheriff's Office, right?

17  A.  Yes.

18  Q.  And this is a letter directed to Richard Randall, the

19  sheriff, correct?

20  A.  I don't know if I heard it -- about it first from him

21  verbally before the letter or if the letter was the first I

22  heard about it.  Again, from 2010, I don't recall the exact

23  sequence of events, but I know that a letter was forwarded.

24  It might have been at my request, in fact, after being told of

25  it verbally.

Koster - direct by McLaughlin

1   Q.  So you get this report that Burgner was caught -- caught

2   Jasnosz with his wife on July 14th, 2010, correct?

3   A.  I believe he caught him leaving his house.

4   Q.  Okay.  And so you investigated, right?

5   A.  Yes.

6   Q.  Okay.  And you talked to Burgner directly, right?

7   A.  I did.

8   Q.  And he told you that he suspected his wife of having an

9   affair, so he purposely came home early on July 14th.  And

10  before he did, he circled the block, and he found a black

11  Dodge Charger.  And he took down the registration number, the

12  license plate, starting with a 39.  And because he knew that

13  Jasnosz, who is undercover detective, right, was assigned by

14  the KCSO to an unmarked black Dodge Charger.  And he parked

15  right behind that black Dodge Charger.

16          Do you recall that being in his statement?

17  A.  I do.

18  Q.  Okay.  So then he parks behind that car, and he cuts

19  through the yard.  And as he enters his house, he sees that

20  the storm door is slowly closing as if someone just left.  And

21  his wife comes out of the bedroom, and she is partially

22  undressed.  That's what he reported to you, right?

23  A.  Yes.

24  Q.  So he confronts his wife and he learns that, yes, it was

25  Jasnosz, and they never did cease having this affair, correct?

1   A.   Again, as to my recollection, without seeing the case

2   file, I don't remember if his wife admitted that or not.   My

3   recollection sitting here today without reviewing my

4   investigation is that she did not, but I don't dispute the

5   fact that he did.   I'm -- just the characterization of the

6   question, I don't recall.

7   Q.   Okay.   So he returns to his car, and the Dodge Charger is

8   gone.   That's what he reports to you --

9   A.   Yes.

10  Q.   -- right?

11       So is it fair to say that Burgner was royally pissed

12  off?

13  A.   No, surprisingly not.   He was very disappointed and upset,

14  but just to be honest with an answer, he was much calmer than

15  I would have been in the situation.

16  Q.   Well, he told you that he had tried to move on but he

17  could no longer interact with Jasnosz in a professional or a

18  personal level, didn't he?

19  A.   Yes.

20  Q.   He had no confidence in Jasnosz's trustworthiness or his

21  ethical standards, and he felt that the professional

22  relationship between the two agencies, those two sections, was

23  severely deteriorated due to Jasnosz's conduct, correct?

24  A.   Yes.

25  Q.   And so the next thing you discover is that the license

Koster - direct by McLaughlin

207

1   plate assigned to Jasnosz's Charger did not match the number

2   that was given to you by Burgner that he saw that night -- no,

3   I'll take that back.  Hold on.

4           So on the morning of the 15th after you heard about

5   this incident, you checked the plate on Jasnosz's vehicle,

6   right, and it started with a 15?

7   A.  I believe so.  Again, when we get into the details of

8   this, given the timeframe, whether I checked the plate first

9   or after, I can't recall, but I know that one of the first

10  things I did was confirm if that license plate number was the

11  same.

12  Q.  All right.  So this is Page 2 of your -- the report.  And

13  it says on Friday -- let's see.

14          MS. BRUCH:  Your Honor, can we have an identification

15  of what exhibit number this is?

16          MS. McLAUGHLIN:  It's the same one.  It's 19.

17          THE COURT:  Plaintiff's 19?

18          MS. McLAUGHLIN:  Plaintiff's 19.

19          THE COURT:  All right.  That's been admitted, so you

20  can put it on the screen.

21  BY MS. McLAUGHLIN:

22  Q.  Do you recall that -- so the license plates for the

23  vehicles are -- assigned to the detectives are covert, correct?

24  A.  Yes.

25  Q.  They are registered to fictitious persons and addresses,

Case: 1:15-cv-00496 Document #: 235 Filed: 07/30/18 Page 208 of 213 PageID #:13932
Koster - direct by McLaughlin
208

1    correct?

2    A.   That's correct.

3    Q.   So on July 19th, you get a written report from Burgner

4    because you had asked him to write it all up after you talked

5    to him, right?

6    A.   Yes.

7    Q.   And you see that the report that he gives, that the

8    license plate number that he wrote down, 39 whatever, doesn't

9    match the license plate that is on -- that is assigned to

10   Jasnosz's car.  It begins with a 15, correct?

11   A.   Again, I believe that's correct.  I know that at some

12   point, I made that discovery.  I just -- without actually

13   seeing the investigative report, I can't recall the date and

14   time, so I don't dismiss that.  I know I found that out.  I

15   just don't -- can't testify to your specific characterization

16   of when I saw that or found that out.  I'm not trying to be

17   evasive.

18   Q.   Well, at some point in time, you find out that Jasnosz is

19   assigned license number with a 39, and Detective Hogan, who

20   drives a Chevy Impala, is assigned the license plate with a 15

21   number, correct?

