```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    CARRIE M. WARREN,                )    Docket No. 15 C 496
                                       )
 4                   Plaintiff,        )    Chicago, Illinois
                                       )    July 23, 2018
 5           v.                        )    9:41 a.m.
                                       )
 6    KENDALL COUNTY SHERIFF DWIGHT     )
      BAIRD, in his official capacity  )
 7    and as successor in office to    )
      Richard Randall, KENDALL COUNTY, )
 8    ILLINOIS, RICHARD RANDALL, SCOTT )
      KOSTER and SABRINA JENNINGS,     )
 9                                     )
                     Defendants.       )
10
                              VOLUME 4-A
11                 TRANSCRIPT OF PROCEEDINGS - Trial
            BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
12
      APPEARANCES:
13
      For the Plaintiff:     MS. COLLEEN M. McLAUGHLIN
14                           Law Offices of Colleen M. McLaughlin
                             1751 S. Naperville Road, Suite 209
15                           Wheaton, IL 60189

16                           MS. KAREN J. DORAN
                             Karen J. Doran Attorney at Law LLC
17                           2100 Manchester Road, Suite 942
                             Wheaton, IL 60187
18
      For the Defendants:    MS. JULIE A. BRUCH
19                           MS. KARIN ANDERSON
                             O'Halloran Kosoff Geitner & Cook LLC
20                           650 Dundee Road, Suite 475
                             Northbrook, IL 60062
21
      Court Reporter:        LAURA R. RENKE, CSR, RDR, CRR
22                           Official Court Reporter
                             219 S. Dearborn Street, Room 1432
23                           Chicago, IL 60604
                             312.435.6053
24                           laura_renke@ilnd.uscourts.gov

25
```

1                          I N D E X

2       WITNESS                                      PAGE

3       LOUISE MAY
            Direct by Ms. Doran ...................... 645
4           Cross by Ms. Bruch ....................... 656
            Redirect by Ms. Doran .................... 678
5
        JEFFREY WARREN
6           Direct by Ms. Doran ...................... 681
            Cross by Ms. Bruch ....................... 698
7           Redirect by Ms. Doran .................... 722

8       JENNIFER MALLON
            Direct by Ms. McLaughlin ................. 723
9           Cross by Ms. Bruch ....................... 732
            Redirect by Ms. McLaughlin ............... 739
10
        CARRIE MELISSA WARREN
11          Direct (Resumed) by Ms. McLaughlin ....... 741
            Direct (Resumed) by Ms. McLaughlin ....... 764
12          Cross by Ms. Bruch ....................... 806

13

14                     E X H I B I T S

15      NUMBER                                   ADMITTED

16      Plaintiff's Exhibit

17          No. 45   ................................ 757

18
        Defense Exhibit
19
            No. 9    ................................ 774
20

21      Joint Exhibit

22          No. 12   ................................ 744

23

24

25

```
 1          (In open court outside the presence of the jury.)
 2              THE CLERK:  15 C 496, Warren v. Kendall County
 3     Sheriff.
 4              MS. McLAUGHLIN:  Plaintiff.
 5              MS. BRUCH:  Good morning, your Honor.
 6              THE COURT:  All right.  Ready to proceed?
 7              MS. BRUCH:  Yes, your Honor.
 8              THE COURT:  All right.  We lost a juror.  "Lost" is
 9     the wrong word, but one of our jurors is ill and couldn't come
10     in today.  It is Ms. --
11              THE CLERK:  Molo, or Mollo.
12              THE COURT:  Motto, Ms. Motto.
13              THE CLERK:  Mollo.
14              THE COURT:  Oh, is that it?  Mollo.
15              THE CLERK:  Molo or Mollo, something.
16              THE COURT:  I'll find it.
17              Elizabeth Molla.
18              Any objection to proceeding and going with ten jurors?
19     Any objection by plaintiff?
20              MS. McLAUGHLIN:  No.
21              THE COURT:  By defense?
22              MS. BRUCH:  No, your Honor.
23              THE COURT:  Okay.  We can't let the case -- we can't
24     recess for the day.  And she has an illness, and there's no
25     telling whether she'll be back tomorrow.  So I'm going to tell
```

1    the jury that we are going to proceed with ten jurors.  They're

2    still a legal jury.

3          Sandy, if you could make sure when you go back there

4    you get her notes and copy of instructions.  Maybe the jury can

5    point you to them.

6          THE CLERK:  Sure, sure.

7          THE COURT:  And collect those so that the notes can be

8    destroyed.

9          THE CLERK:  Okay.

10          THE COURT:  All right.  And then the plaintiff is

11    testifying on direct examination, correct?

12          MS. DORAN:  Yeah.  We have --

13          THE COURT:  Oh, you have a couple witnesses out of

14    order.

15          MS. DORAN:  That's exactly right.  We have three

16    third-party witnesses that are ready to go.

17          THE COURT:  All right.

18          MS. DORAN:  We've spoken with counsel about it.  And

19    just so your Honor knows, it's going to be Louise May, Jeff

20    Warren, and then followed up by Jennifer Mallon.  And then

21    we'll put the plaintiff back on the stand.

22          THE COURT:  All right.  Any objection by defense?

23          MS. BRUCH:  No, your Honor.

24          THE COURT:  Okay.  And I've already spoken about the

25    limits of what Mr. Warren can say about why he redacted the

1    records.  And I haven't heard anything yet to make me revisit

2    that.  I don't think the Buis LEADS or New World check is

3    relevant, and so -- and even if it were relevant, I think the

4    prejudicial impact would outweigh its probative value.  So I'm

5    not going to allow that.

6              MS. DORAN:  Understood.

7              THE COURT:  Okay.  Then let's bring in the jury.

8              MS. DORAN:  I did have one question, though, your

9    Honor.

10             THE COURT:  Go ahead.

11             MS. DORAN:  Did you say that today we were going to

12   have a long break?

13             THE COURT:  No.

14             MS. DORAN:  I thought it was Thursday and Monday.  I

15   must have been mistaken.

16             THE COURT:  No.  I've got a final pretrial -- let's

17   see.  No, nothing today.

18             MS. DORAN:  Very good.

19             THE COURT:  So we're good.

20             THE CLERK:  All rise.

21        (Jury in at 9:45 a.m.)

22             THE COURT:  All right.  Please be seated, ladies and

23   gentlemen.

24             Good morning.  Sorry for the delay.  It was not the

25   attorneys' fault, but I had other cases that took longer than I

1    had hoped.

2              You may have noticed you're down to ten.  Ms. Molla

3    was sick and couldn't be here today, and we can't delay the

4    trial for a full day.  So ten jurors is still a legally

5    constituted jury.  You can all fully deliberate, and any

6    verdict you reach will be a valid one and a legal one.  But

7    we're going to proceed with ten jurors.

8              Also, there's this background noise which you'll hear.

9    Think of it as a bubbling spring and relax with it.  We're

10   going to try and get it fixed, but I don't want to delay the

11   case any further.  If any of you find it distracting, though,

12   raise your hand and we'll recess till we get it fixed.  But

13   we've got a call in to try and get somebody who can figure out

14   why that noise is coming through.  It's not too bad, but if it

15   distracts you, just raise your hand and we'll make sure we take

16   a recess till we get it fixed.

17             The plaintiff was on the stand Friday, but just as we

18   did earlier in the case with a couple other witnesses, we're

19   going to interrupt her testimony with three shorter witnesses

20   who, for scheduling purposes, it's easier to have them come in

21   now.  They're all plaintiff's witnesses.  So with that, we will

22   interrupt the plaintiff's testimony to call some other

23   witnesses in the case.

24             You may call your next witness.

25             MS. DORAN:  Thank you, your Honor.  We call Louise

645

May - Direct by Doran

1    May.

2              THE COURT:  All right.

3         (Witness enters the courtroom.)

4              THE CLERK:  If you can step up to the witness stand

5    over here, please.

6              If you could raise your right hand.

7         (Witness duly sworn and takes the stand.)

8              THE WITNESS:  I do.

9              THE CLERK:  You may be seated.

10             THE COURT:  All right.  You may proceed.

11             MS. DORAN:  Thank you, your Honor.

12                LOUISE MAY, PLAINTIFF'S WITNESS, SWORN

13                        DIRECT EXAMINATION

14   BY MS. DORAN:

15   Q.  Good morning, Louise.  Would you please state your name and

16   spell it for the record.

17   A.  Louise May.  L-O-U-I-S-E, M-A-Y.

18   Q.  Thank you.

19             And how do you know the plaintiff?

20   A.  She's my daughter-in-law.

21   Q.  And you've been Melissa's mother-in-law now for how many

22   years?

23   A.  14, 15.

24   Q.  Are you --

25   A.  14, yeah.

May - Direct by Doran

1   Q.   14 years?

2   A.   Yeah.

3   Q.   About that.

4            Are you close with Melissa?

5   A.   Yes.

6   Q.   Tell us a little bit about yourself.  Where do you live?

7   A.   I live in Aurora.

8   Q.   And have you always lived in Aurora?

9   A.   Just about all my life, yeah.

10  Q.   I see.

11           Have you ever been married?

12  A.   Yes.

13  Q.   How many times?

14  A.   Twice.

15  Q.   And the first time is -- when was that?

16  A.   I was married in '65.

17  Q.   And through that marriage, is that how you had your son

18  Jeff?

19  A.   Yes.

20  Q.   And Jeff, of course, is Melissa's husband, correct?

21  A.   Right.

22  Q.   Very good.

23           So you also have a granddaughter through your son Jeff

24  and Melissa, correct?

25  A.   Correct.

May - Direct by Doran

1  Q.  And do you have a relationship with your granddaughter

2  Megan?

3  A.  Yes, I do.

4  Q.  What sort of relationship do you have with her?

5  A.  I babysit for her every once in a while.

6  Q.  You babysit with her now that she's 14 or more when she was

7  younger?

8  A.  When she was younger.

9  Q.  I see.  She probably appreciates that.

10 A.  Yeah.

11 Q.  Did you babysit Megan when Carrie was working for the

12 Kendall County Sheriff's Office?

13 A.  Yes, I did.

14 Q.  Okay.  And I may refer to the Kendall County Sheriff's

15 Office as the KCSO, so just keep that in mind.

16 A.  Okay.

17 Q.  Did you work in 2014?

18 A.  Yes, I did.

19 Q.  Where did you work?

20 A.  Jewel-Osco.

21 Q.  And what did you do for Jewel-Osco?

22 A.  I just worked part time there as a floral designer in the

23 floral department.

24 Q.  I see.

25      I want to take your memory back to the night of

May - Direct by Doran

1    Sunday, January 5th, 2014.  Can you tell us what you remember

2    about that evening?

3    A.   I got a couple phone calls from Melissa.

4    Q.   Okay.  So let's -- let me ask you about those.  Did she

5    call you on your cell phone or on a landline, or how did you

6    get the phone call?

7    A.   On my cell phone.

8    Q.   And how -- did you know that it was her when the phone came

9    in -- when the phone call came in?

10   A.   Yes.

11   Q.   How did you know it was her?

12   A.   Contact -- in my contacts.  She's on my caller ID.

13   Q.   I see.

14           By the way, what was your phone number then?

15   A.   (630) 308-4878.

16   Q.   Okay.  And that's the same number you have now?

17   A.   Yes.

18   Q.   When she called you the first time, was it -- what time of

19   day was it?

20   A.   It was in the evening.

21   Q.   Do you remember what you talked about?

22   A.   Checking to see if I could watch Megan the following day.

23   Q.   Was that pretty typical that you would watch Megan on

24   Monday morning?

25   A.   It all depended on her work schedule or what was going on,

May - Direct by Doran

1    if she needed me.  She knew she could call me any time.

2    Q.  Okay.  Did she tell you why she needed you to watch Megan

3    that day?

4    A.  Yes.  She had jury duty.

5    Q.  I see.

6             Was there some reason that Megan couldn't go to school

7    that Monday?

8    A.  I believe she was off for winter break, but she was also

9    sick.

10   Q.  I see.

11            Did you agree to watch Megan?

12   A.  Yes.

13   Q.  And after that first phone call on Sunday night, I think

14   you said that you got a second phone call from your

15   daughter-in-law?

16   A.  Yeah, because she --

17   Q.  And what was that about?

18   A.  -- she wasn't sure if she had to work after jury duty.  She

19   was still uncertain and said that she still didn't know for

20   sure if she had to, but if I could still come.

21   Q.  Okay.  So at the end of that second phone call, what was

22   your plan for the next day with regard to Megan?

23   A.  That I would get there early in the morning.  I think I

24   left maybe about 7:30 in the morning.  And it was snowing.

25   Q.  Okay.

May - Direct by Doran

1    A.  So I left a little bit earlier.

2    Q.  Okay.  And how long were you planning on staying at the

3    house that morning?

4    A.  I had to work.  I couldn't quite remember if it was, like,

5    11:00 or 12:00 that day.  So I said I would come and stay with

6    her until I had to leave for work.

7    Q.  I see.

8         So the next morning, Monday, January 6th, can you tell

9    us a little bit about the road conditions.

10   A.  They were bad.  We had a big snowstorm that day, so I kind

11   of left early.  I'm a kind of a cautious driver, so I took my

12   time.

13   Q.  Okay.  Did you take the same route that you normally do?

14   A.  No.  Actually, I kind of rotate routes to their house.  And

15   this one seemed a little bit better as far as road conditions,

16   so I took that.

17   Q.  Okay.  And do you remember if it was snowing?

18   A.  Yes.

19   Q.  Did you use your phone during that drive?

20   A.  Yes.

21   Q.  And tell us about that.  Did you make a call, or did

22   somebody call you?

23   A.  Somebody called me.

24   Q.  And who called you?

25   A.  Melissa.

May - Direct by Doran

1    Q.   How do you know it was Melissa?

2    A.   Because I seen the Caller ID on my phone.

3    Q.   Did you answer the phone?

4    A.   After I pulled over.

5    Q.   Why did you pull over?

6    A.   Because I don't talk on my phone when I drive.

7    Q.   I see.

8         And do you remember where you pulled over?

9    A.   I was in Montgomery, right on -- well, I took Route 25

10   into -- to Mill Street, I believe, and then River.  And right

11   when I turned the corner by a gas station, I pulled off to the

12   side of the road and took the call.

13   Q.   Okay.  And what did the two of you talk about?

14   A.   She just wanted to see if I was on my way and how the roads

15   were.

16   Q.   I see.

17   A.   And I told her I was going to be there soon as I could.

18   Q.   Was it a pretty short call then?

19   A.   Yeah.  Yeah, didn't last too long.

20   Q.   Okay.  So eventually you got to Carrie's house?

21   A.   Yes.

22   Q.   I call her Carrie; you call her Melissa?

23   A.   Yeah.

24   Q.   Okay.  So eventually you got to Carrie's house.  And was

25   she still there?

May - Direct by Doran

1   A.  No.  She had left.  Megan had said that she had just left.

2   But she had told me that earlier on the phone call that I had

3   that morning, that she would have to leave soon.  And I told

4   her that was fine, that I would be there as soon as I could.

5   Q.  Okay.  And was Megan sick that day?

6   A.  Yes.

7   Q.  And at some point did you leave the house to go to your

8   shift at Jewel?

9   A.  Yes.

10   Q.  Were you at the house when Carrie arrived for lunch?

11   A.  No.

12   Q.  Besides those -- that morning phone call in the car, did

13   you have -- did you talk to Carrie again that day?

14   A.  Yes.

15   Q.  When was that, approximately?

16   A.  I'd say somewhere -- it was, like, after 10:00 sometime.

17   Q.  Okay.  And what did you talk about?

18   A.  That she was going to be able to have a lunch break.

19   Q.  Okay.

20   A.  And that she would come home and check on Megan.

21   Q.  Okay.

22   A.  Because she knew I had to leave.

23   Q.  Did you tell her anything about Megan?

24   A.  That she was feeling better.

25   Q.  Okay.  So you've said that you've been related by marriage

May - Direct by Doran

1  to Melissa for 14 years now.  Do you remember when she got the

2  job as a Kendall County Sheriff's Office Deputy?

3  A.  Yes.

4  Q.  How did you find out about it?

5  A.  She had told me.  My son had told me.  They were excited

6  about it.

7  Q.  I see.  And how did Carrie react to the news that she was a

8  deputy?

9  A.  She was happy.  She worked hard for it, going through the

10 academy and everything.  She was thrilled.

11 Q.  After she started working for KCSO, did Melissa talk to you

12 about her job?

13 A.  Off and on, yeah.

14 Q.  And did she -- what was her attitude about her work?

15 A.  She seemed to enjoy it.

16 Q.  What gave you that impression?

17 A.  I never heard her complain about it.

18 Q.  Do you know if Megan ever saw her mother in her Sheriff's

19 Deputy's uniform?

20 A.  Oh, yeah, definitely.

21 Q.  And at some point you found out that Melissa was fired,

22 right?

23 A.  Right.

24 Q.  Did you talk to Melissa about it?

25 A.  Yes.

May - Direct by Doran

1  Q.  And how did she react to that?

2  A.  She was very devastated.

3  Q.  Can you explain that to us a little bit more.  How did you

4  conclude that she was devastated?

5  A.  We had a lot of crying.  I was, like, her -- somebody to

6  talk to, and I would listen.  You know, she could talk on the

7  phone for hours to me, and I'd listen.

8  Q.  I see.

9       Did you notice any differences in her behavior or her

10 demeanor, her personality after she lost her job?

11 A.  Yeah.

12 Q.  What sort of changes?  Did you notice any physical changes?

13 A.  Definitely.

14 Q.  Can you tell us about those.

15 A.  I think she'd rather just lay around in bed instead of get

16 up and doing anything.  She was just, like, kind of little

17 depressed, I would say.

18 Q.  I see.  And did you notice any changes in her grooming

19 habits or the way that she presented herself?

20 A.  Yeah.  She didn't get her hair done like she used to, or

21 her nails.  And, yeah, she was kind of in a different world.

22 Q.  I see.  Did you notice any changes in her relationships

23 with people?

24 A.  Yes.

25 Q.  With whom.

May - Direct by Doran

1   A.  Her husband.

2   Q.  Do you know whether your daughter-in-law found another job?

3   A.  Yes.

4   Q.  And where was that?

5   A.  Olive Garden.

6   Q.  Doing what?

7   A.  She was a waitress.

8   Q.  And what was her attitude about her job as a waitress

9 versus her job as a deputy sheriff?

10   A.  Basically any little bit will help.  It wasn't nothing like

11 moneywise what she was making at the Sheriff's Office.

12   Q.  Did she seem as happy working as a waitress as she had

13 working as a deputy?

14   A.  No.

15   Q.  One more thing I want to ask you about.  Did Melissa or

16 Jeff or anyone else ever suggest to you that maybe you had

17 called Melissa while she was driving through the McDonald's

18 drive-through on January 6th?

19   A.  No.

20   Q.  Did you call her when she was going through the

21 drive-through on January 6th?

22   A.  No.

23   Q.  Did she ever ask you to lie and say that you had called her

24 on January 6th?

25   A.  No.

May - Cross by Bruch

1   Q.  Did you even know about the phone records issue before she

2   was fired?

3   A.  No.

4              MS. DORAN:  I have no further questions.

5              THE COURT:  All right.  Any cross-examination?

6              MS. BRUCH:  Yes, your Honor.

7                        CROSS-EXAMINATION

8   BY MS. BRUCH:

9   Q.  Good morning, Ms. May.  My name is Julie Bruch, and I

10  represent the defendants.  You and I have never met before,

11  correct?

12  A.  Correct.

13  Q.  And I never took your deposition in this case -- is that

14  correct? -- so this is the first time you and I are speaking.

15  A.  Right.

16  Q.  So I'm interested in these phone calls that you've talked

17  about and when this became an issue, in your mind, in this

18  case.

19              So let's go back first in terms of how often did you

20  babysit your granddaughter in 2014?

21  A.  A lot.  Anytime that Melissa had to work and Jeff was

22  working, I would go over to the house -- second shift, third

23  shift, whatever -- and stay with her.

24  Q.  So assuming that Ms. Warren had regular work hours, you

25  would always plan on babysitting your granddaughter as long as

May - Cross by Bruch

1    your son was working that day.

2    A.   Right.

3    Q.   And what was your son Jeff's schedule back in 2014?

4    A.   He'd work 24, off 48.

5    Q.   To your knowledge, when your son was working, was he ever

6    able to remain at home?

7    A.   When he was working?

8    Q.   Yes.

9    A.   Not that I know of.

10   Q.   So when he would be on duty, what time would -- as far as

11   you know, in January 2014, what time would he leave the house

12   for work?

13   A.   I would say 6:00, 6:30 in the morning.

14   Q.   And what time would he get home when he had been on duty?

15   A.   Probably close to the same time, unless he had some errands

16   or whatever to run in the morning.

17   Q.   When you would babysit, would Ms. Warren be the one who

18   would typically be there when you would arrive?

19   A.   Yes.

20   Q.   And when you would be done working for the day -- or not

21   working, but babysitting your granddaughter, would Ms. Warren

22   be the individual who relieved you when she got done with work?

23   A.   Most of the time.

24   Q.   When you would see Ms. Warren, would she typically tell you

25   about her day?

May - Cross by Bruch

1   A.  No, not necessarily.

2   Q.  You mentioned that you worked at Jewel as a floral

3   designer, and you said you were part time.  Did you have

4   regular hours?

5   A.  No.  It was whenever -- they had to give me at least

6   12 hours a week.  I mean, I was part time part time.

7   Q.  So let's talk about the week before January 6th.  What

8   hours did you work that week?

9         MS. DORAN:  Objection.  Outside the scope.

10        THE COURT:  Overruled.

11        THE WITNESS:  I -- I couldn't tell you.  I have no

12   recognition of it right now.

13   BY MS. BRUCH:

14   Q.  Did you babysit your granddaughter the week before

15   January 6th?

16   A.  Probably.

17   Q.  What days did you babysit your granddaughter the week

18   before January 6th?

19   A.  I have no idea.

20   Q.  Do you remember if you babysat her on Monday?

21   A.  It could have been.  I'm not sure.

22   Q.  Do you remember if you worked on the Monday before

23   January 6?

24   A.  I don't remember.

25   Q.  What about the Tuesday?  Did you work the Tuesday before

May - Cross by Bruch

1   January 6th?

2   A.  I could have.

3   Q.  Did you babysit Megan that day?

4   A.  I could have.  I don't remember.

5   Q.  Did you work the Wednesday before January 6th?

6   A.  I know I probably worked one of them, but I'm not sure

7   which one.

8   Q.  What -- do you remember if you babysat Megan that day?

9   A.  I have no idea.

10  Q.  Do you remember the Thursday before January 6th whether you

11  worked or you babysat Megan?

12  A.  No, I don't.

13  Q.  Do you remember if you worked or babysat Megan on the

14  Friday before January 6th?

15  A.  Don't remember.

16  Q.  Do you remember if you worked or you babysat Megan on the

17  Saturday before January 6th?

18  A.  I don't remember.

19  Q.  Do you remember whether you worked on the Sunday before

20  January 6th?

21  A.  Sunday before?

22  Q.  Yeah, the day before.

23  A.  No, I know I didn't on that day because I talked to Melissa

24  that evening.

25  Q.  But you don't remember if you worked that day.

660

May - Cross by Bruch

1    A.  No.

2    Q.  In the -- and you said you worked in the floral department,

3    correct?

4    A.  Mm-hmm.

5    Q.  Now, years ago I used to work at Jewel for, like, seven

6    years.  So I remember -- and I don't know if it's still the

7    same, but they used to have -- and there would be, like, a

8    break room where you'd have a little locker and you could put

9    your purse and belongings in there.  Do they still have that?

10   A.  They still have that.

11   Q.  Okay.  So that hasn't changed.  So when you would get to

12   work, you would put your purse in your locker, correct?

13   A.  People in the floral department always put their purses in

14   a cabinet in the floral department.

15   Q.  And where was the cabinet in relation to where you were

16   doing your work?

17   A.  Like, I could turn around and reach for it.

18   Q.  The date of the 6th, what time did you have to work that

19   day?

20   A.  I believe it was either 11:00 or 12:00.

21   Q.  So it was --

22   A.  11:00 in the morning or 12:00.

23   Q.  Okay.  So assuming -- let's say you were working at 11:00.

24   How long would it take you to get to the Jewel where you worked

25   from Ms. Warren's home?

May - Cross by Bruch

1   A.   Probably about 20 minutes.  And I had brought my uniform

2   with so I could change at the house and go directly there.

3   Q.   And you mentioned that there were bad weather conditions

4   that day.

5   A.   Right.

6   Q.   So would you have left a little bit earlier that day?

7   A.   Yes, I did.

8   Q.   So you would have potentially left at around 10:30 that

9   morning.

10  A.   Right.

11  Q.   And when you -- what's the policy at Jewel about using your

12  cell phone while you're working?

13  A.   We can only use it on our breaks or lunch.

14  Q.   Do you remember if you had any breaks that day?

15  A.   I had one break.

16  Q.   When did you have your break that day?

17  A.   It's usually -- if I started at 11:00, I would have it at

18  1:00.

19  Q.   1:00.

20         So when did you first learn that Ms. Warren had jury

21  duty on January 6th?

22  A.   Oh, probably when she got her notice from the -- you know,

23  in the mail.

24  Q.   Did she make any arrangements with you to watch her

25  granddaughter when she got that notice?

May - Cross by Bruch

1    A.   No, not at that time.

2    Q.   At what point did she ask you if you could watch her

3    daughter while she had jury duty?

4    A.   The Sunday before.

5    Q.   And if Ms. Warren was originally scheduled to work at 2:30

6    that day, would you have already planned on babysitting later

7    that afternoon?

8    A.   Yes.

9    Q.   So I want to show you what has been previously admitted as

10   Defendants' Trial Exhibit 9.

11           MS. BRUCH:   I need the ELMO for this.

12   BY MS. BRUCH:

13   Q.   So, Ms. May, I think that you mentioned that your cell

14   phone number is (630) 308-4878.  Correct?

15   A.   Correct.

16   Q.   So if you look at the phone records for Sunday,

17   January 5th, which is right here, do you see any reference to

18   any phone calls made to your cell phone number from

19   Ms. Warren's cell phone?

20   A.   Yes.

21   Q.   And what time was that call?

22   A.   8:25.

23   Q.   I think we have two --

24   A.   Oh.  8:19.

25   Q.   -- 8:19 and then 8:25.  Those are two calls --

May - Cross by Bruch

1    A.  Right.

2    Q.  -- that she made to you.

3           And let's talk about the first call.  What was the

4    first call about that day?  And this is on Sunday.

5    A.  Just asking me if I'd be able to watch Megan earlier.

6    Q.  And then the second call.  What was the purpose of that

7    call?

8    A.  When I had talked to her on the first call, she wasn't sure

9    if she had to work or not that day.  She was still unsure.  So

10   then the second call, she called me back to let me know she

11   still didn't know but would I still come.  And she'd work

12   things out.

13   Q.  And then you mentioned that on January 6th, the morning of

14   Ms. Warren's jury duty, that she called you that morning.

15   A.  Correct.

16   Q.  What time did she call you?

17   A.  I would say it was probably close to 8:00.

18   Q.  When you -- there's been some testimony in this case how

19   there were not -- there was not only a lot of snow that day,

20   but there was construction in the area.  Do you remember any

21   construction in the area on that route?

22   A.  No.

23   Q.  You testified during direct about the route that you took

24   from your home to Ms. Warren's home.  Do you remember that

25   testimony?

664

May - Cross by Bruch

1    A.  Right.

2    Q.  And you also pointed out the location -- the exact location

3    when you pulled off the road to speak with Ms. Warren.  Do

4    you --

5    A.  Right.

6    Q.  -- recall that?

7    A.  Mm-hmm.

8    Q.  How often does -- did Ms. Warren ever call you either when

9    you are heading to her house or coming home from her house?

10   A.  Not very often.

11   Q.  Let's talk about some of the times that she did call you,

12   though, when she was -- when you were on your way to her house.

13   Would she be calling to find out if you were almost there or

14   where you were?

15   A.  Yes.

16           MS. DORAN:  Objection, your Honor.  Foundation.  Can

17   we get a time frame?

18           THE COURT:  I think it was -- well, go ahead.

19   Objection sustained.  Why don't you try and lay a better

20   foundation as to when such calls would occur.

21           MS. BRUCH:  Sure.  That's no problem.

22   BY MS. BRUCH:

23   Q.  Let's just focus on 2014.  So -- and on the times

24   especially when there were weather situations, did Ms. Warren

25   ever call you in 2014 to ask how it was coming and if you were

May - Cross by Bruch

1   almost there?

2   A.   She would call me every once in a while.

3   Q.   Let's just focus just on the calls in 2014.  Can you tell

4   us in 2014 during the -- another time when she called you when

5   you were on your way to the house, where were you along the

6   route?

7   A.   Are you talking the day of jury duty?

8   Q.   No, no, just another -- the next time.

9   A.   She could have called me for anything, either to ask if I

10  was on my way or maybe I could pick her up a Starbucks or

11  something on the way.  Who knows.  I don't know.

12  Q.   And I completely get that.

13          So we're talking about those conversations.  So let's

14  talk about the next one that you remember.  When she called

15  you -- you'd mentioned how you don't like to use your cell

16  phone when you're driving.  Correct?

17  A.   Correct.

18  Q.   So where did you pull over that next time?

19  A.   After that one call?

20  Q.   Yeah, after that one call, like the next time, when she

21  calls for a Starbucks run or something.  Where did you pull

22  over?

23  A.   Wherever I was.  It didn't matter.  I didn't talk on my

24  phone when I drove.

25  Q.   But where specifically along your route did you stop and

1    pull over when she called to ask you for -- to pick her up

2    Starbucks?

3                MS. DORAN:  Objection, your Honor.  Facts not in

4    evidence.  Facts not evidence.

5                THE COURT:  Well, overruled.

6                Go ahead.

7                THE WITNESS:  I -- wherever.  I mean, if I was going

8    down Route 31 and she called me, it could be by Caterpillar.

9    It could have been anywhere.  But I -- I always pull over if I

10   have to take a call.

11   BY MS. BRUCH:

12   Q.  Do you --

13   A.  Unless I didn't think it was important enough that I

14   could -- she could just wait until I got there.

15   Q.  Do you remember any specific locations along your route

16   where you're certain that you stopped to speak to Ms. Warren

17   because she was calling you along your way to get there?

18   A.  Not really offhand I can't think of anything.

19   Q.  Was there anything specific about the call that you

20   received from Ms. Warren on January 6th in the morning that

21   makes you remember the exact, precise location on the road

22   where you stopped to answer this call?

23   A.  I remember it only because she wasn't sure of what she

24   was -- what was going on.  I thought, well, maybe they canceled

25   court, so I might as well pull over and take it.  Then I can

May - Cross by Bruch

1   turn around and go back home.

2   Q.   And that's why you remembered the specific location.

3   A.   Right.

4   Q.   Okay.  Got it.

5        So what time did you get to Ms. Warren's house that

6   day?

7   A.   I'd say it was little after 8:00.  Not much after 8:00.

8   Q.   You mentioned that Ms. Warren was already gone when you got

9   there, correct?

10  A.   Correct.

11  Q.   Was her husband, your son Jeff, there when you got there?

12  A.   No.

13  Q.   Did you speak with Jeff at all that day?

14  A.   Not that I can remember.

15  Q.   How long were you at the house that day?

16  A.   I'd say two and a half, three hours, maybe longer.  I'm not

17  sure.

18  Q.   So you were there from 8:00 to --

19  A.   No.

20  Q.   -- 10:30, you think?

21  A.   Yeah, around there.

22  Q.   And then you would have had to leave for work.

23  A.   Right.

24  Q.   So when you left for work, did you call Jeff to let him

25  know that your granddaughter Megan was going to be home alone?

May - Cross by Bruch

1  A.  No.

2  Q.  Did Jeff Warren, your son, ever come home at any time while

3  you were babysitting on January 6th?

4  A.  No.

5  Q.  You mentioned that you had a second call from Ms. Warren on

6  January 6th, correct?

7  A.  Correct.

8  Q.  And I'm really interested in those phone calls because when

9  I look at the records -- and maybe you can help me with this.

10  Let's look at these records from Monday, January 6th.  Do you

11  see your phone number anywhere on this record?

12  A.  Just those two.

13          Oh, January 6th.  I'm sorry.  No.

14  Q.  So you don't see your phone number listed anywhere for

15  January 6th --

16  A.  No.

17  Q.  -- correct?

18          All right.  What time did Ms. Warren call you after

19  she was done with jury duty?

20  A.  I don't remember her calling me after jury duty.

21  Q.  So you only had one call with her, and that was in the

22  morning on your way to their house that morning?

23  A.  No, I had two calls.

24  Q.  When was the second call?

25  A.  It was around 10:00, a little after.

May - Cross by Bruch

1    Q.   She called you at 10:00 a.m.?

2    A.   I'm not sure if it was 10:00 a.m., but it was right in

3    that -- around in that -- between 10:00 and 10:30.

