877

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3    CARRIE M. WARREN,              )   Docket No. 15 C 496
                                    )
4                  Plaintiff,       )   Chicago, Illinois
                                    )   July 24, 2018
5           v.                      )   9:24 a.m.
                                    )
6    KENDALL COUNTY SHERIFF DWIGHT  )
     BAIRD, in his official capacity)
7    and as successor in office to  )
     Richard Randall, KENDALL COUNTY,)
8    ILLINOIS, RICHARD RANDALL, SCOTT)
     KOSTER and SABRINA JENNINGS,   )
9                                   )
                   Defendants.      )
10
                       VOLUME 5-A
11          TRANSCRIPT OF PROCEEDINGS - Trial
       BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
12
     APPEARANCES:
13

14   For the Plaintiff:    MS. COLLEEN M. McLAUGHLIN
                           Law Offices of Colleen M. McLaughlin
15                         1751 S. Naperville Road, Suite 209
                           Wheaton, IL 60189
16
                           MS. KAREN J. DORAN
17                         Karen J. Doran Attorney at Law LLC
                           2100 Manchester Road, Suite 942
18                         Wheaton, IL 60187

19   For the Defendants:   MS. JULIE A. BRUCH
                           MS. KARIN ANDERSON
20                         O'Halloran Kosoff Geitner & Cook LLC
                           650 Dundee Road, Suite 475
21                         Northbrook, IL 60062

22   Court Reporter:       SANDRA M. MULLIN, CSR, RMR, FCRR
                           Official Court Reporter
23                         219 S. Dearborn Street, Room 2260
                           Chicago, IL 60604
24                         312.554.8244
                           sandra_mullin@ilnd.uscourts.gov
25

878

1                        I N D E X

2   WITNESS                                    PAGE

3   CARRIE MELISSA WARREN

4        Cross (Resumed) by Ms. Bruch ............. 897
         Redirect by Ms. McLaughlin ............... 915
5        Recross by Ms. Bruch ..................... 922
         Further Redirect by Ms. McLaughlin ....... 923

6

7   SABRINA JENNINGS

8        Direct by Ms. McLaughlin ................. 925
         Direct (Resumed) by Ms. McLaughlin ....... 999
9        Juror Questions by Ms. McLaughlin ....... 1003
         Direct (Resumed) by Ms. McLaughlin ...... 1009
10       Cross by Ms. Bruch ...................... 1016
         Juror Questions by Ms. Bruch ............ 1051
11       Cross (Resumed) by Ms. Bruch ............ 1052
         Redirect by Ms. McLaughlin .............. 1058

12

13  TRACY ANN PAGE

14       Direct by Ms. Anderson .................. 1067

15

16  LISA BOWEN

17       Direct by Ms. Anderson .................. 1073

18  INSTRUCTIONS CONFERENCE ...................... 1097

19

20                      E X H I B I T S

21  NUMBER                                   ADMITTED

22  Plaintiff's Exhibit

23       No. 28 ................................... 931

24       No. 33 ................................... 934

25

1    (In open court outside the presence of the jury.)

2    THE CLERK:  15 C 496, Warren versus Kendall County.

3    THE COURT:  All right.  Is there anything that

4    either side needs to raise before we bring in the jury?

5    There was some discussion possibly about whether there were

6    certain scope issues that were raised based on the direct

7    examination of the plaintiff for cross.  If that's not the

8    case, or if you've worked that out by agreement, then we'll

9    bring in the jury.

10    MS. BRUCH:  Your Honor, I did send an e-mail to

11    counsel last night with my issues with respect to plaintiff's

12    direct examination and my proposed cures.  I haven't heard

13    back from them, so I don't know what their position is on

14    that.

15    THE COURT:  All right.  I don't want to do it in

16    front of me.  Have you seen the e-mail, Ms. McLaughlin?

17    MS. McLAUGHLIN:  I have.  I have a major issue with

18    one of their proposed cures.

19    THE COURT:  Here's what I'm going to ask you to do.

20    Take two or three minutes, talk about the issues that are not

21    major, that you have no disagreement on, so you have an

22    agreement that you can -- so I only hear the contested issue.

23    MS. McLAUGHLIN:  Okay.

24    THE COURT:  So take your time, but I'm not leaving.

25    MS. McLAUGHLIN:  Okay.  Thank you.

1          (Counsel conferring.)

2          THE COURT:  Okay.  Have you -- what are you

3     contested on?

4          MS. BRUCH:  Okay.  So there were four issues.  One

5     of them, we've agreed on.  Three, we haven't.  The one that

6     we've agreed on would require your Honor to instruct the

7     jury -- and it pertains to her mention how she went to the

8     EEOC.  And we would like that you would advise the jury that

9     all persons wishing to bring discrimination claims must first

10    go to the EEOC, and the EEOC did not make any ruling in

11    Ms. Warren's favor.

12         THE COURT:  Okay.  All right.  I can make that

13    instruction.

14         MS. BRUCH:  Okay.  So then the first issue that is

15    contested is Ms. Warren had testified that she had not been

16    afforded progressive discipline.  And there are a couple

17    proposals that defendants have that they would like to first

18    elicit the following testimony regarding her prior

19    disciplinary history without any elaboration whatsoever.

20         Just that, number one, in February 2013, she was

21    given an oral reprimand for reassigning herself without

22    permission from her supervisor.  And, number two, on

23    March 11, 2013, she was given a one-day suspension for

24    violating the Sheriff's Office policy on sexual harassment.

25    We would not go into any details whatsoever under the

1    circumstances of that discipline, just that she has been

2    disciplined in the past.

3           We also request that we would be permitted to

4    present the jury with an un-redacted page from Geisen's

5    arbitration ruling that's already been admitted into

6    evidence, but we redacted a page where it summarizes Chief

7    Deputy Koster's identification of all sheriff's employees who

8    have been terminated for untruthfulness and allow Chief

9    Deputy Koster to testify regarding any of those terminations

10   that he already has not discussed.  That was our proposal

11   with respect to that issue of Ms. Warren complaining that she

12   was not afforded progressive discipline.

13           THE COURT:  Okay.

14           MS. McLAUGHLIN:  In response to that, your Honor?

15           THE COURT:  Go ahead.

16           MS. McLAUGHLIN:  I have a number of points to make.

17   First off is, I want to note the circumstances under which

18   Ms. Warren made this comment.  It was basically almost the

19   last -- I think it was the last question that I asked, in

20   terms of why are we here, why are you angry.  And, yes, she

21   blurted out something with respect to progressive discipline.

22   It was certainly at the most emotional point of the -- of the

23   trial.  And we had been avoiding those issues.

24           But the fact of the matter is that the motion in

25   limine, our motion in limine, No. 7, this is in response to

1    our motion in limine, your Honor.  And our motion in limine,

2    No. 7, is that defendants be barred from bringing up

3    progressive discipline.  You know, it's because we feared

4    that they were going to come up with some crazy theory of,

5    she has already -- she has been subjected to progressive

6    discipline for untruthfulness.  And if you -- this was the

7    motion that was granted by agreement.  And our motion is, and

8    just so that I'm clear on it, for the record, was, "Bar

9    defendants from arguing that plaintiff received benefits of

10   progressive discipline."  So, again, the agreement was that

11   defendants are barred from it, not necessarily the plaintiff.

12   And I understand that -- I understand that there is confusion

13   there.

14              THE COURT:  That's turning the -- turning the

15   agreement on its head.

16              MS. McLAUGHLIN:  But --

17              THE COURT:  She raised it.  And by voluntarily

18   raising it -- and I don't care whether it was an emotional

19   moment, or not.  She's an experienced witness at this point,

20   having been through this once already, having been deposed a

21   number of times.  And you're an experienced attorney that

22   needs to warn your witnesses, and I'm sure you have, that if

23   certain areas are out of bounds on motions in limine, they

24   can't bring them up.  It's the same rule defense has.  And

25   when that comes out, if you can't reach an agreement on a

1    curative basis about it, then they get to bring out that she

2    was subject to progressive discipline.

3           Right now the jury has the impression, which is

4    unfortunate because I thought we'd stay away from this, that

5    she was treated unfairly because she was not afforded

6    progressive discipline.

7           MS. McLAUGHLIN:  But -- sorry.

8           THE COURT:  If they want to cure it, I'm going to

9    let them do it.  Unless you can reach an agreement on some

10    other way of undoing this.

11           MS. McLAUGHLIN:  Your Honor, I also want to point

12    out that we do have the stipulation, and that has been read

13    to the jurors twice now, that any prior discipline did not

14    enter into the decision to terminate her at this point.  So

15    that, in and of itself, I think is curative, if you will.

16    And, again, the client, you know, didn't say that she did not

17    receive progressive discipline in the past.  She was

18    referring to this particular instance of, you know,

19    untruthfulness.  But by main point is that the motion in

20    limine was to bar defendants from it.

21           THE COURT:  Well, if the defendants are barred from

22    it, why should the plaintiff be allowed to do it?  Barring

23    means neither side gets to do it.  And if there is an

24    agreement that they're not going to do it, in my mind, it's

25    illogical to believe the plaintiff then can do it.  I'm not

1    sanctioning her.  I'm not going to, you know, sanction her

2    for violating it.  We're just trying to figure out how to

3    cure it.

4              MS. McLAUGHLIN:  Okay.

5              THE COURT:  One cure is I say that the statement of

6    the plaintiff, she was not subject to progressive discipline,

7    is stricken.  The jury should disregard it in its entirety.

8              The alternative is to allow defendants to put on

9    evidence that she had received lesser sanctions for other

10   conduct prior to the sanction in this case.  Those are the

11   two alternatives I see.  One is simpler than the other.

12             MS. McLAUGHLIN:  And I definitely would go with the

13   first one, and we would have no objection to that.  We have

14   major objections to the latter, as it -- it would be a

15   penalty.  The sanction that Ms. Bruch is suggesting I think

16   is Draconian.

17             THE COURT:  It's not a sanction, it is just

18   correcting a record allowing the defense to defend

19   themselves.  She -- the plaintiff gets up and says something

20   that is both a violation of the motion in limine and not

21   true.  And there is two ways to cure it.  Either the defense

22   gets on to put their position of what they think is the truth

23   and let the jury decide, or I strike her testimony.  What

24   does defense prefer?

25             MS. BRUCH:  I mean, I would like to -- you know,

1    it's difficult because our preference would be to identify

2    the fact that she has been disciplined in the past.  The

3    problem is, I don't want, then, in closing argument, to then

4    say, they stipulated that the prior discipline had nothing to

5    do with this.  And the only reason it's coming out is -- and

6    we stipulated to that issue thinking that everyone would not

7    violate the motion in limine and this wouldn't be an issue.

8    So we would have never stipulated in the first place.  So I'm

9    sort of at a loss as to the best way to handle it.

10             THE COURT:  How much more do you have of your

11   cross?

12             MS. BRUCH:  About 30 minutes, 45 minutes.

13             THE COURT:  I don't want to break at that point, so

14   you need to talk to your clients and your co-counsel about

15   what you want to do.  I'm willing to do either one because I

16   don't think it is inappropriate for them to bring out prior

17   issues of discipline of this plaintiff when she gets up and

18   says, I wasn't afforded progressive discipline, which means,

19   for any person who has any common sense in the jury, means

20   this is the first time she stubbed her toe, and that they

21   gave the ultimate sanction to someone who had never been

22   involved in any wrongdoing of any kind.  Especially when the

23   jury has now heard that everybody at that Sheriff's Office

24   gets some kind of sanction for something, and, yet, the

25   plaintiff is portrayed as someone, incorrectly through her

1   testimony, as someone who has never run afoul of any rule,

2   major or minor.

3          So that is the ruling.  You can talk about what you

4   want to do, but I -- if you want me to give an instruction,

5   I'll do it first thing when we start.  If I don't get that

6   request by an agreement for instruction, you're free to put

7   in the other evidence.

8          MS. BRUCH:  Okay.  Thank you.

9          THE COURT:  Through her.

10         MS. BRUCH:  Yes. Then the next issue is, Ms. Warren

11   had testified that a female deputy, Nicole Porus, was

12   terminated by the Sheriff's Office.  Now, again, this was

13   subject to a motion in limine, and as well there was an issue

14   of who were the proper comparators.  She was never brought up

15   as a comparator on this issue so we're staying away from it.

16   Our proposal is to have Commander Jennings testify that both

17   Porus and a male deputy were in violation of the Sheriff's

18   Office residency requirement, both were given time to

19   relocate or be terminated.  The male deputy moved, but Porus

20   refused to move and was terminated for residency violation.

21   Nothing further on that.

22         THE COURT:  Response?

23         MS. McLAUGHLIN:  Your Honor ruled yesterday that

24   the objection to that was untimely and thus waived.  I would

25   otherwise ask you to stick with that prior ruling.

1          THE COURT:  Reply.

2          MS. BRUCH:  We're not asking you to strike that

3   testimony, we're just asking to cure the statement.

4          THE COURT:  Well, the objection -- the reason I

5   said it was an untimely objection was that were -- so I would

6   have stricken it at the time.  But refresh my memory on

7   exactly what the plaintiff said about Porus, adding yet

8   another issue to this case that I thought was closed.

9          MS. BRUCH:  So the question was:  "One of the

10  deputies, female deputies, no longer employed?"  That was the

11  question that Ms. McLaughlin asked.

12          The answer was, "Yeah, she got fired."

13          So the impression is that we're out to get female

14  deputies.

15          THE COURT:  Yeah, you can bring that out through

16  Jennings.

17          MS. BRUCH:  And then the third issue is Plaintiff's

18  Motion in Limine No. 11 was to bar defendants from arguing

19  that Ms. Warren failed to mitigate her damages because the

20  issue of lost wages should be decided by the court.  So in

21  reliance on that, we didn't plan on bringing up any real

22  damages testimony in terms of her work.  And during direct,

23  Ms. Warren testified at length about her job search efforts

24  and employment at Olive Garden, including claiming that she

25  left Olive Garden because of a worker's compensation injury.

1    So, in response, defendant should be permitted to read in the

2    deposition testimony of her Olive Garden manager, Tiffany

3    Thomas, and I cited to them the page and line numbers, where

4    she essentially states that Ms. Warren walked off the job and

5    was terminated.

6            THE COURT:  Response?

7            MS. McLAUGHLIN:  My response to that is that the --

8    the testimony was elicited for the emotional distress

9    component of having to go through the job search and having a

10   prior inmate be the one to actually get her the job at Olive

11   Garden.

12           THE COURT:  This is about why she left Olive

13   Garden.

14           MS. McLAUGHLIN:  And then -- yes, so that testimony

15   was -- I was just trying to show that she has gained other

16   employment and --

17           THE COURT:  Okay.  Did you --

18           MS. McLAUGHLIN:  -- has improved her lot in life

19   and her disposition because she has now gotten into -- you

20   know, so I was trying to fill in the context of, yes, now she

21   is back in the -- you know -- out back into the --

22           THE COURT:  So why all the testimony about the

23   injury to the hand by carrying a tray and a worker -- you

24   know, why -- why all that?  I sua sponte read the instruction

25   to the jury, reminding them that lost wages are not an issue

1    for them because I heard way too much about it in the

2    plaintiff's testimony.  That was supposed to be reserved for

3    testimony before me, in the event there is a verdict for the

4    plaintiff.  And I wanted to remind the jury that that was not

5    an issue for them.  But a worker's comp --

6            MS. McLAUGHLIN:  And --

7            THE COURT: Well, go ahead.

8            MS. McLAUGHLIN:  I would suggest that that cured

9    that issue.  I didn't -- you know, it has -- the information

10   that Ms. Bruch is trying to elicit has absolutely no bearing

11   on anything that the jury is going to be considering.

12           THE COURT:  You can ask her why she left, if she

13   just left.  If she denies it, you can put in the dep

14   testimony.

15           MS. BRUCH:  And just so you know, your Honor, in

16   her direct examination, the question that she was asked is,

17   why did you leave?  That open-ended question.  And her answer

18   was, "I tore the tendons in my wrist, and I injured my knee.

19   So I had to quit because I couldn't carry trays, couldn't

20   walk, so I had to recover."

21           That is completely untrue.  The testimony from the

22   Olive Garden manager that we wanted to read into the evidence

23   will give the reason.  That question should have never been

24   asked in the first place.

25           THE COURT:  I agree.  You can ask it again, if you

1  want, or if -- you can rebut that improper statement by the

2  plaintiff by putting in the dep if you want.  That's fine.

3          These are self-inflicted wounds.  She shouldn't

4  have said it.  And this is not everyone's first time at the

5  rodeo.  It was not -- I would be more forgiving if this were

6  the first time we did this.  It's the second time.  There

7  shouldn't be these kinds of unsolicited or volunteered

8  answers or open-ended questions that would allow a plaintiff

9  to -- who is not schooled in the law and maybe doesn't

10 realize what the rules are to put in facts that are not meant

11 to be heard by the jury.  So you can do that.  Anything else?

12         MS. BRUCH:  No, your Honor.

13         MS. McLAUGHLIN:  I'm a little confused with respect

14 to the ruling on the first motion.  In terms of eliciting --

15 you said that she could elicit facts from Carrie on her --

16 from Carrie herself regarding prior discipline, or the fact

17 that she has been disciplined.  But the information

18 concerning Geisen, that goes -- the arbitration grievance

19 testimony that she wants to bring in has this list of people

20 that have not been comparators, we have no information on,

21 nothing, so --

22         THE COURT:  Explain the Geisen situation, why it is

23 relevant.

24         MS. BRUCH:  So what happened was we had -- one of

25 the exhibits is the arbitration ruling on Geisen showing he

1    was terminated for untruthfulness.

2            THE COURT:  All right.

3            MS. BRUCH:  And I didn't show it to the jury, I

4    just asked Chief Deputy Koster to explain the situation.  The

5    document has been admitted, though, but it has been admitted

6    with a page redacted.  And in the page that's redacted, it

7    lists all of the individuals who, during that hearing, Chief

8    Deputy Koster testified that they had been terminated for

9    untruthfulness issues to show consistency within his thinking

10   process.  So there are a few on there that he had not

11   discussed during my examination of him, and I would be asking

12   to bring him up on the stand during our case in chief to

13   elicit testimony to show he is being consistent.

14           THE COURT:  Well, that has nothing to do with the

15   plaintiff's testimony; correct?

16           MS. BRUCH:  Well, it has to do with the issue of

17   progressive discipline, in terms of she is saying, I wasn't

18   afforded progressive discipline, and his answer is going to

19   be, well, none of these people were.  That when there is

20   untruthfulness, in that circumstance, they don't get

21   progressive discipline.

22           MS. McLAUGHLIN:  And we have never, ever received

23   any discovery on any of those -- those individuals.  The

24   Geisen arbitration came to us very late in the game, and it

25   was -- it was not even an issue.  With respect to this one

1  page where he listed, we've done this before.

2  THE COURT:  Well, whether that page comes in is,

3  I'm not ruling on that because if there is a number of names

4  that come up that were un -- well, it was redacted at the

5  beginning for a reason, presumably.  I'm not going to have a

6  problem, and I don't have a problem, with Koster coming back

7  in and saying the progressive discipline was not afforded to

8  people who lie because, when you lie, you don't need

9  progressive discipline.  That's kind of an open-and-shut

10  case.  If that's his testimony and that's the way he dealt

11  with people, he is free to come in and say that, in light of

12  what the plaintiff said.

13  MS. BRUCH:  Okay.

14  THE COURT:  Whether I allow the second page or the

15  redacted page of the Geisen document in, I need to see it.

16  But that, to me, is almost beside the point.  It is what he

17  has to say about how he deals with people he believes lie.

18  That is certainly allowable for the defendants to put into

19  their case in light of the statement of the plaintiff.

20  MS. McLAUGHLIN:  Okay.  And so that I'm sure -- I'm

21  certain and my client is certain as to what she can testify

22  to, if Ms. Bruch elicits testimony that she had previously

23  received an oral reprimand and a suspension, am I allowed to

24  ask her any questions about the circumstances of those?

25  THE COURT:  Sure, yeah.  Absolutely.  Why not?  If

1    you want to bring out that she has been disciplined in the

2    past, that's fine.  But she gets to explain why.  And the

3    better route here, quite frankly, is to either strike her

4    testimony or simply allow the fact that -- allow Deputy

5    Koster to testify that he -- progressive discipline is not

6    really important when someone is accused and he believes

7    they've lied.  But if you want to ask her if she has been

8    disciplined in the past, she ought to be able to explain why.

9    And if her view of it is different than what other people

10   say, so be it.

11            Now, if she gets into the sexual harassment issue

12   back and forth, which what you started to get into yesterday

13   and why I was a little unhappy with that at sidebar, I'm

14   assuming you don't want this jury to know a jury already

15   heard those allegations and found against your client.

16   That's the penalty for opening that up again.  Do you want

17   this jury to hear that?  Of course you don't.

18            So I -- it was off the table, and that's why I was

19   at sidebar wondering why on earth you were raising these

20   questions again when a jury found against you, and I'd let

21   this jury hear that, if they thought -- if we're going to

22   retry that case, which we're not because we're closing

23   tomorrow.

24            With all of that, what do you intend to ask her?

25            MS. BRUCH:  Well, all right.  So if I can take

1 literally 30 seconds --

2          THE COURT:  Go ahead.

3          MS. BRUCH:  -- I just want to consult.

4          THE COURT:  Yeah.

5       (Counsel conferring.)

6          MS. BRUCH:  All right.  So, your Honor, this is

7  what we'd like to do.  I would like to ask her the following

8  questions, you know:  Ms. Warren, you testified that you were

9  not afforded progressive discipline.  Then I'm going to ask

10  her, number one:  Isn't it true that in February 2013, you

11  were given an oral reprimand for reassigning yourself without

12  permission from your supervisor?

13          Number two:  And isn't it true on March 11, 2013,

14  you were given a one-day suspension for violating the

15  Sheriff's Office policy on sexual harassment?

16          And that's it.

17          THE COURT:  All right.  And she'll likely say yes

18  to each.

19          Ms. McLaughlin, how are you going to follow up on

20  redirect?

21          MS. McLAUGHLIN:  I don't want to open too much of a

22  door, obviously, but I would like her to say that she

23  disagreed with both of those assessments.

24          THE COURT:  She can.  That's fine.  But the more

25  explanation she gives -- I mean, I expect nearly everybody

1  who gets disciplined, except the rare self-aware person,

2  probably disagrees with the discipline they get at the

3  Sheriff's Office or any other organization.  She can say she

4  disagrees with it.  The fact is -- what's important is the

5  fact that she received it.  Is she going to disagree with the

6  fact that she got those areas of discipline?

7              MS. McLAUGHLIN:  No, she won't disagree with that.

8              THE COURT:  All right.  Well, then, that may --

9  that's fine, you can ask those limited questions.  And she

10  can say on redirect, if she wants, she disagrees with them.

11  But if we're going to get into re-litigating those two

12  issues, we open a can of worms that implicates the issues in

13  the first trial, at least one of them does, on the sexual

14  harassment.  And that is an area that I think you both want

15  to avoid.  All right?  Then that's how we're going to

16  proceed.

17              MS. BRUCH:  Okay.  Thank you, your Honor.

18              THE COURT:  And I will start with the fact that all

19  persons who file a federal lawsuit are required to go to the

20  EEOC to get permission to file a lawsuit in federal court,

21  which is the right-to-sue letter.  She got one here; correct?

22              MS. McLAUGHLIN:  Yes.

23              THE COURT:  All right.  So they need permission to

24  get to federal court, and there was no ruling by the EEOC in

25  her favor.  This jury has the case, not any other body.

1            MS. McLAUGHLIN:  Right.

2            MS. BRUCH:  Okay.  Thanks.

3            THE COURT:  All right.  Let's bring in the jury.

4            MS. MCLAUGHLIN:  May I run to the washroom?

5            THE COURT:  Oh, all right, yes.  Let's wait until

6    Ms. McLaughlin comes back.  If you want to assemble them,

7    that would be great.

8            (Jury in at 9:50 a.m.)

9            THE COURT:  All right.  Please be seated, Ladies

10   and Gentlemen.  I apologize for the delay.  I'm blaming my

11   externs, the law students sitting in back.  They were the

12   cause.  Actually, it's my fault, and I apologize for this.

13   It's not the fault of the attorneys, but we did resolve a

14   couple issues outside your presence that may shorten some of

15   the presentation, so.  But I apologize for having you waiting

16   in the jury room.

17           I will make one comment, one instruction to you.

18   There was reference yesterday to -- by Ms. Warren to filing a

19   complaint with the EEOC, the Equal Employment Opportunity

20   Commission.  In the United States, under the law, anyone who

21   is going to come to federal court to file a lawsuit, as

22   Ms. Warren did, has to go through the EEOC first and get

23   permission from them to file a suit.  It's called a

24   right-to-sue letter, and she received one.  It's not an

25   adjudication by the EEOC and the EEOC didn't rule in her

1  favor or against her.  They simply authorized the lawsuit to

2  come forward.  So the reference to the EEOC is not a positive

3  or negative for either sides, it's a procedural issue that

4  just gets the case in the federal court.

5       So with that instruction, you may continue your

6  cross-examination.

7       MS. BRUCH:  Okay.  Thank you, your Honor.

8  CARRIE MELISSA WARREN, PLAINTIFF HEREIN, PREVIOUSLY SWORN,

9            CROSS-EXAMINATION (Resumed)

10  BY MS. BRUCH:

11  Q.   Ms. Warren, yesterday you testified during your

12  attorney's questioning of you that you were not afforded

13  progressive discipline in the Sheriff's Office.  Do you

14  recall that testimony?

15  A.   I do.

16  Q.   Isn't it true that, in February 2013, you were given an

17  oral reprimand for reassigning yourself without permission

18  from your supervisor?

19  A.   Yes.

20  Q.   And isn't it true, that on March 11, 2013, you were

21  given a one-day suspension for violating the Sheriff's Office

22  policy on sexual harassment?

23  A.   Yes.

24  Q.   Yesterday we were talking about the answers to

25  interrogatories that we had served on you, or questions about

1  the allegations in your lawsuit.  Do you remember that
2  testimony?
3  A.    Against -- okay, I'm sorry, I lost -- against
4  allegations of -- can you repeat the question?
5  Q.    Sure.  There were a series of questions that we asked
6  you in writing to answer concerning the allegations you were
7  making in the case; correct?
8  A.    Correct.
9  Q.    And, as part of that, there were some interrogatories
10  that we sent to you on behalf of Commander Sabrina Jennings,
11  asking you to identify the names of any persons with
12  knowledge and what information they had relating to this
13  lawsuit.  Do you recall answering that interrogatory?
14  A.    I do.
15  Q.    And do you recall that, with respect to your
16  mother-in-law, Louise May, the statement that you made to us
17  was that she was your mother-in-law, May knows everything,
18  including the family and marital issues this situation has
19  caused?
20  A.    Yes, she knows how it has affected our family.
21  Q.    All right.  Then there was an interrogatory that you
22  referred to in your Answer to Interrogatory No. 22.  And in
23  that interrogatory, you were asked to identify each and every
24  phone call that you and Commander Jennings both agreed took
25  place but only showed up on one of the other records but not

1    both.

2              And your answer to that interrogatory was:  "All my

3    calls from my cell phone are not showing up on the Kendall

4    County Sheriff's Office phone records.  Jennings stated that

5    she called my cell phone, and it doesn't show on my records.

6    My phone records are showing no incoming calls, and I did

7    speak with my mother-in-law.  My text to Commander Jennings

8    while I was at the courthouse were never provided.

9    Investigation continues, plaintiff will supplement."

10             Was that your answer?

11   A.    That was my answer.

12   Q.    And would you agree with me that you had answered that,

13   according to the verification page, you signed this on

14   September 18, 2015?

15   A.    Yes.

16   Q.    And since September 18, 2015, you have never

17   supplemented that answer; have you?

18   A.    I don't know if my attorneys have or not.  I know I

19   haven't.

20   Q.    I want to draw your attention to August 31st, 2016.  And

21   on that day, did you -- you were asked questions regarding

22   the timeframe of what you did when you left the courthouse

23   after jury duty, all the way up until the time that you got

24   home.  And were you -- in that testimony, under oath, were

25   you asked these questions and gave these answers?  And this

1    is August 31, 2016, starting at page 377, line 11, going to

2    page 379, line 1.

3           "Q:  So after you talk with Commander Jennings, what did

4           you do?"

5           Or, actually, I'm taking that back.  Strike that.

6    I'm going to go back, and just for clarification, we're going

7    to start at page 375 of August 31, 2016, with lines 5 through

8    17.  So were you asked these questions and gave this answer?

9           "Q:  So what did you do?

10          "A:  I hurried out of the courthouse.  I called my

11          husband.  I called the jail to try to get ahold of

12          Commander Jennings.  They were unable to --

13          "Q:  Who is they?

14          "A:  The deputies that answered in master control.

15          Commander Jennings did not respond to the radio

16          traffic for a call to be transferred to her.  So I

17          then called Commander Jennings on her cell phone,

18          which was approximately 11:15, 11:20, somewhere

19          around there.

20          "Q:  Did she answer?

21          "A:  On the cell phone, she did, yes."

22          Were those the questions you asked and the answer

23   you gave?

24   A.   Yes.

25   Q.   Now let's turn to page 377, line 1 through page 379 --

1    excuse me, line 11, through page 379, line 1.  Were you asked

2    these questions and gave this answer?

3         "Q:  So after you talked to Commander Jennings, what did

4         you do?

5         "A:  Drove to McDonald's, grabbed lunch.

6         "Q:  While you're at McDonald's, what occurred?

7         "A:  I received a call while I was in the drive-thru.

8         "Q:  On your cell phone?

9         "A:  Yes.

10        "Q:  What did the caller say?

11        "A:  It was very brief.  Went over my bluetooth in my

12        vehicle, hands free, so I didn't have my phone to look.

13        The call was identified as Carrie, I do remember that.

14        Nothing else is needed, everything is done, have a good

15        day, don't work too hard, that was the whole

16        conversation.

17        "Q:  Did you recognize the voice of the person talking

18        to you?

19        "A:  No, I didn't.  No.

20        "Q:  Did you say, hey, who is this?:

21        "A:  No, I didn't.

22        "Q:  How did you interpret that phone call?

23        "A:  I knew, with my name as Carrie, I took it as

24        someone from the courthouse because my mind was in line

25        with courthouse jury duty at the time and with work.

1    "Q:  So you took this as a call from the courthouse?

2    "Answer:  I initially did, yes.

3    "Q:  How did you -- what did you interpret the call to

4    mean?

5    "A:  That I was done with jury duty, I was dismissed.

6    They didn't need me or they weren't going to use me, or

7    what have you.

8    "Q:  All right.  This is happening while you're in the

9    drive-thru?

10    "A:  Yes.

11    "Q:  Okay.  What did you do after that?

12    "A:  I went directly home, ate as I'm driving, threw the

13    McDonald's bag to my daughter, got my uniform on and

14    went directly back to the jail."

15    Were those the questions you were asked and the

16  answers you gave?

17  A.  Yes.

18    MS. MCLAUGHLIN:  Objection, improper impeachment.

19    THE COURT:  Overruled.  Ladies and Gentlemen,

20  sometimes the parties, I've told you this, will read off a

21  deposition they believe is inconsistent with something the

22  witness said in court or with a prior statement.  And I don't

23  rule typically on those because it would -- then I would be

24  deciding whether something is inconsistent or not.  That's

25  your job.  And I'm not going to interfere with that process.

1    So it's for to you judge whether witnesses' statements before

2    court are consistent or inconsistent with their statements in

3    court.  The lawyers I'm sure will have plenty to say about

4    this in closing arguments.  So objection overruled.

5    BY MS. BRUCH:

6    Q.   Ms. Warren, would you agree with me that, in your

7    testimony, under oath, on August 31, 2016, you made no

8    mention of your mother-in-law, Louise?

9    A.   Yes.

10   Q.   So then on April 19, 2017, you testified under oath and

11   asked -- answered questions from your own attorney,

12   Ms. McLaughlin, about what you did after leaving the

13   courthouse; correct?

14   A.   Yes.

15   Q.   And on April 19, 2017, were you asked the following

16   questions by your attorney and gave the following answers?

17   This is page 401, line 17, to page 402, line 2.

18        "Q:  So you leave the courtroom and -- you leave the

19        courthouse.  What happens next?  You're intending to

20        drive home, I believe, this is what you said?

21        "A:  Yes.

22        "Q:  And is that what you did?

23        "A:  That is what I did.

24        "Q:  Did you do anything while you were driving?

25        "A:  I was calling.

1    "Q: Okay. Who did you call first?

2    "A: I called the jail."

3    Were you asked those questions and you gave those

4 answers?

5 A. Yes.

6 Q. Then, going to page 402, lines 15, through page 403,

7 line 14, were you asked the following questions by your

8 attorney and gave the following answers?

9    "Q: And were you able to be patched through to

10   Commander Jennings at the jail?

11   "A: No. She didn't answer.

12   "Okay. So then what did you do?

13   "A: I got off the phone, and then I called her cell

14   phone.

15   "Q: Okay. And then did you reach her?

16   "A: She said that she had switched me over to day shift

17   and that, when I was done with jury duty, to go back

18   over to the jail and finish up my day.

19   "Q: And what did you say to her?

20   "A: I said, as soon as I'm done, I will report back. I

21   told her I was heading home.

22   "Q: Did you indicate to her anything else when you

23   talked to her?

24   "Answer: I told her that we broke for lunch, I was

25   running home to check on my daughter and my dog, and as

1     soon as I was done, I would be back over to the jail.

2     "Q:  What's the next thing that happens?

3     "A:  I go through the McDonald's drive-thru.

4     "Q:  And as you're going through the McDonald's

5     drive-thru, what happens?

6     "Answer:  I get a call."

7     Were those the questions you were asked and the

8 answers you gave?

9 A.   Yes.

10 Q.   Then you were asked by your attorney about the remainder

11 of your drive home during your testimony under oath on

12 April 19, 2017.  And were you asked the following questions

13 and gave the following answers?  This is page 404, lines 6

14 through 16.

15     "Q:  What was the conversation on the call?

16     "A:  Hey Carrie, nothing else is needed.  Nothing else

17     is needed.  Have a good day.  Don't work too hard.  It

18     was a very short brief conversation.

19     "Q:  Did you say anything?

20     "A:  I said thank you.  I mean, it was -- they called me

21     Carrie, so I assumed it was someone from the courthouse.

22     "Q:  So what did you do next?

23     "A:  I got the food, went home, threw the food at my

24     daughter, let the dog out, got my uniform on and went

25     directly back to the jail."

1    Were those the questions you were asked and the

2  answers you gave?

3  A.   Yes.

4  Q.   Again, no mention of calling Louise when you testified

5  under oath in April 2017; correct?

6  A.   No, not at that time.  No.

7  Q.   So, but on April 20, 2017, you did testify under oath

8  claiming that your mother-in-law, Louise, called you, and

9  that Jennifer Mallon, who we saw yesterday, also called you?

10 A.   Yes.

11 Q.   So I -- and at that time, you claim that -- you did not

12 bring up any testimony whatsoever of calls that you made to

13 either Louise May or Jennifer Mallon; correct?

14 A.   Correct.

15 Q.   So you attended a pre-disciplinary hearing on March 11,

16 2014, with Chief Deputy Koster, your union representative

17 Richard Stomper, and Deputy Little as your union steward;

18 correct?

19 A.   Correct.

20 Q.   During the March 11th hearing, Mr. Stomper at that time

21 mentioned that the phone records not being accurate because

22 it didn't show Commander Jennings phone calls to you and did

23 not show any incoming calls; correct?

