1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3  CARRIE M. WARREN,           )  Docket No. 15 C 496
                       )
4          Plaintiff,   )  Chicago, Illinois
                     )  July 25, 2018
5          v.          )  9:24 a.m.
                     )
6  KENDALL COUNTY SHERIFF DWIGHT )
  BAIRD, in his official capacity )
7  and as successor in office to  )
  Richard Randall, KENDALL COUNTY, )
8  ILLINOIS, RICHARD RANDALL, SCOTT )
  KOSTER and SABRINA JENNINGS,    )
9                     )
          Defendants.  )
10

                    VOLUME 6
11            TRANSCRIPT OF PROCEEDINGS - Trial
      BEFORE THE HONORABLE THOMAS M. DURKIN, and a Jury
12

  APPEARANCES:
13

  For the Plaintiff:    MS. COLLEEN M. McLAUGHLIN
14                   Law Offices of Colleen M. McLaughlin
                   1751 S. Naperville Road, Suite 209
15                   Wheaton, IL 60189

16                   MS. KAREN J. DORAN
                   Karen J. Doran Attorney at Law LLC
17                   2100 Manchester Road, Suite 942
                   Wheaton, IL 60187
18

  For the Defendants:   MS. JULIE A. BRUCH
19                   MS. KARIN ANDERSON
                   O'Halloran Kosoff Geitner & Cook LLC
20                   650 Dundee Road, Suite 475
                   Northbrook, IL 60062
21

  Court Reporters:      LAURA R. RENKE, CSR, RDR, CRR
22                   SANDRA M. MULLIN, CSR, RMR, FCRR
                   Official Court Reporters
23                   219 S. Dearborn Street, Room 1432
                   Chicago, IL 60604
24                   312.435.6053
                   laura_renke@ilnd.uscourts.gov
25

1                            I N D E X

2       WITNESS                                        PAGE

3       DEON LITTLE
             Direct by Ms. Bruch ..................... 1129
4            Cross by Ms. McLaughlin ................ 1136
             Redirect by Ms. Bruch ................... 1144
5

6       SCOTT KOSTER (Recalled)
             Direct by Ms. Bruch ..................... 1145
7

8       DEFENSE RESTS ................................ 1156

9
        CARRIE MELISSA WARREN (Recalled)
10           Direct by Ms. McLaughlin ................ 1157

11

12      DEFENDANTS' RULE 50 MOTION ................... 1161

13

14      JURY CHARGE (Final) .......................... 1170

15

16      CLOSING ARGUMENTS

17           On Behalf of the Plaintiff .............. 1182
             On Behalf of the Defense ................ 1202
18           Rebuttal on behalf of the Plaintiff ..... 1229

19

20      JURY CHARGE (Final Resumed) .................. 1246

21

22                         E X H I B I T S

23      NUMBER                                      ADMITTED

24      Plaintiff's Exhibit

25          No. 42  ................................. 1166

 1        (In open court outside the presence of the jury.)

 2            THE CLERK:  Okay.  15 C 496, Warren v. Kendall County

 3    Sheriff.

 4            MS. BRUCH:  I'll go get her.

 5            THE COURT:  Okay.

 6        All right.  Good morning.

 7            MS. McLAUGHLIN:  Good morning.

 8            MS. BRUCH:  Good morning.

 9            THE COURT:  You should have received an e-mail last

10    night from my law clerk, giving you the final language for the

11    comparator instruction.  So ...

12            MS. DORAN:  We did.

13            THE COURT:  All right.  And for the record -- well,

14    I'm going to -- I'm going to give you an oral ruling and

15    telling you why that language is the way it is, but we're going

16    to wait on that because I want to get testimony done.  So --

17            MS. DORAN:  Judge?

18            THE COURT:  Yeah.

19            COURT REPORTER:  Step forward, please.

20            MS. DORAN:  Certainly.  Karen Doran.

21        I'm wondering if I could get -- if Judge is going to

22    give us another clean copy of the jury instructions.

23            THE COURT:  Yes.

24            MS. DORAN:  Okay.  Very --

25            THE COURT:  Yeah.

1    MS. DORAN:  Because I did write on mine.  So --

2    THE COURT:  No, no.  My law clerk has made copies for

3    the jury, and we'll be giving each side two copies, along with

4    my -- well, along with me.  But she made copies last night, so

5    she'll have them out here shortly.

6    MS. DORAN:  Thank you.

7    THE COURT:  And we'll take a break before we read

8    the -- after the testimony before we read the instructions and

9    start closing arguments.

10   All right.  Are the parties ready to proceed with the

11   remaining witnesses in this case?

12   MS. DORAN:  We are.

13   THE COURT:  All right.  And they are who?

14   MS. BRUCH:  We have Deputy Little briefly, and then we

15   have Koster coming back up -- again, I don't think it's going

16   to be too long -- the stipulation, and then we're done.

17   THE COURT:  All right.

18   And what's your rebuttal case?

19   MS. McLAUGHLIN:  Carrie Warren.

20   THE COURT:  Okay.  All right.

21   You're not calling Mr. Stomper?

22   MS. McLAUGHLIN:  No, we're not.

23   THE COURT:  Okay.  All right.

24   Then let's bring in the jury.

25   MS. BRUCH:  Your Honor, I do have one procedural

1   question, and that is that at the conclusion of evidence, we

2   will be making a Rule 50 motion.  Procedurally, how would you

3   like to do that with respect to the jury, you know?

4           THE COURT:  Go to sidebar.

5           MS. BRUCH:  Okay.  So I didn't know if you wanted to

6   hear -- do you want to hear oral argument?  We're going to file

7   it too, so --

8           THE COURT:  No.  Just make the motion at sidebar and

9   say that you're going to -- you want to incorporate a written

10  filing with your motion.

11          MS. BRUCH:  Perfect.

12          THE COURT:  But at the close of your -- you're making

13  it at the close of your case.  Is that correct?

14          MS. BRUCH:  I think we're going to do it at the close

15  of all evidence.

16          THE COURT:  That's fine.  Then just go to sidebar.

17          Well, we'll -- when the evidence is over, we're going

18  to take a break.

19          MS. BRUCH:  Okay.

20          THE COURT:  And that break will then allow us to make

21  sure you all have copies of the instructions, we've got them

22  ready for the jury, and you can make your motion at that time.

23          MS. BRUCH:  Perfect.  Okay.  Thank you, your Honor.

24          THE COURT:  All right.  Thanks.

25          MS. McLAUGHLIN:  Your Honor, I would for the record

1    want to interject my continuing objection to having Mr. Little

2    called as I don't think he is a proper rebuttal witness because

3    we're still in their case in chief, it's unfair surprise, all

4    the things that I've argued yesterday.

5         But I would also ask for a limiting instruction

6    regarding his testimony.  Obviously, this is after-acquired

7    evidence.  It only pertains to the alleged attack on the

8    credibility of my client.

9         It had nothing to do with the decision to terminate or

10   the decision not to reverse the termination during the

11   grievance process because they did not have it in their

12   possession.  So I haven't thought of the wording of that, but I

13   think that a limiting instruction at the end of Mr. Little's

14   testimony is appropriate.

15        THE COURT:  Response?

16        MS. BRUCH:  Well, the same would be true for Louise

17   May.  She certainly was never brought up during the grievance

18   process, her employment, anything.  So --

19        THE COURT:  Yeah.  One, this isn't rebuttal -- she's

20   not a -- Little's not a rebuttal witness; he's a defense

21   witness.  Rebuttal is -- this is a defense.  Your client got up

22   and made representations about the availability of unredacted

23   phone records, the circumstance by which the redacted phone

24   records were turned over to the defendants, the haphazard way

25   they were redacted; it wasn't intentional to mask a phone call.

1    And that's all -- you know, that's fine.  That's part of your

2    case.

3              They get to respond to that, as to the availability of

4    the unredacted phone records and the timing of it.  There's no

5    instruction needed on that.  This is just evidence.  This is

6    evidence that responds to assertions made by the plaintiff on

7    issues material to the case.

8              And it's part of the grievance process.  It's not

9    after-acquired evidence because, as I said before, the

10   grievance process where your client was attempting to overturn

11   an initial decision of termination is part of the entire

12   employment decision made by the defendants.  So it's not

13   after-acquired evidence in any classic sense that requires any

14   instruction.

15             And you can certainly argue it.  You can argue that

16   this all happened after the initial decision was made by Koster

17   and that that is the critical part of the case, just as the

18   defense could argue that given the fact your client wanted to

19   get that decision overturned through the grievance process,

20   then evidence that went into the grievance process, or the lack

21   of evidence, the availability of it or the unavailability of

22   it, is all relevant.

23             So it's -- in my mind, it's simply relevant evidence,

24   not with any special label.  And so I'll give no instruction.

25   It's a matter of argument, not special instruction.

Little - Direct by Bruch

1    Okay.  Anything else we need to discuss?

2    MS. BRUCH:  No, your Honor.

3    THE COURT:  Anything from plaintiffs?

4    MS. McLAUGHLIN:  No.

5    THE COURT:  Okay.  Let's bring in the jury.

6    And you can have Mr. Little come in.

7    MS. BRUCH:  Okay.  Thank you.

8    (Witness enters the courtroom.)

9    THE CLERK:  All rise.

10   (Jury in at 9:31 a.m.)

11   THE COURT:  All right.  Please be seated, ladies and

12   gentlemen.  Good morning.

13   JURY MEMBERS:  Good morning.

14   THE COURT:  All right.  We have a limited amount of

15   evidence you're going to hear this morning.  We'll take a

16   break, and then we'll begin closing arguments.

17   So with that, please swear the witness.

18   THE CLERK:  Mm-hmm.

19   Can you stand and raise your right hand, please.

20   (Witness duly sworn and takes the stand.)

21   THE WITNESS:  Yes.

22   THE CLERK:  You may be seated.

23       DEON LITTLE, DEFENDANTS' WITNESS, SWORN

24                    DIRECT EXAMINATION

25   BY MS. BRUCH:

                          Little - Direct by Bruch

1    Q.  Sir, can you please introduce yourself to the jury and

2    spell your last name for the record.

3    A.  My name is Deon Little, L-I-T-T-L-E.

4    Q.  Can you tell us what is your role in the Kendall County

5    Sheriff's Office.

6    A.  Currently I'm a field training officer and corrections

7    deputy.

8    Q.  So, Deputy Little, in January 2014, did you have any role

9    in relation to the union?

10   A.  Yes.

11   Q.  And what --

12   A.  I was a union steward at that time.

13   Q.  Can you explain what it means to be a union steward.

14   A.  We definitely -- we negotiate contracts.  And if there's an

15   issue with a violation of any rules, we're there to assist the

16   representatives, the union reps.

17   Q.  Did you play any role in the disciplinary process for

18   Carrie Warren beginning in 2014 in your position as a union

19   steward?

20   A.  As a witness, yes.

21   Q.  Okay.  So I want to just draw your attention to specific

22   dates, and if you could tell us if you played any role in that

23   situation.

24          So initially, there's been evidence that Ms. Warren

25   was given a Notification of Charges on January 14, 2014, by

Little - Direct by Bruch

1   Commander Jennings.  Were you present for that meeting?

2   A.  Yes.

3   Q.  Okay.  Do you remember anything specific about that

4   meeting?

5   A.  No, ma'am.

6   Q.  Okay.  Then there was another meeting that took place on

7   February 5th, 2014, which was a formal interrogation with

8   Commander Jennings.  Were you present for that formal

9   interrogation?

10  A.  Yes.

11  Q.  And then the next step in the process was on February 28th,

12  2014, with Chief Deputy Koster, there was supposed to be a

13  pre-disciplinary hearing.  That actually didn't take place that

14  day.  Were you present for that meeting?

15  A.  Yes.

16  Q.  And then the last step in the process would have been on

17  March 11th, 2014, there would have been the pre-disciplinary

18  hearing.  Were you present for that meeting?

19  A.  Yes, I believe so.

20  Q.  Okay.  And then the evidence has been that Ms. Warren was

21  terminated on March 12, and then following that, she filed a

22  grievance.  Did you play any role in the grievance process --

23  A.  No, not --

24  Q.  -- after she was terminated?

25  A.  No.

Little - Direct by Bruch

1    Q.  So your involvement would have been only while she was

2    actually an employee of the Sheriff's Office.

3    A.  Yes, ma'am.

4    Q.  All right.  I want to draw your attention to a meeting that

5    took place at Ms. Warren's home.  Can -- do you recall ever

6    going to Ms. Warren's home in relation to her disciplinary

7    proceeding?

8    A.  Yes.

9    Q.  Can you please tell the jury the circumstances surrounding

10   that meeting.

11   A.  After that meeting, she stated that -- I believe she stated

12   that she had the phone records.  So I went to the house with

13   her and her husband, and I reviewed the phone records with her.

14   Q.  Okay.  And do you recall what meeting it was?  Or can you

15   just tell us in terms of what was going on in the process, as

16   best you can recall.

17   A.  I believe it was the first time, after the first meeting,

18   that she was just trying to verify the dates and who called --

19   not the dates, but who actually made the phone call to her at

20   the time.

21   Q.  So would this have been -- okay.  And just to refresh your

22   memory.  So we have on February 28th, 2014, the evidence is

23   that Ms. Warren submitted an e-mail from her travel agent,

24   Chris Fidler.

25          Did you have any -- at the time that you went to the

Little - Direct by Bruch

1   Warrens' home, did the name "Chris Fidler" ever come up?

2   A.  No, not the name.  But she may have said her travel agent;

3   it must have been her travel agent by mistake.  But no name.  I

4   didn't know a name at that time.

5   Q.  So as far as you know, there was no e-mail from a travel

6   agent as of the time you went to her home.

7   A.  No.

8   Q.  So this would have been some date before that.

9   A.  Yes.  When I went to her home, yes.

10  Q.  All right.  So as best you recall, first, when you got to

11  her home, who was present at the house?

12  A.  Me, her husband, and the dog.

13  Q.  And Ms. Warren.

14  A.  Yeah.  And Ms. Warren, of course.

15  Q.  What happened during this meeting?

16  A.  The -- I'm not sure who had the phone records, but I just

17  remember standing around the kitchen counter, looking over the

18  phone records.  And she was trying to figure out what calls

19  came in during that time.

20  Q.  Do you recall the phone records being redacted in any way

21  when you were at her home?

22  A.  No.

23  Q.  Did you see the phone records?

24  A.  Yes.

25  Q.  All right.  So let me show you what's been marked as

Little - Direct by Bruch

1   Defendants' Exhibit No. 9.

2          MS. BRUCH:  Is this -- I don't know that my screen is

3   on.  Is anybody's?

4          THE COURT:  No.  Here, let me --

5          THE WITNESS:  No.

6   BY MS. BRUCH:

7   Q.  Okay.  Showing you what's been marked as Defendants'

8   Exhibit 9.  Does this appear to be the phone record that you

9   were looking at with Ms. Warren at her home?

10   A.  I'm not sure.  I can't testify to that.  It was a record

11   similar to this, but I don't know if this is the actual record.

12   Q.  When you were with Ms. Warren, were you going through each

13   individual call?

14   A.  No, we weren't going through the calls.  She just looked at

15   it.  She was trying to pick out numbers around the time, I

16   believe, she received a call while she was on break from jury

17   duty.

18   Q.  Did you have any understanding at the time that you were at

19   her home about what date and time that would have been?

20   A.  I'm sorry.  Can you repeat that?

21   Q.  Sure.  At the time that you were at her home and you were

22   looking at these records, did you have any understanding of

23   what day she had jury duty?

24   A.  Yes.

25   Q.  And sitting here today, do you remember what day that was?

Little - Direct by Bruch

1   A.  No.

2   Q.  Do you remember if Ms. Warren had a particular time frame

3   during that day that she was focusing on when she was looking

4   at these records?

5   A.  I don't remember a particular time frame, but I assume it

6   had to be around a lunchtime, so somewhere between 10:30 and

7   12:00.  But that's only a guess.

8   Q.  Was there any discussion during that meeting at the home

9   about redacting the phone records?

10  A.  Yes.  I believe her husband made the suggestion that they

11  redact some of the records because it's their personal, private

12  records and it didn't have anything to do with the times that

13  she may have received that phone call during her lunch break

14  from jury duty.

15  Q.  When Ms. Warren's husband made that comment, was Ms. Warren

16  present?

17  A.  Yes.

18  Q.  And did she respond to that statement?

19  A.  I don't recall her making any statements at that point.

20  Q.  Were you present when or if the document was ever redacted?

21  A.  When it was done, no.

22  Q.  When you were going through these records with Ms. Warren,

23  you mentioned that she was trying to figure out who was calling

24  her.  Correct?

25  A.  Yes.

Little - Cross by McLaughlin

1   Q.  And do you remember any particular names coming up?

2   A.  No.

3   Q.  Do you remember her mentioning the travel agent?

4   A.  No, not at that time.

5   Q.  At what point did she identify the travel agent?

6   A.  I think that came at maybe the second meeting when we had

7   the files and she was going through them to see, "Oh, this

8   person had to have called me."  But at that point, not that day

9   when we were in the kitchen.

10          MS. BRUCH:  Okay.  I don't have anything further.

11          THE COURT:  All right.  Any cross-examination?

12                      CROSS-EXAMINATION

13  BY MS. McLAUGHLIN:

14  Q.  Good morning, Deputy Little.  My name is Colleen

15  McLaughlin.  We met for the first time last evening, right?

16  A.  Yes, ma'am.

17  Q.  Okay.  And we had an opportunity to talk for a few minutes,

18  correct?

19  A.  Yes, ma'am.

20  Q.  But you've talked to Ms. Bruch or someone from Ms. Bruch's

21  office on more than one occasion, haven't you?

22  A.  Twice.

23  Q.  Okay.  When was those?

24  A.  I originally met with her Monday and then -- actually,

25  three times, yesterday and then today.

Little - Cross by McLaughlin

1    Q.  And Monday was the first time that you brought up the fact

2    that you were at Carrie Warren's home and that while you were

3    there, there were phone records.  Correct?

4    A.  Yes.

5    Q.  You've known about this lawsuit since it was filed, haven't

6    you?

7    A.  Yes, ma'am.

8    Q.  And Sheriff Baird circulated a copy of the complaint and

9    the answer to his entire staff, didn't he?

10   A.  I believe so.

11   Q.  So you knew that there was allegations out there concerning

12   Carrie and the phone records, correct?

13   A.  Yes, from Carrie.

14   Q.  And prior to last Monday, you never came forward with this

15   information, correct?

16   A.  No.  I was never asked.

17   Q.  So you were only at Carrie's house to discuss -- let me try

18   to get the time frame here.

19          You believe that this meeting took place on the day

20   that Carrie received the investigation packet that had all the

21   memos and information about the charges that were against her,

22   correct?

23   A.  Yes, everything that was the original.

24   Q.  Pardon?

25   A.  Everything from the original date.  The first -- the start

Little - Cross by McLaughlin

1    of her first disciplinary when she got that paperwork.  So the

2    very first day that she was given paperwork, that was that day.

3    Q.  Okay.  So you had at that point -- for the first time,

4    you're seeing the memos that Tracy Page wrote that said she

5    came -- "She told me she came back to the courthouse," and the

6    memo that Nicki Swiss wrote that said, "No, she didn't come

7    back to the courthouse; we released everybody."  Is that -- do

8    you recall those documents?

9    A.  I don't know.  I know that she was given documents.  I

10   didn't review documents.

11   Q.  Well, you recall discussing Chris Phillips's memo, don't

12   you?

13   A.  Yes, from Carrie.  She told me what he had said about her.

14   Q.  Was that at the house on that day?

15   A.  Yes.

16   Q.  Okay.  And so you're -- you have -- and you made the

17   comment to her, "Tell me you didn't make that statement," or

18   something to that effect, right?

19   A.  She told me a statement that she was accused of making, and

20   I just told her, "Tell me you didn't say that and make that

21   statement."