22   A.   Yes.

23   Q.   Okay.  And Hogan, he was on vacation from July 6th to July

24   16th, and his car was parked in the lot over at the public

25   safety building, right?

Koster - direct by McLaughlin

1   A.  It may have been part of that time, but also during that

2   time, we were conducting an undercover surveillance of a large

3   trucking firm.  And those vehicles, even the ones that were

4   parked, I think, on some nights were being used to conduct

5   that.

6           So even though he was on vacation, that car was

7   assigned to him, to have different cars on that surveillance

8   detail, I can't -- so I can't characterize it that his car was

9   left there all the time.  It may have been used as part of

10  that.

11  Q.  Okay.  At some point, you viewed a videotape of Detective

12  Jasnosz in the parking lot with the two cars right next to

13  each other, the Impala and the Dodge Charger, and Detective

14  Jasnosz had changed the license plate from one car to the

15  other; isn't that correct?

16  A.  Yes.

17  Q.  And that was the morning after the encounter on July 14th

18  with Burgner?

19  A.  Yes.

20  Q.  And you asked around, and you said, "Hey, Detective Hogan,

21  did you switch that license plate?"  He said, "No."  Right?

22  A.  He -- yes.

23  Q.  And nobody could verify anything about the license plate

24  being switched, correct?

25  A.  Well, I think -- I mean, if I look confused, I think it's

Case: 1:15-cv-00496 Document #: 235 Filed: 07/30/18 Page 210 of 213 PageID #:13934
Koster - direct by McLaughlin
210

1    because, again, I've not been able to see and review the

2    actual document that you are looking at.

3            I think it's a little bit out of order.  I think I

4    might have asked about the plate not matching the car to the

5    detectives before I saw the video that showed that there was

6    an exchange from the plate from one car to the other, from

7    Detective Sergeant Jasnosz.  Again, I'm not -- I'm just not

8    sure of the order that that occurred in, but both of those

9    things are, in fact, true.

10           MS. McLAUGHLIN:  Your Honor, I have a suggestion.  It

11   is 4:29, I believe or -- yes, 4:29.  I would ask that I'm

12   going to -- I would be allowed to present the report to

13   Mr. Koster, have him review it.  The jury can be dismissed.

14   We'll pick up with this tomorrow.

15           THE COURT:  That's fine.  You can provide him with

16   the document.  He can look it over tonight to refresh his

17   memory.  And it's 4:30, so we will break for today.

18           Ladies and gentlemen, please don't discuss the case

19   among yourselves or with anyone else.  Keep an open mind.

20   There's more evidence to hear.  And then please do collect

21   your materials.  You can leave them in the jury room.  In

22   fact, don't take them home.  I know you're dying to do that,

23   but don't take them home.  We'll keep them locked up, and then

24   you can retrieve them tomorrow morning.

25           So you see you tomorrow morning about 9:15.  And

1  hopefully, we'll start a little earlier than we did this

2  morning, but I have other cases, and I'm going to try to get

3  through them quickly.  So please be here about 9:15.

4       THE CLERK:  All rise.

5     (Proceedings heard in open court.  Jury out.)

6       THE COURT:  All right.  Ms. McLaughlin, you're free

7  to provide any documents you want to the witness, or if you

8  want his lawyer to do it, she can do it, but if you have a

9  particular set of documents you want him to review to refresh

10  his memory, that's a good idea, and you may want to do it --

11  you have them and he doesn't, and he's asked to review them.

12       If you wanted to save some time, I'm sure he's going

13  to -- there's no homework requirements, but I'm sure he'll

14  review them carefully, and it might expedite the

15  cross-examination.  So feel free to do it.  I don't think he

16  has to remain in the courtroom to do that.

17       MS. McLAUGHLIN:  No.

18       THE COURT:  But --

19       MS. McLAUGHLIN:  Take it home.  Bring it back.

20       THE COURT:  And if there's other documents like that,

21  there's other files that you're going to go over that you

22  think would make sense for him to review so that he can answer

23  the questions without having to take time in court to review

24  them, this is a good opportunity to do it.  So I won't direct

25  it, but it sounds like a good idea.

1          Okay.  Sir, you're excused.

2          THE WITNESS:  Thank you.

3          THE COURT:  And please don't discuss your testimony

4    with anyone because you're on cross-examination.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Thank you.

7          All right.  Anything we need to put on the record?

8          MS. BRUCH:  No, your Honor.

9          THE COURT:  And from plaintiffs?

10         MS. McLAUGHLIN:  No.

11         THE COURT:  Okay.  We'll see you tomorrow morning

12   about 9:15.

13      (Proceedings adjourned at 4:31 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3          We, LAURA R. RENKE, KELLY M. FITZGERALD, and JUDITH A.

4    WALSH, certify that the foregoing is a correct transcript of

5    the record of proceedings in the above-entitled matter.

6

7    */s/ LAURA R. RENKE*                            *July 19, 2018*
     LAURA R. RENKE, CSR, RDR, CRR
8    Official Court Reporter

9
     */s/ KELLY M. FITZGERALD*                       *July 19, 2018*
10   KELLY M. FITZGERALD, CSR, RMR, CRR
     Official Court Reporter
11

12   */s/ JUDITH A. WALSH*                           *July 19, 2018*
     JUDITH A. WALSH, CSR, RDR, F/CRR
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25