4    Q.   And are you certain of that?

5    A.   Yep.

6    Q.   Did Ms. Warren tell you where she was when she called you?

7    A.   No, she didn't.  Only thing she had said, that she was

8    taking a lunch break.

9    Q.   So she had already left the courthouse at that time?

10   A.   That I am not sure.  She said she was going to take a lunch

11   break.  I should put it that way.

12   Q.   Did she tell you that she was on her way home at that

13   point?

14   A.   She said that she would be coming home so she could check

15   on Megan.  She knew I had to leave.

16   Q.   Did you have any conversation about whether you were needed

17   in the afternoon?

18   A.   Yes.

19   Q.   What was that conversation?

20   A.   She was not sure if she had to work -- go to work after

21   jury duty or she was still not sure what was going on.  She

22   said that she would call me if she had to work.  Otherwise, you

23   know, just figure that she was coming home.

24   Q.   Okay.  So if I have this clear, at about 10:00, you get

25   this phone call from Ms. Warren.  And at that point you're

May - Cross by Bruch

1    thinking you still have to go back to the house in the

2    afternoon when you're off work to watch your granddaughter,

3    correct?

4    A.   Correct.

5    Q.   And what time were you working till that day?

6    A.   That day, I was working till 3:00.

7    Q.   So your plan was when you got off of work at 3:00, you were

8    going to go to the Warrens' house to babysit your

9    granddaughter, correct?

10   A.   Correct.

11   Q.   Is that what you did?

12   A.   No.

13   Q.   Why not?

14   A.   Because I never heard from her.  And that was the agreement

15   that we had, that she would call if she needed me to come.  If

16   I didn't -- she didn't need me, she wouldn't call me.

17   Q.   So when you talked to her at 10:00, she wasn't sure if she

18   needed to go to work, but her default option was for you not to

19   come babysit?

20   A.   No.  She was going to call me if she needed me to come and

21   babysit.

22   Q.   When did Ms. Warren first tell you that she was being

23   investigated by the Sheriff's Office?

24   A.   I don't recollect.  I don't know.

25   Q.   Was it while she was still employed by the Sheriff's

May - Cross by Bruch

1  Office?

2  A.  No.

3  Q.  So when did you first find out that there was this

4  investigation?  Was it after she was terminated?

5  A.  Yes.

6  Q.  And at what point in time that -- did you ever learn that

7  the reason why the Sheriff's Office gave for her termination

8  was regarding her truthfulness concerning phone calls that she

9  claimed to have received concerning her jury duty service?

10  A.  All she mentioned to me was about phone calls.  I don't

11  remember anything else.

12  Q.  When did she mention to you about phone calls?

13  A.  That -- something about she made a phone call that she said

14  she didn't or something.  I don't know.  Or somebody at work --

15  I'm not sure.  Trying to get ahold of somebody about jury duty.

16  Q.  What did she tell you?

17  A.  She said she never received calls or -- I'm not sure what

18  it was all about, but --

19  Q.  But she told you she never actually received the calls.

20  A.  Right.

21  Q.  When did she tell you that?

22  A.  I don't know.  Just in conversation, really.

23  Q.  Did she tell you that she claimed to have received the

24  calls?

25  A.  You know, I'm not real sure to really say yes or no on

May - Cross by Bruch

1   that.

2   Q.  At what point did she ask you about calls that you received

3   from her?

4   A.  I don't think she ever did.

5   Q.  When did you discuss with her, if ever, about the fact that

6   she called you on January 6th?

7   A.  Could you repeat that?

8   Q.  Sure.  When did Ms. Warren ever discuss with you the fact

9   that, "Hey, you remember I called you on January 6th?"

10  A.  I do believe she asked me if I remembered about talking

11  on -- I want to say it was almost January 5th she was asking

12  me, that Sunday night before, on both days she asked me about

13  it.  And I said, "Yeah, I remember."

14  Q.  When did she first ask you about that?

15  A.  I'm not sure.  Maybe it was when they were preparing for

16  trial or -- I don't know.  It's been a long time.

17  Q.  Was it when she was still employed by the Sheriff's Office?

18  A.  No.

19  Q.  How many -- she left the Sheriff's Office in 2014.  So now

20  we're into July of 2018.  So tell me, as best you remember, the

21  first time that Ms. Warren asked you if you remembered having a

22  conversation with her on January 5th and January 6th.

23  A.  I have no idea.  I can't remember for sure.

24  Q.  Did Ms. Warren ever suggest to you that she scrolled

25  through her phone and noticed that she had these calls?

May - Cross by Bruch

1   A.  No.

2   Q.  Did she ever suggest to you how she recalled that she had

3   these conversations with you on January 6th?

4   A.  No.

5   Q.  Can you in any way, shape, or form give me some ballpark

6   estimate of when you and her first had this conversation about

7   these calls?

8   A.  No, I'm not sure.

9   Q.  When, if ever, did Ms. Warren tell you that you might be a

10  witness in this case?

11  A.  Couple weeks ago.

12  Q.  Were you aware that back in 2015 that Ms. Warren had listed

13  you as a witness in this case?

14  A.  No.

15  Q.  Were you aware -- did Ms. Warren tell you that she was

16  identifying you as a witness in this case, saying that "May

17  knows everything, including the family and marital issues this

18  situation has caused"?

19  A.  No.

20  Q.  You didn't know that?

21  A.  I didn't know, no.

22  Q.  And she -- you're -- did you know that Ms. Warren never

23  identified you in 2015 as someone she called on the morning of

24  her jury duty?

25          MS. DORAN:  Objection, your Honor.  This is outside

May - Cross by Bruch

1    the scope.

2           THE COURT:  Let's go to sidebar.

3        (At sidebar outside the hearing of the jury.)

4           THE COURT:  It's not a scope issue.  It's more an

5    issue of whether or not the statements of counsel in a document

6    predicting who would be a will-call witness and what their

7    information is is attributable to the plaintiff herself.  An

8    interrogatory, obviously, would be.  I'm not sure this is fair

9    game to put on Ms. Warren's desk, or plate because this is her

10   attorneys that wrote that down, not her.  Interrogatories she

11   signs.

12          So unless you can give me a reason that this is

13   somehow attributable to the plaintiff, I'm going to sustain the

14   objection for a different reason, not on scope.

15          MS. DORAN:  I understand.

16          MS. BRUCH:  So this is actually part of her answers to

17   interrogatories.

18          THE COURT:  Oh, yes?

19          MS. BRUCH:  So it's not her 26(a)(1) answer.  She

20   attached -- in all of her answers, she goes, "See Plaintiff's

21   Exhibit 1," and then it's attachment.  And when you read it,

22   it's clearly her way of speaking.  She wrote this, the

23   plaintiff.

24          THE COURT:  Well, are these interrogatory answers?

25          MS. BRUCH:  Yes, her interrog answers.

May - Cross by Bruch

1          THE COURT:  Oh, they are.  Okay.  I misunderstood.

2          All right.  Last word from plaintiffs.

3          MS. McLAUGHLIN:  How is it possible that --

4          MS. DORAN:  I'm not -- okay.

5          THE COURT:  One of you.

6          MS. DORAN:  I'm not sure that I understand what

7     counsel is referring to, but that's on me.

8          I would like to revisit the scope issue, though, your

9     Honor.  I don't understand how -- this is a cross-examination.

10    This is not --

11         THE COURT:  Scope doesn't work because they could call

12    her in their case if they wanted and ask these same questions.

13    These are clearly relevant because they are attempting to show

14    that she's got a great recall of two days from --

15         MS. DORAN:  Right.

16         THE COURT:  -- four years ago and doesn't remember

17    anything else.  That's classic cross.  I mean, that's --

18         MS. DORAN:  Right.

19         THE COURT:  So be it.  That's going to -- argument

20    you're each going to make.

21         But if Ms. Warren said that she's going to talk about

22    emotional issues -- or her mother-in-law is going to talk about

23    emotional issues and made no mention of the fact she's talking

24    about phone calls, it's a matter of impeachment.

25         But I had misunderstood.  I thought this was a

1    will-call list from a final pretrial order that -- may-call and

2    will-call with the description provided by counsel.

3              MS. BRUCH:  The interrogatories.

4              THE COURT:  Apparently it is -- and you're

5    representing that this was attached or part of an interrogatory

6    answer.

7              MS. BRUCH:  Correct?

8              MS. McLAUGHLIN:  Can you identify the interrogatory?

9              MS. BRUCH:  Every single one of them.  They're all

10   marked as exhibits for impeachment, 26, my defendants.  Every

11   one they say, "See Plaintiff's Exhibit 1," and what I'm

12   referring to is Plaintiff's Exhibit 1.

13             THE COURT:  Okay.  Well, then you can proceed.

14             MS. DORAN:  Thank you.

15        (In open court in the hearing of the jury.)

16             THE COURT:  All right.  Objection overruled.

17             You may continue.

18   BY MS. McLAUGHLIN:

19   Q.  So can you just tell us again the first time that you

20   realized from your discussions with Ms. Warren that you were

21   going to be a witness in this case concerning phone calls that

22   Ms. Warren made to you?

23   A.  A couple weeks ago.

24   Q.  And when you spoke with Ms. Warren a couple weeks ago, did

25   she tell you now four years later she suddenly realized that

May - Cross by Bruch

1   she had this phone call with you on January 6th?

2   A.  She never explained why.

3   Q.  What did she explain to you?  What did she tell you?

4   A.  Just that I -- I don't really basically know if I'd be

5   upset if I was called.  She didn't want me to have to go

6   through it all.  And I said that if it -- whatever.  You know,

7   it is what it is.

8   Q.  Did Ms. Warren -- first of all, what -- do you have the

9   same cell phone carrier now that you had back in 2014?

10  A.  Yes.

11  Q.  Do you receive paper copies of your bills, or do you just

12  look at them online?

13  A.  We get paper copies.

14  Q.  How long do you keep them for?

15  A.  They go right in the shedder after the bill is paid.

16  Q.  Did you ever reach out to your cell phone carrier to see if

17  you had any records of any phone calls that you may have

18  received on January 6, 2014?

19  A.  No.

20  Q.  You were never asked to do that.

21  A.  No.

22  Q.  So just so I'm clear, you've never personally gone back to

23  look at your phone records to see if you actually did receive

24  these calls from Ms. Warren on January 6, 2014?

25  A.  No, I haven't.

May - Redirect by Doran

1    Q.  You're relying on Ms. Warren's recollection that she made

2    these phone calls to you when you're coming here to testify in

3    court today.

4    A.  Well, not only hers, but mine too.  I remember getting

5    them.

6    Q.  Did Ms. Warren ever tell you whether she suggested to the

7    Sheriff's Office at any time that her phone records were not

8    accurate because she remembered calling you twice on

9    January 6th?

10   A.  No.

11          MS. BRUCH:  Nothing further.

12          THE COURT:  Any redirect examination?

13          MS. DORAN:  Yes, your Honor.  Thank you.

14                  REDIRECT EXAMINATION

15   BY MS. DORAN:

16   Q.  Ms. May, Ms. Bruch asked you some questions about whether

17   you remembered babysitting Megan all those days prior to

18   January 6th.  Do you remember that testimony?

19   A.  Yes.

20   Q.  Did you have a regular babysitting schedule with Megan?

21   A.  They would let me know, like, a week in advance or

22   whatever, just to let me know what Jeff's schedule was, what

23   hers and whatever.  I filled in the days that Jeff wasn't

24   there.

25   Q.  I see.  And so were you expecting to babysit for Megan on

1  the morning of January 6th?

2  A.  Yes.

3  Q.  You were expecting -- when --

4  A.  Not the morning, but the afternoon I was.

5  Q.  Oh, okay.  So you were not expecting to babysit Megan on

6  the morning of January 6th.

7  A.  No.

8  Q.  And you didn't find out that you were needed until the

9  evening before, correct?

10  A.  Right.

11  Q.  After Carrie was fired in March of 2014, did you do a lot

12  of babysitting for Megan that year?

13  A.  No.  I would say it was less than I usually did.

14  Q.  Okay.  And apart from the snowy day of January 6th, through

15  the rest of 2014 that you did do babysitting for Megan, can

16  you -- do you have any recollection as you sit here about

17  another similar weather condition situation that was going on

18  as you were on your way to babysit Megan?

19  A.  Not quite as bad as it was that day on the 6th.  But

20  there's been other problems, you know, rainy or, you know,

21  storms, you know, other kind of storms.  But nothing --

22  Q.  So I'm sure that you love your daughter-in-law very much.

23  But would you come into this courtroom and lie under oath?  Is

24  that what you're doing today?

25  A.  I'm not lying.

May - Redirect by Doran

1   Q.   Did your daughter-in-law call you on the 6th?

2   A.   On the 6th, yes.

3   Q.   Can you explain why your phone number does not show up on

4   her bill?

5   A.   I have no clue.

6           MS. BRUCH:  Objection.  Lack of foundation.  Calls for

7   speculation.

8           THE COURT:  Well, overruled.

9           I think we heard part of the answer.  Go ahead and

10  finish your answer.

11          THE WITNESS:  I have no idea.

12          MS. DORAN:  No further questions.

13          THE COURT:  All right.  Any recross?

14          MS. BRUCH:  No, your Honor.

15          THE COURT:  Are there any questions of the jury of

16  this witness?

17      (No response.)

18          THE COURT:  All right.  I see no hands.

19          Ma'am, you're excused.  Thank you.

20          THE WITNESS:  Thank you.

21          THE COURT:  All right.  Please call your next witness.

22          MS. DORAN:  Our next witness is going to be Jeff

23  Warren.

24          THE COURT:  All right.

25          MS. DORAN:  And he's coming in.

J. Warren - Direct by Doran

1      THE COURT:  Well, Ms. May said she works at Jewel.

2   Ms. Bruch said she worked at Jewel.  I was a bag boy at Jewel.

3   So I'm sure some of you probably worked at Jewel too.

4      (Witness enters the courtroom.)

5      THE COURT:  All right.  Sir, up here, please.

6      THE WITNESS:  Good morning.

7      THE COURT:  Good morning.

8      All right.  Please raise your right hand.

9   (Witness duly sworn and takes the stand.)

10     THE WITNESS:  I do.

11     THE COURT:  All right.  Have a seat, please.

12     You may begin.

13     MS. DORAN:  Thank you.

14        JEFFREY WARREN, PLAINTIFF'S WITNESS, SWORN

15               DIRECT EXAMINATION

16  BY MS. DORAN:

17  Q.  Good morning, Jeff.  Could you please state your name and

18  spell it for the record.

19  A.  Jeffrey, J-E-F-F-R-E-Y, last name Warren, W-A-R-R-E-N.

20  Q.  And you're Carrie's husband, right?

21  A.  Correct.

22  Q.  What do you do for a living?

23  A.  I'm a battalion chief with the Oswego Fire Protection

24  District.

25  Q.  I'm sorry.  Could you say that one more time?

J. Warren - Direct by Doran

1    A.  A battalion chief with the Oswego Fire Protection District.

2    Q.  I see.  So you're a firefighter.

3    A.  Yes.

4    Q.  And how long have you worked for the Oswego Fire -- can I

5    say Fire Department?

6    A.  Sure.

7    Q.  It's just easier for me.  Thank you.

8    A.  I was hired full time in September of '95.

9         COURT REPORTER:  Can you put the microphone a little

10   closer to where you're sitting?

11        THE WITNESS:  I'm sorry.

12        COURT REPORTER:  Thank you.

13        THE WITNESS:  Is that better?

14        COURT REPORTER:  Yes.  Thank you.

15   BY MS. DORAN:

16   Q.  And prior to that, my understanding is that you were a 911

17   dispatcher?

18   A.  That is correct.

19   Q.  Okay.  And did you -- did you meet former Sheriff Richard

20   Randall when you were a 911 dispatcher?

21   A.  Yes.  I knew of him.

22   Q.  Okay.  And do you know Chief -- or former Chief Deputy

23   Scott Koster?

24   A.  Yes.

25   Q.  How long have you known him?

J. Warren - Direct by Doran

1    A.   I was hired as a 911 dispatcher the summer of '91.  So

2    sometime in that general vicinity is when I met him.

3    Q.   I see.

4         And how about Commander Sabrina Jennings?  Do you know

5    her?

6    A.   Yes.

7    Q.   And how long have you known her?

8    A.   I believe she was hired for the county shortly after I was,

9    in '91 or early '92.

10   Q.   Okay.  As a battalion chief, where do you rank in the

11   overall hierarchy of the Oswego Fire Department?

12   A.   About third in the chain of command.

13   Q.   Okay.

14   A.   There's a chief, deputy chief, assistant chief, and then

15   the battalion chief level.

16   Q.   I see.  And as a battalion chief, do you have professional

17   interactions with the Kendall County Sheriff's Office?

18   A.   Yes.

19   Q.   Can you tell us about that.

20   A.   We cross paths, interact on different emergency calls,

21   difference of -- different events or outings that we may cross

22   paths at.

23   Q.   Do you remember when you and Carrie first started talking

24   about her applying for a Kendall County Deputy Sheriff's

25   position?

J. Warren - Direct by Doran

1    A.   Yes.

2    Q.   And did you encourage her?

3    A.   Yes, I did.  It was kind of a -- I don't know -- kind of a

4    joking challenge, I guess, for her to go through the process.

5    Q.   Why was it a joking challenge?

6    A.   Well, she -- she was selling flooring in the retail

7    industry.  And in '08 when the economy crashed, things weren't

8    good with her industry.  So the ad in the paper was there for

9    testing for corrections deputy, and we kind of joked about it

10   and kind of razzed her a little bit about the physical agility

11   test and such.  And she went ahead and did it.

12   Q.   And she passed the test, right?

13   A.   Correct.

14   Q.   So how did your wife react when she found out she was hired

15   as a Deputy Sheriff?

16   A.   Well, she was very excited.  Kind of went from a job, I

17   guess, in selling flooring to more of a career, more of a

18   stable career.

19   Q.   How were things financially for you as a family after she

20   got the KCSO job?

21   A.   Things were good.  When there's two careers in a household

22   supporting it, things tend to be very well and running very

23   well.

24   Q.   Were you able to take vacations?

25   A.   Absolutely.

J. Warren - Direct by Doran

1    Q.   How would you describe your wife's communication style?

2    A.   Uh --

3    Q.   Is she -- let me ask it this way.  Is she open and

4    forthcoming, or is she more reserved?

5    A.   She's a very open book.  Likes to talk to anybody that will

6    listen to her.  Sometimes it's almost to a fault.

7    Q.   How about you?  Are you open like that or more reserved?

8    A.   No, I'm a more private, reserved individual.

9    Q.   Did Melissa talk to you about the work that she did for

10   Kendall County?

11   A.   Yes.

12   Q.   How frequently?

13   A.   Very frequently.  Pretty much every night when she got home

14   from work.

15   Q.   And so generally how would you describe your wife's

16   attitude about her job?

17   A.   Very excited.  Took it serious.  Yeah.  And, you know,

18   pretty much would tell anybody that she talked to what she did

19   for a living.  She was very prideful with -- with her job, her

20   career.

21   Q.   Did she talk about any friendships that she had developed

22   with coworkers?

23   A.   Absolutely.  It seemed that she established quite a few

24   friendships.

25   Q.   And did you socialize with any of these work friends that

J. Warren - Direct by Doran

1   she made?

2   A.   On occasion, yes.

3   Q.   So at some point you found out that your wife had been

4   called for jury duty.  When was that?

5   A.   Roughly December.  We -- we found out that she got called

6   for -- she got the notice in the mail for jury duty for

7   January.

8   Q.   And you knew it would be -- it was potentially for Monday,

9   January 6th, right?

10  A.   Correct.

11  Q.   Okay.  So let's talk briefly about the weekend before jury

12  duty.  How was your wife's mood that evening, Sunday,

13  January 5th?

14  A.   We were kind of stressed out because we really were trying

15  to figure out all the arrangements that were going to occur

16  with our daughter because I was on duty that Monday.  So ...

17  Q.   And did you know that your mother was actually going to

18  come and watch Megan for you guys?

19  A.   For a -- we had that as a contingency because we -- we

20  weren't sure yet what Melissa's schedule was going to be in

21  regards to jury duty.

22  Q.   Okay.

23  A.   We were trying to line up every possible scenario that

24  could play out and have that in place.

25  Q.   Did you see your wife turn her cell phone off Sunday night?

J. Warren - Direct by Doran

1   A.   I don't recall that she turned her cell phone off.

2   Q.   So you didn't see it.

3   A.   No.

4   Q.   When did you first learn that KCSO was accusing your wife

5   of misconduct relating to the jury duty?

6   A.   I don't recall an exact day.  I believe it was, like, a

7   week or two after the jury duty.

8   Q.   Did she show you a copy of the written charge that she

9   received from her commander?

10  A.   She had it.  I never actually read it or looked at it.

11  Q.   Eventually did you read it and look at it?

12  A.   I skimmed it over, but I didn't really engage in it.

13  Q.   What was Melissa's reaction to being accused of misconduct?

14  A.   She was deflated, kind of troubled.  Wasn't really sure

15  where everything was coming from because a lot of those

16  allegations weren't accurate.

17  Q.   When you say "deflated," what do you mean by that?

18  A.   Just kind of like -- just took the wind out of her sails,

19  if you will.

20  Q.   Did you review your wife's written answer to the written

21  charges?

22  A.   No, I did not.

23  Q.   After she gave her written answer to the written charges,

24  did you offer her any advice as to what she should do to defend

25  herself?

J. Warren - Direct by Doran

1   A.   The only thing I mentioned to her is that she needed to

2   contact her union representation.

3   Q.   Okay.  Did you know that she was being accused of

4   attempting to purposefully get out of serving on the jury?

5   A.   Yes.

6   Q.   Did you offer her any advice as to defending herself

7   against that allegation?

8   A.   I just said that we needed to get a copy of the transcript

9   from the court reporter.

10  Q.   Who is in charge of the cell phone bill in your house?

11  A.   Me.

12  Q.   And did you get a paper bill, or did you access it online?

13  A.   It got accessed online.

14  Q.   Were you and your wife on the same phone plan?

15  A.   Yes.

16  Q.   And that was through AT&T, right?

17  A.   Correct.

18  Q.   Your monthly AT&T bill, did it reflect both your cell phone

19  activity and your wife's cell phone activity?

20  A.   Yes, it did.

21  Q.   Was it your practice to look over the bill before you paid

22  it?

23  A.   I usually scanned it but really didn't get too revolved in

24  looking over it.

25  Q.   Was it your practice to print it out?

J. Warren - Direct by Doran

1    A.  No.

2    Q.  At some point did Melissa ask you for the January 6th --

3    for the telephone bill reflecting calls on January 6th?

4    A.  Yes.

5    Q.  And do you recall when she first asked you about that bill?

6    A.  It was relatively -- I don't recall the exact date.  I know

7    it was relatively soon after she got the allegations that were

8    brought forth.

9    Q.  And did she tell you why she wanted that bill?

10   A.  No, she did not.  She just said that it was requested

11   that -- that a copy of her cell phone bill be turned in.

12   Q.  And how did you respond?

13   A.  My reaction was "No, I'm not giving that information up."

14   Q.  Why?

15   A.  Well, several different reasons.  The biggest one is

16   privacy.  I didn't want to turn in my -- my personal cell phone

17   bill.  Transactions were attached to that.  I -- that was the

18   biggest issue was privacy.

19          But a little bit further than that is I was under the

20   impression that they wanted it to see whether she was on her

21   cell phone in the pre-jury assembly room.  She admitted to

22   that.  And also there's cameras around where they can check to

23   see if she was.  They don't need my cell phone bill for that.

24   Q.  Now, at some point you found out that the KCSO was seeking

25   more than a mere three-day suspension, that your wife was going

J. Warren - Direct by Doran

1    to be formally interrogated.  Right?

2    A.  Correct.

3    Q.  And did you get the impression from your wife that she

4    thought that the charges, the written charges that she was

5    facing, had somehow changed?

6              MS. BRUCH:  Objection.  Leading.

7              THE COURT:  Sustained.

8    BY MS. DORAN:

9    Q.  Did you and your wife talk about her preparing for that

10   formal interrogation?

11   A.  We had several conversations throughout this process.  And

12   there were a lot that had to do with, you know, her meetings as

13   she was preparing to deal with them.

14   Q.  Did your wife tell you that she believed that the KCSO was

15   accusing her of lying about receiving a phone call?

16             MS. BRUCH:  Objection.  Leading.

17             THE COURT:  Sustained.

18             Just ask what they discussed.

19   BY MS. DORAN:

20   Q.  Did Melissa tell you what charges she thought she was

21   facing?

22   A.  As the process went on, yes, we -- I was notified of

23   everything that she was facing as she was preparing for -- for

24   the meetings.

25   Q.  So what was her reaction when she found out that she was

J. Warren - Direct by Doran

1   facing a formal interrogation?

2   A.  Very, very nervous, very upset.  She still was kind of

3   trying to figure out why -- that was the big thing -- and

4   trying to understand where all this was coming from.

5   Q.  And what did you think about the developments?

6   A.  My personal opinion is I -- I thought I smelled a rat.  It

7   seemed like a witch-hunt.  And that was just my personal

8   opinion to that.

9   Q.  When you found out that your wife was going to face a

10  formal interrogation, did you change your mind about handing

11  over your private cell phone bill?

12  A.  We had a -- we had a time period where she was going to a

13  meeting.  And she begged and pleaded to me to get those records

14  for her.  It was quite a heated morning in the Warren household

15  between her and I.

16  Q.  I want to stop you right there.  Prior to the formal

17  interrogation of February 4th --

18          MS. McLAUGHLIN:  5th.

19          MS. DORAN:  Sorry.

20  BY MS. DORAN:

21  Q.  (Continuing) -- February 5th, did you change your mind

22  about -- the formal interrogation with Commander Jennings, did

23  you change your mind about giving your wife your personal cell

24  phone bill to give to her employer?

25  A.  I don't -- I don't recall the exact date on when I decided

J. Warren - Direct by Doran

1    to give that up.  But I believe it was some -- some period

2    after that.

3    Q.  Okay.  So at some point the two of you talked about --

4    again about that cell phone bill, right?

5    A.  Yes.  It was a common discussion with us.

6    Q.  You had multiple discussions?

7    A.  Yes.

8    Q.  And each time, what was your position?

9    A.  I wasn't going to give that up.

10   Q.  For the same reasons that you told us before?

11   A.  Absolutely.

12   Q.  And at some point you found out that Melissa was going in

13   for a pre-termination hearing with the Chief Deputy Koster,

14   correct?

15   A.  Yes.

16   Q.  And do you recall that that pre-termination hearing was

17   scheduled for the end of February?

18   A.  It very well could have since I believe she was terminated

19   in early March.

20   Q.  Okay.  So do you remember her getting ready for that

21   pre-termination hearing with Chief Deputy?

22   A.  Yes.

23   Q.  And did you talk to her the day of that pre-termination

24   hearing?

25   A.  Yes.

J. Warren - Direct by Doran

1   Q.  Did you -- what did you talk about?

2   A.  Just everything surrounding it.  And, once again, the cell

3   phone bill was a -- was a high topic that morning.

4   Q.  Who brought up the phone bill?

5   A.  She did.

6   Q.  And did you continue to argue that you weren't going to

7   give it to her?

8   A.  Yes.

9   Q.  Did you ultimately acquiesce and get the bill for her?

10  A.  Yes, I did.

11  Q.  So tell us about that.  How did you do it?

12  A.  Well, like I said, with a -- a morning of going back and

13  forth and her trying to plead with me to -- to get that, I told

14  her -- I said, "Fine.  I'll give you the cell phone bill, but

15  I'm going to black out every number on it.  And you can take

16  that in."

17          So I went to the computer, printed it off, went to the

18  office, and got the record out of the printer.

19  Q.  And then what did you do with it?

20  A.  Went to the kitchen, island in the kitchen, and started

21  blacking out the numbers.

22  Q.  What did you use to black out the numbers?

23  A.  A black Sharpie.

24  Q.  Where was Carrie at this point?

25  A.  Standing next to me, asking me not to do that.

J. Warren - Direct by Doran

1    Q.  And how did you respond?

2    A.  I said no, I was going to do that.

3    Q.  At some point when you were redacting this phone bill, did

4    you change your mind about redacting or blacking out every

5    single line?

6    A.  Yeah, there was -- there -- there was a couple-minute time

7    frame there where we were going back and forth and she was

8    pleading that -- to stop doing that.  It was one of those

9    things.  Me, I was very angry, upset.  And it got to the point

10   to where I just wanted to quit hearing her.

11          So I did a few more numbers, what I could, and I gave

12   her the -- the phone record for her to go to her meeting.

13   Q.  So did she eventually get that phone bill from you?

14   A.  Yes.

15   Q.  And is that when she left the house?

16   A.  Yes.

17   Q.  What was her mood like?

18   A.  She was very upset.

19   Q.  With who?

20   A.  Me, I would imagine.

21   Q.  Did Melissa tell you to black out any of those numbers?

22   A.  No.

23   Q.  Did she do any of the redacting?

24   A.  No.

25   Q.  Did she ever ask you to lie and say that you had called her

695

J. Warren - Direct by Doran

1    on the 6th?

2    A.   No.

3    Q.   So you're aware that the pre-termination hearing didn't go

4    on the 28th of February, right?  It was postponed, correct?

5    A.   That is correct.

6    Q.   And you guys had a planned vacation just shortly after

7    that, right?

8    A.   Correct.

9    Q.   That was the vacation to Cancun that Chris Fidler had

10   booked for you guys?

11   A.   Yes.

12   Q.   And when you returned, what happened to Melissa's job?

13   A.   She was terminated.

14   Q.   How did your wife take the news?

15   A.   Very distraught, very upset, still, you know, the why.  The

16   why is the big question with anything like that.  And kind of

17   felt like she lost her self-worth.

18   Q.   Was your wife very emotional when she told you that she had

19   been fired?

20   A.   Yes, she was -- she was emotional.  She was trying not to

21   be.  But -- but, yeah, she was emotional.

22   Q.   Was she crying?

23   A.   Yes.

24   Q.   Is that something that your wife normally does?

25   A.   No.

J. Warren - Direct by Doran

1    Q.  Did you notice any differences in her personality since she

2    lost her job?

3    A.  Yes.  She -- like I said, she was a very bubbly, outgoing

4    person who would talk to anybody at the drop of the dime.

5              After that happened, she pretty much turned into a

6    hermit.  Just kind of there.  Kind of lights on, nobody home.

7    Just basically existing, if you will.

8    Q.  Did you notice any differences in her sleep patterns?

9    A.  Yes.

10   Q.  Can you describe those.

11   A.  Pretty much slept the days away, taking several doses of

12   Benadryl a day to -- to force her to sleep.

13   Q.  How about her grooming habits?  Did your wife take care of

14   herself to the same standards as she had?

15   A.  No, she pretty much let herself go.

16   Q.  Were you present when Melissa told Megan that she'd been

17   fired?

18   A.  I don't recall being present at that point.

19   Q.  Do you -- did you ever talk to your daughter about that?

20   A.  Briefly we discussed it.  But I just told our daughter that

21   if it's something that she wanted to talk about that I'd be

22   more than happy to talk about it with her.

23   Q.  How did the loss of Melissa's job affect your family

24   financially?

25   A.  Well, I mean, we -- we took a $60,000-a-year hit.  On top

J. Warren - Direct by Doran

1  of that, I had to try to pick up the slack.  And I was working

2  nonstop for about an 18-month period.

3  Q.  Did your wife look for work after she was fired?

4  A.  Yes.

5  Q.  Do you know if she applied for law enforcement jobs?

6  A.  No, I don't believe she applied for any law enforcement

7  jobs.

8  Q.  Did she eventually get a job?

9  A.  Yeah, she eventually got a job as a server at Olive Garden.

10  Q.  And how would you describe Melissa's attitude toward the

11  work that she does now?

12          Or, actually, let me ask you one more question.  Is

13  that what she's doing right now?

14  A.  No.  She works -- she sells granite countertops right now

15  and is -- also works as a server for Outback.

16  Q.  Okay.  So how would you describe your wife's attitude

17  toward the work that she does now compared to the work that she

18  did when she was a Sheriff's Deputy?

19  A.  I think now it's -- what she does now is just that: it's

20  work.  You know, people tend to approach things different when

21  it's just a job as opposed to a career.  And I think that's

22  kind of what she's doing.

23  Q.  Has her termination affected your relationship with your

24  wife?

25  A.  Oh, absolutely.

J. Warren - Cross by Bruch

1    Q.   In what way?

2    A.   Well, there's this constant tension.  There's -- you know,

3    there's a lot of issues that -- that that's the root of.

4    Q.   After Carrie was fired, you eventually handed over an

5    unredacted phone bill, right?

6    A.   Yes.

7    Q.   And that was during the grievance process?

8    A.   Correct.

9    Q.   Did you believe that the KCSO would change its mind and

10   rescind the termination during that process?

11   A.   Well, that's not why I gave the unredacted record.  I gave

12   that at the advice of the -- the FOP.

13   Q.   The FOP is the union?

14   A.   Yes.

15   Q.   Okay.

16          MS. DORAN:  One moment.

17       (Counsel conferring.)