24 A.   Correct.

25 Q.   And during that hearing, he made no mention of calls

1   that you claim to be missing between Louise May or Jennifer
2   Mallon or anybody else?
3   A.   Correct.  There was no question that was asked about it,
4   so I was -- I didn't give the answer to that.  It was never
5   asked of me.
6   Q.   Isn't it true that during the March 11 hearing you told
7   Chief Deputy Koster that you stood by your February 5th
8   statement to Commander Jennings that you were released from
9   lunch but required to return to the jury duty, but before
10  returning you received a call from someone from the
11  courthouse who informed you that you did not have to return
12  back to the courthouse and that you were dismissed?
13  A.   I never stated that I returned back to the jury duty.  I
14  stated that, when I was done and when I was released, for
15  that phone call that I return back to the jail.  So was your
16  statement that I said that I went back?  Because I've never
17  stated that I went back to the courthouse.
18  Q.   I'm going to turn your attention to your testimony under
19  oath on April 20, 2017.  And at that time, were you asked
20  these questions and gave these answers?  And this is
21  page 555, line 25, through page 556, line 7.
22       "Q:  Isn't it true that, during that March 11th hearing,
23       you told Chief Deputy Koster that you stood by your
24       February 5 statement to Commander Jennings that you were
25       released from lunch but required to return to jury duty;

1          but before returning, you received a call from someone

2          from the courthouse who informed you that you did not

3          have to return back to the courthouse and that you were

4          dismissed?

5          "A:  Yes."

6              Was that the question you were asked and the answer

7     that you gave?

8     A.   I'm assuming, but I don't recall ever saying to anybody

9     that I went back.  But if that's the answer on the record,

10    then I stand by that answer.  But I must have misspoke at

11    that time regarding that because I never went back to the

12    courthouse.

13    Q.   But that was the question that you were asked at that

14    time, and you gave that answer under oath; correct?

15    A.    I did.  I must have misunderstood that, but, yes, that's

16    my answer.

17              MS. BRUCH:  Can you please instruct the witness to

18    answer the question?

19              THE COURT:  Yeah, if -- the first part of the

20    answer stands.  The second part is stricken.  If there is an

21    explanation needed, your attorney can request it of you in

22    redirect examination.

23    BY MS. BRUCH:

24    Q.   During the March 11th, pre-disciplinary hearing, did

25    Chief Deputy Koster then ask Mr. Stomper what the relevance

1    was of the Christine Fidler e-mail?

2    A.   I believe he did.

3    Q.   And did Mr. Stomper tell Chief Deputy Koster that the

4    call you received, where you believed you were being notified

5    that you didn't have to return from the courthouse, actually

6    came from Ms. Fidler?

7    A.   Yes.

8    Q.   And did Mr. Stomper state that, due to the brief and

9    non-specific language that Fidler used during the call, you

10   mistakenly assumed Fidler was a court official, telling you

11   that nothing else was needed from you?

12   A.   Correct.

13   Q.   And then did Chief Deputy Koster ask you if you agreed

14   that what Mr. Stomper was saying was true?

15   A.   I believe he did, yes.

16   Q.   And you did agree that that was true; right?

17   A.   Yes.

18   Q.   You would agree that, as of the March 11th hearing, you

19   were claiming that the call that you received where you

20   believe you were notified you didn't have to return to the

21   courthouse actually came from Fidler?

22   A.   Yes.

23   Q.   And would you agree that, during that hearing, Chief

24   Deputy Koster challenged your claim that the redacted number

25   that's between the call between Commander Jennings and the

1    3:28 PM call from your husband's cell phone was not a call

2    from Christine Fidler?

3    A.    Was that on March 11th or during my --

4    Q.    March 11th.  At that time --

5    A.    The pre-termination hearing?  I'm getting the days of

6    when we handed over the documents versus -- what day are

7    you -- is it the day before I got terminated when it was --

8    Q.    Exactly.  So on February 28th, you hand over the

9    redacted records and the e-mail from Fidler; right?

10   A.    Correct.

11   Q.    But you don't explain what the significance of those

12   are; right?

13   A.    No, we didn't have time to do that.

14   Q.    And we now know that, in that interim, that's when the

15   Sheriff's Office did their own investigation and found out

16   that --

17   A.    Okay.

18   Q.    -- Ms. Fidler never called you on that day; right?

19   A.    That -- yes, that's when it was a heated conversation

20   and documents were slammed at -- yes, right, the day before I

21   was terminated.

22   Q.    So that's on March 11th, when, first, Chief Deputy

23   Koster asked you, are you claiming that this redacted number

24   is a call that you received from Chris Fidler?  And you said

25   yes; right?

1    A.    Yes.

2    Q.    And that's when he put the documents down and said,

3    you're a liar, and showed you the transcript of the interview

4    with Fidler; right?

5    A.    Correct.

6    Q.    So did Chief Deputy Koster ask you if you could provide

7    call records without the numbers redacted?

8    A.    I don't -- I don't believe he did because right after

9    that is when he got into a heated discussion with Richard

10   Stomper, my union rep.

11   Q.    Okay.  I want to draw your attention to your testimony

12   under oath on April 20, 2017, page 564, starting at line 23,

13   going to page 565, line 1.  Were you asked this question and

14   gave this answer?

15        "Q:  When you had this meeting with Chief Deputy Koster,

16        did he ask you if you could provide the call records

17        without the numbers redacted?

18        "A:  I believe he did, yes."

19        Was that the question you were asked and the answer

20   you gave?

21   A.    Yes.

22   Q.    Would you agree with me that you do not have any record

23   whatsoever showing that this phone call, in fact, happened?

24   A.    Yes.

25   Q.    Would you agree with me that, after you had the

1  opportunity to look at these records during this meeting with

2  Chief Deputy Koster, that's when he pointed the finger at you

3  and called you a liar; right?

4  A.  Yes.

5  Q.  And you never provided any additional records to him

6  during that meeting; correct?

7  A.  During that meeting, no, but we did during the grievance

8  process.

9  Q.  Yeah, and, in fact, during the grievance process, you

10  provided the un-redacted records; right?

11  A.  Correct.

12  Q.  And it showed that the redacted call was a call you made

13  to your husband; right?

14  A.  Correct.

15  Q.  Not from Ms. Fidler.

16  A.  Correct.

17  Q.  And would you agree with me that the purpose of this

18  grievance meeting was for you to have the opportunity to

19  present whatever evidence you felt would convince the

20  Sheriff's Office that they should change their minds and

21  reverse the termination; right?

22          MS. McLAUGHLIN:  Objection.

23          THE COURT:  What's the objection?

24          MS. McLAUGHLIN:  Argumentative.

25          THE COURT:  Overruled.

1     THE WITNESS: Okay.  Repeat the question.

2  BY MS. BRUCH:

3  Q.  Sure.  Would you agree that the entire purpose of this

4  grievance hearing that you had with the Sheriff's Office was

5  to give you the opportunity to present whatever evidence you

6  wanted, make whatever arguments you want, to convince the

7  Sheriff's Office that they were wrong and that they should

8  reverse the decision to terminate your employment?

9  A.  Yes.

10  Q.  So if you felt that you should have been given

11  progressive discipline, you could have argued that as part of

12  the grievance process; right?

13  A.  I assume I could have.

14  Q.  And you did.  You said you shouldn't have been

15  terminated; right?

16  A.  I did.

17  Q.  So I just want to make sure that we're clear, just to

18  wrap this up, that, is it your testimony, before these

19  jurors, that you thought that you were to return to the

20  courthouse for continued jury duty after lunch on January 6,

21  2014?

22  A.  Yes, up until the phone call.

23  Q.  And is it your testimony, before these jurors, that you

24  received a call from your travel agent while you were at

25  lunch on January 6th, which you mistook as a call from the

1    jury commission, telling you that you didn't have to return

2    to jury duty?

3    A.    Yes.

4    Q.    And is it your testimony, before these jurors, that,

5    when you contacted your travel agent and had her write the

6    e-mail for you, that you were not attempting to deceive the

7    Sheriff's Office, Richard Randall, Scott Koster or Sabrina

8    Jennings?

9    A.    I never meant to deceive anybody.

10   Q.    Is it your testimony before these jurors that your

11   husband deleted the call record of the call that you received

12   at lunch on January 6th on your phone because he wanted your

13   phone to operate faster?

14   A.    My phone records in my -- my phone log didn't go back to

15   that far.  So either I delete them, or he did, somebody did.

16   And at that time, for my technology, he was doing a lot to

17   keep my phone going faster.

18   Q.    So it's your testimony that it would have been your

19   husband who deleted your call log of the call from January

20   6th?

21   A.    During that time, it's possible it could have been him,

22   or it could have been me.  But I just know that my phone log

23   didn't go back that far.

24        MS. BRUCH:  Your Honor, I move to strike the answer

25   as non-responsive.

1    THE COURT:  Strike the question and the answer.

2    Start over.

3    BY MS. BRUCH:

4    Q.   Okay.  Is it your testimony, before these jurors, that

5    your husband deleted the call record of the call you received

6    at lunch, on January 6, 2014?

7    A.   Yes.

8    Q.   Is it your testimony, before these jurors, that your

9    husband, without your assistance or permission, redacted your

10   phone records before you turned them over to the Sheriff's

11   Office?

12   A.   Yes.

13   Q.   Is it your testimony, before these jurors, that, when

14   you submitted your redacted phone records, you honestly

15   believed the redacted number, which was actually a call you

16   made to your husband, was a record of the call from your

17   travel agent which you mistook as a call from the court?

18   A.   Yes.

19        MS. BRUCH:  Nothing further.

20        THE COURT:  All right.  Redirect.

21                  REDIRECT EXAMINATION

22   BY MS. McLAUGHLIN:

23   Q.   Ms. Warren, as you sit here today, do you have a

24   recollection of whether or not it was you or Jeff who -- do

25   you have any recollection of deleting your phone log prior to

1    January 14th, 15th, of 2014?

2    A.    No.

3    Q.    Okay.  I mean specifically the call log for January 6th.

4    A.    No.

5    Q.    Okay.  Had you -- do you know whether it was you or Jeff

6    who deleted the log?

7    A.    I do not.

8    Q.    You just know it wasn't there?

9    A.    Correct.

10   Q.    Now, there was some testimony yesterday about, let's

11   see, when you -- whether or not you actually checked the call

12   log sometime after January 14th of 2014, when Sabrina

13   Jennings first asked you to check for the -- who called you

14   and to check to find out who called you, the number; correct?

15   A.    Correct.

16   Q.    Do you remember that?  And so I believe your testimony

17   was that you were sure that you checked it as of

18   February 14th.  Do you have an actual recollection of

19   checking -- checking your call log to see if it was there,

20   the call was there, at anytime between January 14th, and

21   February 14th, when you made the call to Fidler?

22   A.    No, I wasn't checking my phone log until I was

23   questioned by her.

24   Q.    Is it possible that you did check it?

25   A.    Prior to -- no, I wouldn't have any reason to go through

1    until she asked me for that.

2    Q.   No, no, no, I mean -- I'm talking about after January

3    14th, when she asked.  Let's walk through that day.

4    A.   Okay.

5    Q.   So you're coming on the shift, Sabrina Jennings is

6    leaving; correct?

7    A.   Correct.

8    Q.   On January 14th.  Your meeting is at, like, 3:00 o'clock

9    in the afternoon; correct?

10   A.   Correct.

11   Q.   Okay.  So after you go -- had this meeting, did

12   Commander Jennings suggest that you go get your phone and

13   check it right then and there?

14   A.   She asked if I could provide her the phone records.

15   Q.   Okay.  But where was your phone at the time?

16   A.   It was in my car charging.

17   Q.   And did she indicate, well, go get it, and we'll check

18   it right now?

19   A.   No.

20        MS. BRUCH:  Objection, leading.

21        THE COURT:  Sustained.

22   BY MS. BRUCH:

23   Q.   So after the meeting, did you then go to work?

24   A.   Yes.

25   Q.   Okay.  And you worked a full shift?

```
 1    A.   I did.
 2    Q.   So you would have worked until, what, 11:00 o'clock, or
 3    so, that night?
 4    A.   Yes.
 5    Q.   And do you recall, then, if sometime thereafter, the day
 6    after, whatever, do you have any specific memory of, oh,
 7    yeah, Jennings asked me for the phone log, I better check
 8    and -- do you have any recollection of checking?
 9    A.   I don't know exactly when I checked.  I know it was
10    right before I called Christine Fidler.  That is what I
11    recall.
12    Q.   Okay.
13    A.   So whenever those dates were when it became relevant
14    that that was an issue that the courthouse didn't call me.
15    So whatever those dates were.
16    Q.   Okay.  You did testify earlier that you believe you
17    asked your husband for the phone records sometime before
18    February 14th; correct?
19    A.   Correct.
20    Q.   Okay.  And would you have asked him for those phone
21    records prior to checking the log on your phone itself?
22             MS. BRUCH:  Objection, leading.
23             THE COURT:  Overruled.
24    BY THE WITNESS:
25    A.   Yes.  I asked him for the phone records after we got the
```

1  paperwork from -- the memo, stating that the courthouse
2  didn't call me.  But I asked him for the phone records
3  initially, and he said no.  And then I checked my phone log
4  to see and figure out during my part of my investigation to
5  prove my innocence that -- that's when I checked my phone
6  log.
7  Q.  All right.  Okay.  You were asked on cross-examination,
8  you were -- your testimony on April 24 of 2014, was read to
9  you.  It was page 554, line 25, to 556, line 6.  And I want
10 to read this to you again.
11        All right.  So this is an e-mail from chief
12 deputy -- that chief deputy -- Oh, excuse me, my apologies.
13        Isn't it true that during the March 11th hearing
14 you told Chief Koster that you stood by your February 5th
15 statement to Commander Jennings that you were released from
16 jury duty but required to return -- you were released from
17 lunch but required to return to jury duty.  But before
18 returning, you received a call from someone from the
19 courthouse who informed you that you did not have to return
20 back to the courthouse and that you were dismissed.  And you
21 said yes.
22 A.  Yes.
23 Q.  At any place in that -- in that question, does it
24 indicate that you told Commander Jennings that you actually
25 returned to the courthouse?

1  A.   No.

2  Q.   Have you ever told Commander Jennings or anyone else

3  that you actually did go back to the courthouse?

4  A.   No, I never went back to the courthouse, so I wouldn't

5  tell anybody that.

6  Q.   You were asked about the the jury check-in and the fact

7  that there was a piece of paper on the jury check-in desk

8  that apparently talked about the cell phone ban.

9        We'd like to play Plaintiff's 7.  I believe this

10  was already admitted. I believe it is already admitted.

11        MS. DORAN:  It is Plaintiff's 6.

12     (Video playing in open court.)

13  BY MS. McLAUGHLIN:

14  Q.   Okay.  Can you tell me what this is?

15  A.   That is me approaching the jury check-in.

16  Q.   And there appear to be two people behind -- behind the

17  desk?  I see two sets of hands?

18  A.   Yes.

19  Q.   And what is going on here at this point in time?

20  A.   That's when I'm checking in.  I gave them my documents.

21  That was during the time when they said that it was all

22  criminal cases and one of them went back to see if I needed

23  to stay since I was a deputy.

24  Q.   Well, I think it's pretty obvious, but, you put your

25  purse on the counter next to the sign, not on top of the

1    sign; correct?

2    A.   Correct, yeah.

3    Q.   Okay.  If you had noticed -- well, let me just finish

4    this up.

5              And now you're going into the jury room; correct?

6    A.   Correct.

7    Q.   Okay.  If you had noticed the sign there on the counter,

8    would you have taken out your phone and played Angry Birds on

9    it all morning?

10   A.   No, I wouldn't.  No, I would not.

11        (End of video.)

12   BY MS. McLAUGHLIN:

13   Q.   You were asked on cross-examination if you thought it

14   was odd that you would be receiving a phone call from the

15   from the courthouse, that you would be singled out, and you

16   said no.  Why did you think that?

17   A.   Because I'm an employee of Kendall County, and at the

18   courthouse, and also the Sheriff's Office, share similar

19   programs.  So we have access to all the deputies at the

20   courthouse and at the jail, if we ever need to get ahold of

21   them.  We also handle security issues at the courthouse, so

22   they have my information.

23   Q.   Okay.  Do you recall when it was that you first asked

24   Louise or told Louise that she might be needed to be a

25   witness in this matter?

1  A.   She -- she was always on the witness list, and I know

2  that she was aware of being on the witness list.  But I'm not

3  sure exactly when I told her she was going to be called in

4  this case.

5  Q.   Okay.

6  A.   It's -- I'm not sure exactly when I told her that she

7  was going to be called.  Maybe when she got the summons.  I

8  don't recall at this time.

9          MS. McLAUGHLIN:  May I have just a moment, your

10  Honor?

11          THE COURT:  You may.

12          MS. McLAUGHLIN:  Nothing further on redirect.

13          THE COURT:  All right.  Any additional questions?

14          MS. BRUCH:  Yes, your Honor.

15                    RECROSS-EXAMINATION

16  BY MS. BRUCH:

17  Q.   Ms. Warren, you just testified that you think that

18  Ms. May may have realized that she was going to testify in

19  this case when she got the summons.  You know I didn't send

20  her a summons; right?

21  A.   I don't know who sent her the summons.

22  Q.   And you also -- is it true that you just now said that

23  you don't know if you looked through your cell phone log on

24  January 14, 2014?

25  A.   I didn't -- I looked through my cell phone log when the

 1   documents are showing that nobody from the courthouse called
 2   me.  So whenever those dates were is when I went through my
 3   cell phone log.  So what were those dates?
 4   Q.   Well, I want to just draw your attention to your
 5   testimony under oath on -- yesterday.
 6   A.   Okay.
 7   Q.   Page 840, I'm sorry I'm looking at my phone, 843 to 844.
 8   So 843, line 25, to 844, line 7.  And were you asked these
 9   questions yesterday and gave this answer?
10        "Q:  When you left the meeting, after you left this
11        meeting on January 14th, did you check your phone log?
12        "A:  After that meeting, I did.
13        "Q:  What did you see in your phone log?
14        "A:  That my numbers didn't go back that far.
15        "Q:  So on January 14th, you checked your phone log, and
16        your phone log didn't go back to January 6th?
17        "A:  That is correct."
18        Was that the testimony that you gave under oath
19   yesterday and the answers -- the questions you were asked and
20   the answers you gave?
21   A.   For -- yes.
22        MS. BRUCH:  All right.  Nothing further.
23        THE COURT:  All right.  Anything else?
24                   REDIRECT EXAMINATION
25   BY MS. McLAUGHLIN:

```
 1  Q.   Is it possible that you could have gotten your dates
 2  confused?
 3  A.   Yes.
 4              THE COURT:  Anything else?
 5              MS. BRUCH:  Nothing.
 6              THE COURT:  Any questions of the jury of this
 7  witness?  All right.  I see no hands.
 8              Ma'am, you're excused.  Thank you.
 9              THE WITNESS:  Thank you.
10       (Witness excused.)
11              THE COURT:  Please call your next witness.
12              MS. McLAUGHLIN:  May I have just a few minutes?  I
13  have everything ready to go, but it's in the other room.
14              THE COURT:  All right.  We're not going to have a
15  full recess, but we'll stand up and stretch, if you'd like
16  and talk about anything other than the case.
17       (Recess from 10:34 a.m. to 10:37 a.m.)
18              THE COURT:  All right.  Please call your next
19  witness.
20              MS. McLAUGHLIN:  Sabrina Jennings.
21              THE COURT:  All right.  Please raise your right
22  hand.
23       (Witness sworn.)
24              THE COURT:  All right.
25
```

1     SABRINA JENNINGS, DEFENDANT HEREIN,

2     PLAINTIFF'S ADVERSE WITNESS, SWORN,

3     DIRECT EXAMINATION

4  BY MS. McLAUGHLIN:

5  Q.   Good morning, Commander Jennings.  State your name and

6  spell it for the record.

7  A.   My name is Sabrina Jennings, S-a-b-r-i-n-a,

8  J-e-n-n-i-n-g-s.

9  Q.   And you are the commander of the jail division at the

10  Kendall County Sheriff's Office; correct?

11  A.   That is correct.

12  Q.   And you started at the jail as a corrections deputy in

13  1991?

14  A.   Yes, I did.

15  Q.   And you were amongst the first three females that were

16  ever hired at the Kendall County Sheriff's Office; correct?

17  A.   One of the first three for the corrections division,

18  yes.

19  Q.   Okay.  You would agree with me that the Sheriff's Office

20  is a male-dominated profession; wouldn't you?

21  A.   Yes.

22  Q.   When did you become the commander?

23  A.   2003.

24  Q.   The Kendall County Sheriff's Office did not have an

25  anti-harassment and discrimination policy until 2009;

1    correct?

2    A.   I believe it was sometime in that timeframe, yes.

3    Q.   Now, let's take a look -- if a female came to you and

4    said that men don't respect the women in the department, a

5    statement such as that, you wouldn't necessarily consider

6    that to be a complaint of gender discrimination; would you?

7    A.   Not necessarily, no.

8    Q.   You've known Melissa since 2009; correct?

9    A.   I met her when she was hired, when we did the interview

10   process.

11   Q.   And is it fair -- is it fair to say that she is a bit of

12   a talker?

13   A.   Yes.

14   Q.   It's your position that you were not looking into Carrie

15   Warren for violations of the truthfulness policy until after

16   February 5, 2014, at the formal interrogation; isn't that

17   correct?

18   A.   Yes, after the formal interrogation, that's when I was

19   looking into untruthfulness.

20   Q.   So let's go back and see how this investigation

21   unfolded.  It's Joint Exhibit 3.

22             THE COURT:  Hang on one second while I make sure

23   the witness and the jury can see it.

24   BY MS. McLAUGHLIN:

25   Q.   This is your internal report or internal investigation

1    report that you authored; correct?

2    A.    Yes.

3    Q.    Okay.  And you authored this sometime after

4    January 14th, when you provided Carrie with the notice of

5    charges; correct?

6    A.    I believe so, yes.

7    Q.    When did you turn this report into Scott Koster?

8    A.    I believe I would have turned this report in when I

9    handed it and the rest of the paperwork that I gave him,

10   after the formal, but I'm not -- I'm not -- I can't give you

11   an exact date of when he got this.

12   Q.    Okay.  So do you recall that you handed it in all

13   together with all the exhibits when you gave it to Scott

14   Koster?

15   A.    I believe I did, but I can't say yes or no to that.

16   Q.    You didn't provide various pieces of evidence to him

17   piecemeal; did you?

18   A.    No.

19   Q.    Well, you have a list of attachments here, and one of

20   them is Assistant State's Attorney Maria Del Amado.  And her

21   memo is dated January 17th.

22          So is it fair to say that it was sometime after

23   January 17th that you provided the memo to Scott Koster?

24   A.    Yes.

25   Q.    And do you recall if you had also provided the memo to

1   Scott Koster prior to January 21st -- or 24th, of 2014, when

2   you sent to Carrie Warren the notice that she was going to be

3   subject to a formal interrogation?

4   A.   Are you talking about the original summary that you

5   sent, that you showed me?

6   Q.   Right, this summary here, the internal investigation

7   report.

8   A.   I don't know what date I gave that to him.  I know that

9   I eventually gave it to him, but I don't know what date I

10  gave it to him on.

11  Q.   Did you make any changes to this report after you

12  delivered it to Scott Koster?

13  A.   No.

14  Q.   I want to point out to you that, in your report, you

15  indicate that you spoke with Carrie on January 5th, that

16  Sunday night, and you told her that she gets paid for jury

17  duty and that she was supposed to be handing over her jury

18  duty pay, and then, per her union contract, she was going to

19  get a full day's pay; correct?

20  A.   What I told her is that, if she gets any pay for the

21  jury duty, that she would hand over that -- she would hand

22  over the check to the Sheriff's Office.  I didn't say

23  anything about pay from the Sheriff's Office during this.

24  Q.   But it's your understanding, I mean, you told her to do

25  that so that, per her union contract, she was going to get

1    paid her full day's wages?

2    A.   Yeah, she would have been paid.

3    Q.   Okay.  And that's 8.5 hours; correct?

4    A.   Yes.

5    Q.   And the fact that she managed to get back to work and

6    finish out part of a shift for two-and-a-quarter hours, or

7    so, she was still entitled, per her union contract, to the

8    8.5 hours of pay; correct?

9    A.   I don't know what -- what it specifies in the union

10   contract, as far as the pay.  But I do know that she should

11   have worked her 8.5 hours.  And that's what I had indicated,

12   that she worked eight-and-a-half hours.

13   Q.   Aren't you, when you refer to this, telling her, turn in

14   your pay, aren't you referring to the fact that she is going

15   to get paid --

16   A.   Yes.

17   Q.   -- a full 8.5 hours?

18   A.   I said that she would -- she would be paid for the day,

19   yes.  And if she gets a check from the courthouse, the

20   officers always hand the checks into the courthouse because

21   they get paid by the Sheriff's Office.

22   Q.   So did you at any time provide her with instructions on

23   how to account on her timesheet for the actual hours that she

24   worked that day, versus the hours that she was at jury duty?

25   A.   No.

1   Q.   And did you at any time tell her, well, okay, you've

2   only worked from 8:30 rather than 6:30, which is your normal

3   shift time, so you owe us two more hours.  Did you ever

4   approach her about, you owe us a couple hours?

5   A.   No.

6   Q.   But you were looking into her falsifying her timesheet

7   as of January 14th; weren't you?

8   A.   I don't know when I was looking at her timesheet, if it

9   was prior to January 14th, or if it was after.  But I wasn't

10  looking at any excessive discipline or anything for

11  falsifying her timesheet.  I don't know when I looked at that

12  timesheet.

13  Q.   Let's move on to the morning of January 6th.  You

14  changed your schedule; correct?

15  A.   Yes, I did.

16  Q.   And then you say that you tried to contact Deputy Warren

17  via phone, but were -- was unsuccessful; correct?

18  A.   That is correct.

19          MS. McLAUGHLIN:  Okay.  Plaintiff's 28.

20          THE COURT:  It's not in evidence.

21          MS. McLAUGHLIN:  Okay.  Then I would move to have

22  it admitted before I publish it.

23          THE COURT:  Any objection?

24          MS. BRUCH:  No objection.

25          THE COURT:  All right.  Plaintiff's 28 is admitted.

1    (Plaintiff's Exhibit 28 admitted in evidence.)

2    BY MS. McLAUGHLIN:

3    Q.    Okay.  Plaintiff's 28, this is a phone record from the

4    Kendall County Sheriff's Office, indicating that on 1/6,

5    2014, at approximately 7:25, 7:27 and 7:31, these are phone

6    calls that you made to Carrie Warren's -- to Carrie Warren;

7    correct?

8    A.    I don't know because I'm not sure what the 466-8501

9    number is.  The number that I give out when -- for the

10   Sheriff's Office that I know of is 553-7500.

11   Q.    Okay.  All right.  So would you agree that there appears

12   to be three phone calls made to Carrie Warren in succession

13   from 7:25 AM to 7:31 AM?

14   A.    If those are her phone records, but I don't -- I

15   don't -- like I just said, I don't know what her phone number

16   is.

17   Q.    Okay.  Well, we're going to get to that.

18   A.    Okay.

19   Q.    And you indicated that you made three phone calls to

20   her.  And it's your testimony, correct, that you made these

21   phone calls at around 7:30 in the morning; correct?

22   A.    I believe I called her twice.

23   Q.    Okay.  Well, this shows that you called the number

24   793-3901, and that number you called twice; correct?

25   A.    That's what the records say, but I remember calling her

1    twice.

2    Q.   And in between that, you also tried to call her on her

3    home phone; isn't that correct?

4    A.   I remember calling her cell phone and not getting an

5    answer, it went directly to voicemail.  And I remember

6    calling her home phone.  After those two attempts, I wasn't

7    able to get in touch with her, I know I called the

8    courthouse.

9    Q.   Okay.

10   A.   I don't remember a third call.

11   Q.   Okay.  But one -- at least you remember at least one

12   call to her home and one call to her cell?

13   A.   Yes, ma'am.

14   Q.   And if the record shows that you made two calls to the

15   cell, you have no reason to refute that; do you?

16   A.   If it says that I did, then I did.  But I remember the

17   two calls.

18   Q.   Okay.  So then you indicate that you called Deputy

19   Commander Leinen; correct?

20   A.   Yes.

21   Q.   And he is the deputy commander in charge of the

22   courthouse; correct?

23   A.   Yes.

24   Q.   Okay.  And you told him, according to your report, I

25   asked Commander Leinen to inform Deputy Warren, that, if she

1  was chosen for jury duty and she was there all day, she could

2  just go home afterwards.  If she was dismissed from jury

3  duty, she needed to come over here and finish out her

4  8.5 hours, and then she would go home afterwards.

5           And Deputy Leinen said he would relay that message;

6  correct?

7  A.   Correct.

8  Q.   You didn't tell Deputy Leinen that Carrie had been

9  switched from second shift to first shift during that phone

10  call; did you?

11  A.   No.

12  Q.   And you didn't tell Deputy Leinen that Carrie -- he

13  should relay to her that she needs to immediately report to

14  the jail from the courthouse; did you?

15  A.   Not that I recall, no.

16  Q.   Okay.  So the last paragraph that you write in a report

17  that you provided to Chief Koster is, Deputy Leinen spoke to

18  Deputy Warren and relayed to her that she was dismissed from

19  jury duty -- that if she were dismissed from jury duty, she

20  needed to report immediately to -- for duty so she could

21  finish out her 8.5 hours.

22           But that's not what Deputy Leinen -- you note the

23  word immediately there?

24  A.   Yes.

25  Q.   Okay.  That's not what Deputy Leinen reported to you; is

1    it?

2    A.   That is what Deputy Leinen reported to me.  He said that

3    is what he told her.

4    Q.   Deputy Leinen submitted a memo to you on January 7,

5    2014; correct?

6    A.   Yes, he did.

7    Q.   And in that memo --

8              This is Plaintiff's Exhibit 33.  I don't think it

9    was yet -- has yet been admitted?

10             MS. ANDERSON:  I'm sorry, Plaintiff's 33?

11             MS. McLAUGHLIN:  Plaintiff's 33.

12             MS. ANDERSON:  No, it hasn't been admitted yet.

13             THE COURT:  Any objection?

14             MS. BRUCH:  No objection.

15             THE COURT:  Plaintiff's 33 is admitted.

16        (Plaintiff's Exhibit 33 admitted in evidence.)

17   BY MS. McLAUGHLIN:

18   Q.   So in -- this is Plaintiff's Exhibit 33.  This is the

19   memo that Deputy Leinen sent to you on January 7, 2017;

20   correct?

21   A.   Correct.

22   Q.   And nowhere in this memo does he report to you that he

23   told Carrie to report immediately; correct?

24   A.   In this memo, he does not use the word immediately.  But

25   when he talked to me on the phone, that's what he said to me.

1    Q.   When did you talk to him on the phone?

2    A.   I talked to him -- after he talked to Carrie, he had

3    called about some other issues that was going on across the

4    street.

5    Q.   Okay.  So when you wrote this memo, you have -- you put

6    in the word immediately.  And this is what you provide to

7    deputy -- Chief Deputy Koster prior to January 21st; isn't

8    that correct?

9    A.   As I stated previously, I don't know when I gave him

10   that.  But what is written in there is what Deputy Commander

11   Leinen had told me.

12   Q.   So, then, on -- you're aware, aren't you, that on

13   January 21st, two weeks later, Chief Deputy Koster and Leinen

14   conferred, and Leinen changed his memo to read --

15           This is the -- this is a side-by-side of Kendall

16   9730, which is, I'm sorry, part of the Joint Exhibit 3 that's

17   included in your packet and the other memo.

18           So let me ask you this:  Were you made aware that

19   Deputy Leinen changed his memo to add the word immediately?

20   A.   At that time, no.  I learned about that in previous

21   testimony.

22   Q.   And can you explain to me how it got into the packet of

23   information that you sent to Deputy Koster -- Deputy Chief

24   Koster?

25   A.   No.

1    Q.    Is it your testimony that you didn't switch out the
2    original memo from January 7th to switch it out and include
3    the amended memo of January 21st, when you submitted this
4    to -- before you submitted it to Chief Koster?
5    A.    No, I didn't switch anything out.
6    Q.    Okay.  So let's move on, then.  Koster -- so you get a
7    call from Carrie Warren at 11:19 AM; correct?
8    A.    Yes.
9    Q.    And on January 7th, you knew that she was at work, that
10   she had reported to work, by 12:45 in the afternoon; correct?
11   A.    The day of jury duty?
12   Q.    Right.  I mean, that's, according to your report, here:
13   "At approximately 12:45 Deputy Warren --"
14   A.    Yes.
15   Q.    "-- showed up in my office"?
16   A.    Yes.
17   Q.    Okay.  She is already in uniform, so you know that from
18   11:20 to 12:45, that that's the time that she took for -- for
19   lunch; right?
20   A.    I know she called me at 11:19 that morning.  She said
21   that she had been released from jury duty to go to lunch.
22   And that when she went back from -- when she reported --
23   when she -- she had to report back to the courthouse, and she
24   thought that afterwards she would be released.  So, yes, I
25   figured that was lunch because usually with the jurors you

1    get an hour.

2    Q.   And she actually arrived back at the courthouse at

3    12:27.  Didn't you subsequently discover that?

4    A.   She arrived back at the courthouse or the jail?

5    Q.   I'm sorry, at the jail, at 12:27.  She walked into the

6    doors of work at 12:27?

7    A.   She walked in the doors sometime around 12:27, 12:30,

8    that timeframe, yes.

9    Q.   Okay.  And this is -- 12:27 is an hour and eight minutes

10   after you spoke to her; right?

11   A.   Yes.

12   Q.   Okay.  So didn't she, in fact, arrive at the jail sooner

13   than you actually expected her?

14   A.   Yes, if I had been thinking about it at the time, but I

15   wasn't thinking about her arrival time, or anything.  I just

16   know that she said she had to go back to the courthouse and

17   she would be released afterwards.

18   Q.   Okay.  So let's move on to the January 14th meeting in

19   which you report on that.  You explain to her that you are

20   looking into allegations made about her conduct in the

21   courthouse when she was on jury duty.

22           And one of the questions you ask is:  What time did

23   you return after lunch?  Correct?

24   A.   I believe so.

25   Q.   But you already knew -- what time did she return to

1    court after lunch; correct?  That's one of the questions that
2    you asked her?
3    A.   May I go back?  I don't believe I asked her what time
4    she returned back from lunch.  I believe I asked her when she
5    went back to the courthouse.
6    Q.   Okay.  And -- but you knew that was after her supposed
7    lunch break; right?  That was your understanding; right?
8    A.   Yes, she went to lunch, and I asked her what time she
9    went back to the courthouse.
10   Q.   You already knew that she hadn't returned to the
11   courthouse; isn't that correct?
12   A.   That is correct.
13   Q.   And so when you asked that question on January 14th,
14   what time did you get back to the courthouse, you were
15   looking to trap her in a lie; weren't you?
16   A.   No.
17   Q.   But Carrie didn't lie to you.  She immediately said, no
18   hesitation, I didn't go back to the courthouse; right?
19   A.   That is correct.
20   Q.   You also asked her who called -- who called you?  And
21   she immediately says, I don't know.  Right?
22   A.   There was previous conversation prior to.  She had told
23   me after she didn't go back to the courthouse that she had
24   received a phone call from somebody at the courthouse saying
25   that she didn't need to go back, so she didn't go back to the

1  courthouse.