22   Q.  So I'm a little confused about the time.  Were you with

23   Carrie when she got the investigation packet?

24   A.  Yes.

25   Q.  Okay.  So -- and she got that at the jail, correct?

1139

Little - Cross by McLaughlin

1    A.  Yes.

2    Q.  And you -- it's your recollection that it was Scott Koster

3    and/or Tracy Page that provided it to her?

4    A.  I don't recall.  I know she was given a packet that day.

5    Q.  Okay.  So you get this packet.  And do you sit down at the

6    jail and start reviewing the --

7    A.  No.

8    Q.  -- the documents?

9    A.  No, I wouldn't do that.  That would be given to Stomper,

10   the union rep.  He would go over the packet.

11   Q.  Well, you went to her house to go over those documents,

12   right?

13   A.  No.  I went to the -- her house to look at the phone

14   records because she was trying to figure out who had called her

15   that day.  So as the union steward, I went over there so we

16   could find out information so we could give that to Stomper

17   about who actually called her.

18   Q.  Wasn't the focus of your investigation during all of this

19   time -- isn't that what you told me yesterday? -- the focus of

20   your investigation during this time was on what was occurring

21   at the courthouse.

22   A.  No.  I went to her house strictly for the phone records,

23   not to investigate, because I wouldn't have investigated

24   anything.

25   Q.  Wasn't the focus of your -- of the -- of -- you helped her

Little - Cross by McLaughlin

1    prepare for the defense, right?

2    A.   No.   That would have been Stomper, the union steward.   I

3    wouldn't have helped her prepare.   I'm just there as a union

4    rep.

5    Q.   Then why were you there?

6    A.   I mean as a union steward.

7    Q.   Then why were you there if you weren't helping her prep?

8    A.   As a friend, and she wanted -- as a friend and as a union

9    steward, she wanted me to look at the records to see who had

10   called, to help her figure out who had called.   So as a friend,

11   as a coworker, and as a union steward, I went to her house to

12   look at the records with her.

13   Q.   But you -- and you're saying you never, ever saw the

14   remainder of the documents, the memos and things like that?

15   A.   I did not go through those documents.

16   Q.   Okay.

17   A.   I wouldn't have had a reason.   She did brief me on some of

18   the stuff that was in them, but I didn't go through the

19   documents myself.

20   Q.   So how long after that time when you actually received the

21   documents and you were with her when Carrie received the

22   documents, when did this trip to the house occur?

23   A.   Immediately afterwards.

24   Q.   Did you drive together?

25   A.   No.

Little - Cross by McLaughlin

1    Q.   Did you drive in tandem?

2    A.   Probably so because I couldn't recall where she lived at.

3    So I'm sure I followed her or I GPS'd it.  I'm not sure.

4    Q.   All right.  So you basically arrive at the house at the

5    same time?

6    A.   I assume.

7    Q.   And didn't you tell us yesterday that Jeff Warren already

8    had the phone record or the phone bill printed out when you

9    arrived there?

10   A.   I believe so, yes.

11   Q.   And it's your claim now that you spent about, what, half

12   hour, 45 minutes maybe just talking about the phone record?

13   A.   Just looking at the phone records, yes.

14            And she gave the statement about the Chris Phillips

15   part.  And then she actually -- she tried to review what had

16   took place.  But I didn't look at the paperwork for what took

17   place, but she was telling me what had taken place that day.

18   Q.   All right.  Well, let me make this straight.  Neither Jeff

19   nor Carrie printed out that phone bill while you were there,

20   correct?

21   A.   Not to my knowledge.  It was already printed, I believe.

22   But I'm not sure.

23   Q.   And you also recall Jeff commenting about the Chris

24   Phillips statement and saying something along the lines of

25   "We've got to -- it's easy to prove that wrong; we just have to

Little - Cross by McLaughlin

1    get the transcript."  Don't you recall that?

2    A.  No, I do not.

3    Q.  So you recall Jeff was saying that the phone records are

4    none of the KCSO's business, right?

5    A.  Yeah, the personal numbers.

6    Q.  Okay.  And you heard Jeff say if he had to produce them, he

7    was going to redact them, right?

8    A.  No, he didn't say that.  I didn't -- I don't recall him

9    saying that.  I just recall him saying that some of the numbers

10   are personal information.  Kendall County doesn't need them.

11   Q.  But you just testified you talked about redaction.

12   A.  Or redacting --

13   Q.  Wasn't that Jeff Warren's -- what Jeff Warren was saying:

14   "If I'm going to have to produce these, I'm going to redact

15   them"?

16   A.  But he didn't make that statement in that way.  He just

17   said, "They don't need the numbers."  That was the statement

18   that he actually made.  He didn't say, "I'm going to redact

19   these numbers because" -- because of what you said.

20   Q.  Okay.  So it was your impression that if he was forced to

21   produce these records -- because he thought it was none of

22   their business -- he was going to redact anything he thought

23   was personal.  Correct?

24   A.  Yes.

25   Q.  Okay.  So you never saw Jeff or Carrie actually redact

Little - Cross by McLaughlin

1   anything on that day.

2   A.   No.

3   Q.   Okay.  And the only comments that you recall that were

4   being made while reviewing the phone records was Carrie saying,

5   "This has got to be it," or "This might be it."  Right?

6   A.   Something along those lines, yes.

7   Q.   So it's your recollection that Carrie thought she had

8   actually found on the phone record a number that would possibly

9   be the number that called me?

10  A.   Yes.

11  Q.   Okay.  You never heard Carrie say when examining these

12  records, "Well, what's going on here?  There is no number that

13  I don't recognize here on my January 6 phone bill.  Where is

14  the phone call that I got when I was going through the

15  McDonald's drive-through?"  Did you ever hear her say anything

16  like that?

17  A.   I don't recall her saying that that day.

18  Q.   Right.  She was saying, "Oh, this must be it."

19  A.   Yes.

20  Q.   You're an FTO, you said.

21  A.   Yes, ma'am.

22  Q.   You're no longer a union steward?

23  A.   No, ma'am.

24  Q.   FTO is --

25  A.   Field training officer.

Little - Redirect by Bruch

1  Q.  Right.  That's kind of a low-level supervisor type of

2  position, right?

3  A.  It could be considered that, yes.

4  Q.  You hope to be sergeant someday?

5  A.  No, ma'am.  I like being an FTO, and that's what I want to

6  do is train people.  So that's what I strive to do.

7  Q.  You're under the direct supervision of Commander Jennings,

8  aren't you?

9  A.  Yes, ma'am.

10       MS. McLAUGHLIN:  No further questions.

11       THE COURT:  All right.  Any additional redirect

12  examination?

13       MS. BRUCH:  Yes, your Honor.

14                    REDIRECT EXAMINATION

15  BY MS. BRUCH:

16  Q.  Deputy Little, isn't it true that the reason why I met with

17  you on Monday was because you had received a subpoena to

18  testify in this case from Ms. Warren's attorneys?

19  A.  Yes, ma'am.

20       MS. BRUCH:  Okay.  Nothing further.

21       THE COURT:  Okay.  Anything else from plaintiff?

22       MS. DORAN:  No.

23       MS. McLAUGHLIN:  No.

24       THE COURT:  Any questions by the jury of this witness?

25       (No response.)

Koster (Recalled) - Direct by Bruch

1    THE COURT:  All right.  I see no hands.

2    Sir, you're excused.  Thank you.

3    THE WITNESS:  Okay.  Thank you, sir.

4    THE COURT:  Okay.  Please call your next witness.

5    MS. BRUCH:  Chief Deputy Koster.

6    THE COURT:  All right.  The witness has previously

7    been sworn.  Sir, you're still under oath.

8    THE WITNESS:  Yes, your Honor.

9    THE COURT:  All right.  You may proceed.

10    SCOTT KOSTER, DEFENDANT HEREIN RECALLED, PREVIOUSLY SWORN

11                   DIRECT EXAMINATION

12    BY MS. BRUCH:

13    Q.  Chief Deputy Koster, I just want to clear up a few issues

14    that came up after you got off the stand in this case.

15         And the first issue that I want to bring up is can you

16    identify the circumstances surrounding the memo with Chief --

17    with Deputy Commander Leinen about the circumstances

18    surrounding Ms. Warren's release from jury duty.

19    A.  Yes.  As I believe I previously testified, I noticed -- and

20    I think it would have been at the time where I received the

21    complete investigative report from Commander Jennings.  I

22    reviewed all those documents.  And as part that, I reviewed

23    the --

24    THE WITNESS:  I'm sorry.  I'm hearing something else.

25    THE COURT:  Oh.

Koster (Recalled) - Direct by Bruch

1    THE WITNESS:  I thought I was hearing a recording

2  played.

3    THE COURT:  No.

4    MS. McLAUGHLIN:  Your Honor, I'm sorry to interrupt,

5  but may I have a sidebar?

6    THE COURT:  All right.  Now you will hear some

7  whispering.

8    (At sidebar outside the hearing of the jury.)

9    THE COURT:  Go ahead.

10    MS. McLAUGHLIN:  He's already testified about the

11  circumstances under which Leinen -- that Leinen memo came

12  about.  He's saying he wants to clarify that.  That's not

13  rebuttal.

14    THE COURT:  Well -- go ahead.

15    MS. BRUCH:  Commander Jennings was asked questions

16  about the Leinen memo.  I'm trying to clear up what she said so

17  that it's clear what his role is versus her role because she

18  didn't know, and it was kind of left hanging out there that she

19  may have been involved in this.  And he's going to say she had

20  nothing to do with it.

21    THE COURT:  If that's the extent of it, this is --

22    MS. BRUCH:  That's the extent of it.  We're moving on.

23    THE COURT:  Yeah, then we're not retreading old

24  ground.  He's clarifying that he had nothing to do with that.

25  That's perfectly appropriate in light of the questions asked of

Koster (Recalled) - Direct by Bruch

1    Jennings.

2              MS. McLAUGHLIN:  Okay.

3          (In open court in the hearing of the jury.)

4              THE COURT:  All right.  You may proceed.

5              MS. BRUCH:  Okay.

6    BY MS. BRUCH:

7    Q.  So do you remember the question?

8    A.  Yes.  And I guess to kind of summarize it, as a result of

9    what I recalled Deputy Commander Leinen telling me about his

10   conversation with Ms. Warren where he said that he told her to

11   immediately report to duty and the fact that Commander Jennings

12   had recalled that he had said the same thing, and his -- his

13   memorandum did not indicate that he used the word

14   "immediately."

15             And that was the point that I -- I had reached out to

16   him and asked him for clarification on what he had said.  I

17   wanted him to tell me specifically what he had said.  And if --

18   whichever version was accurate, you know, I wanted to make sure

19   it was included with the final record.

20             I don't believe that -- I don't know that I ever had

21   any conversation with Commander Jennings indicating that there

22   had been a change from that memorandum.  I may have, but I

23   don't have a recollection.

24             But those are the circumstances given that I wanted to

25   have an accurate record since both my recollection and

Koster (Recalled) - Direct by Bruch

1    Commander Jennings' recollection appeared to be the same.  So I

2    felt that that may have been what I heard, and I confirmed that

3    with Deputy Commander Leinen.

4    Q.  Did Commander Jennings have anything to do with this

5    process or discussions with Leinen?

6    A.  Not that I can recall, no.

7    Q.  Okay.  And was Ms. Warren ever disciplined for any issues

8    relating to the Leinen memo?

9    A.  Oh, no, she was not.

10   Q.  Then I want to move on to the issue of the missing calls

11   from the Sheriff's Office the morning of her jury duty.

12        And during Commander Jennings' testimony, she was

13   asked questions about calls that she made -- a call that she

14   made to Ms. Warren's cell phone.

15        And that issue -- she wasn't certain on the number of

16   calls, but was that issue ever raised with you, not with

17   Commander Jennings?

18   A.  Yes.  That issue of the phone calls from the Sheriff's

19   Office that did not appear on Ms. Warren's phone bill statement

20   was raised I believe at the -- at the grievance hearing, a

21   combined Step II and III grievance hearing.  I think that was

22   when it was first raised.

23        And upon examining and based on the information that I

24   know that Commander Jennings had provided me that her phone

25   calls had went directly to voice mail, it was my opinion that

Koster (Recalled) - Direct by Bruch

1   those phone records -- that those calls would not have showed

2   up on Ms. Warren's phone bill.

3   Q.  Because they went to voice mail.

4   A.  Because they went to voice mail.

5   Q.  Next I want to move on to the issue of juror -- jury pay.

6   And I think there's been a little bit of confusion on that

7   issue, even though it's sort of a minor topic.

8        But can you just explain how -- your understanding of

9   how juror pay comes in with employees of the Sheriff's Office

10  when they have jury duty.

11  A.  Yes.  If an employee of the Sheriff's Office has jury

12  duty -- and that would mean that they were actually selected

13  for -- for jury service and were serving, they would get a

14  stipend or a per diem for their service.  And it's usually

15  like -- I think it's $12 a day.  It might have went up recently

16  by state statute.

17       They are -- they have the option, which they will

18  always choose, to turn over that 12 or $15 stipend and then, if

19  they served the full day, obviously, they will receive a full

20  day's pay.

21       In a case where you're called for jury selection, we

22  would also cover your -- your pay for the time that you were

23  there being selected.  If you are not selected, then you would

24  either be required to come back and work your remaining hours

25  to make a complete eight-and-a-half-hour day or you would be

Koster (Recalled) - Direct by Bruch

1    compensated for the time you were at jury selection or you

2    would need to take some type of compensatory or vacation time

3    to cover the rest of that time.

4    Q.   In this case, Louise May, who is Ms. Warren's

5    mother-in-law, came in to testify, and there was some evidence

6    concerning a number of phone calls that Ms. Warren may have

7    made to Louise May on the day of her jury duty.

8              During any of this process that you were investigating

9    the situation concerning Ms. Warren's release from jury duty,

10   did Ms. Warren ever bring up the name "Louise May"?

11   A.   No.

12   Q.   Did she ever bring up her mother-in-law?

13   A.   No.

14   Q.   During the grievance process, did the name "Louise May"

15   ever come up?

16   A.   No.

17   Q.   Did the name -- like, her mother-in-law, anything related

18   to her mother-in-law ever come up during the grievance process?

19   A.   No.

20   Q.   There was some testimony concerning the issue of whether or

21   not Ms. Warren should have been given progressive discipline.

22   Can you please explain what your philosophy is on the issue of

23   progressive discipline as it relates to untruthfulness during a

24   formal interrogation.

25   A.   Yeah.  It's been my consistent standard that untruthfulness

Koster (Recalled) - Direct by Bruch

1   engaged in as part of a formal interrogation -- or there could

2   also be other levels of untruthfulness that would -- would

3   preclude any progressive discipline and would go straight to a

4   recommendation of termination, such as lying in a proceeding

5   such as this in court or lying on an affidavit, anything where

6   you're -- you're under notice that you're to tell the truth.

7   Q.   There's also been some testimony that when -- after Judge

8   Pilmer made this complaint about Ms. Warren that the Sheriff's

9   Office was setting her up or on a witch-hunt.  Did you perceive

10  that when Judge Pilmer and Judge McCann called you in and you

11  had this meeting with them that the judges were trying to set

12  up Ms. Warren?

13  A.   No, I don't believe they were for her or would ever do that

14  for any person -- or to any person.

15  Q.   Did you ever perceive that the jury commissioners were

16  trying to set up Ms. Warren?

17  A.   No, not at all.

18  Q.   Was the Sheriff's Office, in your mind, trying to set up

19  Ms. Warren?

20  A.   No, we were not.

21  Q.   Ms. Warren had testified that she believed that the

22  courthouse would have called -- or the jury commission may have

23  called her cell phone because since she's an employee of the

24  Sheriff's Office, they would have her cell number.

25          Can you explain what the Sheriff's Office does with

1152

Koster (Recalled) - Direct by Bruch

1    employee cell numbers, and do they share those with others?

2    A.  No, we don't share them outside of anyone that's an

3    employee of the Sheriff's Office.  That would include the jury

4    commission, judges.  There would be no one.

5           We have a separate personnel file.  We would not share

6    that.  Even if a judge came and asked me for a home phone

7    number for an employee, or a cell number, I would not give it

8    to him unless I had already obtained consent from that employee

9    to do so.

10   Q.  The last topic that I want to bring up is the denial of the

11   grievance.  And let me just show you a document.

12          Showing you what's been marked as Defendants' Exhibit

13   No. 10.  And I believe you identified this as the document that

14   you prepared denying Ms. Warren's grievance.  Is that correct?

15   A.  Yes.

16   Q.  Okay.  And I want to just go through the reasons for your

17   decision.

18          So initially there was a meeting on April 4th, 2014,

19   as part of the grievance process, correct?

20   A.  Yes.

21   Q.  And tell me what information was presented to you during

22   that meeting.

23   A.  During that meeting, the only topic that the business

24   agent, Richard Stomper, for the FOP brought up was the

25   truthfulness or untruthfulness regarding Ms. Warren's statement

Koster (Recalled) - Direct by Bruch

1    about receiving a phone call and who she received it from and

2    the fact that there was a discrepancy in the time of -- I think

3    from her return to lunch.

4           And as evidence or the only thing that was presented

5    to support those positions were a now unredacted phone record

6    from Ms. Warren, as well as copies of the Sheriff's Office

7    phone records that we had provided at his request prior to this

8    meeting that showed phone calls being made, I believe, to

9    Ms. Warren's phone number.

10   Q.  And those were the ones that went to voice mail?

11   A.  Yes, ma'am.

12   Q.  I want to turn to the second page of this memo.  And can

13   you tell me, what information did you rely on that you

14   indicated in this document as part of the basis for your denial

15   of the grievance?

16   A.  Well, as for the first section, it was -- it was discussing

17   the statements that she had made about being told to return to

18   the jury after lunch, as well as the statements that she had

19   made to Ms. Bowen and Ms. Page where I was present in the break

20   room, stating that she had returned and then was released.

21          And a result of this meeting, the -- the -- Ms. Warren

22   or her representatives did not present any evidence denying

23   that or make any denial of those -- those facts.

24   Q.  Did you make any determination as to whether you believed

25   that Lisa Bowen and Tracy Page were accurately recalling their

Koster (Recalled) - Direct by Bruch

1  conversation with Ms. Warren?

2  A.  I believe they were truthful.

3          MS. McLAUGHLIN:  I'm going to object to this line of

4  questioning, your Honor.  It's beyond rebuttal.

5          THE COURT:  Yeah, this has been gone through before.

6  This is an exhibit that's already been admitted.

7          MS. BRUCH:  We didn't go through this at all.

8          THE COURT:  Well, you admitted it.  But you offered

9  the document; it was admitted.  You had an opportunity to go

10 through it on direct examination when you had that.

11         A few more questions, but make it brief.  The

12 document's in evidence, and you had an opportunity to go

13 through that document with this witness when he was on direct

14 examination.

15         MS. BRUCH:  Sure.

16 BY MS. BRUCH:

17 Q.  Okay.  I just want to focus your attention specifically on

18 the issues relating to the time of -- during the April 4th

19 hearing when you received the unredacted records.  And what was

20 your -- and this is sort of the conclusion at the end of your

21 memo where you denied the grievance.

22         What was your conclusion relating to the additional

23 evidence that you received as part of the Step II grievance

24 process?

25 A.  It did not provide any additional evidence that would

Koster (Recalled) - Direct by Bruch

1   support Ms. Warren's statement that she received a phone call

2   from anyone at that time that would have been associated with

3   her jury service or her travel agent.

4           MS. BRUCH:  Okay.  I don't have anything further.

5           THE COURT:  All right.  Any cross-examination?

6           MS. McLAUGHLIN:  No.

7           THE COURT:  All right.  Witness is excused.

8           THE WITNESS:  Thank you, your Honor.

9           THE COURT:  Oh.  Well, any questions by the jury of

10  this witness relating to the last round of questions?

11      (No response.)

12          THE COURT:  The question about rebuttal witnesses,

13  when a witness is recalled, it's not to do -- have a do-over.