18          MS. DORAN:  No further questions.

19          THE COURT:  All right.  Any cross-examination?

20          MS. BRUCH:  Yes, your Honor.

21                    CROSS-EXAMINATION

22   BY MS. BRUCH:

23   Q.   Mr. Warren, I want to talk about your wife's cell phone.

24   Is it true that the only things that you've done on your wife's

25   phone is when she tells you that her phone is running slow that

J. Warren - Cross by Bruch

1  you'll delete the apps that are running in the background?

2  A.  That is correct.  I've told her and shown her how to delete

3  apps or any programs that are running in the background and

4  just to get away -- get rid of any things that might be logging

5  her cell phone down.

6  Q.  So isn't it true when your wife says, you know, "My phone

7  is freezing up," or "It's slowing down," then you tell her to

8  just delete those background apps?

9  A.  Correct.

10  Q.  You don't tell her to delete her call log.

11  A.  I tell her sometimes, you know, if you have calls in your

12  log from -- that have been there a while, get rid of them.

13  Q.  And when have you had that conversation with her?

14  A.  That's just a general conversation.

15  Q.  And did you ever suggest to her how -- when you said that

16  they've been in there for a long time, how long?

17  A.  No, I've never given a time period.

18  Q.  You've never touched her phone to delete anything, right?

19  A.  I've deleted apps and -- and stuff like that to show her

20  how to do it.

21  Q.  But you've never deleted her call log, have you?

22  A.  Not that I recall.

23  Q.  You don't know if your wife knows the steps needed to

24  delete a phone call from her phone.  Isn't that true?

25  A.  I'm sorry.  Can you repeat that?

1    Q.  Isn't it true that you don't even know if your wife knows

2    the steps needed to delete a phone call from her phone?

3    A.  She's never asked me to show her how to do it, so I've

4    assumed that she knows how to delete a call off her call log.

5    Q.  Mr. Warren, do you remember testifying under oath on

6    April 27, 2017?

7    A.  Yes.

8    Q.  And do you recall at that time you were sworn to tell the

9    truth?

10   A.  Yes.

11   Q.  And at that time, were you asked the following questions

12   and gave the following answer?

13        MS. BRUCH:  This is page 1626, lines 19 to 22.

14   BY MS. BRUCH:

15   Q   "Q:  Knowing that your wife has problems with technology,

16       in your experience, would she know the steps needed to

17       delete a phone call from her phone?

18       "A:  I don't know if she does or not."

19        Was that the question you were asked and the answer

20   you gave?

21   A.  Yes.

22        MS. DORAN:  Objection.  Not impeaching.

23        THE COURT:  Overruled.  It's up for the jury to decide

24   whether anything's inconsistent or consistent.  So overruled.

25   BY MS. BRUCH:

J. Warren - Cross by Bruch

1  Q.  You would agree with me that you've never deleted her call

2  log.

3  A.  Not that I recall.

4  Q.  Do you recall on that same day being asked these questions

5  and giving these answers?

6         MS. BRUCH:  This is page 1627, lines 3 to 5.

7  BY MS. BRUCH:

8  Q   "Q:  Can you think of any reason why you would go into your

9      wife's cell phone and delete her call log?

10      "A:  I haven't deleted her call log."

11         Was that the question you were asked and the answer

12  you gave?

13  A.  Yes.

14  Q.  I want to ask you about your wife's January 6, 2014, jury

15  service.  You knew that day that your wife had jury duty,

16  correct?

17  A.  Yes.

18  Q.  And isn't it true that you were still at home in the

19  morning of January 6th when your wife left for jury duty?

20  A.  No, I wasn't at home.

21  Q.  What time did you leave that morning?

22  A.  I usually leave for work about quarter to 6:00.

23  Q.  So when your mother arrived at the home that morning, you

24  were not present.

25  A.  No.

J. Warren - Cross by Bruch

1  Q.  What was your understanding of when your wife had to work

2  that day, if at all?

3  A.  At that point I don't believe we knew what was happening

4  yet with her work schedule.

5  Q.  Did she call you that morning?

6  A.  I don't recall if she called me that morning or not.

7  Q.  How many times did she call you that day?

8  A.  I don't recall.

9  Q.  Mr. Warren, isn't it true that you're claiming on the day

10  that your wife had jury duty, January 6th, she told you that

11  day that the travel agent, Chris Fidler, had called you --

12  called her?

13  A.  I don't -- I don't recall anything about whether she

14  mentioned the travel agent or not.

15  Q.  Did your wife share with you that she received a phone call

16  from someone who she believed was her travel agent?

17  A.  I don't recall that conversation with her.

18  Q.  Do you recall giving testimony under oath on November 17,

19  2015?

20  A.  Yes.

21  Q.  And at that time you were sworn to tell the truth.

22  A.  Yes.

23  Q.  You -- at that time were you asked these questions and gave

24  these answers?

25        MS. BRUCH:  This is page 63, lines 1 through 4.

J. Warren - Cross by Bruch

1   BY MS. BRUCH:

2   Q   "Q:  Did your wife ever share with you that she received a

3       phone call from someone who she believed was her travel

4       agent?

5       "A:  Yes."

6           Were you asked that question and gave that answer?

7   A.  Yes.

8   Q.  And you believe that she told you about the call from the

9   travel agent on the day of her jury duty.

10  A.  Can -- I'm sorry.  Can you repeat that?

11  Q.  Sure.  And you believe that she told you about the call

12  from the travel agent on the day of her jury duty.

13  A.  Correct.

14  Q.  And after your wife met with Commander Jennings on

15  January 14, she told you that she needed her phone records,

16  right?

17  A.  At some point she asked for her phone records.  I don't

18  recall if it was that day.

19  Q.  You don't recall your wife saying that she needed the phone

20  records from January 6 when she had jury duty, right?

21  A.  All the phone records that I was asked for were for

22  January 6.

23  Q.  Do you recall being asked this question and gave this

24  answer on April 27, 2017?

25          MS. BRUCH:  And this is page 1620, lines 12 through

1    14.

2    BY MS. BRUCH:

3    Q.  Were you asked this question and gave this answer?

4        "Q:  Did your wife tell you on January 15th that she needed

5        her phone records of calls from January 6th when she had

6        jury duty?

7        "A:  I don't recall what day she needed them for."

8            Was that the question you were asked and the answer

9    you gave?

10   A.  Yes.

11   Q.  If your wife was asked by Commander Jennings to get her the

12   records on January 14th and you ultimately gave them to her on

13   February 28th before her pre-disciplinary meeting with Chief

14   Deputy Koster, how many conversations did you have with her

15   about the phone records?

16   A.  I don't recall an exact number.

17   Q.  Did you ever have any meetings or discussions at your home

18   between you, your wife, and any member of the union?

19   A.  No.

20   Q.  Did any of the -- either Mr. Stomper or Deputy Little, you

21   understood they were the individuals that were assisting your

22   wife through this disciplinary process, correct?

23   A.  Correct.

24   Q.  Did you ever have any meetings with either of them at your

25   home?

J. Warren - Cross by Bruch

1    A.  I don't recall any meetings.

2    Q.  You don't recall ever being present for any meeting where

3    either one of them came to your home to discuss this situation?

4    A.  No.

5    Q.  You mentioned earlier that you had seen copies of the

6    paperwork that your wife received and skimmed through it.  Do

7    you recall that testimony?

8    A.  Yes.

9    Q.  What paperwork did you review?

10   A.  It was the -- the paperwork that she had laying on the

11   island in the kitchen.

12   Q.  When did you review that paperwork?

13   A.  I don't recall an exact day.

14   Q.  Would it have been after the meeting with Commander

15   Jennings on January 14th?

16   A.  I don't recall that.

17   Q.  When you spoke with your wife about the phone records, she

18   never asked you for the password to the account so she can just

19   pull it up online?

20   A.  No.

21   Q.  You never refused to give her the password for the account,

22   did you?

23   A.  No.

24   Q.  So when your wife told you she was being investigated and

25   that the Sheriff's Office wanted to see her cell phone records,

1  you said no, right?

2  A.  Correct.

3  Q.  And then you changed your mind.

4  A.  Yes.

5  Q.  Did you think that the outgoing calls that you made to your

6  wife were private?

7  A.  What do you mean, were private?

8  Q.  Well, you mentioned the fact that you had privacy concerns

9  about the Sheriff's Office seeing the records, right?

10  A.  Correct.

11  Q.  Did you think that the Sheriff's -- that the calls that you

12  made to your wife would be private?

13  A.  Yeah, they're my -- they're my calls.

14  Q.  Did you think that the calls that your wife made to you

15  would be private?

16  A.  Yes.

17  Q.  So did you think that all incoming calls to your wife were

18  private?

19  A.  I thought all calls on call log to me are private.

20  Q.  Did you think that the amount of airtime used for the call

21  was private?

22  A.  Sure.

23  Q.  What about the length of the call?  Did you think that was

24  private information?

25  A.  Sure.

J. Warren - Cross by Bruch

1    Q.   And did you think that the time of the call would be

2    private information?

3    A.   Yes.

4    Q.   Showing you what's been marked as Joint Exhibit 9.  This is

5    the document that you gave to your wife prior to the

6    pre-disciplinary hearing, correct?

7    A.   Yes.  It appears to be.

8    Q.   And this was -- the redacting on this was done by you,

9    correct?

10   A.   Yes.

11   Q.   There's some handwritten notes in this document.  Do you

12   recognize that handwriting?

13   A.   Yes.

14   Q.   Whose handwriting is that?

15   A.   Carrie's.

16   Q.   Do you know when your wife wrote that on this document?

17   A.   No, I do not.

18   Q.   She didn't do it in your presence?

19   A.   No.

20   Q.   So you mentioned how you were standing at the counter and

21   you were redacting, and she's standing next to you pleading

22   with you not to, right?

23   A.   Correct.

24   Q.   And at that point did you know that the issue was relating

25   to January 6th, the date of her jury duty?

J. Warren - Cross by Bruch

1   A.  Yes.

2   Q.  Did you know what the approximate time frame was of the

3   call that the Sheriff's Office was looking for on January 6th?

4   A.  I don't believe I did.

5   Q.  Did it ever -- did you ever consider to just redact all of

6   the numbers except those for January 6th?

7   A.  I don't recall that.

8   Q.  But you do recall that you redacted these numbers quickly

9   and just handed this to your wife as she ran out the door,

10  correct?

11  A.  She was getting ready to leave, yes.

12  Q.  Did she stop and review the records before leaving after

13  you --

14  A.  No.

15  Q.  -- handed her the document?

16  A.  No.  What she did when she got in the car and all that, I

17  have no idea.  But as she walked out the door, no.

18  Q.  Is it accurate that there's only one number that's redacted

19  here for January 6th?

20  A.  January 6th.

21  Q.  Here.  I can make it bigger.

22  A.  Just it's tough to --

23  Q.  That's the one at the bottom.

24  A.  Okay.  Yep.

25  Q.  And is it accurate that you don't know what number you

J. Warren - Cross by Bruch

1    redacted there?

2    A.  I can't tell on this.  No, I can't.

3    Q.  And you don't remember why you redacted that record.

4    A.  No.

5    Q.  But you did know at the time that you redacted the number

6    that the calls made and received on your wife's cell phone

7    between the morning of her jury service and the time that she

8    reported to work was an issue as part of the Sheriff's Office

9    investigation, right?

10   A.  Correct.

11   Q.  Mr. Warren, did you redact Joint Exhibit 9 for the purpose

12   of deceiving the Sheriff's Office about the calls that your

13   wife received on January 6th?

14   A.  No.

15   Q.  So your contention under oath is that there's no rhyme or

16   reason as to why you redacted the numbers.

17   A.  Correct.

18   Q.  And are you positive that Ms. Warren did not help you

19   redact any of the numbers?

20   A.  Yes.

21   Q.  You didn't have the phone numbers of any of your wife's

22   coworkers on your personal cell phone, right?

23   A.  Not that I believe I did, no.

24   Q.  During your wife's employment, you did not call Commander

25   Jennings' cell phone, right?

J. Warren - Cross by Bruch

1    A.  No.

2    Q.  You couldn't identify what Commander Jennings' cell phone

3    number was, correct?

4    A.  No.

5    Q.  And no one ever pointed out to you that a particular phone

6    number on this log was Commander Jennings', correct?

7    A.  No.

8    Q.  So let's look at Defendants' Exhibit 9.

9         So initially after you printed out this -- let me take

10   that back.

11        So when you first decided that you were going to give

12   your wife the cell phone records, you would have printed out

13   this page from your computer, correct?

14   A.  Yes.

15   Q.  And the phone records would have looked essentially the

16   same as this document, without the handwritten note at the top,

17   right?

18   A.  Correct.

19   Q.  So it was up to you to decide then what records should be

20   redacted.  Is that correct?

21   A.  Correct.

22   Q.  And you're sure you didn't discuss with your wife which

23   numbers to redact.

24   A.  Correct.

25   Q.  This is something that you did quickly as your wife's

J. Warren - Cross by Bruch

1   heading out the door, right?

2   A.  Yes.

3   Q.  And would you agree with me that you didn't spend a lot of

4   time at all redacting these records?

5   A.  No.

6   Q.  And it's your testimony under oath that no one helped you

7   redact the records, right?

8   A.  Right.

9   Q.  No one had any input at all as to what numbers were going

10  to be redacted.

11  A.  Correct.

12  Q.  And you don't know why you redacted what you did, correct?

13  A.  Correct.

14  Q.  Now, there's a number that appears quite frequently in the

15  document.  It's (630) 730-2196.  What number is that?

16  A.  That's my cell phone number.

17  Q.  So if you take a look -- let's just focus on -- so we can

18  make this a little bit bigger.

19          Let's focus on the records from January 5th.  Are

20  there calls that were made on that day between -- from your

21  wife to your number?

22  A.  Yes.

23  Q.  And what times were those calls on January 6th from your

24  wife to you?

25  A.  In the evening, 7:25 and 8:43.

J. Warren - Cross by Bruch

1  Q.  And on January 6th, are there any calls that were between

2  your wife and you?

3  A.  Yes.

4  Q.  And what times?

5  A.  There's an 11:16, 11:32, and a 3:28.

6  Q.  So you didn't have any issue with the Sheriff's Office

7  seeing that your wife had made calls to you or that you had

8  made calls to your wife, correct?

9  A.  Correct.  But that's not why I left that out.  Those were

10 at the bottom of the page.  And --

11 Q.  Okay.  So let me just go back now.  I'm going to -- let's

12 show -- this is your testimony under oath on April 27, 2017.

13 And we're going to look at page 1621, from lines 15 to 18.

14      Were you asked this question, and you gave this

15 answer?

16     "Q:  Did you have any issue with the Sheriff's Office

17      seeing that your wife had made calls to you or that you

18      made calls to your wife?

19     "A:  No."

20      Was that the question you were asked and the answer --

21 A.  Yes.

22 Q.  Focusing on the time frame of January 5th and 6th, looking

23 at those numbers in Defendants' Exhibit 9, can you tell me any

24 numbers that you thought would cause you concern and make you

25 think that this is a privacy issue that the Sheriff's Office

J. Warren - Cross by Bruch

1   should not see this call?

2   A.  They're all private.

3   Q.  Looking again -- this is your testimony under oath on

4   April 27, 2017, starting at page 1621, lines 19 to 25.

5           Were you asked this question and gave this answer?

6       "Q:  So let's focus more down in the time frame of

7       January 5th and January 6th.  And looking at those numbers,

8       can you tell me any numbers that you thought would cause

9       you concern and make you think that this was a privacy

10      issue that the Sheriff's Office should not see this call?

11      "A:  Not off the top of my head.  There's some numbers on

12      there that I don't know what they are."

13          Was that the question you were asked and the answer

14  you gave?

15  A.  Yes.

16  Q.  Would you agree with me that you don't even know who most

17  of those numbers belong to?  Right?

18  A.  Correct.

19  Q.  And so looking at the number (773) 818-0728, you don't know

20  whose number that is, correct?

21  A.  No, I do not.

22  Q.  And looking at the number (630) 636-4636, you don't know

23  whose number that is, do you?

24  A.  Correct.

25  Q.  Then the 2196 number, that's your cell phone, right?

J. Warren - Cross by Bruch

1    A.   Correct.

2    Q.   And then (630) 308-4878, we heard from your mother that's

3    her number, right?

4    A.   Correct.

5    Q.   And (630) 224-8328 [*sic*].  You're not sure whose number

6    that is, right?

7    A.   244-8328?

8    Q.   Yeah, 244-3828 [*sic*].

9    A.   Yeah.  No, I don't know who that is.

10   Q.   Okay.  Then the next call, that's your mother again.

11   A.   Correct.

12   Q.   And then there's a call to you.

13   A.   Mm-hmm.

14   Q.   And then we turn to Monday, January 6th, which is the day

15   that your wife had jury duty.

16   A.   Correct.

17   Q.   And there's some calls to (630) 553-7500.  And other than

18   knowing it's a Yorkville number, you don't know whose number

19   that is, correct?

20   A.   Correct.  I -- I think that it's the Sheriff's Department.

21   Q.   All right.  I'm going to now turn to -- this is your

22   testimony under oath on April 27, 2017.  And we're going to go

23   to page 1622, lines 18 to 20.

24        Were you asked this question and gave this answer?

25        "Q:  Then we turn to Monday.  And there's some calls to

715

J. Warren - Cross by Bruch

1      (630) 553-7500.  Whose number is that?

2      "A:  I'm not sure.  It's a Yorkville number."

3      Were you asked that question and gave that answer?

4  A.  Yes.  And I'm still not a hundred percent sure whose it is.

5  Q.  Then in the records for the 6th, there's another call to

6  you, right?

7  A.  Yes.

8  Q.  And then there's a call to (630) 244-8328.  And you're not

9  sure whose number that is, correct?

10  A.  Correct.

11  Q.  Then there's some calls to you.

12  A.  Yes.

13  Q.  But you knew that January 6th, those are the calls that the

14  Sheriff's Office is looking at.

15  A.  Yes.

16  Q.  All right.  So I want to put these records next to each

17  other now.

18      THE COURT:  How much more do you have on cross?

19      MS. BRUCH:  This is -- we have both Defendants'

20  Exhibit 9 --

21      THE COURT:  Ms. Bruch, how much more do you have on

22  cross?

23      MS. BRUCH:  Oh, I'm sorry.

24      THE COURT:  We're going to take a morning --

25      MS. BRUCH:  I think about 10 minutes, 15 minutes.

J. Warren - Cross by Bruch

1      THE COURT:  Let's take our morning break now then,

2  ladies and gentlemen.

3      We're going to break for about 15 minutes.  Please

4  don't discuss the case among yourselves or with anyone else,

5  and keep an open mind.  There's more evidence to hear.

6      (Jury out at 11:20 a.m.)

7      THE COURT:  All right, sir.  You can leave the stand.

8  15 minutes.  You're on cross-examination, so please don't

9  discuss your testimony with anyone.

10      THE WITNESS:  Okay.  Thanks.

11      THE COURT:  See you in 15 minutes.

12      Anything we need to discuss before we go off the

13  record?

14      MS. BRUCH:  No, your Honor.

15      THE COURT:  From plaintiffs?

16      MS. DORAN:  No.

17      MS. McLAUGHLIN:  No.

18      THE COURT:  Okay.  Thank you.  See you in 15.

19      (Recess at 11:20 a.m., until 11:35 a.m.)

20      THE CLERK:  All rise.

21      (Jury in at 11:35 a.m.)

22      THE COURT:  All right.  Please be seated.

23      You may continue your cross-examination.

24      MS. BRUCH:  Thank you, your Honor.

25  BY MS. BRUCH:

J. Warren - Cross by Bruch

1    Q.   Okay.  So we left off we were looking at Joint Trial

2    Exhibit 9, which was the redacted phone records, and

3    Defendants' Exhibit 9, which is the unredacted cell phone

4    records and going through kind of your thought process in

5    choosing which numbers to redact for January 5th and

6    January 6th.

7            So now that we have those numbers -- we have the

8    records next to each other, and we know now that the number of

9    (630) 730-2196 -- that's your cell phone number, correct?

10   A.   Correct.

11   Q.   So if we look at January 5th, you did not redact that call,

12   correct?

13   A.   No.

14   Q.   And also there was a call at 8:48 p.m., and that was

15   another call to your cell phone, correct?

16   A.   Correct.

17   Q.   You did not redact that number.

18   A.   No.

19   Q.   On Monday, January 6th, we've got your number, again, at

20   11:16.  You did not redact that call.

21   A.   Correct.  It's hard to see because there's a bunch of black

22   shading on that side.  But it doesn't appear that there is.

23   Q.   And there's also calls to your number at 11:32 and

24   3:28 p.m., correct?

25   A.   Correct.

J. Warren - Cross by Bruch

1    Q.   And the 3:28 p.m. is not redacted, correct?

2    A.   Correct.

3    Q.   But the 11:32 is.

4    A.   Correct.

5    Q.   Okay.  Let's talk about the other calls.

6            So the first call for January 5th, that's the

7    (773) 818-0728.  Do you know whose number that is?

8    A.   No.

9    Q.   The next one is (630) 636-4636.  Did you know who that is?

10   A.   No.

11   Q.   Then we've got (630) 308-4878.  That's your mother-in-law,

12   right?

13   A.   My mom, yes.

14   Q.   Or I'm sorry.  Your mom.

15           And then the next number is not redacted.  And that's

16   to (630) 244-8328.

17   A.   Correct.

18   Q.   And then that same 8328 number, that shows up again on

19   Monday, January 6th, at 8:20, correct?

20   A.   Correct.

21   Q.   And that's not redacted.

22   A.   No.

23   Q.   And then the number at 8:25 on the 5th, that is to your

24   mother, correct?

25   A.   Let's see.  Correct.

J. Warren - Cross by Bruch

1  Q.  Okay.  Then let's go to the 6th.  There do you see any

2  calls to your mother?

3  A.  No.

4  Q.  Then on the 6th, though, we see (630) 553-7500 a number of

5  times.  That is not redacted, correct?

6  A.  Correct.

7  Q.  And at the time, you didn't know what that number was.

8  A.  Nope.

9  Q.  So if I were to represent to you that the only numbers that

10 you did not redact on January 5th and January 6th are numbers

11 to Commander Jennings' cell phone and the Kendall County

12 Sheriff's Office, as well as your cell phone, would that --

13 would you agree with that?

14 A.  No, because I don't know who Commander Jennings' cell phone

15 number is.

16 Q.  Just assume for this question that the only numbers besides

17 yours that were not redacted were to Commander Jennings' cell

18 and the Sheriff's Office.  Can you come up with any reasonable

19 explanation why those would be the only numbers that weren't

20 between you and your wife that you chose not to redact?

21 A.  No.  Like I said, there's no rhyme or reason to why I

22 picked the numbers I did.

23 Q.  Would you agree with me that it's extremely coincidental

24 that the only numbers, especially for January 5, that you

25 didn't redact would be a number to Commander Jennings?

1          MS. DORAN:  Objection.

2    BY MS. BRUCH:

3    Q.  Or call to Commander Jennings.

4          MS. DORAN:  Argumentative.

5          THE COURT:  Sustained.

6    BY MS. BRUCH:

7    Q.  I just want to make sure we are absolutely clear that you

8    did not have assistance from anyone in determining which

9    numbers to redact.

10   A.  Correct.

11   Q.  This was totally done by you.

12   A.  Correct.

13   Q.  And you're certain that you never had a conversation with

14   your wife regarding which numbers she thought should be

15   redacted and which shouldn't.

16   A.  Correct.

17   Q.  Can you explain to us then -- you redacted this number at

18   11:32.  That was a call that your wife made to you, right?

19   A.  11:32?

20   Q.  11:32.

21   A.  It doesn't say incoming.

22   Q.  Was it -- so --

23   A.  I'm not sure if it was to me or I called her.

24   Q.  But you redacted it, though.

25   A.  Yes.

J. Warren - Cross by Bruch

1   Q.  And you knew that at the time that you redacted it that

2   your wife's calls made between the morning of jury service and

3   the time that she reported to work was an issue as part of the

4   investigation, right?

5              MS. DORAN:  Objection.  Asked and answered.

6              THE COURT:  Sustained.

7   BY MS. BRUCH:

8   Q.  Mr. Warren, isn't it true that before you redacted these

9   phone records, you and your wife saw that the records for

10  January 6 saw no incoming -- showed no incoming calls?

11  A.  Can you repeat that?

12  Q.  Sure.  Isn't it true that before you redacted these

13  records, you and your wife knew that those phone records did

14  not show any redacted -- any incoming calls?

15  A.  I wasn't aware of that.

16  Q.  Isn't it true that before you redacted these records, you

17  and your wife agreed that you would try to protect her from

18  being disciplined by redacting the call that was made to you on

19  January 6th after you left the -- after she left the courthouse

20  to make it look like the travel agent had called her and you

21  just wouldn't let the Sheriff's Office see the unredacted

22  records?

23  A.  No.

24  Q.  So are you denying that there was any discussions between

25  you and your wife to mislead the Sheriff's Office?

J. Warren - Redirect by Doran

1   A.  Correct.

2   Q.  Are you denying that you redacted the call to you on

3   January 6th, and that was done in an effort to help your wife

4   perpetuate a lie?

5   A.  Correct.

6          MS. BRUCH:  Nothing further.

7          THE COURT:  All right.  Redirect.

8                  REDIRECT EXAMINATION

9   BY MS. DORAN:

10  Q.  Hi, Jeff.

11         Were you angry when you were redacting your bill?

12  A.  Yes.

13  Q.  I'm going to pop up on the screen here this Defense Exhibit

14  No. 9.

15         Can you think of any reason why the defendants would

16  have been entitled to see the calls made on December 31st?

17  A.  No.

18  Q.  How about the calls made on January 2nd?

19  A.  No.

20  Q.  The calls made on January 3rd?

21  A.  No.

22  Q.  The calls made on January 4th?

23  A.  No.

24  Q.  The calls made on January 5th?

25  A.  No.

Mallon - Direct by McLaughlin

1          MS. DORAN:  No further questions.

2          THE COURT:  All right.  Any additional cross?

3          MS. BRUCH:  No, your Honor.

4          THE COURT:  All right.  Are there any questions of the

5     jury of this witness?

6       (No response.)

7          THE COURT:  I see no hands.

8          So, sir, you're excused.  Thank you.

9          THE WITNESS:  Thank you.

10         THE COURT:  All right.  Please call your next witness.

11      (Witness enters the courtroom.)

12         MS. McLAUGHLIN:  Your Honor, the plaintiffs call

13    Jennifer Mallon.

14         THE COURT:  All right.

15         Ma'am, please raise your right hand.

16      (Witness duly sworn and takes the stand.)

17         THE WITNESS:  I do.

18         THE COURT:  All right.  Have a seat.

19         And you may begin.

20           JENNIFER MALLON, PLAINTIFF'S WITNESS, SWORN

21                      DIRECT EXAMINATION

22    BY MS. McLAUGHLIN:

23    Q.  Okay.  Ms. Mallon, would you state and spell your last name

24    for the record.

25    A.  Mallon.  It's M-A-L-L-O-N.

Mallon - Direct by McLaughlin

1    Q.   Okay.  First name Jennifer?

2    A.   Yes.

3    Q.   Okay.  And where do you live?

4    A.   Des Moines, Iowa.

5    Q.   And how do you know Melissa Warren?

6    A.   About -- it's been about 25 years ago, she moved to

7    Des Moines with her ex-husband, and we worked together.

8    Q.   Okay.

9    A.   And became very close friends.

10   Q.   Okay.  So when Melissa lived in Iowa, did you do things

11   together?  Tell me about that friendship.

12   A.   We had a lot of fun.  We rode motorcycles.  My ex-husband,

13   we had WaveRunners and things.  We just did outside activities

14   a lot.  And we went on trips together and just, you know,

15   things that friends do, close friends.

16   Q.   And did you see each other -- when you say you worked

17   together, did you socialize together regularly as well?

18   A.   Uh-huh, all the time.

19   Q.   Okay.

20   A.   All the time.

21   Q.   And then there came a time when she moved away from Iowa?

22   A.   Mm-hmm.

23   Q.   You still live in Iowa, correct?

24   A.   I still live in Iowa, yep.

25   Q.   Okay.  Okay.  So when she moved away from Iowa, how did

Mallon - Direct by McLaughlin

1    that affect your friendship?

2    A.   We -- we just didn't see one another, but we talked pretty

3    much every day.  Every day.

4    Q.   Okay.  And has that continued throughout the 25 years of

5    your friendship?

6    A.   Yes, it has.  There might be a period where she's got a lot

7    going on or perhaps I do where we might not talk for a week or

8    so.  But we talk pretty much every day.

9    Q.   Okay.  So tell me.  How would you describe your friend

10   Melissa Warren?

11   A.   I really -- I admire Melissa very much.  She's a really --

12   she's a very strong person.  She has high standards for herself

13   and for her friends.  She's one of my most honest friends.  Put

14   me in place -- put me in my place when needed.  And she's just

15   a really strong person.

16   Q.   Okay.  Would you describe her as outgoing?

17   A.   Very much so, yes.

18   Q.   Is she a fun person to be around?

19   A.   Very much.

20   Q.   So tell us -- so, obviously, you were aware of when she got

21   her job at the --

22   A.   Yeah.

23   Q.   -- Sheriff's Office.  Tell us about how she felt about

24   becoming a Sheriff Deputy.

25   A.   She was so proud of herself.  She had always been a server

Mallon - Direct by McLaughlin

1    or -- it all surrounded not going to college, and she was very

2    proud of becoming a Sheriff and having that as a career and

3    proud of what that meant I think to others, perhaps even more

4    than herself.  I don't -- I'm not -- I can't say that,

5    obviously, but that's how it felt to me.  And I was happy for

6    her.

7    Q.  Did she talk to you a lot about her job?

8    A.  Yes.

9    Q.  Did she talk about the ups and downs, or how did -- what

10   things did she talk about?

11   A.  There were just -- she -- there were many things that she

12   enjoyed.  She actually enjoyed the -- I don't know if inmates,

13   prisoners, you know, bringing them meals.  She'd talk about the

14   things that she enjoyed a lot.

15          But then there were a lot of things that would go on

16   internally.

17   Q.  Okay.  So like any job, there's ups and downs.

18   A.  Right, exactly.

19   Q.  And so -- but overall, would you characterize her

20   experience or her job that she enjoyed her job?

21   A.  Very much so.

22   Q.  When she found out that she might be -- that she was

23   charged with these allegations of -- on January 6th of 2014,

24   when she found out about these charges, that she was alleged to

25   have caused a disturbance in the courthouse and that she had,

Mallon - Direct by McLaughlin

1   you know, purposely brought in the cell phone against the rules

2   and that she was trying to get out of jury duty, did you talk

3   with her at that time about what was -- about her feelings?

4   A.  Yes, we talked about it.

5   Q.  And how was she feeling then?

6   A.  She felt terrible.  She -- it was -- it was almost -- it

7   was unbelievable.  She were planning on -- we did -- a group of

8   us went on a trip.  We went with eight people.  And our

9   husbands went.  But her -- leading up to the trip, the whole --

10  it just surrounded that, the courtroom and the cell phone.  And

11  it just seemed almost silly.  I -- I mean, I couldn't

12  understand.  But, yeah, she talked to me a lot about it.

13  Q.  Okay.  And she was upset over this, right?

14  A.  Very much so.

15  Q.  So when it finally came to a point where she was accused of

16  lying, did she talk with you about that?

17  A.  Yes.

18  Q.  What was her reaction to being accused of purposely

19  deceiving the KCSO?

20  A.  She couldn't believe it.  It was -- it's so out of

21  character for something she wouldn't do.

22          And I -- to this day, I still can't understand what it

23  was all about.  It was -- it's -- it's so out of character,

24  first of all.  And, second of all, I don't -- personally I

25  don't know what the, quote/unquote, lie was.

Mallon - Direct by McLaughlin

1   Q.  Okay.  So when she was terminated --

2   A.  Mm-hmm.

3   Q.  -- what changes did you notice in your friend at the time

4   that she was terminated?

5   A.  Just we don't -- you can't talk to her where she's mentally

6   present often.  She obsesses over it.  It's getting better.

7   But there was a long period where I -- you didn't have your

8   friend --

9   Q.  Let's talk about that first, you know, few months, you

10  know.  Or how long did that last in terms of, you know, when

11  you would say that she wasn't there?

12  A.  Probably a year.

13  Q.  Okay.

14  A.  I don't know.

15  Q.  And tell us about what you observed in her demeanor at that

16  time.

17  A.  She just didn't go anywhere.  She didn't change her

18  clothes.  She didn't -- we would talk, and she would say, "I

19  can't believe what a mess my hair is," or just she took no

20  personal care and sat in a room.

21  Q.  Did she -- would you describe her as a person who has a lot

22  of self-confidence?

23  A.  Yes, I would.

24  Q.  Did this termination affect her self-confidence?

25  A.  Yes, it did, very much.

Mallon - Direct by McLaughlin

1   Q.   How so?

2   A.   She's just not -- she -- again, she's getting better, but

3   she wasn't outgoing.  She couldn't laugh and joke and do the

4   things that she used to do because I think she felt less than.