2  Q.   And you didn't direct her to go get her phone at that

3  time; did you?

4  A.   I had asked her if she could provide me a screenshot of

5  her phone showing the incoming call, and she had told me that

6  she didn't know if she had it because, when her phone starts

7  to run slow, either her husband makes her delete the calls or

8  he deletes them herself.  So then after she told me that she

9  didn't know if she could provide a screenshot, I asked her if

10  she could just get me a copy of the phone records so I could

11  see that, yes, she did receive a call.

12  Q.   So you asked her for some kind of proof of the phone

13  call, of the bill, or a screenshot from her phone?

14  A.   Yes, I did.

15  Q.   Okay.  And that's personal property; right?

16  A.   I don't know if I would constitute it as personal

17  property if I'm asking for a copy of something, something to

18  prove that she -- she said she got a phone call, and I

19  believed that, yes, she got a phone call.  I just wanted the

20  proof to put with all the rest of my paperwork.

21  Q.   So then you indicate that you checked the video, and,

22  yes, there are a number of people who also seem to have cell

23  phones with them; correct?

24  A.   Oh, this -- yes.

25  Q.   And you also checked the exit video in your -- in your

1    report you say you checked the exit video to see that there

2    were signs on the doors?

3    A.   Yes, to see the signs and also to confirm the time that

4    she left.

5    Q.   And there weren't signs on every single -- every single

6    panel, every single door in the entryway to the courthouse;

7    was there?

8    A.   Not that I recall.  I believe the signs were on the

9    doors that are mainly used for entry, not exit.

10   Q.   Okay.  And you didn't go back and say, oh, wait a

11   second, I want to see whether or not Carrie actually looked

12   at that sign when she entered the courthouse.  So you didn't

13   pull that portion of the videotape when she was actually

14   entering the courthouse; did you?

15   A.   No, I didn't.

16   Q.   Okay.

17   A.   But with the way the signs were posted and the lettering

18   size on the sign, you didn't have to stop and read it.  It

19   was very big lettering.

20   Q.   Okay.  So you assumed that she must have seen it;

21   correct?

22   A.   I presumed she did, yes.

23   Q.   And to verify your presumption, you could have easily

24   asked for the video of her entering the court -- entering the

25   courthouse to see whether or not she stopped at all or

1    appeared to even glance up on this cold, bitter day, if she

2    even glanced at the door.  But you didn't do that; did you?

3    A.    No, I did not.

4    Q.    Now, you recall the conversation with Tracy Page -- you

5    claim that you had a conversation with Tracy Page later --

6    I'm sorry, on January 6th; correct?

7    A.    I believe it was the day of jury -- the jury trial.  Was

8    that January 6th or January 7th?

9    Q.    Sixth.

10   A.    Yes.

11   Q.    Okay.  So, and this is sometime after Carrie Warren had

12   popped her head into you and said, I'm here?

13   A.    I believe so, yes.

14   Q.    Okay.  And Tracy Page is an administrative person, and

15   her office is on the second floor; correct?

16   A.    Yes.

17   Q.    And your office is on the first floor?

18   A.    Yes.

19   Q.    But you're often up into those administrative services;

20   right?

21   A.    Yes, when I have to take paperwork up or do -- perform

22   business up there, yes.

23   Q.    So you were delivering some papers to Tracy, and you

24   dropped something off at her, and she told you that she saw

25   Carrie Warren earlier, and that she and Lisa Bowen and Chief

1    Koster were talking, and Carrie said, I had to go back to the

2    courthouse after lunch just to get dismissed from jury duty.

3    That's your testimony; right?

4    A.    That's what was relayed to me by Tracy Page, yes.

5    Q.    But you don't recall any of the specifics of that

6    conversation because it was extremely brief and just a random

7    fact that Tracy Page offered up to you; correct?

8    A.    The conversation was brief.  I was up there -- I believe

9    I was dropping off paperwork, and --

10   Q.    All right.

11   A.    -- she had mentioned it and --

12   Q.    The question is --

13   A.    -- I said all right.

14   Q.    The question is:  You don't have any specific

15   recollection of that conversation because it was extremely

16   brief and it was just a random fact that was offered up by

17   Tracy; correct?

18   A.    No, I remember -- I remembered her saying that.  Why she

19   said it, I don't know.  I didn't ask.  But I do remember her

20   saying that.

21   Q.    And you had no recollection of how this random

22   conversation with Tracy Page came up; do you?

23   A.    No, ma'am.

24   Q.    Do you recall testifying or giving your testimony under

25   oath on May 1st, 2014 -- I'm sorry, May 1st, 2017?

1    A.   Yes, I gave testimony, but I don't remember everything I

2    said.

3    Q.   Okay.  And on page 1097 -- I'll drop that question.

4         All right.  So let's take a look at the Christopher

5    Phillips memo.

6    A.   Okay.

7    Q.   You recall that; don't you?

8    A.   Yes, I know he wrote a memo.

9    Q.   Okay.  Christopher Phillips submitted a memo, and he

10   said -- he was the courtroom deputy who was actually in the

11   courtroom when Carrie was called into the -- the -- for the

12   jury panel; correct?

13   A.   I believe so, yes.

14   Q.   And that, in that memo, Christopher Phillips says that

15   Carrie stood up and said:  I'm a Kendall County Sheriff's

16   Deputy, and I always side with the cops.  Correct?

17   A.   That's what he said.

18   Q.   So when you had -- you're looking into a charge that

19   Carrie was potentially trying to get out of jury duty; right?

20   A.   Correct.

21   Q.   That's the allegation?

22   A.   Correct.

23   Q.   And you had Judge Pilmer's statement, and you had Chris

24   Phillips' statement, and you had those Facebook posts;

25   correct?

1    A.    Correct.  I'm not sure when I got the Facebook posts,

2    though.  But I do know that they existed.

3    Q.    Didn't Deputy Commander Leinen send them to you

4    literally the night of January 6th?

5    A.    He sent them to me, but I don't remember when it was

6    exactly I got them.  But I do know that they existed, yes.

7    Q.    Okay.  So you're looking at this situation, and you've

8    got Phillips' statement, you've got Pilmer's statement, and

9    you've got the Facebook posts.

10            So when you look at these, Phillips' statement and

11   the Facebook post, it doesn't jump off the page at you that

12   Phillips cites almost verbatim what Carrie said in her

13   Facebook post the night before, about, I'll be siding with

14   the police?

15   A.    Yes, I believe that Phillips was writing what was on --

16   on her Facebook.

17   Q.    Okay.  And you have Carrie's statement.  She wrote a

18   report; correct?

19   A.    Yes.

20   Q.    And when you questioned her on January 14th, she

21   vehemently denied that she ever made that statement in court;

22   correct?

23   A.    That is correct.

24   Q.    Okay.  So you had these diametrically opposed

25   statements, one, that Christopher Phillips is saying, she got

1  up in court and she made this statement in court.  And Carrie

2  saying, no way did I make that statement in court.  Two

3  diametrically opposed statements.  Would you agree with me?

4  A.  Yes.

5  Q.  Both cannot be true; correct?

6  A.  I believed that Carrie did not say that in court, but I

7  also believe that, when Chris Phillips wrote his report, he

8  was remembering something that he had seen on Facebook.  Did

9  Carrie make those statements, I don't believe she did in

10  court, no.  And that's what I've testified to previously.

11  Q.  You had these two statements in front of you, and you

12  don't order the transcript to verify what exactly Carrie

13  said?

14  A.  No, ma'am.

15  Q.  You assumed Carrie didn't make the statement, and you

16  assume that Christopher Phillips must have gotten it mixed

17  up; correct?

18  A.  That's not correct.

19  Q.  Didn't you just say you assumed he misremembered, or

20  something to that effect?

21  A.  I believe that Chris Phillips was posting -- had written

22  something that he had seen in a Facebook post.  I believe

23  that Carrie did not make those statements, and I did not

24  order the transcripts.  I didn't even know that they existed

25  until sitting here in jury court.  But Judge Pilmer did not

1    mention anything about Facebook post or anything in his

2    e-mail.  And I truly believe that, if Carrie would have said

3    something like that, it would have been in Judge Pilmer's

4    memo.

5    Q.   Thank you.  So you recognize that there is an

6    inconsistency between Chris Phillips' statement and all the

7    other evidence; correct?  But you didn't put it -- you don't

8    mention that in your report; do you?

9              MS. BRUCH:  Objection to the form of the question,

10   compound.

11             THE COURT:  Sustained.

12   BY MS. McLAUGHLIN:

13   Q.   You recognize that there was an inconsistency between

14   Chris Phillips' report and Carrie Warren's statements;

15   correct?

16   A.   Correct.

17   Q.   And you did not mention that inconsistency in your

18   report, in your internal report, regarding this situation;

19   did you?

20   A.   That is correct.

21   Q.   And you didn't report Christopher Phillips for -- well,

22   let me ask you, this report that he wrote, that's -- any

23   report that is submitted in writing by a deputy, that's an

24   official police report; correct?

25   A.   It could be considered one, yes.

1    Q.   Okay.  And they are expected to be truthful and honest

2    and complete; correct?

3    A.   Yes.

4    Q.   Okay.  So you didn't report Deputy Phillips' statement

5    that was -- that you believe was not accurate.  You did not

6    report that to anyone; did you?

7    A.   No, I did not.

8    Q.   And you didn't report Chris Phillips because, he's not

9    my deputy?

10   A.   At the time, no, he was not, and he is still not in my

11   office -- he's still not my deputy.

12   Q.   So not my problem; right?

13   A.   No because I believe that Chris recalled -- when he

14   wrote his report, he was recalling something that he had seen

15   on Facebook.

16   Q.   Have you ever known Chris Phillips to have memory

17   problems?

18   A.   No, ma'am.

19   Q.   Okay.  And he wrote this report literally within

20   24 hours of the occurrence having -- having taken place in

21   court; correct?

22   A.   I don't know when I wrote this report.

23   Q.   When Chris Phillips submitted a report to you.

24   A.   Oh, Chris Phillips?  He may have.

25   Q.   Okay.  So the next thing is that you send Carrie the

1    notice on January 24th that she is going to have a formal

2    interrogation.  And you spoke to Chief Koster about this

3    prior to writing that notice of formal interrogation to

4    Carrie; right?

5    A.    I know I spoke to Chief Koster, but I don't recall when

6    it was I spoke to him.  It may have been before, it may have

7    been after.  I don't recall.

8    Q.    And that is plaintiff's -- or, I'm sorry, Joint

9    Exhibit 12.  And you say that you're going to have -- convene

10   this formal interrogation on January 29th.  But that's not

11   the date that it actually occurred; is it?

12   A.    I don't believe so, no.

13   Q.    Okay.  Because you had -- you knew between January 24th,

14   when you served this on Carrie, and February 5th, when the

15   formal interrogation actually took place, you had

16   correspondence with Rick Stomper, and you knew that -- you

17   arranged a mutually agreeable date with him; correct?

18   A.    I know I had corresponded with Richard Stomper, but I

19   don't recall all the -- what it was.  I know that I had -- I

20   believe he sent me an e-mail about a date and a time, and I

21   replied back saying that that was fine.

22   Q.    Okay.  So just to clarify, when you sent this notice

23   to -- of the formal interrogation to Carrie, you provided her

24   with this -- with this notice of formal interrogation a copy

25   of the notice of charges; right?

1    A.    Yes, I believe I did.

2    Q.    And it was the original notice of charges, nothing

3    amended at that point in time; correct?

4    A.    I don't believe I amended anything.

5              THE COURT:  Why don't we take our morning break.

6    It's about 11:20.  We've been going about an hour and a half.

7    So we'll break for about 15 minutes.

8              Please don't discuss the case among yourselves or

9    with anyone else.  And keep an open mind, there is more

10   evidence to hear.  Thank you.

11       (Jury out at 11:20 a.m.)

12             THE COURT:  All right.  The witness is excused, but

13   you're on cross-examination, so please don't discuss your

14   testimony with anyone.

15             THE WITNESS:  Yes, sir.

16             THE COURT:  All right.  Anything we need to talk

17   about on the record?  Plaintiffs?

18             MS. McLAUGHLIN:  No.

19             THE COURT:  Defense?

20             MS. BRUCH:  No.

21             THE COURT:  Okay.  See you in 15 minutes.

22       (Recess from 11:20 a.m. to 11:36 a.m.)

23             THE COURT:  All right.  Anything we need to

24   discuss?

25             MS. McLAUGHLIN:  No.

1    MS. BRUCH:  No, your Honor.

2    THE COURT:  All right.  Let's bring in the jury.

3    (Jury in at 11:36 a.m.)

4    THE COURT:  Please be seated, Ladies and Gentlemen.

5    You submitted a number of questions.  And so the procedure is

6    proper, no need to do it now.  You can hold onto those

7    questions until all the questioning is done by the attorneys

8    because some of these questions may be answered, and you may

9    not feel the need to have them asked.  But I will run these

10   by the attorneys.  And, if proper, they'll be asked, so.  But

11   sometimes better to wait until the end because some of these

12   may be answered anyway.

13   Okay.  You may continue your cross-examination.

14   BY MS. McLAUGHLIN:

15   Q.  I wanted to just point out, when you gave the notice of

16   formal interrogation on the 24th, we've established that you

17   also provided a copy of the original notice of charges;

18   correct?

19   A.  Yes, I believe I did.

20   Q.  And as of the 24th, you were already pursuing discipline

21   for untruthfulness; isn't that correct?

22   A.  No, ma'am.

23   Q.  Didn't you previously testify that if untruthfulness was

24   not an issue, that based on all the rest of the investigation

25   materials that you had at your disposal, that you would have

1  recommended a suspension of not greater than three days?

2  A.  Can you repeat that, please?

3  Q.  Didn't you previously testify that if untruthfulness was

4  not an issue, that based on all the rest of the investigation

5  materials that you had at your disposal, that you would have

6  recommended a suspension of not greater than three days;

7  correct?

8  A.  I don't recall if I testified to that, or not.  When I

9  gave notice for the formal, I wasn't sure what I was going to

10  do as far as discipline.

11  Q.  Testimony that was given on August 30, 2016, page 246,

12  line 8 through 15.  You were under oath at that time;

13  correct?

14  A.  I believe so, yes.

15  Q.  "Q: If truthfulness was not an issue and it was just the

16      rest of the information that you had obtained, would you

17      have recommended suspension or discipline in excess of

18      three days?

19      "A:  I would have recommended a suspension, I believe

20      that it would have been a suspension for three days."

21          Did you give those -- were you asked that question,

22  did you give that answer?

23  A.  Yes.

24  Q.  Okay.  So you were contacted by Carrie's business rep,

25  Rick Stomper, and you finally agreed on February 5th as the

1  formal interrogation date.

2  This is bates-stamp 181 from Joint Exhibit 3, and

3  this is an e-mail exchange between yourself and Stomper, and

4  you say:  "This date is great for us."  Do you recognize

5  that?

6  A.  Yes.

7  Q.  Okay.  So before the formal interrogation, you confer

8  with Scott Koster; don't you?

9  A.  I'm pretty sure I did, yes.

10  Q.  And he provided you with a list of questions; did he

11  not?

12  A.  I don't recall if he provided me with a list of

13  questions, but I know that we had discussed the formal

14  interview, and everything.

15  Q.  Did he give you any tips on what to do?

16  A.  Told me to be calm, don't let Stomper get to me.  Told

17  me I would be fine.

18  Q.  In fact, you do recall that he gave you a list of

19  questions, but you claim you didn't use them; right?

20  A.  He may -- he may have shown me something or told me

21  something, but --

22  Q.  But it's your testimony that you didn't use those

23  questions?

24  A.  I don't believe that I did.  I know I had -- I know I

25  had a bunch of questions that I had already done up myself.

1      MS. McLAUGHLIN:  Plaintiff's 31.

2      THE COURT:  Plaintiff 31 is in evidence.

3  BY MS. McLAUGHLIN:

4  Q.  So April 2017, your testimony there, page 1142, lines 17

5  to 21.  Were you asked the following and give the -- did you

6  give the following response?

7      "Isn't it a fact that Chief Koster provided you with

8      questions that you should ask during the preliminary --

9      or during the formal interrogation?

10     "A:  I think Chief Koster showed me questions that I

11     could ask, but I didn't ask his questions."

12         That's the testimony you gave?

13 A.  Yeah.

14 Q.  And that's, in fact, not true; isn't it?  You, in fact,

15 did ask all of Chief Koster's questions; didn't you?

16 A.  I asked the questions that I had printed out.

17 Q.  Okay.  Let me show you Plaintiff's 31.  This is the list

18 of questions that was provided to you by Chief Koster; is it

19 not?

20 A.  I don't know if these were provided to me by Chief

21 Koster, or not.  As I testified earlier, I know that we had

22 discussed a bunch of stuff, and I had questions already

23 written out that I was going to ask.

24 Q.  And these are the questions, Joint Exhibit 19, that you

25 asked; correct?

1   A.   Yes.

2   Q.   Okay.  So we're going to take a look at this side by

3   side.  All right.  I know that this is pretty tiny.  Let's

4   see how big I can get it.

5        Chief Koster asked:  "Get a copy of the juror

6   notice prohibiting the cell phone."

7        Did you do that?

8   A.   I believe I already had it.  I know I had it, but I'm

9   not sure when I got it.

10  Q.   Okay.  "And get a copy of the door sign prohibiting

11  juror cell phones."

12  A.   Yes, I got a copy of that.

13  Q.   Okay.  "And then present them to her and ask if she saw

14  and read them."  Right?

15  A.   Yes.

16  Q.   Okay.  "And ask if she brought her cell phone into the

17  courthouse and jury assembly room."

18       At this point in time, you already knew that she

19  had.  She had told you immediately on January 14 that she

20  had; correct?

21  A.   Yes.

22  Q.   Okay.  "Ask if she used her cell phone in the assembly

23  room."

24       Okay.  So let's look at the questions you asked.

25       "Did you call the number on the summons to see if

1    you had to report?"  She says, yes.

2              "Did you listen to the message?"  Yes.

3              "Did you receive/read these items?"

4         You appear to be referring to the summons and the

5    sign; correct?

6    A.   Yes.

7    Q.   Okay.  And that's what Chief Koster says that you should

8    be doing, show her the summons and the sign; correct?

9    A.   Yes.  I would have asked her that anyhow.

10   Q.   All right.  So then you asked:  "Did you bring the cell

11   phone into the courthouse and the jury assembly room?"

12             Isn't that exactly the question that Chief Koster

13   told you to ask?

14   A.   I was going to ask them anyhow because she had already

15   told me that she had.

16   Q.   "Did you use your cell phone in the jury assembly room?"

17             Isn't that one of the questions that you -- that

18   Chief Koster instructed you to ask?

19   A.   No because I already know that she had her cell phone in

20   the jury room and that she was using it.

21   Q.   Okay.

22   A.   That's something I was already going to ask her.

23   Q.   So, "Did you state that you shouldn't have to serve on a

24   jury because of where you work or because you are in law

25   enforcement in front of members of the public?"

1      And Chief Koster says:  "Ask while in the

2    courthouse if she stated she should not have to participate

3    in jury duty because of her status as a deputy sheriff, law

4    enforcement in front of members of the public."

5      Essentially the same question; right?

6    A.   Pretty much, yes.

7    Q.   Okay.  And it goes on and on like that.  In fact, there

8    is only one question that you ask of Carrie that Chief Koster

9    didn't put on his list.  Isn't that true?

10   A.   It's possible.  I don't know.  But the questions here I

11   was already going to ask her because the questions was

12   already information that she had given to me in my office.

13   Q.   And Chief Koster asked you to address her false

14   statements regarding being released for lunch.

15     Chief Koster had already formed the opinion that

16   those statements were false.  Let me rephrase that.

17     You had already formed that opinion that her

18   statements were false and told Chief Koster that; didn't you?

19   A.   No.

20   Q.   "Address her false statements regarding her continuing

21   to lie."

22     You and Chief Koster had both drawn a conclusion

23   that she had already submitted false statements prior to

24   asking her any questions at the March 5th formal

25   interrogation; didn't you?

1    A.    The only thing that I believe that she wasn't honestly

2    truthful about with me was the signs for the cell phone

3    usage.

4    Q.    So --

5    A.    To me.  Yes.

6    Q.    So did you at any time discuss with Chief Koster, why

7    are you saying those are false statements, we haven't

8    established that yet?

9    A.    No.

10   Q.    Okay.  This was your first formal interrogation with

11   Stomper?

12   A.    My first formal interrogation with Stomper, yes.

13   Q.    And was it your first formal interrogation ever?

14   A.    No.

15   Q.    You had done one other?

16   A.    One other, yes.

17   Q.    And which deputy was it did that involve?

18   A.    That was Deputy Crumly.

19   Q.    Right.  Okay.  And with Deputy Crumly's formal interview

20   or inquiry, there was no FOP union rep; correct?

21   A.    I believe that Herb Walton was there.

22   Q.    Right.  A deputy steward; correct?

23   A.    Yes.  He's union rep for the corrections division, yes.

24   Q.    Right.  But no one from the business office?

25   A.    No.

1    Q.    Okay.  So Chief Koster didn't give you any instructions

2    on how to conduct a proper interrogation; did he?

3    A.    For Deputy Crumly, or --

4    Q.    Well, either.

5    A.    I don't recall.

6    Q.    Okay.  He just -- with respect to Melissa Warren, he

7    just told you, lock her into her lies; right?

8    A.    No, he did not.

9    Q.    He told you to get yes-and-no responses; didn't he?

10   A.    I don't recall if he said that.  I know that he said

11   that he wanted to get her answers on record.

12   Q.    So having done the other interrogation of Deputy Crumly,

13   was that interrogation of Deputy Crumly recorded?

14   A.    I don't know if it was or not.  I don't remember.

15   Q.    Isn't that proper procedure to record formal

16   interrogations?

17   A.    I believe so, but I don't remember.  I know that there

18   were other people in the room besides Deputy Crumly and

19   myself and Deputy Walton.

20   Q.    Okay.  So on the day of February 5th, 2014, when you had

21   the formal interrogation of Melissa Warren, you have Tracy

22   Page in the room with you; right?

23   A.    Yes.

24   Q.    And Tracy Page's function in that room was to record the

25   formal interrogation; correct?

1    A.    I believe so, yes.

2    Q.    But she didn't record all of the formal interrogation;

3    did she?

4    A.    I found out that she had not, no.

5    Q.    So you knew Stomper was coming, no question about that.

6    You had the confirmation in your -- your e-mail.  And you

7    started the -- he was late, and you started the interrogation

8    without him; didn't you?

9    A.    That is correct.

10   Q.    Okay.  So down here on the bottom of this bates-stamp

11   181, from Joint Exhibit 3, there is a listing of times.

12   That's your handwriting; correct?

13   A.    Yes.

14   Q.    And your record of the times that you started was at

15   3:06; correct?

16   A.    Yes.

17   Q.    And then Stomper walked in at 3:11?

18   A.    Yes.

19   Q.    Then you had a consult where you broke for a while,

20   correct --

21   A.    Yes.

22   Q.    -- at 3:15?  You resumed at 3:25?

23   A.    Yes.

24   Q.    And 11 minutes later, you're done; correct?

25   A.    Yes.

1    Q.   Okay.  So you start -- your testimony is that Carrie
2    Warren and Deon Little readily agreed to start this
3    interrogation without Stomper present; correct?
4    A.   Yes.
5    Q.   But they didn't really have a choice in the matter; did
6    they?
7    A.   That's not true.
8    Q.   So Stomper comes in at 3:11, and he is furious that you
9    started without him; right?
10   A.   Yes.
11   Q.   And did he point out that you weren't even recording as
12   you should be?
13   A.   I don't know if he pointed that out, or not.  I know
14   that he was very mad, he was yelling at me.  So I don't
15   remember everything that he had said now.
16   Q.   Okay.  And none of that is recorded; correct?
17   A.   I don't believe so.  I don't --
18   Q.   And nothing about what you started at 3:06 to 3:11 is
19   recorded; correct?
20   A.   No.  Just my handwritten notes.
21   Q.   And that's Joint Exhibit 19, those are your handwritten
22   notes; correct?
23   A.   Yes.
24   Q.   Okay.  We'll get back to those in just a moment.
25        So when you start back -- okay.  So you have a

1  break; right?

2  A.   Yes.  Stomper had requested to consult with --

3  Q.   And during that break, you talked to Koster; correct?

4  A.   I don't -- I believe I did, but I don't recall

5  everything that we talked about.  I think I might have told

6  him that Stomper showed up because the last time I had talked

7  to him was when Stomper didn't show up, and I had asked him

8  what do I do.

9  Q.   I'm sorry, repeat that.  You went and talked to him

10  beforehand, or -- oh, you talked to him before you started

11  and asked, should I start without him.  Is that what you're

12  saying?

13  A.   I had went to Chief Koster and told him that Stomper

14  wasn't there.  I believe that Carrie and Deon were trying to

15  call him to find out where he was at because we didn't know,

16  and asked what I should do.  And I was told to give him a few

17  minutes, and then if he didn't show up, see if we could

18  start.  And that's what I did.  And then when Stomper showed

19  up and then went on his consult, I believe I might have gone

20  and told Chief Koster that Stomper did arrive.

21  Q.   When you went to go see Chief Koster, you were actually

22  very frazzled during that break; weren't you?

23  A.   Yes.

24  Q.   And Chief Koster, you talk at the time that there is no

25  recording going on; right?

1   A.   I don't remember how that came up.  I don't know if he

2   had asked somebody in the room.  I don't recall him asking me

3   because I wasn't paying attention to recordings, or anything

4   else.

5   Q.   You don't announce at the start of it, this is the

6   formal interrogation of Carrie Warren, it's taken on

7   such-and-such a date, we are all -- the people who are

8   present, and this -- this interview is being recorded.  You

9   don't make any kind of preliminary statement like that?

10  A.   I don't believe I did, no.

11  Q.   Okay.  So he tells you to make sure that it gets

12  recorded; correct?

13  A.   He had -- I believe he said that to somebody, but I

14  don't know -- I don't recall him saying that to me, no.

15  Q.   Okay.  So when you resume the interrogation, you don't

16  actually start the recording right away; do you?

17  A.   I wasn't responsible for the recording.

18  Q.   But it didn't start at the very beginning; did it?

19  A.   I don't know if it did, or not.

20  Q.   Okay.  This is Plaintiff's 32.  It has been admitted

21  into evidence already, and it's the transcription of the tape

22  recording that we all heard here in court of the formal

23  interrogation, the audio tape recording.  And you note it,

24  starts with the word, yes.  So obviously there is something

25  before that; correct?

1  A.   I'm going to presume that there was, but I don't know

2  what it was.

3  Q.   Okay.  So you have her identify the summons, correct,

4  during the formal interrogation?

5  A.   Yes.

6  Q.   And you ask her, did you read the summons?

7  A.   I believe I did, yes.

8  Q.   That's what you're referring to here when you say:  "Did

9  you receive, see or read these items?  Yes, the summons.  No,

10  the sign."

11  A.   Yes.

12  Q.   Right?  And you never asked her, did you take a look at

13  the back of the summons, where it specifically says, cell

14  phones are not allowed?

15  A.   No.

16  Q.   You never asked her that?

17  A.   No.

18  Q.   And it's your opinion that Carrie must be lying because

19  it's totally unreasonable for a deputy sheriff who works in

20  this complex to flip over the summons, see that there is a

21  map on the back and go, I know that, and not even look and

22  read the entire summons in the back of the page where it says

23  cell phones are not allowed.  That, to you, was unreasonable.

24  She must have read it; correct?

25  A.   I believe that when I asked her if she saw and read the

1    summons, she said, yes, she did.  I did not stop to think,

2    did you read the entire summons, did you look at the fine

3    print, or anything else.  I asked her a question, she said,

4    yes, she did.

5    Q.   So Carrie tries to explain a number of her responses;

6    didn't she?

7    A.   She tried to, yes.

8    Q.   And you repeatedly insisted on yes-or-no answers;

9    correct?

10   A.   That is correct.

11   Q.   Even after Stomper pointed out to you that, quote, "She

12   doesn't have to answer yes or no, she can give a truthful

13   answer," unquote, you still insist on a yes-or-no answer;

14   don't you?

15   A.   That is correct.

16   Q.   And when you talked about the tape, you never asked her

17   if she listened to the tape all the way through?

18   A.   No, I asked her if she listened to the recording, and

19   she said she had.

20   Q.   And you didn't point out to her that, at the very end of

21   the recording, there was this -- this cell phone prohibition

22   and ask her specifically if she had heard that; correct?

23   A.   No, ma'am.  She was to call the -- and listen to the

24   recording, and she told me that she did.

25   Q.   Okay.  So we have your notes on what she supposedly said

1    during the -- during both sessions.  You've got a first, and

2    then you have a first and -- okay.  Actually, you don't have

3    a second there.

4            But what does this first mean that you're referring

5    to here?

6    A.   That was the first time that I had asked those questions

7    prior to Stomper coming in.

8    Q.   Okay.  And the second time you asked -- you asked those

9    questions, she didn't provide you anything that was

10   inconsistent; did she?

11   A.   Yes, she did.

12   Q.   Okay.  So -- well, are you claiming that, while at the

13   courthouse did you complain about having been there all day,

14   and then you have to go to work afterwards in front of

15   members of the public, and you say:  She first said yes, and

16   then she said no?

17   A.   That is correct.

18   Q.   Okay.  And do you recall that during -- during the

19   interrogation, and I don't want to have to play it back here,

20   but do you recall that Carrie tried to explain that she

21   really wasn't complaining.  And you kept insisting on a yes

22   or no.  And then she said, well, you know, okay, wasn't

23   complaining, but -- so I have to say no.  Do you recall that?

24   A.   Yes, I recall that.

25   Q.   And this whole interrogation lasts 11 minutes; correct?

1  A.  Yes.

2  Q.  So right after the interrogation, you write up another

3  report; don't you?

4  A.  Yes, I did.

5  Q.  And this report is dated -- this is Joint Exhibit 2.

6        I believe this has been entered; hasn't it?

7        THE COURT:  It's in evidence.

8        MS. McLAUGHLIN:  Yes, okay.

9  BY MS. McLAUGHLIN:

10  Q.  Joint Exhibit 2, and it's dated February 6th.  So the

11  day after the formal interrogation; correct?

12  A.  Yes.

13  Q.  And these are your findings and recommendations to

14  terminate Carrie; correct?

15  A.  Yes.

16  Q.  So just a few questions on this.  In this report, you

17  find that she was untruthful during the investigation with

18  comments that she made to Judge Pilmer; isn't that correct?

19  A.  That is correct.

20  Q.  And the reason you thought she was untruthful to the

21  judiciary was that she made those comments on Facebook about,

22  I'll be siding with the cops.  And so it was your opinion, or

23  at least one of your opinions, that, when he asked her if she

24  could put aside that -- the fact that she worked for the KCSO

25  and still render a fair and impartial decision, that she must

1  be lying because she had previously posted that comment on

2  Facebook. That was your opinion. That's what you formed

3  your opinion of?

4  A. I believe that when she made that post on Facebook and

5  told Judge Pilmer that she could -- well, she had originally

6  told Judge Pilmer that she didn't feel that she could be an

7  impartial juror. But after speaking -- after Judge Pilmer

8  followed up with other questions, she said that she could.

9  Q. Okay. So let's get this straight. She didn't say she

10 could be impartial. When he asked, does anybody have any

11 issues about being impartial, she raised her hand and stood

12 up; correct?

13 A. That is correct.

14 Q. And then Judge Pilmer asked her if she can put that

15 aside, that she works for the Kendall County Sheriff's

16 Office, and render a fair and impartial verdict. And she

17 says, yes. Correct?

18 A. I believe after some short conversation that that's --

19 that is what she said, yes.

20 Q. But you formed the opinion, based on the fact that she

21 had written the Facebook post the night before, that she had

22 to have been lying to Judge Pilmer in response to that

23 question that she could be fair; correct?

24 A. I don't believe that's why I felt she was lying to Judge

25 Pilmer. I believe that she was -- I felt she was lying to

1  Judge Pilmer because she had told Judge Pilmer that she had

2  to work that afternoon after jury duty when she had told me

3  in my office that she knew she didn't.

4  Q.  Your testimony given on May 1st, 2017, page 1121, lines

5  8 through 14.

6      "Q:  Really?  How do you know that she was untruthful to

7      the judge if you didn't get the transcript?

8      "A:  Because of her -- on her Facebook she had posted

9      that if it's civil she believes people should pay their

10     bills.  If it's criminal, she sides with the cops.  She

11     made those posts on Facebook, but then she told -- she

12     had told Judge Pilmer that she could be fair and

13     impartial.  Those two statements conflict with each

14     other."

15      Were you asked that question, and did you give that

16  answer?

17  A.  Yes, ma'am.

18  Q.  And then you also thought that she must be lying to the

19  judge after having -- about having to work that afternoon

20  because, according to you, Leinen told her, Deputy Commander

21  Leinen told her earlier that morning that she was on first

22  shift so she already knew that that was the basis of --

23  that -- and so she already knew that she was re-assigned.

24  And that was the basis of your opinion -- another basis for

25  your opinion that she had to have been lying to Judge Pilmer;

1    correct?

2    A.    She told me herself that she knew that she had been

3    changed and that she wasn't working that afternoon.  Yes, I

4    did relay the message to Deputy Leinen to tell her that.  And

5    Deputy Leinen told me that he told her that, but then she had

6    also confirmed that in my office.

7    Q.    Testimony given on May 1st, again, 2017, same page,

8    1121, line 15 through 1122, line 3.

9          "There was also something about regarding her schedule.

10         When I talked to her, she had told me that she had

11         talked to Commander Leinen, and she knew that her

12         schedule had changed."

13         So on this date, May 1st of 2017, you testified

14   that Carrie told you that Commander Leinen had told her that

15   her schedule had changed; correct?

16   A.    Yes.

17   Q.    But he did not tell her that her schedule had changed,

18   he told her, just call you?

19   A.    Deputy Commander Leinen told me that he had referred --

20   relayed to her that, if she were selected for jury duty, she

21   was to finish out her jury duty, go home after she was done.

22   But if she wasn't selected, then she was to come back to the

23   jail and finish out her eight-and-a-half hours.  That is what

24   he told me.

25         When I talked to Carrie at 11:19, Carrie had also

1  told me that she knew that she was coming back to the jail

2  after -- after she got released from jury duty.

3  Q.  But she didn't tell you that she had received that

4  information from Deputy Commander Leinen; did she?

5  A.  I believe she -- I believe that I asked her if she had

6  talked to Leinen, and she said yes.

7  Q.  Well, of course she said she talked to Leinen.  But did

8  she tell you that Leinen said, I know my shift has changed?

9  A.  I don't know what Leinen told her.  I just know that

10  Deputy Commander Leinen told me and what she referred back to

11  me.

12  Q.  Didn't you say in your investigative report on

13  January 14th of 2014, that you knew that Carrie knew about

14  her schedule because she supposedly logged in and had

15  checked, that she knew that the schedule had been changed?

16  A.  Yeah, I believe she said that to me when -- during the

17  phone call that she made when she was released for lunch.

18  Q.  So, anyway, on your report of February 6th, you

19  recommend -- and on February 6th you formed the formal

20  interrogation, and you are raising questions about her

21  timesheets; isn't that correct?

22  A.  Yes, I had referred to her timesheets, yes.

23  Q.  Right.  You think she falsified her timesheets because

24  she put 8.5 hours down on her timesheet; correct?