14  It's not to hear the same testimony over.  It's really just to

15  rebut anything that has come up since earlier testimony.  And I

16  believe you may hear from Ms. Warren, and she is allowed to do

17  that too.  But it's not an attempt to relitigate or rehear the

18  same testimony you heard before.

19          So all right.  With that, sir, with no questions from

20  the jury, you're excused.  Thank you.

21          All right.  Any additional defense witnesses?

22          MS. BRUCH:  Your Honor, we have a stipulation that

23  we'd like to read.

24          THE COURT:  All right.  You may.

25          MS. BRUCH:  Okay.  The stipulation that has been

1  agreed to by the parties is as follows:

2          If Tiffany Thomas were called to testify in this

3  matter, she would state that she was Carrie Warren's manager at

4  the Olive Garden restaurant in the fall of 2015.

5          On Saturday, September 26, 2015, Ms. Warren was

6  overcome by stress while waiting on tables and walked off her

7  job.  Ms. Warren was terminated from her employment with Olive

8  Garden for leaving her job during her shift and not for any

9  medical or health reasons.

10          There's the end of the stipulation.

11          THE COURT:  All right.

12          Any additional defense witnesses or evidence?

13          MS. BRUCH:  No.  Defense rests.

14          THE COURT:  All right.  Defense has rested.

15          Is there any rebuttal case by the plaintiff?

16          MS. McLAUGHLIN:  Yes.

17          THE COURT:  All right.

18          MS. McLAUGHLIN:  We call Carrie Warren.

19          THE COURT:  All right.

20          All right.  Ms. Warren, you're still under oath.

21          THE WITNESS:  Okay.  Thank you.

22          THE COURT:  All right.

23       CARRIE MELISSA WARREN, PLAINTIFF HEREIN RECALLED,

24                      PREVIOUSLY SWORN

25                    DIRECT EXAMINATION

Warren (Recalled) - Direct by McLaughlin

1    BY MS. McLAUGHLIN:

2    Q.   Carrie, how often did you see Commander Jennings in the

3    actual jail on the shifts that you worked?

4    A.   On afternoons and midnights.  Not very often at all.  Very,

5    very few times.

6    Q.   Once a month?

7    A.   Not even that.

8    Q.   Twice a month?

9    A.   She was usually gone shortly after we had briefing at 3:00.

10   Q.   Okay.  Did you ever see her pitching in to help with the

11   day-to-day chores, serving trays, delivering meds, mail,

12   whatever?

13   A.   No.

14   Q.   All right.  You previously testified that there was a

15   meeting -- or that Deon Little was at your house, going over

16   documents.  Correct?

17   A.   Correct.

18   Q.   Okay.  At that meeting -- well, first of all, did you ask

19   him to come over to review the phone records?

20   A.   Not to review the phone records.  He came over to review

21   the documents and the memos.

22   Q.   Okay.  And when you were at your house, did you or Jeff

23   have a printed-out copy of the phone bill?

24   A.   Not at all, no.  If I had those records, I would have taken

25   them to the Sheriff's Office.

1     MS. McLAUGHLIN:  No further questions.

2     THE COURT:  All right.  Any cross?

3     MS. BRUCH:  No, your Honor.

4     THE COURT:  Any questions by the jury of this witness

5  in light of these last group of questions?

6     (No response.)

7     THE COURT:  All right.  I see no hands.

8     So, Ms. Warren, you're excused.  Thank you.

9     THE WITNESS:  Thank you.

10     THE COURT:  All right.  Any additional rebuttal

11  evidence by the plaintiff?

12     MS. DORAN:  No.

13     MS. McLAUGHLIN:  No.

14     THE COURT:  Any additional surrebuttal evidence then

15  by defense?

16     MS. BRUCH:  No, your Honor.

17     THE COURT:  All right.  Ladies and gentlemen, you've

18  heard all the evidence you're going to hear in this case.

19  We're going to take a very short break to allow -- my courtroom

20  deputy's going to go back and collect from you the instructions

21  you have now.  If you have notes on those that you want to

22  maintain, just transfer them to your notebook.  We'll give you

23  a minute or two to do that.

24     But, otherwise, I want her to come back with ten

25  copies of instructions because I'm going to give you a new set

1   of instructions in about ten minutes when we come back.  I'm

2   going to read those instructions to you.  You'll keep those for

3   your deliberations.  And then the attorneys will have their

4   closing arguments.

5           So with that, we'll take about a ten-minute break.

6           THE CLERK:  All rise.

7           THE COURT:  And, once again, there's more to hear, so

8   don't make up your mind about any aspect of the case, and

9   please don't discuss the case among yourselves or with anyone

10  else.

11          And if you have your instructions out here, make sure

12  you take them back.

13      (Jury out at 10:08 a.m.)

14          THE COURT:  All right.  You can have a seat.

15          With respect to the "similarly situated" instruction

16  on page 24, I'm going to --

17          MS. DORAN:  Judge, I'm sorry to interrupt you.

18          THE COURT:  Yeah.

19          MS. DORAN:  But I believe maybe a juror left a jury

20  instruction behind?

21          THE COURT:  Yeah, Ms. Newland will get them.

22          MS. DORAN:  Okay.  Very good.

23          THE COURT:  I had asked them to take them with.  So I

24  hope they follow my instructions more closely.

25          All right.  You all should have received a set of

1  final jury instructions, which incorporate the rulings I've

2  made -- that were made yesterday, the additions and

3  modifications we made yesterday, and also a final version of

4  the instruction that relate to -- related to comparables or

5  similarly situated individuals.

6        So -- and that's the "similarly situated" instruction

7  on page 24, I overrule plaintiff's objection to the language

8  "without differentiating or mitigating circumstances that would

9  distinguish their conduct or their employer's treatment of

10  them."  This language comes straight from the Seventh Circuit

11  opinions in *Coleman v. Donahoe*, 667 F.3d 835, 847

12  (7th Cir. 2012), and *Monroe v. Indiana Department of*

13  *Transportation*, 871 F.3d 495, 507 (7th Cir. 2017).

14        The Court has closely aligned the instructions with

15  the language in both *Coleman* and *Monroe* by using the word

16  "standards" instead of "rules" and by keeping the

17  "differentiating or mitigating" language, but I've also made

18  small language tweaks to make this part of the instruction

19  easier for the jury to understand.

20        I also overrule plaintiff's proposed addition to the

21  final line of the "similarly situated" instruction.  This

22  language is taken from *Coleman*, which states, quote:  "All

23  things being equal, if an employer takes an action against one

24  employee in a protected class but not another outside that

25  class, one can infer discrimination.  The similarly situated

Defendants' Rule 50 Motion

1    prong establishes whether all things are, in fact, equal."

2    That's 667 F.3d at 846.

3          Instruction No. 24 is about "whether all things are,

4    in fact, equal."  It is not about when the jury can find

5    discrimination, which is covered by "elements" instructions.

6          I find that adding the plaintiff's proposed language

7    could confuse the jury and make them think they can find

8    discrimination without undertaking the careful burden-shifting

9    analysis set forth in the prior "elements" instructions.

10         So that's the reason for the language in the currently

11   and final constructed "similarly situated" instruction on

12   page 24.

13         All right.  Anything else we need to discuss?

14   Otherwise, I'm going to have the jury come back out in about

15   five minutes.

16         MS. ANDERSON:  Your Honor, do you want the Rule 50

17   motion?

18         THE COURT:  All right.  Go ahead.

19         MS. ANDERSON:  Defendants are moving pursuant to

20   Rule 50 --

21         COURT REPORTER:  Pull the microphone near you, please.

22         MS. ANDERSON:  Oh.

23         COURT REPORTER:  Thank you.

24         THE COURT:  You can sit down.

25         MS. ANDERSON:  Defendants are moving pursuant to

1162

Defendants' Rule 50 Motion

1    Rule 50 for judgment as a matter of law as to all issues in

2    this case.

3            There's been no evidence that Ms. Warren's gender was

4    a motivating factor in her termination.  In fact, despite Chief

5    Koster testifying that it was challenging to hire and retain

6    female deputies, he did not lessen the severity of discipline

7    that he would issue female deputies.

8            The evidence shows that the deputies were disciplined

9    based on their infraction, not on their gender.  Deputies who

10   were untruthful during formal investigations were terminated.

11   Deputies who were -- who violated sick time or attendance

12   policies were disciplined for those infractions.

13           As to Ms. Warren's termination, both Commander

14   Jennings and Chief Koster testified that Jennings initiated the

15   investigation into the initial charges, but that once Chief

16   Koster took over, he independently gathered additional evidence

17   and made his recommendation to Sheriff Randall to terminate

18   Ms. Warren's employment for reasons different than those relied

19   on by Jennings.

20           The evidence does not support punitive damages against

21   the individual defendants.  There was no targeting.  There was

22   no malice and no reckless disregard of Ms. Warren's rights.

23   The investigation was initiated by a circuit court judge -- or

24   when we received an e-mail from a circuit court judge -- who

25   had no personal knowledge of Ms. Warren.  Ms. Warren's own

Defendants' Rule 50 Motion

1    actions and untruthfulness caused her termination.

2         Chief Koster gave Ms. Warren an opportunity to explain

3    her actions, the cell phone bill, and the e-mail from

4    Ms. Fidler and even spoke to Ms. Warren's union business rep

5    about the information provided by Ms. Warren.  These are not

6    the actions of a malicious Chief Deputy.  The Court should not

7    send the issue of punitive damages to the jury.

8         The evidence similarly does not support the award of

9    future emotional damages.  There's no evidence to support such

10   an award.  There's no medical diagnosis or expert testimony and

11   no inherently degrading conduct that would support future

12   emotional damages.  The evidence does not show that future

13   emotional distress is reasonably expected to continue.

14   Therefore, the issue of future emotional damages should not be

15   sent to the jury.

16        Finally, with qualified immunity.  The individual

17   defendants are entitled to qualified immunity on the

18   Section 1983 claims.  They relied on information that they

19   obtained they could not discipline individuals if they could

20   not prove that those individuals had conducted terminating

21   offenses, especially when they had to go through the grievance

22   process with the union rep.

23        In light of *Coleman*, it was not clearly established at

24   the time of Warren's termination that a judge or jury could

25   second-guess and infer a gender-discriminatory motive from the

Defendants' Rule 50 Motion

1    business decision of government officials such as Koster,

2    Randall, and Jennings.

3            For the foregoing reasons, defendants request this

4    Court grant them judgment as a matter of law on all issues in

5    this case.

6            And, your Honor, we do have a motion that we'd be

7    filing.  We also ask for leave to file in excess of 15 pages.

8    We do have an attachment that will provide examples of --

9    actually, of the perjury that we believe also merits dismissal

10   of this case, and incidents and examples of the perjury will be

11   included in the attachment.

12           THE COURT:  All right.  Well, I'll grant you leave to

13   file a brief in excess of 15 pages.

14           I'm allowed under Rule 50 to take the matter under

15   advisement and allow the case to go to the jury before I rule,

16   and that's what I'm going to do here.

17           So you can file your motion.  I'm not going to require

18   a response from the plaintiffs.  I will allow the case to go to

19   the jury.  If there is a verdict for the plaintiff, you can

20   renew your motion.  You've preserved any issues contained in

21   your motion for renewal after a verdict if it's in favor of the

22   plaintiff.

23           So that will be the ruling.

24           MS. ANDERSON:  Okay.  Thank you, your Honor.

25           THE COURT:  All right.

1     MS. McLAUGHLIN:  Your Honor, one more thing.  We

2  rested pending the documents, and there were a few exhibits.  I

3  didn't think it had to be done in front of the jurors, so I

4  wanted to raise it now.

5     THE COURT:  Go ahead.

6     MS. McLAUGHLIN:  I think it was Plaintiff's 42 and 43

7  are the only ones that I don't think got admitted that were

8  testified about.

9     THE COURT:  Well --

10    MS. McLAUGHLIN:  So I move for the admission of those

11 two documents.

12    THE COURT:  42 and -- okay.  I don't see --

13    MS. ANDERSON:  Your Honor, we didn't have a 42, a

14 Plaintiff's 42.  And 43 wasn't admitted.

15    MS. BRUCH:  I think they handed me 43, and I don't

16 think that they ever discussed it.

17    MS. ANDERSON:  It was never discussed, and I -- they

18 never handed it --

19    THE COURT:  One at a time, please.

20    42 is on the exhibit list as the Dean termination

21 findings.  That's what Plaintiff's 42 is.

22    Is there any objection to that being admitted?

23    MS. BRUCH:  I don't even have a 42 --

24    MS. ANDERSON:  No.

25    MS. BRUCH:  -- honestly.  So I don't --

1       THE COURT:  Well, it's on the exhibit list.  See if

2  it's --

3       MS. McLAUGHLIN:  Do we have an extra copy of it?  It

4  would be ours, Plaintiff's.

5       MS. BRUCH:  The exhibit list that I have goes 41 and

6  then it skips to 45.

7       THE COURT:  No, I have one that was an updated list as

8  of 7/14.  It's the one I've been operating under.  It has an

9  Exhibit 42, which is also contained in the exhibit binder

10  provided to me by the plaintiffs.  And it is a memo dated

11  December 9th, 2014, relating to Deputy Dean.

12       So is there any objection to 42?

13       MS. BRUCH:  No objection.

14       THE COURT:  All right.  42 is admitted.

15     (Plaintiff's Exhibit 42 admitted in evidence.)

16       THE COURT:  What's the other exhibit?

17       MS. ANDERSON:  43.

18       THE COURT:  All right.  I have no 43 on my exhibit

19  list.  I have no 43 in my binder.

20       MS. McLAUGHLIN:  It was -- it was tendered to

21  defendants as an additional exhibit when we talked about it.

22       THE COURT:  What is it?

23       MS. McLAUGHLIN:  It also relates to Dean.

24       THE COURT:  Make sure you're in front of a microphone,

25  unless you have your --

1    MS. McLAUGHLIN:  Sorry.  It also relates to Dean.

2    MS. BRUCH:  Your Honor, 43 was tendered to us, but it

3    was never brought up with any witness; it was never mentioned.

4    So I didn't object to it because it never came up.

5    THE COURT:  All right.

6    MS. McLAUGHLIN:  I believe I referenced it during

7    Koster's testimony when we were discussing Dean but did not go

8    into detail on it.

9    MS. BRUCH:  It was never referenced.

10   THE COURT:  Well, I had no problem admitting exhibits

11   that were referred to where the parties were going to agree to

12   their admission and they were part of the record but weren't

13   formally moved in.

14   I don't have a 43 even on my exhibit list because had

15   you brought it up by exhibit number during testimony of a

16   witness, I would have noted to you at that time I don't have a

17   43.  I don't even have a line for 43 on the exhibit list.  It

18   goes from 42 to 45.  And in the binder, there is -- it's a --

19   there's a tab for 42, and there's no document behind it.

20   Or 43, rather.  There's no tab behind it.

21   MS. McLAUGHLIN:  All right.

22   THE COURT:  So I'm going to deny the request to admit

23   Plaintiff's Exhibit 43.

24   All right.  Anything else we need to discuss?

25   MS. BRUCH:  Not for defendants.

1    THE COURT:  Plaintiff?

2    MS. McLAUGHLIN:  No, we're fine.

3    THE COURT:  All right.

4    And, Sandy, did you collect ten?

5    THE CLERK:  I did.  I put them in the recycle bin.  I

6  believe we've got ten over there.  Did you want Dan to hand

7  them out?

8    THE COURT:  Yeah, Dan can hand them out.

9    There's something up there.  Is that a notepad of a

10  juror.

11    THE CLERK:  I think that's just a notepad of one of

12  the jurors.  She left it.

13    THE COURT:  That's fine, and she's allowed to do that.

14    THE CLERK:  Yeah.

15    THE COURT:  All right.  Then we're going to bring in

16  the jury.  I'm going to read the instructions.

17    MS. McLAUGHLIN:  Can I have a break?  I didn't take a

18  break.

19    THE COURT:  Okay.  Go ahead.  We'll wait.

20    (Ms. McLaughlin exits the courtroom.)

21    THE COURT:  Ms. Doran, are you doing the closing?

22    MS. DORAN:  Yes, sir, I am.

23    THE COURT:  How long do you think you'll be?

24    MS. DORAN:  Probably about 25 minutes.

25    THE COURT:  25?

1    MS. DORAN:  Maybe 30.

2    THE COURT:  Okay.  Good.

3    And how long is your closing?

4    MS. BRUCH:  Over an hour.

5    THE COURT:  All right.  Well, I don't want to test

6    their patience for lunch.  But if we can get this in before

7    lunch, that would be the preference.  I'm not going to make

8    this into an endurance contest.  I'll break up an argument or

9    break up between closing and rebuttal if we're close to lunch.

10   Not going to make them sit there watching the clock to go eat

11   lunch when you want them all concentrating.

12   So I prefer not to do that because it's better they

13   just hear all the arguments at once.  But we'll see how they

14   go.

15   MS. BRUCH:  Okay.

16   (Ms. McLaughlin enters the courtroom.)

17   COURT SECURITY OFFICER:  All rise.

18   (Jury in at 10:25 a.m.)

19   THE COURT:  Please be seated, ladies and gentlemen.

20   I can hear you in the hallway, and it's very

21   unfortunate you're not getting along.

22   (Laughter.)

23   THE COURT:  All right.  I'm going to read to you the

24   final instructions.  These are the instructions that will guide

25   you during your deliberations.  I'm required to read them to

Jury Charge (Final)

1   you, even though you'll be reading along.

2            And you'll have a copy of these.  You can take your

3   copies back to the jury room with you.

4            So, members of the jury, you've seen and heard all the

5   evidence and arguments of the attorneys.  I will instruct you

6   on the law.

7            You have two duties as a jury.  Your first duty is to

8   decide the facts from the evidence in the case.  This is your

9   job and yours alone.

10           Your second duty is to apply the law that I give you

11  to the facts.  You must follow these instructions, even if you

12  disagree with them.  Each of the instructions is important, and

13  you must follow all of them.

14           Perform these duties fairly and impartially.

15           Nothing I say now, and nothing I did during the trial,

16  is meant to indicate any opinion on my part about what the

17  facts are or about what your verdict should be.

18           The evidence consists of the testimony of the

19  witnesses, the exhibits admitted in evidence, and stipulations.

20           A stipulation is an agreement between both sides that

21  certain facts are true or that a person would have given

22  certain testimony.

23           Certain things are not to be considered as evidence,

24  and I'll list them for you:

25           First, if I told you to disregard any testimony or

Jury Charge (Final)

1   exhibits or strike any testimony or exhibits from the record,

2   such testimony or exhibits are not evidence and must not be

3   considered.

4        Second, anything you may have seen or heard outside

5   the courtroom is not evidence and must be entirely disregarded.

6        Third, questions and objections or comments by the

7   lawyers are not evidence.  Lawyers have a duty to object when

8   they believe a question is improper.  You should not be

9   influenced by any objection, and you should not infer from my

10  rulings that I have any view as to how you should decide the

11  case.

12       Fourth, the lawyers' opening statements and closing

13  arguments to you are not evidence.  Their purpose is to discuss

14  the issues and the evidence.  If the evidence as you remember

15  it differs from what the lawyers said, your memory is what

16  counts.

17       Certain demonstrative exhibits have been shown to you.

18  Those are used for convenience and to help explain the facts of

19  the case.  They are not themselves evidence or proof of any

20  facts.  They will not be given to you to take back to the jury

21  room when you deliberate.

22       During this trial, I asked some witnesses questions

23  myself.  Do not assume that because I asked questions, I hold

24  any opinions on the matters I asked about or on what the

25  outcome of the case should be.

Jury Charge (Final)

1          During trial, certain testimony was presented to you

2     by the reading of a deposition.  A deposition is the sworn

3     testimony of a witness taken before trial.  The witness is

4     placed under oath to tell the truth, and the lawyers for each

5     party may ask questions.  The questions and answers are

6     recorded.

7          Deposition testimony is entitled to the same

8     consideration and is to be judged, insofar as possible, in the

9     same way as if the witness had been presented to testify.