5   Q.   During that first year after she lost her job -- so was

6   there a change in her outgoingness?

7   A.   Oh, very much, yes.

8   Q.   Okay.  Did you --

9   A.   She lost a lot.

10  Q.   Did you try to encourage her to get out and do things?

11  A.   Yes, I did.

12  Q.   Do you recall if you visited her during that time?

13  A.   No.  She didn't want anyone to come here.  And I think

14  there was just a lot of conflict going on at home.  And I just

15  felt like it was most important that she take care of her

16  daughter.  And she didn't want anyone to come.

17  Q.   Okay.  So how -- what did you observe with respect to

18  her -- how she felt with respect to her daughter Megan?

19  A.   She's always been a wonderful mom.  And Megan's their only

20  child.  And she -- she is a wonderful mom.  She just -- I -- I

21  don't think she was present mentally a lot for Megan during --

22  during that period.

23  Q.   Did she cry when she was on the phone with you?

24  A.   Yes.

25  Q.   Is she typically a crier?

Mallon - Direct by McLaughlin

1    A.   No.

2    Q.   Do you know if she was exercising?

3    A.   No, she wasn't doing anything.

4    Q.   Did you try to encourage her to do so?

5    A.   Yes.

6    Q.   Were you concerned about her emotional health?

7    A.   Very much concerned I was.  I was concerned how she shut me

8    down or shut me out when I tried to help.  And I -- it's a --

9    it's a closed off where you can't get through.

10   Q.   Have you gone on any vacations together since the trip to

11   Cancun right before she was terminated?

12   A.   No.

13   Q.   Have you tried to talk her into going on vacation?

14   A.   We will again.  But it's not -- it's not time yet.

15   Q.   Okay.  Was she concerned about money?

16   A.   Yes, very much so she's concerned about money.  She works

17   two jobs, and most of the time she doesn't have a day off

18   regardless.  So we're -- we'll wait.  That day will come again.

19   Q.   How do you -- how did you observe this termination

20   affecting her pride?

21   A.   It devastated her.  She had always her -- her home life,

22   her yard, her home.  She takes so much pride in all of those

23   things.  And her -- her ability to cope with just the

24   day-to-day, everything went down, just rock bottom.  So she

25   didn't -- her pride, she didn't have any, none.

Mallon - Direct by McLaughlin

1    Q.  Did you ever talk to Jeff about --

2    A.  No.

3    Q.  -- things?

4    A.  No.  Jeff doesn't want to talk.

5    Q.  Okay.

6    A.  Not at all.

7    Q.  Is there anything else that you tried to do to cheer her

8    up?

9    A.  I sent her gifts in the mail and just called a lot, sent

10   cards.  Anything that you can do as a friend to try and help.

11   Q.  Is there anything else that you wish to tell us about how

12   she was then -- how she was previously versus how -- how she

13   was after she was terminated?

14   A.  She was just the most outgoing, confident person that I

15   ever knew.  And she had a lot of trust in people.  And not --

16   not anymore.  Things have changed.  But, again, she's -- it's

17   going to get better.

18   Q.  Well, you said that you've seen a little improvement.  When

19   did you start to see improvement?

20   A.  About a year ago.

21   Q.  Okay.  And that's when she got the job in the granite

22   industry.

23   A.  Yes, mm-hmm.

24   Q.  Okay.  So financially things were better?

25   A.  Yes.  She works every day.

732

Mallon - Cross by Bruch

1    Q.   Okay.

2    A.   And the evenings as a waitress, or a server.  I don't know.

3         MS. McLAUGHLIN:  Thank you very much.  No further

4    questions.

5         THE COURT:  All right.  Any cross-examination?

6         MS. BRUCH:  Yes, your Honor.

7         THE COURT:  Go ahead.

8                      CROSS-EXAMINATION

9    BY MS. BRUCH:

10   Q.   Ms. Mallon, you talked about how you and Ms. Warren speak

11   on the phone every day, right?

12   A.   Well, yes.

13   Q.   And do you -- did you speak with her on January 6th, the

14   date of her jury duty?

15   A.   I honestly -- I don't believe I did.  But I don't -- I

16   could not answer that.

17   Q.   Did you and Ms. Warren ever have any conversations where

18   she asked you, "Hey, do you remember I called you on that day?"

19   A.   No.

20   Q.   Did you ever say to her, "I remember calling her on that

21   day"?

22   A.   No.

23   Q.   That never happened.

24   A.   Not that I'm aware of.

25   Q.   You said that when you speak with her that you talked about

Mallon - Cross by Bruch

1    the charges.  Was that at the time when she was still employed

2    by the Sheriff's Office?

3    A.   Yes.  I believe so.  I'm not positive of when she got

4    fired.  It was after we came back from vacation, so yeah.

5    Q.   So you all went to Cancun together?

6    A.   Right.

7    Q.   And at the time that you went to Cancun, she was under

8    investigation but had not been terminated yet, correct?

9    A.   Correct.

10   Q.   So was that a topic of conversation during your vacation?

11   A.   It was short because we had a full group of people that

12   were -- that's not what you went on vacation to talk about.

13   Q.   Before you left for vacation, had that been a topic of

14   conversation between you and Ms. Warren?

15   A.   Minimally.  I don't -- when you're -- okay.  We had talked

16   about what happened, but -- so I want to be clear.  When you're

17   saying "charges," I'm not sure that I would have ever

18   understood.  I still don't really understand the charges aspect

19   or what goes on with all of those types of things, you know, in

20   employment with the Sheriff.

21   Q.   Did Ms. Warren ever talk to you about the circumstances

22   surrounding her leaving the courthouse after she had jury duty

23   on January 6th, 2014?

24   A.   Not to anything other than it was snowing and -- no.

25   Q.   What did she tell you about that jury duty situation?

Mallon - Cross by Bruch

1    A.  That she brought a cell phone in the courtroom.  And my

2    understanding was that she -- they -- the claim was that she

3    caused a ruckus or tried to get out of jury duty in some

4    manner.  That's --

5    Q.  Did she ever discuss with you whether she was released for

6    lunch and had to return to the courthouse?

7    A.  Whether she was released -- I know she was released for

8    lunch and went to McDonald's.  But I don't know about --

9    anything about returning to the courthouse, no.

10   Q.  So she talked to you about she went to McDonald's.

11   A.  Mm-hmm.

12   Q.  Is that yes?

13   A.  Yes, that is a yes.

14   Q.  And when did she tell you she went to McDonald's?

15   A.  I can't answer that with a degree of certainty.  I mean,

16   after the -- the jury duty.

17   Q.  And did she tell you that she had gone to McDonald's before

18   she was terminated or after she was terminated?

19   A.  I can't answer that.  I don't -- I don't think she got

20   terminated that day.

21   Q.  Well, I'm just curious, though.  She mentioned that she

22   went to McDonald's.  Is that a typical conversation that you

23   and Ms. Warren had about, "Hey, what did you have for lunch

24   today?"

25   A.  Well, she goes -- yeah, she goes through a lot of

Mallon - Cross by Bruch

1    drive-throughs.  That kid, yeah.

2    Q.  Yeah.

3    A.  They're at the drive-through more than any other people I

4    know.

5    Q.  And what other places did she tell you she went through the

6    drive-through that week?  Not -- just not anytime, but just

7    that week of January 6th.  What other place did she go through

8    the drive-through?

9    A.  I can't recall.

10   Q.  Do you remember her talking about going to the

11   drive-through in Taco Bell that week?

12   A.  I can't recall.

13   Q.  Or Wendy's?

14   A.  I cannot recall.  I would --

15   Q.  Burger King?

16   A.  I don't know.

17   Q.  Any particular reason why this McDonald's sticks in your

18   mind from that day?

19   A.  Well, because it's been something that's involved with

20   this.  And so because that's -- she talks about it because it's

21   involved with this situation.

22   Q.  And that's why I'm trying to figure out when she talked to

23   you about the McDonald's.  Did she talk to you about it the

24   time frame that she went through McDonald's?  Did she talk to

25   you about it before you went to Cancun?  When was this?

Mallon - Cross by Bruch

1  A.  No, it was when this all started.

2  Q.  So when --

3  A.  The termination.  I would think.  I'm -- I'm going to be

4  honest with you.  I have no idea when she first talked about

5  it.

6  Q.  What did she tell you?  What was her story about

7  McDonald's?

8  A.  It -- it's not as specific as I think you're trying to ask

9  because I know that it has something to do with this whole

10  situation.  But I -- I really -- I don't know what you're

11  trying to ask.  I don't --

12  Q.  Well, when she was talking about it, she said to you, "I

13  was going through the drive-through at McDonald's," right?

14  A.  Mm-hmm.

15  Q.  Is that yes?

16  A.  Yes, that's a yes.

17  Q.  And did she say to you, "And I received a phone call"?

18  A.  Phone call, yeah.  I know --

19  Q.  From who?

20  A.  The travel agent.

21  Q.  And when did she tell you she received the phone call from

22  the travel agent?

23  A.  Ooh.  I don't know.

24  Q.  Did she ever tell you that she received a phone call from

25  the Court?

Mallon - Cross by Bruch

1    A.  No, I don't know.  I can't.  I don't know.

2    Q.  What did she tell you about what the travel agent said to

3    her when she got the call?

4            MS. McLAUGHLIN:  Your Honor, at this point I'm going

5    to object.  This whole line of questioning is totally beyond

6    the scope of direct.

7            THE COURT:  Overruled.

8            THE WITNESS:  I don't -- what did she tell me about --

9    say that again.

10   BY MS. BRUCH:

11   Q.  Sure.  When she told you about getting a call from the

12   travel agent, what did she say the travel agent said to her?

13   A.  I can't -- I seriously cannot remember.  Anything I say is

14   a guess, but I think it was that the times were changing.  I --

15   I can't remember.

16   Q.  Do you remember if she told you about the travel agent

17   before you went to Cancun, during Cancun, or after Cancun?

18   A.  Before.

19   Q.  And so you went to Cancun when?

20   A.  In March.

21   Q.  And what day?  Do you remember what day in March you went

22   to Cancun?

23   A.  No, I don't.  It would have been the first of March.

24          Before my birthday.  Okay?  My birthday is March 13th.

25   It would have been before that.

Mallon - Cross by Bruch

1    Q.   When you spoke with Ms. Warren about this travel agent, did

2    she tell you that she had any conversation with the travel

3    agent?

4    A.   Yes.

5    Q.   And what did she tell you about that?

6    A.   I think it was that the times changed, but I can't -- I

7    can't remember.  I'm sorry.  I cannot remember.

8    Q.   What about did she tell you that she had a follow-up

9    conversation with the travel agent, asking her to prepare an

10   e-mail for her?

11   A.   I can't remember.  I don't.

12   Q.   When you were discussing this investigation with

13   Ms. Warren, you mentioned on direct that you -- that she was

14   talking to you about the charges.  Is that accurate?

15   A.   Mm-hmm.

16   Q.   Is that yes?

17   A.   Yes.

18   Q.   And what charges did she talk to you about?

19   A.   Oh, God.  I don't know.  I don't know what -- I don't know.

20   Q.   But you did talk with her about her cell phone?

21   A.   Her cell phone?

22   Q.   Being in the courtroom.

23   A.   Yes.  And I know that it had something to do with the

24   travel agent calling her.  I -- the level of detail that you're

25   going to, I don't know the answer about those specifics.  I

1  don't -- I didn't get into that.

2  Q.  I'm just curious because, you know, you were talking about

3  how when this was going on, this was a big deal to Ms. Warren,

4  right?

5  A.  It was.

6  Q.  And you talked to her every day, right?

7  A.  I -- yeah.  I supported her, but I don't -- I didn't

8  memorize the details of this case.  I'm her friend and I

9  listened, but I didn't -- I have a job and I have a life, and

10  I -- those details are not -- I didn't write them down or keep

11  track of them.

12  Q.  You mentioned during direct that you talk with her about

13  how she was accused of lying.  Is that true?

14  A.  I know, yeah.

15  Q.  And do you have an understanding of what she was accused of

16  lying about?

17  A.  No, I really don't.

18  Q.  Have you ever come to learn what Ms. Warren was accused of

19  lying about?

20  A.  No, I have not.

21       MS. BRUCH:  Okay.  Nothing further.

22       THE COURT:  All right.  Any additional direct?

23                    REDIRECT EXAMINATION

24  BY MS. McLAUGHLIN:

25  Q.  Is it your recollection that she was very upset about being

740

Mallon - Redirect by McLaughlin

1   accused of lying?

2   A.  Yes.  And I think she lied -- or what they're saying she

3   lied about was the time it took to get back to work.  I wish I

4   had a better -- I'm there to support her.  But the -- to get in

5   at that level, I didn't.

6   Q.  You didn't help her get into the nitty-gritty of the

7   evidence, right?

8   A.  No, because I didn't want to talk about it.

9   Q.  Okay.

10          MS. McLAUGHLIN:  All right.  Nothing further.

11          THE COURT:  Anything else?

12          MS. BRUCH:  No, your Honor.

13          THE COURT:  Are there any questions of the jury of

14  this witness?

15      (No response.)

16          THE COURT:  All right.  I see no hands.

17          Ma'am, you're excused.  Thank you.

18          All right.  Please call your next witness, or recall

19  the plaintiff if that's your next witness.

20          MS. McLAUGHLIN:  We will be recalling the plaintiff,

21  your Honor.

22          THE COURT:  All right.

23          And, ma'am, you're still under oath.

24          THE WITNESS:  Okay.

25          THE COURT:  All right.  You may continue.

1    CARRIE MELISSA WARREN, PLAINTIFF HEREIN, PREVIOUSLY SWORN

2              DIRECT EXAMINATION (Resumed)

3    BY MS. McLAUGHLIN:

4    Q.  So when we ended off on Friday, we were -- we had moved up

5    to January 14th and were talking about you writing up your

6    report.  But I'm going to go back for just a moment.

7           When called into the commander's office on

8    January 14th and you hear from her that she wants to talk to

9    you about what happened during jury duty, what's the first

10    thing that enters your mind?

11    A.  Well, I was shocked.  I was trying to make out the charges

12    that she presented to me.

13    Q.  Oh, before you even got the charges.  You just find out

14    it's something about jury duty.  What's the first thing that

15    enters your mind?

16    A.  I'm reading over the charges, and I'm thinking getting out

17    of jury duty.  And I thought did I not finish my jury duty?  I

18    mean, I was trying to just make sense as to the charges and

19    what was being accused to me.

20           I really didn't know what to really think.  I just

21    knew that I was -- I felt like I was being set up.

22    Q.  Did you have any idea on that day when you were first shown

23    the charges -- did you have any idea who might be making these

24    accusations about making a disturbance when you entered or

25    trying to get out of jury duty or -- did you have any idea who

742

C. Warren - Direct by McLaughlin

1    was making those charges?

2    A.  No.  That wasn't provided to me.

3    Q.  Did you ask?

4    A.  I could have.  I'm -- it would make sense that I would.

5    But I'm not sure now.  It's been a while.

6    Q.  And how long was this conversation with Commander Jennings

7    on January 14th?

8    A.  It wasn't a long conversation because she was in the

9    process of leaving for her day.  And it was a presentation of

10   the charges, and then she briefly asked me some questions and

11   then she required me -- she gave me an order to write a memo

12   for my statements in response to those charges.

13   Q.  And at any time during that initial conversation with her,

14   did you apologize for bringing the cell phone in?

15   A.  Oh, of course.  I didn't know that that was a violation.

16   And, quite frankly, she didn't either.  She was just presenting

17   the charges at that time.

18   Q.  So going back one more thing that I forgot to ask you on

19   Friday.  Did you -- is it your habit to turn off your phone at

20   night while it's charging?

21   A.  No.

22   Q.  Was your phone turned off on the morning of January 6th,

23   2014?

24   A.  No.

25   Q.  Okay.  So you were asked to write a report.  And I believe

C. Warren - Direct by McLaughlin

1    that you said that Deputy Little said you were rambling, and so

2    you edited it.  Correct?

3    A.  Correct.

4    Q.  Okay.  So Rick Stomper is in the business office of the

5    FOP, correct?

6    A.  Correct.  He's, I believe, located downtown, I believe, at

7    whatever the FOP office is located.  But I'm not sure exactly

8    where.

9    Q.  Is he an attorney?

10   A.  Honestly, I don't know.  I don't think he ever said he was,

11   but I don't know what his background is.

12   Q.  Did you contact Stomper before or after you received your

13   notice of formal interrogation?

14   A.  I contacted him before my interrogation when I received the

15   charges.

16        (Counsel conferring.)

17            MS. McLAUGHLIN:  I'm sorry, your Honor.

18            I just want to verify the admission of the documents

19   that we gave you.

20            MS. BRUCH:  Yes.

21            MS. McLAUGHLIN:  Okay.

22   BY MS. McLAUGHLIN:

23   Q.  Okay.  So I believe Joint 12 has already been admitted.

24            THE COURT:  Joint what?

25            MS. McLAUGHLIN:  12.

1        MS. ANDERSON:  No, it hasn't.

2        THE COURT:  It has not.

3        MS. McLAUGHLIN:  Okay.

4        THE COURT:  Is there any objection?

5        MS. BRUCH:  No, your Honor.

6        THE COURT:  Joint 12 is admitted.

7      (Joint Exhibit 12 admitted in evidence.)

8        THE COURT:  You may display it.

9   BY MS. McLAUGHLIN:

10  Q.  All right.  So this is Joint 12.  And it appears to be

11  dated January 24, 2014.  And it is -- do you recognize this

12  document?

13  A.  I do.

14  Q.  Okay.  And it informs you -- Commander Jennings informs you

15  that she's recommending discipline greater than an unpaid

16  suspension of three days, correct?

17  A.  Correct.

18  Q.  And then you have the -- you're notified that it's set for

19  1/29 of 2014, this formal interrogation, correct?

20  A.  Correct.

21  Q.  Had you ever been formally interrogated before?

22  A.  No.  I don't know too many that have.

23  Q.  Okay.  So when you received this notice of interrogation --

24  formal interrogation, was there also a Notice of Charges

25  attached?

C. Warren - Direct by McLaughlin

1   A.   It was the same charges that was given to me when she first

2   pulled me into the office.

3   Q.   All right.  So that notice said January 29th.  Did it go --

4   did the formal interrogation go on that day?

5   A.   No, it did not.

6   Q.   And why was that?

7   A.   They were dealing with Deputy Brennan, I believe, on that

8   day or --

9   Q.   Okay.  Was there an agreement between Stomper and Jennings

10  to reschedule the date?

11  A.   Yes.  There were some e-mails.  I'm not sure of the exact

12  dates on those or what was exactly said between the two.  But I

13  know that there was numerous e-mails in conjunction with

14  setting up the time for the interrogation.

15  Q.   So all right.  We get to the day of the formal

16  interrogation.  It's February 5th, correct?

17  A.   Correct.

18  Q.   And it's approximately 3:00 in the afternoon?

19  A.   Yes.

20  Q.   And who all is present?  At least initially.

21  A.   Initially, it was myself and Deputy Little -- my union

22  steward -- Tracy Page, Deputy Commander Gillespie, and

23  Commander Jennings.

24  Q.   And where does this take place?

25  A.   Upstairs in the Sheriff's Office conference room.

C. Warren - Direct by McLaughlin

1  Q.  And where is Stomper?

2  A.  He hadn't gotten there yet.

3  Q.  So what happened?

4  A.  They proceeded not to wait for him.  And they started the

5  proceedings without him.

6  Q.  Did Sabrina Jennings give you an opportunity to call him

7  and find out what his ETA was?

8  A.  She asked -- she asked us where he was at, and we stated

9  that he was en route.  But there was no opportunity to actually

10  give him a call.

11  Q.  Okay.  Did she call him and ask him where -- what his ETA

12  was?

13  A.  No.  Her main focus was to start the interrogation.

14  Q.  Did she request your permission to start without him?

15  A.  I don't think she requested my permission.  She stated that

16  she was in charge of this investigation and that they were

17  going to proceed without Stomper.

18  Q.  Did you feel that you had -- did you feel you had any

19  choice in the matter?

20  A.  No.

21  Q.  Was this session being recorded, this earlier -- when you

22  started without Stomper?

23  A.  No.

24  Q.  Did Commander Jennings indicate at the beginning of this

25  interrogation that it would be recorded?

1   A.  She could have, but I'm not definite on that.

2   Q.  What was Tracy Page doing during this time before Stomper

3   got there?

4   A.  She was -- she was present.  She was sitting next to Deputy

5   Commander Gillespie, and she was taking notes.  I'm trying to

6   remember if there was a recording device there.  I don't

7   believe that there was.

8          But, yeah, I don't remember seeing a recording device

9   at that moment.

10  Q.  Okay.  So you start.  Do you recall what is said or asked

11  of you?

12  A.  A brief -- she started with the interrogation questions

13  that was presented earlier in the recording.

14  Q.  She had a list of questions?

15  A.  She did.

16  Q.  So during that first few minutes of the interrogation when

17  you -- when Stomper wasn't there, how would you describe how

18  that interrogation was going?

19  A.  Well, it wasn't friendly.  Pretty -- pretty intimidating is

20  a good word to put it.

21  Q.  Were you trying to explain your answers?

22  A.  Yes, but I was unable to.  She wanted yes-or-no answers.

23  Q.  So you're a few minutes into this interrogation and

24  Mr. Stomper appears, correct?

25  A.  Correct.

1    Q.   So what happens then between Stomper and Jennings?  What

2    happens then?

3    A.   Richard Stomper entered into the conference room and made a

4    statement like, "What?  You're starting without me?  You can't

5    start without me.  You knew I was going to be here.  Why are

6    you interrogating my client?"  Something along that line, in

7    generalization type terms.  And she made the statement along

8    the line of, well, she was almost done.

9           And that's when he said to me if I wanted to have a

10   brief meeting with him because that was the first time I'd

11   actually met him.

12   Q.   Okay.  So then you took a break?

13   A.   We did.

14   Q.   So without telling me what he said to you, what did you

15   tell Stomper about what was going on while he wasn't there?

16   A.   I informed him that I couldn't give exact answers.  I felt

17   that they were open-ended questions that I could not adequately

18   give yes-or-no answers to.  They were pretty much compound

19   questions that I couldn't answer with yes or no.

20   Q.   Okay.  And what did Commander Jennings and Gillespie and

21   Tracy Page, what did they do during the break?  Do you know?

22   A.   They were up and moving around.  I didn't take notes on

23   them.  I was having a meeting with Richard Stomper in regards

24   to the charges and what had transpired in the room prior to him

25   getting there.

C. Warren - Direct by McLaughlin

1    Q.   Okay.  So then you resume again and -- well, we've heard

2    the tape here in court.  Is that what happened?

3    A.   Yes.

4    Q.   So the next thing that occurs after that is you get a

5    notice of pre-disciplinary hearing, correct?

6    A.   Yes.

7    Q.   And that is Joint 10.

8          MS. McLAUGHLIN:  Is that admitted?

9          MS. ANDERSON:  Admitted, yes.

10   BY MS. McLAUGHLIN:

11   Q.   Okay.  And so this is from Chief Koster, Joint 10.  Here we

12   go.  It's from Chief Koster to you.  And it says you're to

13   appear before Sheriff Randall for a pre-disciplinary hearing on

14   Thursday, February 20th.  And along with this notice, you are

15   being provided copies of all pertinent documents that make up

16   the foundation for which the discipline is being contemplated.

17          Did you receive a packet of information at that time?

18   A.   We received -- when you say "packet of information," are

19   you talking about statements from other people in regards to my

20   actions at the courthouse?

21   Q.   Correct.

22   A.   We -- I believe I received those on the 13th.

23   February 13th, I believe.

24   Q.   Well, that's the date that this memo was sent to you.

25   A.   Oh, okay.

1    Q.  Okay.  So good memory.

2    A.  I thought that was on the 20th.  Sorry.  I was reading his

3    memo.

4    Q.  Okay.  All right.  So you get a packet of information.  So

5    for the first time, you're seeing documents to support the

6    charge, correct?

7    A.  Correct.  Yeah, on the 13th is when we received those

8    documents.

9    Q.  Okay.  So what all was in there?

10   A.  That's the first time that we saw the statements in regards

11   to my actions at the courthouse, the complainants, the people

12   that were bringing the complaints against me.  But there -- we

13   noticed that there were a few that were missing.

14       (Counsel conferring.)

15   BY MS. McLAUGHLIN:

16   Q.  So did you actually receive Commander Jennings' internal

17   report?  I'll show you briefly what that is.

18            Joint Exhibit 3, the summary of the investigation.  Do

19   you recall receiving that at that time, on February 13th of

20   2014?

21   A.  That -- that came later on.

22   Q.  Okay.  So to the best of your recollection, you only

23   received the attachments, the various memos from all the court

24   deputies, et cetera?

25   A.  Correct.

C. Warren - Direct by McLaughlin

1   Q.   Okay.

2   A.   There was a packet of their statements in regards to what I

3   said and my behavior at the courthouse.

4   Q.   So who was with you when you reviewed these documents?

5   A.   Richard Stomper was there, and Deputy Little was also

6   there, my union steward.

7   Q.   So you review these documents and you see for the first

8   time that there are deputies at the entry saying that you are

9   loud and abrasive and an embarrassment, and you have Judge

10   Pilmer's memo and Chris Phillips's statement about what you

11   supposedly said during the jury selection process, and you had

12   the summons and the sign, the tape recording.

13          Did you also have Tracy Page and Lisa Bowen's

14   statements about you telling them that you had to return to the

15   courthouse and that you'd only been dismissed for lunch?

16   A.   I believe that was in the packet on those, yes.

17   Q.   Okay.  So what is your reaction to this entire thing?

18   A.   Shock, set up.  I need to prove that I didn't do these

19   things.  It was -- Stomper was -- at that point mentioned that

20   something's not right --

21          MS. BRUCH:  Objection.  Hearsay.

22          THE WITNESS:  -- so we got the --

23          THE COURT:  Sustained.

24          THE WITNESS:  -- transcripts.

25          THE COURT:  Sustained.

C. Warren - Direct by McLaughlin

1   BY MS. McLAUGHLIN:

2   Q.  Okay.  So --

3        THE COURT:  The reference to what Stomper said is

4   stricken.

5        THE WITNESS:  Okay.  My apologies.

6   BY MS. McLAUGHLIN:

7   Q.  What did you find the most troubling out of all this

8   information that came to your attention?

9   A.  It's when you know that you didn't act in a certain way and

10  that people are lying.  And I was in a situation where it's my

11  word against theirs.  And it was up to me to figure out how to

12  prove it, that I was, in fact, being truthful and they weren't.

13  Q.  What was your reaction to Christopher Phillips's statement?

14  A.  I didn't -- I was just shocked that he would lie on an

15  internal memo in regards to what I said and how I acted inside

16  the courtroom.  And that's when we decided that we definitely

17  need to get the transcript on exactly what was said in the

18  courtroom, and also the videos, to prove that I was -- what I

19  was saying was truthful and they, in fact, were lying.

20  Q.  Did you get an opportunity to review the videos on that

21  day, December -- I'm sorry -- February 13th, when you first got

22  the packet?

23  A.  We didn't have the videos then.  There was a meeting that

24  was after that that we tried to review, and then there was a

25  timeline there where -- we couldn't get it to work.  Tracy Page

C. Warren - Direct by McLaughlin

1    couldn't get it to work.  And then they needed to use the room,

2    and then that was rescheduled for another date, I believe.  And

3    that's when we were able to review it, at a later time.

4    Q.  Okay.  So you didn't actually review the videos until

5    February 28th when you met again for the pre-disciplinary

6    hearing, correct?

7    A.  Correct.

8    Q.  Okay.

9    A.  Once we ordered the transcript and the videos, it was after

10   that when we were able to review them.  It was pretty late in

11   the game.

12   Q.  When you left -- when you saw this packet of stuff, did you

13   have any idea what the issue was with the time you left the

14   courthouse and whether you returned to the courthouse?

15   A.  No, because we were -- we were focused -- the

16   investigation, we didn't know what they were investigating

17   other than what the charges were.  And then we were reviewing

18   what people's statements were in regard to my actions and my

19   statements.  So that's what we were mainly focusing on.

20          There was -- because of the statements of Tracy Page

21   and Lisa Bowen and -- there was a -- there was a little memo in

22   there from Nicki Swiss that caught Stomper's attention about we

23   didn't call the jurors back.  So I thought, oh, my God.  Maybe

24   I didn't finish my jury -- you know, my jury duty.  So that was

25   where our mind was going with that.

C. Warren - Direct by McLaughlin

1    And so that's when I then began to do a thorough

2  investigation for myself to figure out all of these questions

3  for them.

4  Q.  Okay.  So we already said you tried to get the transcript.

5  A.  Right.

6  Q.  And we've addressed that here.

7    What did you do about trying to get something

8  regarding the phone records?  Did you ask your husband?

9  A.  Yes.  I told my husband that I needed the cell phone

10  records for January 6th.  And he flat-out said, "No, they don't

11  need it."

12  Q.  Okay.  So wait.  Let's go back to January 14th because I

13  don't recall if we discussed this.

14    Commander Jennings on January 14th, when she first

15  gave you the charges, she asked you who it was that called you,

16  correct?

17  A.  I -- we had a conversation regarding that, and I said that

18  I got a call while I was going through McDonald's

19  drive-through.  And then she did ask can you provide your phone

20  records to identify that call.  It was brief, but yes.

21  Q.  Did you have any idea why she wanted to verify why you got

22  the phone -- who you got the phone call from?

23  A.  I had no idea at that moment.  I was focused on the

24  actual --

25  Q.  Okay.

C. Warren - Direct by McLaughlin

1    A.  -- charges that were --

2    Q.  But --

3    A.  -- on the paper.

4    Q.  -- at the time, did you agree to look through your phone

5    and see if it was still there?

6    A.  Oh, of course.  But I didn't have my -- my phone was not on

7    me --

8    Q.  Okay.

9    A.  -- at the time.  But, yes, I did agree to that.

10   Q.  Okay.  And then did you subsequently look to see if that

11   phone call was still in your log?

12   A.  I did.  That's when I realized that my phone log didn't go

13   back for what the -- all that --

14   Q.  Okay.

15   A.  It was a while back.  So my phone log didn't go back that

16   far.

17   Q.  Okay.  So my point is that sometime after January 14th, did

18   you ask your husband for the phone bill?

19   A.  I asked my husband for the phone bill once we got the -- it

20   was after the interrogation is -- is the big blow because I

21   wanted the phone records.  But it seemed like I remember asking

22   him before that and he flat-out said no.

23   Q.  Okay.

24   A.  And then we just let it go for a while because we were

25   focusing more on the charges.

1    Q.  So do you have access to your phone bill?

2    A.  I do not.

3    Q.  Did -- well, you said he flat-out refused to give you them.

4    Did you ask for the password so that you could access them

5    yourself?

6    A.  I did.  But I don't know his work passwords, and they're

7    all the same to him.  So I don't know what his passwords are.

8    I know our passwords for our e-mail that we share together for

9    personal, but beyond that for bills, I don't -- he handles all

10   of that.

11   Q.  And so, basically, if I recall correctly, at the

12   February 5th formal interrogation, you indicated to Jennings

13   that you were willing, but your husband was not.

14   A.  That is correct.

15   Q.  Okay.  So let's go through what you did to -- on

16   February 14th to attempt to figure out who it might have been

17   that called you, or to verify that phone call.  What did you

18   do?

19   A.  I asked for the phone records.  He said -- he said

20   absolutely not.

21        I was upstairs, and I just started scrolling through

22   my phone.  I mean, I have a lot of friends, but I don't have a

23   large world.  You know, the people that I talk to on a regular

24   basis are logged in my phone by name and contact.  So I just

25   logged through, and there was a number that was not logged in.

C. Warren - Direct by McLaughlin

1    So I got curious, and I called it to see who it was.

2    Q.   Okay.  And can you relay to us how that conversation came

3    about, or what was said during that conversation.

4    A.   Well, when I called, it was the travel agent that answered

5    the phone on the other line.  And I told her who I was.  And I

6    told her that -- that I'm trying to figure out who called me on

7    January 6th.  I told her the brief conversation, and she

8    mentioned that that was something that sounded like she would

9    say.  She mentioned that she remembered calling me on a real

10   snowy day, and she thought it was her.

11       And I asked her to check her records and then send me

12   over an e-mail, that I needed it for work.

13   Q.   Okay.  So I want to digress for a moment.

14       (Counsel conferring.)

15   BY MS. McLAUGHLIN:

16   Q.   Had you had communications with Christine Fidler the week

17   before January 6th?

18   A.   I did.

19       MS. McLAUGHLIN:  Oh, never mind.  I do have it.

20       Okay.  This is Plaintiff's Exhibit 45.  It has not yet

21   been admitted into evidence.

22       THE COURT:  Any objection?

23       MS. BRUCH:  No objection.

24       THE COURT:  Plaintiff 45 is admitted.

25       (Plaintiff's Exhibit 45 admitted in evidence.)

C. Warren - Direct by McLaughlin

1  BY MS. McLAUGHLIN:

2  Q.  Okay.  This is Plaintiff's 45.  And do you recall what this

3  is?  I'm going to draw your attention to right over here.