25  A.  Yes.

1   Q.   Okay.  So you make findings, and you say she should

2   be -- concluded that she was not truthful during portions of

3   this investigation, and you list, what, five different

4   things, one, two, three, four -- five different things:

5   Abusive position, truthfulness, cooperation with internal

6   investigation, reporting for duty and termination of duty

7   assignment and sheriff's records and reports.  Those are the

8   five charges -- five violations of rules that you think that

9   she should be terminated for; correct?

10  A.   Yes.

11  Q.   And not one of those findings is listed in the notice of

12  charges that was provided to her; isn't that correct?

13  A.   That is correct.

14  Q.   So you've read -- I'm going to go back for just a moment

15  to January 6th, on jury duty.  And we have already submitted

16  into evidence -- well, it has been submitted into evidence,

17  Defendant's Trial Exhibit No. 9, which is Carrie's

18  un-redacted phone records.  And on page 2, it shows that

19  there were three texts sent, 11:05, 11:06 and 11:07, to phone

20  number (630) 244-8328.  That's your phone number; correct?

21  A.   Correct.

22  Q.   Did you receive those texts?

23  A.   I don't remember getting any text from her.

24  Q.   Did you ever check to see whether or not she had --

25  well, is it true, do you not check your texts daily?

1    A.    I check my text messages, yes, but I don't remember

2    getting any text messages from her.

3    Q.    Oh.

4    A.    I know I got a phone call from her, but I don't remember

5    getting any text messages from her at all.

6    Q.    So if her phone record shows that there was a text

7    message sent to you, phone record is inaccurate?

8    A.    I did not say that.  What I said was, I don't remember

9    getting any text messages from her.  I don't remember seeing

10   any text messages from her.  I know I got a phone call from

11   her.

12   Q.    Let's move on to the various comparators that we've

13   discussed.  You've been here in court, and you've heard all

14   the testimony about the comparators; right?

15   A.    Yes.

16   Q.    Okay.  So I'm not going to go through all of -- all of

17   them in a whole lot of detail, but you read all the reports

18   regarding discipline that involve correctional deputies;

19   correct?

20   A.    As they come across my desk, yes.

21   Q.    Well, they all do; right?

22   A.    If I'm out of town, or something, there may be something

23   that occurs that I don't see because then it would go to --

24   directly to the chief deputy.

25   Q.    Okay.  So with respect to the various individuals that

1    we had talked about here today during this trial, Brennan,

2    Levy, Graham, Buis -- who am I forgetting -- Dean, you --

3    with the exception of Jasnosz, you've seen all those

4    discipline reports; correct?

5    A.    No.  I did not see Dean.  I did not handle Dean.

6    Q.    On the pat-down?

7    A.    On the pat-down, yes, I did.

8    Q.    Okay.  All right.  So -- and, I mean, it's either you

9    conduct the investigation yourself, or a sergeant under your

10   command conducts the investigation and reports up to you;

11   correct?

12   A.    Yes.  The majority of the time the sergeants conduct the

13   investigations.

14   Q.    Okay.  So from 2011, to 2013, isn't it correct to say

15   that Deputy Brennan had a chronic problem with un-excused

16   absences?

17   A.    I know he had a problem with being absent and being

18   tardy.  But the timeframe, I would have to see those

19   documents because I know that there was a time where he had a

20   lot of problems with it, and then it had stopped for a while,

21   and then it started up again.

22   Q.    So in 2013, do you recall that he was charged with

23   falsifying his timesheets?

24   A.    It's possible.

25   Q.    And do you recall writing in your report that Deputy

1   Buis, quote, "Had a long history of un-excused absences"?

2   A.   Are we talking about Brennan or Buis?

3   Q.   Brennan.  I'm sorry.

4   A.   It's possible.

5   Q.   Okay.  And you didn't conduct any formal interrogation

6   of Deputy Brennan at any time -- well at any time; did you?

7   A.   No.

8   Q.   And so even though this was a chronic situation with

9   him, he was written up many times, given suspensions, but

10  nothing more; correct?

11  A.   Correct.

12  Q.   Okay.  Let me just make this clear.  So except for

13  Jasnosz and the termination of Dean, okay, you were directly

14  responsible for the investigation or the supervising of the

15  investigations of each of these incidents that we have

16  discussed here at the trial; correct?

17  A.   No, my sergeants took care of the investigations.  They

18  were the ones responsible.

19  Q.   And my question is, you were responsible for the -- some

20  of those you did yourself, and others you were responsible

21  for overseeing the sergeant that did the investigation;

22  correct?

23  A.   Yes, I would be responsible for the sergeant.

24  Q.   And with the exception of Jasnosz, and now you're saying

25  Dean, you made the recommendation for discipline on each of

1    those deputies; did you not?

2    A.   No, I did not make the recommendation for discipline.

3    The sergeants would make the recommendation for discipline,

4    and I would either concur or not concur.

5    Q.   Okay.  And then you pass it along to Chief Deputy

6    Koster; correct?

7    A.   Yes.

8    Q.   Okay.  So with respect to Levy, you conducted the

9    interview of Levy yourself with respect to the claim by the

10   inmate that he had requested her to write a pornographic

11   letter to him; correct?

12   A.   Yes, I was in on that -- I sat in on that investigation,

13   as well as Deputy Commander Gillespie.

14   Q.   But you were in charge of that investigation; correct?

15   A.   I believe Deputy Commander Gillespie is the one that was

16   in charge of that investigation.

17   Q.   Didn't you write the report?

18   A.   Yes, I did.

19   Q.   Didn't you write the report on the formal -- the

20   interview that you conducted of Levy?

21   A.   I didn't have a formal interview of Deputy Levy.  We had

22   an informal interview in my office, and, yes, I -- I did

23   write a report on that.

24   Q.   Okay.  So -- but you wrote it, not Gillespie; correct?

25   A.   No.  Deputy Commander Gillespie's report was not in the

1    packet that was provided.

2    Q.   All right.  Then you wrote a separate report, and it

3    was -- it was --

4    A.   Yes, I did write a report.

5    Q.   -- your report; correct?

6           Okay.  And you conducted the interview of Levy

7    yourself; didn't you?  You're the one who asked him the

8    questions?

9    A.   I know I asked him questions.  Deputy Commander

10   Gillespie may have asked him questions.  I don't recall.

11   Q.   You didn't conduct a formal interrogation the way you

12   did with Carrie; did you?

13   A.   No, I did not.

14   Q.   And you didn't even tape record your interview with

15   Deputy Levy; did you?

16   A.   No, I do not tape record informal.

17   Q.   Well, that would have been an option.  The rules allow

18   for you to interview deputies and have them tape recorded;

19   right?

20   A.   I believe that the rules are tape recording formal --

21   formal interrogations, but not informal.  And when I spoke to

22   Deputy Levy, I was not doing a formal interrogation on him.

23   Q.   You don't believe it was an option to tape record?

24   A.   No.

25   Q.   And given the seriousness of the charges, wouldn't you

1    think that tape recording his responses would have been

2    prudent?

3    A.   No.

4    Q.   So, now, despite the seriousness of the allegations

5    against Levy, or for that matter Brennan that was being

6    investigated at the same time, you did not have a trained

7    detective from your investigations division conduct any kind

8    of taped interview with Levy or Brennan; correct?

9    A.   No.

10   Q.   And you claim that you asked him during your interview

11   all -- about all the allegations, the specifics of all the

12   allegations; don't you?

13   A.   I believe I asked him about the allegations.  I don't

14   know if I asked him about all of the allegations, but I know

15   that I asked him about the allegations that were made about

16   him.

17   Q.   Okay.  And it would be important to document his

18   responses to all the questions that you asked of him in your

19   report; wouldn't it be?

20   A.   Yes.

21   Q.   You, in fact, did not document all the questions you

22   asked him, did you, or his responses?

23   A.   I don't believe I did, no.

24   Q.   You basically generalized in your report what his

25   responses were; didn't you?

1    A.    No.   I put down in my report what his responses were to
2    me.
3    Q.    Okay.  Well, in that -- in that interview, you didn't
4    ask him whether he asked the inmate to write him a letter;
5    did you?
6    A.    I don't believe I did, but I don't recall.  I could
7    have, but I -- I don't remember.
8    Q.    Wasn't that the issue?  Didn't the inmate said, he made
9    me write him a letter for the next time that he was on shift.
10         So wouldn't it have been prudent to ask him, did
11   you ask that inmate to write you a letter?
12   A.    The allegation was that he had asked her, not that he
13   made her.  And there were other complaints about
14   inappropriate comments made.
15   Q.    Okay.  But you never asked Levy:  Did you ask her to
16   write you the letter?
17   A.    I don't -- I don't believe I did.  I don't recall doing
18   that.
19   Q.    He acknowledged receipt of that letter; correct?
20   A.    Yes, he did.
21   Q.    And it was basically a pornographic letter; right?
22   A.    Yes, it was.
23   Q.    Okay.  And he suggested, maybe he didn't say directly, I
24   don't know, but he suggested that she wrote it of her own
25   accord; right?

1    A.    The letter that he read?  Yes.

2    Q.    Yeah.

3    A.    She wrote it on her own accord.

4    Q.    The letter that he wrote to her -- that she wrote to

5    him, excuse me.

6    A.    He said that he had -- master control had called him and

7    said that the inmate had an inmate request slip to go to the

8    nurse.  And he went to go and get the request slip.  And

9    that, in the slip, there was another letter that was

10   addressed to him.

11   Q.    So he was suggesting to you that I didn't -- I just got

12   this letter out of the blue; right?

13   A.    Yes.

14   Q.    And the inmate in her report says, he told me that, you

15   know, my first letter was really hot, and he wanted me to

16   write him another letter.

17   A.    That's what she said.

18   Q.    Right.  So you had this information, and you don't ask

19   Levy, specifically did you ask this woman to write you a

20   letter.  You don't ask that; right?

21   A.    As stated before, I don't recall asking him that.  I

22   might have, but I don't recall it.  And I don't remember.

23   Q.    And you didn't ask -- you didn't document in your report

24   that you had asked Levy if he had actually made the comments

25   that the inmate attributes to him about, oh, you made my dick

1   hard all night, or, you know, those comments.  You didn't ask

2   him specifically if he made those comments to her; did you?

3   A.   I don't believe I asked him about specific comments, no.

4   What I do know is that --

5   Q.   There is no question pending.

6           THE COURT:  Well, do you need that to complete your

7   answer?  If it's adding something else, then your lawyer can

8   ask you.  Do you need this to complete the answer you gave to

9   her last question?

10          THE WITNESS:  No, I'm finished.

11          THE COURT:  Okay.

12  BY MS. McLAUGHLIN:

13  Q.   And ultimately you decided, based on your interview of

14  the inmate -- because you interviewed the inmate as well,

15  too; right?

16  A.   Yes, I spoke to the inmate.

17  Q.   Right.  So you didn't just take her written word, you

18  got it more details when you interviewed her; right?

19  A.   When I interviewed her, I -- she told -- I interviewed

20  her, I asked her questions, she told me what she said.  But

21  what she said to me was not what was in her written document.

22  That was more -- her written document was more detailed than

23  what she had informed DC Gillespie and myself in my office.

24  Q.   So did you ask the inmate, well, you say in this report

25  here that he made these additional statements.  You gave more

1    details.  Did you ask her, tell us about all those details?

2    A.   No, I did not.

3    Q.   Okay.  So ultimately you decided that, based on your

4    interview of the inmate and on Levy, it was a he-said,

5    she-said situation, and you give him a three-day suspension?

6    A.   I believe there were a lot of allegations that were

7    made, that some of the allegations were found to be true.

8    Some of the allegations we couldn't have determined if they

9    were true, or not.  So, yes, I gave Levy a three-day

10   suspension because he should not have made comments about the

11   letter that he had read.  And when he received the second

12   letter, he should have informed somebody about it.

13   Q.   Okay.  There was another incident with Levy.  And that's

14   one where he was accused of retaliating against an inmate

15   where he called the inmate a bitch-ass punk, or words to that

16   effect, because the inmate had complained about his conduct

17   the night before?

18   A.   That is correct.

19   Q.   Right?  Remember that?

20   A.   Yes.

21   Q.   Okay.  And Jeanne Russo investigated that and looked at

22   the videotape.  Did you also look at the videotape?

23   A.   I don't recall if I did or not.

24   Q.   And the videotape did not support Levy's version of the

25   events as he reported them to you; is that correct?

1    A.   Deputy Levy had told Sergeant Russo that he did go back
2    into the pod, he was talking to the inmates.  The inmate had
3    got out of his bunk, came to the railing, they were talking.
4    The inmate went back to his bunk, and it ended up with him
5    leaving a piece of paper on the table.
6    Q.   Okay.  So you don't recall looking at the video, but you
7    recall that Jeanne Russo reported that the -- basically that
8    the videotape that she saw did not -- was not consistent with
9    Levy's statement; correct?
10   A.   Can I see what you're referring to, please?  Because I
11   know there were reports done, and I know that deputy -- or
12   Sergeant Russo had done a memo on it.
13   Q.   Okay.  Do you recall that Sergeant Russo said, she
14   looked at the tape, and the inmate got out of bed, stood at
15   the railing, appeared to be listening, then returned to his
16   bed, and Levy is flailing his arms?
17   A.   I believe that's what she reported, yes.
18   Q.   Okay.  So, in her opinion, the videotape did not support
19   Levy's version of events; correct?
20        MS. BRUCH:  Objection to form, mischaracterizes the
21   record.
22        THE COURT:  Well, once again, the witness can
23   correct the question if she believes the question contains
24   facts that are inaccurate.
25        So listen to the question.  If you can answer it,

1    answer it.  If you think it has presumptions or statements

2    that are incorrect, you have to respond to that question by

3    saying so.  So ask your question again.

4    Q.   Russo was of the opinion that the -- the videotape did

5    not support Levy's version of events; correct?

6    A.   I'm not exactly sure what Sergeant Russo's opinion of it

7    was.

8    Q.   And do you -- I'm sorry.

9              THE COURT:  Let the witness finish.  Go ahead.

10   BY THE WITNESS:

11   A.   I know that she said she reviewed the video, and what

12   she put in her report is what happened.  He had gone in

13   there, he was talking to the inmates.  The inmates claim that

14   Deputy Levy was yelling at him and swearing.  The video has

15   no audio, so that could not be confirmed.  I believe the

16   video showed that, yes, he was flailing his arms and using a

17   lot of hand motion when he was talking.  But that's something

18   that Deputy Levy did all the time with everybody, including

19   myself, when he would talk to me.  I don't know what her

20   opinion was.

21   BY MS. McLAUGHLIN:

22   Q.   So -- I'm sorry.

23   A.   I'm done.

24   Q.   So there were also, as you mentioned, inmates who

25   corroborated the statement of the inmate who made the report;

1   right?

2   A.   I believe that there were inmates that said that Levy

3   was swearing at them, and then there were inmates that said

4   they didn't hear anything and inmates who had nothing to say.

5   And I believe that there were inmates that said that the

6   whole thing was petty, or it was a petty request to begin

7   with, so.

8   Q.   So bottom line is, you find that there is just not

9   enough to -- to discipline Levy on for untruthfulness;

10  correct?

11  A.   No.

12  Q.   Basically it's a he-said, he-said?

13  A.   No.  But he was disciplined for retaliation.

14  Q.   Okay.  So the 2011, incident that we talked about with

15  respect to Levy, was not the only incident in which Levy was

16  accused of sexual misconduct; is it?

17  A.   No, there was another incident years later.

18  Q.   Okay.  When he was terminated in 2014, wasn't one of the

19  reasons that you stated in his termination documents was

20  that, quote, "He sexually harassed numerous female inmates

21  during their incarceration"?

22  A.   Yes, I did state that because I believed that to be true

23  at the time.

24  Q.   Okay.  And the same is true for Brennan.  It was -- that

25  2011 incident was not the only incident where he was accused

1   of sexual misconduct; correct?

2   A.   Deputy Brennan was also accused of sexual misconduct

3   years later.  But at the time, in 2011, I had nothing that

4   could substantiate any allegations made against Brennan.  In

5   fact, the inmates that were claiming that the -- that the

6   inmate that was involved with Brennan, the inmate said no, it

7   was Deputy Levy that she had a problem with.  But there was

8   nothing to corroborate anything about Brennan.  Years later,

9   that's when Brennan had his other issue.

10  Q.   Despite the seriousness of the allegations against

11  Brennan, you never sent a trained detective to interrogate

12  Brennan or the witnesses against him; did you?

13  A.   In?

14  Q.   In 2011.

15  A.   2011?  No, because there was nothing to corroborate

16  anything that was said.

17  Q.   All right.  And you never formally interrogated him; did

18  you?

19  A.   No, I did not.

20  Q.   So, Crumly.  You talked about Crumly, and you said that

21  there was a formal interrogation there; correct?

22  A.   Yes.

23  Q.   And, actually, I believe the documents refer to it as a

24  formal inquiry.  But you're basically saying that's the same

25  thing?  What's the difference?

1  A.   Yes.  It's -- it was -- I don't really know if there is

2  a difference.  Formal inquiry was -- yeah, I wanted to get

3  his answers on record.  I had not even spoken to Deputy

4  Crumly prior to that investigation.

5  Q.   And Crumly lied during this formal inquiry; didn't he?

6  A.   I don't believe he did, no.

7  Q.   Well, you specifically asked him whether he had fed more

8  than one inmate.  And he responded that he had only given one

9  inmate a taste; isn't that correct?

10 A.   That is correct.

11 Q.   And numerous other deputies provided statements that

12 contradicted that; isn't that correct?

13 A.   That is correct.

14 Q.   In fact, one of them went so far as to say it was all

15 four of them, and not only did he give them a taste, but they

16 went back for seconds.  Isn't that correct?

17 A.   Yes, a deputy did say that.

18 Q.   So with this directly contradictory evidence from

19 numerous sources, you chose not to believe that Crumly lied

20 during his formal inquiry; didn't you?

21 A.   I believe that Crumly was recalling an incident that had

22 happened years prior, that he believed to be true.  And I

23 also believe that the deputies that also gave the statements

24 were recalling something that had happened years prior that

25 they believed to be true.  And all of those deputies also

1   believed that the sergeant on duty knew about what was going

2   on, when, in fact, he didn't.  So I believe that it was

3   something that had happened years prior that people were

4   relying on memory from, and everything else.  So I believe

5   that Deputy Crumly was being honest with me.

6   Q.   You don't think that Deputy Crumly was, you know,

7   admitting because he got kind of caught red-handed with this

8   and -- this offense, and that he was admitting he was wrong,

9   but he was trying to minimize it by saying, oh, it was only

10  one inmate, and it was only a little taste?  You don't think

11  that?

12  A.   No, because Deputy Crumly knew whether it was one inmate

13  or 50 inmates, the outcome was still going to be the same.

14  He was in trouble, and he was going to be disciplined for it.

15  Q.   Okay.  Because a violation of that policy is -- is

16  serious; right?

17  A.   What policy?

18  Q.   Well, of giving gifts to, basically, showing favoritism

19  to an inmate?

20  A.   I believe that that could -- yeah, I believe that that's

21  serious.

22  Q.   Doesn't that cause potential problems, the other inmates

23  see it as favoritism, and what's their reaction to that?

24  This caused a major safety issue within the jail; right?

25  A.   I wouldn't say a safety issue, but it could cause an

1    issue with the inmates, yes.

2    Q.   Isn't that why you have the policy because it's a safety

3    issue?

4    A.   What policy are you referring to?

5    Q.   The policy that you don't give gifts because it could

6    result in a safety issue.

7              MS. BRUCH:  Objection, relevance.

8              THE COURT:  Sustained.

9    BY MS. McLAUGHLIN:

10   Q.   Okay.  So during that formal interview, you ask Crumly

11   about the weapon.  And he clearly did not tell you the truth

12   about the condition of his weapon when it was confiscated,

13   when he was put on administrative leave; isn't that correct?

14   A.   When I asked Deputy Crumly about the condition of his

15   weapon, he told me what the condition of his weapon was.  It

16   was fully loaded, with one in the pipe, I believe he said.

17   And when I had informed him that that's not how his weapon

18   was, he was shocked, he didn't believe it.  And we had to

19   explain to him how his weapon was.  So when he told me how he

20   handed in his weapon, I truly believed that that's what he

21   thought it was because that's how he is.  He is -- he is into

22   weapons and guns, and everything else.  So, yes, I believed

23   him when he told me that's what he thought.

24   Q.   And when he told you that deputy -- that sergeant, then

25   Sergeant Gillespie, knew about the vat of venison issue, that

1    forced your hand -- that during the formal interview, he told

2    you that Gillespie knew about the stew incident and hadn't

3    report it; right?

4    A.    He said that Sergeant Gillespie knew about it, but he

5    didn't know how he knew about it.

6    Q.    And that forced you to investigate Gillespie; correct?

7    A.    Yes, I asked -- I asked Sergeant Gillespie about it.

8    Q.    And he -- and during that investigation of Gillespie,

9    Crumly then turned around and said, no, no, no, I was wrong,

10   I was mistaken, he didn't know; right?

11   A.    I don't recall if he did that, or not.  I know that

12   Deputy Crumly stated that Sergeant Gillespie had told him

13   something about cooking in west pod.  And when I talked to

14   Sergeant Gillespie and asked him if he knew about Deputy

15   Crumly giving the inmates the venison stew, Sergeant

16   Gillespie said no, he thought that Deputy Crumly had been

17   cooking down in west pod, and he didn't want him cooking in

18   west pod, that was to be done in the break room.

19                THE COURT:  Maybe it's obvious, but it isn't always

20   to me, and I think the last witness, Ms. Warren, and now I've

21   heard from this witness, pods.  Why don't you ask the witness

22   what a pod is, and so, at least the record is clear, maybe

23   the jury already knows, but let's make sure everyone is on

24   the same page.

25   BY MS. McLAUGHLIN:

1   Q.   Can you tell us what a pod is within the jail?

2   A.   A pod?

3   Q.   Yeah.

4   A.   Okay.  A pod is -- in the jail, we have two different

5   types of inmate living.  We have a dormitory living, which is

6   a big room with a separate sleeping area that has bunk beds.

7   A pod is an area in the jail where you have your single,

8   individual cells.  So in the middle of the area, you have an

9   inmate common area, where they watch TV, talk on the phone,

10  and everything like that.  And then when they lock down at

11  night, or during lockdown times, they go into individual

12  cells.  So a pod is an area that has an individual cell for

13  the inmate.

14           MS. McLAUGHLIN:  Your Honor, I have just a few more

15  areas, very brief, but my back is killing me.  Can we take a

16  lunch break?

17           THE COURT:  All right.  We'll take a break.

18           All right.  Ladies and Gentlemen, we will take our

19  lunch break right now.  It's about 12:40.  Why don't you come

20  back at 1:45, and we'll resume the testimony of this witness

21  at that time.  Please don't discuss the case among yourselves

22  or with anyone else.  Keep an open mind.

23           (Jury out at 12:39 p.m.)

24           THE COURT:  All right.  Ma'am, you're excused, but

25  you're still on cross-examination so don't discuss your

1   testimony with anyone.

2          All right.  Anything we need to discuss on the

3   record before we come back?

4          MS. McLAUGHLIN:  I don't think so, no.

5          MS. BRUCH:  No, your Honor.

6          THE COURT:  Okay.  We received -- we can go off the

7   record.

8       (Recess from 12:39 p.m. to 1:45 p.m.)

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    CARRIE M. WARREN,               )   Docket No. 15 C 496
                                      )
 4                 Plaintiff,         )   Chicago, Illinois
                                      )   July 24, 2018
 5           v.                       )   1:45 p.m.
                                      )
 6    KENDALL COUNTY SHERIFF DWIGHT   )
      BAIRD, in his official capacity )
 7    and as successor in office to   )
      Richard Randall, KENDALL COUNTY,)
 8    ILLINOIS, RICHARD RANDALL, SCOTT)
      KOSTER and SABRINA JENNINGS,    )
 9                                    )
                   Defendants.        )
10
                              VOLUME 5-B
11              TRANSCRIPT OF PROCEEDINGS - Trial
           BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
12
      APPEARANCES:
13
14    For the Plaintiff:    MS. COLLEEN M. McLAUGHLIN
                            Law Offices of Colleen M. McLaughlin
15                          1751 S. Naperville Road, Suite 209
                            Wheaton, IL 60189
16
                            MS. KAREN J. DORAN
17                          Karen J. Doran Attorney at Law LLC
                            2100 Manchester Road, Suite 942
18                          Wheaton, IL 60187

19    For the Defendants:   MS. JULIE A. BRUCH
                            MS. KARIN ANDERSON
20                          O'Halloran Kosoff Geitner & Cook LLC
                            650 Dundee Road, Suite 475
21                          Northbrook, IL 60062