10         You've heard evidence about whether defendants'

11    conduct complied with or violated certain rules or regulations.

12    You may consider this evidence in your deliberations.  But

13    remember that the issue is whether defendants discriminated

14    against Carrie Warren, not whether a rule or regulation may

15    have been complied with or violated.

16         It is proper for a lawyer to meet with any witness in

17    preparation for trial.

18         Any notes you took during this trial are only aids to

19    your memory.  The notes are not evidence.  If you did not take

20    notes, you should rely on your independent recollection of the

21    evidence and not be unduly influenced by the notes of other

22    jurors.  Notes are not entitled to any greater weight than the

23    recollections or impressions of each juror about the testimony.

24         You will not have the opportunity to review any

25    portions of the transcript during your deliberations.

Jury Charge (Final)

1    You should use common sense in weighing the evidence

2    and consider the evidence in light of your own observations in

3    life.  In our lives, we often look at one fact and conclude

4    from it that another fact exists.  In law we call this an

5    "inference."  A jury is allowed to make reasonable inferences.

6    Any inference you make must be reasonable and must be based on

7    the evidence in the case.

8    You may have heard the phrases "direct evidence" and

9    "circumstantial evidence."  Direct evidence is proof that does

10   not require an inference, such as the testimony of someone who

11   claims to have personal knowledge of a fact.  Circumstantial

12   evidence is proof of a fact, or a series of facts, that tends

13   to show that some other fact is true.

14   As an example, direct evidence that it's raining is

15   testimony from a witness who says, "I was outside a minute ago

16   and I saw it raining."  Circumstantial evidence that it is

17   raining is the observation of someone entering a room carrying

18   a wet umbrella.

19   The law makes no distinction between the weight to be

20   given to either direct or circumstantial evidence.  You should

21   decide how much weight to give to any evidence.  In reaching

22   your verdict, you should consider all the evidence in the case,

23   including the circumstantial evidence.

24   In determining whether any fact has been proved, you

25   should consider all the evidence bearing on the question

Jury Charge (Final)

1    regardless of who introduced it.

2          The law does not require any party to call as a

3    witness every person who might have knowledge of the facts

4    related to this trial.  Similarly, the law does not require any

5    party to present as exhibits all papers and things mentioned

6    during this trial.

7          You must decide whether the testimony of each of the

8    witnesses is truthful and accurate, in part, in whole, or not

9    at all.  You also must decide what weight, if any, you give to

10   the testimony of each witness.

11         In evaluating the testimony of any witness, you may

12   consider, among other things:

13         The ability and opportunity the witness had to see,

14   hear, or know the things that the witness testified about;

15         The witness's memory;

16         Any interest, bias, or prejudice the witness may have;

17         The witness's intelligence;

18         The manner of the witness while testifying;

19         The witness's age; and

20         The reasonableness of the witness's testimony in light

21   of all the evidence in the case.

22         You may find the testimony of one witness or a few

23   witnesses more persuasive than the testimony of a larger

24   number.  You need not accept the testimony of the larger number

25   of witnesses.

Jury Charge (Final)

1    In this case, one of the defendants is a governmental

2    entity.  All parties are equal before the law.  A governmental

3    entity is entitled to the same fair consideration you would

4    give any individual person.

5        When I say a particular party must prove something by

6    "a preponderance of the evidence," or when I use the expression

7    "if you find" or "if you decide," this is what I mean:  When

8    you've considered all the evidence in the case, you must be

9    persuaded that it is more probably true than not true.

10       In deciding Carrie Warren's claims of discrimination,

11   you should not concern yourselves with whether defendants

12   Kendall County Sheriff's Office, Richard Randall's, Scott

13   Koster's, and Sabrina Jennings' actions in terminating Carrie

14   Warren were wise, reasonable, or fair.  Rather, your concern is

15   only whether Carrie Warren has proved that defendants

16   terminated her in part because she is a woman, and whether

17   defendants have proved that they would have fired her even if

18   she was a man.

19       You must give separate consideration to each claim and

20   each party in this case.  Although there are four defendants --

21   namely, the Kendall County Sheriff's Office, Richard Randall,

22   Scott Koster, and Sabrina Jennings -- it does not necessarily

23   follow that if one is liable, any of the other defendants is

24   also liable.

25       Carrie Warren claims she was fired because she's a

Jury Charge (Final)

1  woman and that her termination violated federal civil rights

2  law.  She claims that the Kendall County Sheriff's Office,

3  Richard Randall, Scott Koster, and/or Sabrina Jennings are

4  liable for her termination.  You should individually consider

5  and determine whether any of these four individuals terminated

6  Carrie Warren in violation of federal civil rights law.

7        Carrie Warren has made discrimination claims under two

8  different federal statues: Title VII of the Civil Rights Act of

9  1964 against the Kendall County Sheriff's Office; and

10  Section 1983, enacted as part of the Civil Rights Act of 1871,

11  against the Kendall County Sheriff's Office, Richard Randall,

12  Scott Koster, and Sabrina Jennings.

13        Carrie Warren claims she was fired by the Kendall

14  County Sheriff's Office because she is a woman.  To succeed on

15  this claim under Title VII, Carrie Warren must prove by a

16  preponderance of the evidence that her gender was a motivating

17  factor in the Kendall County Sheriff's Office's decision to

18  fire her.  A motivating factor is something that contributed to

19  the Kendall County Sheriff's Office's decision.

20        If Carrie Warren proves that her gender contributed to

21  the Kendall County Sheriff's Office's decision to fire her,

22  then the Kendall County Sheriff's Office must prove by a

23  preponderance of the evidence that it would have fired Carrie

24  Warren even if she was a man.

25        If the Kendall County Office satisfies this burden,

1  you must enter a verdict for Carrie Warren but not award her

2  damages on this claim.  If the Kendall County Sheriff's Office

3  fails to satisfy this burden, you may award damages to Carrie

4  Warren.

5       If Carrie Warren does not prove that her gender

6  contributed to the Kendall County Sheriff's Office's decision

7  to fire her, then the Court will enter judgment for the Kendall

8  County Sheriff's Office and you may not award her damages on

9  this claim.

10      Carrie Warren claims she was fired by Richard Randall,

11  Scott Koster, and Sabrina Jennings because she's a woman.  To

12  succeed on this claim under Section 1983, Carrie Warren must

13  prove by a preponderance of the evidence that her gender was a

14  motivating factor in the decision or decisions of Richard

15  Randall, Scott Koster, and/or Sabrina Jennings to fire her or

16  recommend firing her.  A motivating factor is something that

17  contributed to the decision or decisions of Richard Randall,

18  Scott Koster, and/or Sabrina Jennings.

19      If you find that Carrie Warren proves this by a

20  preponderance of the evidence, then you must decide whether

21  Richard Randall, Scott Koster -- Scott Koster and/or Sabrina

22  Jennings have proved by a preponderance of the evidence that

23  they would have fired Carrie Warren or recommended firing her

24  even if she was a man.

25      If Richard Randall, Scott Koster, and/or Sabrina

Jury Charge (Final)

1  Jennings satisfy this burden, you must enter a verdict for

2  Richard Randall, Scott Koster, and/or Sabrina Jennings.  If

3  Richard Randall, Scott Koster, and/or Sabrina Jennings fail to

4  satisfy this burden, you must enter a verdict for Carrie Warren

5  and you may award her damages.

6          You must separately consider whether the parties have

7  met their respective burdens with respect to each of Richard

8  Randall, Scott Koster, and Sabrina Jennings individually.

9          Carrie Warren claims she was fired by the Kendall

10 County Sheriff's Office because she's a woman.  To succeed on

11 her Section 1983 discrimination claim against the Kendall

12 County Sheriff's Office, Carrie Warren must prove by a

13 preponderance of the evidence that her gender was a motivating

14 factor in the decision of an employee of the Kendall County

15 Sheriff's Office to fire her and Richard Randall approved of

16 that decision.  A motivating factor is something that

17 contributed to the Kendall County Sheriff's Office's decision.

18         If you find that Carrie Warren has proved by -- this

19 by a preponderance of the evidence, then you must decide

20 whether the Kendall County Sheriff's Office has proved by a

21 preponderance of the evidence that it would have fired Carrie

22 Warren even if she was a man.

23         If the Kendall County Sheriff's Office satisfies this

24 burden, you must enter a verdict for the Kendall County

25 Sheriff's Office.  If the Kendall County Office -- Sheriff's

Jury Charge (Final)

1  Office fails to satisfy this burden, you must enter a verdict

2  for Carrie Warren and you may award her damages.

3         Carrie Warren has identified male employees who she

4  argues are similarly situated to her yet received more lenient

5  discipline.  For Carrie Warren to prove that a male coworker is

6  similarly situated to her, she must show that he is directly

7  comparable to her in all material respects.  However, he need

8  not be identical to Carrie Warren in every conceivable way.

9         Generally, similarly situated male coworkers will have

10 dealt with the same supervisor or supervisors, will have been

11 subject to the same standards, and will have engaged in similar

12 conduct without differentiating or mitigating circumstances

13 that would distinguish their conduct or their employer's

14 treatment of them.  In the end, you must decide whether there's

15 enough common factors to allow for a meaningful comparison.

16        Carrie Warren must prove by a preponderance of the

17 evidence that Richard Randall, Scott Koster, and/or Sabrina

18 Jennings were personally involved in the conduct that Carrie

19 Warren complains about.  You may not hold them liable for what

20 other employees did or did not do.

21        If you find that Carrie Warren has met her burden of

22 proof against any of the defendants, and that same defendant or

23 defendants failed to meet their burden of proof, then you must

24 determine what amount of damages, if any, Carrie Warren is

25 entitled to recover.  Carrie Warren must prove her damages by a

Jury Charge (Final)

1    preponderance of the evidence.

2              If you find that Carrie Warren fails to meet her

3    burden of proof against any of the defendants, then you will

4    not consider the question of damages.

5              You may award compensatory damages only for injuries

6    that Carrie Warren proves by a preponderance of the evidence

7    were caused by defendants' wrongful conduct.

8              Your award must be based on evidence and not

9    speculation or guesswork.  This does not mean, however, that

10   compensatory damages are restricted to the actual loss of

11   money; they include both the physical and mental aspects of

12   injury, even if they are not easy to measure.

13             In calculating damages, you should not consider the

14   issue of lost wages or benefits.  The Court will calculate and

15   determine any damages for past or future lost wages and

16   benefits.

17             You should consider the mental and emotional pain and

18   suffering that Carrie Warren has experienced and is reasonably

19   certain to experience in the future in calculating compensatory

20   damages.

21             No evidence of the dollar value of mental and

22   emotional pain and suffering needs to be introduced.  There is

23   no exact standard for setting the damages to be awarded on

24   account of pain and suffering.  You are to determine an amount

25   that will fairly compensate Carrie Warren for the injuries she

Jury Charge (Final)

1    has sustained.

2            Carrie Warren is not entitled to recover damages for

3    stress or emotional problems caused by or related to the filing

4    of, or her involvement in, this lawsuit.

5            You may, but are not required to, assess punitive

6    damages against Richard Randall, Scott Koster, and/or Sabrina

7    Jennings.  The purposes of punitive damages are to punish one

8    or more of these defendants for their conduct and to serve as

9    an example or warning to these defendants and others not to

10   engage in similar conduct in the future.

11           Carrie Warren must prove by a preponderance of the

12   evidence that punitive damages should be assessed against any

13   of these particular defendants.  You may assess punitive

14   damages only if you find that the conduct of one or more of

15   these defendants was malicious or in reckless disregard of

16   Carrie Warren's rights.  Conduct is malicious if it is

17   accompanied by ill will or spite or is done for the purpose of

18   causing injury.  An action is in reckless disregard of Carrie

19   Warren's rights if taken with knowledge that it may violate the

20   law.

21           If you find that punitive damages are appropriate,

22   then you must use sound reason in setting the amount of those

23   damages.  Punitive damages, if any, should be in an amount

24   sufficient to fulfill the purposes that I have described to

25   you, but should not reflect bias, prejudice, or sympathy toward

1182

Closing Argument - Plaintiff

1    either or any party.

2              In determining the amount of punitive damages, you

3    should consider the following factors:

4              The reprehensibility of any of the particular

5    defendant's conduct;

6              The impact of the particular defendant's conduct on

7    Carrie Warren;

8              The relationship between Carrie Warren and the

9    particular defendant;

10             The likelihood that the particular defendant would

11   repeat the conduct if an award of punitive damages is not made;

12   and

13             The relationship of any award of punitive damages to

14   the amount of actual harm that Carrie Warren suffered.

15             The final instructions, ladies and gentlemen, I'm

16   going to read to you after closing arguments.  So you can close

17   your instruction packet, and we will begin closing arguments.

18             Is the plaintiff ready to proceed?

19             MS. DORAN:  I am, your Honor.

20             THE COURT:  You may proceed.

21             MS. DORAN:  Thank you.

22              CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

23             MS. DORAN:  Hi.  I'm not sure if any of you remember

24   much about opening statements last week.  I wonder, though, if

25   you remember Ms. Bruch's reference to the Bible.  She quoted

Closing Argument - Plaintiff

1    Proverbs 28:13:  "He who conceals his transgressions will not

2    prosper."

3            I don't know if she meant to imply that the KCSO or

4    Sabrina Jennings or Scott Koster or Richard Randall were like

5    God, having the power to judge sins and a contrite heart.  I

6    sure hope not.  But we're not in church, are we.  We're in

7    federal court.  And you're tasked with upholding our nation's

8    laws.

9            Let me quote you another text.  This one is from

10   Title VII of the Civil Rights Act of 1964.  And it reads:  "It

11   shall be an unlawful employment practice for an employer to

12   discharge any individual because of such individual's sex."

13           Title VII is a comprehensive prohibition against sex

14   discrimination.  It is illegal, absolutely illegal, to take

15   into consideration a person's sex when deciding whether to fire

16   her.

17           The other law I'd like to mention is what we commonly

18   refer to as Section 1983, which just refers to the area in the

19   federal code where you can find it.

20           Carrie is suing under that law as well because it's

21   that law that makes it illegal for municipalities, like the

22   Kendall County Sheriff's Office, and its employees, like Scott

23   Koster and Sabrina Jennings and Richard Randall, from

24   discriminating against Carrie Warren on the basis of her sex.

25           At the very beginning of this trial, Judge Durkin

Closing Argument - Plaintiff

1   said, "If you've already made up your mind, you're not giving a

2   fair shake."  He was stressing how important it is to keep an

3   open mind before coming to a decision.

4          Isn't that what the defendants ought to have done

5   before they fired Carrie?  Isn't that what they did for the

6   men?

7          Didn't they treat -- did they treat Carrie fairly?

8   They didn't give her the same considerations, the same benefit

9   of the doubt that they had given those men.

10          A charge of lying.  There's nothing hurts a person

11   more than being labeled a liar.  It's miserable not being

12   believed.

13          Accusing someone of lying is an aggressive act.  To

14   the defendants, Carrie was guilty until she could prove herself

15   innocent.  As it turned out, it was an impossible task for her

16   to prove that to those defendants.

17          Ms. Bruch showed you this instruction last Wednesday,

18   and then she went on to argue about how they don't need to be

19   fair.

20          Yes, they do.  Yes, they do.  They need to treat

21   people equally despite their sex.  That's only fair.  That's

22   the law.  This word "fair" as it's used here, it doesn't mean

23   that you can't consider whether what they did was legal or

24   equitable.

25          There's nothing fair about why the defendants fired

Closing Argument - Plaintiff

1    Carrie.  And that's what this case is about, fairness.  It's

2    about treating people equally despite whether they're one of

3    the boys or not.

4         Excuse me.

5         So how do you decide that?  How do you determine

6    whether the defendants took into consideration the fact that

7    Carrie wasn't one of the guys?

8         Each of them, in turn, testified that "No, I didn't

9    terminate Carrie because of her gender."  If that's all it took

10   to avoid liability, Carrie could do nothing.

11        But there's another way to determine whether those

12   defendants were illegally motivated by Carrie's gender besides

13   relying on their simple denial:  You compare.  You compare what

14   they did to the men to what they did to her.

15        So let's start with what they did to her.  Their

16   investigation into Carrie's charge was a sham.  They didn't

17   even do what I suspect most of you would think to do:  They

18   didn't review all the video.

19        They didn't share information with her.  They didn't

20   even pull the court transcript.  Their conduct was so far

21   outside a wide range of reasonableness as to be irrational.

22        Did any of you think to yourselves, why is a commander

23   heading up this investigation?  Why not delegate it to someone

24   lower?  Isn't that what Jennings did with the others?

25        So what did her investigation entail?  Carrie was

Closing Argument - Plaintiff

 1    given but one charge.  She wasn't fired for any of those

 2    allegations, none of them.

 3            Consider what's not on that notice.  No allegation

 4    that Carrie knew that she couldn't bring in a cell phone as a

 5    juror.  No allegation that Carrie lied and said she returned to

 6    the courthouse after lunch.  No allegation that Carrie lied and

 7    said someone from the court called her and told her she'd been

 8    dismissed from jury duty.  They kept those allegations from

 9    her.

10            Jennings then interrogated her.  You heard the audio.

11    That sound fair to you?  That sound like Jennings was trying to

12    figure out the facts, or did it sound like she was trying to

13    make a case to fire Carrie?  When answering that question,

14    consider the fact that the very next day, Jennings recommends

15    that Carrie be fired.

16            Koster then schedules, then postpones her

17    pre-termination hearing not once, but twice.  That's the

18    meeting where she supposedly's given the chance to defend

19    herself.  And they didn't record that one.

20            They never amend her charge.  They never withdraw any

21    of those allegations.  Was that fair?  We know they did it for

22    Michael Dean.

23            They send a detective out to interrogate the travel

24    agent.  I mean, what do you make of that?  In all the other

25    cases, not once does a detective come up.  Do you think that's

1187

Closing Argument - Plaintiff

1    fair?

2          They don't tell Carrie that Ms. Fidler reviewed her

3    phone records and concluded, with the help of Detective

4    Ratkovich, that she must not have been the caller after all.

5    They keep that from her.  Was that fair?

6          Then they call her a liar, and they fire her.

7          Now, defendants are trying very hard to convince you

8    that they make a distinction between lies and persisting in

9    lies, between lies and other misconduct.  They make a

10   distinction between lies and falsifying time records, that is,

11   lying about your time.

12         They're doing this because of this instruction

13   (indicating).  They're worried.  They don't want you to compare

14   how they treated any of those guys we've talked about

15   throughout this trial to how they treated Carrie.

16         They're hoping you'll agree with them that these men's

17   infractions were -- how did Scott Koster put it? -- low-level.

18         For example, Jennings actually testifies that though

19   Levy lied about getting the pornographic letter, it's okay that

20   they didn't discipline him for that lie because -- well,

21   because he came clean.

22         Really?

23         They want to convince you that untruthfulness, lying,

24   McDonald's phone call lying is so highly problematic that they

25   had to subject her to that level of scrutiny and then fire

Closing Argument - Plaintiff

1    Carrie for it.

2          But isn't sex with inmates highly problematic?  What

3    did Carrie have to do to be treated like the men?  Engage in

4    sexual misconduct?  Falsify her time records?  Take gifts from

5    inmates?  Use a Taser and then not report it?

6          How seriously do you think that command staff sitting

7    over there at defense table took their own code of conduct?

8    Well, apart from applying it to Carrie.

9          When we asked Chief Deputy Koster about strictly

10   applying it to the deputies, his answer was "Depends.  Depends

11   on high-level infractions, low-level violations."  Depends on

12   something else, doesn't it?  Depends on whether you're one of

13   the guys.

14         Levy got suspended for lying about extorting a

15   pornographic letter from a female inmate.  Is that what you'd

16   call a low-level infraction?  That's what Koster calls it.

17         Now, I don't want to belabor this point.  I really,

18   really don't.  I think you all saw the pornographic letter.