4  A.  It looks -- am I correct that that's my debit card or -- my

5  debit card purchases for -- for January -- January 6 and

6  January 7th, my purchases on my card.

7  Q.  And do you recall requesting that from your credit card

8  company on -- at or near August of 2015?

9  A.  I did.

10  Q.  Okay.  And this document appears to show that you had --

11  well, let me ask you this.  What was your conversation with

12  Christine Fidler the week before January 6th?

13  A.  She was requesting the final -- it was either deposit or

14  the final payment.  She was requesting a payment for the Cancun

15  trip.

16  Q.  Okay.  So what does this credit card statement actually

17  show?

18  A.  It shows that on January 3rd that I made a -- or she ran my

19  card through for the Apple Vacations for our Cancun trip that

20  was coming up.

21  Q.  That would be right here (indicating).

22      And the line item right underneath, what does that

23  reflect?

24  A.  That I ate at McDonald's on January 6th.

25  Q.  Did you eat at McDonald's more than once on January 6th?

1    A.  No, I did not.

2    Q.  One fast food run a day?  Is that it?

3    A.  Yeah, one was enough.

4            THE COURT:  And at a convenient time, we'll take our

5    lunch break.  So let me know when you're changing topics.

6    BY MS. McLAUGHLIN:

7    Q.  So back to the phone call on February 14th.  What was your

8    reaction to finding out that Christine Fidler remembered making

9    that call to you?

10   A.  I thought it -- I thought it made sense because prior to

11   that, I thought it was someone from the courthouse.  But once I

12   got those documents that said that they did not call me, it was

13   part of my investigation and my actions to prove that someone

14   did call me.  So I was looking for those answers.

15   Q.  Were you relieved?

16   A.  Yeah.  I was, like, oh, my God.  How can that -- but, yes,

17   I was relieved.  It made sense to me, and it made sense to her

18   as well.  So --

19   Q.  How did you feel about having to tell her that you were

20   having an issue at work and needed to involve her in your

21   problems?

22   A.  It's -- it's a -- when you're at the Sheriff's Office and

23   when you're under an investigation, it's not something that you

24   are just free to talk to anybody about.

25           So she was not part of the Sheriff's Office.  She,

1    quite frankly, is not part of my normal life other than booking

2    a Cancun trip.  So I just classified it as something political

3    at work that I needed to respond to.

4    Q.  Were you embarrassed about having to drag her into this?

5    A.  Oh, of course.  I mean, anytime when you're under

6    investigation for something, you're -- you're either

7    embarrassed about your actions on what you've done wrong or, in

8    this case, I was embarrassed of my misthinking that it was

9    someone from the courthouse and then now it's her.  It just

10   made sense.

11   Q.  Did you tell her that you had already checked your bills

12   and verified that the phone call was from her?

13   A.  I told her that I was going through my phone, scrolling

14   through the phone, and I called her.

15   Q.  Okay.  But did you make any reference to you going back to

16   your phone bill and saying, "I already verified it"?

17   A.  I didn't have the access to the phone bill.

18   Q.  Okay.  So you didn't make that representation to her.

19   A.  No, I did not, just scrolling through my phone.

20   Q.  Did she provide you then with that e-mail?

21   A.  She did.

22   Q.  Did you tell her what you thought should be in the e-mail?

23   A.  Well, she -- she was going to get -- she just -- she just

24   asked, "Well, what do you -- what do you need?"  And I just

25   gave her direction on what I was needing.  I didn't need a full

C. Warren - Direct by McLaughlin

1    report that were pages and pages long.  I just said, "This is

2    what I'm looking for, and this is what they're requesting."

3    And she did that.

4    Q.  Did you dictate it to her?

5    A.  I didn't dictate.  I gave her direction on what to say,

6    yes, but I didn't tell her word by word exactly what to say.

7    She asked what -- some direction, and I gave her that

8    direction.

9    Q.  Did Christine Fidler in any way indicate that she didn't

10   believe she made the call to you?

11   A.  No.  She said that that sounded like something that she

12   would have said, and she believed she made that because she

13   remembered the day of it being snowmageddon.

14   Q.  Did she in any way indicate that she was willing to lie for

15   you?

16   A.  No.  I've never asked her or anybody to lie for me.

17   Q.  Okay.  Well, that was going to be my next question.  Did

18   you ask her to lie for you?

19   A.  No, I did not.

20          MS. McLAUGHLIN:  Okay.  This is a good time to break.

21          THE COURT:  All right, ladies and gentlemen.  We'll

22   take our afternoon -- or our lunch break.  It's about 12:39.

23   Why don't you come back at 1:45, little over an hour.

24          Please don't discuss the case among yourselves or with

25   anyone else, and keep an open mind because there's more

1    evidence to hear.  Thank you.

2        (Jury out at 12:38 p.m.)

3            THE COURT:  All right, ma'am.  You're excused.

4            THE WITNESS:  Thank you.

5            THE COURT:  You can speak to your counsel during this

6    break.  You're on direct examination.

7            Anything we need to discuss on the record?

8            MS. BRUCH:  No, your Honor.

9            MS. McLAUGHLIN:  There will be an issue, but I'd

10   rather bring it up right before -- after lunch.

11           THE COURT:  All right.

12           MS. McLAUGHLIN:  I want to double-check my notes on

13   something.

14           THE COURT:  We'll bring it up at 1:40.

15           MS. McLAUGHLIN:  Okay.  1:40.  Got it.

16           THE COURT:  Okay.  Thank you.

17       (Recess at 12:39 p.m.)

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    CARRIE M. WARREN,              )    Docket No. 15 C 496
                                    )
4                   Plaintiff,      )    Chicago, Illinois
                                    )    July 23, 2018
5              v.                   )    1:40 p.m.
                                    )
6    KENDALL COUNTY SHERIFF DWIGHT  )
     BAIRD, in his official capacity)
7    and as successor in office to  )
     Richard Randall, KENDALL COUNTY,)
8    ILLINOIS, RICHARD RANDALL, SCOTT)
     KOSTER and SABRINA JENNINGS,   )
9                                   )
                    Defendants.     )
10
                      VOLUME 4-B
11          TRANSCRIPT OF PROCEEDINGS - Trial
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
12
     APPEARANCES:
13
     For the Plaintiff:   MS. COLLEEN M. McLAUGHLIN
14                        Law Offices of Colleen M. McLaughlin
                          1751 S. Naperville Road, Suite 209
15                        Wheaton, IL 60189

16                        MS. KAREN J. DORAN
                          Karen J. Doran Attorney at Law LLC
17                        2100 Manchester Road, Suite 942
                          Wheaton, IL 60187
18
     For the Defendants:  MS. JULIE A. BRUCH
19                        MS. KARIN ANDERSON
                          O'Halloran Kosoff Geitner & Cook LLC
20                        650 Dundee Road, Suite 475
                          Northbrook, IL 60062
21
     Court Reporters:     SANDRA M. MULLIN, CSR, RMR, FCRR
22                        KELLY M. FITZGERALD, CSR, RMR, CRR
                          Official Court Reporters
23                        219 S. Dearborn Street, Room 1432
                          Chicago, IL 60604
24                        312.435.6053
                          laura_renke@ilnd.uscourts.gov
25

1          (In open court outside the presence of the jury.)

2              THE COURT:  Anything we need to discuss before we

3      bring in the jury?

4              MS. McLAUGHLIN:  Actually, no, your Honor.

5              THE COURT:  Okay.  Then let's bring in the jury.

6              Ms. Warren, you can re-take the stand.

7          (Witness resumed stand.)

8          (Jury in at 1:46 p.m.)

9              THE COURT: All right.  Please be seated, Ladies and

10     Gentlemen.

11             All right.  You may continue the direct examination

12     of the plaintiff.

13      CARRIE MELISSA WARREN, PLAINTIFF HEREIN, PREVIOUSLY SWORN

14                      DIRECT EXAMINATION (Resumed)

15     BY MS. McLAUGHLIN:

16     Q.   Okay.  So, Carrie, did you do anything else to dig up

17     support for your defense of the charges?

18     A.   I did.

19     Q.   And what was that?

20     A.   I went to a chiropractor that was actually on jury duty

21     that day.

22     Q.   Okay.  And did you talk with her about what occurred in

23     the courtroom?

24     A.   I did.

25     Q.   And what happened then?

1    A.    She submitted a document with what she observed inside

2    the actual courtroom itself.

3    Q.    Okay.  And on what date did you do that?

4    A.    It was after the February 14th timeframe because -- I'm

5    not sure on the exact date, but it was after I got all the

6    memos and the statements from the people that were involved.

7    Q.    Did you ever submit that memo to Chief Koster?

8    A.    Myself, personally, no.  I gave it to my union rep,

9    Stomper.  And I believe he then gave that to Chief Koster.

10   Q.    But do you know for sure whether it had actually gotten

11   into Koster's hands?

12   A.    I believe it did.  It was in the paperwork that I gave

13   to Stomper.  But, I mean, I gave it to Stomper, and then he

14   gave it to him.  So, you know, I'm assuming that he gave it

15   to Koster.

16   Q.    Did you submit that letter as part of the grievance

17   process after you were terminated?

18   A.    I don't think it was part of the actual grievance

19   process, it was part of the investigation into my actions at

20   the courthouse.

21   Q.    Okay.

22   A.    It could have been part of the -- all the paperwork.

23   There was numerous paperwork that was submitted.

24   Q.    After you were terminated, the focus was exclusively on

25   truthfulness; correct?

1   A.   That is correct.

2   Q.   Okay.  So were you ever told when -- were you ever told

3   at any time prior to your termination that the charges

4   concerning your causing a disturbance in the courthouse or

5   trying to get out of jury duty were not going to be pursued?

6   A.   No.

7   Q.   Okay.  So the next thing that happens is the

8   pre-disciplinary hearing?  Or let me --

9   A.   The pre-termination hearing, is that --

10  Q.   Yeah, the pre --

11  A.   Okay.

12  Q.   The pre -- pre-termination hearing.  But let's talk

13  about February 28th.

14  A.   Okay.

15  Q.   The morning of February 28th, or before you go into work

16  on February 28th, did you re-visit the phone records with

17  your husband, Jeff, in preparation for this?

18  A.   We -- re-visited?  It was more of a heated argument to

19  get those records.

20  Q.   Okay.  So tell us about what happened there.

21  A.   He didn't want to hand over the records.  I was being

22  loud, he was being loud.  He printed out the phone records

23  initially -- initially he wasn't going to give it to me at

24  all.  I mean, he just flat out was against it.  He thought

25  the whole thing was ridiculous, and he didn't want to submit

1    it because of his privacy and along with other people.

2            MS. BRUCH:  Objection, it's a narrative, and

3    hearsay.

4            THE WITNESS:  Sorry.

5            THE COURT:  Well, sustained as to his statements.

6    BY THE WITNESS:

7    A.   Eventually he ended up printing out the documents, and

8    then he started to redact the phone records.

9    BY MS. McLAUGHLIN:

10   Q.   And where was -- where did that take place?

11   A.   He printed them out in the office, and then he -- the

12   argument was predominantly in the kitchen area around our

13   island.

14   Q.   Okay.  And what did you see him doing?

15   A.   He was marking out the phone numbers on all of it.

16   Q.   Okay.  And what were you doing while he was marking out

17   all the phone numbers?

18   A.   Telling him not to do it.  No, that's an understatement.

19   I was pretty loud.  It was a pretty heated argument between

20   the two of us.  I mean, he was going to redact all the -- all

21   the numbers, but he -- he was just going through, and I was

22   saying, you know, you need to stop, this is my career, this

23   is something that involves me.

24           Eventually I just grabbed the paperwork.  You know,

25   he was like -- it was -- it was just a very, very heated

1    argument where him and I both disagreed highly, and he was

2    going to do what he wanted to do. Eventually he handed it

3    over, but it was a quick, grab the document and out the door

4    to meet Chief Koster.

5    Q.   Did you ever discuss with Jeff what to redact?

6    A.   No, not at all. He -- he never asked, to my knowledge,

7    anything about it. He knew it predominantly was about

8    January 6th, but we really never got into too much detail as

9    to what I was really looking for, it was just, I needed those

10   phone records. The Sheriff's Office is requiring those, and

11   I need those records.

12   Q.   Did you have a copy of the un-redacted phone bill that

13   day?

14   A.   No, I did not.

15   Q.   Okay. So did you have any way of knowing what numbers

16   Jeff actually redacted?

17   A.   Knowing the numbers, no. He was just -- he was going

18   through, and he was initially, like I said, he was going to

19   redact all of them and --

20   Q.   How long did that whole process and that whole argument

21   take?

22   A.   Before the -- the argument before they were printed out,

23   or the whole argument, like once he started to redact it?

24   Because --

25   Q.   Once he started to redact.

1    A.    Okay.  Once he started to redact, that wasn't very long

2    at all.  A minute or two.  I mean, it was, he printed them

3    out, he slammed them on the island, and he just started going

4    through.  I'm yelling, stop, this is all about me, this has

5    nothing to do with you.  There were some harsh words that

6    were being exchanged, and eventually I just grabbed them.

7    Q.    Okay.  Did you know when you turned in this phone record

8    later that afternoon that Jeff had redacted a phone call to

9    himself on one -- on January 6th?

10   A.    Not at all.

11   Q.    Do you have any idea why he did that?

12   A.    I have no idea.

13   Q.    So you mentioned previously that -- let's go back to the

14   pre-disciplinary hearing.  You mentioned that you reviewed

15   videos on that day.  So prior to the actual, you know,

16   meeting with Koster, there was a time when you were given the

17   opportunity, finally got the -- the machine to work and were

18   able to view the videos; correct?

19   A.    Correct.

20   Q.    Okay.  So tell us, who all was there, and where -- where

21   did that take place?

22   A.    That took place in the Sheriff's Office conference room

23   where the formal interrogation took place.

24   Q.    Okay.  So this was before you actually started the

25   formal interrogation, obviously, that you're looking at the

1  videos?

2  A.   That we're looking at the videos.  We didn't have the

3  videos until after the formal interrogation.

4  Q.   I'm sorry, the pre-disciplinary hearing.

5  A.   Yes, before the pre-termination hearing, we were looking

6  at the videos.  It was myself, Stomper, I believe Little was

7  there, and we were reviewing the --

8  Q.   And so what was your reaction to actually seeing the

9  videos?

10  A.   I personally was relieved because it was substantiating

11  my whole claim of, you know, I didn't act like an animal.

12  You know, I was acting appropriate.  I didn't say anything

13  that was inappropriate inside the courtroom.  The transcripts

14  validated that what I was saying was, in fact, true, but

15  Deputy Phillips lied on his memo.

16  Q.   So at this point in time, Stomper had actually gotten

17  the transcript by this time; right?

18  A.   That is correct.

19  Q.   Okay.  So does the hearing actually go that day?

20  A.   No, it does not.

21  Q.   So was there interaction with Koster that day?

22  A.   It was -- it was very brief because I believe that was

23  the day that Brennan got arrested for having sex with

24  inmates.  So he had to deal with that on that day.

25  Q.   And what was the interaction with Koster that day?

1   A.   He came in, and he stated that he didn't rely on any of

2   the videos, he didn't rely on any of the transcript.  They

3   didn't even request those, look at those.  It was -- it had

4   nothing at all to do with the investigation into me, and they

5   were just focusing on truthfulness.  That was it.

6   Q.   And he said that in response to what?  Did Stomper say

7   anything to him with respect to the videos?

8   A.   Well, Stomper said, have you ever even looked at this,

9   really?  Have you ever even -- have you even --

10         MS. BRUCH:  Objection, hearsay.

11   BY THE WITNESS:

12   A.   -- looked at this?

13         THE COURT:  Sustained.

14   BY MS. McLAUGHLIN:

15   Q.   Did Stomper then provide documentation to Koster that

16   day?

17   A.   In the pre-termination hearing?  He could have.  I'm

18   drawing a blank at the moment right now.  I mean, there were

19   several dates where documents were handed back and forth, so.

20   Q.   So let's take a look at Joint 9, this is the redacted

21   phone record, and re-establish it was on the morning of -- or

22   on February 28th that you got this from your husband; right?

23   And there is handwriting down here on the bottom.  And no

24   incoming calls or from Commander Jennings' cell phone.

25   That's your handwriting; correct?

1  A.  That is.

2  Q.  Okay.  And when did you put that on -- when did you put

3  that on the document?  When did you write that on the

4  document?

5  A.  I believe it was right before the grievance hearing, but

6  I could be wrong.  I know when we sat down and looked at

7  the --

8  Q.  This is on February 28th.

9  A.  February 28th was Stomper.  We were looking at it in

10  regards to phones and calls, and that's when we took notice

11  that there was no incoming calls from anybody.  But one that

12  we took into account was there was none from Commander

13  Jennings, which in her memo she -- or she had stated that she

14  had called me, but it wasn't showing on my records.

15  Q.  Now, did you speak with -- you don't mention calls to

16  your mother-in-law on this at this point in time.  Did you

17  think about -- did you speak to somebody else on

18  January 6th --

19  A.  I did.

20  Q.  -- as well?  Okay.  And who was that?

21  A.  My mother-in-law.

22  Q.  Okay.  And when did you first call her, or when did you

23  first speak to her?

24  A.  Well, I spoke to her the night before, obviously.  And

25  then in the morning I did call her to make sure that she was

1    on her way and able to get out of her driveway.

2    Q.    Okay.  And there was a second call that your

3    mother-in-law testified to.  She thought that it was around

4    10:00 o'clock.  Where were you at 10:00 o'clock?

5    A.    I was inside the courthouse.

6    Q.    Were you -- where were you physically inside the

7    courthouse?

8    A.    I could have -- it was -- I could have been in the

9    courtroom or in the pre-jury assembly room.

10   Q.    Okay.  Well, let me refresh your recollection on that.

11   Okay?  We're going to take a look at Defendants' Exhibit 9.

12   And this record, it's a two-page record of your un-redacted

13   phone -- phone records.  And there are --

14              THE COURT:  That's not in evidence yet.  Is there

15   any objection?

16              MS. McLAUGHLIN:  Oh, I'm sorry, I thought

17   defendants had entered it.

18              THE COURT:  Well, it's a defendant exhibit.  I

19   doubt they'll object.  Do you have any objection?

20              MS. BRUCH:  No, no objection.

21              THE COURT:  All right.  Defense Exhibit 9 is

22   admitted.  Actually, I think it's Joint 30, so it has got

23   double numbers.

24              MS. McLAUGHLIN:  Oh, okay.  That must be it.

25              THE COURT:  We'll call it in on Defense 9.

1    (Defendants' Exhibit 9 admitted in evidence.)

2           MS. McLAUGHLIN:  Okay.  All right.

3    BY MS. McLAUGHLIN:

4    Q.   So on Page 2 of this exhibit, it shows you were doing --

5    you were texting; correct?

6    A.   I was.

7    Q.   Okay.  So we've got, on Monday, January 1st, you're

8    texting?

9    A.   You mean on January 6th?

10   Q.   Yes, on January 6th.  And you stop texting at, I

11   believe, 9:33; right?

12   A.   Correct.

13   Q.   And you start again at 10:30 something; correct?

14   A.   Correct.

15   Q.   All right.  So is it safe to say that you were at, from

16   9:30 something to 10:30 something, you were in the courtroom

17   itself?

18   A.   That would make sense, yes.

19   Q.   Okay.  So did you make a second call to Louise, your

20   mother-in-law, that morning?

21   A.   I did.

22   Q.   And -- so approximately what time was that?

23   A.   After 11:00.

24           MS. BRUCH:  Objection, asked and answered.

25           THE COURT:  Overruled.

1    BY THE WITNESS:

2    A.    After -- I started making calls when I was leaving the

3    courthouse.  I didn't make any calls when I was inside the

4    courthouse.  So it was after 11:00 o'clock when I started

5    making calls, and she was one of them that I called.

6    BY MS. McLAUGHLIN:

7    Q.    Okay.  And just to be clear, when you were in the jury

8    assembly room, did you actually -- other than texting, did

9    you make any phone calls and talk on the phone to anyone?

10   A.    No, not -- not at all while I was inside the courthouse.

11   Q.    So on February 28th, when you noted that there is no

12   incoming calls, at that time did you even think about your

13   mother-in-law -- talking to your mother-in-law?

14   A.    No, we were focusing on what the sheriffs had.  So we

15   were looking at phone calls regarding Commander Jennings.

16   And it was actually Stomper that said, you don't have any

17   incoming calls.  So, what, nobody called you that day?  And I

18   said --

19                MS. BRUCH:  Objection, hearsay.

20                THE COURT:  Sustained.

21                THE WITNESS:  Yes, I'm sorry.

22                THE COURT:  Yeah, just, you don't need to relate

23   what Mr. Stomper said.  You can talk about what you did in

24   response to it.  You can talk about things that were said

25   that you, yourself, said.  But Stomper's conversation is

1    hearsay, so objection is sustained.

2    BY MS. McLAUGHLIN:

3    Q.    So the next thing that happens is March 11th, and you

4    actually have a pre-disciplinary hearing on that day;

5    correct?

6    A.    Correct.

7    Q.    Who all is present there?

8    A.    It was Chief Koster, Deputy Little and myself.

9    Q.    Was Sheriff Randall there?

10    A.    Sheriff Randall was not at that meeting. I only saw him

11    during the termination. And Richard Stomper, my union rep,

12    was there.

13    Q.    Okay. So how long did that -- where did that meeting

14    take place?

15    A.    In the same office room, Sheriff's Office conference

16    room, upstairs.

17    Q.    How long did that meeting last?

18    A.    Very short. Yeah, very briefly. Five minutes? I mean,

19    it's very briefly. There wasn't a whole lot that was said in

20    regards to much of anything, other than I'm a liar. And then

21    it was --

22    Q.    Okay. Well, as best you can recall, what occurred?

23    A.    We sat down. Chief Koster asked me about the phone

24    calls and -- regarding Christine Fidler. And he slammed down

25    the transcript and leaned over and said, you're a liar. It

1    got very loud.  And I just sat there stunned.  There was --

2    there was brief conversation, I don't know word-by-word, but

3    then it was Stomper and Koster that got up in a very heated

4    conversation right outside the conference room by Commander

5    Smith's office.

6    Q.   To your knowledge, did Stomper make any argument that

7    the bill was not -- the phone bill was not accurate?

8    A.   He did.

9    Q.   Okay.  And, to your knowledge, did Stomper make any

10   argument regarding what -- the lack of benefit to you for

11   lying?

12   A.   He did.

13   Q.   What did you -- so you learned for the first time that

14   Fidler, Christine Fidler, did not call you on that day;

15   correct?

16   A.   Well, that's what they're saying.

17             MS. BRUCH:  Objection, leading.

18             THE COURT:  Overruled.  Go ahead.

19   BY MS. McLAUGHLIN:

20   Q.   Okay.  When Koster said, you're lying, Fidler didn't

21   call you on that day, what was your response to learning

22   that?

23   A.   I was shocked.  I was, like, okay, if somebody from the

24   courthouse didn't call me and Christine Fidler didn't call

25   me, I got nothin'.  I don't know who called me, then.  I have

1   no idea, then.  I had nothin'.  Just shocked.

2   Q.   Would you have submitted this e-mail from Christine

3   Fidler if you believed it was not true?

4   A.   Absolutely not.

5   Q.   You knew that this phone conversation would be

6   verifiable either through her records or your records; right?

7   A.   Yes.

8   Q.   Okay.  So if you know it wasn't her that called you,

9   then, well, what would you have done?

10  A.   I wouldn't have given any -- any document saying that --

11  contrary.  I mean, I just wouldn't have handed that over.  It

12  was my belief that she -- it wasn't somebody from the

13  courthouse, and it was her.  So that's why I handed over

14  those documents, trying to find the truth.

15  Q.   Did you knowingly depart from the truth when you gave

16  over those documents to Koster?

17  A.   No, I did not.

18  Q.   Okay.  So the following day, the termination meeting

19  happens.  Where did that take place?

20  A.   In the same room, the Sheriff's Office conference room,

21  upstairs.

22           MS. McLAUGHLIN:  Joint 15.  I don't have that.

23           THE COURT:  It's in evidence.

24           MS. McLAUGHLIN:  It's already in evidence?

25           THE COURT: Yes, it is.

1       MS. McLAUGHLIN:  Okay.  All right.

2   BY MS. McLAUGHLIN:

3   Q.   And you received a letter from Randall saying, you're

4   terminated; right?

5   A.   That is correct.

6   Q.   What happened at the hearing, or at the actual

7   termination itself?

8   A.   Richard Stomper actually wasn't able to be at this

9   meeting because he was at another department, or his issues.

10  So it was me and Deputy Little, Sheriff Randall, Chief

11  Koster, Tracy Page, and I'm not -- I'm drawing a blank on the

12  other ones.  But just shocked.  Kind of like -- it's all kind

13  of like a daze because it's, you don't believe that that

14  could actually happen to you.  I've never been fired from any

15  job.  And Little escorted me out.

16  Q.   Did you file a union grievance?

17  A.   I did.

18  Q.   Did you cooperate in that process?

19  A.   I did.

20  Q.   Did you turn over your un-redacted records?

21  A.   I did.

22  Q.   Who is in charge of the grievance process?

23  A.   Chief Koster.

24  Q.   Did you ever believe during this process that the KCSO

25  would reverse itself on the decision to terminate you?

1   A.   No.

2   Q.   Does your union contract cover claims of gender

3   discrimination?

4   A.   No, it does not.

5   Q.   Can you grieve gender discrimination under the union

6   contract, to your knowledge?

7   A.   No, you cannot.  No.

8   Q.   So was gender discrimination and the treatment of male

9   deputies versus your treatment as a female, was that ever a

10  topic at the grievance?

11  A.   No.

12  Q.   Okay.  I want to go back and clear up just a few things.

13  Ms. Bruch asked you about your alleged fact to -- alleged

14  failure to disclose your mother-in-law in answers to

15  discovery.  Do you recall that question to you?

16  A.   I do.

17  Q.   Do you recall making that disclosure in response to your

18  answer to Sabrina Jennings' interrogatories to you?

19  A.   I do.

20  Q.   Okay.  Do you recall what it was that you said?

21  A.   If my memory serves me right on the question, it asked

22  who I had spoken to on that particular day.  And I answered

23  that my mother-in-law was one of those individuals.

24  Q.   Okay.

25  A.   In that answer.

1    Q.   And that was in response to Jennings Interrogatory

2    No. 22?

3    A.   If that's what it -- I don't know what 22 is, but if --

4    I'll take your word for it on that.

5    Q.   Okay.  So when you -- you testified earlier that you

6    learned from Dunahoe that you were -- that it appeared the

7    schedule was switched, that you were not working on second

8    shift.

9    A.   It either --

10   Q.   Correct?

11   A.   -- said off, or it was -- it had first on it.  But I

12   didn't know with -- through the text with Dunahoe what that

13   actually meant.

14   Q.   And at what time of day did you actually learn from --

15   you -- well, how did you learn this from Dunahoe?

16   A.   Via text.

17   Q.   And at what time of day did you learn that from Dunahoe?

18   A.   After I got out of the courtroom.

19   Q.   So --

20   A.   So I was in the pre-jury assembly room before we left.

21   Q.   Okay.  So we're going to look again at Defendants' 9, or

22   was that Joint 30?  And we're going to take a look at -- let

23   me see if I can make this a little bigger, make it a little

24   easier to read.

25            So it shows that you are texting that morning with

1    621-5004; correct?

2    A.   Correct.

3    Q.   And whose number is that?

4    A.   Dunahoe.

5    Q.   Okay.  And she was at work; right?

6    A.   She was.

7    Q.   So it shows that you sent a whole bunch of texts, and

8    you received one record at nine -- one text at 9:32.  You

9    quickly text her back.  9:33, you sent another text, and then

10   there is the break until 10:38.

11        Did that message from Dunahoe, the one that you

12   received at 9:32, did that make reference to your being

13   changed, your schedule being changed?

14   A.   The 10:38 is when she responded back about having it off

15   or on first, what was in the computer.

16   Q.   Okay.  So that 10:38 call that you received is -- or

17   text is what you believe is the -- when you first learned

18   from her that the schedule appears to have been changed?

19   A.   That is correct.

20   Q.   Okay.  So you were already back from the voir dire, from

21   the -- from the jury panel?

22   A.   Yeah, uh, I was in the courtroom for the voir dire after

23   9:33, and then I resumed my texting in the pre-jury assembly

24   room at 10:38.  So I was in there for an hour.

25   Q.   Okay.  So then you receive another text from

1     (773) 818-0728.  Do you recall, what number is that?  Whose

2     number is that?

3     A.   I have no idea.

4     Q.   Okay.  As you sit here today, you don't know?

5     A.   No.

6     Q.   And then you have a lot of send-and-receives between

7     yourself and Dunahoe?

8     A.   I actually think that, and I could be wrong, that

9     I think the 773 might be Velez, but I could be wrong on that.

10    Q.   Okay.  Well, let's take a little bit further look.  So

11    so this is all while you're sitting in the -- in the jury

12    assembly room, after the voir dire; correct?

13    A.   Correct.

14    Q.   Okay.  And it shows that you apparently stopped texting

15    at 11:08?

16    A.   Correct.

17    Q.   That was your last text; right?

18    A.   Correct.  Yes.

19    Q.   What did you do after that?

20    A.   That's when I was -- I got into my vehicle, warmed it

21    up, and then I started making calls when I was driving.

22    Q.   Okay.  So you know that you left the courthouse sometime

23    after 11:08 because that was your last text --

24    A.   That is correct.

25    Q.   -- is that correct?  All right.  So let's take a look at

1    11:05, 11:06 and 11:07.  Those texts are to (630) 244-8328.
2    Whose phone number is that?
3    A.   Commander Jennings.
4    Q.   And what did you text her?
5    A.   Requesting information regarding my schedule for the
6    day.
7    Q.   Okay.
8    A.   And letting her know that I was there and we were -- I
9    was probably going to be leaving soon.
10   Q.   Okay.  But you already knew from Dunahoe; right?
11   A.   I knew it was switched in the computer, but I didn't
12   know if it was meaning that I was off, or if I was working
13   first shift.  I didn't know what that meant.  So you never
14   take orders from another deputy, you get it from your command
15   staff.
16   Q.   So you felt you had to confirm?
17   A.   Oh, of course.
18   Q.   Were those text messages at all ever part of the packet
19   of information that you received from -- regarding this
20   investigation on February 13th?  Were those text messages
21   ever part of that packet?
22   A.   I don't think so.
23   Q.   Have you ever seen those text messages?
24   A.   I don't think we ever focused on text messaging.  We
25   were looking at the actual phone calls themselves.

1   Q.   Okay.  So why did you assume that you broke for lunch?

2   A.   Well, there is no cafeteria in there.  You had to eat

3   some time.  So when they told us that you may go or you may

4   leave, I assumed it was for lunch.

5   Q.   Okay.  And could you have stayed there, if you just

6   thought it was a lunch, could you have stayed in the

7   courthouse and gotten something to eat?

8   A.   If you want chips.  There is no -- there is no cafeteria

9   there.  There is no place to -- it's just a vending machine,

10  so it's not set up as nicely as here.  So, no, you would have

11  to leave to go get something to eat.

12  Q.   Okay.  And if you had gone immediately over to the -- to

13  the jail, would you have been able to obtain lunch there?

14  A.   No.  There is vending machines, but there is no

15  cafeteria, or anything like that, at the jail.

16  Q.   Chips and a soda?

17  A.   Yes.

18  Q.   Okay.

19  A.   They have a kitchen that they make the inmates' foods,

20  but that's it.  That's not a cafeteria, or anything like

21  that.

22  Q.   When you were exiting the courthouse at approximately

23  11:10 in the morning, did you see Commander Leinen again?

24  A.   I did, when we were leaving.

25  Q.   And what did he tell you?

1    A.   He told me to get ahold of Commander Jennings.

2    Q.   Okay.  How many correction deputies, all toll, are there

3    at the -- were there at the jail -- well, corrections

4    deputies while you were employed there?

5    A.   In the jail?  I'm not sure of the exact number.  Maybe

6    like 30, 30 to 40, in that range, at the jail.

7    Q.   Was the jail and the courthouse combined at that time?

8    A.   Well, they're two separate divisions.  You've got your

9    courthouse, and then you got your corrections.  So the people

10   over at the courthouse are at the courthouse, and then the

11   jail were in a separate building.

12   Q.   Okay.  Did you know prior to being hired that as a

13   female deputy you would be in the clear minority?

14   A.   Oh, of course.

15   Q.   Okay.  How many female corrections deputies were there

16   when you started?

17   A.   In the jail?

18   Q.   Yes, in the jail.

19   A.   Okay.  Let me think here.  Can I just name them so I

20   can --

21   Q.   Sure.

22   A.   We have Jeanne Russo, Jean Dunahoe, Nancy Velez,

23   Krantz-Lee, myself, and Nikki Porus was there, so six.

24   Q.   Did that number ever increase?

25   A.   No.

1    Q.    Did that number decrease?

2    A.    Yes.

3    Q.    One of the deputies, female deputies, no longer

4    employed?