22    Court Reporters:      KELLY M. FITZGERALD, CSR, RMR, CRR
                            PATRICK MULLEN, CSR
23                          Official Court Reporters
                            219 S. Dearborn Street, Room 1432
24                          Chicago, IL 60604
                            312.435.6053
25                          laura_renke@ilnd.uscourts.gov
```

1      (Proceedings heard in open court, jury out:)

2           THE COURT:  All right.  We received some questions

3    from the jury that I thought we were going to wait until after

4    all of your questioning was done, but we might as deal with it

5    now.

6           The first question reads:  "What were the nature of

7    the texts you received from Ms. Warren during her time at jury

8    duty?"

9           Any objection by plaintiff?

10          MS. DORAN:  No.

11          THE COURT:  By defendants?

12          MS. BRUCH:  No.

13          THE COURT:  All right.

14          "Did you reply to those texts?"

15          Any objection by plaintiff?

16          MS. DORAN:  No.

17          THE COURT:  Defense?

18          MS. BRUCH:  No.

19          THE COURT:  Okay.  Next question:  "Is it normal

20   practice to only allow employees to answer formal

21   investigations with a 'yes' or 'no'?"

22          Any objection by plaintiff?

23          MS. DORAN:  No.

24          THE COURT:  Defense?

25          MS. BRUCH:  No.

 1              THE COURT:  "Are there formal instructions in the

 2     employee manual to" -- it says "to specific behavior for jury

 3     duty?"  And as I said, you can rephrase these questions when

 4     you ask them to make them more understandable, but any

 5     objection by plaintiff?

 6              MS. DORAN:  No.

 7              THE COURT:  By defense?

 8              MS. BRUCH:  No.

 9              THE COURT:  "And what didn't you review" -- or "why

10     didn't you review all CCTV and transcripts when you saw

11     inconsistent reports?"  Then the word "verification" is

12     written.

13              Any objection by plaintiff?

14              MS. DORAN:  No.

15              THE COURT:  By defense?

16              MS. BRUCH:  No.

17              THE COURT:  Okay.  Those could all be asked.

18              Next round of questions:  "Do you believe in second

19     chances?"

20              Any objection by plaintiff?

21              MS. DORAN:  Yes.

22              THE COURT:  By defendants?

23              MS. BRUCH:  No.

24              THE COURT:  What's the objection?

25              MS. DORAN:  It's not a proper question.

995

1          THE COURT:  Well --

2          MS. DORAN:  It's a little vague.

3          THE COURT:  Well, I think it relates to second

4   chances.  I think reasonably it relates to second chances

5   regarding discipline.  Do you believe -- and I would not --

6   and the word "believe" is a little vague.  And, you know, as

7   phrased, if you take it out of context, obviously it doesn't

8   make any sense.  But if the question is meant to say -- and

9   this almost implies some type of progressive discipline issue,

10  which, again, was entered into the case that I thought was not

11  going to be in the case.  But if the question is rephrased:

12  "Do you believe that a person should have a second chance when

13  they make a mistake relating in this context," I think that's

14  a permissible way to ask the question.  I really don't like

15  not having a juror question asked and answered --

16         MS. DORAN:  Understood.

17         THE COURT:  -- unless it's completely improper.  And

18  I think as rephrased, it's a proper question put in the

19  context of this.

20         So as rephrased, is there an objection by plaintiff?

21         MS. DORAN:  And I understand your rephrase is

22  something along the lines of do you believe a person should

23  have a second chance when they make a mistake?

24         THE COURT:  Well, in this context, under these

25  circumstances, should Ms. Warren have been given a second

1    chance.  And you don't have to ask that question.  That is

2    a -- you know, the party that asks it doesn't have to be the

3    party with the witness on the stand.  I could understand why

4    the plaintiffs may not want to ask that question.  But as

5    rephrased, if defense wants to ask it, I'm going to allow it.

6    Is that over objection or without objection?

7           MS. McLAUGHLIN:  Is it under these facts, do you

8    believe a person should have a second chance, or Ms. Warren?

9           THE COURT:  No, Ms. Warren.  Let's make it -- it's

10   too vague otherwise.

11          MS. DORAN:  No objection.

12          THE COURT:  Okay.  So as rephrased, that could be

13   asked.

14          "And do you think that Carrie Warren loved her job?"

15          Any objection to that by the plaintiff?

16          MS. DORAN:  No.

17          THE COURT:  By defense?

18          MS. BRUCH:  No.

19          THE COURT:  "Do you see any reason as to why she

20   might try so hard to fight for her job?"

21          Any objection by plaintiff?

22          MS. DORAN:  No.

23          THE COURT:  By defense?

24          MS. BRUCH:  No.

25          THE COURT:  "Do you think if someone who hates their

1    job" -- "do you think if someone who hates their job, do you

2    think they would fight this hard and to go this far to show

3    how they feel?"

4           It can be rephrased a little bit, but I think the

5    gist of it is pretty clear.  Any objection by plaintiff?

6           MS. DORAN:  No.

7           THE COURT:  Defense?

8           MS. BRUCH:  No.

9           THE COURT:  "Do you believe you made the right

10   choice?"  And I assume that means in recommending termination

11   of Ms. Warren.  And I think in that context, that's obviously

12   what the question is.

13          But as rephrased, any objection by plaintiff?

14          MS. DORAN:  No.

15          THE COURT:  By defense?

16          MS. BRUCH:  No.

17          THE COURT:  Okay.  You're allowed to -- either side

18   can ask these questions.  And I would, though, say when you do

19   it, "I'm going to ask a juror question now."  So make it clear

20   you're asking a juror question.

21          And if, Ms. McLaughlin, you want to do it you can.

22   If these are questions you would rather the defense ask

23   because they just aren't things that you would normally ask --

24          MS. McLAUGHLIN:  Right.

25          THE COURT:  -- then they could do it.  But keep

1    track.  That's why I want you to introduce it and say "this is

2    a juror question," so you both can keep track of what was

3    asked by the other side so it's not kind of embedded in a

4    question that you wouldn't realize was a juror question.  So

5    introduce it as a juror question if you're going to ask it.

6           Okay.  Any questions on that procedure by plaintiffs?

7           MS. DORAN:  No.

8           THE COURT:  Defense?

9           MS. BRUCH:  No.

10          THE COURT:  Okay.  That will be the ruling.  Then

11   let's bring in the jury.

12     (Jury enters.)

13          THE COURT:  Please be seated, ladies and gentlemen.

14          Right before we broke, there was a prisoner on a

15   different case that came into lockup.  I wanted to let you

16   know that has nothing to do with this case.  But I do have

17   other cases, and some of them are criminal, and we do certain

18   other -- I have other court proceedings during the lunch hour,

19   and that's what we were doing there.  And they had a flood in

20   the lockup, so they can't bring prisoners straight down from

21   the prisoner elevator where you wouldn't see them.  They have

22   to take them in the hallway and put them in the lockup.

23   They're working on that.  That's why there was an

24   interruption.  But it shouldn't prejudice either side, and it

25   has nothing to do with this case.

1          So with that, you may continue.

2          MS. McLAUGHLIN:  Okay.  Thank you.

3              SABRINA JENNINGS, DEFENDANT HEREIN,

4          PLAINTIFF'S ADVERSE WITNESS, PREVIOUSLY SWORN,

5              DIRECT EXAMINATION (Resumed)

6   BY MS. McLAUGHLIN:

7   Q.   So, Commander Jennings, if a deputy is required to pull

8   their Taser on an inmate during any kind of incident, they're

9   required to report that they pulled a weapon, correct?

10  A.   Yes.  They're supposed to report that, yes.

11  Q.   Okay.  And Deputy Graham, when he pulled the Taser and put

12  it up against an inmate's chest during a scuffle in the sally

13  port, he did not include in his report that he had pulled his

14  Taser and put it up against this inmate's chest, correct?

15  A.   Correct.  He didn't put it in his report, but I do believe

16  that he reported that he did it later on.

17  Q.   Right.  After he was challenged for not having it in his

18  report to begin with, correct?

19  A.   Yes, the sergeant was looking into that.

20  Q.   So when Sergeant Russo, I believe it was, looked at the

21  videotape and saw that he had pulled the Taser and that it was

22  not in his report, did -- that was brought to your attention,

23  correct?

24  A.   Not right away.  It was Sergeant Craig --

25  Q.   Oh, sorry.  Okay.

1  A.  -- was the one that was handling that investigation.  I

2  believe that he handled it.  And then when he was done with

3  that, he had -- while he was handling that, he came to me

4  sometime and told me what was going on.  I said, okay, fine;

5  handle it, and let me know what you find out.

6  Q.  Do you believe that the sergeant -- that Deputy Graham

7  purposely omitted his use of the Taser because he knew that

8  that would be called into question?

9  A.  No, because it's not uncommon when an inmate is

10  uncooperative and combative that either a Taser could be

11  displayed or OC pepper could be displayed, or the officers

12  even use hand-to-hand technique.  So, no, I don't believe that

13  he purposely omitted anything.

14  Q.  There's a difference between displaying a Taser and

15  holding it up against an individual's chest, isn't there?

16  A.  I believe that any time you take a Taser out of your

17  holster it's displayed regardless of whether you hold it up or

18  you hold it against somebody.  I --

19  Q.  It's your -- okay?

20  A.  I refer to that as it's being displayed, yes.

21  Q.  It's your understanding that Graham's Taser made physical

22  contact with the inmate, right?  That's your understanding?

23  A.  Yes.

24  Q.  Okay.  And Deputy Dean, we talked about him.  With respect

25  to the pat-down situation, you recall that he initially said,

Jennings - Direct by McLaughlin

1001

1     I didn't know that I should -- well, let me rephrase that.  He

2     initially said --

3               THE COURT:  Hang on, Ms. McLaughlin.

4               MS. McLAUGHLIN:  I'm sorry.

5               THE COURT:  I have no idea why that's going off.

6        (Off the record.)

7               THE COURT:  I apologize.  Ask your question again.

8     It was a distraction, and it was nobody's fault.  So start

9     again.

10    BY MS. McLAUGHLIN:

11    Q.  So Deputy Dean initially said that he put in a report that

12    he patted down a female inmate upon -- in booking, correct?

13    A.  Yes.

14    Q.  And he was challenged on that because there was a female

15    deputy on duty.  And when a female deputy is on duty, they are

16    the ones who are supposed to do the pat-downs of the female

17    inmates, correct?

18    A.  That is correct.

19    Q.  And that's a policy -- even if it was an unwritten policy,

20    that is a policy that has been around for -- since you've been

21    commander, right?

22    A.  No.

23    Q.  Okay.  That is the policy -- that was the policy when

24    Deputy Dean failed to -- failed to call for a female deputy to

25    pat down this inmate, correct?

Jennings - Direct by McLaughlin

1002

1  A.  That is the policy when this occurred.

2  Q.  Okay.

3  A.  But that was a fairly new policy.  And it had not been in

4  effect since I became commander back in 2003.

5  Q.  Okay.  You had previously testified in -- you had

6  previously testified that it was your practice to, as often as

7  possible, have at least one female officer, one female deputy

8  on per shift.  Is it -- wasn't that your practice?

9  A.  Yes.

10        MS. BRUCH:  Objection.  Relevance.

11        THE COURT:  Well, she answered the question.

12  Overruled.  But I'm -- if you want to make a proffer as to the

13  relevance, we'll do it at sidebar.

14        MS. McLAUGHLIN:  Okay.  I'll move on.

15  BY MS. McLAUGHLIN:

16  Q.  So Deputy Dean, it winds up he lied about actually giving

17  that female inmate the pat-down, correct?

18  A.  Correct.

19  Q.  And you didn't terminate him for untruthfulness, did you?

20  A.  No, ma'am, I did not because when the sergeant approached

21  him about it with the investigation, he had told the truth.

22  Q.  Okay.

23        MS. McLAUGHLIN:  We have a number of jury

24  questions -- juror questions that I am going to read to you

25  now.

1                          JUROR QUESTIONS

2    BY MS. McLAUGHLIN:

3    Q.  What were the nature of the texts -- these are juror

4    questions.

5            What were the nature of the texts you received from

6    Ms. Warren during the time at jury duty?

7    A.  I don't know.  I never saw any texts.

8    Q.  So obviously you didn't reply to those texts?

9    A.  No, I did not.

10   Q.  Okay.  Do you believe that Carrie Warren should have been

11   given a second chance before you recommended firing her?

12   A.  This is a lengthy answer.  Can I -- can I give this

13   answer?  Because it's not a yes/no answer.

14           THE COURT:  This is a juror question.  You can answer

15   it as best you can.

16           THE WITNESS:  Okay.

17   BY THE WITNESS:

18   A.  When I first spoke to Carrie Warren back I believe it was

19   on January 14th in my office, everything that Carrie Warren

20   had said to me, I believed.  She told me that she complained

21   at the front entryway.  She told me she was cold.  She had

22   made mention that she was salty being there.  She had

23   mentioned babysitting issues.  She told me that she took a

24   cell phone in.  I believed that.

25           When I asked her about the questioning with the

1  judge, she told me that she told the judge that she had to

2  work after jury duty.  Everything she said was what I believed

3  to be truthful and honest with her.

4         I asked her, did she go back to the courthouse after

5  lunch, and she told me no.  She did not know that I had

6  already talked to Deputy Commander Leinen and asked him what

7  time did she come back.  All she knows is that the last time

8  she talked to me, she was released for lunch.  She was going

9  home to check on her dog.  She was going back to the

10  courthouse and then she was going to be released.  That is

11  what she told me.

12        When I called Deputy Commander Leinen to say, hey,

13  what time did she come back, he said, no, she never came back.

14  Carrie didn't know that.  And when I asked her about it, she

15  was honest.  She said she did not go back.  She told me that

16  she received a phone call from somebody at the courthouse

17  saying that she was done.  She didn't need to go back to the

18  courthouse.  And so she came back to work.

19        I asked her for a screenshot of that call because she

20  said she got a call.  There was no reason for me to believe

21  that she did not get that call.  I believed it.  And I

22  believed everything she said with the exception of the -- I

23  still don't see how she could not have seen the signs that

24  were posted about the no cell phone usage.  I believe that she

25  may have seen them.  She might have just kind of put it out to

1  the back of her mind because she was hoping that she was going

2  to get out of jury duty that day.  I don't know.  But when I

3  talked to her in my office, I believed her.

4         When we went for the formal interrogation, the

5  questions that I had prepared for her were questions that

6  could be answered as a yes/no because I already knew the

7  answers.  I knew she had her cell phone.  I knew she was --

8  there were other people in the jury room that had a cell

9  phone.  I know what she had said to the judge.  I know what

10 she said to me.

11        It was during that formal investigation or

12 interrogation that she changed her answers.  She said she

13 wasn't complaining.  She said that she wasn't salty.  I would

14 have to look at the exhibit where it says first answer, this

15 is what she had; second answer, this.  And there's four

16 questions that had asterisks next to it where her answers

17 changed from what she told me in my office.

18        Do I believe that Carrie Warren deserves a second

19 chance?  After that formal interrogation, no, I don't.  She

20 lied to me.  I asked her again for some sort of proof that she

21 received a phone call.  She never gave it to me.

22        Now, in that formal interrogation, had she had said,

23 yes, I did complain; yes, I was salty; yes, if she had

24 answered the way she did in my office, I would not have put in

25 a recommendation for termination.  It was when that formal

Jennings - Juror Questions by McLaughlin

1006

 1    interrogation took place, I knew with what she said to me in

 2    my office and with what she said to me then were two

 3    completely different things.

 4           So, yes, I believe people deserve second chances.  We

 5    give them all the time.  But if I am doing a formal

 6    interrogation and I'm being lied to, that's why I made my

 7    recommendation.

 8    BY MS. McLAUGHLIN:

 9    Q.  Do you think that Carrie Warren loved her job?

10    A.  Yeah, I think she loved her job.  I've been doing this for

11    27 years.  I love my job.  There's bad days.  There's good

12    days.  There's -- with any job, you're going to have bad days,

13    and you're going to have good days.  You're going to have pros

14    and cons.  I believe she loved it.

15    Q.  Do you see any reason as to why she might try so hard to

16    fight for her job?

17    A.  I don't know because with all of the previous testimony

18    that has come out, I don't know why.  And I don't believe that

19    I can say why.

20    Q.  Okay.  Do you think if someone hates their job, do you

21    think they would fight this hard and go to this far to show

22    how they feel?

23    A.  I think it would depend on the job.

24           THE COURT:  I think the witness has answered that.

25           MS. McLAUGHLIN:  Okay.

1    THE COURT:  Because she believes Ms. Warren loved her

2    job.  So I think that question has been answered.

3         Go ahead.

4    BY MS. McLAUGHLIN:

5    Q.  Do you believe you made the right choice in recommending

6    termination?

7    A.  After the formal interrogation, yes, I believe I made the

8    right choice.

9    Q.  Okay.  Another question is, is it normal practice to only

10   allow employees to answer formal interrogation -- to answer

11   formal interrogations with "yes" or "no"?

12   A.  I think that depends on the person that's asking the

13   questions.  When I was speaking to Carrie, when I asked her

14   those questions, I already knew the answers.  She already told

15   me.  She gave me full and complete detail when we were sitting

16   in my office back on I believe it was January 14th.  I wasn't

17   looking for any additional detail because she had already

18   answered my questions.  So, again, it's going to depend on

19   each individual person.

20        When I had my formal inquiry, interrogation with

21   Deputy Crumly, I had not spoken to him before that

22   interrogation at all.  So yes, when I talked to him, I asked

23   questions, and he gave complete answers.  That was the first

24   time I had been hearing -- hearing the answers to my

25   questions.  Carrie had already given me all the answers.  I

1   already knew those answers.  I don't know why she changed

2   them.

3   Q.   Are there formal instructions, an employee manual, that

4   instructs deputies on how to behave when they're at jury duty?

5   A.   I don't believe that there's formal instructions, but I

6   believe that a person should already know -- by their actions

7   and how they speak and how they present themselves, I would

8   think that they would already know that, but I don't believe

9   that there's formal instructions.  What the judiciary has as

10  far as their rules and regulations, that is -- that's the

11  judiciary.  So I can't testify to what the judiciary wants or

12  expects or anything like that.

13  Q.   In any of the training that you received from the KCSO,

14  going through the academy or whatever, have you ever

15  encountered any instruction on, okay, you're a KCSO -- you're

16  a police officer, and if you're called to jury duty, the best

17  way to inform a judge that you are a police officer or that

18  you have a potential knowledge of the case is to ask for a

19  sidebar?

20  A.   No.

21  Q.   Any kind of instruction like that?

22  A.   I don't recall if there is anything.

23  Q.   So the next question is why didn't you review all the CCTV

24  and transcripts when you saw inconsistent reports?  Why didn't

25  you verify?

1    A.   What CCTV?  I mean --

2    Q.   Well, the videos --

3    A.   For what?

4    Q.   -- I am assuming.  Why didn't you review all the videos

5    and transcripts when you saw inconsistent reports?

6    A.   I -- I can't answer that because there's a lot of times

7    where I'll get reports and I won't have video.  When the

8    sergeants say that they've reviewed these items, I'm taking

9    the sergeant on what they say.  They've done the

10   investigation.  If there's anything specific, if I reviewed it

11   or not --

12   Q.   Okay.

13   A.   -- then I think that might be an easier question for me to

14   answer.  But I know that when -- when I get a video or

15   something, I'll pop it in the computer, and I'll watch the

16   video.  I may not recall doing that, but that's my -- that's

17   my practice.  I can't say if I've done it with every

18   individual thing, but that's my practice, so...

19            MS. McLAUGHLIN:  Okay.  I have a couple of follow-up

20   questions.

21            THE COURT:  Go ahead.

22               DIRECT EXAMINATION (Resumed)

23   BY MS. McLAUGHLIN:

24   Q.   So Joint 19 is the exhibit with your questions, and you

25   said you put some asterisks by some of the answers because you

1   felt that Carrie had changed her answers during the formal

2   interrogation.  So let's take a look at that.

3          The first one -- these asterisks by 6, 7, 10, and 11,

4   those are the questions that you are referring to?

5   A.  Correct, yes.

6   Q.  Okay.  So, "Did you state that you shouldn't have to serve

7   on a jury because of where you work or because you are in law

8   enforcement to law enforcement, in front of members of the

9   public?"  And it says, "No first."  So you don't have a

10  response to what she said the second time?

11  A.  No, that's what she said the first time.

12  Q.  And the second time?

13  A.  No.  Not every question was asked twice.

14  Q.  Okay.  So what is it that you are claiming that she has

15  been inconsistent with?

16  A.  Well, with that question right there, when we were in my

17  office and we were talking, I had asked her about when she had

18  gone through the employee entrance, statements that she made.

19  She said that she made a lot of statements such as being in

20  law enforcement, shouldn't have to work there.  But she had

21  also said that on her Facebook post.  And with her Facebook

22  post, some of the replies that she had gotten back were from

23  other -- was from other deputies.

24         So, yes, I believe that she made the statements, and

25  she told me in my office that she was complaining about being

Jennings - Direct (Resumed) by McLaughlin

1011

1    there.  It was cold outside.  Her hands were cold.  Her face

2    was cold.  She had problems with babysitting issues, the

3    weather was terrible, and she didn't want to be there.  We all

4    knew that she did not want to be there.

5    Q.  All right.  The second question:  "While at the

6    courthouse, did you complain about having to be there all day

7    and then having to work afterwards to law enforcement, in

8    front of members of the public?

9         "First yes and then no."

10        Do you recall what the actual testimony was during

11   the formal interrogation with respect to what she said about

12   complaining?

13   A.  She said that she didn't complain.

14   Q.  Okay.

15   A.  The first -- but the first time that I asked that

16   question, she said that yes, she did complain.

17   Q.  Okay.

18   A.  The second time I asked her that question, she said she

19   did not.  In my office, on January 14th, she told me that yes,

20   she did complain.

21   Q.  Complaining is a characteristic -- you're characterizing

22   what was said, right?  If you said I complained about

23   something, that's a characterization, isn't it?

24   A.  It could be, yes.

25   Q.  Okay.  So if she said, boy, it's really cold out here, and

1  I don't have a babysitter for later on, you could characterize

2  that as a complaint, but the actual words are the actual

3  words, right?

4  A.  The words are the actual words.

5  Q.  Yeah.

6  A.  But when Carrie spoke to me in my office, she went into

7  detail about what was said.

8  Q.  Okay.  When --

9  A.  So she was complaining, and she said that yes, she was

10  complaining when she went through the security checkpoint.

11  Q.  And she also said that she said nothing disrespectful,

12  that it was basically chatting with her co-workers?

13  A.  That is correct.  She said that she didn't say anything to

14  disrespect or embarrass the Sheriff's Office.

15  Q.  And when -- I'm sorry.  Were you finished?  That's what

16  she said?

17  A.  Yes.

18  Q.  Okay.

19  A.  That is what she said.

20  Q.  So when you resumed the interrogation after Stomper was --

21  arrived, wasn't the first thing that Stomper said was that

22  my -- Carrie Warren is telling me that she didn't have an

23  opportunity to explain her prior answers during the time that

24  you were asking her questions when he wasn't there?

25  A.  Yes.

1   Q.   Right.  And he made a point of saying she needs to explain

2   things, correct?

3   A.   That's what he was saying, yes.

4   Q.   And do you recall that during that formal interrogation

5   the second part where it was recorded that Carrie kept saying

6   this is the answer to this question, was not a yes or no, I

7   have to explain?  Do you recall her saying those things?

8   A.   I recall her saying that.

9   Q.   Okay.

10  A.   But the questions were developed for --

11  Q.   Ultimately she said --

12  A.   -- yes-or-no answers --

13  Q.   Okay.

14  A.   -- to questions I already had the answers to.

15  Q.   All right.  Let's move on to No. 10.

16       "After you spoke to DC Leinen, you stated that you

17  logged into the computer and you looked at the schedule and

18  saw that you had been moved to first shift.  Did you

19  understand that change?"

20       "No the first time," and then "no access" is written.

21       You understand that the KCSO system doesn't have a

22  VPN or an ability to access it from -- let me rephrase that.

23       Deputies -- I don't know if the brass does, but

24  deputies don't have access from outside computers to access

25  the KCSO computer system, do they?

Jennings - Direct (Resumed) by McLaughlin

1014

1   A.  I believe that all the computers are on the same network.

2   Q.  So it's your testimony that you thought, well, when she

3   said that, she probably was over at the courthouse and at some

4   point in time asked to log onto one of the courthouse

5   computers that would have been hooked up to the KCSO

6   scheduling, and she would be able to access it from there?

7   A.  When we started talking about the schedule and when I

8   talked to her at 11:19 that morning about the schedule, she

9   had told me that yes, she knew what her -- she knew the

10  schedule had been changed and that she had seen it.  So I do

11  believe that all the computers are on the same network so that

12  she can have access to it.

13  Q.  Okay.

14  A.  But that is what she had told me, that she knew what her

15  schedule was.  She knew it had been changed.  She had seen it.

16  And she was going to lunch.

17  Q.  You wrote in your report on January -- your internal

18  report that she told you she logged in and saw it, correct?

19  A.  If that's what I wrote, then yes.

20  Q.  Okay.  So you were under the belief that at some point in

21  time while she was on jury duty, and you have videotape of

22  every minute that she is there in the courthouse, that she

23  went to a courthouse deputy, said, hey, let me log onto the

24  computer system; I want to see whether or not you -- my

25  schedule has been changed, and that's how she got access?

Case: 1:15-cv-00496 Document #: 239 Filed: 07/30/18 Page 139 of 246 PageID #:14743
Jennings - Direct (Resumed) by McLaughlin

1015

1        MS. BRUCH:  Objection to form of the question.  It's

2    compound.

3        THE COURT:  Sustained.

4    BY MS. McLAUGHLIN:

5    Q.  What was your belief in terms of how she would have logged

6    in as you stated in your report?

7    A.  I don't know how she would have logged in, if she would

8    have gone to a court security deputy or if she would have

9    asked somebody from the jury commission or how she would have

10   done it.  I just know what she had told me.  And I did not go

11   into great detail and ask her did you go to this person, did

12   you go to that person.  It's what she told me on the phone

13   when she called me after she had been released for lunch.  And

14   then in the formal interrogation, she said that no, she didn't

15   know her schedule change, and she didn't have access.

16       MS. McLAUGHLIN:  I have no further questions.

17       THE COURT:  All right.

18       And direct examination?

19       MS. BRUCH:  Thank you, Your Honor.

20       THE COURT:  And at the end of all this questioning,

21   I'll give you a chance -- I'll give the jury the chance, if

22   they have additional questions in writing, to submit them and

23   they will be asked of the witness.

24       You may proceed.

25       MS. BRUCH:  Thank you, Your Honor.

Jennings - Cross by Bruch

1016

CROSS-EXAMINATION

BY MS. BRUCH:

Q.   Commander Jennings, can you tell us a little bit about
yourself, your educational background, and things like that?

A.   I grew up in Oswego, Illinois, graduated from Oswego High
School in 1986.   I didn't go to college right after school.   I
had some odd-and-end jobs.

I did finally decide to go to college.   I became an
EMT.   I worked on an ambulance for about three years.

And then after the birth of my oldest daughter, I
moved back in with my dad and then got a job at the
Kendall County Sheriff's Office, and that was back in '91.   I
would take one class a semester whenever I could because I was
trying to get my degree, and Kendall County would pay
50 percent for one class a semester, while raising my
daughter.

And then I was promoted to sergeant mid-'90s, like
'95, '96 era, time frame.   And then I was promoted back in
2003.   One of the suggestions with my promotion was the
sheriff and the chief deputy at the time wanted me to continue
my education.   So I got my bachelor's at Benedictine
University, and that was in 2008.

Q.   How did that make you feel to be promoted to a sergeant
and commander in the Sheriff's Office?

A.   It felt awesome.   I always -- a lot of people don't like

1   to work in corrections.  It could be very stressful.  You put

2   up with a lot of stuff.  But I liked it.  I loved it.

3          When I took the sergeant's exam, I was 150 percent

4   convinced that I failed that exam, and I passed it.  I didn't

5   get promoted the first time around.  Second time around, we

6   took a brand-new exam.  I was now 200 percent convinced I

7   didn't pass it, and I was upset for about three weeks because

8   I didn't pass it.  And then I found out I was the only one

9   that passed it, and I got the third highest score out of the

10  Sheriff's Office for that exam.  Chief Deputy Koster and I

11  believe it was Commander Wollwert had gotten higher scores

12  than me, but it was unbelievable.

13         After I got promoted to sergeant, we've had a period

14  where the corrections commander had been changed.  We had an

15  interim commander, and then they were looking to hire a

16  permanent commander.  And it came down between me and two

17  other people.  I was second on the list, which was fine.  But

18  every day I went into work, and I went into the commander's

19  office and asked what could I do for you, and I learned how to

20  do that job as a job.

21         When Commander Phil Smith was being promoted to

22  patrol commander, Commander Smith had approached the sheriff

23  and the Chief Deputy Tichava and suggested me for the job.  So

24  I was offered the position, and I took it.

25  Q.  And what year was that?

Jennings - Cross by Bruch

1018

1   A.   2003.

2   Q.   At the time you became commander in 2003, how many

3   employees did you supervise in the corrections division?

4   A.   I would say it's probably around -- oh, gosh.  Maybe

5   around 25 or so.  25, 30.

6   Q.   Can you tell us a little bit about just your family

7   background?  Are you married?  What -- I believe you mentioned

8   you have a child?

9   A.   Yes.  I'm married.  I have two children.  One is 27, and

10  one is 17.  The 27-year-old, she's a unique individual.  She's

11  an introvert.  She's a writer.  That's what she is.  My 17-

12  year-old is making up for all the missed sports and activities

13  that my oldest daughter did not participate in.  She's very

14  athletic, very outgoing, total complete opposite of my oldest

15  daughter and how I was when I was her age.

16  Q.   Does your husband work?

17  A.   Yes, he does.  He works for Nicor Gas.

18  Q.   And how long have you been married?

19  A.   It will be 12 years.

20  Q.   So I just want to talk a little bit about some of -- you

21  mentioned you have a degree.  And beyond that, did you have

22  any additional training or more than just a simple one-day

23  class that you attended as part of your work at the

24  Sheriff's Office?

25  A.   Yes.  When I got promoted to sergeant, they sent me to a

1    first-line supervisory school.  It was a 40-hour class.

2          When I went to the police academy back in the '90s,

3    they sent me to Cook County at California and 26th, and that

4    was about a three-month course.

5          When I got promoted to commander, they sent me to

6    Northwestern School of Police Staff and Command, and that was

7    a total of ten weeks over a period of five months.  So I would

8    go to school for two weeks, be at work for two weeks, and I

9    did that for five months.

10   Q.  When you say Northwestern, is that part of Northwestern

11   University?

12   A.  Yes.  And there's been other classes through, like,

13   Western University, week-long classes or classes that go for a

14   period of weeks, but they break it off into, like, one or two

15   weeks a month.  I've been to different classes like that.

16   Q.  Commander Jennings, I just want to focus now on this jury

17   duty situation with Ms. Warren.  So on the Sunday night before

18   Ms. Warren had jury duty, did you have a conversation with her

19   by phone?

20   A.  Yes, I did.  She called me at home.

21   Q.  And tell me as best you recall what was said by you and

22   what was said by her during that conversation.

23   A.  Well, I was surprised that she called me.  But she had

24   told me that she had jury duty the following morning, and she

25   asked what she should do.  I told her that, you know, go to

Jennings - Cross by Bruch

1   jury duty because I didn't know what was going to happen.  She

2   asked me about her schedule, and I don't have schedules at

3   home.  So I told her that when I got to work the next morning,

4   I was going to look at the schedule, and I would call her.

5   And I did.  I called her the next morning.

6           During the conversation, she asked me about her

7   uniform and if she should take it to jury duty with her, and I

8   told her yes because we didn't know if she was going to be

9   selected for a jury or if she was going to be released from

10  jury duty.  And the intention was she'll have her uniform.

11  She'll be across the street; 95 percent positive, absolute

12  chance that she was just going to come over and finish out her

13  eight and a half hours.  But I wanted to look at the schedule

14  to find out what all is going on because, like I said, I don't

15  keep a schedule at home.

16  Q.  Okay.  So then later on the morning of January 6th, did

17  you try to reach her?

18  A.  Yes, I did.  I called her home phone.  I didn't get an

19  answer.  And I called her cell phone, and it went straight to

20  voicemail.

21          When I couldn't get in touch with her, I called

22  Deputy Commander Leinen.  It was prior to the courthouse

23  opening.  I knew he was going to be there.  So I called him to

24  let him know that Carrie Warren was coming in, she had a

25  summons for jury duty, and told him to tell her that if she

1    gets selected for a jury, once she's done with the jury and

2    everything else, just go home; but if she didn't get selected,

3    then tell her to come back -- come over to the jail and finish

4    out her eight and a half hours.

5    Q.   Did you have an opportunity to speak with Ms. Warren later

6    on on January 6th?

7    A.   Yeah.

8    Q.   And how did you get in touch with her?

9    A.   She called me at 11:19.  She called me on my cell phone,

10   and she told me that she had just been released for lunch.

11   She was going to go home.  She was going to check on the dog.

12   And then she had to go back to the courthouse and that she

13   believed that once she got back to the courthouse, she was

14   going to be released from jury duty and that she was -- she

15   knew what her schedule was.  She was going to come over.  And

16   I said, okay.  She had mentioned something about -- she saw --

17   she saw the schedule.  She knew what it was and that she was

18   going to come over.  I said, okay, fine; just let me know.

19   And that was it.

20         Later on that afternoon, maybe 12 -- somewhere around

21   12:45 or so, she popped her head in my office and said she was

22   there, and I said, okay.  I didn't have any other conversation

23   with her at that time because when she popped her head in the

24   office, there were a couple of other officers in my office.

25   We were dealing with another issue.

Jennings - Cross by Bruch

1  Q.  Later on that afternoon of January 6th, did you speak with

2  anyone in the Sheriff's Office about Ms. Warren and her jury

3  duty?

4  A.  Yeah.  I had gone upstairs to Tracy Page's office.  I

5  was -- you know, I don't even remember what I was doing, but I

6  know that I was probably taking papers up there, doing

7  something, and Tracy had mentioned that she saw Carrie and

8  that Carrie told her that she was on jury duty and that she

9  got released for lunch and she had to go back to the

10 courthouse to be released.  And I'm like, okay.  You know,

11 that's exactly what Carrie had told me when she called me on

12 the phone.  So I didn't see anything unusual with that.

13 Q.  So next I want to draw your attention to an e-mail from

14 Deputy Commander Leinen that was sent late in the day or early

15 evening of January 6, 2014.  Did you receive that e-mail?

16 A.  I received a lot of e-mails.

17 Q.  Okay.  And let me just -- to refresh your recollection,

18 I'm going to show you Joint Exhibit 16.

19        Is this an e-mail that you received from

20 Deputy Commander Leinen?

21 A.  Yes.  I received it, but I didn't receive it until the

22 following day.

23 Q.  Okay.  How did you first learn about the concerns by

24 people at the courthouse about Ms. Warren's behavior during

25 jury duty?

Jennings - Cross by Bruch

1   A.   I believe I was upstairs, and I believe that it was

2   Chief Deputy Koster had said something about Carrie and her

3   jury duty and that there were some complaints.  And he asked

4   me to handle it, and I said okay.

5   Q.   So what was your role in responding to the complaints

6   about Ms. Warren?

7   A.   I reached out to Deputy Commander Leinen -- sorry.  I was

8   going to say Gillespie.  I reached out to Deputy Commander

9   Leinen.  He had told me about the complaints that he had, so I

10  had asked him if he would get any appropriate memos that he

11  needed.  Eventually -- I did see this eventually.

12          Later on I had received an e-mail that he had

13  forwarded me to -- that Judge Pilmer had sent to Judge McCann.

14          Then I ended up -- I received some Facebook posts

15  that were Carrie's Facebook posts.  I know Carrie had shown up

16  at my office about 12:45.  But I know I asked for the video of

17  the front entryway, or the check -- the security check-in

18  screening, the jury deliberation room.  I had asked for that.

19  I think I asked for the video of when she was in the

20  courtroom, but I don't -- I don't recall.  But I believe I did

21  because we ended up getting it.  And then the video of when

22  she left.

23  Q.   The videos that you referenced, did you review those

24  videos as part of your investigation?

25  A.   Yes, I did.  I'm still kind of -- the video of when she

Jennings - Cross by Bruch

1024

1  was in the courtroom, I still can't say for sure if I saw that

2  prior to all the previous testimony that was given or not, but

3  I know I've seen it.  I just -- I just can't recall that

4  because I was looking at everything that I had.

5  Q.  And when you were looking at the different reports that

6  you got from individuals, did you find that there was complete

7  consistency among all of the reports that you reviewed?

8  A.  No.

9  Q.  Okay.  The videos that you saw, did they have any audio?

10  A.  No.

11  Q.  Was there any way to determine from watching the videos