19   It's extremely graphic, and, frankly, it's a bit disturbing.  I

20   mean, think about this.  This is a letter written by a woman

21   who has essentially no privacy, who is subject to nighttime

22   inspections by this man.  And his story is that she wrote him

23   this letter of her own free will?  That's absurd.

24         Why not give Detective Ratkovich a half hour with Rick

25   Levy and see if his story holds up.  No.  Levy gets a pass.  He

Closing Argument - Plaintiff

1    gets a second chance.  He didn't even get taken off the night

2    shift.

3           Remember his investigation?  Jennings delegated it to

4    Gillespie.  No video review.  You know, when you're not looking

5    for evidence, you're not going to find corroborating evidence.

6    In her own words, Jennings says she didn't conclude Levy lied

7    about soliciting the letter; he simply received it.

8           But Koster did.  He concluded Levy lied.  Yet he

9    didn't fire him.

10          Jennings testified "I couldn't prove Levy had sex with

11   inmates."

12          Well, how about scouring the video?  How about looking

13   at the security door activity?  How about using one of your

14   detectives?  How about doing a rape kit?  Why don't they do any

15   of those things?

16          Let's talk about Levy's termination.  Did it happen in

17   2011 with a letter?  Nope.

18          Did it happen in 2012 with the male inmate harassment?

19   You remember the "punk ass" comment.  Nope.  He got a third

20   chance after that, and he wasn't fired by the KCSO until months

21   after they fired Carrie.

22          Jennings admitted that when they had finally fired

23   Levy for still more allegations of sexual misconduct, they knew

24   he had a history of inmate harassment.

25          Tim Brennan didn't even get disciplined for having sex

1190

Closing Argument - Plaintiff

1    with inmates.

2              And let's talk about that.  "Rape" isn't a word our

3    state uses for forced-sex crimes.  You saw the one Brennan was

4    eventually convicted of: custodial sexual assault.

5              The statute says consent, or alleged consent, is not a

6    defense.  Sexual penetration by a deputy of an incarcerated

7    inmate is rape.

8              Think back to what they did and what they didn't do

9    when Brennan was accused of multiple allegations of custodial

10   sexual assault.  Would you call what they did an investigation?

11             Remember, no review of video.  No interrogation of Tim

12   Brennan.  No rape kits.

13             Now is the time to bring out your criminal detective.

14   This is, after all, a criminal matter.  Nope.

15             I'm sure you can think of other things they could have

16   done to properly investigate those very serious allegations.

17             Oh, and just like in Levy's case, no referral to the

18   State's Attorney's Office, even though in both cases we're

19   talking about potential criminal activity.

20             So the law did finally catch up to Tim Brennan, no

21   thanks to the defendants.  The state police had to be the ones

22   to remove this man from his pool of victims.

23             And the KCSO?  Well, they didn't even fire him.  He

24   got to resign.

25             But he raped inmates.  He was arrested, charged, and

Closing Argument - Plaintiff

1  convicted of that.  And the thing is, defendants were on

2  notice.

3         "I didn't find any evidence of Brennan having sex with

4  an inmate or an inmate making an allegation that she and

5  Brennan were having sex."  That's what Jennings concluded after

6  her subordinate conducted the investigation into Brennan's 2011

7  allegations.

8         Compare Jennings' involvement there to her involvement

9  in Carrie's investigation.

10        Think about all the others:  Crumly with his stew and

11 soap and pickles.  Graham with his Taser.  Dean with his lie

12 about patting down an inmate.  Brennan and Buis with their

13 falsified time sheets.

14        And who could forget Joe Jasnosz.  Now, his story

15 admittedly is funny.  But what he was up to created a serious

16 problem for the Sheriff's Office, didn't it?  I mean, of all

17 the women in the world, Joe Jasnosz chooses to have an affair

18 with an Oswego police officer, and not just any Oswego police

19 officer.  He's the guy who co-led the joint task force with

20 him.

21        I mean, remember, Joe lied.  He bald-faced lied right

22 to Koster when he denied that Koster had told him to cut it

23 out.  Remember Koster's own conclusion was that Jasnosz had a

24 trustworthiness problem; that is to say, he had a problem with

25 lying.

Closing Argument - Plaintiff

1    But to all that, we think you should remember what Joe

2    Jasnosz did the day after he was caught we'll call it

3    red-handed.  He suspiciously switched his license plate.  They

4    say they didn't have to investigate why he switched the plates

5    because they didn't see anything suspicious in it.

6    Do you?

7    Think about all these men, and ask yourselves whether

8    defendants held them to the same high level of scrutiny that

9    they held Carrie.

10   For the past five days, defendants have been

11   minimizing the male employees' bad acts:  "Well, that was an

12   inmate complaint."

13   It was a potential criminal act.

14   If you give venison stew to one inmate, you've got to

15   give it to every inmate.  I mean, is that really what the

16   problem was, not enough stew?

17   Graham eventually admits shoving his Taser into an

18   inmate's chest.  What, so it's okay not to report using a

19   potentially deadly weapon so long as you own up to it once

20   you're caught?

21   Look.  We're not saying all these guys should have

22   been fired like Carrie was.  All right.  Maybe a few of them

23   should have been fired.

24   What we're saying is, like Crumly and Belmont and

25   Gillespie and even Buis, she should have either been believed

Closing Argument - Plaintiff

1   or given a reprimand.  Maybe a writeup.  We wouldn't be here if

2   they had suspended her.

3           It's very important to guard your honest reputation,

4   but sometimes holding fast to the truth has its costs.  If they

5   had been able to break Carrie down into lying and saying that

6   she never got that phone call, do you think it would have

7   mattered?

8           Remember Koster's stunning statement that Carrie's lie

9   about the phone call was the most egregious lie he had ever

10  heard.  I mean, did you buy that?  That is a bold statement,

11  particularly given the fact that he testified about having to

12  deal with -- what was it? -- 20 disciplines a week.  I mean,

13  that is a lot of misconduct going on at the Sheriff's Office.

14  And Carrie's is the most egregious?

15          Whether in the ordeal of being called before her chief

16  and her commander or whether under the harsh questioning of

17  their attorney, Carrie has never faltered in the statement that

18  she received that call.

19          And why would she lie?  For what?  17 minutes?

20          Whether she found out at 11:00 or 11:10 or she found

21  out while going through the McDonald's at 11:40 or 11:45, what

22  does it matter?  She got to work at 12:27.  What does she have

23  to gain from lying?  If, as the defendants have been arguing,

24  Carrie lied about getting that call, well, why doesn't that

25  make any sense?

Closing Argument - Plaintiff

1    I mean, what was she getting out of it?  It can't be

2  time because she was an hour 17 door to door, despite the

3  weather, despite having to grab some lunch, despite having to

4  drive home and change into her uniform.  They don't deny that

5  she was entitled to an hour break.

6         So what's the reason she had to lie?  To get a measly

7  17 minutes?  For the thrill of it?  To stick it to her travel

8  agent?  I mean, do you buy that?  Doesn't it beg the question

9  if she did concoct a lie, why not say it was just Louise who

10  called or Jennifer or why not Jeff?  I mean, wouldn't that have

11  been easier?  Simpler?

12         It does make sense that Carrie thought it was the

13  court who called her.  You saw the video of her at jury

14  check-in, the one where the woman behind the counter goes and

15  finds out whether she needed to stay.

16         The Sheriff's Office is the security for the court, so

17  it makes sense that she thought they had called her as a

18  professional courtesy.  They had her number; she's one of them.

19         Does anyone think poor Chris Fidler, the woman who

20  gets dragged into federal court, was lying when she said she

21  honestly believed she called Carrie on the 6th?  It made sense.

22  Frankly, it still makes sense.

23         Hand over your cell phone bill.  You know, the one

24  that lists all of your personal, private calls.  Well, Jeff

25  Warren was having none of that.  Remember, he's a battalion

Closing Argument - Plaintiff

1    chief.  He knows these people.  He's more private than Carrie.

2    He's a lot more private than Carrie.

3              Would you trust those defendants with the history of

4    your private phone calls?  Do we blame Jeff because he didn't?

5    Do we blame Carrie?

6              I don't know why the McDonald's phone call doesn't

7    show up.  I don't know why Jennings' calls aren't there.  I

8    don't know why the calls to Louise aren't there.  I don't know

9    why the bill shows no incoming calls at all that day.

10             Jennings doesn't deny that she called Carrie.

11             Louise has a distinct memory of that morning call, and

12   that makes sense.  I mean, it was snowy, bad conditions, bad

13   enough for school closings.  So Carrie's got to get to jury

14   duty.  She's got to make sure Louise is on her way to watch

15   over Megan.

16             It makes sense that Carrie would have called her,

17   right?  Does it make any sense to you at all that Carrie would

18   not have talked to her mother-in-law that morning about her

19   sick daughter?

20             Louise remembers pulling over to the side of the road

21   because, hey, maybe she didn't have to go after all.

22             But, see, it's not about the phone bill.  You heard

23   Koster testify that he didn't think the redacted phone records

24   were conclusive.  He didn't recommend firing Carrie for giving

25   him redacted records or lying about redacted records.  It's a

1196

Closing Argument - Plaintiff

1    distraction, as was Judge Pilmer, Tracy Page, Lisa Bowen, and

2    the Facebook posts.  They don't want you to focus on what's

3    going on; that is, the men get passes, and Carrie gets fired.

4           So they fire her.  Meanwhile, Levy, Brennan, and the

5    whole lot of them were still working there, working for the

6    Sheriff.

7           So let's talk about the three individual defendants.

8    As a jail, how does Kendall County fare?  From what you've

9    learned, how seriously do you think the command staff took

10   their own code of conduct?  We know they took it deadly

11   seriously when it came to Carrie, not so much with the men.  It

12   depends.

13          You know that Carrie is alleging the defendants

14   discriminated against her because of her sex.  So let's

15   consider defendant Richard Randall's concern over sex equality.

16   Title VII was passed in the civil rights movement in 1964.

17   Former Sheriff Randall was initially elected in 1986.  He

18   testified that he hired the first females at the jailhouse.

19   Oh, he gave us a history lesson about the jailer's wife being

20   the matron.  But he admitted that it wasn't until the early

21   '90s that the first women were employed there.

22          So at least five years go by of his first term before

23   he gets around to hiring female guards.  Hmm.

24          Then we find out it's not until a decade and a half

25   later, 2009, that he finally gets a written sex discrimination

Closing Argument - Plaintiff

1  policy in place.  I mean, think about that.  Is that the track
2  record of a man concerned about sex equality in the workplace?
3          He testified that he didn't recall the Levy porn
4  incident or the 2011 allegations against Brennan.  I mean,
5  doesn't that sound incredible to you?  Doesn't it sound -- does
6  it sound like a person who's concerned about the safety of his
7  female inmates?
8          We've also discovered that there are around 30 or 40
9  or so deputies at the jail.  And when Carrie worked there under
10 Sheriff Randall, how many of them were female?  What'd she
11 count, six?  It's a good-paying job.  It's stable.  It's got a
12 lot of respect.  So where are the women?
13         What was Richard Randall really if not the classic
14 rubber stamp?  He made no effort whatsoever to say that he
15 played any role apart from giving his Chief Deputy full rein to
16 handle firing Carrie.  He's where the buck stops at the KCSO.
17 Remember?  He's the final decision-maker for that municipal
18 entity.
19         If he approved of Koster's and Jennings'
20 recommendations to fire Carrie and that recommendation was in
21 any way motivated by gender, then he's liable under
22 Section 1983, and the KCSO is liable too under both Title VII
23 and Section 1983.
24         Scott Koster.  He was very careful to try to
25 distinguish how he treated the men from how he treated Carrie.

Closing Argument - Plaintiff

1   He sics the detective on Ms. Fidler.  He ignores the written

2   Notice of Charges and reverses direction without telling

3   Carrie.  He holds back the Fidler information before the

4   termination meeting.  He has in his mind -- he has his mind

5   made up.  He calls her a liar, and he fires her.

6          They've offered no evidence that he treated men this

7   way.  In fact, remember the amended charges?  The Dean

8   interrogation is starkly different from Carrie's.  He's allowed

9   to explain and clarify his side of the story.  No yes-or-no

10  demands to him.

11         Koster is liable under Section 1983.  And because

12  gender played a role in his decision, the CSO is liable under

13  Title VII and 1983 too.

14         Sabrina Jennings.  She decided back in January to

15  recommend firing Carrie.  She didn't even review all the video

16  or allow Carrie to defend herself really at all before

17  concluding that Carrie's got to lose her job.  There are no

18  male comparators that even come remotely close to this

19  close-mindedness in Jennings.

20         Sometimes as it happens, women discriminate against

21  women.  Jennings climbs the hierarchy, and she guards her

22  position jealously.  Some women reach down and help others; not

23  so Sabrina Jennings.

24         She's liable under Section 1983.  And because gender

25  played a role in her decision, the KCSO is liable under

Closing Argument - Plaintiff

1    Title VII and Section 1983.

2            Getting fired is crushing.  Getting fired because your

3    employer says it doesn't believe you got a phone call over

4    lunch when your male coworkers get slapped on the wrist for all

5    sorts of serious violations, well, that's worse.

6            There's nothing fair about the way Carrie was fired.

7    But you can right that wrong.  You have the power to mete out

8    justice.

9            Carrie suffered debilitating depression.  She stayed

10   in bed for months.  She didn't do her hair, her nails.  She

11   didn't dress like she normally did.  She didn't even want to

12   see her good friend Jennifer, who was so worried about her.

13           She wasn't just fired; she was humiliated.  She had to

14   get a job with the help of a former inmate.  She had to serve

15   Sabrina Jennings Italian food.

16           She was stripped of her dignity.  The identity she had

17   worked so hard to achieve, gone.  She was ashamed.  She felt

18   guilty for having lost her dream job.  She let down her

19   husband.  She let down her daughter.  She let down herself.

20           That career defined her.  It gave her purpose, and it

21   gave her a sense of pride.  She is wounded to the heart by the

22   injustice done to her.

23           The defendants found for the guys.  You should find

24   for Carrie.  And let me show you how you can do that.

25           You have a pretty long verdict form here.  Let me walk

1200

Closing Argument - Plaintiff

1   you through it.

2           At the beginning it says:  "Has Carrie Warren proven

3   that her gender was a motivating factor in any of the

4   defendants' decisions or recommendations to fire her?"  Yes.

5           You proceed to 2A:  "Has Carrie Warren proven that her

6   gender was a motivating factor in the decision by Richard

7   Randall to fire her?"  Yes.

8           "Has Richard Randall proven that he would have fired

9   Carrie Warren if she was a man?"  No.

10          "Has Carrie Warren proven that her gender was a

11  motivating factor in the decision by Scott Koster to recommend

12  firing her?"  Yes.

13          "Has Scott Koster proven that he would have

14  recommended firing Carrie Warren if she was a man?"  No.

15          "Has Carrie Warren proven that her gender was a

16  motivating factor in the decision by Sabrina Jennings to

17  recommend firing her?"  Yes.

18          "Has Sabrina Jennings proven that she would have

19  recommended firing Carrie Warren if she was a man?"  No.

20          If you answered no to this, to this, and to this

21  (indicating), then you answer this question:

22          "Has Carrie Warren proven that her gender was a

23  motivating factor in the decision by the Kendall County

24  Sheriff's Office to fire her?"  Yes.

25          "Has the Kendall County Sheriff's Office proven that

1201

Closing Argument - Plaintiff

1    it would have fired Carrie Warren if she was a man?"  No.

2            And this is the page where you get to award damages.

3    This is where you put a number to award Carrie for the

4    emotional distress that she suffered at their hands.

5            These lines here allow you to award punitive damages

6    against each individual: Richard Randall, Scott Koster, Sabrina

7    Jennings.  Punitive damages are meant to punish.  This is an

8    opportunity for you to right a terrible wrong and send a

9    message to these defendants that they're not above the law.  We

10   ask that you do just that.

11           Thank you very much.

12           THE COURT:  All right.  Thank you.

13           We're going to take -- excuse me -- about a ten-minute

14   break to allow the court reporters to switch.

15           And while you're out, please don't discuss the case

16   among yourselves or with anyone and keep an open mind.  You can

17   leave any of the materials here if you'd like.

18           COURT SECURITY OFFICER:  All rise.

19      (Jury out at 11:14 a.m.)

20           THE COURT:  Anything we need to put on the record?

21           MS. BRUCH:  No, your Honor.

22           MS. DORAN:  No.

23           THE COURT:  Plaintiffs?

24           All right.  Ten-minute break.

25      (Recess at 11:14 a.m., until 11:27 a.m.)

1        THE COURT:  We're going to bring in the jury.

2               And are you using the ELMO?

3        MS. BRUCH:  Yes.

4     (Jury in at 11:26 a.m.)

5        THE COURT:  All right.  Please be seated, Ladies

6  and Gentlemen.

7               Defense ready to give their closing argument?

8        MS. BRUCH:  Yes, your Honor.  Thank you.

9        THE COURT:  You may proceed.

10        CLOSING ARGUMENT ON BEHALF OF THE DEFENSE

11        MS. BRUCH:  May it please the Court.  Counsel.  On

12  behalf of Sheriff Randall, Sheriff Baird, Chief Deputy Koster

13  and Commander Jennings, I would like to thank you for your

14  service during this trial.  I know that each of you made some

15  significant sacrifices to be here and sit on this jury.  And

16  certainly jury service is one of your most important civic

17  duties.  And it's especially difficult to sit as a juror on

18  an employment discrimination case.  And why is that?  Because

19  no one wants to ever see someone lose their job.  That's a

20  terrible thing.  There is a natural desire to sympathize with

21  someone who has lost their job.  And that's why the first

22  instruction that you're given as part of your deliberations

23  is the fact that your duty is to apply the law to the facts,

24  and that you must follow the instructions, even if you

25  disagree with them, even if you feel bad.  Because we

1    probably all feel bad that someone here lost their job.  But

2    that's not your role here.  Your role here is to follow the

3    instructions, even if you disagree with them.  And each of

4    the instructions is important.  You must follow all of them.

5    And that's especially true in this case because, again, you

6    may feel that, you know, it's really awful that she lost her

7    job, but you have to follow the law.

8         And what is the law?  If the plaintiff here were

9    Deputy Ricky Levy, there wouldn't be any struggle by any

10   juror because who would feel sorry for him?  I mean, he

11   clearly deserved to be fired.  There is no question that he

12   should have been fired.  But this is a different situation.

13   This is an employee who defendants terminated because she

14   lied.  And she lied about the circumstances surrounding her

15   release from jury duty.  And right off the top of your head

16   you might be thinking, boy, you know, that's really not such

17   a bad thing.  Why would you fire somebody for that?  But

18   that's not what this type of case -- this case is about.  You

19   know, that certainly might be something that you might not be

20   outraged over.  And when you're looking at the evidence you

21   might be thinking, you know, if I was the sheriff, I might

22   have given her a second chance.  Was that a wise decision?

23   Was this reasonable?  Was this fair?  Should Warren had been

24   given that second chance?  But, again, that's not something

25   that you should consider as part of your deliberations.

1    So, remember, Jury Instruction No. 18. And Jury

2    Instruction No. 18 tells you that whether the decisions of

3    the defendants were wise, reasonable, fair is not something

4    that you should concern yourselves over. Rather, the focus

5    of your deliberations should be on whether Carrie Warren has

6    proved that defendants terminated her in part because she is

7    a woman, and whether the defendants proved that they would

8    have fired her even if she was a man. That's what the focus

9    is of your deliberations. Always keep that in mind as you're

10   reviewing the evidence. It's not whether you would have made

11   that decision if you were in the Sheriff's Office or not.

12   There is a reason for that instruction.

13   And the reason for that instruction is, if you look

14   back at all the jobs that you've ever had from when you were

15   16 until now, who hasn't had a boss that you thought was

16   unreasonable, that was difficult to work with, was mean and

17   wasn't fair. Maybe even incompetent. But that's not really

18   the standard here. Everybody has had that situation, and

19   certainly it's especially true in law enforcement because you

20   heard, as a paramilitary organization, there is a lot of

21   discipline that goes on in the Sheriff's Office. And, in

22   fact, Chief Deputy Koster said on any given week he can see

23   over 20 disciplinary investigation reports pass through his

24   desk. He sees hundreds, if not a thousand of these cases

25   over his career.