5    A.    Yeah, she got fired.

6    Q.    Okay.  Have you ever heard gender derogatory terms being

7    used by your coworkers?

8    A.    Oh, of course.

9    Q.    Have you ever --

10              MS. BRUCH:  Objection, relevance.

11              THE COURT:  See you at sidebar.

12         (At sidebar outside the hearing of the jury.)

13              THE COURT:  I thought this was off.

14              MS. McLAUGHLIN:  I'm not going into details,

15    just --

16              THE COURT:  That doesn't matter.  It's a topic.  I

17    thought this topic of harassment was off the table, by

18    agreement.

19              MS. McLAUGHLIN:  I'm --

20              THE COURT:  The idea of introducing it by not going

21    into detail doesn't answer the question.  You're introducing

22    a topic.  If you're opening that, then my prediction of the

23    jury we did on Wednesday is wrong because I assume that's

24    going to make your client's cross examination extensively

25    longer.  But I -- then I have to rule outside the presence of

1    the jury of its relevance in this case, given the fact the

2    jury already found the defendant not guilty of harassment.

3    So I don't know where you're going.

4            MS. McLAUGHLIN:  I am not suggesting that it's a

5    harassing situation, I'm suggesting that the -- that there is

6    a tolerance of gender -- gender issues.

7            THE COURT:  Your question was, have you ever hear

8    any gender -- whether or not you heard any gender derogatory

9    statements in the -- around the prison, or around the jail.

10   That is a harassment question.  And if harassment is in the

11   case, then you're going to have to -- we're going to have to

12   deal with that outside the presence of the jury because I'm

13   not sure it's relevant to a gender discrimination case.  And

14   it's also in violation of your agreement together, which I

15   ruled was -- I adopted your agreements.

16           MS. McLAUGHLIN:  Well, we're clearly not asking for

17   gender harassment, or going into gender harassment, we're

18   talking about discrimination.

19           THE COURT:  Well, yeah, but the question you asked

20   goes to harassment.

21           MS. BRUCH:  Just so -- can I -- if I can point out,

22   your Honor, that we also had a motion in limine on Porus and

23   Christoffel.  And now they're bringing up how Porus was

24   terminated, which, again, violates the motion in limine.

25           THE COURT:  Well, you should have made a

1  contemporaneous objection on that one because I can't
2  remember all these names.
3          MS. BRUCH:  Well, I didn't know it was going to
4  come out, so.
5          THE COURT:  I know, but you can move to be heard at
6  sidebar, or move to strike it, and I'll do it.
7          Porus got fired for what?  It was some kind of sex
8  thing.
9          MS. BRUCH:  It was residency violation.
10          THE COURT:  Oh, it was residency?
11          MS. BRUCH:  Yeah.  Yes.
12          THE COURT:  I thought Porus was deeply involved in
13  the -- some of the testimony about at least pretrial on
14  sexual harassment.
15          MS. BRUCH:  She was, but it had nothing to do
16  with --
17          MS. McLAUGHLIN:  It had nothing to do with that,
18  and we didn't touch on that.
19          THE COURT:  All right.  Well, you can bring out the
20  reason she was fired, if you want, since it was brought up
21  that she is no longer there; or you can bring it up, if you
22  want, on the direct, if this witness knows from a non-hearsay
23  basis.  But -- or you can bring it out through Jennings, if
24  you want.  She knows, on a non-hearsay basis.  But this is --
25  I'm going to sustain the objection.  And I see what you're

1   doing, and it's not this case.  So objection is sustained,

2   and I'm going to have the last question stricken.

3           (In open court in the hearing of the Jury.)

4           THE COURT:  The objection is sustained, and the

5   last question is stricken.  Although, Ladies and Gentlemen

6   the questions of attorneys are not evidence, as you got by

7   way of my preliminary instructions, and as you have in your

8   packet, and as you'll get in your final instructions.  You

9   may proceed.

10  BY MS. McLAUGHLIN:

11  Q.   On a typical shift that you worked the afternoons or the

12  overnight shifts, how often was there more than one female

13  deputy?

14  A.   Very few.

15          MS. BRUCH:  Objection, relevance.

16          THE COURT:  Sustained.

17  BY MS. McLAUGHLIN:

18  Q.   How would you describe your working relationship -- let

19  me go to another question.

20          Do you consider Commander Jennings a mentor?

21  A.   To me, no.

22  Q.   Why not?

23  A.   She is not approachable.  She is not nice.  She is not

24  someone that I feel that can relate to the majority of us.  I

25  know myself she could not -- I have nothing in common with

1  her.  And she seems to be more with the guys.  She gets along

2  better with them and talks and jokes with them.  She

3  doesn't -- she is not approachable with me or the other

4  females I feel.

5  Q.  When you got sworn in, did you have your picture taken

6  with Sheriff Randall?

7  A.  I did.

8  Q.  Did it go in the local paper?

9  A.  It did.

10  Q.  How did that make you feel?

11  A.  It was pretty cool.

12  Q.  On the day you got terminated, tell us about that.

13  What's the first thing you did?

14  A.  Well, I had to walk out of the building.  Deputy Little

15  escorted me out, called my husband, called Dwight Baird.  He

16  was a close friends of ours, the now current sheriff.  I had

17  to pick my daughter up from school, so I went to pick her up.

18  Contacted Stomper to let him know that I was terminated, and

19  he was getting the grievance papers together to grieve the

20  termination.

21  Q.  Did you cry?

22  A.  Not at first, no.  I was more stunned and more in a

23  daze.  I cried when I picked my daughter up and told her.

24  Q.  So tell us about telling your daughter about having to

25  lose your job.

1   A.    It's not something that you ever want to ever say to

2   your child that you've lost your job, you've lost your

3   career, you've lost your credentials, you've lost -- it's not

4   something I would never wish on anybody.  It's pretty

5   difficult.  She was pretty upset as well, so.  It wasn't a

6   good day at all.

7   Q.    What did this job mean to you?

8   A.    It gave me purpose.  It gave me meaning.  It -- I didn't

9   take the job as a power job, I took the job as -- to give

10  something back, to help people whenever I could.  You know,

11  you can't save the world, but I was good at it.  I enjoyed

12  it.  You know, you have good days and bad days, but I was

13  good at it.

14  Q.    Did you tell your families and friends about having to

15  lose your job?

16  A.    I did.

17  Q.    How did that make you feel?

18  A.    Demeaning.  I mean, who likes to get fired?  I've never

19  been fired before.  And it's embarrassing, it's failure, if

20  that makes --

21  Q.    What do you think was your most prominent emotion when

22  you got -- when you got fired?

23  A.    I wanted to prove that I didn't lie.  I mean, that's

24  what this -- when someone says you've lied, and if you've

25  lied, you take it, and you move on.  But I did not lie.  I

1    did not deserve this.  I was treated differently.  I was

2    going through my mind on other issues, and I was -- I -- it

3    was not fair.  I was not treated fairly, and that is why we

4    are here.  I didn't get progressive discipline.  I didn't get

5    a chance to even present -- it just wasn't fair, and I was

6    just shocked with it.  I was demeaned and --

7    Q.   Did you feel that you were treated differently than male

8    deputies?

9    A.   Yes.

10   Q.   Were you frustrated?

11   A.   Oh, of course.

12   Q.   Angry?

13   A.   Yes.

14   Q.   Tell us about the days and weeks following your

15   termination.

16   A.   Well, your first thought is, okay, this happened.  You

17   think of your family, you think of your home, your car,

18   your -- you know, bills are still coming in.  So first thing

19   you do is you try to get another job.  I went to the EEOC to

20   file my claim with them, but --

21   Q.   Okay.

22   A.   -- just, most importantly, trying to get back on my feet

23   and try to find a job, and nobody wanted me.  Nobody was

24   calling me back.  Nobody would call me in for an interview.

25   Nobody wanted me.  First time in my life, nobody wanted me.

1    Q.   Were you experiencing mood swings?

2    A.   Yes.

3    Q.   Did you have physical symptoms, upset stomach?

4    A.   It was -- it's -- I have witnessed people with

5    depression in the jail, and I never experienced it before,

6    but I can sit here today and honestly tell you that it is

7    debilitating.  You've got to have a lot of support.

8    Q.   How so?

9    A.   Um, you just don't have the energy.  You just don't care

10   about the little things.  My house was pristine and things

11   just started falling apart.  And you just can't fix it.

12   That's the best way I can describe it.

13   Q.   Did you have trouble focusing?

14   A.   I would say yeah.  You try to focus, and you try to do

15   what has to get done, but even those things don't get done.

16   It's debilitating.  Then you feel like you're failing your

17   friends because they want to help, but then you're pulling

18   them down with you.  It's -- it's something I would never,

19   ever want to wish upon anybody.

20   Q.   Did you have a change in your sleep patterns?

21   A.   Yes.

22        MS. BRUCH:  Objection, leading.

23        THE COURT:  Sustained.  Sustained.

24   BY MS. McLAUGHLIN:

25   Q.   Did you have trouble sleeping?

1    A.   I did.

2    Q.   Did you take -- did you do anything to assist you to

3    sleep?

4    A.   Took six to eight Benadryl a day.

5    Q.   Did you gain weight or lose weight?

6    A.   I gained weight.

7    Q.   Did you change your habits with respect to taking care

8    of the house?

9    A.   My daughter and my husband started picking up the slack,

10   but, yes, the house became not normal.  It was -- like I

11   said, I always kept everything pristine, and it was very much

12   less than that.  Same with my yard.  I even had neighbors

13   that came over to see whether or not if we were home because

14   it was out of character.  It was embarrassing.

15   Q.   During that time, did you enjoy doing any of your

16   regular, routine things?

17   A.   I didn't have any regular, routine things, other than I

18   just didn't want to be seen.  I just -- I just didn't want to

19   be seen.

20   Q.   How did this affect your relationship with your

21   daughter?

22   A.   I think it put a lot of stress on her.  She is a

23   national swimmer.  Not just a state swimmer, she is a

24   national swimmer.  And, also, she is an honor student.  And I

25   think that she thought that she had to be perfect.  She had

1    to bring something good to the household.

2           And we used to not care about times.  I mean, we

3    would celebrate them, and then it would be, so what.  But she

4    got really, really down and out if she couldn't drop time to

5    bring something fun to the household.  It was all on her.  If

6    she -- if her grades dropped a little bit, she really was so

7    much hard on her -- on herself.  She just thought that she

8    had to be perfect.  And then when she wasn't, she -- she

9    ended up, she quit swim for four months because she said that

10   it was a financial burden, and she didn't want to put any

11   burden on us.

12           MS. BRUCH:  Objection, hearsay.

13           THE COURT:  Sustained.  And, Ladies and Gentlemen,

14   the damage instruction you received, which will be the one

15   you'll get at the end of the case too, talks about

16   compensatory damages, and it's Page 27, and the emotional

17   pain and suffering the plaintiff experienced and is

18   reasonably certain to experience in the future is something

19   you can consider.  But the -- in calculating damages, you

20   shouldn't consider the issue of lost wages or benefits.  If

21   there is -- I'll calculate that and determine any damages for

22   past or future lost wages and benefits, if there is a verdict

23   for the plaintiff in this case.  That's something that I have

24   to calculate, if you render a verdict in favor of the

25   plaintiff.  So there have been a couple references to the

1    financial issues. And they're only -- they only relate to

2    the issue of emotional pain and suffering, not to the actual

3    lost wages. That will be something I'll hear separately if

4    there is a plaintiff's verdict. You may proceed.

5    BY MS. McLAUGHLIN:

6    Q.    How did your perception of how your termination and your

7    resulting change in how you were feeling -- let me rephrase

8    that.

9           How did it make you feel to know -- to perceive

10   your daughter in this way?

11   A.    I think every parent wants their child to be -- to be

12   obviously a good child and do what's right and know what's

13   right from wrong. But she just seemed to have a lot more

14   burden put on her. And she just wanted things to be happy

15   and normal again, and it wasn't like that.

16   Q.    Are you by nature a social person?

17   A.    Yes.

18   Q.    Did you social -- did your socializing change after your

19   termination?

20   A.    Yes.

21   Q.    How so?

22   A.    I didn't want to be seen. I didn't go out. I didn't

23   want to -- I just didn't want to be seen.

24   Q.    Okay. Okay. You mentioned that you looked for other

25   jobs and that nobody seemed to want you. How many other jobs

1   did you apply for?

2   A.   I did apply for the Illinois State Police because your

3   first thought is to continue on in the same career that

4   you're in because that's what you know.  Didn't hear anything

5   back from them.  No other departments at that time were

6   testing and in the process of hiring, at least to my

7   knowledge it wasn't.  So I applied for -- to furniture

8   stores.  I thought, okay, maybe to sell furniture.  You know,

9   I know design, I know color.  Thought about going back to FCA

10  and -- I don't know if I can say why I --

11  Q.   Was that not an option?

12  A.   That was not an option.

13  Q.   Okay.  So --

14  A.   Other granite companies.  I went on Indeed, and, you

15  know, get your resume, and it shoots out to numerous

16  companies.

17  Q.   Okay.  So were you able to meet all your -- with the

18  loss of your income, how long did it take you to actually

19  find another job?

20  A.   Well, one of our past inmates came up to me at Olive

21  Garden and wanted to tell me that she was doing great.  And

22  she wanted to thank me.  And I told her I was no longer at

23  the Sheriff's Office.  And so, it's kind of funny, she went

24  and got the manager, and that's how I got hired at Olive

25  Garden.  So she got me my job.

1   Q.   How long after your termination did that occur?

2   A.   Six, seven months after my termination.

3   Q.   Okay.

4   A.   I'm guessing.  I mean, give or take, you know.  But it

5   wasn't much less or much more than that.

6   Q.   Was that position full time or part time?

7   A.   Server positions are always considered part time, but I

8   worked there four, five days a week, which on their terms is

9   full time, if that makes sense.

10  Q.   Are you making anywhere near the money that you made as

11  a sheriff's deputy?

12  A.   Oh, my goodness, no.

13  Q.   Okay.  And --

14  A.   But it was better than nothing, so.

15  Q.   Kendall County, have you run into people that you used

16  to work with?

17  A.   I have.

18  Q.   Have you seen Commander Jennings?

19  A.   I have.

20  Q.   When?

21  A.   I had to serve her.

22  Q.   While you were at Olive Garden?

23  A.   Yes, I did.

24  Q.   How did that feel?

25  A.   I did my job, and it didn't make me feel proud to serve

1    her.

2    Q.   Have you ever run into other former coworkers?

3    A.   Yes.

4    Q.   Were you -- some of these coworkers, had you previously

5    socialized with them?

6    A.   Yes.

7    Q.   So what kind of -- who did you socialize with

8    previously?

9    A.   Deputy Velez, Deputy Dunahoe, were probably the two

10   predominant ones.  You know, phone-wise, a lot of them.  But

11   as far as, like, going out, those were the main two.

12   Q.   Did you ever go bike riding with -- motor bike riding

13   with Jeanne Russo?

14   A.   I did.  Her and her husband.

15   Q.   Okay.  And what about Sergeant Flowers?

16   A.   Sergeant Flowers, motorcycles and -- yes, I was close

17   with Sergeant Flowers and also my -- Sergeant Joe Rousseau.

18   Q.   And were you Facebook friends with your coworkers while

19   you were employed?

20   A.   I was.

21   Q.   Are you now?

22   A.   I don't know.  I -- I don't know.  I didn't deplete

23   them, so I don't know, I --

24   Q.   Do you communicate with any of these people?

25   A.   I communicate with Sergeant Joe Rousseau.

1   Q.   Sergeant Rousseau retired, what --

2   A.   And he now lives in Florida.

3   Q.   -- 2010?

4   A.   He is like my -- he's my adopted dad.  He was a good

5   mentor.

6   Q.   But he is long gone from the Sheriff's Office; right?

7   A.   Yeah, he is down in Cape Coral, Florida or --

8   Q.   Okay.  Anyone else that you regularly communicate?

9   A.   Now?  From the Sheriff's Office?

10  Q.   Uh-huh.

11  A.   No.

12  Q.   Do you miss the camaraderie?

13  A.   Of course I do.  It was a part of me.

14  Q.   So you left -- at some point you left.  How long did you

15  work at Outback?

16  A.   I -- now I've been at Outback for, what --

17  Q.   I'm sorry, Olive Garden.

18  A.   Olive Garden?  About a year.

19  Q.   Okay.  And why did you leave?

20  A.   I tore the tendons in my wrist, and I injured my knee.

21  So I had to take -- I had to quit because I couldn't carry

22  trays, and I couldn't walk, so I had to recover.  So I was

23  getting cortisone shots in my wrist, and -- yeah.

24  Q.   So you eventually recover, and you find other

25  employment.  Where did you find other employment?

1  A.    Outback Steakhouse.

2  Q.    Okay.  Well, you're still lifting heavy trays; right?

3  A.    Outback doesn't require heavy lifting trays.  You can

4  carry plates.  They've kind of progressed on through the

5  industry where it has been found that trays are quite

6  damaging.  I mean, yes, you can carry trays, but they don't

7  require it.

8  Q.    How did it feel to go back to waiting tables?

9  A.    I mean, it's a job.  It's better than nothing.  You

10  know, it's not something that I always aspired to do.  It's

11  not something that I would want to continue to do until my

12  golden years.

13  Q.    So you're now -- you are -- you do have another job now;

14  right?

15  A.    I do.

16  Q.    And where is that?

17  A.    At Midwest Stone in Plainfield.

18  Q.    And what are you doing?

19  A.    I sell granite countertops and marble and quartz.

20  Q.    And how long have you had that job?

21  A.    Going on about a -- I might have a year in now.  It's

22  right out around a year.

23  Q.    So with respect to the -- so are you feeling better now?

24  A.    I'm doing better.  I'm not anywhere near what I was

25  before, but, I mean, I'm doing the best I can.

1  Q.   Are you as outgoing as you were prior to your
2  termination?

3  A.   I'm working on that.  But I would say no.

4  Q.   So why are we here?  Tell us, in your own words, why you
5  feel that you have been discriminated against because of your
6  gender.

7  A.   I sit here today in the last four years thinking about
8  what I have contributed to the Sheriff's Office and what I
9  did and how I was treated, how I was investigated, how I was
10 put through a formal interrogation.  And then I think of the
11 male deputies that have done some horrific, disgusting and
12 nasty things, and they were not put through a quarter of what
13 I was put through.  And that angers me.  And I was not
14 treated fairly, nor was I given the same opportunities as
15 them.  And I don't feel like it was fair.  And I want to know
16 why.  And the only reason is because I'm a female.  They have
17 fired me, when they didn't fire male deputies for having sex
18 with inmates.  And that angers me.  And I want to know why.
19 And it only comes to me because I am a female, and I stood
20 against those things.

21          MS. BRUCH:  I'm going to just object for the record
22 of lack of foundation as to some of that testimony.

23          THE COURT:  The plaintiff can state why she
24 thinks -- why she brought the lawsuit, so overruled.

25          MS. McLAUGHLIN:  Can I just have a moment, Judge,

1     to confer with my co-counsel?

2                THE COURT:  You may.

3                MS. McLAUGHLIN:  No further questions at this time.

4                THE COURT:  All right.

5                MS. McLAUGHLIN:  Your Honor, I could use a break.

6                THE COURT:  All right.  Well, we'll take our

7     afternoon break right now, Ladies and Gentlemen.  So please

8     don't discuss the case among yourselves or with anyone else.

9     And keep an open mind, there is more evidence to hear.  And

10    although I say this all the time, and I say it quickly, I

11    really do mean it.  So don't take my speed as indicating I

12    take it any less seriously than the first time I told you.

13    So with that, we'll break for 15 minutes.  Thank you.

14         (Jury out at 2:45 p.m.)

15                THE COURT:   All right.  You can leave the stand,

16    but you've been tendered for cross, so please don't discuss

17    your testimony with anyone.

18                All right.  Anything we need to discuss?

19                MS. BRUCH:  No, your Honor.

20                THE COURT:  Okay.  I had a question for the

21    parties.  I thought the issue of progressive discipline was

22    off the table.

23                MS. ANDERSON:  That's what we thought --

24                MS. BRUCH:  That's what we thought too.

25                THE COURT:  Yeah, if -- all right.  I can only act

1  on motions that are made, but I assume the motions in limine

2  and agreements as to topics to stay off -- out of were

3  agreements that were going to be abided by by the parties.

4  If they're not, then we have a different trial.  All right.

5  See you in 15 minutes.

6          (Recess from 2:46 p.m. to 3:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Jury enters.)

2               THE COURT:  All right.

3               You may cross-examine.

4               MS. BRUCH:  Thank you, Your Honor.

5                       CROSS-EXAMINATION

6   BY MS. BRUCH:

7   Q.  Ms. Warren, during any of the process from when you first

8   learned about the investigation into your jury duty through

9   your court testimony today, were you ever untruthful?

10  A.  No.

11  Q.  In court here on Friday and this morning -- or this

12  afternoon, were you ever untruthful telling your side of the

13  story of what happened?

14  A.  No.

15  Q.  Were you ever deceptive?

16  A.  No.

17  Q.  Would you agree with me that the reasons given by the

18  Sheriff's Office for terminating your employment were

19  untruthfulness?

20  A.  Why they terminated me was for untruthfulness and also

21  some of the charges.

22  Q.  And would you agree with me that you were not terminated

23  for any of the reasons given by Commander Jennings in her

24  notice of charges from January 14, 2014?

25  A.  I believe I was -- in the formal termination that my --

Warren - Cross by Bruch

1    those charges were brought up.

2    Q.   In the termination --

3    A.   For my termination.

4    Q.   In the termination letter it was related to

5    untruthfulness; is that correct?

6    A.   That's correct.

7    Q.   Tell me what your understanding was you were terminated

8    for related to untruthfulness.

9    A.   They didn't believe that I was being truthful during the

10   investigation and in regards to also the phone call.

11   Q.   When Chief Deputy Koster took over the investigation,

12   didn't he make it clear to you that the focus of his

13   investigation was truthfulness?

14   A.   Correct, yes.

15   Q.   When you realized that Chief Deputy Koster's investigation

16   was focusing on your truthfulness, isn't it true that you

17   never told him that some of the things you told

18   Commander Jennings were not true?

19   A.   I never said anything that was untrue.

20   Q.   So even sitting here today when you reflect back on the

21   information that you gave to Commander Jennings, you're not

22   saying that any of that was untrue, right?

23   A.   Can you -- okay.  Repeat, please.

24   Q.   Sure.  As you sit here today, when you think back to the

25   different conversations that you had with Commander Jennings,

Warren - Cross by Bruch

1   you had a conversation with her on January 14th, correct?

2   A.   Correct.

3   Q.   You also had a discussion with her on February 5th during

4   the formal interrogation, correct?

5   A.   Correct.

6   Q.   Thinking of those two conversations with

7   Commander Jennings, was there anything that you said to her

8   then that was not true?

9   A.   No.

10  Q.   So I want to show you the jury summons which was part of

11  Joint Exhibit 3.

12           Do you recall when you got the jury summons that

13  there was this juror profile questionnaire?

14  A.   Yes.

15  Q.   And did you complete that when you were coming for jury

16  duty?

17  A.   I did.

18  Q.   And looking at this juror profile questionnaire, would you

19  agree with me that nowhere in there does it ask you for your

20  cell phone number?

21  A.   Correct, yes.

22  Q.   And according to the front of the summons, you're supposed

23  to call in to a phone number and listen to a recorded message

24  for instructions, correct?

25  A.   Correct.

Warren - Cross by Bruch

1   Q.  And you ended up calling that number you said not once,

2   but twice on Friday, right?

3   A.  Correct.

4   Q.  And you've seen throughout this case the transcript of

5   that message.  And in the message, they advise prospective

6   jurors that they're not supposed to bring cell phones or

7   electronic devices into the courtroom, correct?

8   A.  Yes.

9   Q.  And you're saying here today that you did not listen to

10  that part of the message, correct?

11  A.  I never listened to the whole message, no.

12  Q.  I want to show you Plaintiff's Exhibit 32.  Earlier in the

13  trial, we listened to the audiotape from that February 5

14  formal interrogation, and the jury was given a transcript of

15  that.  And I want to show you one particular question.

16          MS. McLAUGHLIN:  Are you moving for admission of the

17  transcript?

18          MS. BRUCH:  I will move for admission.  I thought it

19  had been admitted.

20          MS. ANDERSON:  It was admitted on the 19th.

21          THE COURT:  Plaintiff's 32 is in evidence.

22  BY MS. BRUCH:

23  Q.  Do you recall during the formal interrogation by

24  Commander Jennings that she asked you if you called the number

25  on the summons the Friday before January 6th to see if you had

Warren - Cross by Bruch

1  to report for jury duty?

2  A.  Yes.

3  Q.  And you told her that you did?

4  A.  I did.

5  Q.  And one of the questions of Commander Jennings was did you

6  listen to the message when you called, and your answer was

7  yes, correct?

8  A.  Yes, I did listen to it.

9  Q.  And would you agree with me that you never told

10  Commander Jennings that you hung up before listening to the

11  entire message?

12  A.  I never told her that during this interrogation.

13  Q.  And when you met with Chief Deputy Koster on March 11th,

14  you never told him either that you hung up before the message

15  finished playing?

16  A.  I'm not sure when I actually mentioned that.  At some

17  point, it was mentioned, but I don't recall exactly when it

18  was mentioned.

19  Q.  Okay.

20  A.  I'm having a hard time remembering if they even asked

21  that, if I heard the whole message.

22  Q.  Could it have been brought up for the first time when I

23  took your deposition?

24  A.  Could have, sure.

25  Q.  So the morning of your jury duty, January 6, 2014, the

Warren - Cross by Bruch

811

1   weather was so bad you wondered if there was even going to be

2   court that day, correct?

3   A.   Correct, yes.

4   Q.   So if you look at the back page of the summons, which,

5   again, was part of Exhibit 3, there's a reference in there to

6   inclement weather/emergency.  Do you see that?

7   A.   I do.

8   Q.   And it provides instructions on what you should do if

9   there's bad weather, right?

10  A.   Yes.

11  Q.   Did you ever look at the summons to see what instructions

12  that the Court provided you on what to do if there was bad

13  weather that day?

14  A.   No, I didn't.

15  Q.   So when you testified in court on Friday, did you tell the

16  jurors that on Saturday you were off work, and your daughter

17  had a swim meet at Metea Valley, and she got some pretty good

18  times that day?

19  A.   Yeah, she got a few time drops, yes.

20  Q.   Okay.  And did you tell the jurors that you were also off

21  on Sunday, and your daughter got pretty sick, so you're not

22  sure if she swam in the meet that day?

23  A.   That is correct.

24  Q.   Ms. Warren, do you recall testifying under oath on

25  August 31, 2016?

Warren - Cross by Bruch

812

1   A.   Yes.

2   Q.   And that was two years ago, right?

3   A.   August of 2017?

4   Q.   '16.

5   A.   '16.  Oh, yeah, that's two years ago.

6   Q.   At that time, were you asked these questions and gave the

7   following answers?

8              MS. BRUCH:  And I'm referring to page 359, starting

9   at line 19, to page 360, line 2.

10  BY MS. BRUCH:

11  Q.   And the question is:

12             "Q.  Did you have to work on Saturday?

13             "A.  I'm not sure.  It's been two and a half years.

14   If you could produce a schedule, I could be exact.  Right

15   now I'm not sure.

16             "Q.  How about Sunday?

17             "A.  Same thing.  I'm not sure.  I think I was off

18   because I made a call to her that evening, and I recall

19   being home.  So I believe I was off Sunday."

20             Were those the questions that you were asked and the

21   answers you gave?

22             MS. McLAUGHLIN:  Objection.  Improper impeachment.

23             THE COURT:  That's for the jury to decide.

24             Ladies and gentlemen, you'll hear various impeachment

25   where one party will argue that the -- something said one time

1   is different than something said the other time.  Ultimately

2   that's for you to decide.

3           So objection is overruled.  The jury can decide

4   whether it's inconsistent or consistent.

5           Go ahead.

6   BY MS. BRUCH:

7   Q.  Was that the questions you were asked and the answers you

8   gave?

9   A.  Yes.

10  Q.  So on Sunday night, January 5th, you called

11  Commander Jennings at her home to let her know that you had

12  jury duty, correct?

13  A.  I did.

14  Q.  At any time when you notified people in the Sheriff's

15  Office that you received a jury summons, did any one of your

16  supervisors express to you that being on jury duty would be

17  any imposition in the Sheriff's Office?

18  A.  Anyone in the Sheriff's Office?

19  Q.  Yes.

20  A.  Stating that?  No.

21  Q.  Did any of your supervisors in the Sheriff's Office

22  discourage you from serving your duty as a juror?

23  A.  No.

24  Q.  Commander Jennings told you to report to the courthouse

25  when you spoke with her that night and that you would report

1  for your regularly scheduled shift until she could see the

2  schedule the next day, and she would let you know what to do,

3  right?

4  A.  Yeah, she didn't know until she got in the next day to

5  look at the schedule to advise me.

6  Q.  Didn't Commander Jennings tell you to bring your uniform

7  with you that day?

8  A.  No, I don't recall that at all.

9  Q.  Knowing that there's been a lot of snow and that there's

10 construction in the area and -- wouldn't you anticipate that

11 it would take you more time to get to the courthouse than on a

12 typical day?

13 A.  Sure.

14 Q.  So wouldn't that be more of a reason to bring your uniform

15 with you that day?

16 A.  No.

17 Q.  So at that time, you normally were working second shift,

18 which would start at 2:30, right?

19 A.  Correct.

20 Q.  So isn't it true that one of the reasons why you didn't

21 bring your uniform with you that day is because you said that

22 it would not be safe being inside your car at the public

23 safety center?

24 A.  That was one of the questions prior, during my deposition.

25 That was asked, and that is a reason that I would not.  But

Warren - Cross by Bruch

1   that's not the only reason.

2   Q.   The public safety center, there's a locker there for you

3   to keep your belongings, right?

4   A.   In the jail, yes.

5   Q.   So I want to talk about the childcare issues.  Now, on

6   Friday, did you tell the jurors that on Sunday night, you were

7   trying to get answers from Commander Jennings on what your

8   schedule would be for Monday because your husband was going to

9   be on duty that day; is that correct?

10  A.   Yes, we were trying to get answers as to what my schedule

11  is going to be for that Monday for jury duty.

12  Q.   And you also testified that Louise, your mother-in-law,

13  was scheduled to work, correct?

14  A.   Correct.

15  Q.   You also said that you knew that the weather was going to

16  be bad but you didn't know if schools were going to be closed

17  yet, correct?

18  A.   We found out that schools were going to be closed at some

19  point.  I believe it was the night before.

20         MS. BRUCH:  Your Honor, can you instruct the witness

21  to answer the question as asked?

22         THE COURT:  Well, re-ask the question.

23         MS. BRUCH:  Okay.

24  BY MS. BRUCH:

25  Q.   Did you testify on Friday that you knew the weather was

**Warren - Cross by Bruch**

1   going to be bad but you didn't know if schools were going to

2   be closed yet?

3   A.   Yes.

4   Q.   Okay.  So you're saying that on Sunday night you didn't

5   know if schools were going to be closed, correct?

6   A.   I'm not sure exactly when we found out exactly when

7   schools were going to be closed, but it was pretty much

8   implied that they were going to be closed.

9   Q.   Okay.  I want to turn to your testimony under oath on

10  August 31, 2016.

11       MS. BRUCH:  Page 419, lines 1 through 3.

12  BY MS. BRUCH:

13  Q.   At that time were you asked the following questions and

14  you gave the following answers:

15       "Q.  How did you know your daughter's school was

16   cancelled?

17       "A.  Notice the night before, I believe."

18       Was that the question you were asked and the answer

19  you gave?

20  A.   I believe so, yes.

21  Q.   Okay.  Is it true that on Sunday night, you called your

22  mother-in-law Louise, and she was going to watch your daughter

23  in the morning.  And then she had to work, and she was going

24  to come back later in the afternoon to watch your daughter

25  while you were at work, correct?

Warren - Cross by Bruch

817

A.  That is correct.

Q.  And you testified earlier on Friday that your husband got up at 4:30 in the morning even though his shift starts at 7:00, and he's one of those freaks that gets into work at 5:00 or 5:30 in the morning every day?

A.  Yes, he gets in there very early.  His shift starts at 7:00.

Q.  Did you also testify that you were a little late to jury duty because you were waiting for your mother-in-law to be able to get to your house because she was coming from the other side of Aurora to Oswego?

A.  Yes.

Q.  You were still at home when you called her, right?

A.  I was.

Q.  You're saying you called her on her cell phone?

A.  Yes.

Q.  And you left the house before your mother-in-law got there?

A.  I did.

Q.  Wasn't your husband still at home when you left for work?

A.  No, he was not.  He was already on duty.

Q.  Okay.  I want to draw your attention to on April 21, 2017, did you testify under oath in this case, April 21, 2017?

A.  Oh, I'm sorry.  I was waiting for the question.  Yes.

Q.  Okay.  And were you asked these questions and gave these

Warren - Cross by Bruch

818

1   answers?

2           MS. BRUCH:  And this is page 747, line 16, to page

3   748, line 16.