12  whether one individual statement or another individual

13  statement was accurate or not?

14  A.  No, there was not.

15  Q.  So I want to fast forward now to January 14th.  Was that

16  the first time that you spoke with Ms. Warren concerning the

17  complaints that you received about her behavior at the

18  courthouse?

19  A.  Yes.

20  Q.  So tell us about that meeting.  What time did it start and

21  who was there?

22  A.  I was the only one that was there.  I know Carrie got to

23  work at 3:00.  So I'm going to guess it was sometime I think

24  probably between 3:00 and 3:30.  I'm not sure of the exact

25  time.  But I had called her, asked her if she could, you know,

1  25 my office, which is -- 1025 means report to.  And she came

2  into my office, and she said hi.  I said hi.  And she said,

3  what's up?  And I told her there were some complaints about

4  her actions when she was over serving jury duty over at the

5  courthouse and that I needed to talk to her about them.

6  Q.  When Ms. Warren testified she talked about how you put on

7  your coat and you appeared to be in a rush; could you explain

8  what you recall doing during that meeting?

9  A.  Okay.  It is not uncommon for me at all to never take my

10 coat off in the winter during the day.  When they built the

11 Sheriff's Office, my office is right here, and there's a brick

12 wall.

13      On the other side of that wall is the main computer

14 room for the entire Sheriff's Office.  When they built the

15 building, somebody decided that they were going to take the

16 ventilation that goes to the outside, and they were going to

17 use that vent to provide heat and air to both my office and

18 the office of the computer room.  The only thing is because

19 they have to keep that computer room constantly cold, my

20 office is constantly cold.

21      So it was not common -- if I'm in my office in the

22 wintertime without a coat, that is uncommon.  So for me to be

23 sitting there with my coat on, no, I did it all the time.

24 Thankfully a few years ago, our facilities management got --

25 it's like a steam vent.  So I have my own little thermostat

Jennings - Cross by Bruch

1   and the heater right above my desk, so I could turn -- turn

2   the heat on above my desk in the wintertime when it gets cold.

3   Otherwise I would be sitting there with my coat on the entire

4   time.

5   Q.  So let's focus on what was said during the meeting.  So

6   after you two kind of -- you said that you were investigating

7   the complaints you received from the courthouse.  What

8   happened next?

9   A.  Carrie got excited.  And, I mean, not excited like

10  "hooray."  She started going into detail about that day, about

11  the court, what she said when she was at the security

12  checkpoint.  And, I mean, it was nonstop.  So she was kind of

13  hyper when she was talking to me about it.  I kept

14  interrupting her, telling her that I had to read the charges

15  to her.  And I would start reading the charges, and she just

16  kept going on.

17        I finally got the charges read to her, got them read,

18  got them signed.  And then after all of that was done, I

19  looked at her, and I said, okay; tell me what happened.  And

20  she -- she repeated the story.

21  Q.  So as best you can recall, tell me what the story was that

22  she told you that day.

23  A.  She didn't want to be there.  It was cold outside.  Her

24  hands were cold.  Her face was cold.  And, yeah, she did tell

25  the officers that she was salty.  There was a problem with her

Jennings - Cross by Bruch

1027

1  trying to get a babysitter.  And then she had to work after

2  jury duty.  So it was very evident that she didn't want to be

3  there.

4          When she was told by one of the court security

5  deputies that she needed to see Deputy Commander Leinen, I had

6  heard -- one of the reports was she's like, well, what does he

7  want and everything else, which I could see happening because

8  she didn't want to be there.  But then she had told me in the

9  office that she got excited because maybe it was her ticket

10 out of there.  She told me that she -- after she spoke to

11 Deputy Commander Leinen about her schedule, she had a couple

12 of questions about her schedule, and Deputy Commander Leinen

13 told her, I'm only telling you what I was told.  If you have

14 any other questions, you need to contact Commander Jennings.

15         Then she was taken to the jury check-in.  At the jury

16 check-in, she told me that she had spoken to somebody there.

17 The person told her to hold on a minute and took her jury

18 summons to the back to see if she was going to be called

19 because she worked for the Sheriff's Office.  And she told me

20 again that while she was there, she was, like, yes, this is my

21 ticket out of here.  They came back and said no, you were

22 needed, so she went and sat back in the jury room.

23         She said that she was on her phone and so were other

24 people, which was confirmed.  It was truthful.

25         Then she went in for -- went in front of the judge,

Jennings - Cross by Bruch

1    answered questions that the judge had had.  And one of the

2    things that I don't recall the exact wording was I had asked

3    her if she had told Judge Pilmer that she had to work second

4    shift after or before she saw her schedule.  And she told me

5    after.  And I kind of -- you know, I just stopped.  I kind of

6    looked at her, like, you know, are you sure?  And she's like,

7    hold on a minute.  And she waited a few minutes and she said,

8    yes, it was after.  I said, okay.

9         I asked her what time she went back to the

10   courthouse, and she said she didn't.  And she didn't.  She was

11   honest about that.  She didn't; I knew she didn't.  She said

12   that she got a phone call from somebody at the courthouse

13   saying that she was done, she didn't need to go back to the

14   courthouse, so she didn't.  She came to work.  I believed it.

15        So then I asked her -- you know, I think we were kind

16   of winding things about -- I think she had been in my office

17   anywhere from maybe 30 to 45 minutes.  And I asked her if she

18   could, you know, put what she had said to me and what occurred

19   in writing.  She said she would.  And she left, and then I

20   left later on.

21   Q.  Did it ever come up about any verification of the call

22   that she received?

23   A.  Yes.

24   Q.  What was that about that?

25   A.  She told me that she received a phone call.  And I

Jennings - Cross by Bruch

1    believed her, okay.  She said she got a phone call.  So I

2    asked her if I could have a copy, like a printout of a

3    screenshot from her phone that shows the call that she got.

4    She had told me that she didn't know if she still had it

5    because when her phone starts to run slow, either her husband

6    deletes her phone logs and stuff to get her phone to run fast

7    or she'll delete it.  But she said that she would look for me.

8    I said, okay, and then I asked her, I said, well, if you don't

9    have that phone log, if you can't give me a screen shot, I

10   asked her if she would give me a copy of the phone bill that

11   would show the call.

12   Q.   Okay.  Anything else you remember about the meeting on

13   January 14th?

14   A.   Without looking at the report that I wrote, I think that

15   was pretty much everything that was covered.

16   Q.   During that January 14th meeting, was there ever a point

17   in time where you cut off Ms. Warren and didn't allow her to

18   explain her side of the story of what happened at the

19   courthouse?

20   A.   Oh, no.  Absolutely not.  I had to keep interrupting her

21   just so I could read the charges.  And then when I finally got

22   the charges read to her and signed, I asked her, okay, tell me

23   again; what happened?  I asked her a second time, and then I

24   even asked her questions.

25          So, no, she was never cut off.  And with the

1    exception of her not seeing the phone records, I pretty much

2    believed everything that she said to me.  So, no, she was

3    never cut off.

4    Q.  Okay.  So at some point then did you serve Ms. Warren with

5    a notice of formal interrogation?

6    A.  Yes, I did.

7    Q.  Okay.  So let me show you Joint Exhibit 12.

8         Did you provide this memo to Ms. Warren on

9    January 24, 2014?

10   A.  Yes, I did.

11   Q.  What's the purpose of this notice?

12   A.  I wanted to get her answers on record as to what happened.

13   I wasn't exactly sure of the type of discipline.  I know that

14   when I recommend discipline, it goes up a chain of command.

15   But I had concerns because there was a judiciary that was

16   involved, where she had in my office told me that she told the

17   judge, yes, I have to work after jury duty, but then she told

18   me that she had told him that after she saw the schedule.

19        With what I had heard from Tracy Page and Lisa Bowen,

20   it was the same thing that she had told me when she called me

21   at 11:19 prior to her saying that she got a phone call.

22        So as far as being untruthful, you know, I don't

23   think she was truthful with other people, but I believed her

24   to be truthful with me, not to the point of termination or

25   anything like that, but maybe a suspension.  I just didn't

Jennings - Cross by Bruch

1    know if it would be three days or less.  But I didn't want to

2    put in for a recommendation and then be told that, you know,

3    it should have been more than what I recommended.  So I just

4    want -- I just wanted to make sure I got her answers on record

5    because I already knew what her answers were and then put in a

6    recommendation.

7    Q.  So what is the purpose of a formal interrogation?

8    A.  I'm going to ask questions, and the person is going to

9    give me the answers to those questions.  And it's on record.

10   I mean, I don't...

11   Q.  Is there a distinction in your mind between the statements

12   that someone makes to you during an initial interview and the

13   statements that are made to you during a formal interrogation?

14   A.  Oh, yes.

15   Q.  And why do you draw that distinction?

16   A.  If I'm doing an informal interview with somebody and I'm

17   talking to them, I want them to tell me everything they know.

18   I want them to give me full detail, which is what Carrie did.

19   If I find somebody is being untruthful, deliberately, to me,

20   I'm going to -- I'm going to ask them about it.  I'm going to

21   give them a chance to go back and say you know what?  I'm

22   sorry, I didn't realize.  I didn't realize this.  I didn't

23   realize that.  And I do that.

24          When you're in that formal interrogation now, I don't

25   expect to be lied to.  I don't expect to have answers to

Jennings - Cross by Bruch

1032

1   questions that I already know the answers to changed.  I've

2   already got the details.  I have full detail.

3        So, yeah, there's a difference, if you're

4   fact-finding, you're in an informal interview or anything like

5   that, yeah.  If I feel somebody is lying to me and I ask them

6   about it, then yeah, that's their chance.  Tell me what's

7   going on.  And it's happened before in the past, not just with

8   Ms. Warren.

9   Q.  So I want to focus then on you've mentioned how -- we've

10  heard a lot of testimony already about what was asked and what

11  was said during the formal interrogation.  And I want to ask

12  you what was your impression at the conclusion of the formal

13  interrogation of Ms. Warren's answers?

14  A.  I believe Ms. Warren was not truthful with me.  She

15  changed her answers to what she had told me in my office.  I

16  had asked her again for phone records to prove that she got a

17  call.  She refused.  I just -- I did not believe her.  And I

18  was dumbfounded.  And I don't know why.

19  Q.  You don't know why you were dumbfounded, or --

20  A.  I don't know why she changed her answers when she had --

21  we had this full detailed conversation in my office.  The

22  questions that I was asking her is questions that she gave me

23  answers to in my office.  I just -- I couldn't believe it.  I

24  never had anybody lie to me like that in something that was so

25  formal.

Jennings - Cross by Bruch

1033

1     So I just -- and after that was done, I went to

2  Chief Deputy Koster.  And I just looked at him, and I go, she

3  lied to me.  And he just looked at me, and I just kind of -- I

4  turned around, and I walked out of his office, and I went

5  downstairs.  And I'm just like, okay.  So...

6  Q.  During your part of this investigation, did Ms. Warren

7  ever provide any cell phone records to you?

8  A.  No, she did not.

9  Q.  Did she --

10  A.  I have asked for them.  She never gave them to me.

11  Q.  Did she ever provide you with a screenshot from her cell

12  phone?

13  A.  No, she did not.

14  Q.  When you were conducting your investigation after that

15  original meeting on January 14th, did Ms. Warren ever come up

16  to you and explain whether or not there was still the call

17  from January 6th on her cell phone call log?

18  A.  She didn't say anything, no.

19  Q.  So I want to next show you Joint Exhibit 5.

20     Could you identify what this document is?

21  A.  It's my investigative summary to Chief Koster.  I don't

22  know if that was the initial from start to finish or if this

23  is the one that has my recommendations on it.

24  Q.  This is the one with the recommendations, so we'll go

25  through it.

Jennings - Cross by Bruch

1034

1   A.   Okay.  Yes.

2   Q.   So I want to go through -- well, why don't you tell me

3   from this first page, can you tell me what in here you found

4   to be significant that would warrant your recommendation for

5   termination.

6   A.   For this here?

7   Q.   On this page.  Is there anything in here that you --

8   A.   No.

9   Q.   -- would rely on to support that?

10  A.   No.

11  Q.   Okay.  What about on this page?

12  A.   Yes.

13  Q.   And what is it on this page that supports your

14  recommendation for termination?

15  A.   During the formal interrogation, I believed that she was

16  untruthful with me.  And I believed it was deliberate compared

17  to the questioning and everything that had happened on the

18  14th.  I believe she lied to me.

19  Q.   There's a section in here on discipline.  What's the

20  purpose of this section?

21  A.   The purpose of that section is to explain why I was

22  recommending the discipline that I was recommending.  And it's

23  to try to sum it all up.  I mean, it just -- this is why I'm

24  recommending the discipline that I'm recommending.

25  Q.   Next I want to show you Joint Exhibit 3.

Jennings - Cross by Bruch

1        What is this document?

2    A.    That was everything that happened.  When I -- when I

3    talked to her -- actually, it's pretty much from start to --

4    with the jury notice and when she called me, when she went to

5    jury duty, everything that happened from that point up until

6    before the formal interrogation.

7    Q.    Attached to that summary is a number of attachments, and

8    there are a lot of documents.  What is this?

9    A.    That is a list of all of the documentation that was --

10   that went along with that summary that would have --

11   eventually have gone up to Chief Deputy Koster.

12   Q.    So this -- after you compiled all of these records, you

13   gave this to Chief Deputy Koster?

14   A.    Eventually I did, yes.  I don't remember when I did it, if

15   it was before the formal interrogation or if it was after.

16   Q.    Once you gave your recommendations to Chief Deputy Koster

17   and provided these reports and attachments, did you have any

18   further involvement in the investigation into Ms. Warren's

19   jury duty?

20   A.    The only thing that happened was I was doing -- with our

21   e-mail system we have what's called Barracuda, and it keeps

22   e-mails for a certain period of time.  And I was doing random

23   checks on the Barracuda system.  And while I was doing a

24   random check, I had seen that e-mail that Carrie Warren had

25   sent out, and it looked to be like a home -- home address

Jennings - Cross by Bruch

1036

1 e-mail.  It wasn't a Sheriff's Office e-mail or anything that

2 I didn't -- that didn't look like it would pertain to work.

3         So -- and there was an attachment.  I pulled up the

4 attachment, printed it out, took a look at it, and saw that it

5 was the -- resembled the e-mail that she had sent to me about

6 what had -- after our January 14th meeting.  And I went

7 upstairs, and I gave it to Chief Deputy Koster.  After that I

8 had nothing to do with anything.

9 Q.  So I'm going to show you what's been introduced as

10 Joint Exhibit 8.  Is this the memo that you found on the

11 Barracuda search?

12 A.  I believe it may be.  There were two memos that were

13 similar.  There was the one that she had given me and then one

14 that I found.  But, yes, I do believe that this might be the

15 one that she had gave me.

16 Q.  So did you --

17 A.  Or that I found.  Sorry.

18 Q.  Did you sit through any of the pre-disciplinary hearings

19 or meetings between Chief Deputy Koster, Ms. Warren and

20 Mr. Stomper?

21 A.  I don't recall if I did or not.  I may have.  But if I

22 did, I would have had nothing to do with those meetings.  I

23 don't remember if I was sitting in on the meeting when the

24 subject of Christine Fidler came up or if I was in Tracy's

25 office and heard about it.  I may have been in the room, but I

Jennings - Cross by Bruch

1  can't tell for sure.

2  Q.  Did the name "Christine Fidler" ever come during -- come

3  up during your portion of the investigation?

4  A.  Oh, no.  Never heard of her before.

5  Q.  Okay.  So all just -- I want to move on to the topic of,

6  you know, you talked about how you've been the commander of

7  the corrections division for quite some time.  And can you

8  tell us generally what percentage of the employees that you

9  supervised have you disciplined over the years?

10 A.  I would say almost all of them.

11 Q.  Why do you discipline employees?

12 A.  To correct wrongdoing and correct behavior.  If somebody

13 does something wrong, we try to counsel them on it.  We bring

14 it to that person's attention because they may not realize

15 that they're doing something wrong.  So we -- we try to

16 discipline -- yeah, "discipline" is a hard word if I'm going

17 up to somebody and saying, hey, you spelled this guy's name

18 wrong in a booking as opposed to, you know, you didn't do a

19 cell check or something like that.  Depending on what the case

20 is, we try to correct action of wrongdoing for everybody's

21 safety and security.

22 Q.  How would you describe your management style?

23 A.  From 2003 to now, it has changed immensely.  I used to be

24 very autocratic.  It was my way or no way.  Everything was

25 black and white.  There was no gray.

1       Over the years, I learned through, you know, trial

2   and tribulations that it's not always my way is the best way.

3   I started out seeing gray.  Now I see color.  I believe that

4   everybody deserves a chance.  I believe that everybody makes

5   mistakes.  I make mistakes.  I'll be the first one to tell you

6   I make mistakes, and I'll even tell you what I've done.

7       I like to try -- I like to be as fair as I can,

8   honest as I can, consistent when I can.  I know that there are

9   times where I have to be firmer than what I would originally

10  be depending on the circumstances.  I always tell all my

11  officers, if you ever need anything, call me.  It doesn't

12  matter if it pertains to work or if it pertains to personal

13  lives.  If somebody is having a hard time at home, if you need

14  something, call me.  Let me know, is there anything I can do?

15  I keep an open-door policy.  I've had deputies come in my

16  office and yell and scream at me before, and I've sat there,

17  and I listened to it.  And I don't discipline because I know

18  they're venting.  Something is going on.  I try to get out on

19  the floor and help out.  People -- a lot of times deputies

20  will think that I'm out there trying to do something to catch

21  them in something, and it's like, no, I'm serving meal trays.

22  I'm passing out meds.  I'm doing a cell check just like what

23  you guys do because that's where I came from.

24      But while doing all of that, I still want to try and

25  have the best division that we can.  I have a clean jail.  Our

1   jail is very clean.  I like to try and help other agencies

2   when I can help other agencies.  I help -- try to help anybody

3   that walks into the lobby and they need help.  And I always

4   tell my staff, treat others the way you want to be treated.

5   If you're going to go up to anybody, whether it be an inmate

6   or another officer or whoever and you're going to be a jerk to

7   them, expect to be treated that same way.  Be respectful.  Be

8   polite.

9           Now, there's a lot of times where that just doesn't

10  happen where you're trying to be polite to somebody and they

11  don't -- they don't want that.  But I just try to tell

12  everybody, treat others the way you want to be treated.  And

13  if you have a question or anything, come talk to me.  I'm not

14  out to get you.  I'm not out to sabotage anything or do

15  anything.  I want what's best for my deputies, the inmates,

16  the staff, and for the Sheriff's Office as a whole.

17  Q.  There was some testimony that Ms. Warren had brought out

18  about how a female deputy had been terminated while she was

19  there, and I believe that was Deputy Nicole Porus.  Could you

20  explain the circumstances surrounding that issue?

21  A.  Yes.  We were in the process of negotiating the union

22  contract for corrections.  In the union contract, there is a

23  residence restriction.  And I believe you have to live like 25

24  miles straight as an arrow flies from the safety center.

25          While we were doing the negotiations, the union kept

Jennings - Cross by Bruch

1040

1    coming up wanting that language changed so that it would

2    grandfather anybody that currently worked at the

3    Sheriff's Office into that living radius.  And we kept saying

4    no because there was only I think one other -- one person,

5    maybe two that lived outside that radius, and they had for --

6    since they got hired, and that was years and years and years

7    ago.  And we kept saying no.  Well, the union was adamant that

8    there were people that lived outside that radius.  We didn't

9    believe it.  We were saying no, there's not, but they kept

10   coming back with it.

11          So we did a check, and we found two corrections

12   deputies that lived outside the 25-mile radius.  One was

13   Nicole Porus.  I believe she lived like 36 miles, somewhere

14   around there, from the Sheriff's Office.  And the other one

15   was Deputy Tim Swisher.  And I believed he lived 32, 30 -- 30

16   some odd miles from the Sheriff's Office.

17   Q.  Okay.  So now you find out that you've got a male

18   corrections deputy and a female corrections deputy who are in

19   violation of this rule.  What do you do?

20   A.  We approached both of the officers.  Both of the officers

21   received discipline because they were violating their union

22   contract.  Both of the officers were also told that they had I

23   want to say it was three months to abide by the union contract

24   and move within that 25-mile residence.  We also wanted to see

25   proof that they did move, whether it be an electric bill, a

1    lease, anything that would -- that would prove that they moved

2    within that living radius.

3    Q.  So at the end of the three months, what happened?

4    A.  Deputy Tim Swisher was in contract to buy a house.  He got

5    out of that contract, and he moved within the 25-mile radius.

6            Deputy Nicole Porus refused to move.

7    Q.  So then what happened?

8    A.  The chief deputy had recommended her termination to the

9    sheriff for violation of the union contract and the radius

10   restriction.

11   Q.  Okay.  So I want to move on to some of the other

12   situations with individuals who had violated rules that had

13   been brought up in this case.

14           First there were a number of records relating to

15   Deputy Tim Brennan being tardy or possibly inappropriately

16   taking a sick day.  Do you recall those incidents?

17   A.  Yes, I do.

18   Q.  During any of those incidents involving Deputy Tim Brennan

19   and his tardiness or taking sick days, did you ever find him

20   to be untruthful?

21   A.  No, I did not.

22   Q.  There were also some issues with Deputy Eric Buis and his

23   coming in late in June of 2014.  Was there ever anything about

24   that incident where you felt that Deputy Buis was being

25   untruthful with you?

Jennings - Cross by Bruch

1    A.   No, I did not.

2    Q.   Next there was an incident with Deputy Jeremy Crumly and

3    accepting inmate gifts.  And during that incident, do you

4    recall what prompted the investigation into Deputy Crumly?

5    A.   I believe somebody put a note, an anonymous note on one of

6    the sergeants' desk about him getting a jar of pickles or

7    something like that.  And that's -- I believe that's what

8    prompted it.

9    Q.   Who did the investigation into that anonymous complaint?

10   A.   I believe I did.

11   Q.   Okay.  And as part of your investigation, how many

12   employees in the corrections division did you reach out to to

13   get any information relating to this incident?

14   A.   All of them.

15   Q.   What did you do with all of them?  How did you reach out

16   to them?

17   A.   I talked to everyone in person and asked them what they --

18   what they knew about the incident.

19   Q.   Did you take this seriously?

20   A.   Yes, I did.

21   Q.   And what did you find out as part of your original

22   investigation?

23   A.   I found out that Deputy Crumly did accept a jar of pickles

24   from a work release in May.  They were not store-bought

25   pickles.  They were like canned, homemade.

1    I also found out that Deputy Crumly had -- there were

2  two times where somebody had left bags of -- a bag of soap by

3  his car.  At first he thought it was a deputy playing a joke

4  on him.  Second time he found out that it was the same work

5  release inmate that had given him the pickles.

6    And then I had found out that years prior he had

7  brought like a venison roast or venison stew into the jail for

8  the deputies.  And nobody wanted them, so he had decided that

9  he was going to let an inmate have the stew.

10  Q.  Did you have a problem with that?

11  A.  Yes, I did.

12  Q.  Why did you have a problem with that?

13  A.  Well, No. 1, venison is not a meat that a lot of people

14  eat.  I was afraid of any type of allergic reaction or the

15  inmate getting ill from it.

16    I also had an issue with -- and this is one of the

17  things I stand by is if you're going to do it for one inmate,

18  you do it for every inmate because we don't want other inmates

19  to think that there's favoritism or anything else like that

20  because the inmates could very easily complain.  That's why

21  it's my policy is if I'm going to do it for one, I am going to

22  do it for everyone, not just the select few.  So, but yeah, I

23  had a problem with that.

24  Q.  Did you discipline Deputy Crumly?

25  A.  Yes, I did.

Jennings - Cross by Bruch

1  Q.  And what was your recommendation for discipline for him?

2  A.  A five- to seven-day suspension without options.

3  Q.  What does that mean, "without options"?

4  A.  He can't use any vacation time or comp time that he has on

5  the books.  It is unpaid leave.  So that means that it's going

6  to affect his paycheck.

7           THE COURT:  How much longer do you have on direct

8  examination?

9           MS. BRUCH:  I would say probably about 15 minutes.

10          THE COURT:  All right.  Let's take our afternoon

11  break right now, but we're going to do it for about ten

12  minutes to try and get as much of this testimony in today as

13  we can.

14          Do any of you have questions at this point that you

15  would be submitting to this witness?  Because if you do, we'll

16  collect them and discuss them during your break.  I thought I

17  saw some pages being pulled off the notebook.  So if you do,

18  why don't you just leave them right there on the corner of the

19  bench, corner of the jury box, and we'll collect them, and

20  we'll talk about those during your break.  So about a

21  ten-minute break, and please don't discuss the case among

22  yourselves or with anyone else and keep an open mind.

23    (Jury exits.)

24          THE COURT:  All right.  You can leave the stand.

25  You're on direct examination.  You can speak to your

Jennings - Cross by Bruch

1045

1  attorneys.  And while you're there, why don't you hand me that

2  note.  Thank you very much.

3          THE WITNESS:  You're welcome.

4          THE COURT:  All right.  This is a question for the

5  witness.

6          MS. DORAN:  Should we close the door, Judge?

7          THE COURT:  Yeah, why don't you, if you could.  Thank

8  you.

9          All right.  The question reads:  "If you had inquired

10  directly to Deputy Brennan" -- and maybe we're getting to him

11  anyway.  That's my aside.  I'll start over.

12          "If you had inquired directly to Deputy Brennan if he

13  had asked an inmate for the pornographic letter, and if he had

14  answered affirmatively, could you let us know if that would

15  have altered your personal recommendation on his level of

16  discipline?"

17          And then the second question is:  "Would you have

18  considered termination if the answer to question No. 1 is

19  'yes'?"

20          Any objection by plaintiff?

21          MS. DORAN:  No.

22          MS. McLAUGHLIN:  Except that it's Levy, not Brennan.

23          THE COURT:  I know, but it's -- I'm not going to

24  sustain an objection to a juror question as leading.

25          Any objection other than the form by plaintiff?

1      MS. DORAN:  No.

2      THE COURT:  By defendants?

3      MS. BRUCH:  No.

4      THE COURT:  You can ask this if you want since it's

5  your examination now.

6      MS. BRUCH:  I will.

7      THE COURT:  You can take this and show this to

8  plaintiff's counsel.  And let's be back in eight minutes.

9    (Recess.)

10    (Jury enters.)

11      THE COURT:  Sorry for the abbreviated break, but we

12  have a fighting chance of completing all the testimony in the

13  case today which means we would be able to start closing

14  arguments tomorrow morning.

15      We'll certainly begin them, if not first thing in the

16  morning when we start, then after some short testimony.  There

17  will be a court security officer assigned to sit outside the

18  jury room when you have questions or things like that.  But

19  also he will take you down to the second floor for lunch.  If

20  you are deliberating over lunchtime, you will stay together.

21  He will take you down.  The government will buy you lunch,

22  although in every real sense, it's really out of your pocket

23  because we're all taxpayers.  The trickle-down you may not

24  notice, but your lunch will be paid for through the court

25  security officer.  So if you don't want to bring your lunch,

Jennings - Cross by Bruch

1047

1   you don't have to.  But if you prefer to bring it, you

2   certainly can.  But you will remain together after closing

3   arguments in the jury room, or to the second floor to pick up

4   some lunch and come back to the jury room to eat lunch

5   together.

6           So with that, you may continue your direct

7   examination.

8           MS. BRUCH:  Thank you, Your Honor.

9   BY MS. BRUCH:

10  Q.  Commander Jennings, I just want to wrap up the issue of

11  Deputy Crumly and ask you, did you ever find Deputy Crumly to

12  be untruthful during your investigation into his accepting

13  these inmate gifts?

14  A.  No, I didn't.

15  Q.  I now want to move on to Deputy Graham and his use of a

16  Taser.  Did you -- what was your involvement in that

17  investigation?

18  A.  I believe it's concurring or not concurring with the

19  recommended discipline by the sergeant.

20  Q.  So the sergeant did the investigation?

21  A.  Yes.

22  Q.  And when you reviewed the investigation that had been done

23  by the sergeant, did you find anything in Deputy Graham's memo

24  where he admitted that he displayed his Taser that was

25  untruthful?

Jennings - Cross by Bruch

1    A.  No, I did not.

2    Q.  Next I want to move on to Deputy Levy.  First there was an

3    incident that was addressed concerning an inmate allegation

4    regarding both Deputy Brennan and Deputy Levy in 2011.  You

5    recall that?

6    A.  Yes.

7    Q.  And there were some statements made I believe by

8    Ms. Warren about how Deputy Brennan had sex with an inmate at

9    that time.  Did you find any evidence of Deputy Brennan having

10   sex with an inmate in 2011?

11   A.  No, I did not.

12   Q.  Did you find any inmate to even make an allegation that

13   they personally had a sexual relationship with Deputy Brennan

14   in 2011?

15   A.  No, I did not.

16   Q.  What about Deputy Levy, what were the allegations

17   concerning Deputy Levy?

18   A.  The allegations with Deputy Levy were he -- the

19   allegations were that he asked for a letter, a provocative

20   letter, to be written to him by the inmate.  He wanted to see

21   her naked and bending over in front of him to wipe up coffee.

22   And if she didn't do anything, he was going to revoke her

23   laundry privileges.

24   Q.  Did Deputy Commander Gillespie have any involvement in

25   this investigation?

Jennings - Cross by Bruch

1049

1  A.  Yes, he did.

2  Q.  What did Deputy Commander Gillespie do as part of this

3  investigation?

4  A.  Deputy Commander Gillespie did all the charging notices

5  with Deputy Levy.  I believe he gathered the memos from the

6  deputies and the inmates that were involved.

7           And then he also went to the Illinois Department of

8  Corrections to speak to the one witness that the inmate had

9  said, this is my witness; she will verify everything that I've

10  said.  So he went to the Illinois Department of Corrections to

11  speak to her.

12  Q.  After Deputy Commander Gillespie completed his portion of

13  the investigation, did you review his reports?

14  A.  Yes, I reviewed his reports.

15  Q.  And in his reports, what evidence did he obtain concerning

16  the information he got from the deputy that was at the

17  Illinois Department of Corrections?

18  A.  The inmate?

19  Q.  I'm sorry.  The inmate, not the deputy.

20  A.  There was no -- nothing to corroborate anything that the

21  inmate said.  In fact, the inmate at the Illinois Department

22  of Corrections said that she never saw anything.  She had

23  heard Deputy Levy make some inappropriate comments or

24  unprofessional comments, I believe, but nothing inappropriate,

25  and that the females that we were housing from DeKalb County

1  who had originally started all the allegations, she said that

2  when they were housed at Boone County previously and they

3  didn't want to be there and they wanted to go back to DeKalb,

4  they had made a lot of allegations about the deputies there at

5  Boone County.  She wasn't sure what they had said, but she was

6  aware that these same inmates had also made allegations of

7  this type at another county.  And when DeKalb County sent

8  those inmates to Kendall County to house, they had done the

9  same thing trying to get back.

10  Q.  So this was with respect to the inmates who initially

11  brought sort of hearsay allegations concerning Deputies

12  Brennan and Levy?

13  A.  Yes.  Yes.

14  Q.  Now, as part of your investigation, did you also receive a

15  memo or reports from Deputy Jean Dunahoe?

16  A.  Yes, I did.

17  Q.  And what -- what was Deputy Jean Dunahoe's involvement in

18  this whole situation?

19  A.  Deputy Dunahoe was working on a day, and there was a

20  female inmate.  I believe it was the same inmate who had all

21  the allegations made against her from the other inmates, was

22  very upset, very depressed.  And what had come from that was

23  the inmate that had started all the allegations against the

24  inmate who the allegations were against got into an argument.

25  And the inmate that started all the allegations had told the

Jennings - Juror Questions by Bruch

1051

1  other inmate, yes, this is what I said, had made comment that

2  she said that she was -- not that inmate, but the one inmate

3  told the other inmate, yes, I told them that you're having

4  sexual relations with Levy, and Levy wouldn't have any sexual

5  relations with you because something about he didn't want to

6  see the spots, and that she's saying that to get this other

7  inmate into trouble and to get other deputies that she didn't

8  like fired.

9  Q.  So at the conclusion of this investigation when you

10  reviewed all of the reports, what were your conclusions and

11  findings?

12  A.  I didn't believe there -- there was nothing to corroborate

13  any sexual misconduct between -- with the deputies or the

14  inmates.

15         What I did find, though, is that Deputy Levy had made

16  inappropriate comments to an inmate, should have never been

17  made, and he was disciplined for that.

18  Q.  I want to ask you -- this is a question from one of the

19  jurors.

20                     JUROR QUESTIONS

21  BY MS. BRUCH:

22  Q.  And the question is, if you had inquired directly to

23  Deputy Brennan -- but I think this means Deputy Levy -- if he

24  had asked an inmate for the pornographic letter and if he had

25  answered affirmatively, could you let us know if that would

1   have altered your personal recommendation for his level of

2   discipline?

3   A.   I would have asked for more discipline.  I don't -- I

4   would not have asked for termination if he was honest with me

5   and said yes, he said it, I wouldn't have asked for

6   termination.  But I would have asked for more than a three-day

7   suspension.

8   Q.   Why wouldn't you have considered termination?

9   A.   One, he didn't lie.  And while it's very inappropriate and

10  something that I don't tolerate, he's not lying about it.  The

11  officers are covered under a union contract.  So one of the

12  things that we do look at is especially with terminations or

13  discipline that is more serious, like more than three days, we

14  also look at the possibility of the grievance procedure.  And

15  if I would have recommended termination, I don't believe that

16  with the grievance procedure in place and him being honest

17  about it, I don't believe that that would have been something

18  that would have gone forward.

19                  CROSS-EXAMINATION (Resumed)

20  BY MS. BRUCH:

21  Q.   So this is my question.  So just kind of playing devil's

22  advocate, so you had a situation where the inmate had claimed

23  that Deputy Levy had requested this provocative letter, and

24  Deputy Levy denied that.  So why wasn't he disciplined for

25  untruthfulness relating to that denial?

Jennings - Cross (Resumed) by Bruch

1053

1   A.   Can you repeat that?

2   Q.   Sure.  Absolutely.

3        So you had -- in the situation of the Deputy Levy

4   investigation, the inmate had claimed that Deputy Levy, after

5   he read the initial provocative letter that he admitted

6   reading, that he then solicited a second letter from her.  Do

7   you recall that allegation?

8   A.   Yes, that's what she said.

9   Q.   And then in Deputy Levy's response, he denied that he

10  solicited the letter, but he admitted that he read it after

11  she gave it to him.  Do you recall that testimony?

12  A.   Yeah, but I don't know if he solicited it or not.

13  Q.   That's the point.  While she's saying he solicited it,

14  he's denying it.  So were you ever able to conclusively

15  determine who was telling the truth on that?

16  A.   No, I was not.

17  Q.   Did you ever make a determination that the inmate in this

18  particular situation back in 2011 was telling the truth and

19  Deputy Levy was not?

20  A.   No.

21  Q.   Now back -- now fast forward to 2014, and you have another

22  situation where Deputy Levy is being accused of inappropriate

23  conduct with female inmates, correct?

24  A.   Yes.

25  Q.   And now, at that point, reflecting back on the situation

1    that happened in 2011, what were you able to conclude or what

2    did you conclude?

3    A.   With the later incident that happened, one of the things

4    that did come up that it took me back to 2011 was the inmates

5    back in 2011 and in 2014, there was mention about nobody is

6    going to believe them.  When I heard that again and the later

7    incident about nobody is going to believe you, you're an

8    inmate, that, kind of like, wait a minute here.  I've heard

9    this before.

10           During that entire investigation, what the outcome

11   was was I could not prove that Deputy Levy had sexual

12   relations with an inmate.  No matter what stone I turned over,

13   what was done, we could not prove it.  I believe he may have

14   harassed the inmates.  I know he had in the past.  But I

15   couldn't prove it.

16           What I could prove is that he lied to

17   Detective Jasnosz in a criminal investigation.  He was

18   heard -- because they had even gone to the point of doing

19   overhears.  He knew he got a letter put on his car.  He didn't

20   know who it was from.  Another deputy told him who it was from

21   and told him to report it.  He never reported it in.

22   Q.   Let me just stop you real quick.  Just so we're clear,

23   this is in 2014, correct?

24   A.   2014, yes.

25   Q.   I'm sorry.  Go ahead.

1  A.  So he got another letter.  Another deputy said, this is

2  who wrote this letter; you need to report it.  He never did

3  report it to anybody.

4          He had talked to this inmate on the phone.  He had