1       So people are being disciplined all of the time in
2   the Sheriff's Office, and it's very easy to look at from the
3   outside and think, wow, that's really harsh.  And you may not
4   find that Commander Jennings or Chief Deputy Koster are warm
5   and fuzzy people.  But keep in mind that Commander Jennings
6   was one of the first females hired in the corrections
7   division by Sheriff Randall.  She was one of the first
8   females in a very male-dominated environment.  And despite
9   that fact, she was able to rise through the ranks.  Sheriff
10  Randall, he promoted her to sergeant in the corrections
11  division.  Not only did he promote her to sergeant, she
12  testified to the wide range of training that she was provided
13  by Sheriff Randall throughout her career.

14      Not only was she promoted to sergeant, she was
15  promoted to be the head, in charge, of the entire corrections
16  division.  The commander.  That's a big job.  So if Sheriff
17  Randall was not liking of female employees, you have to ask
18  yourself, why would he put a female in charge of that entire
19  division?

20      You also heard of the name Jeanne Russo.  Sergeant
21  Russo.  Again, another female employee who was promoted by
22  Sheriff Randall to supervise what was mainly male employees
23  in the corrections division.

24      So certainly there are opportunities for females in
25  the corrections division, and the Sheriff's Office isn't just

1    looking to get rid of female employees.

2           Now, keep in mind that most of the inmates in the

3    jail are men, so most of the deputies that Commander Jennings

4    supervises are men also.  She better be tough.  You know,

5    Commander Jennings and Chief Deputy Koster have a huge

6    responsibility.  They have to make sure that the employees

7    under their command follow the rules.  And do employees get

8    upset if they're disciplined?  Absolutely they do.  It's

9    pretty rare for an employee to say, yes, I deserved that, to

10   be disciplined.  If you were to look back at all of the

11   people that you know in your family, your professional life,

12   your personal friends, and if there has ever been anyone in

13   your life who has been terminated for a job, and it hasn't

14   been because there was like a cutback at the factory or

15   something like that, has there ever been a situation where

16   your friend said, yeah, they should have fired me sooner, I

17   deserved it.  No, that never happens.  Everyone says:  It

18   wasn't fair.  They were out to get me.  This is

19   discriminatory.  That's a common reaction from individuals

20   who have been terminated from a job.  There is nothing unique

21   about that.  In this situation people are upset.  They're

22   going to say, my boss wasn't fair.  But it's very unlikely

23   that they're going to say that they deserve to be fired.

24          But here, in this case, Ms. Warren had an extra

25   protection that many employees don't have.  She was a member

1    of the union.  And as part of the union, she had the

2    responsibility, or she had the ability to not be fired unless

3    there was just cause.  So if she felt that the procedures

4    that the Sheriff's Office was employing throughout this

5    disciplinary process were not fair, she had the opportunity

6    to make that argument through the grievance process.

7               One of the court's instructions that you'll hear is

8    No. 7.  And No. 7, again, provides that:  You've heard

9    evidence about whether defendant's conduct complied with or

10   violated certain rules or regulations, and you may consider

11   this evidence in your deliberations.  But remember that the

12   issue is whether defendants discriminated against Carrie

13   Warren and not whether a rule or regulation might have been

14   complied with or violated with.  So, again, not the focus of

15   your deliberations.

16              What exactly are you being asked to decide?  The

17   focus of your deliberations is going to be on whether or not

18   Ms. Warren satisfied her burden.  Because she has the burden

19   of proof here, to show by a preponderance of the evidence

20   that her gender motivated the decision of Commander Jennings

21   and Chief Deputy Koster to recommend to Sheriff Randall to

22   fire her, and, was Sheriff Randall motivated to fire

23   Ms. Warren because she is a woman.  The answer to those

24   questions is very easy:  No, not at all.  Ms. Warren's gender

25   had nothing to do with their decisions or their

1    deliberations.  If a male deputy had engaged in the same

2    behavior, they would have been fired too.

3           So what prompted the investigation that led to her

4    termination?  You heard from Judge Pilmer that the first and

5    only time that he ever reported behavior by a prospective

6    juror that he had problems with was the situation with

7    Ms. Warren.  And he reported that to Judge McCann.  And this

8    is what he told you.  He told you that his impression was

9    that she wasn't even willing to sit on a one-day trial, much

10   less a seven-day trial.  Judge Pilmer's impressions were

11   entirely justified, given that Ms. Warren's Facebook post

12   complained about how, I can't believe me being in law

13   enforcement that I'm having to show up at the courthouse

14   Monday morning for jury duty.  Why they would want me on a

15   jury is beyond me.  If it's a civil case, I do believe that

16   people should pay their bills.  If it's criminal, I side with

17   the police.  Yep, I'm a bit salty about that one.

18          So even coming into the courthouse, she was already

19   upset about having to be there.

20          She complained that she was going through security.

21   And you saw the video of her in the jury assembly room.  What

22   is she doing?  She is putting her coat back on.  She is

23   putting her coat back on because she thought she was better

24   than everyone, and she's out of here, and she doesn't have to

25   spend the day serving her jury service.

1    Other people in the courthouse complained about the
2    way that Ms. Warren behaved in the courthouse.  Her testimony
3    from her and her husband is both that she felt that she was
4    being set up.  Is there any evidence to suggest that Judge
5    Pilmer, who is not employed by the Sheriff's Office, and the
6    jury commissioners, who are not employed by the Sheriff's
7    Office, were out to get her, were trying to set her up, or
8    were motivated in any way to bring forth their concerns
9    because she is a woman?

10    At the end of the day, though, whether or not
11    Ms. Warren is guilty of the complaints, the behavior that she
12    was accused of by people at the courthouse is really not even
13    relevant.  And the reason why because the decision to
14    terminate her employment was not based on anything that she
15    did at the courthouse.  The only reason why that we even
16    brought up that evidence is to show that the -- the whole
17    investigation was initiated from an outside complaint, not
18    from the Sheriff's Office.  And there has been some -- it was
19    brought up during closing argument by counsel that, well, if
20    this wasn't a big deal, why wasn't a low-level sergeant
21    assigned to investigate this?  And I think you heard evidence
22    that the reason why is this was a complaint that came through
23    the chief judge of the courthouse.  So they're not -- they're
24    going to give respect and deference to the judiciary and not
25    going to assign this to a sergeant.  They're going to assign

1   it to Commander Jennings to take a look at.  And if it was

2   going to be something that they thought from the outset that

3   they were going to terminate her for, wouldn't they have had

4   Chief Deputy Koster investigate it from the beginning?  You

5   saw him on the stand how deliberate and how much work he does

6   in terms of investigating cases.  He would have just handled

7   this right from the beginning, if the original intent was,

8   we're out to get her because she is a woman, we want to fire

9   her, then he would have taken care of it.

10          Now let's focus on the circumstances surrounding

11  Ms. Warren's release from jury duty.  If you remember

12  Ms. Warren's testimony on direct examination with her

13  attorney, the only thing that she told you about was how

14  Judge Pilmer was explaining to the prospective jurors about

15  what the procedures were for lunch.  And if you are seeing

16  somebody out in the hallway, that the attorneys can't speak

17  with you.  And things like that.

18          And then she testified that she eventually got to

19  leave the courthouse, but the only thing that she was told

20  was, you may go, you may leave.  Ms. Warren's explanation is

21  completely unworthy of belief.

22          Recall Judge Pilmer, when he got on the stand, and

23  he testified that after Ms. Warren was not selected for the

24  jury, which was clear to her that he released her and told

25  her that she needed to go back to the jury assembly room.

1    And this is what he instructed her.  You see the transcript.

2    "I presume at this point they'll probably be releasing you to

3    let you go."  He then said, "So if you go back there, and

4    then you will be released."  So Judge Pilmer is telling her,

5    you're done, you're going to be out of here.  It was clear

6    she was not going to be on that jury.  It's very clear that

7    she is going to be told that she can go.  During the time

8    that she is in the jury assembly room, she is told, you may

9    go.  Ms. Warren claims that she thought she had to return.

10   But, again, you will not find a single piece of evidence in

11   the record of, all the exhibits that you're going to see.

12   You're not going to see anything that would support her claim

13   that at 11:00 o'clock in the morning, at the Kendall County,

14   at the courthouse, that people are being released from jury

15   duty for lunch at 11:00, and then told, you may go, but not

16   given any instruction on when to come back, how long lunch

17   is, nothing like that.  There is nothing that you're going to

18   see in the record.

19            At that point, Ms. Warren leaves the courthouse,

20   calls Commander Jennings, and says, we broke for lunch, and

21   that, as soon as she is done, she would come back over to the

22   jail.  At the time that she called Commander Jennings, she

23   knew full well that she was done and that she was not just

24   breaking for lunch.

25            Ms. Warren said on the witness stand and repeated

1   yet another lie that she told the Sheriff's Office.  She
2   claimed that she received a phone call from someone as she is
3   going through the McDonald's drive-thru who says, "Hey,
4   Carrie, nothing else is needed.  Have a good day.  Don't work
5   too hard."  You can scour through all of the exhibits in this
6   case, and you won't see any evidence that she ever received
7   any call when she was going through the McDonald's
8   drive-thru.  I can't emphasize this enough.  There is no
9   evidence of any call whatsoever being made to her when she
10  went through the McDonald's drive-thru.
11          When Ms. Warren gets back to the jail after she has
12  been gone, she admits to going to the break room, and she has
13  this conversation with Tracy Page and Lisa Bowen.  Her
14  statement was so strange that it would have stuck in their
15  mind because what she tells them is that she had jury duty,
16  the courts released the jurors for lunch, then they had to go
17  back, and once they got back, they were released to go.  And
18  both Tracy Page and Lisa Bowen thought, well, that's a
19  ridiculous way to operate the jury commission.  Why wouldn't
20  they just tell you that before lunch?  So they certainly
21  thought it was pointless that why would they tell these
22  people that they could leave for lunch and then let them go
23  when they come back?  Again, it's your decision on who to
24  believe of that situation.  And certainly our position is
25  that Tracy Page and Lisa Bowen have no reason to make up what

1    she said during that situation.

2              Now, when we skip forward to this January 14th

3    meeting in Commander Jennings' office.  Now, Ms. Warren was

4    asked what she was thinking when she learned about the

5    charges on January 14th.  And she said she felt like she was

6    being set up.  By who?  By Judge Pilmer?  By the jury

7    commission?  I mean, during that meeting, that's the time

8    that Ms. Warren was the one who voluntarily told Commander

9    Jennings that she received this phone call from someone

10   telling her that she didn't have to report back to the

11   courthouse and she was done.  This was another lie.

12   Ms. Warren knew full well that she never got any call when

13   she went through the McDonald's drive-thru.  She couldn't

14   have thought that she got a call from anybody at the

15   courthouse.  Why?  Because she didn't give them her cell

16   phone number.  How would they know that it was -- to call

17   her?  They didn't ask for the cell phone numbers of any of

18   the jurors.  And why would they -- they pick her out?  Chief

19   Deputy Koster told you the Sheriff's Office doesn't even

20   release the numbers of their employees to the jury

21   commissioners.  They wouldn't have even had them.

22             So on the January 14th meeting, this is eight days

23   after her jury service on January 6th, that's when Commander

24   Jennings says, well, just give me a screenshot of your phone

25   so I can see that you had this call.  And if you don't have

1    that, just get me the phone records.  So, first, under direct

2    examination, Ms. Warren claimed that her call log didn't go

3    back that far.  It didn't go back the eight days.  Then she

4    claimed that she looked at her call log on that day and those

5    calls had already been deleted from her call log.  Then she

6    changed her testimony again and said, well, maybe it was her

7    husband that deleted the call log.  But you heard her

8    husband.  He said he has never done that.  He says he only

9    deletes apps if her phone is running slow or tells her to do

10   that.

11          So then what happens next?  Also, keep in mind that

12   on February 14th is when she supposedly looks at her call log

13   and she sees the Chris Fidler phone call.  When was the Chris

14   Fidler call?  The Chris Fidler call was on January 10, four

15   days before the January 14th meeting.  So if on January 14th

16   she looks at her call log, then -- and all of the calls on

17   her log were deleted, the January 10th call shouldn't be

18   there either; right?  How would she even have that?

19          Then she prepares a memo to Commander Jennings

20   about what happened at the time of her jury duty.  And take a

21   look at Joint Exhibit 8.  And when you look at that, what

22   you're going to see is that what Ms. Warren was doing is that

23   she was trying to suggest to the Sheriff's Office that, in

24   fact, she was just out on lunch, even though that was not

25   true.  She writes, he informed us, referring to Judge Pilmer,

1    "He informed us sometime today we would break for lunch and

2    continue on possibly until 4:30 p.m."  She is not being

3    truthful in her memo.  She wasn't selected for jury duty.

4    She wasn't selected for that jury.  She knows that she wasn't

5    going to be sitting in Judge Pilmer's courtroom until

6    possibly 4:30.  So this is not an instruction that Judge

7    Pilmer gave to her.  Why did she put that in her memo to the

8    Sheriff's Office if it was not to deceive them about her

9    whereabouts and what she was doing?

10        So now let's move forward to the February 5th

11   formal interrogation.  And you've heard that the purpose of a

12   formal interrogation is not to just let somebody just give a

13   whole long narrative of their side of the story.  Commander

14   Jennings had already got her side of the story on January

15   14th.  So she already knew what Ms. Warren's explanation was

16   related to jury duty.  February 5 was just to get

17   confirmation that what she said earlier was, in fact,

18   truthful.

19        But what happened during that February 5 formal

20   interrogation?  What happened was that Ms. Warren changed her

21   answers.  She lied to Commander Jennings during that formal

22   interrogation.  So you may recall that Mr. Stomper kept

23   asking Commander Jennings for the names of the complainants

24   during that meeting.  Had Ms. Warren known the names of Judge

25   Pilmer, Nikki Swiss and the courthouse deputies, how would

1    that have changed any of her answers to those questions?  You

2    heard her on the stand in this case.  She has told you that

3    she has testified truthfully from the beginning all the way

4    through.  She is not coming on the stand and saying, oh, upon

5    further reflection, some of the answers that I gave on

6    February 5th were inaccurate, and I didn't fully understand

7    the question.  She is saying, I gave truthful answers at that

8    time.  So who the complainants are is irrelevant.

9            Now, also, if you take a look at Commander

10   Jennings' reports, there is some suggestions that she did not

11   do a full investigation, didn't review the videos.  In fact,

12   an attachment to Commander Jennings' report are the videos.

13   She reviewed the videos as part of her investigation.  There

14   is no audio on the videos.  So there is no way for her to

15   determine what was said by anyone because there is simply no

16   audio.

17           Now that you've had an opportunity to hear from

18   Chief Deputy Koster, though, you can see how meticulous he

19   was, and he takes over the investigation after February 5th.

20   And he provides her with this notice of pre-disciplinary

21   hearing.  Prior to getting this notice, Ms. Warren knew that

22   the subject of her truthfulness was already the focus of the

23   Sheriff's Office investigation.  So she also knows at that

24   time from getting the reports and the records from Commander

25   Jennings that the courthouse people are saying, we didn't

1   call her.  So now she has got to come up with some story of

2   who supposedly called her when she went through the

3   McDonald's drive-thru, knowing that no such call ever

4   happened.  So how is she going to explain that?  She is at

5   the fork in the road.  And this is what distinguishes her

6   from the other deputies.  The other deputies, when faced with

7   that fork in the road, what did they do?  They said, turn

8   left.  Sorry, I was untruthful, my report was incorrect,

9   you're right, I didn't say something that was accurate, I'm

10  sorry.  Do they still get disciplined?  Absolutely, they

11  still get disciplined.

12          Instead, Ms. Warren goes to the right, and instead

13  she doubles down on her lie.  How does she double down on her

14  lie?  She then calls the travel agent, Chris Fidler, to tell

15  her that she has a political problem at work.  And you heard

16  Chris Fidler.  Did Chris Fidler appear that she was lying to

17  you or that she was part of some coverup out to get

18  Ms. Warren because she's a woman?  No.  What Chris Fidler did

19  tell you, and, again, she did not say she felt like she was

20  being interrogated, she was just being questioned by the

21  detective.  And what she said was that she was told by

22  Ms. Warren that, you'll never hear from anyone.  Just -- just

23  prepare -- this is what you need to put in the memo.  Send me

24  this e-mail.  You'll never hear from them.  If Ms. Warren

25  truly thought that Chris Fidler called her on January 6th,

1    why would she care if anyone in the Sheriff's Office followed

2    up and asked her any questions?  Ms. Warren knew from her

3    phone log, knew that she never got a call from Christine

4    Fidler on January 6th.

5            And now we get to the redacted records.  Now, both

6    of the Warrens got on the witness stand and testified, under

7    oath, that Ms. Warren had absolutely nothing to do with the

8    redaction of the cell phone records.  It wasn't her idea.

9    She wanted to turn over everything.  And they had this heated

10    discussion, and he just quickly redacted random numbers with

11    no rhyme or reason, and she grabbed that paper and rushed out

12    the door for this February 28th meeting.  And Mr. Warren

13    claimed that he randomly redacted these entries seemingly

14    with no thought whatsoever.  So let's look at those records.

15            We see in both Joint Trial Exhibit 9 and

16    Defendant's Exhibit 9, you have seen this over and over, so I

17    don't want to spend a lot of time on it.  But it certainly is

18    suspicious that even though there was no rhyme or reason

19    whatsoever to his redactions that the only numbers that he

20    did not redact for January 5th and 6th are records with the

21    Sheriff's Office and Commander Jennings.  Those are the only

22    calls that he is not redacting that are not to him.  Right?

23    But he doesn't supposedly know that those numbers are for the

24    Sheriff's Office or Commander Jennings.  So what's the

25    chance?  You could spend hours and hours going through these

1    records and just basically flipping a coin, should I redact

2    this one, should I redact that one, randomly.  There is no

3    possible way that you're ever going to only select the

4    non-Sheriff's Office numbers and the call that's not --

5    that's to him as the ones that you don't redact.  It's not

6    even plausible.

7                Now, you also know, based on the testimony you

8    heard today, that this was not some random act.  This was not

9    something that Mr. Warren did as she is rushing out the door.

10   Deputy Little came in here and told you that, before that,

11   they had a meeting in the home, and they looked at these

12   un-redacted records.  So she knew full well that there is no

13   phone call from anyone as she goes through the McDonald's

14   drive-thru.  She knows that.  So there is a conversation that

15   takes place before -- while Deputy Warren is there, and this

16   is before Chris Fidler ever comes into play, that, uh-oh,

17   well, let's just redact these numbers.  That was the

18   discussion of Mr. Warren, saying, well, these -- this is

19   privacy concern, I'm going to mark some of these off.  They

20   got together.  They did it jointly.  Or maybe even she did

21   it, who knows.  But how do we know that this is something

22   that they conspired with?  First of all, we know that from

23   Deon Little because he said that she saw the un-redacted

24   records before they were ever redacted.  She has denied it.

25   And how else -- this is your common sense.  This is how you

1    know that she is the one who saw it and was aware of it.

2         Take a look at this document.  This is the document

3    that she gave to Chief Deputy Koster on February 28th.  And I

4    asked her, and she was asked about the handwritten notes, the

5    notes that are here and here in this document.  When were

6    those -- when were those notes written?  And they were

7    written by her.  And what did she say?  She said that those

8    notes were written after her termination as part of the

9    grievance procedure.  Right?  That's what she told you.  What

10   do you notice about this writing here?  Do you notice that

11   it's in the same Sharpie pen as the redactions?  What

12   conclusion can you draw from that?  The conclusion that you

13   can draw from that is that she was conspiring with

14   Mr. Warren, and they purposely redacted this call to deceive

15   the Sheriff's Office and make them think that that particular

16   call was made by Chris Fidler, knowing full well that the

17   records didn't show that.  She could have come clean.  She

18   chose not to.  She double down.