4   BY MS. BRUCH:

5   Q.  And the question is:

6           "Q.  So if you had a babysitter only until

7   10:00 a.m., could you explain what it was that you planned

8   to do while you were -- with respect to your childcare while

9   you were at court on jury duty and your husband was working

10  that day?

11          "A.  Okay.  My husband, he was on duty that day.

12  With him being a battalion chief, he does not have to stay

13  at the fire station.  He can go freewill within the

14  district.

15          Now, he -- we had my mother-in-law that was there

16  until 10:00.  She had to work.  My husband was at the home.

17  But we were running the risk -- or if there was a major

18  accident or any type of call, he would obvious -- would

19  obviously have to leave our home, leave our childcare there

20  and assist in those calls.  So we had a grave concern on

21  what was our schedule, what's the game plan, because

22  normally she would have been at school that day, but schools

23  were closed, and she was also ill.

24          Now, for my afternoon shift, I obviously had that

25  already lined up because that's what we had already planned

1    on because that's my normal routine.  And my mother-in-law

2    was going to be at my home after she got off work, and that

3    was going to be right after school time."

4         Was that the question you were asked and the answer

5    you gave?

6    A.  Yes.

7    Q.  Now, you're aware from this case that there's a copy --

8    there's a sign on the courthouse when you're there for jury

9    duty advising the jurors that there's no cell phones allowed?

10   A.  I do now --

11   Q.  You --

12   A.  -- but at the day of, I did not see it.

13   Q.  You entered through the public entrance, correct?

14   A.  Yes, I did.

15   Q.  And when you got to the courthouse, you had to check in at

16   the jury assembly room, correct?

17   A.  Yes.

18   Q.  And when you checked in for jury service, did anyone ask

19   you for your cell phone number?

20   A.  No.

21   Q.  Did you overhear any of the courthouse staff members

22   asking any potential jurors for their cell phone numbers?

23   A.  No.

24   Q.  At the check-in counter in the jury assembly room, there

25   was a sign on the counter that also said "no cell phones

Warren - Cross by Bruch

1   allowed," right?

2   A.  I know that now, yes.

3   Q.  And you stopped at the counter to check in when you

4   arrived at the courthouse, right?

5   A.  Yes.

6   Q.  Okay.  And, Ms. Warren, would you agree with me that on

7   Friday you told the jurors that you did not stop and read that

8   sign on the counter because you put your purse on it?

9   A.  Yeah.  I put my purse on it.  I never looked at it.  Yeah,

10  I didn't see it.

11  Q.  Because you put your purse on it, right?

12  A.  Yeah, I think that was my statement.  I put my purse on

13  it.  I put my purse next to it or on it.  I just never -- I

14  never saw it.

15  Q.  Well, let me just refresh your memory.

16  A.  Okay.

17          MS. BRUCH:  This is on page 610 from July 20, 2018,

18  lines 9 through 11.

19  BY MS. BRUCH:

20  Q.  Were you asked these questions and you gave these answers:

21          "Q.  At any time did you stop to read the piece of

22    paper that was on the check-in counter desk?

23              "A.  I did not.  I put my purse on it."

24          Was that your testimony from Friday?

25  A.  Yes.

Warren - Cross by Bruch

821

1   Q.  And do you recall on Friday that your attorney showed you

2   a screenshot of the security camera video of you standing at

3   the jury check-in and verifying that was you, right?

4   A.  At the check-in or at the magnetometer?

5   Q.  At the jury check-in.  There was a picture shown.  It was

6   a screenshot, right?

7   A.  I believe so, yes.

8   Q.  And we didn't actually see the video from you standing

9   there, right?

10  A.  I don't know if we did or not.  I believe -- did we show

11  the video?  I don't know.  I don't recall.

12  Q.  Would you agree with me that on August 31, 2016 when you

13  testified under oath, you were given an opportunity to review

14  the video of you standing at the jury check-in, and your purse

15  was not covering the sign on the counter?

16  A.  We reviewed the tape.  And I believe we reviewed where I

17  put my purse on the counter, but I'm not recalling exactly

18  right now.

19  Q.  Okay.

20          MS. BRUCH:  This is August 31, 2016, page 399.

21  Actually, it's -- actually, this is page 402 starting at

22  line 3, going to line 5.

23  BY MS. BRUCH:

24  Q.  And were you asked this question and gave this answer:

25          "Q.  Does that video show your purse on that sign at

1    any point?

2            "A.  No.  It doesn't -- that I put it directly on,

3    no."

4            Was that the question you were asked and the answer

5    you gave?

6    A.  Yeah.  I'm not sure if I put it directly on it, but, yes,

7    I would agree with that.

8    Q.  So -- and you knew that when you testified under oath in

9    2016, correct?

10   A.  Yes.

11   Q.  So after checking in at the jury assembly room, that's

12   when you were called into Judge Pilmer's courtroom to be

13   questioned as a potential juror in a criminal case, correct?

14   A.  I was -- I'm sorry.  I blanked out.

15   Q.  Okay.

16   A.  What was your --

17   Q.  Then you're called into Judge Pilmer's courtroom, and

18   you're questioned as a potential juror, correct?

19   A.  Yes.

20   Q.  And you weren't selected for that jury, right?

21   A.  No, I was not.

22   Q.  Okay.  I want to show you Defendants' Exhibit 8.

23           Ms. Warren, isn't it true that after Judge Pilmer

24   finished questioning the prospective jurors and you understood

25   that you were not selected for the jury that Judge Pilmer told

1    you that you would probably be released to go?

2    A.  Yes.

3    Q.  And you see this transcript of the statement that

4    Judge Pilmer made that day.  Is that an accurate statement of

5    what he told you when you were in his courtroom on January 6,

6    2014?

7    A.  I would assume, yes, that it's accurate.  I have no reason

8    to think otherwise.

9    Q.  And it's your testimony that after hearing that from

10   Judge Pilmer that you were under the impression that you were

11   simply released for lunch?

12   A.  I was under the impression that we could be called for

13   other jurors.  We were heading back to the jury assembly room,

14   potentially used for other jurors.

15   Q.  So when you got back to the jury assembly room, nobody

16   asked you for your cell phone, right?

17   A.  No, they did not.

18   Q.  And there were at least over 30 prospective jurors in that

19   jury assembly room at that point, right?

20   A.  Yes, I would agree with that.

21   Q.  And you didn't hear them asking any of those 30 plus

22   prospective jurors for their cell phone number, right?

23   A.  No, I did not.

24   Q.  So as you're sitting in the jury assembly room a little

25   after 11:00, that's when one of the employees says, "You may

Warren - Cross by Bruch

824

1    go"?

2    A.  Yes.

3    Q.  She doesn't say anything else to the group besides "You

4    may go," correct?

5    A.  That's what I recall, yes.

6    Q.  She doesn't say, "You may go, but you must return," right?

7    A.  I didn't listen that close on it.  I remember "you may

8    go."  I didn't really pay that close attention.

9    Q.  Do you remember testifying under oath on October 8, 2015?

10   A.  Oh, I do.  Yes.

11           MS. BRUCH:  And this is page 164 at lines 14 to 21.

12   BY MS. BRUCH:

13   Q.  Were you asked these questions -- this question and gave

14   this answer:

15           "Q.  Did she say, 'You may go, but you must return'?

16           "A.  Not that I recall.  It was -- when we were in

17    the actual courtroom, the judge stated that when we would be

18    released for lunch, if we saw the counsel out, to not talk

19    to the counsel, don't take any offense by it, so forth.

20    That's when he mentioned about the lunch break and so

21    forth."

22           Was that the question you were asked and the answer

23   that you gave?

24   A.  Yes.

25   Q.  The person in the jury assembly room didn't give any time

Warren - Cross by Bruch

1    when you needed to be back, right?

2    A.  Not that I recall, no.

3    Q.  So you thought that lunch at the courthouse began at

4    11:00?

5    A.  I figured that an hour lunch is appropriate.  That's what

6    I know that the deputies get.

7    Q.  But you thought that that was at 11:00?

8    A.  Whenever we were released that I figured we were on lunch

9    break.

10   Q.  You didn't ask her any questions on how much time do we

11   get?

12   A.  No, I did not.

13   Q.  You did not try to stop and speak with her before you

14   left, right?

15   A.  No, because there was numerous people that were, and I

16   wanted to get home quick to my daughter.

17   Q.  So when you left the courthouse, it was your intention

18   first to get in touch with Commander Jennings, right?

19   A.  Correct.

20   Q.  So the first call that you made then was to the jail to

21   find out when you were working, right?

22   A.  Yes, to get ahold of Commander Jennings.

23   Q.  And that call would have been made at 11:14?

24   A.  Yes.

25   Q.  So on Friday, did you testify that you tried calling your

Warren - Cross by Bruch

826

1  husband Jeff, but if memory serves you correctly, you were

2  playing phone tag a little bit; and you first got his

3  voicemail, so you don't know exactly when you called him to

4  let him know you were working on first shift and would be off

5  for that afternoon.  Is that true?

6  A.  I remember having multiple calls, attempting to call.  I

7  don't remember the exact events on how many times I called

8  him, but I know that I contacted him multiple times that day.

9  Q.  Okay.  So let's look at Defendants' Exhibit 7.  According

10 to your unredacted phone records, at 11:16, there's a call to

11 the 630-553-7500 number.  That's the jail, right?

12 A.  It is.

13 Q.  And then the next number was at 11 -- the next call was at

14 11:16, and that's to the 630-730-2196 number, correct?

15 A.  Correct.

16 Q.  And that's your husband's number?

17 A.  That is.

18 Q.  And it looks like you spoke with him at that point for

19 three minutes; is that right?

20 A.  Yes.

21 Q.  So now looking at this record, does that cause you to

22 believe that you actually got ahold of him then and didn't get

23 his voicemail and the two of you had a conversation?

24 A.  Yes.

25 Q.  And what did you speak with him about at that point?

Warren - Cross by Bruch

1  A.  I was letting him know that I was heading home.  I wanted

2  to see if he was there or if he was out on calls, just letting

3  him know that I was on lunch break and heading home to check

4  on Megan and the dog.

5  Q.  So then according to the phone records, at 11 -- the next

6  call after that it shows 11:20 to 630-244-8328.  Is that

7  Commander Jennings' number?

8  A.  Yes.

9  Q.  So that's the point in time when you had your conversation

10  with her, right?

11  A.  That is correct.

12  Q.  Is it accurate -- and I want to make sure that we're

13  correct on this.  So during your conversation with

14  Commander Jennings, did you tell her that you left the

15  courthouse, that we were on lunch, that you're headed home to

16  check on your daughter and dog and getting in touch with her

17  and that you would let her know when you were released?

18  A.  That's part of the conversation, yes.

19  Q.  Okay.  And you told Commander Jennings that you were going

20  to report back to the courthouse after lunch?

21  A.  Yes.

22  Q.  And you also told Commander Jennings that you were hoping

23  that you would get released?

24  A.  Yes.

25  Q.  At that point Commander Jennings told you that she changed

1    your shift, and when you were done with jury duty, you should

2    go to the jail and finish up your shift?

3    A.   Yeah, she said for me to finish up first shift.

4    Q.   And then you told Commander Jennings that when you were

5    dismissed you would be over to finish working, correct?

6    A.   Yes.

7    Q.   And her response was, that's fine, just let me know when

8    that happens, correct?

9    A.   Yes.

10   Q.   So now on Friday, you testified that after leaving the

11   courthouse, you also called your mother-in-law Louise,

12   correct?

13   A.   I did.

14   Q.   So this would have been the second call that you made to

15   Louise that day, right?

16   A.   Yes.

17   Q.   Did you call Louise when you were leaving the courthouse?

18   A.   I did, but I was driving.

19   Q.   Okay.  So according to the records here, at 11:20, you

20   found out from Commander Jennings that you were going to be

21   working first shift, correct?

22   A.   Correct.

23   Q.   So after you found that out, is that when you called

24   Louise?

25   A.   I didn't call Louise until when I was -- right when I was

Warren - Cross by Bruch

829

1   leaving the courthouse.  So I didn't know what shift I was

2   actually working because I hadn't gotten ahold of

3   Commander Jennings at that time yet.

4   Q.  So after you did get ahold of Commander Jennings, did you

5   call Louise then to let her know, hey, I just spoke with

6   Commander Jennings; I don't have to work?

7   A.  No.

8   Q.  So you would have called -- would Louise have been your

9   first call?

10  A.  Louise was one of my first calls when I was leaving the

11  courthouse.

12  Q.  When you say one of your first calls --

13  A.  Mm-hmm.

14  Q.  Why don't you just take us through, what was your first

15  call?

16  A.  So based on this, 11:14, I called the jail.  So that was

17  my -- I would say my first call to try to get ahold of

18  Commander Jennings.

19  Q.  And then what would be your second call?

20  A.  I would have called either my husband or Louise, and then

21  I called Commander Jennings on her cell phone because she

22  wasn't at the jail, or she wasn't responding at the jail.

23  Q.  Now, I believe you testified on Friday that when you

24  called Louise, she was already at work.

25  A.  Mm-hmm.

Warren - Cross by Bruch

830

1  Q.  Is that yes?

2  A.  Yes, that's what I believe.  I don't know if she was there

3  or not, but I know she was gone from my home.

4  Q.  So at at least 11:14, your understanding was that Louise

5  was gone from your house and was already at her job?

6  A.  She was either -- well, she was already gone from my home.

7  I don't know if she was already at her work or if she was

8  already there.  I know that she was gone from my home and

9  either on the road to work or already there.  I'm not sure.

10  Q.  Well, do you remember her saying, well, hold off; I have

11  to pull off to the side of the road to speak with you?

12  A.  She does that.  I don't remember on that day that she said

13  it.  I could see her pulling off to the side and then talking,

14  not saying, hold on, I got to pull over.  But I don't remember

15  her saying that to me on that particular call, no.

16  Q.  Did she tell you whether she was with any customers in the

17  floral department that day?

18  A.  No.

19  Q.  Did she tell you whether she was working at that point?

20  A.  No.

21  Q.  So on Friday, you testified that on your way home, you

22  went through the McDonald's drive-thru, correct?

23  A.  I did.

24  Q.  And you told the jury that your daughter wanted two

25  hamburgers with ketchup only and a fry and a root beer,

Warren - Cross by Bruch

1    correct?

2    A.   That is correct.

3    Q.   And that you got two cheeseburgers, right?

4    A.   I did.

5    Q.   Now, is it true that you're claiming at approximately

6    11:30 a.m., or maybe even up to noon, you received this phone

7    call on your cell phone telling you that you didn't need to

8    return?

9    A.   When I went through McDonald's drive-thru, that's when

10   that call came through.

11   Q.   This was not a call that you placed?

12   A.   No, it is not.

13   Q.   So who called you?

14   A.   I don't know.  I believed it was from the courthouse.  And

15   then my second response was the travel agent.  I don't know.

16   But that's the two that I believe.

17   Q.   Would you agree with me that as of April 20, 2017 when you

18   testified under oath that you were still claiming that the

19   call that you received was from Christine Fidler, the travel

20   agent?

21   A.   Yes.

22   Q.   And you testified that when the person called you that

23   what they said was, hey, Carrie, nothing else is needed, don't

24   work too hard, have a good day, correct?

25   A.   Yes.

**Warren - Cross by Bruch**

1  Q.  Now, you heard Christine Fidler come into court and

2  testify, correct?

3  A.  I did.

4  Q.  Would you agree that the first call she made to you was on

5  January 2nd telling you that payment was needed for your

6  vacation?

7  A.  I don't know the exact timeline, but I know I spoke to her

8  multiple times that week.

9  Q.  Did you speak with her more than twice?

10  A.  I would say yes.

11  Q.  And you saw her phone records reflected two phone calls

12  between the two of you.  You saw that, right?

13  A.  Yes.

14  Q.  And do you dispute that her phone records are accurate?

15  A.  I don't know if phone records are accurate.  All I know is

16  that there's calls on my phone record that's not accurate.

17  Q.  So she had -- so according to her phone records, it shows

18  that there was a call on January 2nd, and she's saying that's

19  when she would have told you that payment was due, correct?

20  A.  Could be, yes.

21  Q.  And then the second call that she made to you was on

22  January 10th telling you that your documents were ready?

23  A.  There had to have been other calls prior to that because I

24  had to make payment, requesting payment, picking up documents.

25  There was more than two conversations I believe that would

1  have taken place during that time based on past travel

2  experiences.

3  Q.  And do you recall at any time before today testifying

4  under oath that you had multiple telephone conversations with

5  Christine Fidler in January 2014?

6  A.  In January 2014, I had multiple conversations with her.

7  After the fact I first thought it was from the courthouse on

8  January 6th, but we believed that she called me on

9  January 6th.  I just can't show it on the phone records.

10  Q.  But my question to you is that you've testified under oath

11  in this case before today, correct?

12  A.  Mm-hmm.  I have.

13  Q.  And when you testified under oath before today, did you

14  ever testify that you had more than two conversations with

15  Christine Fidler?

16  A.  I don't know if I testified to that or not.  I can't

17  remember every single detail.

18  Q.  If the person who called you didn't say your documents

19  were ready, how would you know to pick them up?

20  A.  I wouldn't know if they didn't say documents were ready.

21  Q.  When you got this phone call when you were going through

22  the McDonald's drive-thru, what was the prefix of the phone

23  number?

24  A.  I have no idea because I didn't look at it.

25  Q.  Is it a number that you recognized?

Warren - Cross by Bruch

834

1   A.  I can't answer to it because I didn't look at it.  I was

2   paying when I was going through McDonald's drive-thru.

3   Q.  So you know what the area code was of the number?

4   A.  I actually don't, no.

5   Q.  You don't know if it was the prefix 553, which is the

6   county?

7   A.  I have -- no, I have no idea what it was.  I didn't pay

8   attention to that.

9   Q.  Did you recognize the voice of the person who called you?

10  A.  No.

11  Q.  And you never asked, who is this again?

12  A.  No, I did not.

13  Q.  After you left the McDonald's drive-thru, did you go back

14  and look at your phone and think, you know, let me check to

15  see who that was that called because I wasn't quite sure who

16  it was?

17  A.  No.

18  Q.  And you initially had claimed that the call was from the

19  courthouse, correct?

20  A.  Yes.

21  Q.  Did you think that it's odd that you never gave your cell

22  phone number to anyone in the courthouse but yet they're

23  supposedly calling you on your cell phone?

24  A.  No.

25  Q.  Did you think that they were calling over 30 prospective

1   jurors to let them know that they were not needed?

2   A.   I don't know what they do, but I didn't think it would be

3   odd if they were calling me.

4   Q.   Did you think that it would be odd that they didn't have

5   any of the cell phone numbers for over these -- over 30 people

6   and they're frantically apparently trying to try track them

7   down to call them on cell phone numbers that they don't have?

8   A.   My number is in their computer.

9   Q.   So you think you were singled out and they were just

10  calling you?

11  A.   Possibly, yes.

12  Q.   So did you try to then -- after you got this call when

13  you're going through the McDonald's drive-thru, did you try to

14  call Commander Jennings and say, you know, hey, I just got a

15  call from the courthouse, and I don't need to go back?

16  A.   I'm sorry.   Repeat the question.

17  Q.   At any time after you got this call when you were going

18  through the McDonald's drive-thru, did you then follow-up with

19  Commander Jennings and say, hey, I just got this phone call,

20  and I don't need to come back to jury duty?

21  A.   No, I didn't call Commander Jennings back.

22  Q.   Okay.   And you said you then went home, and you got your

23  uniform, right?

24  A.   I did.

25  Q.   And did you then see -- you saw Chief Deputy Koster,

1    Tracy Page and Lisa Bowen in that break room, right?

2    A.  I did upstairs.

3    Q.  And did you tell them that you had been at the courthouse

4    for jury duty?

5    A.  I did tell them I had jury duty that morning.

6    Q.  And did you tell them that the courts released the jurors

7    for lunch and the jurors had to go back, and once you got

8    back, they released you?

9    A.  I stated that the jurors, we broke for lunch, and that I

10   felt sorry for the jurors having to go back but I was lucky

11   that I was released.

12   Q.  So you told them that you were lucky that you were

13   released?

14   A.  I felt bad about the jurors having to go back on a crummy

15   day like that but that I was there to work day shift since

16   Commander Jennings had changed my shift.  And that was why I

17   was there.

18   Q.  Do you recall testifying on -- this is October 8, 2015,

19   starting at page 177, line 24, and going to page 178, line 6,

20   were you asked this question and did you give this answer:

21        "Q.  Did Tracy ever say to you, that stinks; too bad

22    they couldn't release you before lunch so you didn't have to

23    waste your time going back?

24        "A.  I don't recall that.  I remember it saying that

25    stinks, not for me to go back because I never said I had to

Warren - Cross by Bruch

837

1    go back.  I said the jurors had to go back, but I never said

2    I went back."

3            Was that the question you were asked and the answer

4    you gave?

5    A.  It is.

6    Q.  When you said it was a long day, that was something that

7    you said to them, right?

8    A.  I could have said that.  That's something that I would

9    say.  But I don't know if I said that or not.  Could have.

10           MS. McLAUGHLIN:  Your Honor, may I have a sidebar for

11   just a moment?

12           THE COURT:  All right.

13     (Sidebar.)

14           MS. McLAUGHLIN:  I have not been objecting to all of

15   these what I believe are improper impeachments that are not

16   really impeachments because Your Honor has said basically that

17   is for the jurors to decide.

18           THE COURT:  Go ahead.

19           MS. McLAUGHLIN:  But I don't want to be constantly

20   interrupting.

21           THE COURT:  All right.

22           MS. McLAUGHLIN:  But I just want to be clear that we

23   have this continuing -- I mean, I want to make the record.

24           THE COURT:  Well, go ahead and make your objection,

25   but I'm going to rule -- if I hear something that's plainly

Warren - Cross by Bruch

1    not impeaching, I will say that's not impeaching, and I'll say

2    move on.

3           Everything I've heard so far, because whether it's

4    the answer your client gives in court or the answer she gave

5    at the trial, both of which are lengthy, there have been some

6    major inconsistencies and some minor ones.

7           What I typically do, rather than getting the

8    transcript and examining it line by line and her making the

9    statement here is just simply say it's up to the jury to

10   decide.  I view that as a better practice unless there's

11   something that's plainly not inconsistent.

12          MS. McLAUGHLIN:  Okay.

13          THE COURT:  I haven't heard anything so far that is

14   so far -- so corroborative or so consistent that I would

15   strike it.  I could slow things down a little and do it that

16   way, but I don't think that's --

17          MS. McLAUGHLIN:  Well, I don't want to do that, but I

18   just want to make sure I make the record.

19          THE COURT:  Well, if you want, make that objection

20   next time, and I'll say in front of the jury you have a

21   continuing objection, so at least it's preserved in front of

22   the jury.

23          MS. McLAUGHLIN:  Okay.

24          THE COURT:  And you have a continuing objection.  But

25   what I typically do when objections like that occur is I tell

1    the jury they're the ones that have to decide.

2              MS. McLAUGHLIN:  Okay.

3              THE COURT:  And we can do it that way.  Then you've

4    got it preserved not only here but in front of the jury too.

5              MS. McLAUGHLIN:  Okay.

6              THE COURT:  Okay.

7              MS. McLAUGHLIN:  Okay.  Thank you.

8       (End of sidebar.)

9    BY MS. BRUCH:

10   Q.   Okay.  So we were talking about the time frame when you

11   were in the break room at this public safety center with Tracy

12   Page and Lisa Bowen.  And at that time you told them that it

13   was going to be a long day, correct?

14   A.   Sounds like something that I would have said, that I

15   thought it was going to be a long day.  But she was nice

16   enough to switch me over to day shift.

17   Q.   What jurors were going back?

18   A.   The ones that were going to be used for other jurors.

19   That was my belief at the time.

20   Q.   How did you know that?

21   A.   That was my belief based on being in the courtroom and

22   just what I believed.

23   Q.   Why -- I don't understand.  Why would you be under the

24   impression that other people had to go back?  I mean, you said

25   you got a call saying that you weren't needed anymore.  So who

1    else would have -- who would have to go back?

2    A.   If they were going to use them for other court cases.

3    Q.   So some of the other prospective jurors you thought could

4    be used for other court cases?

5    A.   Yes.

6    Q.   But not you?

7    A.   That's what my belief was at the time, yes.

8    Q.   You would agree that you didn't go back to the courthouse

9    after lunch, correct?

10   A.   No, I did not.

11   Q.   So on January 14th, that's when Commander Jennings gives

12   you notification of charges, correct?

13   A.   That is correct.

14   Q.   And during that meeting, she told you that there were some

15   complaints about your behavior at the courthouse?

16   A.   Yes.

17   Q.   And based on the notification of charges that she gave

18   you, your understanding is you were going to be investigated

19   on those issues, right?

20   A.   Yes.

21   Q.   Did you tell the truth during that meeting?

22   A.   I did.

23   Q.   Did you tell Commander Jennings that you didn't know that

24   you were not allowed to have your cell phone or any other

25   electronic device with you while you were at the courthouse

1    for jury duty?

2    A.  Yes.

3    Q.  Did you tell Commander Jennings that you were released to

4    go to lunch somewhere around 11:30 and you called

5    Commander Jennings to let her know what was going on?

6    A.  Yes.

7    Q.  Okay.  And now for the first time during that January 4th

8    meeting, that's when you disclosed to her that shortly after

9    you had spoken with her that you received a phone call from

10   someone telling you that you didn't have to report back to the

11   courthouse and that you were done, correct?

12   A.  Correct.

13   Q.  You were the one that raised the issue of receiving this

14   phone call, correct?

15   A.  I believe I did.

16   Q.  Okay.  Isn't it true that you can't identify any question

17   that Commander Jennings asked you during the January 4th

18   meeting that would prompt you to volunteer that you received a

19   phone call from someone telling you that you didn't have to

20   report back to the courthouse and you were done?

21   A.  It was in reference to trying to get out of serving on the

22   jury.  That's what I thought that charge was in reference to.

23   Q.  So you brought it up though?

24   A.  Yes, because at the time I was concerned whether or not if

25   I didn't complete my jury duty.

Warren - Cross by Bruch

842

1  Q.  Okay.  So then when you brought this up to

2  Commander Jennings, then she asked you, okay, who called you,

3  right?

4  A.  Yes.

5  Q.  And you told her you didn't recognize the number?

6  A.  I told her I didn't recognize -- I didn't know who it was

7  that called me.

8  Q.  Okay.

9  A.  I don't think I said recognize the number.  I just didn't

10 know who called me.  I mentioned someone from the courthouse.

11 Q.  Did she then ask you if the number was still in your

12 phone, and you said you would check?

13 A.  Yes.

14 Q.  Did Commander Jennings tell you to check and give her the

15 phone records?

16 A.  Yes.

17 Q.  And she asked you then if you would supply the number, and

18 you said at that time you would have no problem with that?

19 A.  Correct.

20 Q.  So she just wanted to know the number of who was it that

21 called you, right?

22 A.  She wanted my phone records, and I at the time had no

23 problem supplying that.

24 Q.  Okay.  And you could have given her a screenshot, right?

25 A.  She asked -- I guess I could have, but she asked for the

Warren - Cross by Bruch

843

1    phone records.

2    Q.   She -- but all she wanted to know from your understanding

3    was who was that person that called you, right?

4    A.   Yes.  She asked for the phone records, and she wanted to

5    know who called me from the courthouse.  And I had no problem

6    with supplying that information to her.

7    Q.   Did you tell her, well, can I just give you the phone

8    number of the person?

9    A.   That I could just -- I didn't know it at the time.

10   Q.   No, I'm saying did you say to her, you know what?  Instead

11   of giving my whole phone records, could I just give you the

12   number of the person who called me?

13   A.   I don't think that was mentioned.  I could -- I don't

14   recall that being mentioned like that.

15   Q.   But did you think -- I know it wasn't mentioned, but did

16   you think about that, like, hey, you know what?  I don't want

17   to turn over all of my personal, private phone records.  She

18   just wants to know this call.  Could I just give you the

19   name -- the number of the call?

20   A.   No, because she asked for the phone records.

21   Q.   What about just a screenshot, did she ever ask you for a

22   screenshot?

23   A.   I don't know  -- I don't recall if she asked for that.  I

24   recall her asking for the phone records.

25   Q.   Okay.  When you left the meeting, after you left this

1   meeting on January 14th, did you check your phone log?

2   A.  After that meeting, I did.

3   Q.  What did you see in your phone log?

4   A.  That my numbers didn't go back that far.

5   Q.  So on January 14th, you checked your phone log, and your

6   phone log didn't go back to January 6th?

7   A.  That is correct.

8   Q.  But you hadn't deleted any numbers from your call log?

9   A.  I don't recall deleting them.  My husband sometimes would

10  delete things.  But all I know is that when I scrolled

11  through, it didn't go all the way back to January 6th.

12  Q.  So now are you telling us that your husband deleted your

13  call log?

14  A.  It's possible, yes.

15  Q.  So at the time that you left the meeting with

16  Commander Jennings on January 14th, is it accurate that there

17  were two things that you know you needed to do.  No. 1 was to

18  prepare a memo of your version of what happened; is that

19  correct?

20  A.  That is correct.

21  Q.  And No. 2 was to get your phone records or some proof of

22  who called you when you were going through the McDonald's

23  drive-thru, right?

24  A.  Yes.

25  Q.  Those were the only two things that you had to do when you

Warren - Cross by Bruch

1   left her office on January 14th, right?

2   A.   Yes.

3   Q.   Did you ever show Commander Jennings the call log from

4   your phone?

5   A.   No.

6   Q.   Ms. Warren, is it true that the reason why you didn't show

7   Commander Jennings the call log from your phone is because you

8   know you never got a call on January 6th --

9   A.   That's not true.

10  Q.   -- when you were going through McDonald's --

11  A.   No.  I don't agree with that.

12  Q.   You never received a call from the courthouse, right?

13  A.   Well, that's what they're saying.

14  Q.   You never received a phone call from your travel agent,

15  Christine Fidler, did you?

16  A.   Well, that's what they're saying, but I don't -- I know I

17  got a phone call, and those are the only two that would be

18  possible, calling me.  So those are the only two answers I

19  have to give at this point.

20  Q.   But your call log for that time frame only shows the call

21  that you made to your husband; is that right?

22  A.   Phone call made to my husband?

23  Q.   Yes, the one that's at 11:32, right?  Because you said

24  that at -- you didn't talk to Commander Jennings when you were

25  going through McDonald's, right?

1    A.  I didn't have my phone log available.  It didn't go back

2    that far on my phone.

3    Q.  Now, you're telling us today that you looked at your cell

4    phone call log on January 14th?

5    A.  I scrolled through my phone on multiple days.  I went back

6    as far as I could go when I was looking at -- are you talking

7    about, like, on my cell phone looking at my calls?

8    Q.  Exactly.

9    A.  Yes, I went -- I was scrolling through to see if there

10   were any numbers that I didn't recognize or that wasn't under

11   my contacts by name of the person.

12   Q.  And you looked through your call log on January 14th,

13   right?

14   A.  Yes, I did.

15   Q.  All right.  So I want to point your attention to your

16   testimony under oath on April 20, 2017.

17          MS. BRUCH:  And this is on page 521, starting at

18   line 14, and it -- let's see.  And this was 522, line 14.

19   BY MS. BRUCH:

20   Q.  And I apologize that this is long, but to get it out.

21          THE COURT:  If you're going to read it though, go

22   more slowly because people read things more quickly than they

23   normally talk, and it's not fair to the court reporter.

24          MS. BRUCH:  Absolutely, Your Honor.

25   BY MS. BRUCH:

**Warren - Cross by Bruch**

1    Q.  So were you asked these questions and gave these answers:

2              "Q.  Maybe my question was not clear.  Let me just be

3    very clear.  The night that you came home from work or early

4    the next morning, did you look on your cell phone and look

5    on the log on your physical phone for those calls?

6              "A.  I don't remember specifically for it, but I

7    think it's possible that I did.  I -- it would make sense

8    that I would have looked at it, but it wasn't a main focus.

9    I was worried about the charges.

10             "Q.  Did you ever look at your cell phone log ever?

11             "A.  Yes, I did.

12             "Q.  When did you -- when can you say that you looked

13   for certain at your cell phone log?

14             "A.  For certain for that particular call was for

15   Christine Fidler to see what numbers I would not recognize

16   and that wasn't logged by name in my phone.

17             "Q.  So you had this meeting with Commander Jennings

18   on January 14th?

19             "A.  Yes.

20             "Q.  And you spoke with Christine Fidler on

21   February 14th, right?

22             "A.  I believe -- I believe that's what the document

23   said, yes.

24             "Q.  So you're telling us that you waited a month

25   before you looked for certain on your cell phone to check to

Warren - Cross by Bruch

848

1    see who called you?

2           "A.   For certain, yes."

3           Was that the questions you were asked and the answers

4    you gave?

5    A.   Yes.

6    Q.   I want to show you the memos that you wrote after this

7    meeting with Commander Jennings, so we have Joint Exhibit 8

8    and Joint Exhibit 3, page 173.  Let's start with Joint Exhibit

9    8.