5  given out his personal cell phone number to this inmate.

6  There were overhears.  And while nothing was ever said about

7  having a sexual relationship, I had come to the conclusion

8  that yes, it could -- it could very well have happened and be

9  implied.  But I couldn't -- I could not prove that.  But I

10  could prove everything else.  I could prove the lies.  I could

11  prove the violations of the PREA policy and everything else.

12  So, yes, I recommended termination for him.

13  Q.  Now, the last employee I want to bring up is

14  Deputy Michael Dean.  And there was an incident in February

15  2014 where Deputy Dean was disciplined.  Do you recall that

16  incident?

17  A.  He was disciplined a couple of times.

18  Q.  This is for the incident where he was given a one-day

19  suspension about his pat-down search.

20  A.  Yes.

21  Q.  And tell me, first of all, who did the investigation into

22  that incident?

23  A.  Sergeant Jeanne Russo.

24  Q.  And after Sergeant Jeanne Russo completed her

25  investigation, what was her recommendation to you?

1   A.   I think she recommended an oral reprimand, a verbal,

2   verbal reprimand.  I believe that's what she had recommended.

3   Q.   Did you concur with her recommendation?

4   A.   No, I did not.

5   Q.   And why not?

6   A.   Because I believed that he was untruthful to her.  I

7   believe he should have known the policy on the pat search.  It

8   was recently new because we were trying to become PREA

9   compliant.  And I believed that a written reprimand as opposed

10  to a verbal reprimand was appropriate.

11  Q.   And I think actually you gave him a one-day suspension,

12  just to refresh your --

13  A.   Did I?  I'm sorry.

14  Q.   I could show you the document.

15  A.   Then, yes, I believe a one-day suspension was appropriate

16  for that.

17          THE COURT:  All right.  We got another acronym,

18  "PREA."  Why don't you explain, ask the witness to explain

19  what that is.

20          THE WITNESS:  Okay.  PREA is a federal law that was

21  passed awhile back.  It stands for the Prison Rape Elimination

22  Act.  And all detention facilities, halfway houses, juvenile

23  facilities, are to comply with certain aspects with this act,

24  and it's used to help eliminate rape in prison.

25  BY MS. BRUCH:

1    Q.  And how did that relate to the situation with Deputy Dean
2    and the pat-down search?
3    A.  One of the parts of PREA is that people are not to pat
4    search members of the opposite sex, where we used to -- I used
5    to be able to go and pat search any male inmate at any time.
6    Males used to be able to pat search female inmates using the
7    back of their hands and everything.  When this changed and we
8    were going through the PREA compliance, we had to change that
9    so that females do the pat searches of females, and males do
10   pat searches of males.
11   Q.  Are there exceptions to that rule?
12   A.  There are exceptions, but they have to be extenuating
13   circumstances.
14   Q.  Okay.  So initially was it your understanding that
15   Deputy Dean was untruthful?
16   A.  Initially, yes.  He wasn't untruthful to the sergeant, but
17   then he had said that yes, he did not do the pat search.
18   Q.  So ultimately he told the truth?
19   A.  Yes, he did tell the truth.
20   Q.  Commander Jennings, did Ms. Warren's gender, the fact that
21   she's a woman, play any role in your recommendation to
22   terminate her employment?
23   A.  Absolutely not.
24   Q.  Were you motivated in any way to recommend Ms. Warren's
25   termination based on her gender?

1  A.  No.

2  Q.  If a male employee had engaged in the same type of conduct

3  as Ms. Warren, what would your recommendation have been?

4  A.  I would have recommended termination.

5          MS. BRUCH:  Nothing further.

6          THE COURT:  All right.  Any additional

7  cross-examination?

8     (Counsel conferring.)

9          THE COURT:  You may proceed.

10          MS. McLAUGHLIN:  Sorry.  Yes.  Okay.

11                   REDIRECT EXAMINATION

12  BY MS. McLAUGHLIN:

13  Q.  So, Commander Jennings, you talked about PREA.  Do you

14  know when that act was passed?

15  A.  No, ma'am, not off the top of my head, no.

16  Q.  It was actually passed in 2003.

17  A.  Okay.

18  Q.  Are you aware of that?

19          And as a -- somebody who runs a jail and there's a

20  state law that covers a -- an issue such as rape elimination,

21  right?

22  A.  Yes.

23  Q.  You became aware of that law sometime long before the

24  policy, the official policy came into effect at the KCSO,

25  didn't you?

1   A.   No.   PREA was enacted in 2003, but PREA did not have all

2   of the guidelines enacted until much later.

3   Q.   Okay.

4   A.   We've just gone through our second PREA audit, and an

5   audit takes place every three years.  So when we got all of

6   the -- the requirements of PREA and everything else, that was

7   when we had started to make changes with policies and

8   procedures and everything so that we could become compliant

9   and change recordkeeping for that.

10  Q.   Okay.  So your KCSO policy came into effect sometime in

11  2013, correct?

12  A.   I have to see the policy to know that.  It's possible.

13  But I can't tell you the exact year that the PREA policies

14  came into effect.

15  Q.   Okay.

16  A.   There were numerous policies.

17  Q.   But isn't it a fact that even though you didn't -- to

18  become PREA compliant, you had to have actually a written

19  guideline, correct?

20  A.   Yes.

21          MS. BRUCH:   Objection.  This is beyond the scope of

22  cross-examination.

23          THE COURT:   Well, I probably started it by asking

24  what "PREA" meant.  So I'll let the question and answer go

25  ahead, but I assume you don't have many more questions on

1     this.

2                  MS. McLAUGHLIN:  Just -- yes.

3     BY MS. McLAUGHLIN:

4     Q.  When --

5                  MS. McLAUGHLIN:  What was my last question?  I'm

6     sorry.

7                  THE WITNESS:  If we had to have written guidelines

8     about PREA.

9     BY MS. McLAUGHLIN:

10    Q.  Right.

11    A.  Yes, we do have policies and procedures on PREA.  Yes.

12    Q.  But, in effect, you were operating under -- on written

13    guidelines that basically, when there's a female officer on

14    duty, the female officer should be patting down the female

15    inmates, correct?

16    A.  No, those aren't written guidelines because even if a

17    female officer was on duty doesn't mean that they necessarily

18    did all the female pat searches.  Females pat searched males,

19    and males pat searched females.

20    Q.  So if you believed Carrie Warren, and that's what you

21    testified to during your direct examination, that on

22    January 14th there was nothing she said that you didn't

23    believe, if you believed her, why were you putting her through

24    a formal interrogation?

25    A.  As I had testified earlier, there was a judiciary that was

1   involved that I believed her to be untruthful to.  There was

2   also a couple of other members of the Sheriff's Office staff

3   that she had been untruthful to.  I did the formal

4   interrogation so that I could get her answers on record,

5   recommend any appropriate discipline, and show that yes, we

6   knew there was a problem.  We knew there was an issue and that

7   it had been taken care of appropriately.  And that's why.

8   Plus I was still waiting to get a screenshot or copies of her

9   records so that I could close everything up.

10  Q.  So you said at the -- your impression at the end of the

11  formal interrogation was that she had changed some of her

12  answers, and that's why you went to Koster and said, she lied

13  to me --

14  A.  Yes.

15  Q.  -- right?

16  A.  That is correct.

17  Q.  Didn't you, in fact, have a conversation with Koster about

18  her lies prior to the formal interrogation?

19  A.  No, ma'am, because what she had said to me on January 14th

20  I believed.  I knew that -- I had questions about seeing the

21  signs about the cell phones, and, you know, there were

22  questions.  She told the judge one thing and told me another.

23  But, no, I did not go to commander -- or Chief Deputy Koster

24  at any time before the formal about any untruthfulness or

25  lies.  I came to that conclusion after the formal.

Jennings - Redirect by McLaughlin

1062

1  Q.  Okay.  And Chief Koster wasn't surprised at your

2  exclamation that, oh, she lied to me, was she -- was he?

3  A.  I don't know what Chief Koster thought.  He just sat there

4  and looked at me, and I turned around, and I walked away.  I

5  went back down to my office.  He didn't say anything to me or

6  do anything that would make anyone believe I knew it.  He

7  didn't do nothing.  He sat there, and he just looked at me.

8  And --

9  Q.  Okay.

10  A.  -- I left.

11  Q.  So one of the things that you think she lied about in her

12  formal interrogation was the fact that during the formal --

13  I'm sorry.  One of the things that you thought that she lied

14  about was that when she talked about getting the phone call on

15  January 14th, you asked who called.  She says, I don't know.

16  You say, can you find out?  She says, sure, I'll look at my

17  phone records.  She never mentioned to you that she got the

18  call going through the drive-thru at McDonald's at the

19  January 14th meeting?

20  A.  I don't know if she said that or not.  I just know that

21  she said she got a phone call from somebody that was at the

22  courthouse telling her she didn't need to come back to the

23  courthouse.

24  Q.  That is not noted in your January 14 -- your original

25  internal report, that she said it was because she came through

Jennings - Redirect by McLaughlin

1  the McDonald's drive-thru, right?

2  A.  Probably not.  I don't recall if she told me that.

3  Q.  Okay.

4  A.  And that wouldn't have made a difference if she was at

5  McDonald's drive-thru or if she was in her living room.

6  Q.  But my question, ma'am, is after the -- so she further

7  explains things at the formal interrogation, and she says,

8  yes, I got this call while I was going through the drive-thru

9  at McDonald's.  And you came to the conclusion that that was a

10  change in her story, didn't you?

11  A.  No.

12  Q.  Okay.  Did Chief Koster come to that conclusion?

13  A.  I don't know what Chief Koster came to.  I don't know what

14  his conclusion was.  You would have to ask him.

15  Q.  Adding that additional detail at the formal

16  interrogation -- scratch that.  We'll move on.

17         Was Joe Jasnosz grandfathered in -- grandfathered in

18  with respect to the union residency restriction, to your

19  knowledge?

20  A.  I don't know.  I don't know who it was.  I know

21  Sergeant Roseth was, but I'm not sure who the other people

22  were, if there was more than that.  But I do know that

23  Sergeant Roseth was, and he's a patrol sergeant.  He's not in

24  corrections.

25  Q.  On your direct exam, Ms. Bruch said that Levy had denied

1    that he asked the inmate, the female inmate, for the

2    pornographic letter, but that's not, in fact, the case, is it?

3    He never denied that because you never asked the question of

4    him, correct?

5    A.   If he asked for a letter?

6    Q.   Yeah.

7    A.   No, I don't recall if I asked him if he had asked for a

8    letter or not.  That was I believe my previous testimony.  I

9    don't recall if I had asked him or not.

10            MS. McLAUGHLIN:  I have nothing further.

11            THE COURT:  Any additional questions?

12            MS. BRUCH:  No, Your Honor.

13            THE COURT:  Are there any questions of the jury of

14   the witness.

15            Would you mind having your extern collect the

16   question and bringing it over to the side?

17            I hope you're getting paid as much as my externs are.

18            If you would bring it over to the front right up

19   here.  Thank you.

20            I'll see the attorneys at sidebar.

21     (Sidebar.)

22            THE COURT:  The question is:  "Does the union

23   contract dictate or recommend the level of discipline for

24   different violations?"

25            Does anybody know the answer to that?

1    MS. BRUCH:  I don't have the slightest idea.

2    MS. McLAUGHLIN:  That the complaint and investigation

3  process has some reference to it, but we'll have to ask the

4  witness.

5    THE COURT:  Okay.  Any objection by plaintiff?

6    MS. McLAUGHLIN:  No.

7    THE COURT:  By defense?

8    MS. BRUCH:  No.

9    THE COURT:  Okay.  I don't care who asks it.

10    MS. BRUCH:  I'll ask it.

11    THE COURT:  If you want to ask it, go ahead.

12    MS. BRUCH:  Sure.

13  (End of sidebar.)

14    THE COURT:  All right.  You may proceed.

15    MS. BRUCH:  Thank you.

16                  JUROR QUESTIONS

17  BY MS. BRUCH:

18  Q.  Commander Jennings, does the union contract dictate or

19  recommend the level of discipline for different violations?

20  A.  No, it does not.  There's -- there's discipline that's

21  listed in there, anywhere from counseling, to suspension, to

22  termination.  But it doesn't dictate what kind of discipline

23  you're going to recommend for any individual instance or

24  incident, I should say.

25    THE COURT:  All right.  Are there any additional

1     follow-up questions the attorneys have based on that question?

2           MS. BRUCH: No, Your Honor.

3           THE COURT: Ms. McLaughlin?

4           MS. McLAUGHLIN: No.

5           THE COURT: All right.

6           Any additional questions by the jury based on that

7     last interchange?

8           All right. With that, the witness is excused.

9           Thank you.

10          THE WITNESS: Thank you.

11          THE COURT: Plaintiffs may call their next witness.

12          MS. McLAUGHLIN: Plaintiffs rest at this point

13     subject to document review.

14          THE COURT: All right.

15          MS. McLAUGHLIN: And I do anticipate calling Carrie

16     as a rebuttal witness, but after the defendants' case.

17          THE COURT: Let's see what the defense case is for

18     you to call a rebuttal witness. But the plaintiff has rested

19     her case.

20          Defense may call their first witness, or next witness

21     because you've had witnesses through the direct examination of

22     some of the defendants.

23          So who is your next witness?

24          MS. ANDERSON: Tracy Page.

25          THE COURT: All right.

1   Right up here, ma'am.

2   Please raise your right hand.

3   (Witness sworn.)

4   TRACY ANN PAGE, DEFENDANTS' WITNESS, DULY SWORN,

5   DIRECT EXAMINATION

6   BY MS. ANDERSON:

7   Q.  Good afternoon.  Could you please state your full name for

8   the record.

9   A.  Tracy Ann Page.

10  Q.  Could you spell your last name?

11  A.  P-a-g-e.

12  Q.  Ms. Page, where do you work?

13  A.  The Kendall County Sheriff's Office.

14  Q.  And how long have you been employed by the Kendall County

15  Sheriff's Office?

16  A.  Approximately ten and a half years.

17  Q.  What is your position at the Kendall County Sheriff's

18  Office?

19  A.  I am the executive assistant to the sheriff, and I also

20  deal with human resources, accounts payable and receivable.

21  Q.  Did you have that same position in January 2014?

22  A.  Yes.

23  Q.  In that position, did you have occasion to interact with

24  deputies?

25  A.  Yes.

Page - Direct by Anderson

1068

1  Q.  Would you see them in the lunchroom or the break room?

2  A.  Yes.

3  Q.  Okay.  What about deputies from the jail, did you have any

4  occasion to interact with deputies from the jail?

5  A.  Yes.

6  Q.  Did you ever have a conversation with the deputy who was

7  using the vending machine?

8  A.  Yes.

9  Q.  And who was that deputy?

10 A.  For this particular case, it was deputy -- Ms. Carrie

11 Warren.

12 Q.  And how do you know Ms. Carrie Warren?

13 A.  She was a deputy in the jail for the Kendall County

14 Sheriff's Office.

15 Q.  So I want to ask you about a conversation you had with

16 Ms. Warren on January 6, 2014.  Could you tell us what

17 happened regarding that conversation?

18 A.  I was eating lunch in the break room.  Ms. Warren came to

19 the vending machines.  It was an unusual time to see her

20 there.  I said, "Hi, how are you doing?"  And she explained

21 that she had jury duty that day.

22 Q.  And why was it unusual to see her there?

23 A.  It wasn't her normal working hours.

24 Q.  And do you know what her normal working hours are?

25 A.  It was either --

1  Q.  Or were?

2  A.  It was either second or third shift.  I don't recall

3  exactly what shift it was.

4  Q.  And were you alone in the break room when you were having

5  this conversation with Ms. Warren?

6  A.  No, I was eating lunch with two other people.

7  Q.  And who were the other people?

8  A.  Lisa Bowen and Chief Deputy Scott Koster.

9  Q.  And did you prepare a memo regarding this conversation?

10 A.  Yes, I did.

11 Q.  Okay.  I'm going to show you the memo.  It is Joint

12 Exhibit 3 which has already been admitted.  And this Joint

13 Exhibit 3 is quite large.  So this is Bates number 179 in the

14 lower right-hand corner.

15       Do you recognize this document?

16 A.  Yes.

17 Q.  Is this the memo you prepared regarding your conversation?

18 A.  Yes.

19 Q.  And why did you prepare the memo?

20 A.  I was asked to prepare the memo.

21 Q.  And who asked you to prepare the memo?

22 A.  That I do not know.

23 Q.  Do you remember if the person who asked you to prepare it

24 told you why you needed to prepare it?

25 A.  Not why, no.

1  Q.  Did the person who asked you to prepare it tell you what

2  to write in the memo?

3  A.  They told me what the subject matter should contain.

4  Q.  And what was the subject matter you were supposed to write

5  about?

6  A.  My conversation with Ms. Warren in the lunchroom vending

7  machine area.

8  Q.  Did the person who asked you to write the memo give you

9  any other help in composing this memo?

10  A.  No.

11  Q.  So on Monday, January 6th, you were sitting in the break

12  room having lunch between 12:30 and 1:00.  Is that what you

13  remember?

14  A.  Yes.

15  Q.  It says "the second break room."  What is the second break

16  room?

17  A.  There's actually two break rooms.  It should -- there's a

18  second floor break room with the vending machines, but there's

19  also a first floor break room within the jail, but it doesn't

20  have vending machines.  It's just a room with a table,

21  refrigerator, microwave.

22  Q.  Okay.  And midway through, it says, "Deputy Warren stated

23  that she had jury duty today, and the courts released the

24  jurors for lunch.  And then they had to go back, and once she

25  got back, they released her."  Let me see if I can -- right

1   about there.

2   A.   Okay.

3   Q.   And you remember her telling you that?

4   A.   Yes, I do.

5   Q.   What was your understanding about Ms. Warren's role in

6   whether or not she went back to the courthouse to be released?

7   A.   I took it that she was released for lunch, and then she

8   had to go back to the courthouse to report back for jury duty.

9   Q.   So that she was one of the jurors that had to go back?

10  A.   Yes.

11  Q.   Do you recall her telling you luckily she got out, but

12  other jurors had to go back?

13  A.   No, I do not recall that.

14  Q.   Okay.  The last sentence was, "I replied something to the

15  effect of, 'That stinks.  Too bad they couldn't release you

16  before lunch so that you didn't have to waste your time going

17  back.'"

18          Is there any reason you put that in quotes?

19  A.   Because that's what I said, and that's how I talk.

20  Q.   Okay.  But that's what you said to her and not what she

21  said?

22  A.   I said that stinks, too bad.

23  Q.   And is that your signature on the bottom of the page?

24  A.   Yes, it is.

25  Q.   Do you remember anything else from your conversation with

1    Ms. Warren in the lunchroom that day?

2    A.   No.  Our conversation was short.

3    Q.   Did you include everything you remembered about your

4    conversation with Ms. Warren in the memo to

5    Commander Jennings?

6    A.   Yes.

7    Q.   Did you know at the time you wrote this memo whether

8    Lisa Bowen was asked to prepare a memo?

9    A.   I know that Lisa was also asked, yes.

10   Q.   Did you discuss your memo with Ms. Bowen?

11   A.   After it was written, no, or even during writing, no.

12   Q.   Okay.  Did you discuss the memo with anyone else at the

13   time?

14   A.   Probably just when I handed it to Commander Jennings, I

15   said, here's my memo.

16   Q.   Did you review the memo before you signed it?

17   A.   Yes.

18   Q.   And are the statements contained in the memo truthful?

19   A.   Yes.

20        MS. ANDERSON:  No further questions.

21        THE COURT:  Any cross-examination?

22        MS. McLAUGHLIN:  No, Your Honor.

23        THE COURT:  All right.

24        Any questions by the jury of this witness?

25        All right.  I see no hands.

 1          Ma'am, you're excused.  Thank you.

 2          THE WITNESS:  Thank you.

 3          THE COURT:  All right.  Defense may call their next

 4  witness.

 5          MS. ANDERSON:  We're calling Lisa Bowen.

 6          THE COURT:  Right up here, ma'am.

 7          And please raise your right hand.

 8    (Witness sworn.)

 9          THE COURT:  Have a seat.

10          And you may begin.

11          LISA BOWEN, DEFENDANTS' WITNESS, DULY SWORN,

12                      DIRECT EXAMINATION

13  BY MS. ANDERSON:

14  Q.  Good afternoon, Ms. Bowen.  Could you please state your

15  full name for the record and spell your last name.

16  A.  Lisa Bowen, B-o-w-e-n.

17  Q.  And, Ms. Bowen, where do you work?

18  A.  The Kendall County Sheriff's Office.

19  Q.  How long have you been employed with the Kendall County

20  Sheriff's Office?

21  A.  Almost ten years.

22  Q.  What is your position there?

23  A.  The records division manager.

24  Q.  Is that the same position you had in 2014?

25  A.  No, it isn't.

Bowen - Direct by Anderson

1  Q.  What position did you have in 2014?

2  A.  I was the administrative manager.

3  Q.  I'm sorry.  The?

4  A.  The administrative manager.

5  Q.  Administrative manager.  In that position, did you have

6  occasion to interact with any of the deputies?

7  A.  Yes.

8  Q.  Would you see them in the lunchroom --

9  A.  Yes.

10  Q.  -- or the break room?  Is the lunchroom and the break

11  room, are those two separate things?

12  A.  It's the same room.

13  Q.  It's the same place.

14      What about deputies from the jail, did you have

15  occasion to see corrections deputies in the break room?

16  A.  Sometimes.

17  Q.  Did you ever see them having lunch there?

18  A.  No.

19  Q.  Do you recall having a conversation with a deputy who was

20  using the vending machine?

21  A.  Yes.

22  Q.  And what was that conversation?

23  A.  It was a conversation about jury duty and why that deputy

24  was actually upstairs.

25  Q.  And who was that deputy?

1   A.   Deputy Warren.

2   Q.   And could you tell us a bit more about the conversation?

3   A.   We were having lunch, and she came into the break room,

4   and it seemed odd to see her there at that time of day.  And

5   so we had asked what she was doing there, and she said that

6   she had been across the street for jury duty and that they had

7   been released for lunch, and that they had then gone back

8   after lunch and then been released for the day.  And we were

9   talking about how that was odd they would do that.

10  Q.   And who else were you -- were you talking to?  You said

11  "we were talking about this."

12  A.   Tracy Page and Chief Koster.

13  Q.   Okay.  Why did you think it was odd to see Ms. Warren in

14  the break room?

15  A.   Because we usually don't see corrections deputies

16  upstairs.  It's very rare.

17  Q.   Did you prepare an e-mail memo regarding this conversation

18  you had?

19  A.   Yes, I did.

20  Q.   I'm going to show you the e-mail.  It's again part of

21  Joint Exhibit 3.  This page is marked with 180 in the lower

22  right-hand corner.

23         Do you recognize this document, Ms. Bowen?

24  A.   I do.

25  Q.   This is the e-mail that you prepared regarding your

1    conversation?

2    A.  Yes.

3    Q.  And why did you prepare this e-mail?

4    A.  I was asked to prepare it.

5    Q.  Do you remember who asked you to prepare it?

6    A.  I believe it was Chief Koster.

7    Q.  Okay.  And did Chief Koster tell you why you needed to

8    prepare this memo?

9    A.  No, he didn't.

10   Q.  Did Chief Koster tell you what to write in this e-mail

11   memo?

12   A.  Not specifically.  He just said he wanted a memo as to

13   what our conversation was.

14   Q.  Did he help you in any way compose this e-mail memo?

15   A.  No, he did not.

16   Q.  So let's take a quick look at the e-mail.

17        On January 6, 2014 at approximately 12:30 p.m., you

18   were sitting in the upstairs break room having lunch with

19   Tracy Page and Chief Koster; is that correct?

20   A.  Yes.

21   Q.  Okay.  "Deputy Warren came in off the elevator and bought

22   something from the vending machines."  You recall that?

23   A.  Yes.

24   Q.  "She explained" -- I'm sorry -- "She stated that she had

25   been at the courthouse for jury duty."  Then, "She complained

1   that they kept the potential jurors all morning, had them go

2   to lunch and made them come back after lunch only to dismiss

3   them at that time."

4           You recall her saying that to you?

5   A.  Yes.

6   Q.  What was your understanding of what Ms. Warren's role was

7   regarding this particular jury duty?

8   A.  That she was one of the potential jurors.

9   Q.  Was she one of the potential jurors that had to go back to

10  the courthouse after lunch only to be dismissed?

11  A.  Yes.

12  Q.  Do you recall Ms. Warren telling you that she was lucky

13  she got out but other jurors had to go back?

14  A.  No.

15  Q.  Okay.  Then you state, "I recall this conversation because

16  I remember thinking it was kind of pointless to have them come

17  back after lunch only to let them go."

18          Did you state that?

19  A.  At the time, yes.

20  Q.  Is that your signature block at the bottom of the e-mail?

21  A.  Yes, it is.

22  Q.  Do you remember anything else from the conversation you

23  had that day in the break room?

24  A.  No.

25  Q.  Did you include everything about that conversation from

1  what you remember in this e-mail memo?

2  A.  Yes.

3  Q.  Did you know at the time you wrote this e-mail memo that

4  Tracy Page had also been asked to prepare a memo?

5  A.  No, I did not.

6  Q.  Did you discuss your memo with her at the time you wrote

7  it?

8  A.  No, I did not.

9  Q.  Did you discuss your memo with anyone else at the time you

10 wrote it?

11 A.  No, I did not.

12 Q.  Did you review the e-mail memo before you sent it?

13 A.  Yes.

14 Q.  And did you, in fact, send it?

15 A.  Yes.

16 Q.  Now, are the statements contained in this e-mail truthful?

17 A.  Yes, they are.

18          MS. ANDERSON:  I have no further questions.

19          THE COURT:  Any cross-examination?

20          MS. McLAUGHLIN:  No, Your Honor.

21          THE COURT:  All right.

22          Any questions of the jury of this witness?

23          I see no hands.

24          The witness is excused.  Thank you.

25          THE WITNESS:  Thank you.

1    THE COURT:  All right.

2    Defense should call its next witness.

3    MS. BRUCH:  Defendants call Deputy Deon Little.

4    THE COURT:  All right.

5    MS. McLAUGHLIN:  Your Honor, may I have a moment to

6  speak with counsel?

7    THE COURT:  Sure.

8    (Counsel conferring.)

9    THE COURT:  Deputy Little, come on up, please.

10    MS. McLAUGHLIN:  I would like a sidebar.

11    THE COURT:  Okay.

12    You could have a seat.

13    MR. LITTLE:  Thank you.

14    THE COURT:  Go ahead.

15    (Sidebar.)

16    MS. McLAUGHLIN:  Your Honor, Deon Little was

17  subpoenaed by myself.

18    THE COURT:  Yes.

19    MS. McLAUGHLIN:  I contacted -- we had no contact

20  with him.  We tried, but he did not call us.  I contacted --

21  or we informed Ms. Bruch this morning that we would not be

22  calling him.  He is not on their "may call" list or "will

23  call" list.  And so I object to this witness being called.

24    THE COURT:  Response?

25    MS. BRUCH:  They subpoenaed him.  They told him that

1    he needed to be here today.  He's here.  I'll call him then.

2    If they're not going to call him, I will.  He's listed on the

3    witness list.

4              THE COURT:  Whose witness list?

5              MS. BRUCH:  On their witness list.

6              THE COURT:  All right.  Well, I think each side

7    typically reserves the right to call any witness on the other

8    side's witness list.  I've seen that on every witness list

9    I've ever seen.  I don't know if you did it in this case, but

10   if they reserve the right to call witnesses that are on the

11   other side, then they're entitled to call him.

12             Do you know if it's on your list.

13             MS. DORAN:  It wasn't.

14             MS. BRUCH:  I have no idea whether I did it or not.

15             THE COURT:  Okay.  One person at a time.

16             Go ahead.

17             MS. BRUCH:  But I know certainly the issue came up in

18   the first trial where they had done the same thing.  They

19   subpoenaed Sergeant Flowers.  He showed up, and Your Honor

20   told us we could call him.  And then ultimately plaintiff

21   decided that they would call him, but that was what happened

22   in the first trial.

23             THE COURT:  Was he deposed?

24             MS. BRUCH:  Flowers?

25             THE COURT:  No, Little.

1       MS. BRUCH:  Flowers wasn't, and Little wasn't.

2       THE COURT:  Right.  What are you going to ask him?

3       MS. BRUCH:  I'm going to ask him about -- to

4   substantiate Ms. Warren's statements about meeting at her

5   house and when that happened and what happened.

6       THE COURT:  Meeting at her house?

7       MS. BRUCH:  They had a meeting at her home to discuss

8   defense of this situation and what was done.

9       THE COURT:  She brought that up.  Okay.

10      Go ahead.

11      MS. DORAN:  They're not -- they did not reserve

12  calling any other witnesses that weren't on their list.

13      THE COURT:  All right.  Well, if you didn't put him

14  on your witness list, I know they subpoenaed him.  But if they

15  withdraw him as a witness and you didn't put him on a witness

16  list, I'm not going to allow him to testify.

17      MS. BRUCH:  I would suggest that I could call him as

18  a rebuttal witness.

19      THE COURT:  Well, what's he going to say that's

20  different than what Ms. Warren said?

21      MS. BRUCH:  He's going to say that when he went to

22  their house that they did review the documents.  And at that

23  time, he showed -- she showed him the unredacted phone

24  records.

25      THE COURT:  Okay.

1082

1    MS. McLAUGHLIN:  And -- okay.

2    MS. BRUCH:  So that's rebuttal to her case.

3    MS. McLAUGHLIN:  And -- well, so they're allowed to

4    call Deon Little, and we're not allowed to call Stomper as a

5    rebuttal witness?  I mean, I --

6    THE COURT:  I didn't rule on Stomper.  I don't

7    believe I ruled on him.

8    MS. McLAUGHLIN:  I believe you did.

9    THE COURT:  Well, what does defense recall?  I didn't

10   know that I gave a final ruling on Stomper.

11   MS. BRUCH:  I believe you said that Stomper could

12   not -- could address one particular area but not that they

13   couldn't call him.  They could call him.  It was just on one

14   particular topic.

15   THE COURT:  Well --

16   MS. McLAUGHLIN:  That was Ms. Bruch's whole argument,

17   that we shouldn't be allowed to call him at all.

18   THE COURT:  All right.  I simply without reviewing

19   the transcript can't -- and if you don't agree on what I said

20   about Stomper, then I'm going to have to go back to the

21   transcript and read it if you want any kind of a definitive

22   ruling.

23   MS. BRUCH:  If Your Honor would give me a moment, I

24   can just check my notes to see if we do agree with Your Honor

25   or not.

1    THE COURT:  Are you going to call Stomper?  If I give

2  you the opportunity, would you call him?

3    MS. McLAUGHLIN:  Not until tomorrow obviously.

4    THE COURT:  No, I understand that.

5    MS. McLAUGHLIN:  I don't know.  I would want to

6  reserve the right to do so.

7    THE COURT:  All right.  I'll let them call Little

8  here.  And if you want to call Stomper tomorrow to deal with

9  issues that Little raises, I'll allow you to do it if he wants

10  to come in tomorrow.  It doesn't open up the whole world, but

11  it's -- in fairness, you ought to be able to -- if he's got

12  something different to say than what -- he, being Stomper --

13  something different to say than what Little says, you can call

14  Stomper tomorrow.  And you're going to call your client in

15  rebuttal anyway tomorrow.

16    MS. McLAUGHLIN:  I have another argument to be made

17  that I would like to put on record, and that is that we had

18  asked for the opportunity, as you ruled in the prior trial,

19  that, you know, witnesses that had not been deposed or

20  interviewed that they be given that opportunity.  We asked for

21  the opportunity to depose Little, and you denied it.  That's

22  one of the reasons why we're withdrawing him as a witness

23  because we did not know what he was going to be saying.  And,

24  you know, now we're being blindsided by him being called as a

25  witness without the opportunity to depose him.

1    THE COURT:  Well, as I recall, that was the

2  opportunity, is if they were going to call someone, "they"

3  being the opponents were going to call someone you didn't know

4  about and didn't have the opportunity to depose, you would get

5  a chance to interview that person.  You're the one that

6  subpoenaed him and then withdrew it.  There's no obligation

7  for him to sit down and talk to you when you're calling him as

8  a witness.  Most people won't.

9    MS. McLAUGHLIN:  Well, I would have subpoenaed him

10  for a deposition, but Your Honor said we couldn't do that.

11    THE COURT:  Well, you could have deposed him a lot

12  earlier.  But the rule about taking someone's deposition was

13  to prevent surprise at a trial the week before trial which I'm

14  more liberal than most judges because I had it done to me when

15  I was practicing.  So I allow people opportunities at the last

16  minute to interview or take depositions of people before trial

17  when -- and sometimes even during trial.  But as the last

18  witness in a case, you subpoenaed him, and he's been sitting

19  here -- when did you withdraw the subpoena?

20    MS. DORAN:  We withdrew it this morning about 9:00.

21    THE COURT:  Okay.  All right.  I wish someone would

22  have raised this with me earlier.

23    MS. DORAN:  We didn't know that they were going to

24  call him.

25    MS. McLAUGHLIN:  We had no idea they intended to --

1    THE COURT:  Could Little be here tomorrow?

2    MS. BRUCH:  I can have -- I mean, I'm sure we could

3    have him be here tomorrow if you need him to.

4    THE COURT:  It's 4:21.  I don't know that we'll

5    finish him by 4:30.

6    MS. BRUCH:  Yeah.

7    THE COURT:  So I would rather discuss this in an

8    orderly way.

9    Other than Little, are you re-calling Koster?

10   MS. BRUCH:  Yes, we're re-calling Koster quickly, but

11   that's it.

12   THE COURT:  All right.

13   And then you're calling your client?

14   MS. McLAUGHLIN:  I'll have to now for sure.  Yes.

15   THE COURT:  Okay.  All right.  So I'm going to let

16   the jury go now.  I'm going to tell them -- unless you want

17   to -- what's Koster going to talk about?

18   MS. BRUCH:  Very brief issues.  And then he's going

19   to go over his recommendations in his grievance letter, what

20   his thought process was.

21   THE COURT:  All right.

22   MS. BRUCH:  And then that's it.

23   THE COURT:  I'm going to let them go now, tell them

24   we're going to start at 9:15 tomorrow.  We're going to have

25   some brief testimony from a couple of witnesses, and I'm going

1  to tell them we're going to try to work out any agreements to

2  limit the testimony so that it's brief.  And then you can

3  begin closing arguments tomorrow morning, probably midmorning

4  instead of first thing in the morning.

5          But I'm not in a position right now to rule on the

6  fairness of Little testifying based on what I know right now.

7  I want to hear your arguments without the pressure of having

8  him sitting there and the jury waiting.

9          MS. McLAUGHLIN:  Okay.

10          THE COURT:  So that's how we're going to do it.

11          MS. McLAUGHLIN:  All right.  Thank you.

12          THE COURT:  As long as you're not going to lose him

13  as a witness if I decide to call him -- decide to allow you to

14  call him.  We're not going to lose him as a witness tomorrow,

15  correct?

16          MS. BRUCH:  I don't believe so because I think his

17  boss is here.  So she'll have him come.

18          THE COURT:  I understand.

19          MS. ANDERSON:  Short of a medical appointment or

20  something.

21          THE COURT:  Okay.  Fair enough.

22    (End of sidebar.)

23          THE COURT:  All right.  Ladies and gentlemen, it's

24  4:23.  Rather than prolong a sidebar where all you're doing is

25  watching us talk over outside your presence, we're going to

1    recess for today.

2         Tomorrow I expect you're going to hear from a couple

3    of relatively short witnesses, witnesses you may have already

4    heard from, but to come back and cover a couple of small

5    areas.  I still fully expect that we're going to begin closing

6    arguments no later than midmorning tomorrow and have this case

7    in your hands before lunch depending on the length of the

8    arguments, but have the case in your hands tomorrow for

9    deliberations.

10         So we're going to discharge you for today.  Please

11   don't discuss the case among yourselves or with anyone else.

12   And keep an open mind.  There's more evidence to hear, and

13   ultimately there's arguments to hear.  And you really are --

14   it's hard to do, but you need to keep an open mind until

15   closing arguments are over and you go back and you

16   collectively start, for the first time, to talk about the case

17   among yourselves.  So please follow that admonition.

18         And I apologize for letting you out six minutes

19   early, but you can hold it against me some other time.  And

20   we'll see you tomorrow morning at 9:15.  Thank you.

21     (Jury exits.)

22         THE COURT:  All right.  Deputy Little, we're

23   discussing whether you're going to be a witness in this case

24   and the scope of your testimony, so it may be you have to come

25   back tomorrow.

1088

1    MR. LITTLE:  Okay.  No problem.

2    THE COURT:  But I think you have the people that can

3  tell you you have to come back tomorrow in the courtroom.

4    MR. LITTLE:  Yes.

5    THE COURT:  So do you have any pressing -- other

6  issues, medical appointments or anything else that would

7  prevent you from coming in tomorrow morning?

8    MR. LITTLE:  Not on Wednesday, no, sir.

9    THE COURT:  Okay.  Very good.  You'll get some notice

10 from the attorneys for the defense tonight on whether you need

11 to come all the way downtown tomorrow or not.  But we're going

12 to discuss that outside your presence.

13    MR. LITTLE:  Okay.

14    THE COURT:  So you're excused for now.

15    MR. LITTLE:  Thank you.

16    THE COURT:  I would ask you to stay in the courtroom

17 for about five minutes.  We'll let the jurors pass.

18    MR. LITTLE:  No problem.

19    THE COURT:  They walk by past here, so we'll wait a

20 few minutes.

21    MR. LITTLE:  No problem.

22    THE COURT:  Okay.

23    Then why don't we talk a little about -- well, first,

24 let's go off the record.

25   (Recess.)

1   THE COURT:  There's been a request.  Deputy Deon
2   Little of the Kendall County Sheriff's Office was listed as a
3   may-call witness by the plaintiffs in the final pretrial order.
4   He was subpoenaed by the plaintiffs to appear at trial.  He was
04:35:12   5   released from that subpoena this morning.  Apparently in
6   preparation for his testimony, he was interviewed by the
7   defense when they learned a fact that clearly rebuts the
8   testimony of the plaintiff, is inconsistent with the
9   plaintiff's testimony on a relevant material issue.
04:35:36   10   So plaintiffs have objected to allowing this witness
11   who they subpoenaed to be called in the defense case, and
12   defense has stated that they ought to be able to call him.  I
13   don't see any reason why he can't be.  You've got a proffer of
14   what he said.  If you want to -- if you intend to call him in
04:35:59   15   the defense case, he needs to be down here at a time either
16   tonight on the phone or at a time in the morning where he can
17   be available for an interview by the plaintiffs.  They're
18   entitled and I'll let them get answers to any relevant
19   questions they have.  If you don't make him available, he won't
04:36:20   20   be a witness.
21   MS. BRUCH:  That's fine.  I will make him available by
22   8:45.  Does that sound --
23   THE COURT:  Well, if they want to talk to him tonight,
24   you can do it over the phone.  If they want to talk to him
04:36:32   25   tonight over the phone or talk to him face to face tomorrow,

1    provided his schedule, it's an imposition on him, but he ought

2    to be made available in a timely way to the plaintiffs so that

3    they can at least talk to him and prepare any cross for him

4    that they want.  But you're calling him on that one discrete

04:36:49    5    issue.

6                MS. BRUCH:  Exactly.

7                THE COURT:  All right.

8                MS. BRUCH:  I don't want to ask him about anything

9    other than just establishing that he was a union steward and

04:36:56    10   what does that mean, skipping right to that issue.

11               THE COURT:  All right.  I'm not restricting plaintiffs

12   to that issue.  If you have other issues you want to raise with