19        So at the February 28th disciplinary hearing,

20   that's when they hand those records.  And what did they say?

21   Oh, these are -- these are records that are going to

22   basically support her truthfulness.  They knew that

23   truthfulness was an issue.  Those documents were given to

24   support the issue of truthfulness.  They had nothing to do

25   with anything whatsoever at the courthouse.

1   So then we get to the March 11th meeting.  And

2   that's the meeting where Stomper says that this was a comedy

3   of errors and that she mistakenly thought that the call from

4   the travel agent was really from the courthouse.  And, at

5   that point, the Sheriff's Office had already spoken with

6   Christine Fidler.  They knew that there was no such call on

7   January 6th from Fidler.  So that's when Chief Deputy Koster

8   says, you're a liar.  He made that determination.  He didn't

9   say, you're a woman, and I'm going to terminate you because

10  you're a woman.  She is a liar.  She lied about that.  So

11  after they're confronted, they don't -- again, no admission

12  that, oh, oops, we made a mistake, this didn't happen.  She

13  stuck by her story.

14          Now, I want to just briefly mention Louise May.  I

15  mean, shockingly, Ms. Warren triple down on her lie during

16  this trial.  Now she is bringing in her mother-in-law, Louise

17  May, to come in and try to cover for her.  Remember,

18  Ms. Warren testified under oath on the circumstances

19  surrounding her leaving the courthouse before.  You heard

20  testimony in August 2016, under oath, about calls she made

21  about leaving the courthouse and never once mentioned Louise

22  May or her mother-in-law.  In April, 2017, she was asked

23  questions, under oath, by her own attorney about the

24  circumstances surrounding her leaving the courthouse, and the

25  steps she took, the calls that she made.  Again, no mention

1    of Louise May.  No mention of her mother-in-law.

2            If, in fact, these calls were made, wouldn't the
3    first thing that you would do is get Louise May's phone
4    records?  She's the mother-in-law.  Hey, mom, can you just
5    get me these records?  I want to prove that I made this call
6    to you and that my records are incomplete.  That would be the
7    first thing that you would do.  Did you see any Louise May
8    phone records in this case?  No.  Because they know that that
9    didn't happen.  And, in fact, the story is especially
10   implausible, given that Louise May has, in the records show
11   from Ms. Warren's statements that she made to deputies that
12   day that she only had baby-sitting until 10:00 o'clock.  And
13   Louise May said that it takes her 30 minutes to get from the
14   home, from the Warren's home, to Jewel, where she works.  So
15   by 11:00 o'clock in the morning, Louise May is already
16   working at Jewel.  She is in the floral department.  What did
17   Louise May tell you about the rules at Jewel about people
18   being on cell phones?  Do you see, when you go over to Jewel,
19   or Mariano's, do you see people -- employees talking on their
20   cell phone?  No.  Because her cell phone is in her purse.
21   It's in a cabinet.  She is working after 11:00 o'clock.  She
22   is not talking to Ms. Warren.  She can't -- she can't take
23   that call.  So the fact that Ms. Warren is saying that after
24   she was released from her jury duty at about 11:15 she is
25   calling Louise May and they're actually having a conversation

1    is not plausible because Louise May is already at work at

2    that time, and she can't accept the phone call.  She said she

3    can't talk on her phone until she takes her break, which at

4    that point would have been 1:00 o'clock.  That never

5    happened.

6            But then you go back to, well, what about, though,

7    the calls that Commander Jennings made to her in the morning

8    that don't appear in the phone log?  Well, Chief Deputy

9    Koster told you why he didn't consider that to be

10   significant.  And that's because when the calls were made to

11   Ms. Warren, her phone was turned off.  So the call gets

12   immediately directed to a totally different number for your

13   voicemail.  It doesn't show up on your phone log.  So your

14   phone records are not going to show those calls.

15           So, you know, you think about this.  Well, why is

16   this a big deal?  You know, they're trying to say that she

17   was only 17 minutes late.  We're saying she only had a

18   30-minute lunch hour, so it was more than that.  But even

19   still, why is this a big deal?  If she is going to lie about

20   such a minor event and recruit her travel agent and now

21   recruit her mother-in-law, innocent people to come in to lie

22   for her, then what is she going to do?  What extent is she

23   going to go to to give untruthful statements regarding

24   somebody who has been arrested for a DUI?  Is she going to

25   put in the report that the person said, oh, yeah, I drank

1  three margaritas, or, oh, I was drinking beer that night?  Is

2  she going to put statements in that report, come into court,

3  raise her hand and testify under oath to convict somebody of

4  a crime when her statements are not truthful?  That's a

5  concern of the Sheriff's Office.  That should be, frankly, a

6  concern of anyone who could be arrested by a law enforcement

7  officer.  That's not what the Sheriff's Office is going to

8  tolerate.  The Sheriff's Office is not going to tolerate

9  people who are willing to go to such extreme lengths to lie

10  and cover up the lies.

11        So then we get to Chief Deputy Koster's

12  recommendation.  I'm not going to go through it all.  You can

13  certainly take a look at both Defendant's Exhibit 9 and 11.

14  There is literally pages and pages of his reasoning and

15  thought process that he went through in making his

16  recommendations.

17        So certainly there is no evidence to show that

18  these individuals, the defendants, had -- were motivated in

19  any way by her gender to make these recommendations.

20        So I want to just now touch on the comparators, the

21  other deputies in terms of the discipline and whether or not

22  they should have been terminated.  The evidence is that none

23  of them were untruthful when they were investigated.  And if

24  they said something that maybe there was some discrepancies,

25  they couldn't prove who was telling the truth and who was

1    not, the same situation happened with Ms. Warren.  You will
2    recall that the deputies going through the courthouse, they
3    gave conflicting statements.  They made statements about what
4    Ms. Warren said, Ms. Warren denied it.  So, again, we have
5    statements that don't necessarily mesh.  Was Ms. Warren
6    terminated or disciplined for the conflict between the
7    courtroom deputies, their statements and hers?  No, she was
8    not.

9          The individuals with respect to their timesheets.
10   Remember, always go back to Jean Dunahoe and Buffalo Wild
11   Wings.  She lied and said she was sick when she wasn't.  Was
12   she terminated?  No, she was not because that's not something
13   that the Sheriff's Office considers a terminable offense.

14         So then you get to the situation of Deputy Levy.
15   Deputy Levy, there was an extensive investigation into Deputy
16   Levy.  There was never any inmates that came forth in 2011,
17   that said that they had sexual relations with either Deputy
18   Levy or Deputy Brennan.  They keep saying how in 2011, they
19   had sex with inmates.  There is no evidence whatsoever in the
20   exhibits to support that any inmate was making that
21   allegation in 2011.  It was only the provocative letter.  It
22   was a he-said, she-said.  There is no evidence to support
23   that.

24         You know, always focus on that Jury Instruction No.
25   24.  Jury Instruction No. 24, again, reminds you that when

1   you consider whether or not the male coworkers are similarly

2   situated, look at, did they engage in similar conduct without

3   differentiating or mitigating circumstances?  None of those

4   other deputies double down and recruited other people to lie,

5   lied under their formal interrogation.  Like we said earlier,

6   there is over 3,000 pages of disciplinary records that we

7   turned over to plaintiff.  They're cherry-picking a few of

8   those and trying to say that these individuals were treated

9   worse.  And the individuals that we turned over the records

10  for were only for the corrections division.  That doesn't

11  even include all the people in the patrol division.

12  Certainly a lot of discipline going on.  As Commander

13  Jennings said, virtually every single person in the

14  corrections division has been disciplined.

15          So, you know, certainly when you read something on

16  a piece of paper, it's very hard to get a feel for what

17  motivated somebody to recommend the discipline.  But keep in

18  mind that, in most of these situations, the investigation

19  initiated with a sergeant, and it was just Commander Jennings

20  or Chief Deputy Koster that was reviewing the investigation

21  done by someone else.  And, in fact, there was certainly a

22  situation where Commander Jennings recommended more severe

23  punishment for the employee than the sergeant had

24  recommended.

25          But this case is really about the truth.  Who is

1   truthful and who is not.  No one who was truthful -- not only
2   was she untruthful in 2014, but you also have to consider
3   whether she was untruthful during this trial.  You know, look
4   at Instruction No. 14, which says that you must decide who is
5   being truthful.  That's part of your role as a juror in this
6   case, is that you must decide whether the testimony of each
7   witness is truthful or not.  And we submit to you that, when
8   you look at the evidence in this case, it's not difficult to
9   see who is being truthful.  Certainly not Judge Pilmer, he
10  was being truthful.  There is no reason for him to lie.
11  Christine Fidler, no reason for her to lie.  Deputy Little,
12  he came in here today, no reason for him to lie.  Tracy Page,
13  Lisa Bowen, they certainly weren't lying.  Do you really
14  believe Ms. Warren when she told you under oath that she was
15  told to return to the courthouse after lunch, she received
16  this call from the travel agent, that she didn't try to
17  falsely get Christine Fidler to send her the e-mail, she
18  thought the redacted call was actually from Christine Fidler,
19  her husband deletes the call logs, she calls her
20  mother-in-law, not once, but twice.  You know, at least, if
21  anything, Ms. Warren is being consistently untruthful.  She
22  was untruthful from the beginning.  She was untruthful at the
23  end.  She has shown no remorse whatsoever.  To award her
24  judgment and damages based on her clear falsehoods would
25  perpetuate -- it would be, really, a travesty of justice.

1    So the evidence in this case absolutely establishes

2  that Ms. Warren was not discriminated against based on her

3  gender by any of the defendants.  She has failed to meet her

4  burden on her claims.  You may not agree with the decision to

5  terminate, but certainly there can be no disagreement that

6  the basis of that decision was not illegal and that they

7  honestly believe she was being untruthful during the

8  investigation.

9    So, now, when you go back to the jury room and

10  you're looking at the verdict form, it's going to be

11  extremely simple for you to fill out.  Question No. 1:  "Has

12  Carrie Warren proven that her gender was a motivating factor

13  in any of the defendants' decisions or recommendations to

14  fire her?"  You get to Question 1, your answer to that is,

15  no, and then you're done.  Once you answer that question no,

16  your deliberations are over, you can sign and date the form.

17  You don't need to answer the other questions.

18    And so for those reasons, we ask that you return a

19  verdict in favor of all of the defendants, answer no to that

20  question, and not award her any damages.  Thank you.

21    THE COURT:  All right.  Thank you.

22    All right.  Rebuttal argument by the plaintiff.

23    MS. McLAUGHLIN:  I do, but may I ask for

24  three minutes to --

25    THE COURT:  Sure, we'll take a five-minute break to

1    let everyone stretch their legs and let counsel collect her

2    documents.  So five minutes, but then you'll be back.  And

3    then after closing -- the final closing argument, you will

4    get to have some lunch.

5            COURT SECURITY OFFICER:  All rise.

6            (Jury out at 12:09 p.m.)

7            THE COURT:  All right.  We'll pick it up in five

8    minutes.

9            (Recess from 12:09 p.m. to 12:14 p.m.)

10           THE COURT:  Ready for the jury?  Okay.  Let's bring

11   in the jury.

12           (Jury in at 12:14 p.m.)

13           THE COURT:  All right.  Please be seated, Ladies

14   and Gentlemen.  The law allows a plaintiff an extra argument.

15   They have the burden of proof.  So at closing arguments,

16   plaintiffs give their closing argument, defense responds,

17   then plaintiff is given a chance for a brief rebuttal

18   argument.  And the law allows that because they have the

19   burden of proof.  So with that, plaintiff may give her

20   rebuttal argument.

21           REBUTTAL ARGUMENT ON BEHALF OF THE PLAINTIFF

22           MS. McLAUGHLIN:  Good afternoon.  I also want to

23   thank you on behalf of myself, my co-counsel, Karen Doran,

24   and our client, Carrie Warren, for your time during this

25   trial.  We know it's an imposition in your lives, and we do

1    appreciate you taking the time out.

2            I hope you all have appreciated learning about the

3    process of how sausage is made, you know, so to speak.  And

4    you get to see it up close and personal now, not just what

5    you see on TV.  And I hope that it has been a rewarding

6    experience for you over all.

7            So the last thing that counsel said was we're

8    cherry-picking documents.  Damn straight we're cherry-picking

9    documents.  You heard the testimony.  Thousands of thousands

10   of documents that have been produced in this.  Twenty

11   disciplines a week that they looked through.  Yeah.  You can

12   thank me later as to how we culled it down for you.

13           But what I want you to -- what I want to address

14   now just is some of the statements that Ms. Bruch made.  And

15   the first thing that jumps out, you've heard an awful lot

16   about the credibility issues, and I'm going to touch on that

17   in just a moment.  But she said -- she mentioned or brought

18   up that the formal interrogation was just to get confirmation

19   that what she said was truthful, that what Carrie Warren said

20   was truthful.  And I believe Chief Koster also testified --

21   both Chief Koster and Jennings testified that that was --

22   that's the intent of a formal interrogation.

23           When you go back to the jury room, there is the

24   formal interrogation of Michael Dean that was conducted by

25   Chief Koster.  It is Plaintiff's Exhibit 48.  It's going to

1   be worth it for me to take a few minutes to walk you through
2   that and let you decide whether or not the formal
3   interrogation of Carrie Warren was in any way consistent with
4   how they treat their male deputies.

5          So, if you recall, this is the Plaintiff's 48, and
6   it's the formal interrogation of Michael Dean.  And it
7   apparently started at 2:53 in the afternoon, and it ended, I
8   believe, at 3:41.  You'll see that in the document.  And so,
9   you know, almost an hour.  Carrie's formal interrogation?
10  11 minutes.

11         So, if you recall, the last violation that Dean got
12  terminated for was that he was in the master control, and he
13  was supposed to be watching the video monitors, and there was
14  an altercation where an inmate assaulted another deputy.  And
15  he should have seen that on the video monitor and had called
16  for -- called for backup.  And he claimed he didn't see it.
17  And they didn't believe him, so they were investigating that,
18  for untruthfulness, that he did not -- that he -- well, he
19  lied that he didn't see it, and that he did see it, and he
20  didn't call for backup, which would have been the proper
21  procedure.

22         Okay.  So that's the background for you.  So we
23  have -- now, first, Chief Koster, he confirms that Michael
24  Dean had received the amended notice of charges of the
25  allegations.  And then he confirms, oh, I just want you to

1   know, I have an additional amended notification.  I have

2   added a charge of neglect of duty or inattention to duty.

3   Now, recall that Chief Koster said, I don't have to amend any

4   charges when I want to add a different charge.  No, don't

5   have to do that.

6        So the next thing he does, as you go through this,

7   is he directs Michael Dean's attention to the Code of

8   Conduct.  And he directs them to the truthfulness section of

9   the Code of Conduct, and ask, "Have you read and understand

10  that provision of the Code of Conduct?"

11       The next thing he does, and he continues on with

12  that, there is a whole exchange, and he is saying, "Do you

13  understand that making false statements, either verbal or

14  written, as part of your official duties can be used to

15  impeach you?

16       "Do you understand that deputies who make false or

17  untrue statements as part of their official duties can create

18  a substantial liability of risk to their employer?

19       "Do you understand that deputies who are known to

20  have made false or untrue statements as part of their

21  official duties can be perceived as not being reliable to

22  accurately and truthfully report?"

23       He's making sure that Michael Dean understands the

24  charges that he is facing.

25       Then he says, "What I'd like to do now is turn your

1    attention to a video."  He shows Michael Dean a video at the

2    formal interrogation.  And he asks about the video.  He says,

3    if you had observed -- this is the scene of the arresting

4    officer -- I'm sorry, of the officer and the inmate having

5    the scuffle.

6          And he says, "If you had observed interaction

7    between an arresting officer and an arrestee as depicted in

8    this video and a supervisor asked you if you had 'seen

9    anything' relating to their interaction, would you understand

10   that you would be expected and required to report your

11   observations to that supervisor?"

12         So, again, he is totally making sure that it is

13   very clear Michael Dean understands what he is being charged

14   with and giving him every opportunity to respond.

15         So he asks -- he even asks, "Per your recollection,

16   does this video accurately depict you as you were in master

17   control that, the night; right?"

18         Did anybody ever ask Carrie Warren about the videos

19   and say, is this accurate?  Is this what happened?  And if

20   you had looked at what happened -- well, they don't depict

21   what the deputies, all those written notices were accusing

22   her of.

23         But, at any rate, let's look here.  So they show

24   him the video, and, "Can you tell me -- you appear to move

25   your hand up towards your shoulder in the video.  Can you

1  tell me what that movement was?"

2      Again, getting -- getting Michael Dean's side of

3  the story and being sure to be as complete as possible about

4  it.

5      He asks, "To follow up and finish with my last

6  question, you're moving your hand to your shoulder was

7  preparing to make a radio call."  Again, making clear that he

8  understood what that motion was.

9      Then he asks a very direct question, the one that

10  requires that yes-or-no answer, I would think.  "Did Sergeant

11  Russo ask you if you had seen a disturbance or unusual

12  interaction on -- between the arresting officer and the

13  arrestee in this instance?"

14      "She --" He starts to say something; right?

15      Koster interrupts and says, "I would like you to

16  answer the question, and if you have specifics, I'll allow

17  you to clarify.  Did she ask you, did she ask you, did you

18  see a disturbance or unusual interaction.  And don't mince

19  words with me here.  If there was something that a reasonable

20  person would understand what she was asking about, did she

21  ask you that?"

22      So then Koster says, "Now please go ahead and

23  describe what specific question you are saying, you state

24  that she asked you."  So there was a dispute.  He wants you

25  to clarify.

1       "Okay. So to clarify for the record, any statement

2    by Sergeant Russo in which she says that on two separate

3    occasions she specifically asked you..." clarify.

4       Next page. "So let me clarify the question..."

5       Then he goes back, and he discusses the 2005,

6    suspension for sick leave violation, neglect of duty and

7    insubordination. And if you recall, Ladies and Gentlemen, we

8    referenced that and had testimony about that. He was charged

9    for untruthfulness back in 2005. And Chief Koster says, I

10   don't take that into account, that's not my thing. People

11   lie about sick leave, et cetera.

12      But Chief Koster is asking him about the 2005,

13   incident, and he says, "Okay. And you were not sick? You

14   called in sick to not work the shift? You did call in sick

15   to avoid working that shift." Then he goes on.

16      "Would you consider that a truthful, honest report

17   to the Kendal County Sheriff's Office, that report of sick

18   leave, the report that you were calling in sick. Was that a

19   truthful and honest report of illness?

20      "Would you characterize an employee communicating

21   to their employer that they were ill or needed to utilize

22   sick leave, when, in fact, they were not ill, would you

23   consider that a false or untrue report?"

24      And then he moves on down to the pat down where,

25   again, that was another incident earlier that year in 2014,

1    that Michael Dean was accused of untruthfulness.

2          And the note.  Dean asks, "Well, if I could just

3    explain to you when I walked back into, after I was relieved

4    by Deputy Delacruz.  Is that okay?"

5          Koster says, "Sure." Give me your explanation.

6          Again, "Let me clarify, did she direct that

7    question specifically to you?"

8          Again, "So just to clarify..."

9          Next page.  "I want to be very clear that you

10   understand this that you are saying that she did not ask

11   you..." blah, blah, blah.

12         Again, little later on, "I want to be clear and

13   answer me clearly."

14         And then, finally, I want to note that the -- the

15   union rep, and he has an FOP union rep over here.  And the

16   union rep is allowed to ask him questions and clarify

17   matters.

18         Take a look at that document, Ladies and Gentlemen.

19   Take a look at that and compare it to the audio that you

20   heard and the transcript that we have provided you concerning

21   Carrie Warren.  You decide if Chief Koster was telling you

22   and Sabrina Jennings were telling you the truth about what

23   the purpose of formal interrogation was.  You decide whether

24   or not when he decided to print up two minutes, two minutes,

25   of Carrie Warren's formal interrogation, it only lasted 11,

1    but he took two minutes out of it, and that's what he was

2    going to use to support his claim.  You decide whether or not

3    they were already in railroad mode, that they were not

4    already pre-determined that they were going to be terminating

5    my client for untruthfulness.