10          MS. BRUCH:  Joint Exhibit 8 has not been admitted

11   yet.

12          MS. McLAUGHLIN:  If it's a joint exhibit, no.

13          THE COURT:  I believe Joint 8 has been admitted, but

14   if it hasn't, is there any objection?

15          MS. McLAUGHLIN:  No.

16          THE COURT:  Okay.  It's admitted twice.  All right.

17     (Joint Exhibit No. 8 was received in evidence.)

18   BY MS. BRUCH:

19   Q.   Looking at -- I want to just focus -- I don't want to read

20   through the entire document, but within here, you were

21   detailing what the questions were that were asked by

22   Judge Pilmer during jury selection.  And starting on the

23   second page of your memo, did you put in your memo that

24   Judge Pilmer informed you that at some time today that you

25   would break for lunch and continue on possibly up until

Warren - Cross by Bruch

1   4:30 p.m. and that he felt the case could be completed

2   sometime that day?  Is that what you put in your memo?

3   A.  It is.

4   Q.  And did you advise Commander Jennings in that memo that

5   when you were back in the jury assembly room that you found

6   out that you were on the schedule to work day shift instead of

7   afternoon shift?

8   A.  Yes, I found out from Dunahoe via text.

9   Q.  Okay.  And then did you put in your memo that a lady came

10  in and informed you that you could leave for lunch?

11  A.  Yes, I did.

12  Q.  Ms. Warren, would you agree with me that when you wrote

13  this memo that you gave the impression that you had to return

14  to the courthouse after lunch?

15  A.  I don't think I said that I returned to the courthouse in

16  my memo.

17  Q.  I understand that, but were you trying to give that

18  impression when you wrote this memo?

19  A.  No, I don't believe so.  No.  Why would I give that

20  impression when I didn't go back?

21  Q.  Ms. Warren, would you agree with me that it's important

22  for corrections officers at the Sheriff's Office to be

23  truthful?

24  A.  I would agree with that, yes.

25  Q.  And I want to show you -- we've already -- let me show you

1    Defendants' Exhibit 2 and 3.

2                MS. BRUCH:  I don't think 2 has been admitted yet.

3                MS. ANDERSON:  That hasn't been admitted.

4                THE COURT:  All right.  Is there any objection to

5    Defendants' Exhibit 2?

6                MS. McLAUGHLIN:  No.  I'm sorry.  No.

7                THE COURT:  All right.  It's admitted.

8        (Defense Exhibit No. 2 was received in evidence.)

9    BY MS. BRUCH:

10   Q.  Ms. Warren, showing you what's been marked as Defendants'

11   Exhibit 3.  As a deputy, were you also a breath operator,

12   breath alcohol operator, whatever it's called?

13   A.  You could just say breath op.  That's how we refer to it.

14   Q.  Was that one of your duties?

15   A.  It was one of my duties, yes.

16   Q.  Okay.  And I don't want to go through all of these, but

17   just generally speaking, are these memos that you would have

18   performed as part of your official responsibilities, doing

19   breath ops?

20   A.  Yes.

21   Q.  And look at Defendants' Exhibit 2, did you receive a

22   notice to appear in court on January (sic) 3, 2013 regarding a

23   case that you had served as a breath op for?

24   A.  Yes, it's per policy that if we can't meet our court date

25   that we have to let them know that we're unable to attend.

Warren - Cross by Bruch

1  Q.  So you were unable to attend because you were going to be

2  out of town at that point?

3  A.  Yes, I had previous vacation planned for that, for my time

4  off for that time frame.

5  Q.  So on January 24, 2014, is that when Commander Jennings

6  gave you notice of a formal interview?

7  A.  On the 14th?

8  Q.  On the 24th of January.

9  A.  On the 24th?  I would have to see the documents.  That

10 sounds correct, but the dates all kind of blend together for

11 the most part.

12 Q.  No, that's fine.  This is Joint Exhibit 12.  I think it's

13 already been admitted.

14         So did you receive this memo from Commander Jennings

15 on January 24, 2014?

16 A.  That's correct.

17 Q.  And when she provided this notice to you, you had an

18 understanding that she was contemplating recommending

19 discipline in greater than an unpaid suspension of more than

20 three days?

21 A.  Yes.  I was under the understanding that it's three days

22 or more up to termination is what she was contemplating.

23 Q.  Okay.  So then on February 5, 2014, did you attend the

24 formal interrogation by Commander Jennings?

25 A.  I did.

Warren - Cross by Bruch

1  Q.  And you heard the audiotape from that interrogation during

2  this trial, right?

3  A.  I did.

4  Q.  And you saw the transcript, right?

5  A.  I did.

6  Q.  Are there any answers that you gave to Commander Jennings

7  that were untruthful during that interrogation?

8  A.  No.

9  Q.  So isn't it true that the following day, that after you

10 had the January 14th meeting with Commander Jennings, then

11 that's when you first asked your husband for the cell phone

12 records?

13 A.  Once I got the memos is when I -- well, no, the first

14 meeting when she pulled me in and asked me, I asked him for

15 the cell phone records then.  But it really was more of a

16 focus, I guess part of the investigation, if you want to say

17 that, once I got the memos from other people, once I got the

18 complainants' memos.  But I didn't receive that until after

19 the interrogation.

20 Q.  So after though -- so it's true, though, that as of

21 January 14th you knew that your cell phone records were being

22 requested by Commander Jennings, right?

23 A.  When -- yeah, she asked in the initial -- like when I was

24 first brought into the office, she did ask for my cell phone

25 records at that time.

Warren - Cross by Bruch

1  Q.  And knowing that, the first time that then you spoke with

2  your husband about the cell phone records was the next day,

3  January 15th, right?

4  A.  Correct, or it could have even been that day.  I know I

5  asked my husband for those records, and he said no.

6  Q.  You didn't tell him the specific time of the call that

7  would be relevant, right?

8  A.  No.

9  Q.  And you didn't tell him about any specific call that you

10  got on January 6th that you thought was important?

11  A.  I don't think so, no.  I just asked him for the phone

12  records.  I needed them for this investigation.

13  Q.  And because you never discussed with him why you needed

14  the records, he didn't know if you needed the records for a

15  call that you received in the morning, in the afternoon, or at

16  night, right?

17  A.  He didn't want to hand over the phone records because they

18  didn't correlate with the charges that were attached.  Is that

19  answering your question, or am I --

20  Q.  I'm asking did he have any idea the time of a call that

21  was important or why Commander Jennings was asking for the

22  records?

23  A.  I don't know if I relayed that to him or not.  I don't

24  think I did, but it's -- yeah, I don't think I recall ever

25  telling him that.  It was just needing the phone records for

1    that particular day, and he was refusing to give those over.

2    Q.  At some point after your February 5 formal interrogation

3    with Commander Jennings, you knew that no one in the

4    courthouse had called you that day, right?

5    A.  Once I got the documents and the complainants and I was

6    able to see their responses, that's when I knew, based on

7    their statements, that they did not call me.

8    Q.  So now I want to show you Joint Exhibit 10.

9    A.  Or at least they were saying that they didn't call me.

10   Q.  So on February 14, 2014, is that when you got a notice

11   from Chief Deputy Koster to appear at the Sheriff's Office for

12   a pre-disciplinary hearing?

13   A.  Was this the pre-termination hearing?

14   Q.  Yeah, it says -- read the first sentence.

15   A.  Okay.  I'm sorry.

16   Q.  It says you're given notice to appear before

17   Sheriff Randall for a pre-disciplinary hearing on Thursday,

18   February 20, 2014 at 1500 hours?

19   A.  Yeah, it was for the pre-termination hearing.

20   Q.  And would you agree with me that after the February 5

21   formal interrogation, Commander Jennings drops out of the

22   investigation, and you had no further contact with her for

23   this disciplinary process, correct?

24   A.  I would agree with that, yes.

25   Q.  You had no more meetings with Commander Jennings after

1    February 5, right?

2    A.   No.

3    Q.   So then you get this notice from Chief Deputy Koster on

4    February 13th, and you know he's the one now taking over the

5    investigation, right?

6    A.   That is correct.

7    Q.   Okay.  And you have to realize at that point this is

8    pretty serious, right?

9    A.   Oh, of course.

10   Q.   Have you ever had any dealings with Chief Deputy Koster

11   before this?

12   A.   No.

13   Q.   So once you got -- at any point now from after the formal

14   interrogation on February 5th up until when you attended the

15   pre-disciplinary meeting, did you have any meetings with any

16   of your union representatives or your union steward to talk

17   about how are we going to defend this?

18   A.   Yes.

19   Q.   And when did you have your first meeting with them and

20   with who?

21   A.   We -- we requested the transcripts at the courthouse and

22   the videotapes.  And I met with Richard Stomper, and we were

23   going over that and also just trying to make some sense of

24   this.  So I had meetings.  I'm not sure on the exact dates

25   when I had meetings.  I know we had times set up to talk to

Warren - Cross by Bruch

856

1   the command staff, but I also met separately with chief --

2   with Stomper.

3   Q.   Where did you meet with him?

4   A.   At Panera.

5   Q.   And was anyone else present for that meeting?

6   A.   For that particular meeting, no.

7   Q.   Did you ever meet with Stomper at your home?

8   A.   Stomper never came to my home, no.

9   Q.   Did -- I think Dion Little was also involved in this

10  situation?

11  A.   Yes, I believe he came over the day that we got reports on

12  people stating what my actions were.  And he came over to my

13  home, I believe it was that day, and we were looking through

14  documents.  I'm not sure if it was later than that, but Little

15  did come over to my home at some point.

16  Q.   So that would have been -- so you got the documents on

17  February 13, 2014?

18  A.   That -- we got those memos, but we -- that was the only

19  documents.  I'm not sure after that when Little actually came

20  over to my home.  I know at some point he was at my home.  I

21  just can't remember exact date when he was at my home.

22  Q.   Was he at your home before the February 28th aborted

23  pre-disciplinary meeting?

24  A.   Honestly, I can't recall the exact -- I want to say -- it

25  was late in the game.  That I know because we were always

Warren - Cross by Bruch

1  focusing on the actual charges that were on the paper.  The

2  phone -- the phone issue didn't come in I want to say until

3  like February 28th, in that range.  So that's probably my best

4  guess as to about the time frame when he was at my home.

5  Q.  So February 28th then what was the purpose of your meeting

6  with him?

7  A.  We were going over documents.  I think we were going over

8  the redacted phone records.  I'm not sure.  He came over and

9  we were going over records, but I can't remember exactly when

10  that was.  I just know it was late in the game.

11  Q.  Was your husband home when he came over?

12  A.  I'm not sure if he was.

13  Q.  Did you --

14  A.  It's possible, but I can't recall if he was.

15  Q.  Did you look through the unredacted records during your

16  meeting with Deputy Little?

17  A.  I don't know.  I can't testify to that for sure.  It's

18  possible, but I don't recall at this time.  I know at some

19  point, especially for the grievance process, we had the

20  unredacted.  So I don't know if it would make sense to me that

21  once we had the unredacted records that was already going into

22  the grievance process.

23  Q.  So on February 14th, over five weeks after jury duty,

24  that's when you first reached out to Christine Fidler, right?

25  A.  That is correct.

Warren - Cross by Bruch

858

1  Q.  And so on February 14th, that was when you first looked at

2  your call log on your cell phone?

3  A.  That would make sense, yes, because I had -- that's when I

4  got the memos, and the courthouse stated that they were not

5  the ones that gave me a call.

6  Q.  So on February 14, 2014, your call log would show a call

7  from Ms. Fidler on January 10, 2014?

8  A.  On my phone log?  It's possible because when I went back

9  on my phone when I was scrolling for the numbers, that was a

10  number that came up that I didn't have logged into my contacts

11  in my phone.  So I called it to see who it belonged to.

12  Q.  So that call would appear on your call log about five

13  weeks after you had your conversation with her?

14  A.  So from February 14th, from the time that she called me

15  into the office, so however long that would be.  I mean, I

16  don't have that right in front of me, so I don't know how many

17  weeks that is.

18  Q.  Well, you saw on her phone records it showed that she had

19  a conversation with you on January 10th, right?

20  A.  It's possible whatever number I saw.  I don't know if it

21  was after that or before.  But based on what we've seen here,

22  it shows on her records for the 10th.

23  Q.  And so five weeks later, your call log is still showing

24  calls that were made at that point, right?

25  A.  That is correct.

Warren - Cross by Bruch

1   Q.  But your call log did not show calls that were made four

2   days before that on January 6th?

3   A.  That is correct.  My phone log didn't go back that far.

4   Q.  Okay.  But it did go to January 10th, right?

5   A.  That would make sense, but I have no recollection on if it

6   was on the 10th, but that's based on the phone records.  That

7   would make sense it would be back to the 10th, so I would

8   agree with that.

9   Q.  So, Ms. Warren, could you please explain for us how when

10  you first checked your call log --

11  A.  Mm-hmm.

12  Q.  -- on January 14th that it would not have shown a call

13  from January 6th, but yet it would show a call from

14  January 10th?

15  A.  I wasn't under investigation, and I didn't clear any calls

16  once I was under investigation for anything.  So I just left

17  my phone alone.  I didn't really touch it other than just use

18  it for normal calls and texting.

19  Q.  So the call that was made by Christine Fidler on

20  January 10th was still on your call log on January 14th?

21  A.  Unless there was one that was after that, but it would

22  make sense that it would be January 10th.  I have no reason to

23  believe otherwise.

24  Q.  But the call from January 6th was not on your call log?

25  A.  No, it didn't go back that far.

Warren - Cross by Bruch

1  Q.  On January 14th?

2  A.  On January 14th, that is correct.

3  Q.  Would you agree with me that the reason why you called

4  Christine Fidler on -- why you -- you called Christine Fidler

5  and asked her to prepare this memo was because you didn't

6  think that the Sheriff's Office was actually going to follow

7  up and call her back to check on her e-mail?

8  A.  No, I didn't think -- I was searching for the truth, and I

9  wanted to provide the documents that they were needing for an

10  appropriate investigation.  So I felt that I was supplying the

11  truth to them, and why else would I think otherwise?

12  Q.  Did you ever tell Ms. Fidler that no one from the

13  Sheriff's Office would ever follow up with her?

14  A.  I don't believe -- I don't know if I did or not.  It's

15  possible.

16  Q.  Did you tell her you were having a political problem at

17  work?

18  A.  Yes, I did classify it as that for her, for a civilian.

19  Yes.

20  Q.  So on January -- or excuse me -- on February 28th when you

21  were supposed to have the pre-disciplinary hearing, that's

22  when Mr. Stomper gave Chief Deputy Koster the redacted phone

23  records, right?

24  A.  Was that the -- was that the date that they were dealing

25  with the Brennan issue, with him arrested?

Warren - Cross by Bruch

1   Q.  That was the day that -- I believe there's been testimony

2   throughout this case that that was when you were reviewing the

3   videos and doing that.

4   A.  Okay.  Yeah.  So we had a limited time, and I think they

5   had a press conference that they had to deal with on that.

6   Whatever it was, our meeting was not able to follow through,

7   and I think that we had a technical issue on one of the

8   meetings.  They all kind of blend together.

9   Q.  And you would agree with me -- I mean, we've seen those

10  redacted phone records over and over again, but would you

11  agree with me that there's only one call that is redacted that

12  day, and that's a call that you made to your husband, right?

13  A.  That's what's showing, yes.

14  Q.  And you're testifying here under oath that you don't know

15  why your husband chose to redact that call?

16  A.  I have no idea.  I know we were in haste, and I grabbed it

17  quickly from him.  He didn't get a chance to -- I didn't give

18  him a chance to really look over it thoroughly before I took

19  it.  So I have no idea why he did that.  He was going to

20  redact all of them actually.

21  Q.  You know, I do want to go through that actually.  Let's

22  put up these redacted records.  I notice there's some

23  handwriting on here, and I believe you've testified that's

24  your handwriting on this document?

25  A.  That is correct.

Warren - Cross by Bruch

1    Q.  And when did you write these notes on there?  Was that

2    before you gave this document to Chief Deputy Koster?

3    A.  No, I believe that was after, but I could be recalling --

4    I could be recalling incorrectly.  But I know eventually when

5    Stomper and I were going over the records, those were notes

6    that we were trying to make sense from all of this.

7    Q.  So when you were going through these records with

8    Mr. Stomper, the purpose was to determine whether the phone

9    records were accurate?

10   A.  Yes.  Rick Stomper and I were going through phone records

11   to try to make some sense as to whether or not if they were

12   accurate because I knew I got a phone call.  We were just

13   trying to figure out from who and so forth.

14   Q.  And at the time that you went through these redacted

15   records with Mr. Stomper, is it your testimony that you had

16   not seen the unredacted records?

17   A.  That would be correct.

18   Q.  So if you look at the redacted call for January 6th, can

19   you tell me how did you know whether it was an incoming call

20   or an outgoing call?

21   A.  Based on the calls, we knew that Commander Jennings stated

22   that she called me twice and that her calls were not on my

23   cell phone record.

24   Q.  And she said she called you twice when?

25   A.  That morning, and it wasn't showing on our phone records.

**Warren - Cross by Bruch**

1  Q.  Did you notice -- and the whole purpose of you going

2  through this, again, is to figure out are your records

3  accurate, right?

4  A.  That is correct.

5  Q.  And I think you testified that you were playing phone tag

6  with your husband, so there would have been multiple calls.

7  Did you notice that any calls between you and your husband

8  were missing?

9  A.  I guess I didn't look at it that close.  We were looking

10 at -- we just noticed that Commander Jennings' phone calls

11 were not on there, and if her calls weren't on there, then

12 they were -- other calls that were not listed as well.  That

13 was our line of thinking.

14 Q.  Well, what about your mother-in-law Louise?  Did you

15 realize when you looked at this that, hey, I know I spoke with

16 my mother-in-law twice that day; those aren't showing up in

17 here?

18 A.  I think that that came about when we thought about it

19 longer, but we were basically focusing on what the

20 Sheriff's Office was focusing on, and that was

21 Commander Jennings.  She stated she called me, and it's not

22 showing, and I don't know why.

23 Q.  So you were at Panera though with Mr. Stomper, right?

24 A.  I don't know if it was on this meeting, but I do know I

25 met Stomper at Panera to go over documents.

1    Q.  And when you were going over documents, no one in the

2    Sheriff's Office pressured you saying, you know, you have to

3    keep this moving.  You had as much time as you wanted to look

4    over these records, right?

5    A.  This was a separate issue.  This wasn't an assigned

6    meeting at the Sheriff's Office when we were doing this.  The

7    assigned meetings were when we were going over the video of

8    the courthouse and the transcripts and so forth.  I ended up

9    meeting with Stomper privately away from the Sheriff's Office

10   at Panera at a later time.

11   Q.  Exactly.  So you had as much time as you wanted to look at

12   this document, right?

13   A.  Well, we were looking at multiple documents, not just this

14   particular one.

15   Q.  Well, you certainly took the time to handwrite a note

16   there saying no incoming calls from Kendall County Sheriff's

17   Office or from Commander Jennings' cell phone, right?

18   A.  That is correct.  I took a note down because Stomper

19   noticed that as well.  So we put a note down for that.

20   Q.  And you put a note down on both calls to commander, right?

21   A.  Yes, we marked that so that we could identify my calls to

22   her.

23   Q.  But you didn't write in there "missing calls" or "no calls

24   to Louise"?

25   A.  We weren't looking at it that closely.  It was mainly

1  focused on the courthouse, Commander Jennings, and my calls to

2  the commander.

3  Q.  Well, you knew that the calls that were made on that day

4  were important, right?

5  A.  For -- for the commander and to the courthouse and to the

6  jail.

7  Q.  There aren't a lot of calls that day, are there?

8  A.  It doesn't show a lot of calls, no.

9  Q.  And most of them are to people within Kendall County,

10 right?

11 A.  Yes, I was being as -- doing the best job I could to get

12 in touch with my command and people at the Sheriff's Office.

13 Q.  So wouldn't it be glaringly obvious to you when you looked

14 at these records, hey, I remember I spoke with Louise that

15 day, and that doesn't show up here?

16 A.  I honestly at that -- that particular moment I wasn't

17 thinking about Louise.  It was all focused on the Sheriff's

18 Office.

19 Q.  At what moment during this whole process before you were

20 terminated did you realize that, oh, yeah, I remember speaking

21 with my mother-in-law Louise that day?

22 A.  It was some time after that, just trying to figure out and

23 making sense of phone records and trying to make sense of all

24 of this.  And it was at a later time when, yeah, just trying

25 to put the pieces of the puzzle together that I recall talking

1  to her.  She watched my daughter.  I know I spoke to her.  She

2  knows that she spoke to me, and that's also other calls that

3  are not showing on the record.

4  Q.  So that wasn't something that you brought up to Chief

5  Deputy Koster, right?

6  A.  It was never asked, so no, I never answered that.

7  Q.  So you wanted Chief Deputy Koster to say to you, oh, hey,

8  by the way, did your mother-in-law happen to call you on

9  January 6th, and it's not reflected in the redacted phone

10  records you've given me?

11  A.  He didn't ask if anybody else called me.  It was all

12  focused on the Sheriff's Office calls, so I didn't answer that

13  way.  If he would have asked me, I'm sure I would have

14  supplied that.

15  Q.  The second document that you gave to Chief Deputy Koster

16  prior to the pre-disciplinary meeting was the e-mail from

17  Ms. Fidler, the travel agent, correct?

18  A.  That was one of the documents that we gave to Chief Deputy

19  Koster.  It was the -- also on Dr. Warren's e-mail as well, my

20  chiropractor.

21  Q.  And I just want to make sure we're clear.  When you spoke

22  to Ms. Fidler, did you tell Ms. Fidler, don't worry, you'll

23  never hear from anybody?

24  A.  I could have told her in summary that it's not a big deal,

25  but I had an issue at work and it was political and that I was

Warren - Cross by Bruch

867

1  trying to figure out who called me.  So that was why I was

2  calling and to find out who it was and to figure that out for

3  the investigation.

4  Q.  Okay.  I'm referencing your testimony under oath on

5  April 20, 2017.

6         MS. BRUCH:  And this is page 550, lines 21 through

7  23.

8  BY MS. BRUCH:

9  Q.  Were you asked this question and gave this answer:

10        "Q.  Did you tell Ms. Fidler, don't worry, you'll

11   never hear from anybody?

12        "A.  I said something along that line, yes."

13        Was that the question you were asked and the answer

14  you gave?

15  A.  Sounds like it, yes.

16  Q.  When Chief Deputy Koster took over the investigation, did

17  anyone in the Sheriff's Office force you to turn over this

18  e-mail from Christine Fidler?

19  A.  No.

20  Q.  Did anyone in the Sheriff's Office force you to turn over

21  the redacted cell phone records and claim that the redacted

22  call was someone who you thought was an employee of the

23  courthouse?

24  A.  No.

25  Q.  You testified in this case that the calls that were

1 missing were calls for -- that you made to your mother-in-law

2 Louise, right?

3 A. I'm sorry. Repeat the question.

4 Q. In this trial today, now, you're saying that one of the

5 reasons why your phone records are not accurate is because

6 it's missing calls that you made on January 6th, right?

7 A. Yes, it's not showing the calls to my mother-in-law; and

8 if she called me back, it's not showing that either. It's

9 showing no communication with my mother-in-law.

10 Q. Okay. And would you agree with me that this trial is the

11 first time now that you're claiming that the calls that are

12 missing are calls that you made?

13 A. Calls that -- missing that I made?

14 Q. Yes.

15 A. I'm saying that it's not showing the calls that I made to

16 my mother-in-law or the calls that she made in to me. There's

17 numerous calls that are not showing.

18 Q. Okay. I want to direct your attention to your testimony

19 on -- under oath on April 19, 2017.

20   MS. BRUCH: Pages 442, line 22, through page 443,

21 line 11.

22 BY MS. DORAN:

23 Q. And were you asked these questions and gave these answers:

24   "Q. When examining the phone calls and you say no

25  incoming calls, what does that mean?

Warren - Cross by Bruch

869

1            "A.  That means that nobody called my cell phone for

2    that entire day.

3            "Q.  Did somebody call your cell phone?

4            "A.  Well, Commander Jennings said she did.

5            "Q.  Did you receive other incoming calls that day?

6            "A.  Yes."

7            Were those the questions that you were asked and the

8    answers you gave?

9    A.  Yes.

10    Q.  And would you agree with me that you were claiming in

11    April of 2017 that the missing calls were other incoming calls

12    besides Commander Jennings, not outgoing calls?

13    A.  I was -- with that statement, I was stating that it's

14    missing calls and whether -- I don't know if it says incoming

15    or outcoming, but my reference is that it's missing calls on

16    my phone records incoming and outcoming is what we have found.

17    Q.  The question, though, was did you receive other incoming

18    calls that day, and your answer was yes.

19    A.  I knew that I had talked to people for incoming, but they

20    were not shown on the record.

21    Q.  So there's other people that you talked to that aren't

22    showing up on the record besides now Louise?

23    A.  And Commander Jennings.

24    Q.  And other people besides them?

25    A.  It's very possible because if they're not showing, there's

**Warren - Cross by Bruch**

1    other ones that could not be.  I don't know.  I could only go

2    by what the phone records are in my memory.  It's hard for me

3    to believe that nobody called me that whole entire day.

4    Q.  When did you first realize that your phone records were

5    allegedly missing calls with your mother-in-law Louise?

6    A.  During the investigation I believe with my attorney.  I

7    don't -- we didn't focus on it with -- with Stomper because we

8    were focusing on what pertained for the Sheriff's Office.

9    Q.  Where are Louise's cell phone records?

10   A.  I have no idea.  With her?

11   Q.  You never asked her for them?

12   A.  No.

13   Q.  You've never given the Sheriff's Office Louise's cell

14   phone records showing January 6th calls that you claim to be

15   missing from your phone records?

16   A.  No.

17   Q.  So certainly that's not something that the

18   Sheriff's Office would have ever considered when it was

19   determining whether to terminate you because it was never

20   brought up by you, correct?

21   A.  They never asked if I got other phone calls.

22   Q.  That's not my question though.

23   A.  Okay.

24   Q.  My question is, though, that the Sheriff's Office could

25   not have considered this issue of calls with Louise because

Warren - Cross by Bruch

1   you never brought it up?

2   A.  It was not asked, so no, I didn't bring it up.

3          MS. BRUCH:  Your Honor, could you please instruct the

4   witness to answer the question?

5          THE WITNESS:  I don't --

6          THE COURT:  Well, I think she did.  She -- well, ask

7   it one more time.

8   BY MS. BRUCH:

9   Q.  Did you ever advise the Sheriff's Office at any time that

10  there were calls between you and Louise?

11  A.  No.  But I did in my interrogatories.

12         THE COURT:  Really the answer was no.

13         THE WITNESS:  No.

14         THE COURT:  And I know this is not normal human

15  communication in a courtroom for any witness.  You just have

16  to listen to the question and answer the question.  Otherwise

17  the testimony is going to go on for a long time.  So just

18  answer the question that's asked, and, again, your attorney

19  will have a chance to clear up issues if you think there are

20  other parts of an answer that are not directly responsive but

21  you want to testify to.

22         All right.  Proceed.  We've got about three minutes.

23         MS. BRUCH:  Okay.  Thank you.

24  BY MS. BRUCH:

25  Q.  So given the fact that you never brought up the issue of

Warren - Cross by Bruch

1  Louise when the Sheriff's Office was considering whether to

2  terminate you, that would not be something that the Sheriff's

3  Office would have considered, right?

4  A.  In regards to Louise, no.

5  Q.  Do you recall that early on in the litigation I sent you a

6  list of interrogatories or questions to answer in the lawsuit?

7  A.  I remember interrogatories, a lot of questions to answer.

8         THE COURT:  All right.  And interrogatories, ladies

9  and gentlemen, you've heard this a few times, and they are

10 simply written questions prepared by one side that have to be

11 answered by the other side.  And the accuracy of them is sworn

12 to by the party.  So if the defense sent interrogatories to

13 the plaintiff, then answers are usually prepared through

14 attorneys.  But in the end, the plaintiff signs the

15 interrogatory answers attesting to their truthfulness.  Just

16 as the plaintiffs would have sent them to the defense, answers

17 are probably prepared by the attorneys but then reviewed by

18 the parties and signed.

19         So that's what interrogatories are.  They're

20 something that happens in that long process before we get to

21 court, and that's what they are.

22 BY MS. BRUCH:

23 Q.  And, Ms. Warren, do you recall that as part of the

24 interrogatories that I sent to you that you provided a

25 document that identified a list of persons that you believed

Warren - Cross by Bruch

1  had knowledge relating to this case?

2  A.  Yes.

3  Q.  And when you reviewed those answers to interrogatories,

4  you signed off on them that they were true and accurate,

5  correct?

6  A.  That is correct.

7  Q.  Okay.  And in the document, would you agree with me that

8  in your description of your mother-in-law, Ms. May, that you

9  provided -- let me see if I can find it.  That you never

10  mentioned in there that there was this phone call that you

11  made to her?

12  A.  No.  I mentioned that I spoke to my mother-in-law in the

13  interrogatories.  But during the formal investigation, no, it

14  was not asked.  So, no, I didn't say that my mother-in-law had

15  called me.

16  Q.  And in your answers to the interrogatories, would you

17  agree with me that you said that she called you?

18  A.  I would agree that she called me or I could have called

19  her.  It's hard to remember the whole transactions of phone

20  calls.  But I know that we had communication that day

21  regarding our daughter.

22  Q.  So now you're saying that she called you?

23  A.  It's possible too.  I have -- I know that I called her,

24  and I know that I had conversations with her.  But to give you

25  the exact details on the times and how many times and so

Warren - Cross by Bruch

1    forth, I can't be definite on that, but I can testify

2    truthfully that I had -- I had communication with her for that

3    day regarding our daughter, and it's not showing on my

4    records.

5    Q.   And you never identified in your answers to

6    interrogatories that you called your mother-in-law?

7    A.   I identified in the interrogatories that I --

8              MS. McLAUGHLIN:   Objection.   Mischaracterization of

9    the testimony.

10              THE COURT:   Well, the witness has to answer that, not

11   the attorney.   So if it's an incorrect question, you can -- or

12   something in the question is incomplete or incorrect, you can

13   correct it in your answer.

14              So go ahead.

15              THE WITNESS:   Could I see the answer to the

16   interrogatory to refresh my memory?

17              MS. BRUCH:   Oh, absolutely.

18              This has not been seen by the jury, so if we can --

19   or do you want to take it up tomorrow?

20              THE COURT:   Well, it's 4:31, so I think that's a good

21   time to leave off, unless you all want to wait and stay late

22   to see the answer to the interrogatory.

23              I don't see any hands, so we're going to pick that up

24   tomorrow morning.   So let's come back tomorrow morning at

25   9:15.   Please don't discuss the case among yourselves or with

1   anyone else.  I say that because as the case goes on, you

2   start getting impressions about the case.  The attorneys are

3   relying upon you to keep an open mind.  So after closing

4   arguments, you can go back and deliberate.  So please keep an

5   open mind as to the whole case until you get a chance to

6   deliberate later this week.

7           Thank you very much.

8           THE CLERK:  All rise.

9     (Jury exits.)

10          THE COURT:  All right.  Ma'am, you could leave the

11  stand.  You're on cross-examination, so please don't discuss

12  your testimony with anyone.

13          Anything we need to put on the record?

14          MS. BRUCH:  Just, Your Honor, if we could take up

15  tomorrow morning the issues of what happened today.

16          THE COURT:  All right.  Well, be here at 9:00 then.

17  I have a relatively short call, and if I can get through it in

18  five or ten minutes, then we'll take it up before 9:15 to -- I

19  take it this deals with the scope of cross-examination?

20          MS. BRUCH:  Exactly.

21          THE COURT:  All right.  Make sure you contact

22  plaintiffs and let them know what it is you think has been

23  opened and see if you can reach agreement on that so they're

24  not caught unawares of what you intend to raise and can at

25  least respond tomorrow morning.

Warren - Cross by Bruch

876

1          MS. BRUCH:  That's good.

2          THE COURT:  Very good.

3          Anything else from defense?

4          MS. BRUCH:  No.

5          THE COURT:  Anything from plaintiff?

6          MS. McLAUGHLIN:  No.

7          THE COURT:  All right.  Let's go off the record.

8          Kelly, you're done.  Thank you very much.

9     (Trial adjourned until 9:15 a.m., July 24, 2018.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3      We, LAURA R. RENKE, SANDRA M. MULLIN, and KELLY M.

4  FITZGERALD, certify that the foregoing is a correct transcript

5  of the record of proceedings in the above-entitled matter.

6

7  */s/ LAURA R. RENKE*_____        *July 24, 2018*
   LAURA R. RENKE, CSR, RDR, CRR
8  Official Court Reporter

9
   */s/ SANDRA M. MULLIN*_____        *July 24, 2018*
10 SANDRA M. MULLIN, CSR, RMR, FCRR
   Official Court Reporter
11

12 */s/ KELLY M. FITZGERALD*_____        *July 24, 2018*
   KELLY M. FITZGERALD, CSR, RMR, CRR
13 Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25