13   him that are relevant to the case that you think, you know, are

14   somehow positive for your case, you're free to do so.  That's

04:37:08    15   why I'm giving you the opportunity to interview him, so you can

16   see what else he may have to say.

17               But this is relevant information, and there is -- a

18   defense case is often a response to something plaintiff says.

19   In this case, the plaintiff said certain things about the

04:37:26    20   unredacted phone records, and Mr. Little apparently has

21   information inconsistent with that, and the jury can make their

22   own determination as to the credibility of the two witnesses.

23   That will be the ruling.  All right.

24               MS. McLAUGHLIN:  Then may I raise an issue with

04:37:42    25   respect to Mr. Stomper?

1    THE COURT:  Go ahead.

2    MS. McLAUGHLIN:  I had pretty much decided that it

3    wasn't necessary to call him, but in light of this new

4    information with Mr. Little I may reconsider that.  I need to

04:37:57    5    speak with him to see if he has rebuttal testimony.

6    THE COURT:  On this issue.

7    MS. McLAUGHLIN:  Yes.

8    THE COURT:  Stomper obviously has a lot of information

9    on the already well-tread area of the formal interrogation.

04:38:16   10    What Little is saying is something new, and if Stomper has

11    information on that or something related to that, he certainly

12    is eligible to testify.

13    Once again, was Stomper deposed?

14    MS. McLAUGHLIN:  No.

04:38:31   15    THE COURT:  But he did testify at the arbitration or

16    some other proceeding?

17    MS. BRUCH:  At the arbitration?  No, he didn't testify

18    ever.

19    THE COURT:  Ever, okay.  Well, I don't know whose

04:38:43   20    control he's under, but he is a person who can be interviewed

21    by both sides.  If you decide to call him, I'll let you call

22    him, provided he makes himself available to the defense to be

23    questioned on the topic that you're going to raise with him.

24    But this is not to have Stomper come in on a

04:39:01   25    variety of -- well, I'm allowing this limited opening to allow

1 a response to the question about when these unredacted phone

2 records showed up. If Stomper has something to say about that,

3 he certainly can come in. If it's not a broad issue that isn't

4 really -- well, if it's going to be rebuttal, it's got to be

04:39:24    5 true rebuttal.

6               MS. McLAUGHLIN: Absolutely.

7               THE COURT: It's got to be something to rebut

8 testimony that was put in through the direct of any of the

9 defendants or any of the other defense witnesses, not just, you

04:39:35    10 know, a me-too. So it needs to be true rebuttal.

11               So let defense know tonight if you're going to call

12 Stomper. We're are not going to delay the trial. If he's not

13 available tomorrow, he is just not available. Is he under

14 subpoena at all?

04:39:53    15               MS. DORAN: No.

16               MS. McLAUGHLIN: He is.

17               THE COURT: He is?

18               MS. McLAUGHLIN: He is.

19               THE COURT: All right. Well, then you can remind him

04:39:58    20 about his subpoena. I'll enforce subpoenas, but you probably

21 need to get in touch with him right away.

22               MS. McLAUGHLIN: I do, and my concern is I need to get

23 in touch with him before 5:00.

24               THE COURT: Well, then I'll give you that opportunity.

04:40:11    25               MS. McLAUGHLIN: I'll have somebody else call.

1      THE COURT:  You've got four people there who can do

2  it.

3      MS. McLAUGHLIN:  I want to have that phone call made.

4      THE COURT:  Yes, go ahead and do it.

04:40:31  5      MS. BRUCH:  Deputy Little is still here if they want

6  to talk to him now.

7      THE COURT:  Oh, all right.

8      (Discussion off the record.)

9      MS. BRUCH:  Do you want to talk to him now, or do you

04:40:42  10  want to talk to him on the phone?

11      THE COURT:  All right.  Let's go off the record for a

12  minute.

13      (Discussion off the record.)

14      THE COURT:  Okay.  Do you have -- your extern is going

04:41:06  15  to make the call to Stomper?

16      MS. McLAUGHLIN:  Yes.

17      THE COURT:  Okay.  That's one.  Two, Little is

18  apparently still here, and he will make himself available to be

19  interviewed right now if you want to do it.

04:41:15  20      MS. McLAUGHLIN:  I'd prefer to do that, yes.

21      THE COURT:  All right.  Right now will be after we do

22  a few more things.

23      MS. McLAUGHLIN:  Okay.  Sure.

24      THE COURT:  Okay.  You were going to recall your

04:41:24  25  client in rebuttal, correct?

1    MS. McLAUGHLIN:  Correct.

2    THE COURT:  All right.  What is she going to raise in

3  rebuttal, keeping in mind it needs to be true rebuttal and not

4  just the repeating of direct testimony?

04:41:38   5    MS. McLAUGHLIN:  Well, I do understand that, and there

6  were a few things that Commander Jennings spoke about that I

7  was --

8    THE COURT:  All right.  You don't need to go into it

9  with me.  I just want to remind you that it's got to be true

04:41:55   10  rebuttal because I'll sustain objections if it's just repeating

11  of direct.

12    MS. McLAUGHLIN:  Okay.

13    THE COURT:  Saying it twice doesn't make it more

14  believable or less believable.  The jury doesn't need to hear

04:42:05   15  it again.  But if it's a topic that was raised by another

16  witness on the defense side that she didn't address in her

17  direct or cross-examination, you're free to recall the

18  plaintiff and have her testify to that.

19    MS. McLAUGHLIN:  Okay.  Thank you.

04:42:16   20    THE COURT:  But I take it even that won't last very

21  long, correct?

22    MS. McLAUGHLIN:  That should not.  True rebuttal?  No,

23  it won't last long.

24    THE COURT:  All right.  And it must be true rebuttal.

04:42:25   25    MS. McLAUGHLIN:  Yes.

1   THE COURT:  All right.  So I think we still are on

2   track to get this case in the hands of the jury by, you know,

3   10:00, 10:30.  Where are you at on time?  Assuming there's some

4   time taken tomorrow, how much time do you have for your

04:42:38   5   closings?

6   MS. McLAUGHLIN:  I would disagree with the 10:00,

7   10:30 because the closings, I mean, are going to be an hour or

8   so.

9   THE COURT:  No, I meant not to the jury.  I'm sorry.

04:42:47   10   I meant we begin closings by 10:00 or 10:30.

11   MS. McLAUGHLIN:  All right.

12   THE COURT:  I misspoke.  Sorry.  I think we ought to

13   be able to do that.  If Little is a short witness, if Stomper

14   is in just on a rebuttal issue, and if your client testifies on

04:43:04   15   true rebuttal, then I expect we are going to be able to argue

16   by 10:00 or 10:30.

17   MS. BRUCH:  Yeah.

18   MS. McLAUGHLIN:  Right.

19   THE COURT:  Do the parties agree on that?

04:43:12   20   MS. McLAUGHLIN:  Yes.

21   MS. BRUCH:  Yes.

22   THE COURT:  All right.  How much time has been used by

23   plaintiffs and defense up to now?

24   MS. ANDERSON:  We have for defense nine hours and

04:43:21   25   about 11 minutes have been used, and for plaintiff 13 hours and

1  13 minutes have been used.

2         THE COURT:  All right.

3         MS. ANDERSON:  So about an hour and 45 minutes.

4         MS. BRUCH:  I can do a five-hour closing, Your Honor.

04:43:36  5     (Laughter.)

6         THE COURT:  No, you can't, and it looks like you have

7  adequate time to present a full closing on the plaintiff's

8  side.  So, you know, the time limit is what it is.  Okay.  If

9  you have disagreements on the time, I've been keeping track of

04:43:51  10  it, too.  Come to me with it, and I'll tell you what I think.

11         All right.  Then we need to do -- here's what I'll do.

12  Let's go off the record.

13     (Discussion off the record.)

14         THE COURT:  Let's go on the record.  My law clerk

05:10:03  15  should have given you a set of final jury instructions and a

16  verdict form that incorporate many of the revisions we've

17  talked about in earlier instruction conferences, but let's go

18  through them now.  Do both plaintiffs and defendants have a

19  copy of what we gave you?

05:10:21  20         MS. BRUCH:  Yes.

21     (Discussion off the record.)

22         THE COURT:  Okay.  Do you have it, Ms. McLaughlin, on

23  your side?

24         MS. McLAUGHLIN:  Yes.

05:10:35  25         THE COURT:  All right.  What I'm going to do is

1   similar to what we did in the original instructions conference.

2   I'm going to go page by page and possibly give the title of the

3   instruction, and I need to hear from each side whether there's

4   no objection or not.

05:10:46  5        Functions for the court and jury, page 1, any

6   objection?

7         MS. DORAN:  No.

8         MS. BRUCH:  No.

9         THE COURT:  Evidence, page 2?

05:10:54  10        MS. DORAN:  No.

11         MS. BRUCH:  No.

12         THE COURT:  What is not evidence, page 3?

13         MS. DORAN:  No.

14         MS. BRUCH:  No.

05:10:58  15        THE COURT:  Demonstrative evidence, page 4?

16         MS. BRUCH:  No.

17         MS. DORAN:  No.

18         THE COURT:  No inference from Judge's questions, page

19   5?

05:11:06  20        MS. DORAN:  No.

21         MS. BRUCH:  No.

22         THE COURT:  Deposition testimony.  That is apparently

23   going to be read in, so we'll use this.  Any objection?

24         MS. DORAN:  No.

05:11:15  25        MS. BRUCH:  No.

|         | 1  | THE COURT: | Evidence of rules and regulations, page 7? |

             1    THE COURT:  Evidence of rules and regulations, page 7?

             2    MS. DORAN:  No.

             3    MS. BRUCH:  No.

             4    THE COURT:  Lawyer interviewing a witness, page 8?

05:11:22     5    MS. DORAN:  No.

             6    MS. BRUCH:  No.

             7    THE COURT:  Note taking, page 9?

             8    MS. DORAN:  No.

             9    MS. BRUCH:  No.

05:11:27    10    THE COURT:  Weighing the evidence, page 10?

            11    MS. DORAN:  No.

            12    MS. BRUCH:  No.

            13    THE COURT:  Definition of direct and circumstantial

            14    evidence, page 11?

05:11:35    15    MS. DORAN:  No.

            16    MS. BRUCH:  No.

            17    THE COURT:  Consideration of all evidence, page 12?

            18    MS. DORAN:  No.

            19    MS. BRUCH:  No.

05:11:39    20    THE COURT:  Absence of evidence, page 13?

            21    MS. DORAN:  No.

            22    MS. BRUCH:  No.

            23    THE COURT:  Testimony of witnesses, page 14?

            24    MS. DORAN:  No.

05:11:46    25    MS. BRUCH:  No.

Instructions Conference

1099

THE COURT:  Number of witnesses, page 15?

MS. DORAN:  No.

MS. BRUCH:  No.

THE COURT:  All litigants equal before the law, page 16?

MS. DORAN:  No.

MS. BRUCH:  No.

THE COURT:  Burden of proof, page 17?

MS. DORAN:  No.

MS. BRUCH:  No.

THE COURT:  Reasonableness of defendant's actions or action, page 18?

MS. DORAN:  No.

MS. BRUCH:  No.

THE COURT:  Multiple defendants, page --

MS. DORAN:  Oh, I'm sorry.  I apologize.  It was 19, and now it's 18.  I apologize.  Yes, plaintiffs do have an objection on page 18, reasonableness of defendant's action.

THE COURT:  All right.  What's the objection?

MS. DORAN:  The objection is to the use of the word "fair," which is found in the fourth paragraph -- rather, fourth line down where it says "in terminating Carrie Warren were wise, reasonable, or fair."  Instead, Your Honor, we would suggest that we use a different word, like "honorable" or "good" or "principled" or "decent."  The reason is because the

1  word "fair" is a synonym for "impartial, unprejudiced,

2  unbiased, just, equal, equitable, impartial, lawful,

3  legitimate, proper."  All of those things, they can take into

4  account.

05:12:52  5      THE COURT:  Well, you're reading from a dictionary

6  apparently.

7      MS. DORAN:  I'm reading from a thesaurus, you're

8  correct.

9      THE COURT:  All right.  This is a pattern instruction,

05:13:03  10  I believe.

11      MS. DORAN:  I realize that.

12      THE COURT:  What pattern number is it, if anyone

13  knows?

14      MS. DORAN:  I'll be impressed if anyone can pull that

05:13:15  15  one up quickly.

16      MS. BRUCH:  That is Defendants' Exhibit -- Instruction

17  13, which is Seventh Circuit Pattern Instruction 3.07.

18      THE COURT:  All right.  That is -- yes, the word

19  "fair" is contained in the pattern instruction, and I think

05:13:53  20  it's a common sense meaning and an appropriate one.  I think

21  the jurors are not told to go to a dictionary or a thesaurus to

22  try and divine different meanings for a particular word.  I'm

23  going to stick with the pattern instruction.  So 18, reasonable

24  of defendant's action, will be given over objection.

05:14:18  25      MS. DORAN:  If I may, just one more sentence, Your

1   Honor, and I won't belabor it.

2        THE COURT:  Go ahead.

3        MS. DORAN:  Of course, as Your Honor is aware, "fair"

4   is a theme in our case.  When we have comparators, the question

05:14:28   5   is whether they were treated equally, or another word for that

6   is "fair."  That's why I'm saying I think the word "honorable"

7   or "good" or "principled" or "decent" or some other word like

8   that which doesn't have that same connotation would be more

9   appropriate, and that's all I'll say on that, Your Honor.

05:14:45   10        THE COURT:  Okay.  The objection is overruled.  It's

11   whether or not the plaintiff was fired because of her gender,

12   and even in openings I heard the argument from defense:  You

13   may find that this was an overly harsh result, but that's not

14   ultimately the issue you have to decide.  It's whether she was

05:15:10   15   fired because of her gender and whether she would have been

16   fired for the same conduct if she were male.

17        So 18, reasonableness of the defendant's action, will

18   be given over objection.

19        19, multiple defendants?

05:15:24   20        MS. DORAN:  No.

21        MS. BRUCH:  No objection.

22        THE COURT:  20, discrimination claims?

23        MS. DORAN:  No.

24        MS. BRUCH:  No.

05:15:27   25        THE COURT:  21, discrimination under Title VII against

Instructions Conference

1102

1    the sheriff's office?

2              MS. DORAN:  No.

3              MS. BRUCH:  Yes, Your Honor, just for the same reasons

4    that we gave earlier.

05:15:38    5              THE COURT:  Okay.  And that is?  Remind me.

6              MS. BRUCH:  So initially our argument was that there

7    was no error in trial number 1 and that the pattern was

8    correct, and other than that I think we don't have any other

9    objection to this particular instruction.

05:15:57   10              THE COURT:  All right.  For the reasons we put in our

11   order granting a new trial, we're overruling your objection to

12   21.

13              All right, 22, discrimination against the individual

14   defendants under 1983.

05:16:12   15              MS. DORAN:  No.

16              MS. BRUCH:  Yes, Your Honor, for the same reasons.

17   Then I think that we also had submitted a different instruction

18   that had slightly different language which was Defendants'

19   Exhibit -- Instruction No. 6.

05:16:26   20              THE COURT:  All right.  Tell me what the different

21   language is.  As long as I have this in front of me, I'll

22   overrule your objection as to the mixed motive issue that we

23   talked about earlier, but what particular language in this are

24   you objecting to other than the overall instruction itself?

05:16:49   25              MS. BRUCH:  That's a good question, Your Honor.  Now

1    I'll have to go through this.

2         THE COURT:  It's Defendants' what?

3         MS. BRUCH:  Well, one of the issues we've kind of

4    talked about before, and that is that Scott Koster and Sabrina

05:17:16   5    Jennings didn't actually fire her.  They only made

6    recommendations to fire her.  So it was really just Randall

7    that had the authority to fire her.  So to be consistent with

8    the verdict form, there should be some reference in there that

9    Koster and Jennings simply made recommendations.

05:17:34  10         THE COURT:  Well, we could change it to they would

11   have fired Carrie Warren or recommended that she be fired even

12   if she was a man.

13        MS. BRUCH:  Yeah, I think so, just to be clear.

14        THE COURT:  I mean, that's actually a more helpful

05:17:55  15   instruction for the plaintiff, I think, because technically

16   they could say that neither Koster nor Jennings fired her.

17        MS. DORAN:  That would be fine.

18        THE COURT:  So let's get the language straight at the

19   fifth line in the first paragraph with the words "to fire her

05:18:18  20   or recommend firing her."  Any objection to that change by

21   plaintiff?

22        MS. DORAN:  No.

23        THE COURT:  Defendants?

24        MS. BRUCH:  No.

05:18:30  25        THE COURT:  Okay.  We'll need to put similar language

1  in the second paragraph, and we will do that.  With that change

2  in the second paragraph, I think in this one it would be the

3  last line of the second paragraph after the words "Carrie

4  Warren" or "recommended."  We'll put it before "Carrie Warren."

05:18:53  5  So "fired or recommended firing."  Well, we'll have to put it

6  after, "fired Carrie Warren or recommended firing her."

7           MS. BRUCH:  Yeah.

8           THE COURT:  Then it will read "even if she was a man."

9  So with those changes, any objection to 22 by plaintiff?

05:19:15  10          MS. DORAN:  No.

11          THE COURT:  By defendants?

12          MS. BRUCH:  No, other than what we said originally.

13          THE COURT:  Right.  Off the record.

14     (Discussion off the record.)

05:19:24  15          THE COURT:  Back on the record.  23, we will make the

16  same changes to this that were made on page 22.  With those

17  changes, any objection to 23?

18          MS. DORAN:  No.

19          MS. BRUCH:  Yes, for the same reasons.  I don't think

05:19:41  20  for 23 we need that change because it's just the sheriff's

21  office.

22          THE COURT:  Oh, you're right.  I'm sorry.  I misread

23  it.

24          MS. DORAN:  Oh, yes.

05:19:51  25          THE COURT:  That is right, and we don't need that

 1   change in 23.  So other than your earlier objection, any

 2   objection to 23 by the defense?

 3           MS. BRUCH:  No.

 4           THE COURT:  And no objection by plaintiffs, correct?

05:20:01    5           MS. DORAN:  That's correct.

 6           THE COURT:  Okay.  Next is the similarly situated

 7   instruction.  We have modified the suggestion that was made by

 8   plaintiff, which I think I'll hear objections or agreements to

 9   it.

05:20:25   10           MS. DORAN:  We have no objection to the red-lined

11   version.

12       (Discussion off the record.)

13           THE COURT:  I think actually this red-line is

14   plaintiff's proposal.  I'll have to find my notes.

05:20:44   15           MS. DORAN:  That's why we have no objection to it,

16   Your Honor.

17           THE COURT:  Yes, I understand.  But I had a note here

18   with the -- oh, here it is.  In going through it, the last part

19   that is "and assessment as to whether gender discrimination

05:21:11   20   occurred," we are going to propose taking that out so the

21   instruction ends with a period after "comparison."  The male

22   co-worker changes are in and taking out the language "without

23   differentiating or mitigating circumstances as would

24   distinguish their conduct or their employer's treatment of

05:21:35   25   them" is out.  But we are proposing the last portion of the

1    addition be taken out.

2         So with that change, so the proposal is the

3    instruction in the red-line form with the last addition to this

4    instruction taken out with the period going right after the

05:21:56    5    word "comparison," any objection by plaintiff?

6         MS. DORAN:  My objection would be that the language

7    that we're going to be taking out is the current state of the

8    law, but I think Your Honor has heard these arguments ad

9    infinitum at this point.

05:22:17    10    THE COURT:  Well, I think the early part of the

11    instruction correctly states the law.  I think this is

12    redundant.  I don't think what's added at the end is any

13    different than what's in the earlier part of the instruction,

14    so I'll give it.

05:22:28    15    Any objection by defense?

16         MS. BRUCH:  Yes, Your Honor, definitely.

17         THE COURT:  Go ahead.  Go ahead.

18         MS. BRUCH:  We have a strong objection because the

19    Monroe versus Indiana Department of Transportation Seventh

05:22:38    20    Circuit decision and the Coleman versus Donahoe Seventh Circuit

21    decision both fully define what it means to be similarly

22    situated with that language including "without such

23    differentiating or mitigating circumstances as would

24    distinguish their conduct or their employer's treatment of

05:22:56    25    them."

05:23:09

1        So if the instruction is going to be given, the jury

2  should be given a full understanding of what the law is.  So

3  right now they're getting a half-instruction.  They're not

4  getting the full scope of how the Seventh Circuit defines what

5  it means to be similarly situated.  It's a half-definition.

6        MS. DORAN:  All due respect to the Seventh Circuit, I

7  don't understand that language.

8        MS. BRUCH:  Well, that's the point of closing

9  argument, for us to say what that means.

05:23:21

10        THE COURT:  Well, the language "without such

11  differentiating or mitigating circumstances as would

12  distinguish their conduct or their employer's treatment of

13  them" is certainly contained in Monroe and Coleman.  That's a

14  direct quote from them.  Why was it suggested that it be taken

05:24:04

15  out by plaintiffs?

16        MS. DORAN:  Because it doesn't -- I think it's

17  extremely confusing.  I honestly -- I'm not trying to be funny

18  here.  I don't understand what it means.  If I don't understand

19  what it means, I can't imagine that the jurors could make heads

05:24:19

20  or tails of it.  I don't know that there's evidence that's been

21  presented in this trial relating to differentiating or

22  mitigating circumstances to distinguish conduct.

23        THE COURT:  Oh, I disagree on that.  There's been

24  nothing but that when the comparators talked about it.  The

05:24:38

25  suggestion has been that other people lied and weren't fired,

1      and both Jennings and Koster have gone up and explained why

2      they weren't fired.  Whether it was, you know, because they

3      fessed up right away or it was time record lying which they

4      don't believe is lying, whatever their explanations were,

05:25:02   5      that's been the key part of this case and will be the key part

6      of the case ultimately, or one of the key parts.  One area is

7      whether it's credible that they believe Ms. Warren was lying

8      but, two, that they treat other people with similar conduct,

9      similarly situated individuals the same if they were male.

05:25:28   10      I'll reread these cases.  You'll get an e-mail tonight

11      with the final language, and you can place your objections to

12      it on the record tomorrow.  It will have one version of this or

13      another, but I'll reread the cases as to the language taken

14      out.  Where did you get this last sentence, the last portion

05:25:57   15      that the plaintiffs are proposing, the last four lines?  Where

16      did you get that from?  Is it from a case?

17      MS. DORAN:  I lifted it from our proposed similarly

18      situated instruction which was written by another attorney who

19      I think got it from the Coleman case.

05:26:17   20      THE COURT:  All right.  Well, if that's in Coleman,

21      we'll find it.

22      MS. DORAN:  I will point out, Your Honor, that I have

23      a typo in that last line.  So it's not "once can infer."  It's

24      obviously "one can infer."

05:26:29   25      THE COURT:  "One can infer," all right.  Thanks.

1          So we will look and see if that's from Coleman.

2   Certainly the language that you asked to strike out, "without

3   such different differentiating or mitigating circumstances" is

4   from Monroe and Coleman.  We'll see if what you wish to add at

05:26:44    5   the end is in those cases, too.  All right.  So 24 is reserved,

6   but you'll get something tonight and we'll make copies tomorrow

7   morning.  24, rather.

8          25, any objection?

9          MS. DORAN:  No.

05:26:54   10          MS. BRUCH:  No.

11          THE COURT:  26?

12          MS. DORAN:  No.

13          MS. BRUCH:  No.

14          THE COURT:  27?

05:26:59   15          MS. DORAN:  No.

16          MS. BRUCH:  No.

17          THE COURT:  All right.  There's a note from plaintiff,

18   and defendants have by e-mail objected to the issue of future,

19   basically future mental and emotional pain, correct?

05:27:19   20          MS. BRUCH:  Correct.

21          THE COURT:  All right.  Well, I'm going to overrule

22   the defendants' objection to the language, quote, and is

23   reasonably certain to experience in the future, closed quote,

24   in Instruction No. 27.  This language comes straight from the

05:27:34   25   Seventh Circuit Pattern Instruction 3.10 on compensatory

05:27:55

1  damages.  Defendants acknowledge there has been at least some

2  evidence at trial supporting future pain and suffering damages,

3  namely, the plaintiff's own testimony.  She said she's still

4  suffering, suffering emotional pain, some emotional pain and

5  mental pain.

6         It's for the jury to decide whether the plaintiff is

7  reasonably certain to experience pain and suffering in the

8  future based on her testimony, and neither of the cases

9  defendants cite support that it would be legal error to give

05:28:08

10  the full pattern instruction to the jury.

11         In Denny's, the Seventh Circuit upheld judgment as a

12  matter of law as to issue of emotional damages as a whole.  The

13  Denny's court did not focus on future emotional distress or the

14  appropriate jury instruction on that issue.

05:28:26

15         Then in Mendez, the Central District of California

16  found on a motion for a new trial that it properly instructed

17  the jury not to award damages for emotional distress after a

18  certain date because the plaintiff, quote, did not present

19  evidence at trial that she suffered any emotional distress or

05:28:42

20  any other damage whatsoever, closed quote, after that date.

21         Here, by contrast, there's been at least some evidence

22  of future emotional distress from the plaintiff's testimony

23  which the jury can weigh for itself.  So Instruction 27 will be

24  given over objection.

05:28:57

25         28?

| | | |
|---|---|---|
| 1 | MS. DORAN: | No. |
| 2 | MS. BRUCH: | No. |
| 3 | THE COURT: | 29? |
| 4 | MS. DORAN: | No. |
| 05:29:01 5 | MS. BRUCH: | No. |
| 6 | THE COURT: | Actually 29 is just the second page of 28. |
| 7 | MS. DORAN: | Yes. |
| 8 | THE COURT: | I meant to say 30. |
| 9 | MS. DORAN: | No. |
| 05:29:10 10 | MS. BRUCH: | No. |
| 11 | THE COURT: | 31? |
| 12 | MS. DORAN: | No. |
| 13 | MS. BRUCH: | No. |
| 14 | THE COURT: | 32? |
| 05:29:14 15 | MS. DORAN: | No. |
| 16 | MS. BRUCH: | No. |

17          THE COURT:  All right.  Have you looked at the verdict

18  form we proposed?

19          MS. DORAN:  Yes.

05:29:19 20          THE COURT:  And is there any objection to it by

21  plaintiff?

22          MS. DORAN:  No.

23          THE COURT:  By defense?

24          MS. BRUCH:  No.

05:29:24 25          THE COURT:  Pardon me?

1    MS. BRUCH:  No.

2    THE COURT:  Okay.  What I would strongly recommend,

3    though, that you do, because I will do it but I'd much prefer

4    the attorneys do it, is that you put this up on the ELMO and

05:29:38    5    explain to the jury how to follow this.  This is not a

6    completely -- it's as simple as it can be for a complicated

7    verdict form.  I don't want to misstate what they need to find,

8    but I really recommend both of you in your closings -- who's

9    giving the closing for defense?

05:29:55    10    MS. DORAN:  Me.

11    THE COURT:  Pardon?

12    MS. McLAUGHLIN:  For plaintiff, Karen.

13    THE COURT:  For plaintiff, all right.  And who's doing

14    rebuttal?

05:29:59    15    MS. McLAUGHLIN:  I probably will.

16    THE COURT:  Okay.  And for the defense?

17    MS. BRUCH:  I will.

18    THE COURT:  Okay.  You all should, or at least one of

19    you on the plaintiff's team and the defense should do something

05:30:08    20    where you kind of take them through what the steps are because

21    I'd prefer not to do it myself.  I think in fairness they ought

22    to have that explanation.  If I'm satisfied you both explained

23    it to where I think no further explanation is needed, I'm not

24    going to comment on it when I put the verdict form up and show

05:30:28    25    it to them and give it to them before they retire.

1        I'm going to read all the instructions except for the
2    last three.  I'll read those to them before your closing
3    argument, and then I'll read the last three after closing
4    argument and give them one verdict form.

05:30:49    5        Okay.  So other than the comparator evidence
6    instruction which I've reserved on, is there any other issues
7    we need to discuss?

8            MS. DORAN:  Did you want to talk about the testimony?

9            MS. ANDERSON:  Oh, sure.  We can provide the --

05:31:02   10            THE COURT:  Well, let me ask this.  Have you had
11    adequate time to talk to Deputy Little?

12            MS. DORAN:  I believe we have.

13            MS. McLAUGHLIN:  Yeah.

14            THE COURT:  Okay.  Have you had any luck reaching
05:31:13   15    Stomper?

16            MS. DORAN:  I don't believe so.

17            THE COURT:  Okay.  Well, keep trying.  If you can get
18    him in tomorrow, he's under subpoena.

19            MS. DORAN:  Right.

05:31:18   20            THE COURT:  If you can get him in tomorrow, so be it.
21    If you can't get him in, I'd consider if you -- you have no dep
22    or no testimony from anywhere.

23            MS. DORAN:  We do not.

24            THE COURT:  Okay.

05:31:28   25            MS. McLAUGHLIN:  It looks like he called me back just

1    a few moments ago.

2              THE COURT:  Good.  Then why don't --

3              MS. DORAN:  Can she do that while I do this?

4              THE COURT:  Yes, why don't you go reach him and see

05:31:41  5    when you talk to him if there's any reason that you think

6    you're going to call him tomorrow.

7              Okay.  What else do we have, just the transcript from

8    the deposition?

9              MS. BRUCH:  I think so.

05:31:47  10             THE COURT:  Okay.  Do you have it marked up?

11             MS. ANDERSON:  We do, Your Honor.

12             THE COURT:  Okay.  Let me take a look.  I might be

13   able to rule right now.

14             MS. ANDERSON:  There's color ink there.

05:31:58  15             THE COURT:  That's okay.  Thank you.

16             MS. ANDERSON:  There's only a few areas of

17   disagreement.

18             THE COURT:  Okay.  The first question I have is on

19   page 14.  When plaintiff wants to end this on page 14 at line 8

05:32:47  20   and defense wants to complete that page, those comments about

21   she thought she should be able to keep her job and so many

22   other people have done so many other things, that relates to

23   the job with the sheriff's office, not at Olive Garden,

24   correct?

05:33:09  25             MS. BRUCH:  No, this relates to the job at the Olive

1    Garden.

2            THE COURT:  Oh.

3            MR. ANDERSON:  I believe it relates to the job at the

4    Olive Garden because she was terminated for walking out, and

05:33:18   5    she's saying that other people have done the same thing.  It's

6    really at 15-1, "to walk out of your job and still get it

7    back."

8            THE COURT:  All right.  Well, the whole point of --

9    let me read the rest of it.  Sorry.

05:33:29  10        (Brief pause.)

11            THE COURT:  All right.  Refresh my memory on what she

12    said in court about the Olive Garden.

13            MS. BRUCH:  She went into extensive discussion about

14    the job, and ultimately at the end of her testimony on it she

05:34:33  15    was asked why did you leave and her response was that she

16    injured her wrist and that, you know, essentially she couldn't

17    do the job anymore because of her injury.  She couldn't carry

18    trays or something like that.

19            THE COURT:  I recall that.  All right.  It's the gist

05:35:00  20    of this deposition testimony that she was let go because she

21    walked out of the job when she apparently had some issues one

22    day and wasn't able to work and they said:  You've got to work,

23    and if you walk out we fire you.

24            MS. BRUCH:  Well, not only that, it's that she knew

05:35:16  25    that she was terminated, that it wasn't like a confusing issue

1    that she wasn't sure about.

2          THE COURT:  Right.  All right.  Well, then I'm going

3    to allow page 14 through the first line of page 15 to be read,

4    you know, the part where the plaintiff ends.  I'm going to rule

05:35:36    5    that the rest of that page and the first line of page 15 comes

6    in.  Is there an objection to the bottom of page 16 and top of

7    page 17 by plaintiff?

8          MS. DORAN:  There's a -- no.

9          THE COURT:  Okay.  Then is there an objection to page

05:36:11   10    18, lines 7 through 24, and page 19, lines 1 through 5?

11          MS. ANDERSON:  No, Your Honor.

12          THE COURT:  Okay.  So I've resolved the only contested

13    issue?

14          MS. ANDERSON:  Yes, Your Honor.

05:36:25   15          THE COURT:  Okay.  That's the ruling.

16          MS. DORAN:  Well, no.  I'm sorry.  There is a

17    contested issue.  That's the lines on page -- sorry -- page 14,

18    9 through the end, and to the first part of page 15 that we

19    object to.  We object to it as being highly prejudicial.

05:36:47   20          THE COURT:  Why?  Well, I --

21          MS. DORAN:  No probative value.  You know, what she

22    allegedly says to Tiffany Thomas someday after she walked off

23    the job at the Olive Garden is not relevant to what she said on

24    the stand.  It's clear that she was terminated.  She was

05:37:11   25    terminated when she walked off the job, as Your Honor said

1   earlier just a few minutes ago.  If you look at page 16 on line

2   7, the speaker here is talking about how Carrie is talking

3   about deserving to get her job back, not to remain employed.

4           THE COURT:  Page 16?  Well, that's out.

05:37:34   5           MS. ANDERSON:  That's not even in.

6           MS. DORAN:  Right.  What I'm pointing out there is

7   that this section here, this description from pages 14-9

8   through 15-1 relates to allegedly some alleged comments that

9   Carrie made about wanting to get her job back, not why she left

05:37:55   10   the job.

11           MS. BRUCH:  This is the issue.  It's that plaintiff

12   has testified that she left essentially on her own accord

13   because of an injury.  So if I were to just simply ask the

14   question, you know, based on your conversation was it clear to

05:38:12   15   her she was no longer employed, and she says yes, the jury

16   would have no idea what the basis would be for this witness to

17   ever even know what Ms. Warren's state of mind is.  So that's

18   why the testimony on page 14 is essential, so that it's clear

19   from that that we have the admission by Ms. Warren to Tiffany

05:38:33   20   Thomas that she knew she lost her job.

21           MS. DORAN:  As to her state of mind, that's the

22   testimony that comes before.  I mean, that's in.  That's the

23   testimony from Tiffany Thomas saying that she walked off

24   because she feels stressed.  She says she can't do it.  I think

05:38:55   25   there's something in here about a tip.  So, I mean, if the

1    issue is trying to get in her state of mind as to why she left,

2    that's in there.

3         MS. BRUCH:  But a jury could assume that she walked

4    off and thought she still had the job because she had this

05:39:11    5    injury, that she walked off because of her injury.  In her

6    state of mind, she knew she was terminated.  She was not --

7         THE COURT:  All right.  Here's what -- I'm going to

8    exclude page 14, lines 9 through 22, but you can put in lines

9    23 and 24 of page 14 and the first line of page 15 because that

05:39:34    10   is a statement by the declarant, the deponent, as to that you

11   can't walk off your job and still get it back.

12        I don't understand.  The rest of this seems redundant

13   to what was in great detail at the beginning of this talking

14   about why she left her job, none of it having to do with -- why

05:39:58    15   she was fired, rather, none of it having to do with not be

16   being able to lift the server's tray.

17        MS. BRUCH:  But there's nothing in this.  If you cut

18   that out, there's nothing at all in there where Tiffany Thomas

19   says that she told her she was terminated.  There's nothing.  I

05:40:15    20   don't think I saw anything in there where she said "you're

21   going to be fired" or that she would even understand that she

22   was going to be fired.

23        MS. DORAN:  I think Judge pointed out the end of page

24   14, the top of page 15:

05:40:26    25        "And my feelings towards that was we don't want to set

1   that precedent that you are able to walk out on your job and
2   still get it back."

3          It would clearly indicate to the jurors that she
4   walked out and she was fired.

05:40:40   5          MS. BRUCH:  But I think you excluded lines 9 to 22, so
6   where in there would she know she was fired?

7          MS. DORAN:  But lines 9 through 22 is not Tiffany
8   Thomas testifying about what was said prior to her walking off
9   the job.  It was testimony alleged -- statements allegedly made
05:41:05  10   after she had walked off the job coming back with her daughter.
11   Again, if you look on page 16, line 7, that indicates how the
12   speaker is saying that she wanted her job back.

13          THE COURT:  All right.  Let's go off the record for a
14   minute.

05:41:21  15          (Discussion off the record.)

16          THE COURT:  Let's go back on the record.  The parties
17   had discussed the portions of the deposition of Tiffany Thomas
18   being read into evidence, but the parties -- and I commend them
19   for this -- have agreed on a stipulation, a simple one as to
05:45:59  20   what Tiffany Thomas would say if she was called to testify, the
21   language of which in general is that Ms. Warren was fired from
22   her job at Olive Garden because she left without permission and
23   did not leave the job because of a medical condition, words to
24   that effect.  The parties can work on the exact language.  That
05:46:23  25   stipulation will obviate the need for her deposition to be read

1  in.

2          Okay.  Anything else we need to put on the record?

3          MS. BRUCH:  Not for defense.

4          THE COURT:  Plaintiff?

05:46:30  5          MS. DORAN:  Not for us, Your Honor.

6          THE COURT:  All right.  Ms. McLaughlin is talking to

7  Mr. Stomper?

8          MS. DORAN:  She is right now.

9          THE COURT:  Okay.  Good.  So maybe you can get him in

05:46:42  10  if he's got deposition testimony to provide.

11          MS. DORAN:  I can meander back over there and see if

12  she has an answer to that.

13          THE COURT:  Send an e-mail tonight to let us know what

14  the plan is.

05:46:53  15          MS. DORAN:  Very good.

16          THE COURT:  And let the defense counsel know what it

17  is, if he's called, he would testify about.  Hopefully we can

18  either reach agreement or we can tee up the disagreement

19  tomorrow morning.  I don't want him to come in if he's not

05:47:06  20  going to testify.  I don't know where he comes from, but it

21  would be a waste for him to come a great distance if he's not

22  going to testify.

23          MS. DORAN:  That's fine.

24          THE COURT:  But maybe you can give a preview to the

05:47:17  25  other side.  Then if he's going to be called by the plaintiff,

1   he's got to be made available to the defense to be interviewed.

2           MS. DORAN:  Got it.

3           THE COURT:  And he can do that downtown tomorrow or on

4   the phone tonight.

05:47:26   5           MS. DORAN:  Okay.

6           THE COURT:  Did defense hear that?

7           MS. BRUCH:  They're going to let me know if Stomper is

8   going to be called and the subject of that.

9           THE COURT:  And you're going to be given the

05:47:36   10  opportunity to interview him either on the phone tonight or

11  tomorrow morning when he comes in before he hits the stand.

12          MS. BRUCH:  Perfect.

13          THE COURT:  Okay.  Then we are adjourned, and we'll

14  see you tomorrow morning.

05:47:42   15          MS. DORAN:  Thank you, Your Honor.

16          MR. ANDERSON:  Thank you, Your Honor.

17          THE COURT:  Thank you.

18      (Proceedings adjourned to 9:15 a.m., July 25, 2018.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3       We, SANDRA M. MULLIN, KELLY M. FITZGERALD, and PATRICK

4   MULLEN, certify that the foregoing is a correct transcript of

5   the record of proceedings in the above-entitled matter.

6

7

8   */s/ SANDRA M. MULLIN*                    *July 25, 2018*
    SANDRA M. MULLIN, CSR, RMR, FCRR
9   Official Court Reporter

10
    */s/ KELLY M. FITZGERALD*                 *July 25, 2018*
11  KELLY M. FITZGERALD, CSR, RMR, CRR
    Official Court Reporter
12

13  */s/ PATRICK MULLEN*                      *July 25, 2018*
    PATRICK MULLEN, CSR
14  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25