6         Now I want to address a few other things that

7    Ms. Bruch references.  She references Judge Pilmer.  No one

8    is ever saying that Judge Pilmer didn't write his memo and

9    that -- that he might have been justified in doing so.  Take

10   a look at that memo.  He had busted pipes.  He was a little

11   irritated that day.  Might he not have reacted so strongly to

12   what he perceived as Carrie trying to get out of jury duty on

13   any other day?  Maybe, I don't know.  But then he was also

14   told, as is explained in the memo, I was told that she was

15   rude to the entire courthouse staff.  And I was told that she

16   was violating our Facebook policy.  So, okay, I'll add --

17   I'll add my weight to it too, and I'll submit a memo.  We're

18   not saying that he was part of any conspiracy, or anything.

19   But look at the circumstances.

20        Ms. Bruch glosses over the notice of charges, what

21   Carrie was initially brought in for, the whole -- the whole

22   making a disturbance at the courthouse entrance.  She

23   complained.  That's a characterization.  Carrie says, yeah, I

24   stated, I'm having a conversation with my coworkers.  Yeah, I

25   said, gee, you know, I don't have a baby-sitter, it's cold as

1    Hell out here, you know.  That could be characterized as
2    complaining.  Did anyone -- there is no testimony that anyone
3    within earshot even knew that she was a sheriff's deputy.
4    There is nothing in here.  So how is it that she is
5    embarrassing the Sheriff's Office?  Then, of course, you saw
6    the video.  There was nothing in her demeanor or actions that
7    would indicate that she was, like, on a rant.  But that's
8    what those notes say.  When you go back, we didn't go over
9    them in a lot of detail, but they're in the record.  These
10   deputies are saying, we have to move her along because she
11   was embarrassing us.  That's not what the video shows.

12            The bottom line is whatever happened in the
13   courthouse, something smells about that investigation.  I
14   don't know what it is.  May never know what it is.  But
15   something doesn't (sic.), smell.  But the defendants took
16   advantage of a situation and they said, huh, okay, we're
17   going to get her.

18            Jennings says, I never, ever, ever thought of
19   untruthfulness until after she lied to me at the formal
20   interrogation.  February 5th, she says, I walked into
21   Koster's office afterwards and said, she lied to me.  Like it
22   was a big shock.  Do you believe that?  Do you really believe
23   that?  Look at the records.  She started investigating for
24   untruthfulness and the supposed lie about having to go back
25   to the courtroom the next -- the day after she got notice of

1    any incident happening.  She -- there is a memo in there from

2    Nikki Swiss dated January 9th.  That's two days after; right?

3            (Audio interruption.)

4            MS. McLAUGHLIN:  Is that your phone, again?

5    (Laughter.)

6            THE COURT:  That's not mine.  And this happened

7    once during the trial.  Why don't we wait until this stops.  I

8    apologize.  I don't know how this is happening.

9            (Pause in the proceedings.)

10           THE COURT:  All right.  That's how it happened last

11   time and how it was completed, so you can start up again.  I

12   apologize.

13           MS. McLAUGHLIN:  So Jennings is saying, no, I

14   didn't even think of untruthfulness.  But look back, the

15   testimony was that on -- on the eighth, the very -- yeah, I

16   believe it's the eighth, so the day after she gets notice of

17   everything, she talks to Leinen, and she asks Leinen to get

18   Nikki Swiss to send a memo saying that she never was released

19   for just lunch.  So she is already looking into the

20   untruthfulness issue from practically Day One.  And, yet, she

21   got up here, and she said, yeah, I believed her completely.

22   I never thought she was untruthful.  She repeated that over

23   and over again.  And she also said that she never talked to

24   Chief Koster about this untruthfulness jazz either.  But

25   Chief Koster said, oh, yeah, I was thinking about it by

1   then -- before then.  And Chief Koster provides Jennings with
2   a list of questions and says, quite clearly, get her for
3   falsely saying this, get her for falsely saying that.  He
4   uses the word falsely in those -- in those questions.  Those
5   questions that she basically had the same identical questions
6   that she asked -- that she typed up and she asked Carrie at
7   the interrogation.

8         Do you really believe that they didn't discuss and
9   they weren't opting to go, okay, we're going to get her on
10  the untruthfulness charge during that formal interrogation?
11  During that formal interrogation, which they didn't give her
12  a second notice saying untruthfulness is going to be an issue
13  now, they gave Michael Dean that option.  Twice they amended
14  his charges.  Not for Carrie.  No, no, no.

15        And the Leinen memo.  Oh, my God.  We know that
16  Leinen was not told by Jennings when he -- she asked him to
17  deliver the message.  We know that he did not -- that she did
18  not say the word immediately.  And we know from Leinen's
19  testimony, his deposition was read in, that he did not
20  necessarily form an opinion that it was immediately.  Yet,
21  all of a sudden, immediately is in those records.  And why is
22  it in those records?  It's changed two weeks later.  Two
23  weeks later.  January 21st.  And why is it changed?  Do you
24  really believe that it wasn't at Koster's direction that
25  Leinen didn't change that memo?  And then Jennings says, I

1    had no knowledge that the memo was changed.  Yet, in her

2    report, the report that she had already given to Koster, she

3    attributes Leinen with saying the word immediately.  That

4    document was changed after the fact, Ladies and Gentlemen.

5            You know, all these documents, they're both a

6    blessing and a curse; right?  They document everything.  So

7    then it makes it really, really obvious when they don't

8    document things.  Think about that when you're reviewing

9    these documents.

10            We've gone over these phone records ad nauseam.

11   Today we heard from Deputy Little, out of the blue.  His

12   testimony comes to light two weeks ago, apparently.  Shows up

13   yesterday afternoon, well, and this morning, to testify.

14   Ladies and Gentlemen, he is their Hail Mary.  He is their

15   Hail Mary.

16            What did Deputy Little say?  He was at her house.

17   Carrie admitted that, yes.  He was her union rep.  They went

18   to her house.  After they got the packet of materials, Joint

19   Exhibit 3, you'll see it, all the -- all the memos, and

20   et cetera.  And they went -- and they went straight to her

21   house after getting these memos.  And Deputy Little says the

22   phone record was already printed up when he got there?  Huh?

23   They hadn't looked at the documents.  They were looking at

24   them at her house.  They hadn't looked at the documents yet.

25   Nobody knew that there was any issue regarding truth about

1   her having to go back to the courthouse to report at lunch

2   time and then get released. Nobody knew that yet. And

3   Deputy Little is saying, oh, no, no, no, that's what we

4   were -- that's what we were going to go look for. And the

5   records were already printed up. He said, very clearly, he

6   didn't see Jeff and Carrie print them up, they were

7   already -- they were already printed up when he got there.

8   They had no knowledge that this was at issue.

9          And then think about what he said. All he did was

10  hear Carrie say -- well, he did hear Jeff saying, apparently

11  they did have some discussion at some point about phone

12  records, and Jeff is like, that's none of their business,

13  those are my -- no way, I'm not giving them. And he may have

14  even said something along the lines of, you know, if I have

15  to give them to him, I'm going to redact them. But think

16  about it. Deputy Little also says, all Carrie said when she

17  was looking through these records was, this must be it, this

18  must be it. And he said, yeah, I thought she had found the

19  phone call. We know that she never found the phone call.

20  It's not there. It would take, what, on the phone record

21  itself, it's, you know, what, three, four lines? It would

22  take you, what, less than a minute to determine that the

23  phone call isn't there? And, yet, he is saying she was

24  saying, oh, yeah, I remember saying, this must be it, this

25  must be it, this must be it. It doesn't make any sense. He

1   wasn't -- this conversation didn't occur.  He is lying, pure
2   and simple.  He is lying.  Why is he lying?  I can only
3   speculate, you can only speculate.  But his story does not
4   make any sense.  Yes, he was there.  Yes, they were talking
5   about the reports that were in the packet.  But you heard --
6   you heard him also testify that Carrie found -- found the
7   phone call, the missing phone call.  That was his impression.
8   You know why he is lying?  Because he doesn't really know
9   what this case is about.  He has just been told to come in
10  here and testify.  He hasn't been part of this case for the
11  last four years.  He doesn't know what this all is about.  He
12  was told to come in here and testify.

13          I'm not going to belabor a whole lot of the --
14  another glaring thing, though.  I have to comment on some of
15  these things.  Ms. Bruch says that Carrie's phone was turned
16  off that morning, and that's why Chief Koster said that, oh,
17  that's why the records don't show up.  There is absolutely
18  no, no evidence in this record that Carrie's phone was turned
19  off.  The only person to testify about that was Carrie.  And
20  she said, no, I don't -- it's not my habit.  I don't turn off
21  my phone, I charge it while it's on.  And, yet, they boldly
22  say, it was turned off so that's why Jennings' phone calls,
23  which we know were made, don't show up.

24          Ms. Bruch is trying to convince you that there was
25  no evidence of untruthfulness with respect to the comparators

1   that we threw out there.  You're going to have to decide

2   that.  But keep in mind, with Levy, Scott Koster testified, I

3   did not believe him.  What more direct evidence is there that

4   there was evidence that he -- or that they were under that

5   belief, that he lied?  But they don't do anything.

6           With Jasnosz, Chief Koster said, there was no way

7   he didn't understand my first directive.  That's what he

8   wrote in his -- in his memorandum.  Take a look at his

9   memorandum.  In court, he gets up and he says, maybe he did

10  misunderstand.

11          And think about that license plate, Ladies and

12  Gentlemen.  He got caught red-handed.  I want to say with his

13  pants down, but I'll resist that.  Although, I just said it,

14  didn't I?  So he gets caught, and he knows that Burgness

15  (sic.), what the testimony was, let me refresh your

16  recollection, that Burgness, right, had checked on LEADS to

17  find out the license plate.  So he goes, and he changes his

18  license plate so it doesn't connect up so that maybe Burgness

19  will go away and all those things will go away.  And you want

20  to believe the cock and bull that they said, oh, he was

21  involved in an undercover, and so that's why he changed his

22  license plate?  Did they ever check out that story?  No, they

23  never checked it out.  Think about what they -- see, this

24  case is about defendants' actions and their inactions.

25          And when you take away everything else, what's

1   left?  Carrie is a woman.  That's what's left.  You are

2   allowed to make that inference.  You are allowed to say, they

3   have treated all the men this way, they don't treat her this

4   way.  What's the difference?  It has got to be sex.  You're

5   allowed to do that.

6          And keep in mind, Ladies and Gentlemen, your

7   instruction, all it need be is a motivating factor.  There

8   might be some other things that entered into things, but also

9   keep in mind that Koster said, if all we had was what -- no,

10  it was Jennings who said, if all we had was the

11  information -- nothing to do with the truthfulness issue.  If

12  all we had was the information from the deputies and the

13  courthouse and the video, and Pilmer's statement, et cetera,

14  she wouldn't have gotten more than a three-day suspension.

15  But keep in mind that gender discrimination need only be a

16  motivating factor.  It doesn't need to be the motivating

17  factor.  There may not -- there may be other things that come

18  into mind, but as long as gender is playing a part in the

19  decision, it is legally sanctionable.

20         Think of it like this:  Take a glass of water,

21  clear glass of water.  And you say, okay, well, there is

22  this, that's in defendant's favor, there is this, you know,

23  whatever, pour a little water, clear water.  Think of a

24  food -- think of a drop of food coloring.  That's gender

25  discrimination.  Okay?  One drop into that glass of water.

1   What happens?  The whole -- the whole glass turns color.  And

2   that's because gender discrimination permeates everything.

3   Keep that in mind.  Thank you so much for your time.

4          THE COURT:  All right.  Thank you.  Ladies and

5   Gentlemen, if you could turn your instructions to Page 30.

6          Upon retiring to the jury room, you must select a

7   presiding juror.  The presiding juror will preside over your

8   deliberations and will be your representative here in court.

9          A form of verdict has been prepared for you.  Take

10  this form to the jury room, and when you've reached unanimous

11  agreement on the verdict, your presiding juror will fill it

12  in and date it, and all of you will sign it.

13         I do not anticipate that you will need to

14  communicate with me.  If you do need to communicate with me,

15  the only proper way is in writing.  The writing must be

16  signed by the presiding juror, or, if he or she is unwilling

17  to do so, by some other juror.  The writing should be given

18  to the court security officer, who will give it to me.  I

19  will respond either in writing or by having you return to the

20  courtroom so that I can respond orally.

21         The verdict must represent the considered judgment

22  of each juror.  Your verdict, whether for or against the

23  parties, must be unanimous.

24         You should make every reasonable effort to reach a

25  verdict.  In doing so, you should consult with one another,

1   express your own views, and listen to the opinions of your

2   fellow jurors.  Discuss your differences with an open mind.

3   Do not hesitate to reexamine your own views and change your

4   opinion if you come to believe it is wrong.  But you should

5   not surrender your honest beliefs about the weight or effect

6   of evidence solely because of the opinions of other jurors or

7   for the purpose of reaching a unanimous verdict.

8          All of you should give fair and equal consideration

9   to all the evidence and deliberate with the goal of reaching

10  an agreement that is consistent with the individual judgment

11  of each juror.  You are the impartial judges of the facts.

12         The verdict form, I will give to the court security

13  officer.  I am going to swear him in.  Normally Sandy does

14  that, so I will swear him in, based on my recollection of

15  what that oath is, which is, please, sir, raise your right

16  hand.

17         THE CLERK:  I am right here.

18         THE COURT:  You are there.  All right.  Well, then,

19  she will swear in the court security officer.

20     (Court security officer duly sworn.)

21         COURT SECURITY OFFICER:  I do.

22         THE COURT:  All right.  That's exactly what I was

23  going to say.

24     (Laughter.)

25         THE CLERK:  You would probably say it better.

1    THE COURT:  I will give a verdict form to the court

2  security officer.  All of the hard copy exhibits that were

3  admitted in evidence will be brought back to you.  There were

4  some videos and a tape, which were played to you.  If you

5  desire to hear those or see those again, give a note to the

6  court security officer, we'll have you come to court, we'll

7  play it to you in court, and then -- if it's something you

8  want to see again.  So just give a note to the court security

9  officer.

10    He is going to take you down to lunch.  You can

11  begin your deliberations either before you go down or when

12  you come back, but the case is now in your hands.

13    The schedule is yours.  You can go tonight, you can

14  return a verdict this afternoon, if you've reached a

15  unanimous verdict.  If you haven't, you can go a little later

16  than 4:30, if you collectively all want to do that.  If you

17  think you can reach a verdict today, you can go later, but

18  not much later than 5:30 or 6:00 because of the schedules of

19  the other people involved in the case.

20    If you don't reach a verdict today, you'll come

21  back tomorrow morning at a time you'll agree upon, but really

22  no later than 9:00 o'clock, to begin -- continue your

23  deliberations until you've reached a unanimous verdict.

24    So with that, I will give the verdict form to the

25  court security officer, and you are excused.

1           (Jury out at 12:53 p.m.)

2           THE COURT:  All right.  Anything we need to put on

3 the record?

4           MS. DORAN:  No.

5           MS. BRUCH:  No, your Honor.

6           THE COURT:  All right.  What I would like to do,

7 then, is two things.  One, you all need to provide contact

8 information to Ms. Newland so we know we can reach you.  You

9 shouldn't be very far away if we receive a note from the jury

10 so we can answer that note, or if we have a verdict.  But,

11 either way, make sure she has contact information for you.

12           Are you all going to remain in the building?

13           MS. BRUCH:  Yes.

14           MS. DORAN:  Yes.

15           THE COURT:  Okay.  Good.  So that won't be a

16 problem.  But we need to be able to reach you with a cell

17 phone, or if you're down in the cafeteria, or somewhere else.

18           Secondly, you need to gather all of the exhibits

19 that have been admitted, put them in a box of some kind, or

20 if they're in separate binders, that's fine.  And then I need

21 on the record that each side has agreed they reviewed all the

22 exhibits going back to the jury and the exhibits that are

23 going back are by agreement with both sides.  Are you

24 prepared to do that right now?

25           MS. ANDERSON:  Yes, your Honor.

```
 1            THE COURT:  All right.  Let's shut the back door,
 2    please.
 3            All right.  What do you have by way of organizing
 4    the exhibits?  Are they in binders, or are they loose?
 5            MS. ANDERSON:  We have two binders, your Honor.
 6    One for defendants, one joint and plaintiffs, combined.
 7            THE COURT:  Okay.  Why don't you hand those to
 8    Ms. Newland.
 9            MS. DORAN:  Our contact information?
10            THE COURT:  You can give that to her too.
11            THE COURT:  So the two binders are --
12            THE CLERK:  Is this what everybody agrees on?  Why
13    don't you look at it, make sure you're in agreement.
14            THE COURT:  Let's go off the record for a minute.
15        (Discussion had off the record.)
16            THE COURT:  Let's go on the record.  First, does
17    plaintiff agree that the two binders contain only exhibits
18    that have been admitted into evidence and are all the
19    exhibits admitted into evidence, other than the hard copy
20    disks or other electronic media?
21            MS. McLAUGHLIN:  Right.
22            THE COURT:  Plaintiff agrees?
23            MS. DORAN:  Yes.
24            THE COURT:  And does defense agree with the same?
25            MS. ANDERSON:  Yes, your Honor.
```

1    THE COURT:  Okay. Then those will be taken back to
2    the jury right now.
3    Okay.  And then the other thing is, if you want to
4    talk to the jury after the verdict, I allow you to do it,
5    provided whoever is going back agrees not to use anything
6    they learn in any discussions with the jury to impeach the
7    verdict.  Does plaintiff want to go back and talk to the jury
8    after the verdict?
9    MS. DORAN:  We do.
10    THE COURT:  All right.  Do you agree that you won't
11    use anything you learn in any of those discussions to attempt
12    to impeach the verdict?
13    MS. DORAN:  Of course.  Yes.
14    THE COURT:  All right.  Does defense?
15    MS. BRUCH:  Yes.
16    THE COURT:  Do you also agree not to use anything
17    you learn to impeach the verdict?
18    MS. BRUCH:  Yes.
19    THE COURT:  All right.  I don't allow parties to go
20    back and talk to the jury.  The jury is free to talk to
21    parties after, if they want to.  But I do allow attorneys to
22    go back, and externs, anybody associated with the team, other
23    than parties themselves, can go back to the jury to talk to
24    them after, if the jury chooses to speak with you, and that's
25    their call.

1    Okay.  Then, good luck, everyone, and we will

2    contact you when we have any communications with the jury.

3            MS. McLAUGHLIN:  The jury is going to lunch first;

4    right?

5            THE COURT:  They're going to lunch.  I assume

6    they're going right now, unless they want to go back and --

7            MS. McLAUGHLIN:  Because I was thinking to

8    actually, like, go across the street for lunch.

9            THE COURT: That's fine.

10           MS. McLAUGHLIN:  I'm thinking it's probably safe

11   for an hour.

12           THE COURT:  Certainly, I think it is.

13           MS. McLAUGHLIN:  I'm kind of sick of the cafeteria

14   food.

15           THE COURT:  Understood.  Okay.

16           THE CLERK:  So this is all that's going back?

17           THE COURT:  Yes.  Okay.  So that can go back.

18        (Proceedings concluded.)

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3        We, LAURA R. RENKE and SANDRA M. MULLIN, certify that the

4    foregoing is a correct transcript of the record of proceedings

5    in the above-entitled matter.

6

7    /s/ LAURA R. RENKE                        July 25, 2018
     LAURA R. RENKE, CSR, RDR, CRR
8    Official Court Reporter

9
     /s/ SANDRA M. MULLIN                      July 25, 2018
10   SANDRA M. MULLIN, CSR, RMR, FCRR
     Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25